No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

---

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

---

**PETITIONER'S EMERGENCY MOTION FOR STAY PENDING REVIEW**

**Relief Requested By March 26, 2026**

---

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

March 11, 2026

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

## CERTIFICATE OF COMPLIANCE WITH RULE 18

The motion complies with Circuit Rule 18 and Federal Rule of Appellate Procedure 18. On March 9, 2026, Petitioner's counsel requested in writing that, pending judicial review, the Department of War stay its 41 U.S.C. § 4713 Notice, which implements Secretary Hegseth's directive of February 27, 2026. Petitioner's counsel informed the Department that, in light of the urgent need for judicial relief, Anthropic would treat its stay request as constructively denied without a decision from the Department by March 11, 2026 at 12 p.m. ET, and would then seek a stay from this Court pending judicial review. Petitioner's counsel did not receive a response from the Department. Because it would be impracticable to wait for a decision by the Department, Anthropic has complied with Circuit Rule 18 and Federal Rule of Appellate Procedure 18. **Petitioner's counsel notified counsel for Respondents on March 11, 2026, by phone and email, that this motion would be filed. After conferring with counsel for Respondents, the parties agreed that Respondents will respond to the motion by March 19, 2026, and Petitioner will file a reply by March 23, 2026.**

# TABLE OF CONTENTS

Page

CERTIFICATE OF COMPLIANCE WITH RULE 18...............................................i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .................................................................................1

BACKGROUND ..................................................................................4

    A.    Statutory Background.................................................................4

    B.    Factual and Procedural Background ......................................6

        1.    Anthropic's Mission............................................................6

        2.    The Department's Use Of Claude....................................7

        3.    The Department's About-Face..........................................8

        4.    Retaliation Against Anthropic .................................10

ARGUMENT .....................................................................................11

I.    ANTHROPIC IS LIKELY TO SUCCEED ON THE MERITS ...................................12

    A.    The Secretary's Actions Are Contrary To Law And Arbitrary And Capricious.....................................................................12

    B.    The Secretary's Actions Violate Due Process ...................17

    C.    The Secretary's Actions Violate The First Amendment....................19

II.    ANTHROPIC IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM .......................................................................... 22

III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR A STAY ......24

CONCLUSION.................................................................................25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES [*]

*Amerijet International, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014)..................15

*Anthropic BPC v. Department of War*, No. 3:26-cv-01996 (N.D. Cal.) ...................3

*Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962)......................................22

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)....................................................21

*BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002) ........................................21

*Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018)..............23

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017)..........................................13

*District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015)............17

*Environmental Defense Fund, Inc. v. EPA*, 716 F.2d 915 (D.C. Cir. 1983)...........14

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)......................................18

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ........................................15

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013).....................................................24

*GTE Service Corp. v. FCC*, 205 F.3d 416 (D.C. Cir. 2000) ....................................15

*\*In re NTE Connecticut, LLC*, 26 F.4th 980 (D.C. Cir. 2022) ................................24

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 585 U.S. 878 (2018)..................................................20

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) .......................................................22

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)...............24

---

[*]     Authorities upon which Anthropic chiefly relies are marked with asterisks.

*Learning Resource, Inc. v. Trump*, 2026 WL 477534 (U.S. Feb. 20, 2026)............14

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)..............................................18

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018)..................................................19

*\*Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025)
............................................................................................................19, 21, 22

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)................................22

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State
Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)......................16

*\*National Rifle Ass'n of America v. Vullo*, 602 U.S. 175 (2024)...................... 19, 21

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................ 11, 24

*People's Mojahedin Organization of Iran v. U.S. Department of State*,
613 F.3d 220 (D.C. Cir. 2010)..........................................................................19

*Perkins Coie LLP v. U.S. Department of Justice*, 783 F.Supp.3d 105
(D.D.C. 2025) ....................................................................................................21

*President & Fellows of Harvard College v. DHS*, 788 F.Supp.3d 182
(D. Mass. 2025) ................................................................................................20

*\*Ralls Corp. v. Committee on Foreign Investment in U.S.*, 758 F.3d 296
(D.C. Cir. 2014) ................................................................................................18

*Susman Godfrey LLP v. Executive Office of the President*, 789
F.Supp.3d 15 (D.D.C. 2025) ............................................................................23

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ....................18

*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ........13

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971)......................................................18

*World Shipping Council v. Federal Maritime Commission*, 152 F.4th
215 (D.C. Cir. 2025) ........................................................................................14

*Zaid v. Executive Office of President*, 2025 WL 3724884 (D.D.C. Dec.
23, 2025)............................................................................................................23

## STATUTES AND RULES

41 U.S.C.
    § 1323 ............................................................................................4
    § 1327 ...................................................................................6, 12, 15
    § 4713 ......................................................... 4, 5, 12, 13, 15-17

Fed. R. App. P. 18 ..........................................................................i

## LEGISLATIVE MATERIAL

S. Rep. No. 115-408 (2018) ........................................................4, 16

## OTHER AUTHORITIES

*Merriam Webster's Collegiate Dictionary* (11th ed. 2014)....................................13

*Webster's Third New International Dictionary* 1510 (1993)....................................15

## INTRODUCTION

Petitioner Anthropic PBC respectfully requests a stay pending review of unlawful actions the Department of War has taken under 41 U.S.C. § 4713, a provision of the Federal Acquisition Supply Chain Security Act of 2018 (Supply Chain Security Act). Without immediate judicial intervention, the Secretary's actions will inflict escalating and irreparable harm on Anthropic and upend the statutory framework Congress enacted to govern supply-chain security determinations. Indeed, they already are.

This case involves extraordinary assertions of executive power. It began not with a reasoned agency decision but with a social media post by Secretary Hegseth designating Anthropic—an American company and leading developer of frontier artificial-intelligence (AI) systems—a "Supply-Chain Risk." The post purports to order any entity doing business with the Department to immediately cease working with Anthropic. At the same time, the Secretary directed Anthropic to continue providing its AI tools to the Department for up to six months. Other than public invective, including accusing Anthropic of "arrogance," "betrayal," and "corporate virtue-signaling," the Secretary cited no statutory authority and offered no legal or factual explanation for his directive.

When the Secretary did identify specific statutory authority, several days later, he disregarded procedural and substantive limits established by Congress.

1

The Secretary sent Anthropic a written Notice on March 4, 2026, invoking 41 U.S.C. § 4713 (Notice). The Notice formally designated Anthropic as a supply-chain risk and threat to national security under § 4713—a determination that effectively banishes Anthropic's AI models from use anywhere in the supply chains of Department contractors and threatens to trigger a broader blacklisting of Anthropic across government-wide procurement. This authority has been used—at most—only once before, and never against an American company. The statute requires that such a designation be preceded by notice of the evidence supporting it and a meaningful opportunity to respond. It further requires a written determination explaining how the statutory standards are satisfied. The Department ignored each of those safeguards. The Notice purported to take effect immediately, disclosed no supporting evidence, and offered no explanation (reasoned or otherwise) for how Anthropic purportedly met the statute's specific predicates.

These actions not only defy § 4713, they violate the Constitution. By failing to provide Anthropic with notice of the basis for the § 4713 designation or the opportunity to rebut it, the Secretary violated bedrock due process protections. The Secretary's actions also violated the First Amendment. The timing and the Secretary's own words confirm what the record makes plain: this was retaliation for Anthropic's expressive activity. The Department's actions followed directly on the heels of Anthropic's refusal to accede to the Secretary's demand that it

2

abandon two narrow but critical safety limits on the use of its AI models—its

prohibitions on the use of models for lethal autonomous warfare and mass

surveillance of Americans—as well as Anthropic's public explanation for its

decision. The retaliatory nature of the government's response is unmistakable, as

the Secretary himself criticized Anthropic for its "sanctimonious rhetoric" and

perceived "Silicon Valley ideology."

Under these exceptional circumstances, the traditional stay factors strongly

favor a stay pending judicial review. The Secretary's actions exceed his statutory

authority, both procedurally and substantively; they deprive Anthropic of the

meaningful opportunity to be heard that the Fifth Amendment guarantees; and they

reflect open retaliation for Anthropic's protected speech and petitioning activity

concerning the safe and responsible use of AI tools—matters of urgent public

concern. The harms flowing from these unlawful executive actions are immediate,

irreparable, and significant to Anthropic, and the government's unlawful acts

decidedly disserve the public interest.

If the Court denies a stay, Anthropic respectfully requests an expedited

merits-briefing schedule.[1]

---

[1]    To the extent Secretary Hegseth's post invoked a separate authority,
10 U.S.C. § 3252, Add.94 (Dunbar Decl. Ex. 2), Anthropic challenges that action
in *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-1996 (N.D. Cal.).

## BACKGROUND

### A.    Statutory Background

Congress enacted the Supply Chain Security Act to address the risk that "hostile nation states and other bad actors" could "gain unprecedented access to sensitive and classified information via the Federal [information and communications technology] supply chains." S. Rep. No. 115-408, at 2 (2018). In a nutshell, when § 4713's substantive and procedural requirements (described below) are met, the provision delegates to agency heads (including the Secretary) the power to take one or more "covered procurement actions," such as not buying products or services from a contractor or requiring a prime contractor not to use a specific subcontractor in the agency's supply chain. 41 U.S.C. § 4713(k)(4).

In addition, a § 4713 designation by an individual agency (such as the Department) can as a practical matter start an interagency process, overseen by the Federal Acquisition Security Council, resulting in "exclusion" or "removal" of Anthropic across the federal government. 41 U.S.C. § 1323.

The power to blacklist actual and prospective defense contractors and subcontractors is an extraordinary one, and the power to banish Anthropic from all government contracts even more so. Consequently, Congress built substantive limits and procedural safeguards into § 4713. Substantively, the Secretary, upon receiving a "risk assessment" showing a "significant supply chain risk," must make

4

a "written" determination that action under § 4713 is "necessary to protect national security" and that "less intrusive measures are not reasonably available to reduce such supply chain risk." 41 U.S.C. § 4713(b)(3). Congress, moreover, defined "supply chain risk" as specific kinds of risks, including "sabotage" or the "malicious[] introduc[tion of] unwanted function" to articles in the supply chain. *Id.* § 4713(k)(6). Section 4713 is also limited to defined categories of information technology and telecommunications articles. *Id.* § 4713(k)(2).

Congress further imposed critical procedural safeguards. The Secretary may invoke § 4713 authorities "only after": (1) obtaining a recommendation, including a risk assessment, identifying a "significant supply chain risk" in a "covered procurement"; (2) providing "information that forms the basis for the recommendation" to a targeted "source" (i.e., contractor); (3) affording the source 30 days to respond; and only then (4) "making a determination in writing" that the substantive predicates described above are satisfied. 41 U.S.C. § 4713(b). Congress created one limited exception to those requirements when an "urgent national security interest requires the immediate exercise" of § 4713 authorities. *Id.* § 4713(c).

Congress specified that § 4713 determinations are reviewable in this Court, based on an administrative record, and subject to constitutional, statutory,

5

procedural, and arbitrary and capricious challenges. 41 U.S.C. § 1327(b)(1)-(2), (4).

###### B.    Factual and Procedural Background

###### 1.    Anthropic's Mission

Anthropic is a leading frontier AI developer whose flagship family of AI models is known as "Claude." Founded as a public-benefit corporation, Anthropic was established based on the belief that AI technologies should be developed and used for the long-term benefit of humanity and its primary animating principle is that the most capable AI systems should be the safest and the most responsible. Add.21-22 (Kaplan Decl. ¶¶8-10).

From the beginning, Anthropic has focused on developing frontier AI models that are reliable and safe. Add.21-22 (Kaplan Decl. ¶¶8-10). That commitment is embedded in Anthropic's corporate charter and governance. Anthropic and its leaders are also prominent voices speaking on AI safety and policy. Add.38-39 (Heck Decl. ¶6); *see* Add.98-155 (Dunbar Decl. Exs. 4-5).

Claude is a large language model that interprets and responds to user prompts. Add.23-24 (Kaplan Decl. ¶¶14-16). Through training on massive datasets, Claude can perform complex tasks in a fraction of the time humans would require. Add.23 (Kaplan Decl. ¶15). Claude may also be configured to enable it to behave "agentically," meaning it can take actions on behalf of a user such as

retrieving information, can undertake actions online, and can carry out open-ended tasks that Claude plans and adapts. In certain configurations, Claude can perform tasks with minimal ongoing user input, operating with a degree of autonomy.

Like all AI models, Claude can generate inaccurate or misguided outcomes, behave unpredictably, or reflect skewed judgments embedded in training data. Add.24-25 (Kaplan Decl. ¶18). Anthropic maintains a Usage Policy to address AI risks, encourage responsible use, and identify prohibited activities contrary to the company's mission. Add.26-28 (Kaplan Dec. ¶¶21-22).

### 2.     The Department's Use Of Claude

Anthropic has committed to making its technology available to defend the United States. Add.28 (Kaplan Decl. ¶¶25-26). To that end, it built "Claude Gov"—models specifically for U.S. national-security customers. *See* Add.157-158 (Dunbar Decl. Ex. 6).

Anthropic's partnership with the Department began in 2024 and included a 2025 two-year agreement worth up to $200 million, among others. Add.48-51 (Ramasamy Decl. ¶¶4-7). To help support Anthropic's involvement with the Department over the last two years, Claude has been authorized for "FedRAMP High" and Department "Impact Level 4 and 5" workloads. Add.52 (Ramasamy Decl. ¶10). Further, after an 18-month vetting process, the Defense Counterintelligence and Security Agency granted Anthropic Top Secret facility

and personnel clearances. Add.52 (Ramasamy Decl. ¶9); Department officials have described Claude as "far and away the best model." Add.40 (Heck Deck. ¶8); *see also* Add.28 (Kaplan Decl. ¶26).

### 3.    The Department's About-Face

Anthropic has never offered any customer a model without a Usage Policy, including the Department. Add.26 (Kaplan Decl. ¶21). In March 2025, the Department began using Claude subject to a Usage Policy and government-specific addendum that restricted deployment to ensure safe, reliable use. Add.29-30 (Kaplan Decl. ¶29).

At first, the Department used Claude without objection, expanded its deployment of Anthropic, and praised Claude as a superior AI model. Add.29-30 (Kaplan Decl. ¶29); Add.40 (Heck Decl. ¶8). In September 2025, however, while Anthropic and the Department began negotiating Claude's deployment on the Department's "GenAI.mil" platform, Add.53 (Ramasamy Decl. ¶13), the Department insisted for the first time that Claude be permitted for "all lawful uses." Add.30-31 (Kaplan Decl. ¶32). Anthropic ultimately agreed, subject to two narrow but important exceptions: Claude could not be used for lethal autonomous warfare or mass surveillance of Americans. Add.40-42 (Heck Decl. ¶¶9-13); Add.31 (Kaplan Decl. ¶33). Anthropic could not remove these guardrails, it explained, because in its judgment Claude is not yet safe for either use given the

8

risk of error and underdeveloped legal frameworks. Add.31-34 (Kaplan Decl. ¶¶33-36).

Dr. Dario Amodei, Anthropic's CEO and co-founder, communicated to the Department that (to his knowledge) these guardrails have never obstructed military operations, but he agreed the Department should select the right vendor and that Anthropic would assist in an orderly offboarding if not chosen. Add.41-42 (Heck Decl. ¶¶11-13). At a meeting on February 24, 2026, Secretary Hegseth praised Claude's "exquisite capabilities," but stated that unless Anthropic agreed by February 27 to permit "all lawful uses," the Department would designate Anthropic a supply-chain risk or, paradoxically, commandeer Claude under the Defense Production Act. Add.42-43 (Heck Decl. ¶¶12, 16).

On February 26, Dr. Amodei publicly reaffirmed the importance of Anthropic's use limitations, explaining that Anthropic "cannot in good conscience accede to [the Department's] request." Add.164 (Dunbar Decl. Ex. 7). The next day, he responded in writing to the Department's most recent offer. His response attempted to reach a mutually agreeable resolution with the Department while retaining Anthropic's two essential limits—prohibiting Claude's use for lethal autonomous warfare and mass surveillance of Americans. Add.43-44 (Heck Decl. ¶18).

### 4.    Retaliation Against Anthropic

The President and Secretary Hegseth responded swiftly. On February 27, President Trump posted to TruthSocial, ordering agencies to "IMMEDIATELY CEASE" using Anthropic's technology, branding Anthropic the "Radical Left," and threatening civil and criminal consequences. Add.170 (Dunbar Decl. Ex. 8). Secretary Hegseth then issued a "final" decision on social media accusing Anthropic of "sanctimonious rhetoric," "betrayal," and "corporate virtue-signaling," and directing the Department to designate Anthropic a "Supply-Chain Risk to National Security" and bar military "contractor[s], supplier[s], [and] partner[s]" from "any commercial activity with Anthropic." Add.94 (Dunbar Decl. Ex. 2). At the same time, the Secretary announced that Anthropic would be required to continue providing Claude to the Department for up to six months (purported supply-chain risk notwithstanding). *Id.*

After continued discussions, Add.43-44 (Heck Decl. ¶¶18-19), Secretary Hegseth sent Anthropic the § 4713 Notice on March 4, dated March 3, relaying his determination that "use of [Anthropic]" in Department "covered procurements presents a supply chain risk" and that "less intrusive measures are not reasonably available to reduce such supply chain risk." Add.89 (Dunbar Decl. Ex. 1). The Notice provided no additional explanation, nor did it specify facts or evidence underlying any of the Secretary's determinations. Two days later, the Department

reportedly directed military leadership to stop using Anthropic and stop the companies they contract with from using Anthropic within 180 days. Add.96-97 (Dunbar Decl. Ex. 3).

Together, the government's actions are irreparably injuring Anthropic, as described further below. Following those actions, multiple customers have contacted Anthropic asking whether they can continue working with it. Add.74-75 (Smith Decl. ¶20). The Department itself has reached out to Anthropic customers, directing them to end relationships with Anthropic. Add.71 (Smith Decl. ¶14); Add.59-60 (Ramasamy Decl. ¶30). As a result, customers have signaled potential cancellations, delays in national-security contract negotiations, and possible suspension or removal of Claude. Add.61-62 (Ramasamy Decl. ¶33); Add.72-75 (Smith Decl. ¶¶16-20). Even non-defense customers are expressing hesitation about continuing to work with Anthropic. Add.73-75 (Smith Decl. ¶¶17, 20). Hundreds of millions or even billions of dollars are at risk. Add.59-61 (Ramasamy Decl. ¶¶30-32); Add.79-80 (Rao Decl. ¶¶6-7).

## ARGUMENT

This Court should stay the § 4713 Notice pending judicial review because: (1) Anthropic is likely to succeed on the merits; (2) Anthropic faces irreparable injury without a stay; (3) no other parties will be harmed by a stay; and (4) the public interest favors a stay. *Nken v. Holder*, 556 U.S. 418, 431 (2009).

11

## I.    ANTHROPIC IS LIKELY TO SUCCEED ON THE MERITS

The Supply Chain Security Act requires this Court to "hold unlawful"

§ 4713 actions that are, among other things, "arbitrary," "capricious," "contrary to

constitutional right," "in excess of statutory jurisdiction," "lacking substantial

support," or "not in accord with procedures required by law." 41 U.S.C.

§ 1327(b)(2). The Secretary's acts violate each of those standards in multiple ways.

### A.    The Secretary's Actions Are Contrary To Law And Arbitrary And Capricious

1.    The Secretary's actions countermand § 4713's procedural

requirements. Congress directed that the Secretary may invoke § 4713 "only after"

he receives a "joint recommendation" from agency officials that includes a risk

assessment establishing "a significant supply chain risk." 41 U.S.C. § 4713(b)(1).

The statute then requires the Secretary to provide "notice of the joint

recommendation" to the targeted source, "the basis for the recommendation," and

30 days for the source to submit an "opposition." *Id.* § 4713(b)(2). Only "after

considering any information submitted" by the source can the Secretary make the

required written determination. *Id.* § 4713(b)(3).

None of that happened here. Following his February 27 social media post,

the Secretary sent Anthropic the § 4713 Notice, which purports to be "effective

immediately." Add.88-94 (Dunbar Decl. Exs. 1-2). Neither the post nor the Notice

provided Anthropic notice of a "recommend[ed]" action, "information that forms

12

the basis for the recommendation," or an opportunity to "submit information and argument in opposition" before the designation became effective. 41 U.S.C. § 4713(b).

The emergency exception in § 4713(c) cannot possibly sustain the Secretary's actions. To dispense with the statute's procedural requirements, the Secretary must "determine[] that an urgent national security interest requires the immediate exercise of" § 4713 authority. The Secretary does not mention § 4713(c) in his social media post or Notice, much less provide a reasoned explanation for why that emergency standard is satisfied. *E.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 4, 9 (D.C. Cir. 2017) (per curiam) (agency cannot invoke authority it "did not rely on" when it acted).

Nor would there have been any valid basis for the Secretary to invoke the exception. This Court reads emergency exceptions "narrowly." *Utility Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (APA's "'good cause' exception" "is to be 'narrowly construed and only reluctantly countenanced'"). And the Secretary may dispense with the procedural requirements only when an "urgent national security interest requires" that action. "Urgent" and "requires" are words of constraint, not flexibility. *E.g., Merriam Webster's Collegiate Dictionary* (11th ed. 2014) 1377 ("urgent" means "calling for immediate attention: PRESSING"). The Secretary cannot satisfy that standard.

To start, the Department's use of Claude has always been subject to usage limitations on lethal autonomous warfare and mass surveillance of Americans—limitations the Department accepted without complaint, until recently. Add.29-30 (Kaplan Decl. ¶29). Longstanding knowledge of those limits forecloses any claimed emergency now. *Cf. Environmental Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) (APA's "good cause exception does not apply when an alleged 'emergency' arises as the result of an agency's own delay").

Equally important, there is an inescapable illogic in the Secretary's position. "Urgent" national security interests cannot simultaneously compel immediate, wholesale *exclusion* of Anthropic from the supply chain, while the Secretary also requires *continued use* of Claude in vital, classified operations for up to six months. That "evident inconsistency," without "reasonable justification," *World Shipping Council v. Federal Mar. Comm'n*, 152 F.4th 215, 223 (D.C. Cir. 2025), defeats reliance on § 4713(c).

2.    The Secretary's actions also defy § 4713's substantive limits. Even in national-security arenas, "Congress rarely gives the [Executive Branch] a 'blank check,'" *Learning Res., Inc. v. Trump*, 2026 WL 477534, at *71 (U.S. Feb. 20, 2026) (Kavanaugh, J., dissenting), and § 4713 is no exception. As described above, the statute constrains the Secretary's authority in many ways. Use of the authority, for example, must be "necessary to protect national security." 41 U.S.C.

§ 4713(b)(3)(A). And, in this statutory context, "necessary" should be read naturally to mean "essential." *Webster's Third New International Dictionary* 1510 (1993); *see also GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000).

Moreover, § 4713 may be used only if "less intrusive measures are not reasonably available." 41 U.S.C. § 4713(b)(3)(B). And Congress did not leave "supply chain risk" as an open-ended consideration; Congress cabined the concept to circumstances where there is "significant risk" that a bad actor or others may "sabotage, maliciously introduce unwanted function, … or otherwise manipulate" technologies to "surveil, deny, disrupt, or otherwise manipulate" the use of covered articles in the supply chain. *Id.* § 4713(k)(6); *see also id.* § 4713(b)(1).

The Secretary's actions exceed those limits. Indeed, the Notice fails to "mak[e] a determination in writing" that *any* of the substantive predicates are met. 41 U.S.C. § 4713(b)(3). The Secretary's written determination, of course, must be "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see* 41 U.S.C. § 1327(b), but the § 4713 Notice is neither. The Notice at best parrots the statutory factors and by any read does not include any substantive findings. Add.89 (Dunbar Decl. Ex. 1). Such "conclusory statements" "will not do; an 'agency's statement must be one of reasoning.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).[2]

---

[2]      The Secretary's post derides Anthropic as "arrogan[t]," accuses it of

Nor could the Secretary reasonably explain his actions. The statute is designed to ensure "[h]ostile nation states and other bad actors" do not gain "access to sensitive and classified information." S. Rep. No. 115-408, at 2. And it has been used, at most, only once—against a foreign company Vladimir Putin's administration lauded as "do[ing] a lot for the country" and "pay[ing] their debts to the Motherland." Add.176 (Dunbar Decl. Ex. 9). A dispute over use limitations with Anthropic—an American company committed to U.S. national security without ties to foreign adversaries—is worlds removed from that scenario. To be sure, the Department emphatically disagrees with Anthropic's proposed limitations, but that does not mean that use of Claude anywhere in the supply chain risks "sabotag[ing] … or … otherwise manipulat[ing]" defense technology. 41 U.S.C. § 4713(k)(6). And the Secretary has not even attempted to articulate how his disagreement with Anthropic maps onto § 4713's substantive framework, including the definition of "supply chain risk."

The Secretary's actions are also unreasonable because they are internally inconsistent. On the one hand, he labels Anthropic a "Risk to National Security"

---

"betrayal," and blames it for being "ideolog[ical]." Add.94 (Dunbar Decl. Ex. 2). If that is the Secretary's explanation for the § 4713 designation, retaliatory animus is not a "factor" Congress "intended [the Secretary] to consider." *Motor Vehicle Mfrs Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

and he "immediately" purports to require other contractors to stop doing business with Anthropic. Add.88-94 (Dunbar Decl. Exs. 1-2); Add.179-185 (Dunbar Decl. Ex. 10). On the other hand, he demands Anthropic remain on the military's classified systems for up to six months, Add.94 (Dunbar Decl. Ex. 2), and he has recently exempted officials from removing Anthropic for certain "mission-critical activities directly supporting national security operations." Add.97 (Dunbar Decl. Ex. 3). This Court "often" sets aside agency actions reflecting such "unexplained inconsistencies," *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015), and it should do so here.

Finally, the Secretary offered no explanation, much less a reasoned one, for why "less intrusive measures" could not have addressed any bona fide concerns the Department has with Anthropic. 41 U.S.C. § 4713(b)(3)(B). For example, transitioning Claude off of classified systems or using other AI tools from willing providers—which the Department is already doing, *see* Add.186 (Dunbar Decl. Ex. 11)—are obvious less restrictive alternatives.

## B.    The Secretary's Actions Violate Due Process

The Department's failure to provide Anthropic meaningful process violates not only § 4713, but the Fifth Amendment's Due Process Clause. To resolve a due process claim, courts ask (1) whether a person has been "deprived of a protected

17

interest," and (2) "if so, what process" was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The Department's actions impair protected liberty and property interests. They impair Anthropic's liberty interest in its "good name, reputation, honor, [and] integrity" by singling it out as a threat to national security and attaching sweeping legal consequences to that designation. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012). In addition, by purporting to banish Claude's use throughout the defense supply chain, the Department has deprived Anthropic of property interests in "[v]alid contracts" with commercial partners, as well as "the United States." *Ralls Corp. v. Committee on Foreign Inv. in U.S.*, 758 F.3d 296, 315-316 (D.C. Cir. 2014). Effectively "debarring a corporation from government contract bidding," as has occurred here, triggers due process protections. *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003).

Anthropic was thus due—but deprived of—its "right to know the factual basis for" these actions and a meaningful "opportunity to rebut" them. *Ralls Corp.*, 758 F.3d at 318. "[B]oth the Supreme Court and this Court have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process." *Id.* That "essential component[]" of due process was not satisfied here. To date, even after

18

its negotiations with the Department, after the Secretary's social media post, and after the Notice, Anthropic has never been presented with findings, reasoned explanation, or evidence underlying the Secretary's determinations that § 4713's substantive standards are satisfied. [3]

### C.    The Secretary's Actions Violate The First Amendment

Finally, Anthropic is likely to succeed in establishing that the Secretary's actions violate the First Amendment. The First Amendment prohibits government officials from wielding "the power of the State to punish or suppress disfavored expression," *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024), including by "retaliating against individuals for engaging in protected speech," *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Unconstitutional retaliation occurs where (1) an entity engaged in protected conduct; (2) the government took retaliatory action "sufficient to deter a person of ordinary firmness … from speaking again"; and (3) "a causal link" ties "the exercise of a constitutional right and the adverse action." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025). Each occurred here.

---

[3]    The Notice's offer of a "request for reconsideration" is not constitutionally sufficient. Add.90 (Dunbar Decl. Ex. 1). With the § 4713 determination already effective, and no factual basis or explanation for Anthropic to rebut, such after-the-fact process does not satisfy due process. *See People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 228 (D.C. Cir. 2010).

First, Anthropic's communications with the Department and Anthropic's public statements regarding the importance of its safety limitations constitute protected speech and petitioning activity. Since its founding, Anthropic has advocated for the responsible use of AI models, including maintaining and publishing a Usage Policy that embodies the company's commitment to the same, posting public essays and blog posts, and supporting or opposing legislation. Add.21-22 (Kaplan Decl. ¶¶8-13), Add.26-27 (Kaplan Decl. ¶¶21-22); Add.98-168 (Dunbar Decl. Exs. 4-7). The company and its leadership have frequently contributed to public discourse about safe use of AI models, including as recently as the public announcement by Dr. Amodei that Anthropic could not "in good conscience accede to" the Department's demands because the contemplated uses were "outside the bounds of what today's technology can safely and reliably do." Add.163-64 (Dunbar Decl. Ex. 7).

Anthropic's "refusal to acquiesce to [the government's] demands" and its "public statements regarding" that refusal are textbook "protected conduct." *President & Fellows of Harvard Coll. v. DHS*, 788 F.Supp.3d 182, 203 (D. Mass. 2025). Moreover, just as the First Amendment protects "collective bargaining" with the government, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 893-894 (2018), it protects Anthropic's advocacy for its safety judgments in discussions with the Department. That advocacy also constitutes

protected petitioning activity directed to a "department[] of the Government." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002).

The Secretary's own statements "openly acknowledge[] that [Anthropic] engaged in speech." *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F.Supp.3d 105, 151-152 (D.D.C. 2025). The Secretary disparaged Anthropic's actions as "rhetoric," "corporate virtue-signaling," and a manifestation of "Silicon Valley ideology." Add.94 (Dunbar Decl. Ex. 2).

Second, the government's actions would chill any person of "ordinary firmness." *Media Matters*, 138 F.4th at 584. The government accused Anthropic of "betrayal" and told it to "get [its] act together"—that is, abandon its judgments about AI safety and conform to the government's preferred positions. Add.94, 170 (Dunbar Decl. Exs. 2, 8). Few would "feel free to disregard" such "threats of inducement" from the President and Secretary Hegseth, who have "direct regulatory and enforcement authority." *Vullo*, 602 U.S. at 192; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). The consequences to Anthropic, described further in Part II, below, underscore the chilling effect.

Finally, the government retaliated against Anthropic because of its expressed refusal to acquiesce to the government's demands. The President and Secretary threatened Anthropic immediately after it publicly defended the limitations in its Usage Policy, singling out Anthropic's "rhetoric," "virtue-signaling," and

"ideology." Add.94 (Dunbar Decl. Ex. 2). And the Notice itself offers no other explanation for the government's actions; it contains only conclusory recitation of the § 4713 elements. Retaliation is the only plausible explanation.

## II. ANTHROPIC IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM

Without a stay, Anthropic will continue to suffer profound constitutional, reputational, and economic injuries.

First, Anthropic's likelihood of success on its constitutional claims establishes irreparable injury. "[T]he loss of constitutional freedoms …, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). The government's "violation of Fifth Amendment due process rights" is "irreparable harm," *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020), as is its ongoing "retaliation … in response to [the] exercise of … First Amendment rights," *Media Matters*, 138 F.4th at 585.

Second, the Secretary's actions risk ongoing and permanent damage to Anthropic's reputation and goodwill. The Notice brands Anthropic a "supply chain risk," Add.89 (Dunbar Decl. Ex. 1), a designation never before publicly invoked against a U.S. company. It follows on the heels of the Secretary's public accusations that Anthropic engaged in "betrayal" and threatened "American lives." Add.94 (Dunbar Decl. Ex. 2). Such a government-sanctioned "label" risks irreparable "damage [to Anthropic's] good name." *Armour & Co. v. Freeman*, 304

22

F.2d 404, 406 (D.C. Cir. 1962). Indeed, as one district court judge recently explained, "accusations of disloyalty from the nation's highest offices" coupled with adverse government actions inflict irreparable injury. *Zaid v. Exec. Off. of President*, 2025 WL 3724884, at \*12 (D.D.C. Dec. 23, 2025); *see also Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (collecting authority); Add.66-68, 74-75 (Smith Decl. ¶¶5-10, 20).

Third, together with the President's and Secretary's other actions against Anthropic, the actions challenged here have gravely interfered with Anthropic's business relationships. Combined, the social media post and § 4713 Notice threaten *any* commercial counterparty of Anthropic that does business with the Department. Already, Anthropic has received inquiries from more than one hundred enterprise customers about the Secretary's actions. Add.74 (Smith Decl. ¶20). The fact that major customers "have reached out" about the Secretary's actions "signal[s] … they may take their business elsewhere"; only a stay can prevent that "significant financial loss." *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F.Supp.3d 15, 56 (D.D.C. 2025). By Anthropic's best estimate, for 2026, the government's adverse actions risk hundreds of millions, or even multiple billions, of dollars in lost revenue. Add.79 (Rao Decl. ¶6).

Although financial injury is not always irreparable, it is so here. Because sovereign immunity bars Anthropic from recovering damages arising from the

23

government's unlawful disruption of its commercial relationships, "no 'adequate compensatory or other corrective relief will be available at a later date.'" *In re NTE Connecticut, LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (finding irreparable injury where agency actions would "permanently strip[]" entity of "significant future revenues").

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR A STAY

The remaining factors—the balance of equities and public interest—"merge" in litigation against the government. *Nken*, 556 U.S. at 435. "[E]nforcement of an unconstitutional [action] is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), as is "unlawful agency action," *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The government, moreover, will not be harmed by a stay. As explained above, the government has identified no legitimate, non-retaliatory interest in a supply-chain designation. Staying the Secretary's actions would thus inflict no harm, but would merely preserve the pre-February 27 status quo. A stay also would not disrupt the Department's intent to continue using Claude for up to six months for military or other national-security operations. Nor would it force the Department to deal with Anthropic beyond the orderly transition period that the

24

Department has demanded and that Anthropic has always been willing to provide.

*See* Add.41 (Heck Decl. ¶11).

## CONCLUSION

Anthropic respectfully requests that the Court stay the Secretary's actions

pending review. Alternatively, Anthropic requests expedited merits briefing.

Dated: March 11, 2026

Respectfully submitted.

/s/ *Kelly P. Dunbar*

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

The foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), 27(a)(2)(B), 32(f) and D.C. Cir. R. 32(e)(1), because it contains 5,188 words according to the count of Microsoft Word for Office. I further certify that the foregoing motion also complies with Fed. R. App. P. 32(a)(5)-(6) and D.C. Cir. R. 27(d)(1)(E), because it has been prepared using Microsoft Word for Office in 14-point proportionally spaced Times New Roman typeface.

Dated: March 11, 2026                          /s/ *Kelly P. Dunbar*
                                               KELLY P. DUNBAR

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Pursuant to Rule 25(c)(2)(A) of the Federal Rules of Appellate Procedure, I further certify that the foregoing was served to all registered users by filing it with the court's electronic filing system.

/s/ *Kelly P. Dunbar*
KELLY P. DUNBAR
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com