ORAL ARGUMENT NOT YET SCHEDULED
No. 26-1049

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, ET AL.,

*Respondents.*

---

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

---

### BRIEF OF *AMICI CURIAE* FORMER SERVICE SECRETARIES
### AND RETIRED SENIOR MILITARY OFFICERS
### IN SUPPORT OF PRELIMINARY RELIEF

---

Clara J. Shin
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
cshin@cov.com

Sarah E. Harrington
  *Counsel of Record*
Alexander A. Berengaut
David M. Zions
Megan A. Crowley
Mishi Jain
Laila Ujayli
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sharrington@cov.com

*Counsel for Amici Curiae*
*Former Service Secretaries and*
*Retired Senior Military Officers*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici*.**  Except for the additional *amici* represented in this brief, all parties, intervenors, and *amici* appearing before this court are listed at Add.1 of the Addendum filed in conjunction with Petitioner's emergency stay motion.

**Action Under Review.**  References to the actions at issue appear in Petitioner Anthropic PBC's ("Anthropic") Petition for Review, emergency stay motion, and associated exhibits.

**Related Cases.**  This case has not previously been before this Court, any other United States court of appeals, or any other court in the District of Columbia. Anthropic has challenged its designation as a supply chain risk in *Anthropic PBC v. U.S. Dep't of War, et al.*, 3:26-cv-01996 (N.D. Cal.) (complaint filed Mar. 9, 2026), but that designation arises under a different statutory authority than the actions challenged here.

Dated: March 12, 2026

*/s/ Sarah E. Harrington*
Sarah E. Harrington

*Counsel for Amici Curiae*
*Former Service Secretaries and*
*Retired Senior Military Officers*

i

## CERTIFICATE OF SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), a separate brief from *amici* former Service Secretaries and retired senior military officers is necessary. *Amici* share a profound commitment to the rule of law as a cornerstone of national security. Having devoted their careers to ensuring the military's fidelity to the rule of law, they are uniquely positioned to speak about the dangers of the misuse of powerful national-security authorities by civilian political leadership, not to address the serious concerns that led Congress to delegate the authority in question, but as retribution against a private company that has displeased the leadership.

To *amici*'s knowledge, no other *amicus* has filed, or plans to file, a brief expressing similar views or based on similar experiences. Any overlap between this and other *amicus* briefs is thus unlikely. By filing a separate brief, *amici* are also able to present their unique views in a clear, concise, and timely manner. Accordingly, *amici* believe that a separate brief is justified and will serve the Court.


Dated: March 12, 2026                    */s/ Sarah E. Harrington*
                                         Sarah E. Harrington

                                         *Counsel for Amici Curiae*
                                         *Former Service Secretaries and*
                                         *Retired Senior Military Officers*

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES...................... i

CERTIFICATE OF SEPARATE BRIEF .................................................................. ii

TABLE OF AUTHORITIES.................................................................................. iv

IDENTITIES AND INTERESTS OF *AMICI CURIAE*.......................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ...................................................................................................... 6

    I.    The Secretary's Supply Chain Risk Designation Undermines the Military's Adherence to the Rule of Law and the Public's Confidence that the Military Is Governed by the Rule of Law. ........... 6

    II.    Punishing Domestic Defense Contractors Over Policy Disagreements Threatens U.S. Military Primacy and Servicemember Safety. ...................................................................... 12

CONCLUSION .................................................................................................. 18

ADDENDUM ................................................................................................... 19

CERTIFICATES OF COMPLIANCE AND SERVICE ......................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Little v. Barreme*,
　6 U.S. (2 Cranch) 170 (1804) ...........................................................................8

*Marbury v. Madison*,
　5 U.S. (1 Cranch) 137 (1803) ...........................................................................7

*United States v. Lee*,
　106 U.S. (16 Otto) 196 (1882)..........................................................................7

*Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952)..................................................................................10, 12

**Statutes**

10 U.S.C. § 502 ...................................................................................................7

10 U.S.C. § 3252 .......................................................................................4, 5, 10

41 U.S.C. § 4713 .......................................................................................4, 5, 10

Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489 (1862)....................................13

**Executive Order**

Exec. Order No. 14,179, 90 Fed. Reg. 58499 (Dec. 11, 2025)................................14

**Other Authorities**

Lt. Col. Nathan J. Bankson, *Legitimacy and Rule of Law: A Military
　Practitioner's Point of View*, 67 DOJ J. Fed. L. & Prac. 245 (2019)...................6

Benjamin R. Beede, *War Industries Board*, *in 1914-1918 Online:
　International Encyclopedia of the First World War* (Oct. 8, 2014) ...................13

Tess Bridgeman, *What Hegseth's "Supply Chain Risk" Designation
　of Anthropic Does and Doesn't Mean*, Just Security (Mar. 2, 2026)................16

Chief Digit. & A.I. Off., U.S. Dep't of Def., *CDAO Announces Partnerships with Frontier AI Companies to Address National Security Mission Areas* (July 14, 2025) .............................................................14

DARPA, *About DARPA: Our Mission* ....................................................13

Def. Innovation Unit & Chief Digit. & A.I. Off., U.S. Dep't of Def., *DIU and CDAO: Deploying AI for Strategic Impact* (Jan. 21, 2025) ...............14

Fed. R. App. P. 29 ...........................................................................1

The Federalist No. 46 (James Madison) ................................................8

The Federalist No. 51 (James Madison) ................................................6

Marcy E. Gallo, Cong. Rsch. Serv., *IF12869, The Defense Innovation Ecosystem* (Jan. 8, 2025) .................................................................13

Gallup, *Confidence in Institutions* (2024) ...........................................11

Pete Hegseth (@SecWar), X, *Statement on Anthropic and Supply Chain Risk Designation* (Feb. 27, 2026, at 17:14 ET) ........................................4

Kathleen J. McInnis, Cong. Res. Serv., *IF11566, Congress Civilian Control of the Military, and Nonpartisanship* (June 10, 2020) .......................8, 9

Open Letter from Former Secretaries of Defense and Former Chairmen of the Joint Chiefs of Staff, *To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks (Sept. 6, 2022) .........................................9

William M. Reid, Am. Soc'y of Arms Collectors, *1794/1798 U.S. Contract Muskets: The Political and Military Situation That Precipitated These Contracts and a Summary of the Contracts and Contractors* (2016) .........................................................................13

Alan Z. Rozenshtein, *Congress-Not the Pentagon or Anthropic-Should Set Military AI Rules*, Lawfare (Feb. 20, 2026) ...............................8

Kelley M. Sayler, Cong. Rsch. Serv., *R45178, Artificial Intelligence and National Security* (Nov. 10, 2020) ...............................................14

Tom W. Smith & Jaesok Son, Nat'l Op. Rsch. Ctr., *General Social Survey 2012 Final Report: Trends in Public Attitudes about Confidence in Institutions* (2013) .......................................................................11

Mike Walker et al., DARPA, *Innovation at DARPA* (July 1, 2016) .......................13

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*

*Amici* have a strong interest in this case because invoking national-security authorities outside their congressionally set limits threatens the rule of law and all relationships between domestic private-sector partners and our military services. They submit this brief to provide the Court with the perspective of former high-ranking leaders whose professional responsibilities required them to pursue national-security imperatives while complying with the law.[1]

Individual *amici* are identified below. *Amici*'s short biographies listed in the addendum reflect a measure of their distinguished service to our country.

- Admiral C. Steve Abbot, U.S. Navy (Ret.)

- Admiral Thad W. Allen, U.S. Coast Guard (Ret.)

- Vice Admiral Donald C. Arthur, U.S. Navy (Ret.)

- Rear Admiral (Upper Half) William D. Baumgartner, U.S. Coast Guard (Ret.)

- The Honorable Richard Danzig, Former Secretary of the Navy

- The Honorable Carlos Del Toro, Former Secretary of the Navy

- Brigadier General Robert J. Felderman, U.S. Army (Ret.)

- Rear Admiral (Upper Half) F. Stephen Glass, U.S. Navy (Ret.)

- Rear Admiral (Upper Half) Donald J. Guter, U.S. Navy (Ret.)

---

[1] No counsel for any party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

1

- Major General Richard S. Haddad, U.S. Air Force (Ret.)

- Major General Irving L. Halter, Jr., U.S. Air Force (Ret.)

- Rear Admiral (Upper Half) Janice Hamby, U.S. Navy (Ret.)

- Rear Admiral (Lower Half) Charles D. Harr, U.S. Navy (Ret.)

- General Michael V. Hayden, U.S. Air Force (Ret.)

- The Honorable Frank Kendall, Former Secretary of the Air Force

- Major General Steven J. Lepper, U.S. Air Force (Ret.)

- Major General Randy E. Manner, U.S. Amy (Ret.)

- Rear Admiral (Upper Half) James E. McPherson, JAGC, U.S. Navy (Ret.)

- Brigadier General Mark A. Montjar, U.S. Army (Ret.)

- Admiral William A. Owens, U.S. Navy (Ret.)

- The Honorable F. Whitten Peters, Former Secretary of the Air Force

- Major General Gale S. Pollock (Ret.)

- Rear Admiral Michael E. Smith, U.S. Navy (Ret.)

- Major General F. Andrew Turley, U.S. Air Force (Ret.)

- The Honorable Christine Wormuth, Former Secretary of the Army

## INTRODUCTION AND SUMMARY OF ARGUMENT

A military grounded in the rule of law is weakened, not strengthened, by government actions that lack legal foundation. A military that has thrived on public-private partnerships is weakened, not strengthened, when the government sends the message that investing in national security carries the risk of capricious retaliation or disproportionate punishment for voicing disagreement. Designating an American company a security risk, and warning other companies not to do business with it for reasons other than national security, is an extraordinary and unprecedented step for the military's civilian leadership to take. Taking such a step without firm grounding in law is dangerous. That is not the path the United States has followed in building the strongest military in the world. It is not a road that this country, or its military, should go down now.

The United States Armed Forces are the envy of the world, owing first and foremost to the brave men and women who serve their country honorably and selflessly at great personal sacrifice. But the military's strength also flows from two enduring foundations: the ingenuity of the American people and the rule of law. From the earliest days of this country, the military has enjoyed a collaborative relationship with an innovative private sector, working together to forge the technologies that protect our servicemembers and support their missions on ever-changing battlefields—from muskets to aircraft to artificial intelligence. No less

3

important to the military's strength is the rule of law—the backbone of our democracy that the military fights for, and which in turn stands as one of its greatest assets as a cohesive fighting force.

*Amici* have had the great privilege of leading the men and women who serve in the Armed Forces. *Amici* come from different backgrounds, have served in different military departments, and have a range of different perspectives. But they share a profound commitment to the rule of law as a cornerstone of national security. They also share a grave concern over government actions that stretch the law in the name of national security—actions that ultimately threaten national security and the rule of law alike.

The Secretary of Defense recently invoked 10 U.S.C. § 3252 ("Section 3252") and the Federal Acquisition Supply Chain Security Act ("FASCSA"), 41 U.S.C. § 4713, to designate an American company, Anthropic PBC ("Anthropic"), a "Supply-Chain Risk."[1] The Secretary described the consequences of this designation in sweeping terms, including that it restricts any company that does business with the military from engaging in any commercial activity with Anthropic.[2] The Secretary's designation was made against the backdrop of

---

[1] *See* Pete Hegseth (@SecWar), X, *Statement on Anthropic and Supply Chain Risk Designation* (Feb. 27, 2026, at 17:14 ET), https://perma.cc/5BNB-DCRX.

[2] *See* Pete Hegseth, *supra* ("Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic.").

Congress's stark and clearly delineated definition of "supply chain risk": it is "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a [national security] system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4); *see also* 41 U.S.C. § 4713(k)(6) (similar). Recognizing the seriousness of this designation, Congress also imposed protective measures to limit the weaponization of its use, including determinations that the designation "is necessary to protect national security" and that "less intrusive measures are not reasonably available." 10 U.S.C. § 3252(b); 41 U.S.C. § 4713(b)(3).

*Amici* understand that Anthropic's designation as a supply chain risk followed a disagreement about the proper guardrails around the military's use of fast-developing artificial intelligence technologies. As important as those policy questions are, *amici* do not file this brief to weigh in on those debates. Something more basic is at stake: the misuse of powerful national security authorities by civilian political leadership, not to address the serious concerns that led Congress to delegate the authority in question, but as retribution against a private company that has displeased the leadership. On that foundational democratic principle, *amici* are

uniquely positioned to speak, having devoted their careers to ensuring the military's fidelity to the rule of law.

## ARGUMENT

### I. The Secretary's Supply Chain Risk Designation Undermines the Military's Adherence to the Rule of Law and the Public's Confidence that the Military Is Governed by the Rule of Law.

The rule of law is the cornerstone of American constitutional democracy and central to the military's role within it.  As James Madison explained, "[i]n framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."[3]  Under America's constitutional system of government, both the governed and those who exercise power—including the military—must adhere to the rule of law.  The legitimacy of executive action thus depends on adherence to legal constraints, and public confidence in executive officials likewise depends on the perception that it is bound by the rule of law.

For the Armed Forces in particular, adherence to the rule of law is not merely a constitutional ideal; it is a professional and legal obligation.[4]  Servicemembers swear to support and defend the Constitution of the United States and to "bear true

---

[3] The Federalist No. 51 (James Madison).

[4] Lt. Col. Nathan J. Bankson, *Legitimacy and Rule of Law: A Military Practitioner's Point of View*, 67 DOJ J. Fed. L. & Prac. 245, 247–48 (2019) (explaining that "[r]ule of law is the centerpiece to legitimacy" and that a military that "disregards the law . . . will not earn the trust and respect of the population and, therefore, will lose its legitimacy").

6

faith and allegiance to the same . . . according to regulations and the Uniform Code of Military Justice." 10 U.S.C. § 502(a). Through the oaths of enlistment and office, members of the military formally commit themselves to the principle that their authority, and the force they wield on the Nation's behalf, must always remain subordinate to the Nation's laws.

The Secretary's designation challenged in this suit undermines the military's adherence to the rule of law and the public's confidence that the Military is bound by laws. Together and separately, those consequences erode the ability of the Armed Forces to protect the American people and the security of this Nation. When executive officials disregard—or appear to disregard—the limitations imposed by Congress, they violate the fundamental maxim that "[n]o man in this country is so high that he is above the law"—all officials are "creatures of law and . . . bound to obey it."[5] Such limits are particularly important when applied to the U.S. military, which wields extraordinary power and might. In a democratic society, it is critical that the public maintain faith in the military's adherence to the rule of law, including where executive officials invoke extraordinary national-security authorities that Congress deliberately confined to narrow and exceptional circumstances.

---

[5] *United States v. Lee*, 106 U.S. (16 Otto) 196, 220 (1882); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) (similar).

*First*, since the Founding, our Armed Forces have been formed "entirely at the devotion of the federal government . . . render[ing] it sufficiently dependent upon the people," and thus subject to civilian control.[6]  Congress plays a central role in that constitutional framework.  Article I assigns Congress the responsibility to oversee, authorize, and fund the U.S. military, ensuring that military power is exercised pursuant to democratically enacted law, rather than unilateral executive will.[7]  Disregarding Congress's statutory limits governing the use of military authority both undermines institutional trust and erodes the Constitution's allocation of war powers between Congress and the Executive.

The Armed Forces thus depend on Congress not only for the resources to defend our Nation, but also for the legal authority that governs their use.[8]  Congress, in turn, necessarily entrusts military leaders with significant discretion to exercise professional judgment in carrying out statutory directives, leading complex national-security missions, and cultivating the tradition of disciplined, lawful servant

---

[6] The Federalist No. 46 (James Madison).

[7] *See* Kathleen J. McInnis, Cong. Res. Serv., *IF11566*, *Congress Civilian Control of the Military, and Nonpartisanship* 1 (June 10, 2020), https://perma.cc/269Y-7S6N; *accord* Alan Z. Rozenshtein, *Congress—Not the Pentagon or Anthropic—Should Set Military AI Rules*, Lawfare (Feb. 20, 2026), https://perma.cc/VF68-2V6Y ("Congress already regulates military acquisition extensively—through standing procurement law and annual defense legislation—and imposes conditions on weapons systems, intelligence collection, and contractor behavior.").

[8] *See Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177–79 (1804) (military action is unlawful when taken "without any special [congressionally delegated] authority for that purpose").

leadership that defines the military profession.  That constitutional arrangement is operationalized through statutes but sustained by "reservoir[s]" of "[m]utual trust."[9] And that arrangement functions only if executive discretion is exercised within the bounds Congress has established and in faithful execution of legislative commands. Congress must be able to rely on the Secretary to use his discretion to "faithfully implement" legislative directives and limits,[10] and military leaders must exercise that discretion in a manner that upholds and respects civilian rule of law, leaving ultimate control of the military in "the hands of democratically elected civilian leaders."[11]

*Amici* are gravely concerned that the Secretary has exceeded those congressionally prescribed bounds by deploying a supply chain risk designation under Section 3252 and FASCSA in an unprecedented manner that appears disconnected from the purposes those statutes were enacted to serve.  Congress did not intend those statutes to be deployed as general-purpose tools for resolving policy disputes or imposing punitive measures on domestic actors whose views on difficult questions of policy depart from the current Administration's.  Rather, Congress crafted those powerful statutory tools to address a defined universe of national-

---

[9] Open Letter from Former Secretaries of Defense and Former Chairmen of the Joint Chiefs of Staff, *To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations* ¶ 13, War on the Rocks (Sept. 6, 2022), https://perma.cc/KP6S-CQDU.

[10] *Id.*

[11] McInnis, *supra*, at 2.

security threats, such as situations in which a foreign adversary is attempting to "sabotage, maliciously introduce unwanted function, or otherwise subvert" a national-security system.  10 U.S.C. § 3252(d)(4); *accord* 41 U.S.C. § 4713(k)(6) (similar).

Reflecting its considered approach, Congress balanced the exceptional grant of authority in Section 3252 and FASCSA with important safeguards, permitting the Secretary to use these tools only after determining that "less intrusive measures are not reasonably available to reduce . . . supply chain risk."  10 U.S.C. § 3252(b); 41 U.S.C. § 4713(b)(3).  This requirement reflects a deliberate choice to cabin executive discretion and reserve these powers for only the rare situations where they are absolutely necessary.  *See id.*  Treating them otherwise would transform carefully limited national-security tools into instruments of unbounded executive power—the precise affront to the rule of law that the Constitution's separation of powers was designed to avoid.

When executive officials instead deploy delegated authority in ways "incompatible with the expressed or implied will of Congress,"[12] they disrupt this constitutional balance and erode the necessary trust between the branches.  The resulting institutional harms are predictable.  Legislators find themselves wondering

---

[12] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

whether to rescind or grant discretionary authority, hesitating to confer future discretion or provide the authorities and resources necessary to address emerging and emergent threats. That dynamic of distrust ultimately weakens the Nation's ability to respond to national-security challenges.

*Second*, *amici* are gravely concerned that the Secretary's actions threaten the military's legitimacy and civil-military relations generally by creating the appearance that the military is not bound by laws and can punitively retaliate against domestic partners that disagree on difficult policy questions. The Armed Forces have long been among the most trusted institutions in American life.[13] That trust stems in large part from the military's history of remaining apart from and above the fray of American politics, devoted to maintaining its singular mission to protect and preserve our Nation regardless of shifting political winds. Public trust, in turn, confers both the legitimacy and the practical authority necessary for the military to exercise its extraordinary powers in defense of the United States. By adhering to the rule of law, military and executive officials foster public trust and confidence, ensuring that the military retains its position as one of our Nation's most respected institutions.

---

[13] *See, e.g.*, Gallup, *Confidence in Institutions* (2024), https://perma.cc/P97V-6BGJ; Tom W. Smith & Jaesok Son, Nat'l Op. Rsch. Ctr., *General Social Survey 2012 Final Report: Trends in Public Attitudes about Confidence in Institutions* (2013), https://perma.cc/F2CK-HPU5.

When military or civilian leaders use extraordinary authorities such as those at issue here in a manner that appears retaliatory and untethered from their purpose of defending the supply chain from foreign adversaries, they risk undermining public confidence in the rule-of-law foundation from which the military derives its legitimacy. Public confidence erodes when executive officials appear to brandish extraordinary national-security authorities in unprecedented, haphazard, and potentially retaliatory ways. In those circumstances, the public sees military leaders as having "los[t] sight of . . . the balanced power structure of our Republic," and who instead "emphasize transient results [based] upon policies."[14]

Such actions set a dangerous precedent. If extraordinary national-security authorities are perceived as tools for retaliation or political advantage, future officials may feel emboldened to again reach for them in similar ways. That result would further erode the military's hard-earned nonpartisan reputation and risk recasting the institution in the public eye—not as a steady defender of the Nation, but as an instrument of shifting political aims.

## II. Punishing Domestic Defense Contractors Over Policy Disagreements Threatens U.S. Military Primacy and Servicemember Safety.

Advanced technical tools and weapons systems empower our military to achieve its mission objectives, compete with foreign adversaries, and keep our

---

[14] *Youngstown*, 343 U.S. at 634 (Jackson, J., concurring).

servicemembers—and all Americans—safe. Our military maintains its technological edge by working closely with companies in the private sector and the American ingenuity they leverage.[15] The Armed Forces rely on private-sector innovation to adapt to evolving technologies and emerging threats.

These partnerships enjoy a long and storied history. In the early years of the Republic, the federal government contracted with private gunsmiths to manufacture muskets for U.S. forces in the 1790s, and later authorized private railroad companies to build the transcontinental railroad in the 1860s—projects that proved critical to national defense and economic development alike.[16] During World War I, Congress established the War Industries Board to mobilize and coordinate private industry to supply the military.[17] And during the Cold War, President Eisenhower created the Defense Advanced Research Projects Agency within the Department of Defense to catalyze technological innovation through collaboration with private contractors and researchers.[18] That agency's partnerships with private contractors and researchers

---

[15] *See* Marcy E. Gallo, Cong. Rsch. Serv., *IF12869*, *The Defense Innovation Ecosystem* 1–2 (Jan. 8, 2025), https://perma.cc/N8LY-6A28.

[16] *See* William M. Reid, Am. Soc'y of Arms Collectors, *1794/1798 U.S. Contract Muskets: The Political and Military Situation That Precipitated These Contracts and a Summary of the Contracts and Contractors* 1 (2016), https://perma.cc/XSQ4-4CPM; *see also* Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489 (1862).

[17] Benjamin R. Beede, *War Industries Board*, *in 1914–1918 Online: International Encyclopedia of the First World War* (Oct. 8, 2014), https://perma.cc/C5EN-WXAL.
[18] Mike Walker et al., DARPA, *Innovation at DARPA* 1 (July 1, 2016), https://perma.cc/T4HK-9C7C; *see also* DARPA, *About DARPA: Our Mission*, https://www.darpa.mil/about#mission (last visited Mar. 7, 2026).

produced transformative capabilities, including the precursor to the modern internet, advancements in stealth aircraft, miniaturized GPS technologies, radar for unmanned aerial vehicles, artificial intelligence advancements, and more. Today, ongoing partnerships with private companies enable the military to equip our servicemembers with the tools needed to meet today's operational demands and tomorrow's emerging threats.

Advanced artificial-intelligence technologies illustrate the modern importance of this longstanding public-private partnership. The United States' national-security advantage increasingly depends on access to frontier AI systems developed by leading private-sector companies.[19] The Administration itself has emphasized that maintaining a robust domestic ecosystem of multiple frontier AI developers is essential to preserving America's technological edge over foreign adversaries.[20]

The public-private partnerships that facilitate this technological advancement depend on trust, predictability, and adherence to established legal frameworks.

---

[19] Kelley M. Sayler, Cong. Rsch. Serv., *R45178, Artificial Intelligence and National Security* (Nov. 10, 2020), https://perma.cc/7YSZ-B8ZA.

[20] *See, e.g.*, Exec. Order No. 14,179, 90 Fed. Reg. 58499, 58499–01 (Dec. 11, 2025); *see also* Chief Digit. & A.I. Off., U.S. Dep't of Def., *CDAO Announces Partnerships with Frontier AI Companies to Address National Security Mission Areas* (July 14, 2025), https://perma.cc/KE7B-ACRV; *see also* Def. Innovation Unit & Chief Digit. & A.I. Off., U.S. Dep't of Def., *DIU and CDAO: Deploying AI for Strategic Impact* (Jan. 21, 2025), https://perma.cc/6DVY-XWZ9 ("Adopting and responsibly accelerating AI use in the [Department of Defense] is an imperative to deter major conflict—or win if forced to fight—in the twenty-first century.").

When the military demonstrates that it is a reliable and even-handed partner, it attracts leading companies and innovators that are willing to make long-term investments that will advance our national security, while also driving economic growth. Compliance with statutory limits and established procurement processes fosters the stability necessary for these relationships to flourish. But when civilian military leaders transgress the bounds of their authorities and cast aside settled practices, they risk eroding the trust of the American public as well as private partners, and deter future partnerships essential to preserving national security. If American businesses believe that the military does not operate within the rule of law—or that national-security authorities may be wielded unpredictably or punitively—they will be reluctant to form and maintain these partnerships. Indeed, government actions that arbitrarily penalize or exclude leading American developers therefore risk undermining not only the trust that sustains military-industry collaboration, but also the national-security objectives that the Administration's own AI policies purport to advance.

The Secretary's actions here threaten precisely those harms. By using national-security authorities in an unprecedented and potentially unauthorized manner that appears to punish an American company for a policy disagreement, the Secretary risks the long-term viability of critical public-private partnerships. Private companies will rationally fear that those authorities may be used again to resolve

15

disagreements with the private sector. And the consequences of injecting such unpredictability into the public-private partnerships that are vital for our national defense would be dire. When leading technology companies perceive that partnering with the military exposes them to arbitrary or unbounded executive action, they may reassess whether to invest in research relevant to defense uses or commit resources to long-term partnerships with the military. This risks chilling investment in the next generation of technologies that will serve the military's mission, a chill that not only threatens to slow the advancement of U.S. defense capabilities but simultaneously creates openings for foreign adversaries to gain a strategic advantage. In short, *amici* worry that the uncertainty that the Secretary's actions have created will materially detract from military readiness and operational safety by harming the military's ability to equip U.S. servicemembers with the latest, most effective technology.

The risks to operational safety are compounded when the Secretary targets technologies that are already integrated into ongoing U.S. military operations.[21] Sudden uncertainty about the continued availability of such systems or services could disrupt operational planning and place servicemembers at risk. Any decision that affects U.S. military processes and systems during ongoing military operations

---

[21] *See, e.g.*, Tess Bridgeman, *What Hegseth's "Supply Chain Risk" Designation of Anthropic Does and Doesn't Mean*, Just Security (Mar. 2, 2026), https://perma.cc/AU3A-RLTV ("Anthropic's Claude has been, and is, 'extensively deployed' across U.S. military and intelligence systems.").

should be undertaken with utmost deliberation and sensitivity to their operational consequences.

* * * * *

For all these reasons, the challenged designation raises concerns that extend beyond this litigation.  If extraordinary national-security powers may be exercised in ways that appear untethered from their statutory purpose, the resulting uncertainty threatens the rule of law, institutional trust, and public-private cooperation that sustain the Nation's military strength.

## CONCLUSION

Far from protecting U.S. national security, the Secretary's conduct here threatens the rule-of-law principles that have long strengthened our military. *Amici* respectfully urge the Court to take all steps necessary to prevent the misuse of important national security authorities, uphold the rule of law, and ensure the continued preeminence of our Armed Forces.

Respectfully submitted,

Dated: March 12, 2026

Clara J. Shin
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
cshin@cov.com

*/s/ Sarah E. Harrington*
Sarah E. Harrington
  *Counsel of Record*
Alexander A. Berengaut
David M. Zionts
Megan A. Crowley
Mishi Jain
Laila Ujayli
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sharrington@cov.com

*Counsel for Amici Curiae*
*Former Service Secretaries and*
*Retired Senior Military Officers*

18

# ADDENDUM

*Amici*'s short biographies listed below reflect a measure of their distinguished service to our country.

**Admiral C. Steve Abbot, U.S. Navy (Ret.)**, graduated from the U.S. Naval Academy in 1966, after which he was deployed to Vietnam and began a 34-year career with the U.S. Navy. His final active-duty tour was as Deputy Commander-in-Chief, U.S. European Command from 1998 to 2000. Following his retirement, Admiral Abbot served as Deputy Homeland Security Advisor to President George W. Bush from 2001 to 2003.

**Admiral Thad W. Allen, U.S. Coast Guard (Ret.)**, retired in 2010 as the 23rd Commandant of the U.S. Coast Guard. Admiral Allen led the federal responses to Hurricanes Katrina and Rita and the Deepwater Horizon oil spill. He led Atlantic Coast Guard forces in response to the 9/11 attacks and coordinated the Coast Guard response to the Haitian earthquake of 2010.

**Vice Admiral Donald C. Arthur, U.S. Navy (Ret.)**, served as 35th Surgeon General of the Navy. He was Commander of the National Naval Medical Center in Bethesda, Maryland, and the Naval Hospital in Camp Lejeune, North Carolina. He deployed and served with the hospital ship USNS Mercy.

**Rear Admiral (Upper Half) William D. Baumgartner, U.S. Coast Guard (Ret.)**, had a variety of operational and legal assignments during his 33 year career.

19

As a flag officer, he served as the Judge Advocate General (TJAG)/Chief Counsel of the Coast Guard and then as the Commander of the Seventh (Southeast) Coast Guard District.

**The Honorable Richard Danzig** served as the 71st Secretary of the Navy from November 1998 to January 2001. He was the Under Secretary of the Navy between 1993 and 1997. He has been a director of National Semiconductor Corporation (NY Stock Exchange), Human Genome Sciences Corporation (NASDAQ) and Saffron Hill Ventures (a European Venture Fund). He has served as The Chairman of the Board of The Center for a New American Security, Chairman of the Board of the Center for Strategic and Budgetary Assessments, and as Chair of the Advisory Panel for Idaho National Laboratories' Innovation Center. He has also been a member of President's Intelligence Advisory Board, the Secretary of Defense's Defense Policy Board, the Homeland Security Secretary's Advisory Council, the Aspen Strategy Group, the Toyota Research Institute Advisory Board and the Cyber Resilience Forum of the National Academies of Sciences, Engineering, and Medicine. Dr. Danzig's most recent publication is "Artificial Intelligence, Cybersecurity, and National Security: The Fierce Urgency of Now."

**The Honorable Carlos Del Toro** immigrated to the U.S. with his family as refugees in 1962. Raised in the Hell's Kitchen neighborhood of New York City, he received an appointment to the United States Naval Academy and commissioned as

a Surface Warfare Officer upon his graduation in 1983.  His 26-year naval career included a series of critical appointments at sea and ashore, including command as the Commissioning Commanding Officer of USS BULKELEY (DDG 84) and service in a combat zone during Operation Desert Storm.  After retiring from active-duty service, in 2004, Secretary Del Toro continued to support a range of government and private sector programs by founding SBG Technology Solutions, Inc., an engineering services company.  Sworn in as the 78th Secretary of the Navy and Marine Corps on August 9, 2021, Secretary Del Toro led the nearly one-million-person Department through the largest modernization effort in half a century concurrent with the longest sustained surface-to-air naval combat operations since World War II in the Red Sea.  Under his leadership, the Department of the Navy sought and commanded the largest budget in recent history, growing it over twenty-five percent over four years from $210B to $261B.  Today, Secretary Del Toro is also President & CEO of Del Toro Global Associates, LLC.

**Brigadier General Robert J. Felderman, U.S. Army (Ret.)**, served as the United States Deputy Director and Principal Advisor to the North American Aerospace Defense Command (NORAD) and as the Deputy Director of Plans, Policy, and Strategy Directorate (DJ5) at the U.S. Northern Command (USNORTHCOM).  He has commanded troops from squad to brigade.  He is Army branch qualified infantry, armor, cavalry, medical service corps, and aviation.

21

**Rear Admiral (Upper Half) F. Stephen Glass, U.S. Navy (Ret.)**, served in the U.S. Navy for twenty-nine years, serving as Staff Judge Advocate and Force Judge Advocate billets advising Flag rank Commanders regarding military law and procedures, culminating his career as the reserve Judge Advocate General of the Navy. He was awarded the Navy Marine Corps Distinguished Service Medal.

**Rear Admiral (Upper Half) Donald J. Guter, U.S. Navy (Ret.)**, served on active duty in the Navy for 29 years, first as a surface warfare officer and then in the Judge Advocate General Corps, ultimately serving as the Judge Advocate General of the Navy from 2000-2002. After retiring from active duty, he served as Dean of Duquesne Law School and subsequently Dean of South Texas College of Law Houston.

**Major General Richard S. Haddad, U.S. Air Force (Ret.)**, was the Vice Commander of the Air Force Reserve Command, responsible for the daily operations of approximately 70,000 citizen Airmen and 300 aircraft among 3 numbered air forces, 33 flying wings, 10 flying groups and one space wing.

**Major General Irving L. Halter, Jr., U.S. Air Force (Ret.)**, is an Air Force Academy graduate and former fighter pilot, serving in Iraq, Afghanistan, in the Pentagon with the Joint Chiefs of Staff, and as Vice Superintendent of the Air Force Academy. He is the recipient of two Bronze Stars.

**Rear Admiral (Upper Half) Janice Hamby, U.S. Navy (Ret.)**, served on active duty from 1980 until 2012. Dr. Hamby's service included assignments at sea and in war zones, in command, on the Joint Staff, and as a Deputy Department of Defense Chief Information Officer on the staff of the Office of the Secretary of Defense. After retirement she became the Chancellor of National Defense University's College of Information and Cyberspace. She completed her federal service in 2018.

**Rear Admiral (Lower Half) Charles D. Harr, U.S. Navy (Ret.)**, retired in 2013 as the 18th Medical Officer of the Marine Corps, former Commanding Officer of the 4th Medical Battalion. He is a Cardiovascular and Thoracic Surgeon currently practicing in Raleigh, North Carolina, and serving as the Chief Medical Officer of WakeMed Health and Hospitals

**General Michael V. Hayden, U.S. Air Force (Ret.)**, entered active military service in 1969. During his career, he rose to the rank of four-star general and served as Director of the Central Intelligence Agency and the National Security Agency. General Hayden also served as Commander of the Air Intelligence Agency and held senior staff positions at the Pentagon, Headquarters U.S. European Command, and the National Security Council.

**The Honorable Frank Kendall** served as the Secretary of the Air Force from 2021 to 2025 and as the Under Secretary of Defense for Acquisition, Technology

and Logistics from 2012 to 2017.  Earlier in his career he was Vice President of Engineering at Raytheon and a member of the board of directors of Leidos.  He is a member of the Council on Foreign Relations, and a Senior Fellow at the Center for American Progress.  He holds degrees from West Point, Caltech, and Georgetown University Law Center.  He is the author of "Lethal Autonomy; the Future of Warfare" and "Getting Defense Acquisition Right."

**Major General Steven J. Lepper, U.S. Air Force (Ret.)**, served for 35 years in the United States Air Force as a judge advocate in a variety of roles including Deputy Legal Counsel to the Chairman of the Joint Chiefs of Staff, commander, and military judge.  He culminated his service as Deputy Judge Advocate General of the Air Force.

**Major General Randy E. Manner, U.S. Army (Ret.)**, served over 36 years in the U.S. Army in positions such as the Acting Vice Chief of the National Guard Bureau overseeing the readiness and deployment of over 450,000 Guardsmen, the Deputy Commanding General of the U.S. Third Army, responsible for all Army forces in combat in the Middle East, and as the Acting and Deputy Director of the Defense Threat Reduction Agency, responsible for overseeing the safety of all U.S. nuclear and chemical weapons and developing Department of Defense procedures to respond to pandemics.

**Rear Admiral (Upper Half) James E. McPherson, JAGC, U.S. Navy (Ret.),** served on active duty for 26 years, retiring in 2006 as the Judge Advocate General of the Navy. He subsequently served as the General Counsel of the Army, the Undersecretary of the Army, and the Acting Secretary of the Navy.

**Brigadier General Mark A. Montjar, U.S. Army (Ret.)**, served in both the active Army and the Army Reserve from 1972 to 2007. He returned to active duty immediately after the events of September 11, 2001, and took an early retirement from General Motors Corporation in April of 2002 as a Global Purchasing Manager. His last two assignments as a brigadier general were at Ft. Monroe, Va. where he served as the Deputy Commanding General of the US Army Cadet Command (Army ROTC) and at Ft. Belvoir, Va. where he served as the Assistant Deputy Chief of Staff for Operations at the US Army Material Command. After his military retirement he served as a Director of Business Development for Booz Allen, Hamilton, Agility Defense and Government Services, and VSE Corporation.

**Admiral William A. Owens, U.S. Navy (Ret.)**, retired in 1996 as the Vice Chairman of the Joint Chiefs of Staff. He began his career as a nuclear submariner, spending a total of 4,000 days aboard submarines, including duty in Vietnam. Admiral Owens was a senior military assistant to two Secretaries of Defense and served as commander of the U.S. 6th Fleet during Operation Desert Storm.

**The Honorable F. Whitten Peters** served as Secretary of the Air Force, Under Secretary of the Air Force, and Acting Secretary of the Air Force from 1997 to 2001.  He also was the Principal Deputy General Counsel of the Department of Defense from 1995 to 1997.  Since leaving DOD in 2001, Peters has served on or chaired a number of Presidential, DOD, Air Force, and Commonwealth of Virginia advisory committees and was a member of the Board and Chair of the Air and Space Forces Association.  He served as a Navy Line Officer during Vietnam.

**Major General Gale S. Pollock, U.S. Army (Ret.)**, served as the Commander of the U.S. Army Medical Command and the Acting Surgeon General of the Army (the first woman, non-physician to have this role in any of the military services).  General Pollock was the 22nd Chief of the Army Nurse Corps.

**Rear Admiral Michael E. Smith, U.S. Navy (Ret.)**, served on active duty from 1983 until 2015.  During his service he commanded at all operational levels from the commanding officer of the navy's newest destroyer to command of an aircraft carrier strike group.  Mike founded and leads National Security Leaders for America, a bipartisan and pro-democracy organization of over 1400 former senior national security leaders.  Mike most recently served as a Presidential Appointee and Commissioner on the American Battle Monuments Commission and as a Senior Advisor to the Secretary of the Navy.

**Major General F. Andrew Turley, U.S. Air Force (Ret.)**, served in the U.S. Air Force for more than 27 years, in a wide variety of active duty, Air Force Reserve and Air National Guard judge advocate positions at the wing, major command and Air Staff levels, culminating in his appointment as the Ninth Air National Guard Assistant to The Judge Advocate General. As a federal civilian lawyer, he held senior level legal positions with several federal agencies, including the Department of Justice, the White House, and Department of the Air Force, and served as the general counsel of a small DoD agency. He is a retired member of the Senior Executive Service.

**The Honorable Secretary Christine Wormuth** served as the 25th Secretary of the Army from 2021 to January 2025. Prior to becoming Army Secretary, Wormuth was the Under Secretary of Defense for Policy from 2014 through 2016, and served in other senior positions on the National Security Council and in the Office of the Secretary of Defense from 2009 to 2014. Secretary Wormuth is currently the CEO and President of the Nuclear Threat Initiative, a nonprofit organization.

27

## CERTIFICATES OF COMPLIANCE AND SERVICE

1.      I certify that this brief complies with the length limits, type-face, and type-style requirements of Federal Rules of Appellate Procedure 29(a) and 32(a), as it contains 3,755 words and was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

2.      On March 12, 2026, I filed this brief with the Clerk of this Court via the CM/ECF system.  All participants in the case are registered CM/ECF users, and service will be accomplished through that system.

Dated: March 12, 2026                          */s/  Sarah E. Harrington*
                                                                Sarah E. Harrington

                                                                *Counsel for Amici Curiae*
                                                                *Former Service Secretaries and*
                                                                *Retired Senior Military Officers*

28