## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, *et al.*,

*Respondents.*

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## BRIEF OF FORMER SENIOR NATIONAL SECURITY GOVERNMENT OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER AND PRELIMINARY RELIEF

Harold Hongju Koh
Bruce Swartz
Peter Gruber Rule of Law Clinic
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, Connecticut 06520
(203) 432-4932
harold.koh@ylsclinics.org
bruce.swartz@ylsclinics.org

Alexis Loeb
Anthony Schoenberg
John Ugai
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400
aloeb@fbm.com
tschoenberg@fbm.com
jugai@fbm.com

*Counsel for Amici Curiae
Former National Security Government
Officials*

## STATEMENT REGARDING SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are former senior national security officials, diplomats, intelligence professionals, and subject-matter experts. Their decades of combined experience in defense procurement, supply chain security, and the protection of the United States' technological advantage in matters of national defense affords them distinct insights into managing supply chain risks within constitutional and applicable statutory frameworks, including 10 U.S.C. § 3252 and 41 U.S.C. § 4713. *Amici*'s experience renders them particularly well situated to explain how the government's actions in this case distort the national security authorities invoked and risk undermining, rather than advancing, U.S. national security interests.

To *amici*'s knowledge, no other *amicus* has filed, or plans to file, a brief providing the Court with insights from similar expertise. Accordingly, overlap between this brief and other *amicus* briefs is unlikely. *Amici*'s separate brief also provides the Court with the benefit of *Amici*'s unique views in a clear, concise, and timely manner. *Amici*'s separate brief is thus justified and will serve the Court.

Dated: March 16, 2026
By:  ___/s/ Alexis Loeb___

Alexis Loeb

*Counsel for Amici Curiae*
*Former National Security*
*Government Officials*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.


Dated: March 16, 2026        By:     */s/ Alexis Loeb*
                                      Alexis Loeb

                                      *Counsel for Amici Curiae*
                                      *Former National Security*
                                      *Government Officials*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I. Parties and *Amici Curiae*

All parties and intervenors appearing before this Court are listed at Add.1 of the Addendum filed in conjunction with Petitioner's Emergency Motion for Stay Pending Review.

In addition to the *amici* submitting this brief, *amici* include Foundation for Individual Rights and Expression, Electronic Frontier Foundation, Cato Institute, Chamber of Progress, First Amendment Lawyers Association, Former Service Secretaries, Retired Senior Military Officers, Employees of OpenAI and Google, Foundation for American Innovation, Fifty Years, Fathom, ChinaTalk, Martin Chorzempa, Alex Imas, Pangram, Institute for Progress, Dean Ball, Dwarkesh Patel, Roots of Progress, Saif Khan, Freedom Economy Business Association, Candide Group, Howard Fischer, Thomas Haslett, Investor Advocates for Social Justice, Mission Driven Finance, the Nathan Cummings Foundation, Inc., Omidyar Network LLC, Pluralize Capital, and Professor Alan Z. Rozenshtein.

## II. Action under Review

References to the actions at issue appear in Petitioner Anthropic PBC's ("Anthropic") Petition for Review, emergency stay motion, and associated exhibits.

## III.    Related Cases

Anthropic has challenged its designation as a supply chain risk in A*nthropic PBC v. U.S. Dep't of War, et al.*, 3:26-cv-01996 (N.D. Cal.), but that designation arises under a different statutory authority than the actions challenged here. Counsel is unaware of any other related cases currently pending in this Court or any other court.

Dated: March 16, 2026

By:    */s/ Alexis Loeb*
        Alexis Loeb

*Counsel for Amici Curiae*
*Former National Security*
*Government Officials*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ............................................................................1

SUMMARY OF ARGUMENT ...............................................................................2

ARGUMENT .........................................................................................................3

I.     THE NATIONAL SECURITY JUSTIFICATION FOR
DESIGNATING ANTHROPIC A SUPPLY CHAIN RISK IS
PRETEXTUAL AND DESERVES NO JUDICIAL DEFERENCE ..............3

     A.     The Sequence of Events Here Shows That the Designation Was
Pretextual, and Was Intended as a Punishment of Anthropic,
Not to Protect the United States. ..........................................................5

     B.     The Pentagon's Noncompliance with Procedural and Statutory
Standards Reinforces That the Designation Is Pretextual....................6

     C.     The Designation Subverts, Rather Than Advances, National
Security.............................................................................................12

II.    THE DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN
RISK IS UNCONSTITUTIONAL PUNISHMENT-BY-EXECUTIVE ......16

     A.     The Executive Has No Unilateral Power to Punish. ...........................16

     B.     The First Amendment Forbids Retaliatory Executive
Punishment. ......................................................................................17

     C.     The Constitution's Bill of Attainder Clause Prohibits Executive
Punishment. ......................................................................................19

CONCLUSION ...................................................................................................25

LIST OF *AMICI CURIAE*...................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abrego Garcia v. Noem*,
    No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025)...............................17

*Agency for Int'l Dev. v. Alliance for Open Society Inst.*,
    570 U.S. 205 (2013)........................................................................................18

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019)...................................................................................*passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)..............................................................................................6

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)..........................................................................................6

*Ex parte Garland*,
    71 U.S. (4 Wall.) 333 (1867) ...........................................................................21

*In re Grand Jury Subpoenas*,
    No. 1:26-mc-00012-JEB, slip op. (D.D.C. Mar. 11, 2026) ............................3, 17

*Jenner & Block LLP v. U.S. Dep't of Just.*,
    784 F. Supp. 3d 76 (D.D.C. 2025)....................................................................17

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)............................................................................. 21, 22, 24

*Learning Res., Inc. v. Trump*,
    No. 24–1287, 2026 WL 477534 (U.S. Feb. 20, 2026) ......................................22

*Nat'l TPS All. v. Noem*,
    166 F.4th 739 (9th Cir. 2026) ...........................................................................7

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)........................................................................................21

*Oregon v. Trump*,
    165 F.4th 1158 (9th Cir. 2025) ..........................................................................7

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  783 F. Supp. 3d 105 (D.D.C. 2025)...........................................................17, 22

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  No. 25-5241 (D.C. Cir. Feb. 2026)....................................................17

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995)..........................................................................18

*Susman Godfrey LLP v. Exec. Off. of President*,
  789 F. Supp. 3d 15 (D.D.C. 2025)....................................................17

*United States v. Brown*,
  381 U.S. 437 (1965)..........................................................................21

*United States v. Stanchich*,
  550 F.2d 1294 (2d Cir. 1977) (Friendly, J.) ......................................5

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
  784 F. Supp. 3d 127 (D.D.C. 2025)..................................................17

*Zaid v. Exec. Off. of the President*,
  No. 25-01365 (AHA), 2025 WL 3724884 (D.D.C. Dec. 23, 2025).............17, 21

## FEDERAL STATUTES

10 U.S.C.
  § 111(a) ..............................................................................................4
  § 3252..........................................................................................1, 7, 8
  § 3252(b)(1)-(3) .................................................................................8
  §§ 3252(d)(2)(A)–(C) .........................................................................9
  § 3252(d)(4) .......................................................................................8

41 U.S.C.
  §§ 1321-1328 .....................................................................................9
  § 1322................................................................................................10
  § 4713.........................................................................................1, 7, 8, 9

## CONSTITUTIONAL PROVISIONS

U.S. Constitution, Article I, § 9, cl. 3 ............................................20, 22

U.S. Constitution, First Amendment ......................................3, 17, 18, 19

U.S. Constitution, Fifth Amendment ................................................................22

U.S. Constitution, Article I, Bill of Attainder Clause.......................................*passim*

## FEDERAL REGULATIONS

Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sept. 5, 2025)...................................4

Federal Acquisition Regulation 52.204-30.............................................................10

## LEGISLATIVE MATERIALS

Hearing Before the Comm. on Homeland Security and Governmental
     Affairs, S. Hrg. 115-588 (2018)..........................................................................12

S. Rep. No. 115-408 (2018) ....................................................................................11

## OTHER AUTHORITIES

*Claude's Constitution*, Anthropic (last visited Mar. 8, 2026),
     https://www.anthropic.com/constitution.............................................................14

Dario Amodei, *The Adolescence of Technology: Confronting and
     Overcoming the Risks of Powerful AI* (Jan. 2026),
     https://www.darioamodei.com/essay/the-adolescence-of-
     technology#2-a-surprising-and-terrible-empowerment.......................................14

Dean W. Ball (@deanwball), X (Feb. 27, 2026, 5:46 PM),
     https://x.com/deanwball/status/2027515599358730315 ....................................24

Donald J. Trump, (@realDonaldTrump), Truth Social, (Feb. 27, 2026,
     3:47 PM),
     https://truthsocial.com/@realDonaldTrump/posts/11614455296929
     3195...................................................................................................................9, 18

*The Federalist* No. 69 (Alexander Hamilton).........................................................21

Harold Hongju Koh, Bruce Swartz, Avi Gupta & Brady Worthington,
     *The War on Anthropic: Pretextual Designation and Unlawful
     Punishment*, Just Security (Mar. 6, 2026),
     https://www.justsecurity.org/133247/anthropic-hegseth-unlawful-
     punishment/........................................................................................................17

Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Security (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/ .................................................................20

Jared Perlo, *Anthropic Says the Pentagon Has Declared It a National Security Risk*, NBC News (Mar. 5, 2026, 10:07 PM), https://www.nbcnews.com/tech/tech-news/anthropic-says-pentagon-declared-national-security-risk-rcna262013 ......................................13

Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026, at 1:45 PM) ....................................................13

Kenneth Pickthorn*, Early Tudor Government: Henry VII* (1934)...........................20

Lewis Carroll, *Alice's Adventures in Wonderland* (Chi., Volume One Publ'g 1998) (1865) ...............................................................6

Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, Stern Ctr. for Bus. & Hum. Rts. (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/ ................................................................14, 15

Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, Exec. Off. of the President, Accelerating Federal Use of AI through Innovation, Governance, and Public Trust, The White House (Apr. 3, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-21-Accelerating-Federal-Use-of-AI-through-Innovation-Governance-and-Public-Trust.pdf ................................14

Mike Stone, Alexandra Alper & Courtney Rozen, *Defense Contractors, Like Lockheed, Seen Removing Anthropic's AI After Trump Ban*, Reuters (Mar. 4, 2026) ....................................................16

*National Security*, MIT Mgmt. Exec. Edu. (Feb. 23, 2025), https://executive.mit.edu/Understanding-the-impact-of-AI-on-national-security.html ..........................................................15

Raphael Satter & Courney Rozen, *State Department Switches to OpenAI as US Agencies Start Phasing Out Anthropic*, Reuters (Mar. 2, 2026, 11:12 AM)..................................................................23

Ryan Goodman, Siven Watt, Audrey Balliette, Margaret Lin, Michael Pusic & Jeremy Venook*, The "Presumption of Regularity" in Trump Administration Litigation,* Just Security (Nov. 20, 2025) https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/ .......................................................11

Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM), https://x.com/SecWar/status/2027507717469049070 ..............................19

Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII* ........................................................................................................20

Tess Bridgeman, *What Hegseth's "Supply Chain Risk" Designation of Anthropic Does and Doesn't Mean*, Just Security (Mar. 2, 2026), https://www.justsecurity.org/132851/anthropic-supply-chain-risk-designation/ ..........................................................................................9

U.S. General Services Administration, *GSA Stands with President Trump on National Security AI Directive* (Feb. 27, 2026), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-stands-with-president-trump-on-national-security-ai-directive-02272026..............................................................................................24

4 William Blackstone, *Commentaries* ....................................................20

# GLOSSARY

| | |
|---|---|
| DoD | Department of Defense |
| DOJ | Department of Justice |
| FASC | Federal Acquisition Security Council |
| FASCSA | Federal Acquisition Supply Chain Security Act |
| GSA | General Services Administration |
| ODNI | Office of the Director of National Intelligence |
| OMB | Office of Management and Budget |

# INTEREST OF AMICI CURIAE[1]

*Amici curiae* are former senior national security officials, diplomats, intelligence professionals, and subject-matter experts with decades of combined experience in defense procurement, supply chain security, and the protection of the United States' technological advantage in matters of national defense.

Many *amici* have held senior roles within the White House, National Security Council, Department of State, Department of Defense, Department of Justice, Department of Homeland Security, Office of Management and Budget, and other related national security and intelligence institutions, where they were responsible for implementing or advising on the statutory and constitutional authorities at issue in this litigation. Other *amici* have extensive experience evaluating supply chain vulnerabilities, protecting defense systems from infiltration by foreign adversaries, and facilitating responsible integration of emerging technologies into national security operations. *Amici* have no financial interest in the outcome of this litigation.

The perspective of many *amici* is further grounded in their practical experience managing supply chain risks and with the applicable statutory frameworks—including 10 U.S.C. § 3252 and 41 U.S.C. § 4713—and their

---

[1] Pursuant to D.C. Circuit Rule 29(a)(4)(E), counsel for *Amici* state that no counsel for a party authored this brief in whole or in part, and that no person other than *Amici* or its counsel made a monetary contribution to this brief.

professional understanding of the conditions under which advanced technologies—including frontier artificial intelligence systems—can be responsibly incorporated into defense and intelligence operations. *Amici* believe that preserving the integrity of those statutory authorities is a national security imperative. They submit this brief to assist the Court in understanding how the government's actions in this case distort the national security authorities invoked and thereby risk undermining, rather than advancing, U.S. national security interests.

A full list of *amici* and the government positions they formerly held appears at the end of this brief.

## SUMMARY OF ARGUMENT

This case is about pretext and punishment. The pretext is manifest: Anthropic in no way meets the statutory definitions of a supply chain risk, and the Administration has made no serious effort to suggest otherwise. Defendants' "sentence first, verdict afterwards" approach makes clear that they intended to apply this designation before they took even a single one of the procedural steps that are statutorily required antecedents to such a designation.

Nor can the action taken against Anthropic be viewed in isolation. It should instead be seen as the latest chapter in the concerted campaign of pretextual retaliations—often parading in the guise of emergency national security regulations—that has characterized the second Trump Administration. Since

retaking office, President Trump has already attempted to wield the power of the presidency to punish, among others, his political opponents, law firms that hired or represented them, universities whose administrative decisions he disagreed with, journalistic outlets that refused to use his preferred terminology, companies that refused to fire President Trump's political enemies, and members of Congress of whose speech he disapproved. Indeed, "[b]eing perceived as the President's adversary has become risky in recent years." *In re Grand Jury Subpoenas,* No. 1:26-mc-00012-JEB, slip op. at 5 (D.D.C. Mar. 11, 2026).

But the Constitution forbids such arbitrary presidential punishment. The First Amendment of the Constitution bars the government from punishing Anthropic based on its speech or political values. Likewise, the Bill of Attainder Clause forbids punishment without judicial process. Therefore, the Administration's actions here are unlawful not just because they fail to meet the requirements of the supply chain risk statutes, but also because they violate fundamental constitutional guarantees and are thus *ultra vires*.

## ARGUMENT

## I. THE NATIONAL SECURITY JUSTIFICATION FOR DESIGNATING ANTHROPIC A SUPPLY CHAIN RISK IS PRETEXTUAL AND DESERVES NO JUDICIAL DEFERENCE

An agency decision like the one here is arbitrary and capricious if it rests on a pretextual basis. *Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019). To

be sure, a court may not reject an agency's stated reasons for acting as pretextual simply because the agency might have (1) other unstated reasons; (2) been influenced by political considerations; or (3) been prompted by an administration's priorities. *Id.* However, when the "sole stated reason" for an agency action "seems to have been contrived," its invalidation renders the agency decision without reason and thus requires that it be set aside as arbitrary and capricious under the Administrative Procedure Act. *Id.* As shown below, Department of Defense's ("DoD") *sole stated reason* for acting against Anthropic—that the "use of [Anthropic's] products in [DoD's] covered systems presents a supply chain risk"— is plainly pretextual.[2]

As in *Department of Commerce*, the government's justification for designating Anthropic a supply chain risk is "incongruent with what the record reveals about the agency's priorities and decision-making process." 588 U.S. at 785. In *Department of Commerce*, Chief Justice Roberts not only rejected the "contrived" pretextual justification for the agency decision but also asserted that

---

[2] This brief utilizes the title "Department of Defense" (or "DoD") as opposed to "Department of War" because the Department of Defense is established by statute, and any formal name change would require congressional approval. *See* 10 U.S.C. § 111(a). The executive order permitting "secondary title[s]" for the Department and Secretary acknowledges as much, stating that "[s]tatutory references to the Department of Defense [and] Secretary of Defense . . . shall remain controlling until changed subsequently by the law." Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sept. 5, 2025). No statutory change has occurred.

agencies must "offer genuine justifications for important decisions . . . that can be scrutinized by courts and the interested public." *Id.* But the pretext in this case is even less disguised than in *Department of Commerce*. Whereas the justification offered for the action taken in *Department of Commerce* was plausible on its face—although belied by the evidence as to *why* the decision was made—the designation here is both entirely implausible *and* refuted by the evidence as to how and why the decision actually was made. Even when reviewing executive action under a deferential standard, this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). So too here: "the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Commerce*, 588 U.S. at 784.

### A. The Sequence of Events Here Shows That the Designation Was Pretextual, and Was Intended as a Punishment of Anthropic, Not to Protect the United States.

The sequence of events here—government demands during negotiations, public threat escalations, Anthropic's refusal to alter its safeguards, and a sudden "supply chain risk" designation announced on social media without any statutory process—demonstrates that the government sought to wield its statutory authority not because Anthropic suddenly emerged as a supply chain risk, but instead as a pretext to punish Anthropic after negotiations over proposed terms of use broke

down.

DoD has not even attempted to articulate a theory for why disabling Anthropic advances national security interests. This failure is fatal. Agencies must articulate a rational connection between the facts found and the choice made. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). And when an agency shirks its duty to provide a "reasoned explanation" for its decision, agency action is arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

### B. The Pentagon's Noncompliance with Procedural and Statutory Standards Reinforces That the Designation Is Pretextual.

Secretary Hegseth's announcement of the designation before any of the statutorily mandated procedures for making such designations were completed is further evidence that the supply chain risk designation is pretextual. This was "sentence first—verdict afterwards"[3]: a preordained sentence against Anthropic, with a veneer of process to follow thereafter. In the experience of many of the *amici* here, the process specified by the statute allows for essential refinement, and often the resolution, of national security concerns. It requires the inclusion of expertise from across relevant agencies and allows time for points of contention to be clarified. And it prevents consequential decisions—such as supply chain risk

---

[3] Lewis Carroll, *Alice's Adventures in Wonderland* 187 (Chi., Volume One Publ'g 1998) (1865).

designations—from turning on disputed or incomplete evidence.

Procedural irregularities also indicate pretextual agency action, particularly where those actions lack supporting evidence or deviate from normal practice. Where, as here, an agency fails to follow statutory requirements and processes, a reviewing court may fairly infer that the agency's stated rationale is not the true basis for its decision.[4] Such procedural "deficiencies paint a picture of agency action that was not the product of reasoned decision-making, but of a rushed and pre-determined agenda masked by pretext." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 771, 774 (9th Cir. 2026) (Mendoza & Wardlaw, JJ., concurring).

DoD's supply chain risk designations here were procedurally defective at every turn, with respect to the designations both under 10 U.S.C. § 3252 and under 41 U.S.C. § 4713. First, DoD neither followed any of the procedures required by § 3252 nor explained its failure to do so. Under § 3252, the Secretary of Defense may exercise supply chain risk authorities only after a written determination and consultation with procurement or other relevant officials. The Secretary must

---

[4] *See, e.g.*, *Dep't of Commerce*, 588 U.S. at 784–85 (mismatch between agency's actions and *post hoc* statutory justification was informative as to motive); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 771, 774 (9th Cir. 2026) (Mendoza & Wardlaw, JJ., concurring) (recognizing that "serious defects in the process behind the Secretary's TPS vacatur and termination" were "merely a pretext for her true motives"); *Oregon v. Trump,* 165 F.4th 1158, 1186 (9th Cir. 2025) (relying on *Dep't of Commerce* in suggesting that the court should review the President's statements surrounding calling the National Guard to Portland).

(1) determine that the use of the authority is necessary to protect national security by reducing supply chain risk, (2) find that less intrusive measures are not reasonably available, and (3) provide the determination, including risk assessment and consideration of less intrusive means to appropriate congressional committees. 10 U.S.C. § 3252(b)(1)-(3). There is no evidence that these steps were followed. Secretary Hegseth acted without routine interagency review, without statutory procedures, and without any factual justification. In other words, the Secretary substituted a hurried, and ideologically based, designation-by-tweet for the procedures required by § 3252.[5] He invoked no reason for his conclusory pronouncement that Anthropic was a "supply chain risk."

Second, DoD violated post-designation procedures under § 3252. Once a company is designated as a "supply chain risk," a head of a covered agency may

---

[5] DoD invoked both 10 U.S.C. § 3252 and 41 U.S.C. § 4713 to designate Anthropic as a "supply chain risk." Both statutory invocations are unlawful. Regardless of the statute relied on, DoD met neither the definitional nor the procedural standards of either authority. Anthropic does not meet the statutory definition of a "supply chain risk" under § 3252(d)(4), defined as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." Section 4713, the government-wide supply chain risk authority, parallels its DoD-specific § 3252 counterpart, but replaces the word "adversary" with "any person." But just as in § 3252, the rest of the § 4713 definition still does not apply, so this is a distinction without a difference. Moreover, because § 4713 applies across all executive agencies, its broad coverage is accompanied by significant procedural requirements—none of which DoD followed.

carry out "covered procurement actions" and limit disclosures to reduce supply chain risk with respect to "covered systems" and "covered items of supply." The statute, however, grants the Secretary no power "beyond excluding a designated company from participating in contractual bidding for a limited set of systems"[6] through one of three actions: the (1) exclusion of a "source" (i.e., a company) that fails to meet certain qualification standards in the acquisition of covered systems, (2) exclusion of a "source" that fails to achieve an acceptable supply chain risk rating in the evaluation process (during the bid process), and (3) directing a contractor for a covered system to exclude a particular source from consideration for a subcontract. 10 U.S.C. §§ 3252(d)(2)(A)–(C). These permissible remedies were grossly exceeded when President Trump directed "EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology."[7]

Third, DoD also failed to comply with the procedural framework established by the Federal Acquisition Supply Chain Security Act (FASCSA, codified at 41 U.S.C. §§ 1321–1328 and 4713), the second method by which DoD sought to

---

[6] Tess Bridgeman, *What Hegseth's "Supply Chain Risk" Designation of Anthropic Does and Doesn't Mean*, Just Security (Mar. 2, 2026), https://www.justsecurity.org/132851/anthropic-supply-chain-risk-designation/.

[7] Donald J. Trump, (@realDonaldTrump), Truth Social, (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.

exclude Anthropic from federal procurement on supply-chain-security grounds. Ordinarily, designation as a "supply chain risk" under this authority involves a coordinated interagency review and approval by the Federal Acquisition Security Council (FASC). FASC, established by 41 U.S.C. § 1322, is chaired by a senior-level official from OMB and includes representatives from OMB, General Services Administration (GSA), DHS, ODNI, DOJ, DoD, and Department of Commerce. Under FASCSA, the federal government may impose government-wide or multi-agency exclusions on supply chain security grounds through FASC-administered procedures. The law also requires that notice be provided to the designated company with a 30-day opportunity to respond and allows for judicial review of the designation in the U.S. Court of Appeals for the D.C. Circuit. As an initial step, FASC must first recommend an exclusion or removal order, which is then published on SAM.gov. The order would prohibit contractors (via FAR 52.204-30) from providing or using a designated company's products and services in the performance of federal contracts. FASCSA orders do not extend to a contractor's purely internal or commercial operations unrelated to federal contract performance and therefore could not be used to bar other federal contractors from commercial dealings with Anthropic.

There is no evidence that the FASC has recommended an order against Anthropic, which is the mechanism Congress established for government-wide

supply chain exclusions. Moreover, the sidestepping of FASC and its coordinated review processes completely undermines the statute's purpose of ensuring that supply chain decisions that broadly affect the U.S. government are based on objective national security analyses and coordinated across agencies, rather than made as a unilateral agency determination driven by the whims of a particular agency head. DoD's apparent subversion of the FASCSA framework to designate Anthropic as a "supply chain risk" undermines any presumption of regularity underlying DoD's determination.[8]

That the Administration has misused its supply chain authorities is further illustrated by the congressional purpose that first motivated the creation of FASCSA. FASCSA was a response to the longstanding threat that "that foreign governments may target the Federal ICT supply chain via certain products or services."[9] Senate hearings about FASCSA's drafting discussed foreign supply chain risks: Senator Jones highlighted the risk of a company with "ships all over the world [and] infecting the supplies and those kind of things" and Senator McCaskill worried about F-35 production in Turkey, noting "Turkey is building—

---

[8] *See* Ryan Goodman, Siven Watt, Audrey Balliette, Margaret Lin, Michael Pusic & Jeremy Venook*, The "Presumption of Regularity" in Trump Administration Litigation,* Just Security (Nov. 20, 2025) https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/ (collecting cases).

[9] S. Rep. No. 115-408, at 2 (2018).

a cockpit display—is one of their companies, defense contractors, and a center fuselage. Well, now we have Erdogan in disagreement with the United States."[10] No such foreign risk has been cited here, nor could it be.

### C. The Designation Subverts, Rather Than Advances, National Security.

Finally, that the designation here is pretextual is shown by the fact that the designation of Anthropic does not mitigate risks to national security—it increases those risks, by depriving the government of what Secretary Hegseth himself recognized as the "exquisite capabilities" of Anthropic's AI technology. Compl., ECF No. 1 ¶ 98. The designation here signals that a technology company may face sweeping economic restrictions even in the absence of any demonstrated technical risk. Such a signal would discourage other companies from engaging openly with government agencies, raising safety concerns, or participating in policy debates related to AI governance. Over time, that chilling effect risks depriving the U.S. national security community of valuable partnerships with responsible AI developers. The use of supply chain risk designations as tools of political punishment threatens a host of U.S. national security priorities, including: (1) the innovation ecosystem, (2) U.S.-China strategic competition, (3) responsible AI

---

[10] Evolving Threats to the Homeland: Hearing Before the Comm. on Homeland Security and Governmental Affairs, S. Hrg. 115-588 (2018) (Statements of Senator Jones and Senator McCaskill).

development, (4) technological superiority, and (5) the defense industrial base.

Technology companies have already recognized the harm to the innovation ecosystem that could result from arbitrary supply chain designations. The Information Technology Industry Council—which comprises leading technology companies, including Amazon, Apple, and NVIDIA—wrote a letter to Defendant Hegseth expressing that they were "concerned by recent reports regarding the Department of War's consideration of imposing a supply chain risk designation in response to a procurement dispute."[11] As the letter describes, Anthropic's designation threatens "to undermine the government's access to the best-in-class products and services from American companies that serve all agencies and components of the federal government."[12]

This threat to innovation is particularly acute in the context of U.S.-China strategic competition over artificial intelligence. Michael Sobolik, an expert on AI and China, described this decision as "cutting off our nose to spite our own face."[13] "We cannot hobble the most innovative, successful American companies for

---

[11] Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026, at 1:45 PM), https://www.reuters.com/business/retail-consumer/big-tech-group-tells-pentagons-hegseth-they-are-concerned-about-declaring-2026-03-04.

[12] *Id.*

[13] Jared Perlo, *Anthropic Says the Pentagon Has Declared It a National Security Risk*, NBC News (Mar. 5, 2026, 10:07 PM), https://www.nbcnews.com/tech/tech-news/anthropic-says-pentagon-declared-national-security-risk-rcna262013.

asking quintessentially American questions about military use and privacy."[14]

The designation also harms national security by undermining incentives for responsible AI development. Anthropic, a self-described "ethically-oriented AI company,"[15] created Claude's Constitution to help its AI program Claude avoid taking actions "that are unsafe, unethical, or deceptive."[16] This very commitment to imposing guardrails for safe deployment of AI resulted in the Pentagon's designation, "send[ing] a clear message to the entire industry: responsibility is a liability."[17] By disincentivizing American companies from investing in safe AI governance, the Pentagon's action incentivizes reckless and unethical corporate behavior.

Leadership in AI safety is critical for U.S. national security and technological superiority.[18] Failure to encourage AI governance leaves space for

---

[14] *Id.*

[15] *See* Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026), https://www.darioamodei.com/essay/the-adolescence-of-technology#2-a-surprising-and-terrible-empowerment.

[16] *Claude's Constitution*, Anthropic (last visited Mar. 8, 2026), https://www.anthropic.com/constitution.

[17] Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, Stern Ctr. for Bus. & Hum. Rts. (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/.

[18] *See* Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, Exec. Off. of the President, Accelerating Federal Use of AI through Innovation,

other states to write their own rules, undermining the United States's role as a global leader in technology—in an area where India and the European Union are already stepping in to fill a perceived vacuum.[19] Because of the opaque way that AI algorithms operate, governance is necessary to verify the accuracy of data inputs and produce accurate results.[20] National security depends on trustworthy, cybersecure, and safe AI platforms. Anthropic's designation undermines these essential pillars by discouraging companies from ethical self-regulation.

The Pentagon's designation also significantly disrupts national security by forcing companies across the defense industrial base to stop working with Anthropic and redesign their systems using alternative, arguably less effective AI platforms. Anthropic was the first AI company to deploy models in the government's classified networks and the first to collaborate with national security customers on custom models. Following the designation, Lockheed Martin

---

Governance, and Public Trust, The White House (Apr. 3, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-21-Accelerating-Federal-Use-of-AI-through-Innovation-Governance-and-Public-Trust.pdf.

[19] Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, Stern Ctr. for Bus. & Hum. Rts. (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/.

[20] *Understanding the Impact of AI on National Security*, MIT Mgmt. Exec. Edu. (Feb. 23, 2025), https://executive.mit.edu/Understanding-the-impact-of-AI-on-national-security.html.

committed to following the government's ban.[21] Other contractors are expected to follow suit. Abruptly wrenching Anthropic out of existing programs threatens to harm national security by disrupting the extensive progress already made on AI-driven and AI-enhanced defense innovation and modernization.

In sum, DoD's rationale invokes a national-security claim that is both unsupported and contradicted by the overwhelming evidence before it. It will make the United States more vulnerable, not safer. Nothing in this record commands judicial deference to a transparently coercive decision. "If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Dep't of Commerce*, 588 U.S. at 785.

## II. THE DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN RISK IS UNCONSTITUTIONAL PUNISHMENT-BY-EXECUTIVE

### A. The Executive Has No Unilateral Power to Punish.

The Pentagon's use of a supply chain risk designation as an ad hoc punishment of Anthropic is not only forbidden by the governing statutes—it is also flatly unconstitutional. Like other similar punitive actions that have been taken by the Trump Administration—against law firms, universities, and numerous other disfavored individuals and institutions—this designation of Anthropic is an

---

[21] Mike Stone, Alexandra Alper & Courtney Rozen, *Defense Contractors, Like Lockheed, Seen Removing Anthropic's AI After Trump Ban*, Reuters (Mar. 4, 2026), https://www.reuters.com/sustainability/society-equity/defense-contractors-like-lockheed-seen-removing-anthropics-ai-after-trump-ban-2026-03-04/.

unconstitutional exercise of a claimed power that our Constitution denies

the President: the power to arbitrarily punish political enemies.[22] That power is

forbidden by both the First Amendment and by the Constitution's Bill of Attainder

Clause.

**B.      The First Amendment Forbids Retaliatory Executive Punishment.**

The First Amendment bars the government from punishing Anthropic based

on its speech or political values. Anthropic—like the targeted law firms and

individual attorney, who each successfully challenged the Trump Administration in

the District Court for the District of Columbia[23]—has been singled out by the

---

[22] *See* Harold Hongju Koh, Bruce Swartz, Avi Gupta & Brady Worthington, *The War on Anthropic: Pretextual Designation and Unlawful Punishment*, Just Security (Mar. 6, 2026), https://www.justsecurity.org/133247/anthropic-hegseth-unlawful-punishment/; *In re Grand Jury Subpoenas,* No. 1:26-mc-00012-JEB, slip op. at 5; *cf. Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at * 2 (4th Cir. Apr. 17, 2025) (Wilkinson, J.) ("And what assurance shall there be that the Executive will not train its broad discretionary powers upon its political enemies? The threat, even if not the actuality, would always be present, and the Executive's obligation to 'take Care that the Laws be faithfully executed' would lose its meaning.").

[23] *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127 (D.D.C. 2025); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15 (D.D.C. 2025). The Administration has appealed these cases, along with the *Zaid v. Exec. Off. of the President*, No. 25-01365 (AHA), 2025 WL 3724884, (D.D.C. Dec. 23, 2025), and all five cases will be set for oral argument before the same panel. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-5241 (D.C. Cir. Feb. 2026).

Administration for unconstitutional retaliation for protected speech in violation of the First Amendment. The designation runs afoul of limits on the government's ability to condition benefits on the viewpoint of the recipient. When the government rests its regulation on "particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). The Supreme Court has created a broad framework establishing that the Government may not dictate private speakers' viewpoints as a condition of access to public property, programs, or funds. *See Agency for Int'l Dev. v. Alliance for Open Society Inst.*, 570 U.S. 205, 214 (2013) ("The Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." (citation modified)).

The viewpoint discrimination against Anthropic is clear—the President declared Anthropic a "RADICAL LEFT WOKE COMPANY" and its leadership "Leftwing nut jobs."[24] He threatened to "use the Full Power of the Presidency to make [Anthropic] comply," with "major civil and criminal consequences to follow."[25] None of this demonstrates what the statutory authorities to designate

---

[24] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.

[25] *Id.*

supply chain risks require: a neutral assessment, interagency review, notice to the company, and notification to Congress. That administrative process was replaced by a pontific social media broadside and threats targeting Anthropic's corporate values and perceived ideology.

That the Secretary of Defense denounces, despises, or disagrees with a supposed "Silicon Valley ideology"[26] that he attributes to Anthropic does not alter Anthropic's First Amendment rights. Anthropic is a private company that was engaged in contract negotiations with the federal government. Anthropic may freely seek to contract with the Pentagon regarding the use of its products, just as the Pentagon may refuse to contract on the basis that Anthropic proposes. In America's free market system, private businesses enjoy the right to make that decision without fear of the government using national security authorities to punish their choice.

### C. The Constitution's Bill of Attainder Clause Prohibits Executive Punishment.

Even apart from the First Amendment to the Constitution, the Constitution's Bill of Attainder Clause separately denies the President the unilateral power to punish. Executives ranging from British kings to early colonial governors attempted to wield their power to impose arbitrary punishment without the process

---

[26] Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM), https://x.com/SecWar/status/2027507717469049070.

afforded by judicial trial.[27] That is what the President seeks to do here. The President has chosen to target Anthropic, a private company, because it refused to adhere to his demands. In doing so, President Trump claims a power to declare Anthropic guilty and impose punishment—a power known previously in English common law and the U.S. Constitution as the power to "attaint."[28]

But the Constitution's categorical ban on attainder forecloses the President's actions here. Our constitutional and common-law tradition has long recognized that no executive, not even the British king, may assert a unilateral power to attaint.[29] Even a British king seeking to attaint needed to convince Parliament to pass a "bill of attainder," which would declare an accused guilty and impose punishment.[30] The same was true in the American colonies and during the American Revolution, where bills of attainder were a frequently invoked *legislative*—not executive—authority. The Framers would have rebelled at the notion that the President could

---

[27] *See* Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Security (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/.

[28] *See* 4 William Blackstone, *Commentaries* 373-79; U.S. Const. art. I, § 9, cl. 3.

[29] *See* Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 Hist. J. 675, 675 (1975).

[30] In fifteenth-century England, it was clear that "the consent of both branches of Parliament was requisite" for a bill of attainder to be enacted. Kenneth Pickthorn, *Early Tudor Government: Henry VII* 119 (1934).

possess a power denied even to the British king.[31]

Thus, while positioned in Article I, the federal Bill of Attainder Clause—whose text is not limited to Congress—necessarily covers the President. The Framers saw the prohibition of attainders as key to the separation of powers, to ensure that the power of the judiciary is not usurped—as it would be no less by an attainder issued by the executive alone than by one issued by the executive and the legislature acting together.[32] As Justice Black explained in *Joint Anti-Fascist Refugee Comm. v. McGrath*, it cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with [the] power to engage in the same tyrannical practices that had made the bill such an odious institution." 341 U.S. 123, 144 (1951) (Black, J., concurring).

The District Court for the District of Columbia came to the same conclusion in *Zaid v. Executive Office of the President*.[33] The court there held that the plaintiff

---

[31] *See The Federalist No*. 69 (Alexander Hamilton) (declaring that the President's authority would be "in substance much inferior to" "that of the king of Great Britain").

[32] *See id.*; *United States v. Brown*, 381 U.S. 437, 445 (1965) ("The Bill of Attainder Clause was intended . . . as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function."); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1867) ("A bill of attainder is a legislative act which inflicts punishment without a judicial trial."); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) ("A bill of attainder is a law that legislatively determines guilt and inflicts punishment . . . without provision of the protections of a judicial trial.").

[33] *Zaid*, 2025 WL 3724884, at * 16.

had plausibly alleged that President Trump's summary revocation of his security clearance violated the Bill of Attainder clause. As the district court stated, "it is hard to imagine the Framers would have prohibited legislative bills of attainder while leaving the executive branch free to attaint whomever it likes."[34]

Indeed, if Congress attempted by statute to achieve what the Administration has done here by fiat, there would be little question that Congress would have passed a forbidden bill of attainder. Yet if the President and Congress, acting together, cannot take an action that would violate the Bill of Attainder Clause, then the President cannot constitutionally exercise the same power alone, as either an assertion of inherent executive authority or as an authority allegedly delegated by Congress. No statute, even if it were properly applied to the facts at hand—including ones centered on national security—can arrogate to the Executive a power that Congress itself may not exercise. *Cf. Learning Res., Inc. v. Trump*, No. 24–1287, 2026 WL 477534, at *41 (U.S. Feb. 20, 2026) (Thomas, J., dissenting) (noting that the Article I Legislative Vesting Clause and the Fifth Amendment's Due Process Clause "forbid Congress from delegating core

---

[34] *Id.* (quoting *McGrath*, 341 U.S. at 144 (Black, J., concurring)); *see also Perkins Coie LLP*, 783 F. Supp. 3d at 173 n. 36 ("[The] assumption [that the Bill of Attainder Clause applies only to Congress] is called into question, particularly where executive orders appear to stand in for laws, by the constitutional text, which, in art. I, § 9, cl. 3, does not expressly limit the prohibition to the Congress, and then, in the following section 10 applies the prohibition to the States, as well as consideration of the history of bills of attainder . . . .").

legislative power, which is the power to make substantive rules setting the conditions for deprivations of life, liberty, or property").

Finally, it is clear that the designation here is punishment of the type forbidden by the Bill of Attainder Clause. Throughout American history, courts have explained that an unlawful attainder consists of action which (1) applies with specificity and (2) imposes punishment without process. DoD's designation of Anthropic—without evidence or reason—meets both these prongs. It (1) singles out Anthropic, and (2) punishes Anthropic by purporting to both deny it the opportunity to compete for federal government contracts and extinguish its ability to do business with private customers who otherwise have contracts with the federal government.

Defendants' designation of Anthropic as a supply chain risk punished Anthropic by stripping it of both government contracts and the opportunity to do business with government contractors. The Pentagon replaced Anthropic with OpenAI in a contract of up to $200 million. The leaders of the Departments of State, Treasury, and Health and Human Services told employees to stop using Anthropic's Claude, switching to OpenAI or Google's Gemini.[35] The General

---

[35] Raphael Satter & Courney Rozen, *State Department Switches to OpenAI as US Agencies Start Phasing Out Anthropic*, Reuters (Mar. 2, 2026, 11:12 AM), https://www.reuters.com/business/us-treasury-ending-all-use-anthropic-products-says-bessent-2026-03-02/.

Services Administration removed Anthropic from its Multiple Award Schedule, cutting Anthropic off from a platform facilitating sales totaling $52.5B in FY25 to federal as well as state and local governments.[36] One former Trump advisor called the designation "attempted corporate murder."[37]

In sum, the government's actions "possess almost every quality of [an unlawful] bill[] of attainder." *McGrath*, 341 U.S. at 143–44 (Black, J., concurring). They function as a "prepared and proclaimed government blacklist[]," *id.*, punishing Anthropic without any formal investigation, trial, or even informal process. The Pentagon's decision here had nothing to do with national security. Instead, the President decided to punish Anthropic for perceived political and ideological disloyalty, and then set the entirety of the Executive Branch to the task of fulfilling his will. Allowing the Government to proceed in its campaign of attainder against Anthropic would warp valuable national security devices into tools of political abuse.

---

[36] U.S. General Services Administration, *GSA Stands with President Trump on National Security AI Directive* (Feb. 27, 2026), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-stands-with-president-trump-on-national-security-ai-directive-02272026.

[37] Dean W. Ball (@deanwball), X (Feb. 27, 2026, 5:46 PM), https://x.com/deanwball/status/2027515599358730315.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary relief in favor of Petitioner Anthropic PBC in this case.

Dated: March 16, 2026

Respectfully submitted,

By: _ _/s/ Alexis Loeb_

Harold Hongju Koh[38]
harold.koh@ylsclinics.org
Bruce Swartz
bruce.swartz@ylsclinics.org
Peter Gruber Rule of Law Clinic[39]
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, Connecticut 06520
(203) 432-4932
harold.koh@ylsclinics.org
bruce.swartz@ylsclinics.org

Alexis Loeb
Anthony Schoenberg
John Ugai
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400
aloeb@fbm.com
tschoenberg@fbm.com;
jugai@fbm.com

*Counsel for Amici Curiae*
*Former National Security*
*Government Officials*

---

[38] Law student interns Kate Ahrens, Mia Alvarez, Elizabeth Bailey, Kate Davidson, Saavni Desai, Avi Gupta, Harry Seavey, and Brady Worthington contributed to this brief's drafting under supervision by counsel for *amici*.

[39] This brief sets forth the position of the signatories, as represented by counsel and law student members of the Peter Gruber Rule of Law Clinic but does not purport to state the views of Yale Law School or Yale University.

**LIST OF *AMICI CURIAE***

The list that follows identifies the individual *amici* and the government positions they formerly held:

- **Donald Ayer** – Deputy Attorney General (1989–1990); Principal Deputy Solicitor General (1986–1988); United States Attorney, Eastern District of California (1982–1986)

- **John B. Bellinger III** – Legal Adviser, Department of State (2005–2009); Senior Associate Counsel to the President and Legal Adviser, National Security Council (2001–2005)

- **Mary DeRosa** – Deputy Counsel to the President and Legal Adviser, National Security Council (2009–2011)

- **Jon Finer** – Principal Deputy National Security Advisor (2021–2025); Director of Policy Planning, Department of State (2016–2017)

- **Stuart Gerson** – Acting Attorney General (1993); Assistant Attorney General (Civil) (1989–1993); Assistant United States Attorney for the District of Columbia (1972–1975)

- **Avril Haines** – Director of National Intelligence (2021–2025); Deputy National Security Advisor (2015–2017)

- **Peter Keisler** – Acting Attorney General (2007); Assistant Attorney General (Civil) (2003–2007)

- **Mary B. McCord** – Acting Assistant Attorney General for National Security (2016-2017); Principal Deputy Assistant Attorney General for National Security (2014-2017); Assistant United States Attorney for the District of Columbia (1994-2014)

- **James C. O'Brien –** Assistant Secretary of State for European and Eurasian Affairs (2023–2025); Head, Office of Sanctions Coordination, Department of State (2022–2023); Special Envoy for Hostage Affairs (2015–2017)

- **Nuala O'Connor –** Member, President's Board on Safeguarding Americans' Civil Liberties (2004–2005); Chief Privacy Officer, Department of Homeland Security (2003–2005); Chief Counsel, Technology Administration and Chief Privacy Officer, Department of Commerce (2002–2003); Deputy Director, Policy & Strategic Planning, Department of Commerce (2001–2002)

- **Alan Raul –** Associate Counsel to the President (1986–1988); General Counsel, Office of Management and Budget (1988–1989); Vice Chairman of the Privacy and Civil Liberties Oversight Board (2006–2008)

- **Susan E. Rice –** Domestic Policy Advisor (2021–2023); National Security Advisor (2013–2017); United States Ambassador to the

United Nations (2009–2013)

- **Paul Rosenzweig –** Special Advocate, Data Protection Review Court (2023-2025); Deputy Assistant Secretary for Policy, Department of Homeland Security (2005–2009)

- **Nicholas Rostow –** General Counsel and Senior Policy Adviser to the United States Permanent Representative to the United Nations (2001–05); Special Assistant to the President for National Security Affairs and Legal Adviser, National Security Council (1987–93)

- **Wendy Sherman –** Deputy Secretary of State (2021–2023); Undersecretary for Political Affairs, Department of State (2011–2015)

- **Suzanne Spaulding –** Undersecretary, Department of Homeland Security (2013–2017); Minority Staff Director, House Permanent Select Committee on Intelligence (2003–2004); General Counsel, Senate Select Committee on Intelligence (1995–1998); Associate/Assistant General Counsel, Central Intelligence Agency (1989–1995)

- **Jake Sullivan –** National Security Advisor (2021–2025); National Security Advisor to the Vice President (2013–2014); Director of Policy Planning, Department of State (2011–2013)

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,132 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: March 16, 2026                    By:    */s/ Alexis Loeb*
                                                   Alexis Loeb

                                                   *Counsel for Amici Curiae*
                                                   *Former National Security*
                                                   *Government Officials*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on March 16, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: March 16, 2026                    By:    */s/ Alexis Loeb*
                                              Alexis Loeb

                                              *Counsel for Amici Curiae*
                                              *Former National Security*
                                              *Government Officials*