**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-1049**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ANTHROPIC PBC,
*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF WAR,
*Respondents*.

---

On Petition for Review of Department of War 41 U.S.C. § 4713 Notice

---

***AMICI CURIAE* BRIEF OF INDUSTRY TRADE ASSOCIATIONS
IN SUPPORT OF PETITIONER'S MOTION FOR STAY**

---

Daniel W. Wolff
Sharmistha Das
Matthew F. Ferraro
Alexandra L. Barbee-Garrett
Stephanie L. Crawford
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
dwolff@crowell.com

*Counsel for Amici Curiae*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici*.** *Amici* are not aware of any other parties, intervenors, or *amici* who have entered an appearance in this Court, other than those listed in Addendum A of Petitioner's emergency stay motion or disclosed by other *amici* to date.

**Action Under Review.** References to the actions at issue in this case appear in Anthropic PBC's Petition for Review, emergency stay motion, and associated exhibits.

**Related Cases.** To date and to *Amici*'s knowledge and belief, this case has not previously been before this Court, any other United States Court of Appeals, or any other court in the District of Columbia. Anthropic has challenged its designation as a supply-chain risk under a distinct statutory authority in Anthropic *PBC v. U.S. Dep't of War*, No. 3:26-cv-01996 (N.D. Cal.) (Complaint filed Mar. 9, 2026).

Dated: March 16, 2026                    /s/ Daniel W. Wolff
                                          Daniel W. Wolff

i

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amici curiae* certify the following:

TechNet does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in TechNet.

The Software & Information Industry Association ("SIIA") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in SIIA.

The Computer & Communications Industry Association ("CCIA") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in CCIA.

The Information Technology Industry Council ("ITI") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in ITI.

## CERTIFICATE OF SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel certifies that a separate brief is necessary to provide the unique perspective of representatives of technology sector companies, including those that contract with the U.S. Government, on the risks that the government's supply-chain risk designation of Anthropic pose to the enterprise of federal procurement. No other *amici* is able to provide this perspective. This brief is meaningfully different from the briefing submitted by Petitioner and not likely to be submitted by any other *amici curiae*.

Dated: March 16, 2026                                 /s/ Daniel W. Wolff
                                                      Daniel W. Wolff

# TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES............................................................................................i

DISCLOSURE STATEMENT...................................................... ii

CERTIFICATE OF SEPARATE BRIEF.............................................. iii

GLOSSARY .........................................................................vi

IDENTITY AND INTEREST OF *AMICI CURIAE*................................1

INTRODUCTION .................................................................2

SUMMARY OF ARGUMENT ....................................................5

ARGUMENT .......................................................................7

I.    The Administration's Failure to Use Established Process Threatens the Foundations of Federal Technology Procurement................................................7

II.   The Ambiguity and Internal Contradictions of the Administration's Actions Harm the Technology Community. ..................................................................12

III.  The Administration's Actions Threaten *Amici*'s First Amendment Rights........................................................14

CONCLUSION .....................................................................14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974) ................................................................. 14

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) ................................................................. 14

**Statutes**

10 U.S.C. § 3252 ....................................................................... 4

41 U.S.C. § 4713 ................................................................. 4, 5, 9

**Regulations**

48 C.F.R. § 9.402(b) ................................................................. 9

# GLOSSARY

| | |
|---|---|
| AI | Artificial Intelligence |
| FASCSA | The Federal Acquisition Supply Chain Security Act |
| SIIA | The Software & Information Industry Association |
| CCIA | The Computer & Communications Industry Association |
| ITI | The Information Technology Industry Council |

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating for a federal and state policy agenda across the country.

The Software & Information Industry Association ("SIIA") is the principal trade association for those in the business of information, including developers of artificial intelligence ("AI") models and applications.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms.

The Information Technology Industry Council ("ITI") is the premier global advocate for technology, representing the world's most innovative companies, including those that are driving American leadership in AI.

*Amici* industry trade associations submit this brief because the government actions that Anthropic PBC ("Anthropic") challenges in this petition carry immediate and concrete consequences for *amici*'s members

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *amici*, their members, or their counsel funded the preparation or submission of this brief.

and for the legal framework on which the entire government contracting community depends. Many of *amici*'s members contract with the U.S. Government, including the Department of War ("DoW"),[2] to provide mission-critical products and services, including AI technology. The designation of a major domestic AI firm as a supply-chain risk, without the thorough risk assessment required by statute, engenders uncertainty throughout the broader industry. Treating an American technology company as a foreign adversary, rather than an asset, will chill U.S. innovation and further embolden China's efforts to export its own government-backed AI technology. *Amici* respectfully request that this Court grant a stay to consider the issues and forestall harm to the industry.

## INTRODUCTION

If, as the result of a contractual disagreement, the federal government can instantly blacklist a U.S. company from government work on the pretext that the company poses a security risk, then the procurement framework that Congress built over decades becomes

---

[2] The U.S. Department of War is the secondary name for the U.S. Department of Defense.

contingent on political favor rather than the rule of law. A system in which agencies may bypass governing statutes and regulations at presidential or secretarial command is not the system Congress designed, nor the one this Court should endorse.

Congress' comprehensive statutory procurement framework is the product of considered legislative judgment. Competitive bidding and the rule of law are the mechanisms by which the government harnesses the innovation of private industry. Indeed, they are what distinguishes American procurement from the command-and-control models of its adversaries. And they are what gives companies like *amici*'s members the confidence to invest the resources, obtain the security clearances, and build the partnerships necessary to serve the national defense.

The government's own stated policy depends on this architecture. The government has rightly championed global adoption of U.S.-developed AI systems as a national priority. That vision is premised on the availability of a competitive market and innovative domestic technology sector that is incentivized to do business with the government on stable, legally grounded business terms.

The Administration's actions in this case imperil those policy priorities. Following a contract dispute between DoW and Anthropic, President Trump posted on social media on February 27, 2026, that, because Anthropic wanted DoW to adhere to Anthropic's Terms of Service, he was "directing EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology" ("Presidential Directive"). [3] Roughly 90 minutes later, Secretary of War Pete Hegseth announced on social media that he was directing DoW "to designate Anthropic a Supply-Chain Risk to National Security," and, "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic" ("Secretarial Order"). [4] Six days later, the Pentagon delivered two formal determinations to Anthropic, invoking two statutes never used, 10 U.S.C. § 3252, or rarely used 41 U.S.C. § 4713 (the Federal Acquisition Supply Chain Security Act

---

[3] President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.

[4] Secretary Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM), https://x.com/SecWar/status/2027507717469049070.

("FASCSA")) to designate an American company a supply-chain risk to national security (collectively, the "Determinations"). Here, Anthropic seeks review of the Determination under 41 U.S.C. § 4713 (the "Determination").

When the Administration issued the Presidential Directive, the Secretarial Order, and the Determinations, DoW had not completed the statutory procedural requirements. The consequences have been swift: contracts terminated, partnerships frozen, workflows thrown into disarray, and a compliance crisis imposed on companies that may not be able to identify the requirements they must meet, let alone identify whether work product assisted by Anthropic's products or services has been incorporated into their offerings. The Determinations have sent a ripple of uncertainty throughout the broader industry that risks undermining the credibility of the U.S. AI sector and the Administration's own national and economic security objectives.

## SUMMARY OF ARGUMENT

*Amici* request that the Court stay the Determination for three principal reasons.

*First*, the Presidential Directive, the Secretarial Order, and the Determinations threaten the entire enterprise of federal procurement from the technology industry by disregarding the carefully constructed legal structure that *amici*'s members rely upon to make sensible business decisions. If an executive branch agency may convert a contract dispute into a government-wide supply-chain risk designation, disregarding every procedural safeguard Congress prescribed, then the procurement framework Congress built protects no one. Members of the domestic technology sector will rationally recalculate whether government work is worth the risk.

*Second*, to this day, the reach and effect of the government's actions are so unclear that they are causing immediate and substantial harm to the technology industry. Hundreds if not thousands of companies are trying to parse the meaning of social media posts, inconsistent and shifting Administration statements, and vague directions.

*Third*, the conduct in question raises serious concerns that DoW has violated Anthropic's First Amendment rights, including compelling the company to alter its expressive product and retaliating against the

company for its perceived viewpoint. *Amici*'s companies also have an interest in preserving their rights to constitutionally protected speech.

## ARGUMENT

### I. The Administration's Failure to Use Established Process Threatens the Foundations of Federal Technology Procurement.

The federal government's ability to access the world's most advanced commercial technology depends on a procurement system that offers private companies stable rules, predictable terms, and the assurance that disputes will be resolved through established legal channels. That procurement system is the product of decades of bipartisan judgment that competition and procedural regularity are not meaningless bureaucratic formalities but essential preconditions for government procurements that serve American people and incentivize private industry to invest the enormous resources required to serve the national defense.

As several *amici* wrote to the President, "[e]xisting federal procurement processes create that landscape," enabling "the government to identify the right solutions and resolve disputes in a way that incentivizes private innovation and competition" while "preventing a

single point of failure in our national defense infrastructure[.]" [5] Maintaining that competitive edge "requires a policy environment that encourages, rather than restricts, the growth of multiple American AI leaders."[6]

The federal procurement framework that Congress built over decades accordingly reflects a considered judgment about how a democratic government should acquire the commercial technology it needs to defend the nation. For *amici*'s members, like all government contractors, that framework rests on competitive bidding, procedural regularity, and mutual trust between the government and the private sector, and *amici*'s members depend on those due process protections to make business decisions. Before the government may exclude a company from federal contracting, the law requires procedural safeguards: notice of the factual basis for the action, an opportunity to respond, and a written determination grounded in law and fact. *See, e.g.*, 48 C.F.R.

---

[5] Letter from Software & Information Industry Association, TechNet, Computer & Communications Industry Association, and Business Software Alliance to The Hon. Donald J. Trump, President of the United States, at 2 (Mar. 4, 2026), https://www.technet.org/wp-content/uploads/2026/03/Letter-to-the-President-March-4-2026.pdf.

[6] *Id.* at 1.

§ 9.402(b) (debarment may "*not*" be used "for purposes of punishment." (emphasis added)). They are also embedded in 41 U.S.C. § 4713(b), which requires consultation with procurement officials to obtain a joint recommendation that there is a significant supply-chain risk, notice and an opportunity to respond, written determinations, and congressional notification before any covered procurement action may be taken.

The procurement framework Congress built ensures that the disbursement of public funds for the acquisition of goods and services is governed by law rather than by the discretion of individual officials. FASCSA and the greater body of procurement statutes exist to ensure that the government's purchasing power is exercised transparently, competitively, and pursuant to rules known in advance.

Moreover, one of America's greatest competitive advantages is its decentralized, competitive market. The framework of mutual trust established by law allows the United States to draw on the extraordinary innovative capacity of its technology industry—an advantage that its adversaries, with their centralized and state-directed models, cannot replicate. That framework also prevents a single point of failure in the national defense infrastructure.

9

The Determination's designation of Anthropic as a supply-chain risk upends that framework. Anthropic invested in obtaining the federal government's highest unclassified cloud security certification, FedRAMP High authorization, and a Top-Secret facility clearance and personnel clearances issued by the Defense Counterintelligence and Security Agency to embed its engineers in classified programs. Companies do not make these compliance and security investments on the strength of political goodwill. They choose to pursue federal government business in reliance on the federal government abiding by the framework of rights, obligations, and procedures required by law.

If upheld, the Determination would break those commitments by applying to a domestic company the supply-chain risk label that Congress designed to protect the United States from foreign adversaries that may sabotage national security systems.[7] DoW has introduced a new and unbounded risk into every company's calculus about whether to do business with the federal government. In doing so, the government risks

---

[7] Only three exclusion orders have been issued under FASCSA and none against a domestic company. *Supply Chain Security Orders*, Sys. Award Mgmt. (accessed Mar. 16, 2026), https://sam.gov/supplychainorders (click "Download FASCSA Orders") (showing three FASCSA orders for Acronis AG and Acronis SGS Inc.).

chilling domestic innovation and ceding ground to China's state-directed AI enterprise at the precise moment American leadership matters most.

DoW did not follow the process required by the statutes or the Constitution upon which the American technology sector depends. No factual findings were provided to Anthropic. No opportunity to respond was afforded before the restrictions imposed by the Determination took effect. And, although the Secretarial Order was announced on social media on February 27, the formal notification letter—offering no reasoned analysis—did not reach Anthropic until March 4.

DoW's failure to use the established process matters not only to Anthropic but also to every company in the federal contracting ecosystem. A supply-chain risk designation carries profound commercial consequences: it excludes the designated company from government contracts, compels contractors throughout the supply chain to evaluate whether their continued commercial relationships with the company are permissible, and brands the company with a label that Congress reserved for entities posing a risk of foreign adversary sabotage. If a supply-chain risk designation can be imposed on a cleared American company without

11

adhering to statutorily required procedural protections or due process, those protections are a dead letter.

## II. The Ambiguity and Internal Contradictions of the Administration's Actions Harm the Technology Community.

The practical impact on *amici*'s members is already substantial. Anthropic's primary offering, Claude, is not a standalone product that can be cleanly excised from the technology stack—the collection of infrastructure, operations, and data used to create technology applications, products, and services for customers. It is used to write code incorporated into different applications at all levels of the supply chain. Many companies will be unable to remove Claude or even identify whether code has been written with Claude once it is incorporated into their offerings. Other companies use Claude to test the security and capability of existing products and services, including testing for compliance with required government security standards for many of *amici*'s members' offerings.

The Secretarial Order's direction to cease "any commercial activity" with Anthropic adds to the Determination's disruption because the Secretarial Order announces a broader restriction than the

12

Determination implements. *Amici*'s members are making real-time business decisions of enormous commercial consequence in the shadow of these undefined terms. Is the announced ban on "commercial activity" still coming down the pike, and does it encompass Claude-generated code already incorporated into an already-shipping product? Does a cloud platform that hosts Claude alongside dozens of other AI models qualify as a "partner that does business with the United States military" and, if so, is it prohibited from hosting Claude even for purely commercial customers with no DoW connection? And while DoW gave itself a six-month transition period, it provided no comparable transition for the contractors, suppliers, and partners who must now decipher the Secretarial Order's reach and restructure their operations on an immediate basis, or whenever the Determinations are incorporated into their contracts.[8]

---

[8] *See* Mem. from Dep't of War Chief Info. Off. to Senior Pentagon Leadership et al., Removal of Anthropic, PBC Products in DoW Systems, at 2, Dep't War (Mar. 6, 2026), https://www.cbsnews.com/news/pentagon-ai-anthropic-memo-remove-from-key-systems/.

### III.   The Administration's Actions Threaten *Amici*'s First Amendment Rights.

*Amici*'s members engage in a wide range of speech: through expressive products and services, algorithmic speech, competition for commercial and government business, government contracting, and terms of use. First, if the government's actions amount to compelling a contractor to alter the message embodied in an expressive product, like Claude, those actions raise serious compelled-speech concerns. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974). Second, if the government retaliated against Anthropic based on the perceived viewpoint of the company and its leadership, that retaliation is constitutionally impermissible regardless of whether the government characterizes its actions as procurement decisions. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180-81 (2024); *id.* 602 U.S. at 199, 203-04 (Jackson, J., concurring). *Amici*'s members also have First Amendment rights that they wish to exercise, and have an absolute right to exercise, without the threat of unlawful governmental interference.

### CONCLUSION

*Amici* respectfully urge the Court to grant Petitioner's motion for a stay. The government has ample, well-established tools to resolve

procurement disputes and to contract with providers on whatever terms it prefers. What it may not do is misuse extraordinary national security authorities designed for foreign adversary sabotage to punish a cleared American contractor for a negotiation disagreement, dispense with procedural protections Congress enacted, and upend the legal framework on which the entire technology contracting community depends. The Court should preserve the *status quo* while this matter is adjudicated.

Respectfully submitted,

/s/ Daniel W. Wolff
Daniel W. Wolff
Sharmistha Das
Matthew F. Ferraro
Alexandra L. Barbee-Garrett
Stephanie L. Crawford
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
dwolff@crowell.com

*Counsel for Amici Curiae*

March 16, 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(e)(3) because it contains 2,459 words, excluding the portions exempted by Rule 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook.

/s/ Daniel W. Wolff
Daniel W. Wolff

March 16, 2026

16

## CERTIFICATE OF SERVICE

I hereby certify that, on March 16, 2026, I have caused the foregoing to be filed electronically with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Daniel W. Wolff
Daniel W. Wolff

17