**No. 26-1049**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice
Before The Honorables Robert L. Wilkins, Gregory G. Katsas, and Neomi Rao

## REPLY IN SUPPORT OF PETITIONER'S EMERGENCY MOTION FOR STAY PENDING REVIEW

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

March 23, 2026

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ..............................................................................................1

ARGUMENT ......................................................................................................2

I.     ANTHROPIC IS LIKELY TO SUCCEED ON THE MERITS ....................................2

      A.     Anthropic's Stay Request Is Proper ......................................................2

      B.     The Secretary Violated § 4713 ...........................................................3

           1.     Procedural Requirements ...........................................................3

           2.     Substantive Requirements ..........................................................6

      C.     The Secretary Violated Due Process......................................................9

      D.     The Secretary Violated The First Amendment ...................................10

II.     ANTHROPIC IS SUFFERING IRREPARABLE HARM ..............................................11

III.     REMAINING FACTORS FAVOR A STAY ...........................................................12

CONCLUSION..................................................................................................13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES[*]

Page(s)

*Amoco Oil Company v. EPA*, 501 F.2d 722 (D.C. Cir. 1974) ....................................4

*Bailey v. Federal Bureau of Prisons*, 780 F. Supp. 3d 96 (D.D.C. 2025) .......................................................................................................11

*Chamber of Commerce of United States v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) ............................................................................................5

*\*Department of Commerce v. New York*, 588 U.S. 752 (2019) ...............................8

*\*DHS v. Regents of University of California*, 591 U.S. 1 (2020)............................8

*Environmental Health Trust v. FCC*, 9 F.4th 893 (D.C. Cir. 2021)..........................4

*EPA v. Calumet Shreveport Refining, LLC*, 145 S. Ct. 1735 (2025)........................5

*FTC v. Dean Foods Company*, 384 U.S. 597 (1966) .................................................2

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...............................................................13

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)............................................6

*\*In re NTE Connecticut, LLC*, 26 F.4th 980 (D.C. Cir. 2022) ..........................2, 12

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)...............................................11, 13

*Louisiana Public Service Commission v. FERC*, 522 F.3d 378 (D.C. Cir. 2008) ............................................................................................4

*Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) .................12

*\*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983) ...................................8

---

[*]    Authorities upon which Anthropic chiefly relies are marked with asterisks.

*National Council of Resistance of Iran v. Department of State,
251 F.3d 192 (D.C. Cir. 2001)..............................................................9

National Rifle Association of America v. Vullo, 602 U.S. 175 (2024) ....................10

Nken v. Holder, 556 U.S. 418 (2009)........................................................2

*People's Mojahedin Organization of Iran v. United States
Department of State, 613 F.3d 220 (D.C. Cir. 2010) .....................................9

*Ralls Corporation v. Committee on Foreign Investment in United
States, 758 F.3d 296 (D.C. Cir. 2014) .....................................................9

Spring Nextel Corporation v. FCC, 508 F.3d 1129 (D.C. Cir. 2007) ......................4

United States v. Ross, 848 F.3d 1129 (D.C. Cir. 2017).................................5, 6

Widakuswara v. Lake, 2025 WL 1288817 (D.C. Cir. May 3, 2025)......................13

## STATUTORY PROVISIONS

7 U.S.C. § 10a ...............................................................................2

*41 U.S.C.
§ 1327 ...................................................................................2, 3, 5
§ 4713 ...................................................................................1, 3, 4, 5

iv

## INTRODUCTION

The Secretary's opposition reinforces what his actions show: he is abusing 41 U.S.C. § 4713 designation authority not to address a genuine supply-chain risk but to punish Anthropic for protected expression. Yet this Court need not resolve those issues now. For stay purposes, it suffices that Anthropic is virtually certain to establish that the Secretary has violated procedural requirements Congress imposed and the Constitution guarantees.

Due process requires notice and an opportunity to be heard, and Congress codified those protections in § 4713. Section 4713 permits the Secretary to discard those protections only where he articulates an "urgent national security interest" that makes process impracticable. 41 U.S.C. § 4713(c). Documents shared with Anthropic only hours before the Secretary filed his opposition now show he invoked that exception on March 3. But he offers no reasoned explanation of what imminent harm would follow from affording Anthropic notice and a meaningful opportunity to be heard. Nor could he: his longstanding knowledge of Anthropic's usage limitations and demand that Anthropic *remain* on Department systems for up to 6 months refute any purported exigency. And the post-deprivation process the Secretary defends is insufficient under the statute and Circuit precedent.

The remaining factors compel a stay to avoid further irreparable injury to Anthropic's rights, reputation, and commercial relationships. A stay would *not*

compel the Secretary to contract with Anthropic. But it *would* ensure § 4713 authority is not unlawfully used to punish Anthropic, preserve the procedural rights Congress and the Constitution place beyond executive discretion, and protect the public interest.

**ARGUMENT**

**I.    ANTHROPIC IS LIKELY TO SUCCEED ON THE MERITS**

**A.    Anthropic's Stay Request Is Proper**

The Secretary leads with an ambitious argument: this Court has no "power to issue interim relief" under 41 U.S.C. § 1327(b). Opp.13. But stays pending judicial review are "'firmly imbedded in our judicial system,'" *Nken v. Holder*, 556 U.S. 418, 427 (2009), and "this court has an 'inherent' power" under the All Writs Act "to stay agency action," *In re NTE Connecticut, LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022). Congress must speak clearly to divest courts' authority "to protect [their] own jurisdiction." *FTC v. Dean Foods Co.*, 384 U.S. 597, 608 (1966). Nothing in § 1327 does that. The "exclusive remedy" clause in § 1327(b)(4)(C) does not purport to divest this Court of power to grant interim relief to preserve its ability to decide the legality of a § 4713 designation. Congress knows how to forbid stays pending judicial review, *e.g.*, 7 U.S.C. § 10a(a); it did not here. Reading § 1327(b) to foreclose interim relief for procedural and constitutional

2

claims challenging an already-operative designation would raise serious constitutional concerns.

The Secretary's objections that Anthropic "lacked a full understanding of the circumstances when filing its motion," Opp.14-15, catalogue defects of his own making. Had he followed statutory and constitutional requirements, Anthropic would have received notice and an opportunity to be heard before challenging any designation. But it was the Secretary who announced a facially unlawful designation on February 27, Add.94; issued a then-secret determination on March 3, Add.194-196; shared a conclusory, immediately-effective notice with Anthropic on March 4, Add.260-261; and disclosed key agency materials only hours before filing his opposition, Add.241, 195-224. Despite the Secretary's inversion of proper sequencing, he identifies no persuasive reasons this Court cannot resolve Anthropic's stay request now, based on materials before it.

### B.    The Secretary Violated § 4713

#### 1.    Procedural Requirements

Section 4713's text is clear: The Secretary may make a designation only "after" supplying "notice" of its "basis" and permitting a party to "submit information and argument" in response. 41 U.S.C. § 4713(b). That concededly did not happen here. Opp.16-17. Instead, as belatedly disclosed documents reveal, the

3

Secretary invoked the § 4713(c) emergency exception on March 3. His reliance on that exception is untenable. Mot.13-14.

The Secretary's invocation of § 4713(c) is facially deficient. The sum total of his explanation is: "I have determined that an urgent national security interest requires the immediate exercise of the authority in Section 4713(a) pursuant to Section 4713(c)." Add.194. "[T]hat is not a reason; it is a conclusion," *Louisiana Public Service Commission v. FERC*, 522 F.3d 378, 400 (D.C. Cir. 2008), and certainly "not the 'reasoned' explanation required" by the statute, *Environmental Health Trust v. FCC*, 9 F.4th 893, 909 (D.C. Cir. 2021).[1]

Text and structure confirm the emergency exception is not some check-the-box exercise. Congress required the Secretary to issue a written determination justifying a designation, 41 U.S.C. § 4713(b)(3), and provide a "description of the urgent national security interest" to Congress, *id.* § 4713(c)(2)(C)—subject to APA-like review in this Court, *id.* § 1327(b). Such requirements exist to facilitate meaningful judicial review, *e.g.*, *Amoco Oil Company v. EPA*, 501 F.2d 722, 739 (D.C. Cir. 1974), but conclusory agency assertions without "reasoning" make that impossible, *Spring Nextel Corporation v. FCC*, 508 F.3d 1129, 1132-1133 (D.C.

---

[1]    Underlying agency materials passingly refer to "urgent" and "urgently," Add.195, 198, but none explains what exigency required immediate designation or what interests would be impaired by complying with statutory process.

Cir. 2007). The Secretary cannot bypass § 4713's procedural requirements on mere say-so.

Nor are there grounds for dispensing with § 4713(b)'s requirements here. Emergency exceptions are "narrowly construed and only reluctantly countenanced." *United States v. Ross*, 848 F.3d 1129, 1132 (D.C. Cir. 2017). An "urgent national security interest" requires more than the generalized interest in agency action; it requires an exigency that would cause serious harm from following ordinary procedures. *See Chamber of Commerce of the United States v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006) (skipping notice-and-comment requires showing "delay could result in serious harm" or "exigen[cy]").

The Secretary wrongly assumes his insufficient rationales for the designation itself qualify as "urgent national security interest[s]" under § 4713(c). All such designations implicate "national security," 41 U.S.C. § 4713(b)(3)(A), yet Congress established default procedures *before* they may be imposed. If need for a designation alone satisfied § 4713(c), "the exception" would "swallow the rule." *EPA v. Calumet Shreveport Refin., LLC*, 145 S. Ct. 1735, 1751 (2025).

Indeed, the *up-to-six-month* offboarding, Add.97, confirms the Secretary could have delayed finalizing a decision by *one* month to afford Anthropic required process, Mot.14. That is especially so because the Secretary disclaims intending to use Claude for lethal autonomous warfare or domestic mass

5

surveillance. Add.42-43 (Heck Decl. ¶15); *see* Add.254-255 (Second Heck Decl. ¶10).

Moreover, the Secretary's knowledge of Anthropic's usage restrictions for over a year forecloses any exigency. Add.29-30 (Kaplan Decl. ¶29); *Ross*, 848 F.3d at 1133 (delay of "over half a year" defeats exigency). The government's recent "behavior" likewise "undercuts" a "claim of urgency." *Ross*, 848 F.3d at 1133. The day *after* the notice, Under Secretary Michael responded to Anthropic's latest contractual compromise, saying, "I think we are very close here," and "I hope this work[s]." Add.258. It is paradigmatic arbitrariness to sign paperwork on Tuesday declaring Anthropic a sabotage threat and convey on Wednesday being "very close" to continued collaboration. At a minimum, continued negotiations belie any "urgent" security risk.

### 2.    Substantive Requirements

Section 4713 is not a blank check; it is a specific tool for addressing defined "supply chain risks." The Secretary has abused § 4713 to punish Anthropic for its refusal to abandon its negotiation position and for its protected expression. Mot.14-17. Although this Court accords appropriate respect to national-security judgments, invoking such concerns does not compel "abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Enforcing statutory limits respects, not oversteps, this Court's Article III responsibility.

6

a.     Differing views about AI safety do not make an American company an adversary or supply-chain risk. The Secretary's contrary theory is that Anthropic "retains substantial control over the functioning of [Claude] even while used by the military" and cannot be trusted. Opp.1; *id.* at 6, 9-11, 23. The Michael memorandum repeats that rationale, expressing sabotage concerns and claiming Anthropic sought an operational "veto." Add.198.

All of this is disproven by the record. "Anthropic does not have the access required to disable [its] technology or alter [its] model's behavior before or during ongoing operations." Add.275 (Second Ramasamy Decl. ¶14). Once deployed in classified environments, Anthropic has no access to Claude. Add.274-278 (*Id.* ¶¶13-20). It could not "veto" particular uses even if it wanted to. Add.254 (Second Heck Decl. ¶9). And Anthropic did not want to. *Id*. Indeed, Anthropic proposed contract language expressly disavowing such authority. *Id*.

b.     The additional rationales advanced by the Secretary are no more persuasive. Many (AI opacity, drift, model poisoning, and foreign employees, Add.199; Add.227-230) are characteristic of *all* AI models or labs, not just Anthropic, Add.277-279 (Second Ramasamy Decl. ¶¶19-22). And none— including prior dealings with CDC—is logically connected to whether Anthropic acceded to "all lawful uses." The absence of a "rational connection between the

7

facts found and the choice made" reflects arbitrary decisionmaking. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

      c.      The timeline of events independently suggests the Secretary did not act based on genuine national-security concerns. The Michael memorandum, for example, posits that "Anthropic's risk level escalated" during negotiations to "an unacceptable national security threat." Add.200. Yet Michael was still negotiating with Anthropic on March 4—one day after memorializing his sabotage concerns. Add.44 (Heck Decl. ¶19). This underscores the "contrived" nature of the national-security rationale. *Department of Com. v. New York*, 588 U.S. 752, 784-785 (2019).

      d.      Finally, the Secretary cannot persuasively defend how § 4713's "less intrusive measures" requirement is satisfied. Mot.17. Congress intended designations to be a last resort, not a first, yet the agency materials reflect no real engagement with alternatives—including not contracting with Anthropic, limiting the designation to certain uses, or excluding systems unrelated to lethal autonomous warfare or domestic mass surveillance. After-the-fact litigation affidavits (Add.232-233) cannot cure such pre-decisional failure. *DHS v. Regents of Univ. of California*, 591 U.S. 1, 22 (2020).

## C.    The Secretary Violated Due Process

The Secretary's failure to provide notice and an opportunity to respond before imposing the designation violates due process. Mot.17-19. The Secretary does not contest that the designation impaired Anthropic's property and liberty interests. Instead, he argues "post-designation process" is sufficient. Opp.21.

That runs headlong into Circuit precedent. Take *Ralls*, which held that, even in the national-security context, the government must give the targeted company "procedural protections," including notice and an opportunity to respond, "before" infringing liberty or property. *Ralls Corp. v. CFIUS*, 758 F.3d 296, 320 (D.C. Cir. 2014). *Ralls* comports with this Court's terrorist designation precedents, which likewise hold that post-deprivation process is insufficient, absent compelling particularized need. *E.g.*, *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-228 (D.C. Cir. 2010); *National Council of Resistance of Iran v. U.S. Dep't of State*, 251 F.3d 192, 207-208 (D.C. Cir. 2001). If post-deprivation process is insufficient for alleged foreign terrorists, it is inadequate for a leading American company.

The Secretary claims post-deprivation process is sometimes acceptable, "where the government 'must act quickly,'" Opp.21, or "'advance notification'" would risk serious harm, Opp.22. But neither of those conditions exists here, as explained above, and the Secretary has never explained otherwise.

9

Finally, these violations were prejudicial. Had Anthropic been given an opportunity to respond to the now-asserted designation grounds, it would have identified critical errors underlying the decision. Add.271-272, 274-279 (Second Ramasamy Decl. ¶¶5, 13-22).

### D. The Secretary Violated The First Amendment

Finally, the Secretary has unconstitutionally wielded "the power of the State to punish or suppress disfavored expression." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Beyond the Secretary's singling out of Anthropic's perceived "rhetoric" and "ideology," Add.94, the Michael memorandum points to "statements … during negotiations," Anthropic's decision to engage in a "public[] spat," and "public statements of Anthropic's CEO"—all expressive activity. Add.198-199. And the Department's suggestion that negotiations with the government can never be protected expression (Opp.24), ignores the Petition Clause and Supreme Court precedent. Mot.20-21.

The Secretary asks this Court to disregard that evidence and accept that his true motivation was "potential" disruption of military operations. Opp.23-24. Setting aside that such disruption is impossible, Add.275 (Second Ramasamy Decl. ¶15), the Secretary's post and the Michael memorandum make clear that expression was at least a substantial motivating factor—indeed, the Secretary ordered the designation *the day after* Anthropic's public blog post.

If all the Department wanted was not to "use [Department] funds to purchase" Claude, Opp.24, it could have done so (a less intrusive measure contemplated by § 4713). Instead, the designation purports to sweep far more broadly, barring every defense contractor, on any project, from "using [Claude]" for any purpose for "work on Department contracts," Opp.7-8, and potentially initiating a process extending beyond the Department, Mot.2. It also imposes an unwarranted stigma on Anthropic—an American company with a history of supporting the Department.

Finally, that Anthropic "remains free" to speak," Opp.24, ignores the point of a retaliation claim. The government cannot "retaliat[e] against those who have spoken instead of directly restricting their speech." *Bailey v. Federal Bureau of Prisons*, 780 F. Supp. 3d 96, 122 (D.D.C. 2025). Anthropic has established its protected expression, the government's retaliatory response, and the connection between them. Mot.19-22. That suffices.

## II. ANTHROPIC IS SUFFERING IRREPARABLE HARM

A stay is required to avoid further irreparable injury. Mot.22-24.

***Constitutional injuries.*** As to due process, a violation of procedural "due process rights … support[s] [preliminary] relief." *Karem v. Trump*, 960 F.3d 656, 667-68 (D.C. Cir. 2020). The Secretary responds that, unlike *Karem*, Anthropic received "adequate process," Opp.26, but that repackages his failed merits

11

arguments. As to the First Amendment, "suffering from a campaign of [ongoing] retaliation" is "irreparable injury," *Media Matters for America v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025), regardless of showing a current "hind[rance]" of speech, Opp.25.

***Reputational injuries.*** The Secretary ignores the irreparable damage to Anthropic's reputation from being the first American company designated a supply-chain risk. Mot.22-23.

***Commercial injuries.*** The concrete harms the designation is inflicting on Anthropic's commercial relationships, and resulting lost "significant future revenues," *NTE*, 26 F.4th at 991, are also irreparable. Mot.23-24. This reflects not "conjecture," Opp.26, but real-world consequences, *e.g.*, Add.74 (Smith Decl. ¶20); Add.79 (Rao Decl. ¶6). The suggestion that Anthropic is not entitled to preliminary relief because "the President's and Secretary's other actions," Opp.26—some of which must be challenged in district court—are concurrent causes of Anthropic's injuries is unfounded. If true, Anthropic could get relief nowhere because the government has weaponized different authorities in a single retributive campaign. That cannot be right.

## III.    THE REMAINING FACTORS FAVOR A STAY

The public interest will be advanced by a stay preserving the pre-designation status quo, as multiple amici attest. National security is a compelling interest, but

12

"[t]he Constitution … does not permit [the Secretary] to prioritize any policy goal over the Due Process Clause," *Karem*, 960 F.3d at 668 (quotation omitted), and there is also a strong public "interest in the Executive Branch's compliance with congressional mandates." *Widakuswara v. Lake*, 2025 WL 1288817, at *6 (D.C. Cir. May 3, 2025) (per curiam); *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 576 (2004) (Scalia J. dissenting).

Concerns about "countermand[ing] … considered national-security judgments" and "jeopardiz[ing] … active military operations," Opp.27, are unpersuasive. They reflect the technical misunderstanding that Anthropic can manipulate models once delivered to the Department. They are undermined by the Secretary's insistence that the Department continue using Anthropic for six months. And they ignore the Secretary's ability to retain alternative vendors without invoking § 4713.

## CONCLUSION

The Court should grant the stay or, alternatively, order expedited merits briefing.

13

Dated:  March 23, 2026

Michael J. Mongan
Wilmer Cutler Pickering
  Hale And Dorr LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com


Emily Barnet
Wilmer Cutler Pickering
  Hale And Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

Respectfully submitted.

/s/ Kelly P. Dunbar

Kelly P. Dunbar
Joshua A. Geltzer
Kevin M. Lamb
Anneke Dunbar-Gronke
Wilmer Cutler Pickering
  Hale And Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-
gronke@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

The foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), 27(a)(2)(B), 32(f) and D.C. Cir. R. 32(e)(1), because it contains 2,600 words according to the count of Microsoft Word for Office. I further certify that the foregoing motion also complies with Fed. R. App. P. 32(a)(5)-(6) and D.C. Cir. R. 27(d)(1)(E), because it has been prepared using Microsoft Word for Office in 14-point proportionally spaced Times New Roman typeface.

Dated:  March 23, 2026                                    /s/  *Kelly P. Dunbar*
                                                         KELLY P. DUNBAR

# CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Pursuant to Rule 25(c)(2)(A) of the Federal Rules of Appellate Procedure, I further certify that the foregoing was served to all registered users by filing it with the court's electronic filing system.

/s/  *Kelly P. Dunbar*

KELLY P. DUNBAR
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

Page

Addendum A: Declaration of Sarah Heck (Mar. 23, 2026)............................Add.250

Exhibit 1: Email from Emil Michael to Dario Amodei Re:
      Agreement with Department of War (Mar. 4, 2026) ................Add.257

Exhibit 2: Email and two attachments from Anthony Fuscellaro
      to Dario Amodei Re: Official Correspondence from the
      Department of War to Anthropic (Mar. 4, 2026)......................Add.259

Addendum B: Declaration of Thiyagu Ramasamy (Mar. 22, 2026) .............Add.269

# Addendum A: Declaration of Sarah Heck
# (Mar. 23, 2026)

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF SARAH HECK

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

Add.250

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

I, Sarah Heck, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I previously submitted a declaration in this case on March 10, 2026, describing Anthropic PBC's ("Anthropic") relationship and communications with the U.S. Government, including the Department of War ("Department"). I submit this supplemental declaration in support of Anthropic's Reply Brief in Support of Plaintiff's Motion for a Preliminary Injunction.

2. As stated in my March 10 declaration, my understanding of Anthropic's relationship and communications with the Department is based on my experience in my role as Head of Policy. In that role, I lead Anthropic's public policy engagement, government relationships, strategic partnerships, and government communications, including engagements and initiatives that address the intersection of Artificial Intelligence ("AI"), national security, and economic policy. This includes being involved in communications between Anthropic and the government.

3. I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4. As I described in my original declaration, Anthropic and the Department had been negotiating a partnership for several months. I participated personally in these negotiations. This includes attending the in-person meeting on

1

**Add.251**

February 24, 2026, where the Department Chief Technology Officer and Under Secretary of War Emil Michael and Secretary of War Pete Hegseth met with Anthropic CEO Dr. Dario Amodei.

5.    I explained in my prior declaration that Anthropic's negotiations with the Department did not end after the February 27, 2026, directives issued by President Donald Trump and Secretary Hegseth attacking Anthropic. In the days following those directives, the parties continued to work towards an agreement, even as the Department—unbeknownst to Anthropic—was drafting materials claiming that Anthropic posed risks of sabotage, data exfiltration, and other serious harms. At no point in these conversations did Under Secretary Michael or anyone at Department share with Anthropic its apparently grave concerns or suggest that they were an impediment to a deal. To the contrary, the Department and Anthropic were still engaged in negotiations on March 4, 2026—the day *after* the Department completed its formalization of the supply-chain risk designation (but before Anthropic received that formal notice).[1]

6.    In reviewing the materials the government has filed in this case, I was struck by its repeated claim that Anthropic insisted during negotiations that the company have some sort of approval role in the Department's operational decision

---

[1] Attached hereto as **Exhibit 1** is a true and correct copy of a March 4, 2026 email from Emil Michael to Dario Amodei.

2

**Add.252**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

chain. That is false. At no time during Anthropic's negotiations with the Department did I or any other Anthropic employee state that the company wanted that kind of role. We do not want it now, either.

7.     Likewise, at no point during the negotiations did any party raise any concerns about Anthropic taking technical steps to disrupt the U.S. military.  This is a new purported concern that was raised, for the first time, in the government's filings in this case. Had this concern been raised in a manner allowing Anthropic to respond, we would have explained, among other things, the technical impossibility of such disruption. Second Declaration of Thiyagu Ramasamy ("Second Ramasamy Decl.") ¶¶13-20. As I understand from Thiyagu Ramasamy's supplemental declaration, Anthropic is unable to alter an AI model after deployment without the Department's knowledge or consent. Second Ramasamy Decl. ¶17.

8.     Additionally, it is my understanding that the Department had previously expressed concerns that Anthropic had objected—after the fact—about how Anthropic's models were being used in the Department operations and those concerns are now reprised in the government's materials. But this concern was and is misplaced, as Anthropic has made very clear. Indeed, when Secretary Hegseth raised this topic at the February 24th in-person meeting, Dr. Amodei clarified that the company had not objected to the use of its tools as reported. Dr. Amodei

3

**Add.253**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

further explained that Anthropic has no interest in interfering with the Department operations more generally. Dr. Amodei publicly reiterated that stance in a February 26, 2026, blog post, explaining that Anthropic "understands that the Department of War, not private companies, makes military decisions" and underscoring that Anthropic has "never raised objections to particular military operations nor attempted to limit use of our technology in an ad hoc manner."[2]

9.     In an effort to be responsive to the Department's apparent concerns that Anthropic desired an approval role in operations, Anthropic was willing to make contractual commitments as further reassurance. In a draft agreement transmitted to the Department on March 4, 2026, Anthropic included language stating: "For the avoidance of doubt, [Anthropic] understands that this license does not grant or confer any right to control or veto lawful Department of War operational decision-making." Anthropic included this language to clarify that it did not seek to be, and would not be, part of any operational decision chain.[3]

10.     I was also surprised to read in the government's materials that Anthropic's beliefs that Claude should not be used for autonomous lethal warfare

---

[2] *See Statement from Dario Amodei on Our Discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://www.anthropic.com/news/statement-department-of-war.

[3] Attached hereto as **Exhibit 2** is a true and correct copy of a March 4, 2026 email and two attachments from Anthony Fuscellaro to Dario Amodei Re: Official Correspondence from the Department of War to Anthropic.

4

**Add.254**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

or mass surveillance of Americans are part of what makes the company a danger to national security. I find this rationale puzzling for two reasons: (1) when negotiations broke down, the parties were very near agreement on language that would address Anthropic's concerns regarding autonomous lethal warfare and (2) Secretary Hegseth himself referred to Anthropic's concerns regarding autonomous lethal warfare and mass surveillance of Americans as "understandable." That was echoed mere days later by the Commander of U.S. Central Command, who told a media outlet, "Humans will always make final decisions on what to shoot and what not to shoot." And a recent threat assessment from the Office of the Director of National Intelligence, reflecting the collective views of the U.S. Intelligence Community, further confirms that at least some portions of the Administration believe "it is essential to make sure that humans maintain control of the [AI models] and how AI is used." Indeed, on March 4, 2026 — after the Secretarial Letters were drafted, Under Secretary Michael emailed Dr. Amodei to say "I think we are very close here" regarding these two issues.[4]

---

[4] *See* Ex. 1.

5

**Add.255**

*     *     *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 23, 2026.

*Sarah Heck*

Sarah Heck
Head of Policy, Anthropic

**Add.256**

# EXHIBIT 1

3/19/26, 11:59 AM                                    Anthropic Mail - Redline



**Sarah Heck <heck@anthropic.com>**

---

## Redline

---

**Michael, Emil HON (USA)** <emil.g.michael.civ@mail.mil>                    Wed, Mar 4, 2026 at 9:24 AM
To: Dario Amodei <dario@anthropic.com>
Cc: "sheck@anthropic.com" <sheck@anthropic.com>, "Kliger, Gavin I CIV (USA)" <gavin.i.kliger.civ@mail.mil>

Hi Dario,


After reviewing with our attorneys and seeing your last draft (thanks for being fast), I think we are very close here.  I was able to take 'unlawful' out of the bulk collection section which essentially reverts that clause to your language from last night.  Therefore, the only change we would require would be "in accordance with" as opposed to "only as permitted under."  See option 1 in the attached.  We believe this goes above and beyond and we have made significant concessions.  I hope this work as I am running out of time.

[Quoted text hidden]

---

📄 **3.4 Usage Term FINAL.docx**
2837K

**Add.258**

# EXHIBIT 2

**From: Fuscellaro, Anthony COL USARMY OSW SECWAR (USA)** anthony.fuscellaro1.mil@war.mil  📎
**Subject:** Official Correspondence from the Department of War to Anthropic

**Date:** March 4, 2026 at 5:49 PM

**To:** dario@anthropic.com
**Cc:** jbleich@anthropic.com, Matthews, Earl G HON (USA) earl.g.matthews.civ@mail.mil

Mr. Amodei,
Please see the attached letters as official notification from the Department of War regarding
Anthropic.  Hard copies will follow via official mail.

Please acknowledge receipt and direct all responses through the Department of War General
Counsel, Honorable Earl Matthews.  Thank you.

**v/r,**
**COL Tony Fuscellaro, USA**
**Executive Secretary**
**Department of War**

> **Notice to Anthropic Pursuant to Title 10 U.S.C. Section 3252...**
> **OSD002275-26 RESFI NAL.pdf**

> **Notice to Anthropic Pursuant to Title 41 U.S.C. Section 4713...**
> **OSD002275-26 RES FINAL.pdf**

**Add.260**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR – 3 2026

Mr. Dario Amodei
Chief Executive Officer
Anthropic, PBC
548 Market Street
San Francisco, CA  94104

Dear Anthropic, PBC Executive Leadership:

This letter provides notice to Anthropic, Public Benefit Corporation (PBC), and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity") that, pursuant to title 41, United States Code (U.S.C.), section 4713 ("Section 4713"), the Department of War (DoW) has determined that (i) the use of the Covered Entity's products or services in DoW covered procurements[1] presents a supply chain risk and that the use of the Section 4713 authority to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

**Scope of Authorized Covered Procurement Actions**

This Determination is necessary to reduce supply chain risk and applies to the Covered Entity, Covered Products or Services, Covered Procurements, and Covered Procurement Actions as follows:

- **Covered Entity:**  Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof.

- **Covered Products or Services:**  All of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service.  This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:**  All DoW procurements described in Section 4713(k)(3).

- **Covered Procurement Actions:**  All actions described in Section 4713(k)(4).

---

[1] 41 U.S.C. § 4713(k)(3)
[2] 41 U.S.C. § 4713(k)(4)

**Add.261**

**Effective Date**

This Determination is effective immediately and shall remain in effect until modified or terminated in writing by the Section 4713 Authorized Official.

**Request for Reconsideration**

If the Covered Entity wishes to request that the DoW reconsider this Determination, the Covered Entity must submit in writing to the undersigned within 30 days of receipt of this letter, notice of such request for reconsideration. For additional information, requirements, and procedures governing such request, see the enclosed Requirements and Procedures for Requesting Reconsideration of a Section 4713 Determination.

Sincerely,

Enclosure:
As stated

2

**Add.262**

UNCLASSIFIED

**ATTACHMENT 1**
**Requirements and Procedures for Requesting Reconsideration of a Section 4713**
**Determination**

The following requirements and procedures govern a Covered Entity's request for reconsideration of a Section 4713 determination:

1. **Notice of Request for Reconsideration:** Within thirty (30) days of receiving the Section 4713 Authorized Official's letter notifying the Covered Entity of the Section 4713 determination, the Covered Entity may submit in writing to the Section 4713 Authorized Official notice of the Covered Entity's request for reconsideration. Such notice should identify the specific relief or remedy being requested (e.g., specific modifications to, or termination in whole or in part, of any elements of the determination). All notices and written information must be submitted to osd.mc-alex.ousd-a-s.mbx.10-usc-section-3252-determinations@mail.mil.

2. **Opportunity to Submit and Present Information**: If the Covered Entity submits a timely notice of request for consideration, the Covered Entity will be afforded an additional thirty (30) calendar days (from the date the Section 4713 Authorized Official received such timely notice) to submit in writing, and to appear and present, additional information and arguments in support of such request for reconsideration. The Covered Entity must either send, or make arrangements to appear and present, the information to representatives of the Section 4713 Authorized Official within the thirty (30) day period. The Section 4713 Authorized Official may extend the time to appear and submit documentary evidence upon written request by the Covered Entity.

3. **Flexible Procedures**: The Section 4713 Authorized Official may use flexible procedures to allow the Covered Entity to submit and present information in support of the request for reconsideration. In so doing, the Section 4713 Authorized Official is not required to follow formal rules of evidence or procedures in creating an official record of the request for reconsideration and the Official's disposition of that and request.

4. **Content of Submissions/Presentations**: When submitting and presenting information in support of a request for reconsideration, the Covered Entity should, to the maximum extent practicable, identify specific facts that contradict statements contained in the Section 4713 Covered Entity notification, and provide detailed rationale for any arguments in support of the request and the remedy or relief being requested. A general denial is insufficient to support reconsideration of a Section 4713 determination.

5. **Appearing and Presenting Information:** An appearance and presentation is an informal meeting that is non-adversarial in nature. When electing to appear and present information, the representative(s) of the Covered Entity may choose to appear with counsel. Any information to be presented should be provided in written form at least 5 working days in advance of the presentation. Usually, all matters in opposition should be presented in a single proceeding. Any information not submitted in advance, but provided orally during an appearance, must also be submitted in writing after the appearance for the information to be

UNCLASSIFIED

**Add.263**

**UNCLASSIFIED**

considered. The representative(s) of the Section 4713 Authorized Official, and/or other agency representatives, may ask questions of the Covered Entity's representative(s) making the presentation. Federal rules of evidence do not govern the appearance and presentation.

6. **Notice Regarding False Statements**: Any material information submitted in response to this action will be considered a statement or representation to a government official concerning a matter within the jurisdiction of the executive branch of the government. To that end, please note that an individual making any materially false, fictitious, or fraudulent statement or representation to a Government official may be subject to prosecution under 18 U.S.C. § 1001.

**UNCLASSIFIED**

**Add.264**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR − 3 2026

Mr. Dario Amodei
Chief Executive Officer
Anthropic, PBC
548 Market Street
San Francisco, CA  94104

Dear Anthropic, PBC Executive Leadership:

This letter provides notice to Anthropic, Public Benefit Corporation (PBC), and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity") that, pursuant to title 10, United States Code (U.S.C.), section 3252 ("Section 3252"), the Department of War (DoW) has determined that (i) the use of the Covered Entity's products or services in DoW covered systems[1] presents a supply chain risk and that the use of the Section 3252 authority to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

**Scope of Authorized Covered Procurement Actions**

This Determination is necessary to reduce supply chain risk and applies to the Covered Entity, Covered Products or Services, Covered Procurements, and Covered Procurement Actions as follows:

- **Covered Entity:**  Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof.

- **Covered Products or Services:**  All of the Covered Entity's products or services that meet the definition of a "covered item of supply" or that would be procured as part of a "covered system," as those terms are defined at 48 C.F.R. § 239.7301, whether acquired as a product or service.  This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:**  All DoW procurements for which 48 C.F.R. Subpart 239.73 is applicable, in accordance with 48 C.F.R. § 239.7302.

- **Covered Procurement Actions:**  All actions authorized in accordance with 48 C.F.R. § 239.7305.

---

[1] 10 U.S.C. § 3252(d)(5)
[2] 10 U.S.C. § 3252(d)(2)

**Add.265**

**Effective Date**

This Determination is effective immediately and shall remain in effect until modified or terminated in writing by the Section 3252 Authorized Official.

**Request for Reconsideration**

If the Covered Entity wishes to request that the DoW reconsider this Determination, the Covered Entity must submit in writing to the undersigned within 30 days of receipt of this letter, notice of such request for reconsideration. For additional information, requirements, and procedures governing such request, see the enclosed Requirements and Procedures for Requesting Reconsideration of a Section 3252 Determination.

Sincerely,

Enclosure:
As stated

2

**Add.266**

UNCLASSIFIED


ATTACHMENT 1
Requirements and Procedures for Requesting Reconsideration of a Section 3252
Determination

The following requirements and procedures govern a Covered Entity's request for reconsideration of a Section 3252 determination:

1. **Notice of Request for Reconsideration:** Within thirty (30) days of receiving the Section 3252 Authorized Official's letter notifying the Covered Entity of the Section 3252 determination, the Covered Entity may submit in writing to the Section 3252 Authorized Official notice of the Covered Entity's request for reconsideration. Such notice should identify the specific relief or remedy being requested (e.g., specific modifications to, or termination in whole or in part, of any elements of the determination). All notices and written information must be submitted to osd.mc-alex.ousd-a-s.mbx.10-usc-section-3252-determinations@mail.mil.

2. **Opportunity to Submit and Present Information**: If the Covered Entity submits a timely notice of request for consideration, the Covered Entity will be afforded an additional thirty (30) calendar days (from the date the Section 3252 Authorized Official received such timely notice) to submit in writing, and to appear and present, additional information and arguments in support of such request for reconsideration. The Covered Entity must either send, or make arrangements to appear and present, the information to representatives of the Section 3252 Authorized Official within the thirty (30) day period. The Section 3252 Authorized Official may extend the time to appear and submit documentary evidence upon written request by the Covered Entity.

3. **Flexible Procedures**: The Section 3252 Authorized Official may use flexible procedures to allow the Covered Entity to submit and present information in support of the request for reconsideration. In so doing, the Section 3252 Authorized Official is not required to follow formal rules of evidence or procedures in creating an official record of the request for reconsideration and the Official's disposition of that and request.

4. **Content of Submissions/Presentations**: When submitting and presenting information in support of a request for reconsideration, the Covered Entity should, to the maximum extent practicable, identify specific facts that contradict statements contained in the Section 3252 Covered Entity notification, and provide detailed rationale for any arguments in support of the request and the remedy or relief being requested. A general denial is insufficient to support reconsideration of a Section 3252 determination.

5. **Appearing and Presenting Information:** An appearance and presentation is an informal meeting that is non-adversarial in nature. When electing to appear and present information, the representative(s) of the Covered Entity may choose to appear with counsel. Any information to be presented should be provided in written form at least 5 working days in advance of the presentation. Usually, all matters in opposition should be presented in a single proceeding. Any information not submitted in advance, but provided orally during an appearance, must also be submitted in writing after the appearance for the information to be

UNCLASSIFIED

**Add.267**

**UNCLASSIFIED**

considered. The representative(s) of the Section 3252 Authorized Official, and/or other agency representatives, may ask questions of the Covered Entity's representative(s) making the presentation. Federal rules of evidence do not govern the appearance and presentation.

6. **Notice Regarding False Statements**: Any material information submitted in response to this action will be considered a statement or representation to a government official concerning a matter within the jurisdiction of the executive branch of the government. To that end, please note that an individual making any materially false, fictitious, or fraudulent statement or representation to a Government official may be subject to prosecution under 18 U.S.C. § 1001.

**Add.268**

# Addendum B: Declaration of Thiyagu Ramasamy (Mar. 22, 2026)

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

**No. 26-1049**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as
Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## SECOND DECLARATION OF THIYAGU RAMASAMY

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-
gronke@wilmerhale.com

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

I, Thiyagu Ramasamy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I previously submitted a declaration in this case on March 11, 2026, describing Anthropic PBC's ("Anthropic's") relationship with the U.S. Government, including the Department of War ("DoW"). I submit this supplemental declaration in support of Anthropic's Reply Brief in Support of its Emergency Motion for Stay Pending Review.

## Background and Purpose of Supplemental Testimony

2.    As stated in my March 11 declaration, my understanding of Anthropic's public sector partnerships is based on my experience as Anthropic's Head of Public Sector. As I explained there, I previously worked at Amazon Web Services ("AWS") as a Principal Lead for Data, Analytics, and Artificial Intelligence/Machine Learning. In that role, I was responsible for, among other things, implementing Anthropic's AI models, Claude, for AWS's public sector customers, including AWS's deployment of Claude in classified government networks. Together, my prior experience and current role give me a detailed understanding of Anthropic's relationship with the U.S. government, the technical capabilities of Anthropic's AI models, how third-party cloud providers deploy Claude to government customers, and how those customers access and integrate Claude in their workflows.

1

**Add.270**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

3.      I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4.      My original declaration explained that I had never seen or heard any explanation for why Anthropic would be considered a supply-chain risk. I understand that the DoW has since offered multiple rationales in an attempt to support its determination that Anthropic poses a supply chain risk to national security. Those rationales are set forth in (1) the March 17, 2026 declaration of Under Secretary of War Emil Michael and (2) an undated "Memorandum for the Record" documenting his analysis of the purported "Urgent Supply Chain Risk" arising from Anthropic's refusal to agree to DoW's insistence that Anthropic permit the use of its models for "all lawful purposes."

### The Government's Factual Errors And Misunderstanding Of Anthropic's Technology

5.      Neither I nor anyone else at Anthropic had seen Under Secretary Michael's memorandum or declaration until the Department of Justice publicly filed them in this matter. Those materials reflect a fundamental misunderstanding of how Anthropic's tools are deployed in classified systems and otherwise made available to the government, and they contain multiple factual misstatements. Had

2

**Add.271**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

the DoW disclosed its rationales before designating Anthropic a supply chain risk, I and other Anthropic subject-matter experts could have corrected these errors.

6. Most fundamentally, Under Secretary Michael's declaration and memorandum suggest that Anthropic has, over time, proven to be an increasingly untrustworthy partner to DoW. In my experience, however, the opposite is true. Anthropic has consistently worked to deepen its relationship with DoW and to support DoW's specific needs and use cases.

### The Government's Adoption of Anthropic's Models in Classified Environments

7. Beginning in early 2024, Anthropic worked with a third-party cloud provider to support deployment of Anthropic's commercial AI models in classified cloud environments. By May 2024, Claude Sonnet was available on a provider's Top Secret cloud and was being used by Intelligence Community ("IC") and DoW customers. As government users adopted the commercial version of Claude in classified settings, Anthropic received feedback that its commercial models, appropriately trained to decline discussion of classified materials with the general public, sometimes applied those same protections to IC and DoW users in secure environments. In response, Anthropic engaged directly with government stakeholders, including through classified discussions led by Anthropic engineers

3

**Add.272**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

holding security clearances, to understand operational needs and identify appropriate technical solutions.

8.     In December 2024, the updated commercial version of Claude (Sonnet 3.5) was launched in classified cloud environments. To be clear, in these arrangements, once Anthropic gives its models to the third-party cloud provider, Anthropic has no access to, or control over, the model as deployed or used by government customers.

9.     In early 2025, Anthropic—on its own initiative and at its own expense—assigned cleared personnel to develop a version of Claude tailored to national-security needs. In March 2025, that tailored national-security model, called Claude Gov, was made available to IC and DoW customers through classified cloud environments. Government users reported that Claude Gov performed significantly better than the commercial version and did not refuse tasks that were otherwise restricted but appropriate to the national security mission, such as reviewing classified documents or supporting military planning. Adoption increased rapidly across the IC, and government customers expressed strong appreciation for Anthropic's proactive approach to national-security partnerships.

10.     In June 2025 and then again in November 2025, Anthropic deployed new, improved versions of the Claude Gov models. Before each deployment, DoW customers conducted extensive testing to confirm that the new model performed as

4

**Add.273**

expected before the prior version was retired and replaced. Anthropic closely collaborated with its government and third-party partners to ensure a seamless transition throughout this process.

11.     Within weeks of the November 2025 release, nearly all IC and DoW customers had adopted the updated version of Claude Gov. Government users praised this model as a major technical advance, citing significant improvements in reasoning, agentic tool use, and coding. These improvements enabled customers to fully leverage air-gapped deployment of Claude Code, Anthropic's agentic coding tool, which is now widely used across the IC and DoW.

12.     Anthropic's sustained investment and close collaboration with its government partners have made Claude Gov a mission critical capability across classified systems. Anthropic has remained a trusted partner to DoW and the IC at every step, consistently delivering mission-oriented and safety-focused models and supporting AI adoption.

**Anthropic Lacks the Technical Ability to Interfere With DoW Operations**

13.     A central theme of the DoW's belated rationale is the concern that Anthropic could interfere with DoW operations. As I explained in my original declaration, Anthropic has never sought, and has never asserted, any role in DoW's operational decision making. I emphasize here that, apart from the fact that our

5

**Add.274**

company has no desire to interfere with DoW activities, Anthropic is not technically capable of exercising the type of "operational veto" the DoW suggests.

14.     Once Claude is deployed in support of DoW's mission, Anthropic has never had the ability to cause Claude to stop working, alter its functionality, shut off access, or otherwise influence or imperil military operations. Even if it wanted to do so—which it does not—Anthropic could not do so as a technical matter. Claude has always been deployed for DoW by a third party, and Anthropic does not have the access required to disable the technology or alter the model's behavior before or during ongoing operations.

15.     More specifically, as Claude is deployed in DoW environments—such as through air gapped, classified cloud systems operated by third-party defense contractors—Anthropic has no ability to access, alter, or shut down the deployed model. Anthropic does not maintain any back door or remote "kill switch" in Claude. Anthropic personnel cannot, for example, log into a DoW system to modify or disable the models during an operation; the technology simply does not function that way. In these deployments, only the Government and its authorized cloud provider have access to the running system. Anthropic's role is limited to providing the model itself and delivering updates only if and when requested or approved by the customer. Anthropic does not have ongoing connectivity to, or

**Add.275**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

control over, model instances running in DoW secure networks. Model weights are also not automatically modified or updated based on DoW's usage.

16. For these reasons, Anthropic also cannot exfiltrate DoW data or conduct surveillance of DoW activities. Anthropic does not have access to DoW's Claude prompts; because we lack any access to this customer data, there is nothing that we could exfiltrate or inspect. Any suggestion that Anthropic could engage in "data exfiltration" of DoW information is unfounded.

17. Under Secretary Michael's declaration and memorandum also suggest that Anthropic could alter its AI models after deployment without DoW's knowledge or consent, including by changing model guardrails or model weights. Anthropic is not capable of doing so. By "guardrails," I mean the safety and security controls designed to ensure a model behaves as intended. "Model weights" are the internal numerical parameters that shape how the model behaves by determining how strongly different inputs influence a model's outputs. Once a model is running inside a government-secure enclave, Anthropic cannot unilaterally alter these features. To change guardrails or model weights, Anthropic would have to provide an entirely new version of the model, which would require DoW's approval and affirmative action to install.

18. Changing model weights or guardrails is analogous to ordering a cake at a restaurant. Once the cake is served, the diner cannot adjust the recipe at the

**Add.276**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

table, and the chef cannot reach into the dining room–secretly or otherwise–to change it either. Even if the cake is missing only a teaspoon of baking soda, it must be made again from scratch with the correct ingredients baked in. Here, Anthropic is the chef. If changes to model behavior are desired, whether small or large, Anthropic can prepare a new version of the model with those changes built in. But that new version is not automatically substituted. Before deployment, the third-party cloud provider and DoW security reviewers inspect and approve it to ensure it is safe and appropriate. Only after that approval, and only after the customer confirms the new version performs as expected, can it retire the prior model.

19.     I also understand the government has assessed risk based on the belief that AI models may "drift" or degrade over time, leaving the DoW reliant on Anthropic to ensure continued accuracy and fairness. That concern reflects another fundamental misunderstanding of how AI models operate. Once a model like Claude is trained and deployed by DoW, it is static; it does not change or degrade on its own. The model's parameters remain fixed unless and until a newer version is deployed. Anthropic does not, and cannot, push unsupported or undisclosed updates to a model once deployed by DoW.

20.     Finally, Under Secretary Michael's memorandum and declaration cite the "relatively opaque nature of large language model technology" as a baseline risk requiring heightened trust in Anthropic. It is true that large language models

8

**Add.277**

("LLMs") are probabilistic, not deterministic, as Anthropic's Chief Science Officer has explained, and there is some legitimacy to DoW's concern about the opacity of these systems generally. But that characteristic applies to all LLMs. Compared to other AI labs, Anthropic is uniquely transparent. We maintain a publicly available set of normative principles— "Claude's Constitution" —a human readable document that explains the values and rules our AI is trained to follow. Anthropic is also at the forefront of interpretability research aimed at making the behavior of models like Claude easier to understand. If anything, Anthropic presents a lower baseline risk than other AI labs, not a higher one.

**The Government's Other Alleged Concerns are Misplaced**

21.     I understand that the government references Anthropic deployment issues at the Center for Disease Control and Prevention ("CDC") as a factor in its designation. While I cannot be certain which incident Under Secretary Michael is referencing, to the extent it relates to CDC work of which I am aware, that characterization reflects a misunderstanding. My understanding is that the issue arose from the CDC's use of a general commercial model whose standard safeguards—appropriately designed for public users—limited certain interactions related to biomedical research to mitigate public safety risks. Once Anthropic became aware of the issue, we worked promptly with our third-party partners and the government to enable use of the model in a manner appropriate to the CDC's

9

**Add.278**

mission and expertise. As noted above, safeguards suitable for commercial deployments may not be appropriate for government uses, and some government deployments require customization or parameter adjustments. That collaborative, iterative process—balancing safety in commercial settings with valid government uses—is a core tenet of Anthropic's AI safety approach. That is precisely how we addressed the CDC issue once identified, supporting important CDC research while preventing individual users from engineering dangerous biological weapons.

22.     The Michael Declaration also suggests Anthropic's employment of foreign nationals increases "adversarial risk." Anthropic, like many cutting-edge AI companies, employs a globally diverse team of highly skilled researchers and engineers. Anthropic has undergone extensive U.S. Government security vetting in connection with its classified work and takes seriously its obligation to comply with all security and technical requirements for safeguarding sensitive government information. To my knowledge, Anthropic is the only AI company where cleared personnel have led the development of AI models tailored to be deployed in classified environments. As discussed above, for the past two years, Anthropic has been the government's closest and most-trusted partner in driving the adoption of AI models in classified environments.

10

**Add.279**

\*     \*     \*

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 22, 2026.

Thiyagu Ramasamy
Head of Public Sector, Anthropic

11

**Add.280**