# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHROPIC PBC,<br><br>            Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF WAR, et al.,<br><br>            Defendants. | Case No.  26-cv-01996-RFL<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 6 |

## I.    INTRODUCTION

This case touches on an important public debate.  Anthropic says its artificial intelligence product, Claude, is not ready for safe use in fully autonomous lethal weapons or the mass surveillance of Americans.  If the U.S. government wants to use its technology, Anthropic insists that the government must agree not to use it for these purposes.  On the other hand, the Department of War says that it must be the one to decide what functions are safe for its AI tools to perform, not a private company.  This public policy question is not for this Court to answer in this litigation.  It is the Department of War's prerogative to decide what AI product it uses.  Everyone, including Anthropic, agrees that the Department of War may permissibly stop using Claude and look for a new AI vendor who will allow "all lawful uses" of its technology.  That is not what this case is about.

The question here is whether the government violated the law when it went further.  After Anthropic went public with its disagreement with the Department of War, Defendants reacted with three significant measures that are the subject of this lawsuit.  First, the President announced that every federal agency (not just the Department of War) would immediately ban Anthropic from ever having another government contract.  That would include, for example, the National Endowment for the Arts using Claude to design its website.  Second, Secretary Hegseth announced that anyone who wants to do business with the U.S. military must sever any

1

commercial relationship with Anthropic.  That would mean a company that used Claude to power its customer service chatbot could not serve as a defense contractor.  Third, the Department of War designated Anthropic a "supply chain risk," a label that applies to adversaries of the U.S. government who may sabotage its technology systems.  That designation has never been applied to a domestic company and is directed principally at foreign intelligence agencies, terrorists, and other hostile actors.

These broad measures do not appear to be directed at the government's stated national security interests.  If the concern is the integrity of the operational chain of command, the Department of War could just stop using Claude.  Instead, these measures appear designed to punish Anthropic.  One of the amicus briefs described these measures as "attempted corporate murder."  They might not be murder, but the evidence shows that they would cripple Anthropic.

The record supports an inference that Anthropic is being punished for criticizing the government's contracting position in the press.  In their announcements, the President and Secretary Hegseth called Anthropic "out of control" and "arrogant," describing its "sanctimonious rhetoric" as an attempt to "strong-arm" the government.  The Department of War's records show that it designated Anthropic as a supply chain risk because of its "hostile manner through the press."  Punishing Anthropic for bringing public scrutiny to the government's contracting position is classic illegal First Amendment retaliation.

Moreover, Defendants' designation of Anthropic as a "supply chain risk" is likely both contrary to law and arbitrary and capricious.  The Department of War provides no legitimate basis to infer from Anthropic's forthright insistence on usage restrictions that it might become a saboteur.  At oral argument, government counsel suggested that Anthropic showed its subversive tendencies by "questioning" the use of its technology, "raising concerns" about it, and criticizing the government's position in the press.  Nothing in the governing statute supports the Orwellian notion that an American company may be branded a potential adversary and saboteur of the U.S. for expressing disagreement with the government.

There are other serious procedural problems with the government's actions.  Anthropic

2

had no notice or opportunity to respond, which likely violated its due process rights. And the Department of War flouted procedural safeguards required by Congress before entering the supply chain risk designation, including that it consider less intrusive measures.

At bottom, Anthropic has shown that these broad punitive measures were likely unlawful and that it is suffering irreparable harm from them. Numerous amici have also described wide-ranging harm to the public interest, including the chilling of open discussion about important topics in AI safety. The motion for a preliminary injunction is granted.

## II.    BACKGROUND

### A.    Anthropic and the Federal Government's Use of Claude

Plaintiff Anthropic PBC is an AI developer focused on AI research, safety, and policy work. (Dkt. No. 6-1 ¶¶ 8, 12.) Anthropic regularly publishes research on the societal impacts of large language models ("LLMs") and engages in public advocacy for AI safety. (*Id.* ¶¶ 10, 13.) Anthropic's co-founder, Jared Kaplan, states that he and his co-founders started Anthropic "to put safety at the center as AI progress accelerates." (*Id.* ¶ 8.)

Anthropic began commercial deployments of LLMs in early 2023. (*Id.* ¶ 12.) Anthropic's signature model is a general-purpose LLM called "Claude." (*Id.* ¶ 14.) LLMs like Claude are algorithmic systems trained on massive datasets to identify patterns and associations in language and quickly generate outputs and take actions that resemble human responses and actions. (*Id.* ¶ 15.) When given access to tools, Claude can act as an agent of the user ("agentically")—or even autonomously—executing tasks without requiring ongoing user direction. (*Id.* ¶ 16.) Anthropic's clients use its products in myriad contexts. For example, a client's engineers may use their company's Claude subscription to write, test, and fix code, or a client may integrate a Claude model into its own product via an application programming interface ("API"). (Dkt. No. 73 at 7–8;[1] Dkt. No. 6-4 ¶ 6.) Some of these Anthropic clients then provide the U.S. government with products and services that integrate Claude or that were

---

[1] All citations to page numbers refer to ECF pagination.

created using Anthropic's technology to various degrees.  (Dkt. No. 6-4 ¶ 6.)

LLMs, including Claude, can produce responses that diverge from the goals of the people that trained them or reflect skewed or mistaken judgments embedded in their training data.  (Dkt. No. 6-1 ¶ 18.)  Those risks are heightened when an LLM is acting agentically or autonomously out in the world with little or no human supervision.  (*Id.* ¶ 16.)  To address these risks, the publicly available version of Claude has three layers of protection.  First, Anthropic uses various "alignment" techniques to make Claude more reliably follow human values and intentions.  (*Id.* ¶ 19.)  Second, Anthropic has added safeguards that can detect in real time and stop activity Anthropic considers to be harmful.  (*Id.* ¶ 20.)  Finally, Anthropic has a Usage Policy under which users agree not to use Claude in certain specified "risky ways, including ways [Anthropic] understand[s] that it has not been developed for and/or is not ready for."  (*Id.* ¶ 21.)

U.S. intelligence and defense agencies have been using Claude since November 2024 through a partnership with Palantir Technologies.  (Dkt. No. 6-3 ¶ 5.)  Since March 2025, the Department of War[2] has been using "Claude Gov," dedicated models for national security users, through Anthropic partner platforms.  (*Id.* ¶ 6; Dkt. No. 6-1 ¶¶ 27, 29; Dkt. No. 6-17.)  Claude Gov has different safeguards than the civilian models and can, for example, analyze documents marked "Top Secret."  (Dkt. No. 6-1 ¶ 27.)  Claude Gov also has a government-specific addendum to its Usage Policy that eliminates some of the restrictions applicable to the civilian version.  (*Id.* ¶ 28.)  Since DoW began using Claude Gov in March 2025, this government-specific usage policy has "imposed broad restrictions that would have prohibited mass surveillance of Americans and lethal autonomous warfare."  (*Id.* ¶ 29.)

Before the events at issue in this case, DoW appeared to have no objection to the usage policy and did not appear to view Anthropic as a national security risk in any way.  Anthropic's Head of Policy, Sarah Heck, attested that she is unaware of "anyone at DoW ever suggesting

---

[2] In the complaint, motion papers, and evidence, the parties refer to the Department of Defense as the "Department of War" or "DoW."  *Compare* National Security Act Amendments of 1949, Pub. L. No. 81-216, 63 Stat. 578 (1949), *with* Exec. Order No. 14347, 90 Fed. R. 43893 (Sep. 5, 2025).  This Order adopts the parties' phrasing for consistency and ease of reference.

Anthropic's models are somehow insecure or have been compromised." (Dkt. No. 6-2 ¶ 17.) Thiyagu Ramasamy, the Head of Public Sector at Anthropic, has likewise never been made aware of "any potential supply chain risk posed by Anthropic, its employees, or its products and services," despite working closely with DoW to integrate Claude between 2024 and 2026. (Dkt. No. 6-3 ¶¶ 8–11, 17.) DoW has not submitted any evidence disputing this point.

Moreover, while these usage restrictions were in place, DoW's Defense Counterintelligence and Security Agency granted Anthropic a Top Secret facility security clearance enabling it to provide support for classified national security projects, after an 18-month vetting process. (*Id.* ¶ 9.) In June 2025, the General Services Administration ("GSA") and DoW granted Claude authorization through the Federal Risk and Authorization Management Program ("FedRAMP") for use with FedRAMP High and DoD Impact Level 4 and 5 workloads, representing the highest levels of cloud security certification for unclassified and controlled unclassified information. (*Id.* ¶ 10.) In July 2025, Anthropic was awarded a two-year, up to $200 million agreement by DoW's Chief Digital and Artificial Intelligence Office to integrate and optimize AI capabilities across DoW. (*Id.* ¶ 6.) And in August 2025, Anthropic and GSA announced an agreement to deliver Claude Gov to all three branches of the government—civilian executive, legislative, and judiciary. (*Id.* ¶ 7.) The unrebutted record shows that, until this dispute, Anthropic "only ever received positive feedback about Claude's performance from [its] governmental customers." (*Id.* ¶ 12.)

### B.    Defendants and Anthropic Publicly Disagree About Anthropic's Role in Ensuring AI Safety in the Military and Surveillance Context

In the fall of 2025, DoW and Anthropic began discussing a new deployment of Claude on DoW's "GenAI.mil" platform. (Dkt. No. 6-1 ¶ 32.) During these conversations, DoW took the position that Anthropic should permit DoW, its contractors, and its subcontractors to use all versions of Claude for "all lawful uses," without any usage restrictions. (*Id.*) As DoW put it, "We will not let ANY company dictate the terms regarding how we make operational decisions." (Dkt. No. 6-33 at 2.) Anthropic ultimately agreed to do so with "two critical exceptions: mass

surveillance of Americans and lethal autonomous warfare." (Dkt. No. 6-1 ¶ 33.) Anthropic did not believe Claude currently to be safe for those uses based on its training and testing. (*Id.* ¶ 36.) For example, if Claude were used to conduct mass surveillance, Anthropic believed Claude might retrieve a much broader set of information than intended, thus inadvertently violating laws protecting civil liberties. (*Id.* ¶ 34.) Anthropic further believed that lethal autonomous warfare was beyond Claude's current ability to carry out reliably, in light of the potentially grave consequences of a mistake. (*Id.* ¶ 35.) Given the AI safety principles on which it was founded, Anthropic believed that removing those limitations would "undercut Anthropic's core identity." (*Id.* ¶ 38.)

Anthropic's Head of Policy Heck submitted a declaration describing DoW and Anthropic's negotiations. Heck attested that, during the negotiations, Anthropic CEO Dario Amodei told Emil Michael, Under Secretary of War for Research and Engineering, that if Anthropic's position on these two guardrails meant that Anthropic was not the right vendor for DoW's needs, then he would respect that decision. (Dkt. No. 6-2 ¶ 11.) According to Heck, Amodei further stated that, if Anthropic and DoW failed to come to an agreement, Anthropic stood ready to assist in an orderly offboarding from DoW's systems. (*Id.*) Despite disagreements, Heck states that these negotiations, including subsequent conversations through February 27, "remained cordial and amicable." (*Id.* ¶ 18.) Under Secretary Michael does not dispute that account in his declarations submitted in this litigation. (Dkt. Nos. 96-3; 120-1.)

In addition to private conversations, DoW and Anthropic both publicly aired their views. For example, in January 2026, Amodei posted a lengthy essay addressing, among other topics, the risk of using AI technology in surveillance and autonomous weapons. (Dkt. No. 6-7.) That essay advocated "draw[ing] a hard line against AI abuses within democracies," and discussed the need for "bright red lines" and "guardrails" on those topics to prevent "AI-enabled totalitarianism." (*Id.* at 31–32.) The essay also referenced Amodei's prior writings on the subject of AI safety. (Dkt. No. 6-8.) On January 9, 2026, Defendant Secretary of War Pete Hegseth issued a Memorandum containing a subsection titled "Clarifying 'Responsible AI' at the

6

DoW—Out with Utopian Idealism, In with Hard-Nosed Realism," where Secretary Hegseth instructed that the "any lawful use" provision must be incorporated into "any DoW contract through which AI services are procured."[3]  In early February 2026, Under Secretary Michael stated to the press about Anthropic:  "You can't have an AI company sell AI to the Department of War and [then] don't let it do Department of War things."[4]

On February 24, 2026, representatives of Anthropic, including Amodei and Heck, met with representatives of DoW, including Secretary Hegseth.  (Dkt. No. 6-2 ¶ 12.)  The parties discussed Anthropic's ongoing concerns regarding the possible use of Claude in mass surveillance of Americans and lethal autonomous warfare.  (*Id.* ¶¶ 13–15.)  Secretary Hegseth stated that Claude had "exquisite capabilities" but that "DoW had many other vendors to choose from that have never raised" the concerns Anthropic was raising and who "would never hold any veto power over DoW."  (*Id.* ¶¶ 12, 15.)  Secretary Hegseth did not say anything about Anthropic's AI models being unsafe, insecure, or subject to compromise.  (*Id.* ¶ 17.)  Nonetheless, at the end of the meeting, Secretary Hegseth told Anthropic's representatives that if Anthropic did not agree to "all lawful uses" of its products by 5:00 p.m. on February 27, 2026, DoW would immediately designate Anthropic a supply-chain risk and would prevent Anthropic from partnering with DoW, anyone affiliated with DoW, or any other agency.  (*Id.* ¶ 16.)  At the February 24 meeting, the unrebutted record shows that Secretary Hegseth also stated that DoW might invoke the Defense Production Act to designate Anthropic as essential to national security and thus compel Anthropic to provide its services without the restrictions.  (*Id.*)

Following the meeting, on February 26, Amodei issued a public statement on behalf of Anthropic.  (Dkt. No. 6-18.)  Amodei stated that "Anthropic understands that [DoW], not private companies, makes military decisions," and Anthropic had "never raised objections to particular

---

[3] (*See* Dkt. No. 6-3 ¶ 16 (citing https://media.defense.gov/2026/Jan/12/2003855671/-1/-1/0/ARTIFICIAL-INTELLIGENCE-STRATEGY-FOR-THE-DEPARTMENT-OF-WAR.PDF).)

[4] https://defensescoop.com/2026/02/19/pentagon-anthropic-dispute-military-ai-hegseth-emil-michael/.

7

military operations nor attempted to limit use of our technology in an *ad hoc* manner." (*Id.* at 2.)

However, Amodei said that "in a narrow set of cases . . . AI can undermine, rather than defend,

democratic values," and that some uses of AI are "simply outside the bounds of what

today's technology can safely and reliably do." Amodei concluded that Anthropic "cannot in

good conscience" provide DoW the type of access to Claude that it was requesting. (*Id.* at 3.)

> **C.**     **The President and Secretary Hegseth State that Anthropic is Barred from Working with the Federal Government or Defense Contractors**

At 3:47 p.m. E.T. on February 27, 2026, President Donald Trump posted the following

statement on the social media platform Truth Social:

> THE UNITED STATES OF AMERICA WILL NEVER ALLOW A RADICAL LEFT, WOKE COMPANY TO DICTATE HOW OUR GREAT MILITARY FIGHTS AND WINS WARS! That decision belongs to YOUR COMMANDER-IN-CHIEF and the tremendous leaders I appoint to run our Military.
>
> The Leftwing nut jobs at Anthropic have made a DISASTROUS MISTAKE trying to STRONG-ARM the Department of War, and force them to obey their Terms of Service instead of our Constitution. Their selfishness is putting AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY.
>
> Therefore, I am directing EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology. We don't need it, we don't want it, and will not do business with them again! There will be a Six Month phase out period for Agencies like the Department of War who are using Anthropic's products, at various levels. Anthropic better get their act together, and be helpful during this phase out period, or I will use the Full Power of the Presidency to make them comply, with major civil and criminal consequences to follow.
>
> WE will decide the fate of our Country — NOT some out-of-control, Radical Left AI company run by people who have no idea what the real World is all about. Thank you for your attention to this matter. MAKE AMERICA GREAT AGAIN!
>
> PRESIDENT DONALD J. TRUMP

(Dkt. No. 6-20 at 2 (the "Presidential Directive"); *see also* Dkt. No. 6-3 ¶ 19.) A little over an

hour later, Secretary Hegseth posted on the social media platform X:

> This week, Anthropic delivered a master class in arrogance and betrayal as well as a textbook case of how not to do business with the United States Government or the Pentagon. Our position has

never wavered and will never waver: the Department of War must have full, unrestricted access to Anthropic's models for every LAWFUL purpose in defense of the Republic.

Instead, @AnthropicAI and its CEO @DarioAmodei, have chosen duplicity. Cloaked in the sanctimonious rhetoric of "effective altruism," they have attempted to strong-arm the United States military into submission - a cowardly act of corporate virtue-signaling that places Silicon Valley ideology above American lives.

The Terms of Service of Anthropic's defective altruism will never outweigh the safety, the readiness, or the lives of American troops on the battlefield. Their true objective is unmistakable: to seize veto power over the operational decisions of the United States military. That is unacceptable.

As President Trump stated on Truth Social, the Commander-in-Chief and the American people alone will determine the destiny of our armed forces, not unelected tech executives.

Anthropic's stance is fundamentally incompatible with American principles. Their relationship with the United States Armed Forces and the Federal Government has therefore been permanently altered.

In conjunction with the President's directive for the Federal Government to cease all use of Anthropic's technology, I am directing the Department of War to designate Anthropic a Supply-Chain Risk to National Security. Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic. Anthropic will continue to provide the Department of War its services for a period of no more than six months to allow for a seamless transition to a better and more patriotic service.

America's warfighters will never be held hostage by the ideological whims of Big Tech. This decision is final.

(Dkt. No. 6-21 at 2 (the "Hegseth Directive").) Taken together, the Presidential Directive and the Hegseth Directive create an immediate, permanent, federal government-wide bar on using any Anthropic technology (except during a six-month transition period), and also prohibit private companies from doing business with both the military and Anthropic. Neither the President nor Secretary Hegseth cited any statutory authority for the Directives.

On March 4, 2026, Anthropic received two letters on DoW letterhead, signed by Secretary Hegseth and dated one day prior, regarding Anthropic's designation as a "supply chain risk." (Dkt. Nos. 6-27; 6-28; *see also* Dkt. No. 6-9 ¶¶ 27–28.) The first letter cites 41 U.S.C. § 4713. Anthropic has challenged this letter through a separate action. *Anthropic v. U.S. Department of War*, No. 26-1049 (D.C. Cir. March 9, 2026). The second letter cites 10 U.S.C. §

9

3252. (Dkt. No. 6-27 ("Section 3252 Letter").)[5]  The Section 3252 Letter states that DoW

> has determined that (i) the use of [Anthropic and its subsidiaries and affiliates'] products or services in DoW covered systems presents a supply chain risk and that the use of the Section 3252 authority to carry out covered procurement actions is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

(Dkt. No. 96-2 at 18 (footnotes omitted).)  The Letter explains that the designation applies to

Anthropic's existing or future "covered item[s] of supply," or any product or service procured by

DoW as part of a "covered system."[6]  (*Id.*)  At oral argument on Anthropic's motion, Counsel for

Defendants stated that the legal effect of the Supply Chain Designation is to "prevent Anthropic

from being utilized as a *subcontractor* in covered settings" in addition to prohibiting its role as a

prime contractor.  (Dkt. No. 128 at 27 (emphasis added).)  Counsel for Defendants agreed that if

a DoW contractor used Claude Code under a general license as a tool to write software for a

DoW national security system, that action would not be prohibited under the Supply Chain

Designation.  (*Id.* at 26–27.)  Likewise, contractors doing work for DoW would not be

terminated for using Anthropic for non-DoW work based on the designation or the Hegseth

Directive.  (*Id.* at 12.)

The effect of the letter is "immediate" and permanent.  (Dkt. No. 96-2 at 18–19.)

Anthropic was given thirty days to appeal the designation, but it was not provided notice of the

factual basis for the designation on March 4.  (*Id.* at 20–21.)  The Letter makes no reference to

the Presidential Directive or the Hegseth Directive and does not explain how the designation will

be implemented during the six-month transition period described in the Hegseth Directive.[7]

---

[5] Defendants disclosed in litigation that in addition to the letter, Secretary Hegseth issued a determination memorializing the supply chain risk designation on March 3, 2026.  (Dkt. No. 96-2 at 2.)  Because the Court understands Anthropic to be challenging Secretary Hegseth's March 3 action irrespective of whether it was carried out by means of the letter or the directive, this Order considers both documents together and refers to them as the "Supply Chain Designation."

[6] These terms are defined below in Section II.D.

[7] The Presidential Directive, the Hegseth Directive, and the Supply Chain Designation are referred to jointly as the "Challenged Actions."

**D.    Defendants' Authority to Designate a "Supply Chain Risk" Under Section 3252**

Ordinarily, government contractors who face suspension or a long-term ban (known as "debarment") from federal contracting are entitled to a host of procedural protections. *See* 48 C.F.R. § 9.400(a)(1). In most circumstances, government contractors are entitled to pre-deprivation notice and a formalized process for opposing a proposed suspension or debarment. *Id.* §§ 9.406-3, 9-407-3; *see also Friedler v. GSA*, 271 F. Supp. 3d 40, 43–45 (D.D.C. 2017).

In 2011, Congress was concerned that "the globalization of the information technology industry" left DoW vulnerable to "attacks on its systems and networks," and gave the Secretary of Defense the "authority needed to address this risk" when procuring certain sensitive technology systems. S. Rep. No. 111-201, at 162 (2010). Congress enacted the provision that became 10 U.S.C. § 3252, which allows the Secretary to designate a source as a "supply chain risk." Congress defined "supply chain risk" as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a [national security] system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." *Id.* § 3252(d)(4). DoW's implementing instructions for the predecessor provision, which were issued in 2012 in the wake of the law's passage, described the relevant risk as "sabotage or subversion" by "foreign intelligence, terrorists or other hostile elements."[8]

When a source is designated a "supply chain risk," the Secretary may exclude that source from providing equipment for DoW's "covered systems," which are certain sensitive information technology systems used for national security purposes.[9] The exclusion can also extend to those

---

[8] Dep't of Def., Instruction 5200.44, Protection of Mission Critical Functions to Achieve Trusted Systems and Networks (TSN) (Nov. 5, 2012), perma.cc/TW3D-735M.

[9] National security systems include, for example, information systems used for "intelligence activities," "command and control of military forces," or "equipment that is an integral part of a weapon or weapons system." 44 U.S.C. § 3552(b)(6)(A)(i); *see also* 10 U.S.C. § 3252(d)(5) (defining "covered system" as "a national security system").

11

who provide a "covered item of supply," which is an "item of information technology that is purchased for inclusion in a covered system, and the loss of integrity of which could result in a supply chain risk for a covered system." 48 C.F.R. § 239.7301; *see also* 10 U.S.C. § 3252(d)(6).[10] Notably, nothing in Section 3252 authorizes the Secretary to exclude a company from providing services to other government agencies. Nor does Section 3252 contain any authorization to require *all* contractors with DoW, including those whose work does not involve covered systems, to stop working with the entity.

Section 3252 does not include the usual pre-deprivation procedures for suspension or debarment of a government contractor, presumably because most hostile adversaries are foreign actors who lack due process rights. Instead, Congress required a different set of procedural safeguards. Specifically, to exclude a company as a "supply chain risk," the Secretary must first take the following steps: (1) "consult[] with procurement or other relevant officials of the covered agency"; (2) "mak[e] a determination in writing" that the exclusion "is necessary to protect national security by reducing supply chain risk," and that "less intrusive measures are not reasonably available to reduce such supply chain risk"; and (3) provide notice to the appropriate congressional committees explaining the risk and bases for the determination. 10 U.S.C. § 3252(b). DoW's regulations further require that the consultation process include "a risk assessment by the Under Secretary of Defense for Intelligence" before a designation can be made. 48 C.F.R. § 239.7304(a).

### E.    Anthropic's Designation as a Supply Chain Risk

The record indicates that on March 3, 2026—the day before Anthropic received the Section 3252 Letter—Secretary Hegseth formally designated Anthropic a supply chain risk based on a joint recommendation from the Under Secretary of War for Acquisition and

---

[10] The definition covers "equipment [] used by the agency directly or [] used by a contractor [for enumerated purposes] under a contract with the agency that requires—(i) [i]ts use; or (ii) [t]o a significant extent, its use in the performance of a service or the furnishing of a product." 48 C.F.R. § 239.7301. It "does not include any equipment acquired by a contractor incidental to a contract." *Id.*

Sustainment and DoW's Chief Information Officer.  (Dkt. No. 96-2 at 2, 3–4.)   The joint recommendation states that after consultation "with procurement and other relevant officials within DoW and, on the basis of a risk analysis provided by DoW [Chief Information Officer]," they "recommend that there is supply chain risk to DoW covered systems related to the use of Anthropic."  (*Id*. at 3.)  In particular, they found that, "by maintaining the ability and necessity to continuously update the product or service," Anthropic had the "potential" to "subvert the design and/or functionality of their product or service."  (*Id*.)  No further explanation was provided as to why Anthropic's products posed such a risk as compared to other AI or software with regular updates.  The recommendation further found that "less intrusive measures are not reasonably available to reduce such supply chain risk," but did not explain why or state what less intrusive measures were considered.  (*Id.*)

The recommendation attaches a memorandum authored by Under Secretary Michael, who had been a principal negotiator in the contract discussions with Anthropic.  (*Id.* at 6–9 (the "Michael Memo").)  The Michael Memo states that AI models "are acutely vulnerable to manipulation," and Anthropic could use "[p]rivileged access with malintent [to] subtly poison the training data to maliciously introduce unwanted function."  (*Id.* at 7.)  Under Secretary Michael further describes the risk of AI "drift," in which Claude could "degrade as new data is introduced" by Anthropic.  (*Id.*)  He asserts that "DoW would be forced to operate a black box controlled by a hostile party, which could contain hidden biases or backdoors."  (*Id.*)  In conclusion, Under Secretary Michael states:

> In the instant case, Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them. . . .  The supply chain risk level increased when Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law.  This risk further increased when Anthropic asserted in the negotiations that it have an approval role in the operational decision chain, which would require the DoW to accept significant operational risk.  Then during the final weeks of negotiations, it became clear that Anthropic was leveraging DOW's ongoing good faith negotiations for Anthropic's own public relations, and they began engaging in an increasingly hostile manner through the press, despite the ongoing private

> negotiations with DoW leadership.  Finally, this hostile posture was even further compounded when, during a time of active military operations, Anthropic leadership questioned the use of their technology in our warfighting systems clearly permitted under the Terms of Service of their existing contract with our Prime contractor.

(*Id.* at 8.)

The Michael Memo does not address what less intrusive measures were considered.  It also does not explain why DoW believed Anthropic has "privileged access," "backdoors," or can otherwise "control" Claude after its delivery to DoW.  Anthropic has submitted unrebutted evidence that it lacks any such access.  Ramasamy states that, "as Claude is deployed in DoW environments—such as through air-gapped, classified cloud systems operated by third-party defense contractors—Anthropic has no ability to access, alter, or shut down the deployed model."  (Dkt. No. 115 ¶¶ 14–15.)  As to whether Anthropic can cause Claude to "drift" or "degrade," Ramasamy states that "[o]nce a model is running inside a government-secure enclave, Anthropic cannot unilaterally alter these features," and Claude does not "change or degrade on its own."  (*Id.* ¶¶ 17–19.)  In his sur-reply declaration, Under Secretary Michael does not dispute these statements.  (*See generally* Dkt. No. 120-1.)  At oral argument, Counsel for Defendants admitted that he was unaware of DoW having any knowledge that Anthropic had unilateral ability to update or modify its products without DoW's consent.  (Dkt. No. 128 at 39.)  Counsel for Defendants stated that DoW is presently conducting an audit to explore whether any such risk exists.  (*Id.*)

The Michael Memo also does not specify the basis for the statement that "Anthropic asserted in the negotiations that it have an approval role in the operational decision chain."  (Dkt. No. 96-2 at 8.)  Anthropic co-founder Kaplan has attested that "Anthropic has not sought, and would not seek, to dictate how the government conducts its missions."  (Dkt. No. 6-1 ¶ 37.)  Indeed, Anthropic attests that it proposed contract language expressly disavowing any such authority.  (Dkt. No. 114 ¶ 9.)  There is no evidence in the record that Anthropic sought to impose any restrictions other than the usage policies at issue.  Under Secretary Michael's declaration submitted in sur-reply explains that his reference to "approval rights" related solely

to permitting an *exception* to the usage policies:  specifically, he refers to "a contract negotiation meeting on December 4, 2025, [where] Anthropic leadership expressed that DoW would have to call Anthropic in real time to seek authorization for a usage exception to one of their redlines." (Dkt. No.120-1 ¶ 7.)  Under Secretary Michael further explains in another declaration that his reference to Anthropic leadership "question[ing]" the technology's use during an operation referred to a comment made by an unnamed Anthropic executive to a DoW operational support software vendor.  (Dkt. No. 96-3 ¶ 15.)  He does not identify any action taken by Anthropic to stop the use that had been questioned.

In sum, the record shows that, outside of Anthropic's contractual redlines (which Anthropic proposed it might be willing to waive in specific circumstances) and an unnamed Anthropic executive's questions to a third-party vendor, Anthropic has not sought to participate in DoW's operational decision chain.  Under Secretary Michael does not dispute Heck's attestation that negotiations between Anthropic and DoW had remained "cordial and amicable." (Dkt. No. 6-2 ¶ 18.)

Concurrently with entering the supply chain risk designation, Secretary Hegseth sent letters to various congressional committees advising them of his action.  (Dkt. No. 96-2 at 12–17.)  The letters do not describe what less intrusive measures DoW considered prior to making the designation.  (*Id.*)  On March 5, 2026, DoW's Chief Information Officer sent a memorandum to DoW leadership regarding the removal of Anthropic's products in DoW Systems.  The memorandum instructs that, within 180 days, DoW components should remove Anthropic's products "from all DoW systems and networks," as well as from various lists and markets facilitating technology procurement for DoW.  (*Id.* at 22.)  The memorandum clarifies that the "prohibition applies to all [Defense Industrial Base partner] contracts," and the restriction should be incorporated "into all current and future contracts."  (*Id.* at 23.)

F.      **Defendants Disclaim that the Hegseth Directive Had Independent Legal Effect**

At oral argument on Anthropic's motion for a preliminary injunction on March 24, 2026,

15

the Court inquired about the legal basis and effect of the following statement in the Hegseth Directive: "Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic. . . . This decision is final." (Dkt. No. 6-21 at 2.) Counsel for Defendants agreed that he was not aware of any statute that gave Secretary Hegseth the authority to issue such a prohibition and agreed that the statement had "absolutely no legal effect at all." (Dkt. No. 128 at 8–9, 13–14.) Counsel for Defendants also agreed that the statement did not reflect DoW's "immediate intended course of action" and that "DoW does not intend to terminate any contractors on the basis that they have a commercial relationship with Anthropic that [i]s separate from their work for DoW." (*Id.* at 9, 12.) Instead, counsel asserted that the only legal effect of the Hegseth Directive "flows through" the Supply Chain Designation. (*Id.* at 14.) When asked why Hegseth made a public statement that had no legal effect and that did not reflect the immediate intent of DoW, counsel stated, "I don't know." (*Id.*) Even so, Defendants declined to stipulate to enjoin this prohibition because DoW "is continuing to assess the situation" and "will take action as needed . . . to mitigate the risk from Anthropic." (*Id.* at 18–19.)

###    G.    The Challenged Actions Risk Crippling Anthropic

Prior to the Challenged Actions, Anthropic had a large public sector business, reflecting its investment in the lengthy vetting and certification processes described above. Before the start of 2026, Anthropic had projected its expected public sector annual recurring revenue in 2026 to be "several hundred million dollars." (Dkt. No. 6-3 at ¶ 31.) It previously experienced a fourfold increase in that revenue from December 2025 to the end of January 2026, and it had accordingly projected a public sector business in the next five years amounting to billions of dollars. (*Id.*) Anthropic now projects that that business will shrink substantially or disappear altogether absent injunctive relief. (Dkt. No. 6-3 ¶ 33.)

In the immediate aftermath of the Challenged Actions, several federal agencies have already moved to end their relationships with Anthropic. GSA removed Anthropic from the agency's AI platform USAi.gov, cutting off sales opportunities for agencies. (*Id.* ¶ 22.) The

U.S. Department of the Treasury and the Federal Housing Finance Agency announced they were terminating all use of Claude. (*Id.* ¶ 23.) The Department of State and the Department of Health and Human Services ("HHS") have issued internal statements saying they will follow the Presidential Directive. (*Id.* ¶ 25.) The Department of Energy's Lawrence Livermore National Laboratory informed Anthropic that it was shutting down Claude. (*Id.* ¶ 27.)

Defense contractors performing work under government contracts using Claude-integrated APIs are assessing—and in many cases looking to terminate—their reliance on Anthropic. (Dkt. No. 6-4 ¶ 12.) Government contractors outside of the defense sector are following suit. Anthropic reports that one partner, which has a multi-million-dollar annual contract with Anthropic, has switched from Claude to a competing generative AI model to service a contract with the U.S. Food and Drug Administration. (*Id.* ¶ 14.) Anthropic reports it "has received inquiries regarding the [Challenged Actions] from over one hundred enterprise customers expressing deep fear, confusion, and doubt about Anthropic and the repercussions of associating with [the] company." (*Id.* ¶ 20.) Major law firms began alerting their government-contractor clients to "audit[] their Anthropic exposure now" and "prepare to deploy alternatives" to Anthropic. (Dkt No. 6-30 at 4; Dkt No. 6-31 at 3.) Within days of the Challenged Actions, Anthropic has experienced a revenue impact as deals worth hundreds of millions of dollars have been delayed from closing, prospective clients have pulled out of negotiations, and some customers have terminated contracts. (Dkt. No. 6-4 ¶¶ 16–19.)

Several amicus briefs detail the chilling effect and confusion that the Challenged Actions have caused. Small developers describe their uncertainty as to whether they will continue to be able to use Claude Code, or use open source libraries that might contain sections of code written by Claude, without running afoul of the Challenged Actions. (Dkt. No. 73 at 7–8.) A group of industrial trade associations explain that they are unsure whether "Claude-generated code already incorporated into an already-shipping product" will be rejected by DoW and whether their members may continue to "host[] Claude alongside dozens of other AI models . . . for purely commercial customers with no defense connection." (Dkt. No. 72 at 13.) Employees from

major companies in the AI field explain that the Challenged Actions threaten to "chill open deliberation" and "professional debate" among the people best positioned to understand AI technology and its potential for "catastrophic misuse." (Dkt. 24-1 at 6, 8, 9.)

## III.    PROCEDURAL HISTORY

Anthropic filed this action and moved for a temporary restraining order and preliminary injunction on March 9, 2026. Anthropic brings a First Amendment claim, a Fifth Amendment Due Process Clause claim, Administrative Procedure Action ("APA") contrary to law and arbitrary and capricious claims, and an ultra vires action asserting that the Presidential Directive is in excess of statutory and constitutional authority. Anthropic seeks preliminary injunctive relief to enjoin Defendants from implementing, applying, or enforcing in any manner the Challenged Actions. A status conference was held on March 10, 2026. (Dkt. No. 38.) To allow development of a more fulsome record and to afford time for Defendants to respond, the Court determined that the motion should be handled in the preliminary injunction posture rather than in the temporary restraining order posture. Defendants were given until March 17, 2026, to file their opposition to the preliminary injunction motion, and Anthropic was given until March 20, 2026, to file its reply. (*Id.*) On reply, Anthropic introduced two declarations in response to the Michael Memo, which the government had provided to Anthropic for the first time in its opposition brief. (Dkt. Nos. 114, 115.) Defendants were then given until the morning of March 24, 2026, to provide any rebuttal to those declarations, and Defendants submitted a further declaration from Under Secretary Michael in sur-reply. (Dkt. Nos. 117, 120.) A hearing was held on the afternoon of March 24, 2026. Immediately after the hearing, Anthropic was permitted to submit evidence that various Defendant Agencies use or used its services, and Defendants were given a further 24 hours to submit any opposition to Anthropic's evidence. (Dkt. Nos. 126, 131.)

## IV.    LEGAL STANDARD

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7,

22 (2008).  To obtain a preliminary injunction, Anthropic must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Id.* at 20.  When the nonmoving party is the government, the final two factors merge.  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## V.   ANALYSIS

### A.   Anthropic Has Shown a Likelihood of Success on Its First Amendment Retaliation Claim

Government officials cannot use the "power of the State to punish or suppress disfavored expression."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).  The government is entitled to express its views regarding the appropriate use of AI in warfare, and it is entitled to choose contracting partners that best align with those views.  "But a State's failure to persuade" its prospective contracting partner to come around to its views "does not allow it to hamstring" disagreeing parties.  *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578 (2011).  "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right, . . . and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted).

Here, Anthropic has shown a likelihood of success on its First Amendment claim.  The record shows that Defendants' conduct appears to be driven not by a desire to maintain operational control when using AI in the military but by a desire to make an example of Anthropic for its public stance on the weighty issues at stake in the contracting dispute.  Although Anthropic had always applied the usage policies in question to Claude Gov, it had been repeatedly lauded as a partner and passed lengthy national security vetting processes.  Only when Anthropic went public with its concerns about DoW's contracting position did Defendants set out to publicly punish Anthropic for its "ideology" and "rhetoric," as well as its "arrogance" for being unwilling to compromise those beliefs.  At that point, Defendants announced a plan to

cripple Anthropic: to blacklist it from doing business with any company that services the U.S. military, to permanently cut off its ability to work with the federal government, and to brand it an adversary that could sabotage DoW and that posed a supply chain risk. Those actions go far beyond what would be necessary to address DoW's ostensible concern about having complete operational control when using AI. This appears to be classic First Amendment retaliation.

### 1.    Anthropic Has Made Out a *Prima Facie* Retaliation Claim

"To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Upon making a prima facie showing, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Hartman*, 547 U.S. at 260.[11]

Anthropic has shown a likelihood that all three prongs of the test are met. First, it has shown that it engaged in protected activity. In particular, the record shows that Anthropic and its CEO, Dario Amodei, are a loud and influential voice regarding the capabilities, risks, and safe uses of AI technology. *See supra* Section II.A–B. In the context of the current dispute with Defendants, DoW and Anthropic both publicly staked out their positions and engaged in a public debate about what deployments of Claude are currently unsafe and what rights Anthropic has to allow Claude's use by the government only with certain safety restrictions. This "speech on

---

[11] At oral argument, counsel for Defendants raised for the first time the possibility that Anthropic's retaliation claim should be analyzed under the framework laid out in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny. (Dkt. No. 128 at 52–53.) This argument, which neither party briefed, has been waived. Even if the Court applied the *Pickering* framework, Anthropic has made out a *prima facie* case for the reasons described below, and Defendants have not met their burden under the balancing test to identify a legitimate government interest or to show that the interest outweighs the free speech interests, as Defendants have made no argument whatsoever on that issue. *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923, 930 (9th Cir. 2004) (explaining that it is the government officials' burden to invoke and make a showing under the balancing test).

matters of public concern" is at "the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up) (citation omitted). Such speech "is more than self-expression; it is the essence of self-government," and it "occupies the highest rung of the hierarchy of First Amendment values." *Id.* (citations omitted).

Defendants do not dispute that the second prong is met. Anthropic has submitted evidence that the Challenged Actions threaten to cripple the company and chill public debate. *See supra* Section II.G. Several amicus briefs support this conclusion. A group of 37 individuals working on AI technology assert that the Challenged Actions "chill[] professional debate on the benefits and risks of frontier AI systems and various ways that risks can be addressed to optimize the technology's deployment." (Dkt. No. 24-1 at 8.) An industry group of "values-led investors" warns that the Challenged Actions chill speech necessary to allow them to direct their investments to support the "principles and values" they care about. (Dkt. No. 77-1 at 12.) In short, the Challenged Actions easily qualify as ones which would chill a person of ordinary firmness from continuing to engage in further protected speech.

Finally, the Challenged Actions leave little question that the measures were prompted by Anthropic's public repudiation of DoW's contracting request and its perceived use of public scrutiny to "strong arm" DoW into changing its mind. Secretary Hegseth expressly tied Anthropic's punishment to its attitude and rhetoric in the press. He stated that "Anthropic delivered a master class in arrogance." (Dkt. No. 6-21 at 2.) Referring to Anthropic and Amodei, he further stated: "Cloaked in the sanctimonious rhetoric of 'effective altruism,' they have attempted to strong-arm the United States military" through their "corporate virtue-signaling" and "Silicon Valley ideology." (*Id.*) "Anthropic's stance is fundamentally incompatible with American principles." (*Id.*) The President described Anthropic as "radical left, woke company" and its employees as "leftwing nut jobs," who "made a DISASTROUS MISTAKE trying to STRONG-ARM the Department of War." (Dkt. No. 6-20 at 2.) Read in context of these repeated references to rhetoric and ideology, the term "strong-arm" in the Presidential Directive and the Hegseth Directive appears to be characterizing Anthropic as

21

applying public pressure.  That seems particularly likely in light of the undisputedly "cordial and amicable" nature of the contract negotiations themselves and Anthropic's offer to facilitate an orderly transition to another vendor if the parties could not come to terms.

The Michael Memo likewise repeatedly refers to Anthropic's public airing of its dispute with DoW as the reason that it is no longer trustworthy.  (*See* Dkt. No. 96-2 at 7 (describing how Anthropic "opted to publicly spat with DoW" as a basis to distrust it); *id.* at 7–8 (same with respect to "the public statements of Anthropic's CEO and others associated with the company")).)  The memo finds that Anthropic's "risk level escalated" into a "supply chain risk" principally because it was "leveraging DoW's ongoing good faith negotiations for Anthropic's own public relations" and its "increasingly hostile manner through the press." (*Id.* at 8.)  These specific references to Anthropic's viewpoint and public stance are direct evidence of what motivated Defendants' decision-making.

### 2.    Defendants Have Not Carried Their Burden to Rebut Anthropic's *Prima Facie* Case

Defendants raise two interrelated arguments in opposition.  First, they argue that Anthropic's "contracting position" is conduct, not speech entitled to First Amendment protection.   Second, they argue that Anthropic's refusal to accept DoW's terms—not any of Anthropic's speech—was the but-for cause of Challenged Actions.  Neither argument changes the likelihood of success analysis.

First, without reaching the question of whether private contract negotiations alone could constitute protected activity under the First Amendment, the record shows that Anthropic engaged in protected speech when it took public the parties' contracting impasse and the reasons behind its refusal to agree to DoW's terms.  (*See*, *e.g.*, Dkt. Nos. 6-7, 6-18.)  As already explained, Anthropic's views on this matter fall within the heart of what the First Amendment protects: "subject[s] of general interest and of value and concern to the public" and "of legitimate news interests." *See Snyder*, 562 U.S. at 452–53 (citation omitted).  Therefore, to the extent Anthropic publicly discussed its "contracting position," that speech is protected by the First

Amendment.

Next, Defendants argue that even if Anthropic's public statements constitute protected speech, the contract dispute—not Anthropic's speech—was the motive and "but for" cause of the Challenged Actions. (Dkt. No. 96 at 22–24.) They point out that although Anthropic and Amodei have long advocated for AI safety, Defendants took the Challenged Actions only after Anthropic refused to remove its usage restrictions. But Defendants' own actions belie the notion that Anthropic's contracting position is what drove the Challenged Actions. Anthropic had imposed its usage restrictions from the beginning of DoW's use of Claude Gov, and no one had ever suggested that this indicated that Anthropic was untrustworthy or a potential saboteur. To the contrary, Anthropic passed extensive vetting at that time and was praised by the government, which had made arrangements to expand the company's role. It was only when Anthropic publicly discussed its dispute with DoW that Defendants criticized its rhetoric and ideology and adopted the punitive measures at issue.

As for the "but for" cause of the Challenged Actions, Defendants assert that, "[a]t bottom, had Anthropic agreed to the [g]overnment's term, the challenged actions would not have occurred." (Dkt. No. 96 at 23.) That is the wrong question to ask in a "but for" inquiry. The correct question is whether, if Anthropic had not engaged in the protected speech, Defendants would have taken the Challenged Actions regardless. *See CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008) (stating that "defendant must show . . . that it *would* have reached the same decision; it is insufficient to show merely that it *could* have reached the same decision" (emphasis in original)). Defendants have not carried their burden to show that they would have.[12]

---

[12] This case differs from *American Federation of Government Employees, AFL-CIO v. Trump*, 167 F.4th 1247 (9th Cir. 2026). There, the challenged executive order had no retaliatory language and had a "legitimate grounding in national security concerns." *Id.* at 1256–57. As a result, the Ninth Circuit found that stray hostile remarks in a sheet of talking points that accompanied the order were insufficient to show retaliation because the government "would have[] issued [the executive order] in the absence of the asserted retaliatory animus." *Id.* at 1257. Here, by contrast, the Challenged Actions on their face indicate that they are retaliatory, and Defendants have not identified any legitimate national security justifications for the

If this were merely a contracting impasse, DoW would presumably have just stopped using Claude.  This would square with the ostensible risk the Challenged Actions were meant to address:  that Anthropic might interfere with "operational decisions of the United States military," putting "American lives at risk, [America's] troops in danger, and [its] national security in jeopardy."  (Dkt. No. 6-21 at 2; Dkt. No. 6-20 at 2 (capitalizations omitted); *see also* Dkt. No. 6-28 (identifying a risk to national security systems).)  The Challenged Actions, however, far exceed the scope of what could reasonably address such a national security interest.  The Presidential Directive ordered a permanent federal government-wide bar, and the Hegseth Directive blacklisted Anthropic.[13]  Nothing in the record supports a determination that the contracting impasse alone would have triggered such an extreme response.

Although courts owe deference to the government on issues of national security, "concerns of national security and foreign relations do not warrant abdication of the judicial role."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010).  Courts cannot "defer to the Government's reading of the First Amendment, even when such interests are at stake," and "the Government's authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals."  *Id.* (citation omitted).  Anthropic has shown a likelihood of success on its First Amendment retaliation claim.[14]

### B.    Anthropic Has Shown a Likelihood of Success on Its Procedural Due Process Claim Under the Fifth Amendment

"Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of [a government] action and afford them an opportunity to present their objections.'"  *Al Haramain Islamic Found., Inc. v. U.S. Dep't of*

---

sweeping prohibitions at issue.

[13] The Supply Chain Designation exceeds the scope of Defendants' justifications for the reasons described below in Section V.C.

[14] Because this Order finds a likelihood of success on Anthropic's retaliation claim, it does not reach Anthropic's alternate theory of content and viewpoint discrimination.

*Treasury*, 686 F.3d 965, 985 (9th Cir. 2012) (quoting *United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 272 (2010)).  Anthropic argues that Defendants violated Anthropic's procedural due process rights when they summarily blacklisted it and designated it a supply chain risk.  Defendants respond that their actions did not impair any protectible interest Anthropic might have and that even if they did, pre-deprivation process was not necessary.

The *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test governs this claim.  *Al Haramain*, 686 F.3d at 985.  Under *Mathews*, the Court "must weigh (1) [Anthropic's protected] interest, (2) the risk of an erroneous deprivation of such interest through the procedures used, as well as the value of additional safeguards, and (3) the Government's interest in maintaining its procedures, including the burdens of additional procedural requirements." *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 589 (9th Cir. 1998) (citing *Mathews*, 424 U.S. at 334–35).  As already discussed, there are strong interests on both sides of the scale.  Anthropic's interest in its reputation and in its continued eligibility to compete for federal work is undoubtedly significant.  "On the other side of the scale, the government's interest in national security cannot be understated." *Al Haramain*, 686 F.3d at 980.  "Striking a balance between those two strong competing interests cannot be done in the abstract." *Id.*  Therefore, this Order "carefully assess[es] the precise 'procedures used' by the government, 'the value of additional safeguards,' and 'the burdens of additional procedural requirements.'" *Id.* (quoting *Foss*, 161 F.3d at 589).

### 1.    Anthropic Has a Protectible Liberty Interest

The liberty interest protected by the Fifth Amendment encompasses the right to "follow a chosen profession free from unreasonable governmental interference." *Greene v. McElroy*, 360 U.S. 474, 492 (1959).  Therefore, "debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause." *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (citing *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 961–62 (D.C. Cir. 1980)).  Furthermore, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."

25

*Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  Although reputational harm alone is generally insufficient to trigger a liberty interest, *Siegert v. Gilley*, 500 U.S. 226 (1991), reputational harm can give rise to a liberty interest when accompanied by a "tangible" alteration in status.  *Trifax*, 314 F.3d at 644 (citation omitted).

Each of the Challenged Actions deprive Anthropic of protected liberty interests.  First, the Presidential Directive ordered "EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology.  We don't need it, we don't want it, and will not do business with them again!" (Dkt. No. 6-20 at 2.)  That is a permanent debarment with absolutely no pre- or post-deprivation process.  Next, the Hegseth Directive ordered that, "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct *any commercial activity* with Anthropic." (Dkt. No. 6-21 at 2 (emphasis added).)  Secretary Hegseth also "direct[ed] the Department of War to designate Anthropic a Supply-Chain Risk to National Security," which occurred on March 3, 2026.  (*Id.*; Dkt. No. 96-2.)  The designation prohibits Anthropic from providing products or services as a contractor or subcontractor for national security systems.  (Dkt. No. 96-2 at 2, 22–23.)

These acts inflict both reputational harm and an immediate alteration of Anthropic's status and therefore implicate significant liberty interests.  For example, in *Old Dominion*, a government agent determined that a company "lacked integrity," which precluded the company from obtaining any future government contracting work and "threatened the very existence of the business."  631 F.2d at 955, 963.  The D.C. Circuit held that the reputational harm and accompanying loss of government employment "injured a cognizable liberty interest." *Id.* at 962–66.  The same is true here.

Defendants contend that Anthropic, which has private commercial relationships, lacks a liberty interest because the Challenged Actions do not act as a "complete prohibition of the right to engage in a calling." (Dkt. No. 96 at 30–31 (quoting *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999)).)  But a complete prohibition is not the only way to injure a protected liberty interest.  As the D.C. Circuit articulated in its "reputation plus" test, a deprivation of

liberty occurs when the government imposes a "broad preclusion" that "seriously affect[s], if not destroy[s]," a company's "ability to obtain" contracts in its chosen field of business. *Trifax*, 314 F.3d at 644. The record shows that the Challenged Actions threaten to cripple Anthropic by not only stripping it of billions of dollars in federal contracts and subcontracts but also by labeling it as an adversary to the United States and ending its ability to have *any commercial relationship* with any company that might want to do business with DoW.

Thus, Anthropic has shown a substantial likelihood that it has a significant protectible liberty interest.[15]

> **2.    A Serious Risk of Erroneous Deprivation Exists, and Defendants Have Not Shown Any Urgency Supporting the Need to Bypass Pre-Deprivation Process**

The record reflects that the Challenged Actions were taken without any meaningful notice or pre-deprivation process (and, in the case of the Presidential Directive and the Hegseth Directive, without any post-deprivation process either). Although Anthropic was on notice that the government objected to its contracting terms, it had no notice or opportunity to object before Defendants publicly barred it from all federal government work and blacklisted it with private companies working with the U.S. military. It also had no notice or opportunity to object to the factual basis for its designation as a supply chain risk, which it learned of in this litigation. (Dkt. No. 115 ¶ 5.) In fact, three days before he issued the Hegseth Directive, Secretary Hegseth told Anthropic that, unless the company complied, DoW would *either* designate it a supply chain risk (meaning Anthropic presented a grave threat to national security) *or* invoke the Defense Production Act (meaning Anthropic was essential to national security). (Dkt. No. 6-2 ¶ 16.) This contradiction underscores the complete lack of prior notice or process.

Anthropic has also shown that meaningful pre-deprivation notice of DoW's concerns and an opportunity to respond to those concerns were necessary to avoid the risk of erroneous

---

[15] Because this Order finds Anthropic likely to succeed on its due process claim based on its protectible liberty interest, it does not reach Anthropic's property interest theory.

deprivation here.  *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).  Upon learning in this litigation of DoW's stated factual basis for the supply chain risk designation, Anthropic submitted a declaration explaining that DoW's records reflect core misunderstandings about how Anthropic's technology works, which Anthropic could have dispelled if given the opportunity.  (Dkt. No. 115 ¶¶ 13–19.)

Defendants argue that a post-deprivation hearing can satisfy due process "where there is 'the necessity of quick action by the State or the impracticality of providing any predeprivation process.'"  (Dkt. No. 96 at 31 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982).)  Defendants, however, have not carried their burden to show such necessity.  "Pre-deprivation notice typically is required absent 'a strong justification' from the government." *Garza v. Woods*, 150 F.4th 1118, 1130 (9th Cir. 2025) (citation omitted).  Genuine exigency, such as the risk of "asset flight" when government intends to freeze the resources of a suspected terrorist group, can justify post-deprivation process.  *Al Haramain*, 686 F.3d at 985.  However, the bare invocation of a national security interest alone is not a stand-in for exigency.  *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207–08 (D.C. Cir. 2001).  In this case, Defendants present no evidence of exigency whatsoever.  To the contrary, the parties had undisputedly been doing business pursuant to the very terms to which the government objects for over a year before the Challenged Actions, and Anthropic's removal from DoW's systems is slated to take place over a period of six months.

Defendants contend that Anthropic's contractual terms would "diminish functionality and limit DoW's warfighting capabilities" and that Anthropic's growing "hostility in negotiations" was a sign that it might "unilaterally alter system guardrails and model weights."  (Dkt. No. 96-2 at 6–7.)  But, as discussed below in Section V.C.1.a, the unrebutted record shows that Anthropic is not technologically capable of taking such unilateral actions.  And, in any event, the usage restrictions were not new.  Beyond the self-imposed urgency created by the ultimatum that Secretary Hegseth issued on February 24, nothing in the record indicates a heightened supply chain risk to national security systems on February 27 or March 3.  Therefore, even affording

deference to the government's factual conclusion, Defendants have not shown exigency.

With respect to the more sweeping aspects of the Challenged Actions—the permanent federal government-wide bar and the private sector blacklisting—the record contains no indication of any risk, much less an urgent one, motivating those actions. In sum, pre-deprivation notice and process could, and likely should, have been provided to Anthropic before Defendants took the Challenged Actions.

Finally, Defendants argue that because Section 3252 does not expressly provide pre-deprivation process and permits DoW "to limit disclosure of information" related to designations in some circumstances, "[d]ue process is then satisfied." (Dkt. No. 96 at 31 (quoting 10 U.S.C. 3252(c)).)[16] It is true that Section 3252 will often involve a "supply chain risk designation" without pre-deprivation process, and in many instances, this will not run afoul of the Constitution because the government has shown exigent circumstances or the target is either a foreign actor lacking due process rights or a hostile party that does not significantly rely on federal contracting. Here, though, Anthropic is a domestic company with a significant federal contracting business, and no exigency has been shown. Compliance with the statutory requirements does not relieve the government of its due process obligations under the Constitution. *See*, *e.g.*, *United States v. Rivera-Valdes*, 157 F.4th 978, 989 (9th Cir. 2025). As to the argument that Section 3252 permits limitation of disclosures, Defendants have not submitted any evidence indicating that concerns about sensitive information prevented them from providing Anthropic with notice. Indeed, except for a proprietary report that Defendants asked to seal to protect the vendor's business interests (Dkt. No. 97), Defendants filed all of their evidence on the Court's public docket.

Thus, Anthropic has shown a likelihood of success on its Due Process Clause claim.

---

[16] The Court assumes that Defendants' argument relates only to the Supply Chain Designation, as the statutory scheme is inapplicable to the Directives.

C.      **Anthropic Has Shown a Likelihood of Success on Its APA Claim**

Under the APA, an agency action must be set aside and held unlawful if it is "arbitrary, capricious, an abuse of discretion," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).  Anthropic has shown that the Hegseth Directive and the Supply Chain Designation were likely in excess of statutory authority, contrary to law, and arbitrary and capricious.  Section 3252 is intended to address the risk of adversarial sabotage of national security systems, and it does not authorize DoW to designate a domestic vendor a supply chain risk simply because a vendor publicly criticized DoW's views about the safe uses of its system.  Even if Section 3252 could be deployed for this purpose, DoW failed to follow the necessary process because, among other things, it failed to make any reasoned determination about whether less intrusive measures were available.  Finally, the record strongly suggests that the reasons given for designating Anthropic a supply chain risk were pretextual and that Defendants' real motive was unlawful retaliation.

1.      **The Supply Chain Risk Designation Was in Excess of Statutory Authority and Contrary to Law**

a.      **Anthropic's Conduct Does Not Meet the Definition of a Supply Chain Risk**

On the record before the Court, Anthropic's conduct does not appear to be within the definition of "supply chain risk" in Section 3252.  Section 3252 defines a supply chain risk as limited to "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert . . . a covered system."  10 U.S.C. § 3252(d)(4).  Assuming without deciding that a domestic company can be an "adversary," the plain text of the statute is directed at covert acts or hacks, not overt positions taken during contract negotiations.  Indeed, it is difficult to understand how one could sabotage, maliciously introduce an unwanted function, or subvert an information technology system by publicly announcing usage restrictions or insisting on such restrictions in conversations with DoW.  Defendants appear to be taking the position that any vendor who "push[es] back" on or "question[s]" DoW becomes its "adversary."  (Dkt. No. 128 at

30

41.)  That position is deeply troubling and inconsistent with the statutory text.

The legislative history confirms that Section 3252's purpose is to address covert acts, hacks, and other acts of technical sabotage.  Section 3252 was originally enacted as Section 806 of the 2011 National Defense Authorization Act.  Pub. L. No. 111-383, § 806 (2011).  In explaining why Section 806 should be enacted, the Senate Armed Services Committee Report relied upon a report from the Department of Defense about "trusted defense systems."  Specifically, the Committee explained:

> In that report, the Secretary found that the globalization of the information technology industry has increased the vulnerability of the Department of Defense (DOD) to attacks on its systems and networks.  The report found an increasing risk that systems and networks critical to DOD could be exploited through the introduction of counterfeit or malicious code and other defects introduced by suppliers of systems or components.  The committee concludes that the Secretary should have the authority needed to address this risk.

S. Rep. No. 111-201, at 162 (2010).  Anthropic's acts do not appear to bear any relation to the conduct at issue in Section 3252.

Defendants point to Anthropic's "hostile manner" in the press and in contract negotiations as raising a risk that it might sabotage national security systems in the future.  (Dkt. No. 96-2 at 7–8.)  But Defendants do not explain why they infer from Anthropic's forthright insistence on the usage restrictions that it would become a saboteur.  Indeed, sabotage would ordinarily be a surprising culmination to months of "cordial" negotiations.

Defendants argue that Anthropic could "cause their software to stop working" or "unilaterally alter system guardrails and model weights without DoW consent."  (*Id.* at 6–7.)  However, nothing in the administrative record supports the conclusion, found only in the Michael Memo, that Anthropic has the technological capability to access its Claude models after they are deployed on national security systems.  In fact, at oral argument counsel for Defendants acknowledged that he was unaware of any such capabilities.  (Dkt. No. 128 at 39.)  And if extra-record evidence could be considered, the unrebutted evidence is that Anthropic forcefully advocated for contractual limits on DoW's use of its products because it is technologically

incapable of stopping DoW from using its systems in ways that it disagrees with once it hands the products over.  (*See* Dkt. No. 6-1 ¶ 22 ("The Usage Policy is critical because technical safeguards alone cannot prevent all dangerous uses[.]").)  Anthropic has submitted evidence that "Anthropic has no access to, or control over, the model as deployed or used by government customers" (Dkt. No. 115 ¶ 8), and that "Anthropic has never had the ability to cause Claude to stop working, alter its functionality, shut off access, or otherwise influence or imperil military operations" (*id.* ¶ 14; *see also id.* ¶¶ 15–17).  Defendants do not dispute that evidence.

Defendants also contend that AI "technology itself" is inherently "opaque," and that updates from Anthropic could thus "introduce [] vulnerabilities" that were hard to detect.  (Dkt. No. 96-2 at 7.)  But the unrebutted record shows that DoW extensively tested Anthropic's updates before they were deployed in June and November 2025.  (Dkt. No. 115 ¶ 10.)  DoW's stated concern thus does not appear to be specific to Anthropic but instead appears to be inherent to AI technology, and indeed, to technology more broadly.  Most IT vendors could presumably update their systems or introduce unwanted functions without detection, if they wanted to.  Yet Section 3252 obviously does not permit DoW to designate IT vendors as "supply chain risks" whenever they ask probing questions or stubbornly insist on particular contracting terms, even if their doing so causes DoW to doubt their trustworthiness.  Such a breathtakingly broad interpretation of Section 3252 would make its restrictions on the Secretary's discretion meaningless.  Not only would such an approach raise serious due process concerns for the reasons already explained, but it would also effectively gut the statutory and regulatory protections for government contractors in this field.  *See*, *e.g.*, 41 U.S.C. § 1121; 40 U.S.C. § 121(c); 48 C.F.R. §§ 9.406-3, 9.407-3.  Nothing in Section 3252's text, structure, or legislative history supports such radical interpretation of its scope.

> **b.**  **The Supply Chain Designation Failed to Satisfy the Procedural Requirements of Section 3252**

Section 3252 allows the Secretary of War to skip the usual procedural requirements for suspending or debarring federal contractors so long as constitutional guarantees of due process

are otherwise satisfied.  That approach makes sense, given Congress's focus on preventing sabotage and subversion by foreign intelligence agencies, terrorists, and other hostile actors who generally lack due process rights or would be unlikely to take advantage of them.  Instead, Section 3252 and its enabling regulations create institutional safeguards—which the Secretary must complete *before* making a designation—to ensure that its designation is applied properly. The Supply Chain Designation failed to comply with these mandated procedural safeguards.

One of the central safeguards of Section 3252 is the requirement that the Secretary of War make "a determination in writing" that "less intrusive measures are not reasonably available to reduce such supply chain risk."  10 U.S.C. § 3252(b)(2)(B).  To ensure that this first requirement is not an empty letter, the Secretary must provide the appropriate congressional committees with "a discussion of less intrusive measures that were considered and why they were not reasonably available to reduce supply chain risk."  *Id.* § 3252(b)(3)(B).  The second requirement ensures that the Secretary's analysis is preserved for the record and is subject to Congressional oversight.  Only after those steps are complete may the Secretary of War designate a source as a supply chain risk.

There is reason to infer that Secretary Hegseth failed to make the required reasoned determination regarding less intrusive measures, as required under Section 3252(b)(2)(B).  The record contains various declarations from Secretary Hegseth that "less intrusive measures are not reasonably available to reduce such supply chain risk."  (Dkt. No. 96-2 at 2, 12, 13, 14, 15, 16, 17, 18.)  But nothing in the administrative record discusses less intrusive measures or otherwise indicates that DoW engaged in the consideration that would be necessary for Secretary Hegseth to reach such a determination.  Moreover, Secretary Hegseth's six identical notices to various congressional committees do not contain any "a discussion of less intrusive measures that were considered and why they were not reasonably available," as Defendants conceded at oral argument.  (*Id.* at 12–17.)  This silence in the congressional letters is particularly telling in light of the statutory requirement to describe such analysis.  10 U.S.C. § 3252(b)(3)(B).  It strongly suggests that Secretary Hegseth merely *stated* that less intrusive measures were unavailable and

failed to make the required reasoned determination.  *See Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016) ("An agency acts contrary to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision." (citation omitted)).

As a further safeguard, DoW regulations require "a joint recommendation" from specified officials "on the basis of a risk assessment by the Under Secretary of Defense for Intelligence" before a designation can be made.  48 C.F.R. § 239.7304(a).  However, the risk assessment submitted by Defendants does not come from the Under Secretary of Defense for Intelligence.  Instead, the risk assessment was provided by Under Secretary of War for Research and Engineering Emil Michael, who also led many of the contract negotiations with Anthropic.  Under Secretary Michael's declaration states that, due to various DoW reorganizations in 2025, and because of its "institutional and subject matter expertise," his office "has assumed responsibility for providing [] supply chain risk assessments relating to AI."  (Dkt. No. 96-3 ¶ 8.)  However, Under Secretary Michael does not state that the Under Secretary of Defense for Intelligence was unavailable or that the relevant regulations were amended to permit him to prepare the risk assessment.  Therefore, it is likely that the action violated DoW's own regulations implementing Section 3252.

In sum, Anthropic has shown that the Supply Chain Designation was likely contrary to law, both because Anthropic's conduct did not meet the statutory criteria for a supply chain risk and because the action violated the institutional checks and balances required under Section 3252 and its implementing regulations.

### 2. The Hegseth Directive Was in Excess of Statutory Authority and Contrary to Law

Defendants submit no evidence that Secretary Hegseth had complied with the statutory prerequisites of Section 3252 prior to issuing the Hegseth Directive.  The determinations provided by Defendants all occurred *after* the Hegseth Directive was issued.  And Defendants conceded at oral argument that there is no statutory basis for Secretary Hegseth's instruction that

34

"no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic." (Dkt. No. 6-21 at 2.) As such, Defendants concede that the Hegseth Directive was in excess of and contrary to his statutory authority.

Instead, Defendants argue that the Hegseth Directive is not a final agency action and should be viewed as subsumed by the Supply Chain Designation. (Dkt. No. 96 at 25–26.) That reading is contrary to the plain language of the Hegseth Directive. The Hegseth Directive states that it has "immediate[]" effect with respect to the blacklisting of Anthropic and is "final" in all respects, including the mandate that DoW designate Anthropic a supply chain risk. (Dkt. No. 6-21 at 2.) Therefore, it is a final agency action because it purports to be the "consummation" of a decision-making process and because "legal consequences will flow" from it. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). Indeed, Anthropic submits evidence that major law firms promptly issued alerts warning government contractor clients to "immediately review their use of Anthropic technology . . . and prepare to deploy alternatives." (Dkt. No. 6-31 at 3; *see also* Dkt. No. 6-30.) Finally, nothing in the Supply Chain Designation withdraws or rescinds the Hegseth Directive or otherwise renders it non-final.[17]

Thus, the Hegseth Directive was likely in excess of statutory authority and contrary to law.

### 3.    The Supply Chain Risk Designation and the Hegseth Directive's Blacklisting of Anthropic Were Arbitrary and Capricious

An agency decision is unlawfully arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

---

[17] Even if the Court were to consider subsequently generated materials from the Supply Chain Designation in evaluating the Hegseth Directive, the Hegseth Directive would still be contrary to law because the Designation failed to comply with required procedural safeguards and misapplied the "supply chain risk" designation to Anthropic's conduct, as explained above.

(1983).  Where the official "explanation for agency action [] is incongruent with what the record reveals about the agency's priorities and decisionmaking process," and there is a "disconnect between the decision made and the explanation given," an agency has not provided a reasoned explanation, and its action is likely arbitrary and capricious.  *See Dep't of Com. v. New York*, 588 U.S. 752, 783–85 (2019).

The administrative record shows that Defendants' proffered reasons for designating Anthropic a supply chain risk and blacklisting the company with private defense contractors are both implausible and contrary to the evidence for the reasons already discussed.  Sections V.B & V.C.1–2.  Likewise, Defendants' apparent failure to consider less intrusive measures indicates that they likely "failed to consider an important aspect of the problem" that Congress required them to consider.  Section V.C.1–2.

Moreover, the proffered reasons appear pretextual.  The timing of the administrative record raises an inference that it was generated after the fact to justify the foreordained conclusion ordered in Secretary Hegseth's mandate to "designate Anthropic a Supply-Chain Risk to National Security" on February 27.  (Dkt. No. 6-21 at 2; Dkt. No. 96-2.)  The undisputed evidence shows that, in the parties' multi-year working relationship and during Anthropic's extensive national-security vetting process, Defendants never raised any supply chain risk concerns but instead consistently praised Anthropic.  DoW appears to have raised such concerns for the first time in conjunction with the February 27 instruction.  Indeed, all the records Defendants introduce in support of the designation are dated March 2–3, 2026.  (Dkt. No. 96-2 at 2–9; Dkt. No. 120-1 ¶ 19.)[18]

The inference of pretext is further reinforced by the inconsistencies in the record. Defendants have introduced evidence that on March 2–3, 2026, Under Secretary Michael and

---

[18] The only exception is a "Due Diligence Preliminary Report" prepared by a vendor, dated February 26, 2026, two days after Secretary Hegseth issued the ultimatum to Anthropic threatening to designate it a supply chain risk.  (Dkt. No. 97-2 at 10–22.)  The due diligence report does not corroborate the risks that purportedly resulted in the supply chain risk designation.

other DoW leaders finalized various recommendations, memos, and determinations in support of designating Anthropic an "unacceptable national security threat." (Dkt. No. 96-2 at 8.) Yet the day after the designation was finalized—and before it was communicated to Anthropic—Under Secretary Michael and Amodei cordially exchanged drafts of Anthropic's usage terms, with Under Secretary Michael writing to Amodei: "After reviewing with our attorneys and seeing your last draft (thanks for being fast), I think we are very close here." (Dkt. No. 114-1 at 2.) It is exceedingly difficult to square this correspondence with Under Secretary Michael's contemporaneous characterization of Anthropic as a "hostile" company presenting an "intolerable" risk to covered systems and an "unacceptable national security threat." (Dkt. No. 96-2 at 8.) It is also difficult to harmonize the concerns discussed in the Michael Memo with Secretary Hegseth's threat, three days earlier, to designate Anthropic as essential to national security under the Defense Production Act. (Dkt. No. 6-2 ¶ 16.) "Altogether, the evidence tells a story that does not match the explanation" given. *Dep't of Com.*, 588 U.S. at 784.

In sum, the contradictory positions, the procedural defects, and the rushed process following a public declaration of the foreordained conclusion all indicate that the actions were arbitrary and capricious. *See, e.g.*, *Nat'l TPS All. v. Noem*, 166 F.4th 739, 774 (9th Cir. 2026) (Mendoza, J., concurring) ("Taken together, these deficiencies paint a picture of agency action that was not the product of reasoned decision-making, but of a rushed and pre-determined agenda masked by pretext."). While arbitrary and capricious review is deferential, it is not an "empty ritual." *Dep't of Com.*, 588 U.S. at 785. Agencies must "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id.*

Thus, Anthropic has shown a likelihood of success on the merits of its arbitrary and capricious claim.[19]

---

[19] This Order does not reach the novel issues raised by Anthropic's *ultra vires* challenge to the Presidential Directive because the Court has already found that Anthropic is likely to succeed on its First Amendment and Due Process Clause claims concerning the Directive.

D.    **Anthropic Has Shown a Likelihood of Irreparable Harm**

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quotation marks and citations omitted).  Anthropic has shown that it is experiencing ongoing constitutional injuries.  With respect to its First Amendment claim, Anthropic remains subject to the likely retaliatory Challenged Actions, and Defendants do not dispute that the Actions would chill a person of ordinary firmness from continuing to engage in the protected activity.  Anthropic is not required to show that it has succumbed to the chilling effects of the Challenged Actions in order to be entitled to injunctive relief.  *Ariz. Students' Ass'n*, 824 F.3d at 867.

Anthropic's due process injuries are likewise ongoing and significant.  The Presidential Directive bars Anthropic from all present and future federal government contracting work despite the fact that, to this day, Anthropic has received no meaningful notice regarding the factual basis on which it was debarred and has had no pre- or post-deprivation opportunity to object to the debarment.  As a result, Anthropic is likely to experience a "loss of opportunity to pursue [its] chosen profession," which "constitutes irreparable harm."  *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citations omitted).  The Supply Chain Designation is also likely to cause irreparable harm to Anthropic's liberty interests.  Defendants have already started implementing the exclusion authorized by the designation, despite not giving Anthropic any pre-deprivation process.  As a result, Anthropic has shown that it is experiencing a "loss of control over business reputation and damage to goodwill," which "constitute[s] irreparable harm."  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)).

Anthropic has submitted concrete, non-speculative evidence of the ongoing harms to its liberty interests.  Within days, many large enterprise customers signaled that publicly doing business with Anthropic over competitors was not worth it.  (Dkt. No. 6-4 ¶ 16.)  Three government contractor customers terminated their contracts with Anthropic, or were instructed to

do so by Defendants; three deals valued at over $180 million fell apart despite being on the verge of closing; potential partners demanded additional protective contractual provisions such as unilateral termination; customers asked to cut short their contracts or reduced their amount, in some instances specifically mentioning the Challenged Actions; and others switched from Claude to competing generative AI tools.  (Dkt. No. 6-4 ¶¶ 11–19; Dkt. No. 6-3 ¶ 33.) Anthropic's Chief Financial Officer, Krishna Rao, projects that, depending on how broadly Anthropic's customers interpret the Challenged Actions, Anthropic could lose between hundreds of millions and multiple billions of dollars in 2026 revenue.  (Dkt. No. 6-5 ¶ 6.)  Moreover, Defendants do not contest that Anthropic will be unable to obtain compensatory relief from the government, making its economic harm likely irreparable.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).[20]

As discussed above, Defendants disclaim any present intent to enforce the portion of the Hegseth Directive stating, "effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic." *See supra* Section II.F.  However, Defendants declined to stipulate to enjoin this portion of the Hegseth Directive, asserting that they were "continuing to assess the situation" and "will take action as needed . . . to mitigate the risk from Anthropic."  (Dkt. No. 128 at 18–19.)  Because Defendants appear to be reserving their rights with respect to the above statement, Anthropic has shown a sufficiently "immediate" danger of irreparable harm.  *Cf. Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (holding that the "threat of irreparable harm [was] sufficiently immediate to warrant preliminary injunctive relief," notwithstanding a proposed

---

[20] Defendants suggest that Anthropic could recover for its economic harms via a breach of contract action in the Court of Federal Claims.  But Anthropic's challenge seeks injunctive relief as to the policies that blacklist Anthropic and bar it from government contracting, not to enforce the terms of any government contract.  Such claims could not be brought in the Court of Federal Claims and would not entitle Anthropic to money damages.  *See, e.g., Washington v. United States Dep't of Educ.*, 161 F.4th 1136, 1139–40 (9th Cir. 2025) (prospective vacatur of allegedly arbitrary and capricious policy not to renew grants was not within jurisdiction of the Court of Federal Claims).

stipulation by defendants, because of the "limited nature" of the stipulation offered).

Anthropic has shown that it is likely to suffer irreparable harm absent injunctive relief.

### E.   The Balance of Equities and Public Interest Favor Anthropic

A likelihood that constitutional violations have occurred weighs heavily in favor of an injunction, because "all citizens have a stake in upholding the Constitution." *Hernandez*, 872 F.3d at 996 (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)). In such circumstances, "the merged third and fourth factors [tip] decisively in [a plaintiffs'] favor." *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (quoting *Baird*, 81 F.4th at 1042).

In opposition, Defendants focus on one specific harm that they believe the government will suffer because of the preliminary injunction: the risk that "an AI model used in national security systems [would] be sabotaged by a hostile and untrustworthy corporate owner." (Dkt. No. 96 at 36.) However, the preliminary injunctive relief that the Court authorizes does not require the government to continue to use Claude on its national security systems. Therefore, this harm does not weigh against granting injunctive relief. Defendants also briefly argue that the public interest is harmed if the government is unable to "effectuat[e] statutes enacted by representatives of its people." (*Id.* at 37.) But "the rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'" *Washington*, 145 F.4th at 1037 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)). The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

The balance of equities and public interest therefore decisively favor Anthropic. As already discussed, the financial and reputational harm that Anthropic is experiencing as a result of the likely unlawful Challenged Actions risk crippling the company. In addition, amici have credibly described significant harms to the public interest if injunctive relief is denied. A brief submitted by military leaders warns that the Challenged Actions "will materially detract from military readiness and operational safety." (Dkt. No 58 at 14.) Employees from other major companies in the AI field explain that the Challenged Actions threaten to "chill open

40

deliberation" and "professional debate" amongst the people best positioned to understand AI technology and its potential for "catastrophic misuse." (Dkt. 24-1 at 6, 8, 9.) A nonprofit advocacy group for small developers explains that their members are particularly vulnerable to sudden, large changes in government procedures, and the confusion and ambiguity created by the Challenged Actions will impose significant costs on them. (Dkt. No. 73 at 4–5.)

For all these reasons, the balance of equities and public interest favor Anthropic.

## VI.    REQUEST FOR BOND AND FOR A STAY

In light of Anthropic's non-opposition, Defendants' request for an administrative stay for seven days to allow the United States to seek an emergency, expedited stay from the court of appeals is **GRANTED**.

Defendants also seek to have the Court impose a bond under Federal Rule of Civil Procedure 65(c) because "any preliminary relief would potentially mandate that the Executive spend money on unneeded and unwanted uses of Anthropic's technology that may be lost forever once distributed." (Dkt. No. 96 at 39.) Under Rule 65(c), it is up to the Court's discretion what amount of security is required, if any. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). The preliminary injunction does not mandate that the government purchase Anthropic's products, so Defendants have not made any showing of the costs or damages they will sustain as a result of the injunction. *Id.*; *see also* Fed. R. Civ. P. 65(c). In light of Anthropic's showing on the merits, and the lack of evidence of harm to Defendants, the Court sets a nominal bond of $100.

## VII.    SCOPE OF INJUNCTIVE RELIEF

Anthropic seeks to enjoin the following Agencies: DoW, U.S. Department of State, HHS, U.S. Office of Personnel Management, U.S. Nuclear Regulatory Commission, U.S. Department of the Treasury, U.S. Department of Commerce, U.S. Social Security Administration, U.S. Department of Homeland Security, Securities and Exchange Commission, National Aeronautics and Space Administration, U.S. Department of Energy, Federal Reserve Board of Governors, National Endowment for the Arts, Federal Housing Finance Agency, U.S.

41

Department of Veterans Affairs, and GSA (together with their respective agency heads, the "Defendant Agencies"). Anthropic also seeks to enjoin the Executive Office of the President ("EOP").

Anthropic has introduced evidence that all of the Defendant Agencies either (1) "have contracts to use Anthropic's technology or use Anthropic's technology through a third-party provider," (2) "have indicated they would be terminating the contracts or terminating uses of Anthropic's technology since February 27, 2026," or (3) facilitate other agencies' access to Anthropic's technology. (Dkt. No. 126 ¶ 3–5.) Because the Presidential Directive orders all federal agencies to immediately and permanently cease all use of Anthropic's technology, Anthropic has made the necessary showing that the Court may enjoin each of the Defendant Agencies from implementing the Presidential Directive. Anthropic has also shown that it is entitled to injunctive relief against DoW and Defendant Secretary Hegseth with respect to the Hegseth Directive and the Supply Chain Designation.[21]

At oral argument, Counsel for Anthropic indicated that it was seeking an injunction against the EOP because of "its likely role in carrying out" the Presidential Directive. (Dkt. No. 128 at 47.) However, because there is no record evidence that EOP has taken any action to carry out the Presidential Directive, no injunctive relief will issue as to EOP at this time. Like all other persons, EOP is barred from acting for, with, by, through, or under authority from any enjoined Defendant, or in concert or participation with any enjoined Defendant, in any manner inconsistent with the preliminary injunction order.

---

[21] Defendants argue that no jurisdiction exists over Anthropic's "challenge to an agency's termination of any contractual relationship with Anthropic" because such claims belong in the Court of Federal Claims. (Dkt. No. 131 at 2.) But Anthropic seeks to enjoin policies rather than to undo contract terminations, and it asserts constitutional challenges. Therefore, the Court has jurisdiction to issue injunctive relief. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (stating that policy guidance related to contracts could likely be challenged in district court); *Cooper v. United States*, 771 F. App'x 997, 1000–01 (Fed. Cir. 2019) (holding that Due Process Clause and First Amendment claims did not provide a cause of action under the Tucker Act because they were not "money mandating").

## VIII.  CONCLUSION

For the forgoing reasons, Anthropic's Motion for Preliminary Injunction (Dkt. No. 6) is

**GRANTED** as modified.  A separate order concerning Anthropic's request for a Section 705

stay and preliminary injunctive relief will issue, but is hereby stayed for seven days.


**IT IS SO ORDERED.**

Dated: March 26, 2026

RITA F. LIN
United States District Judge

43