No. 26-1049

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,
*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his
official capacity as Secretary of War,
*Respondents*.

*ON PETITION FOR JUDICIAL REVIEW OF DEPARTMENT OF WAR
41 U.S.C. § 4713 NOTICE*

## BRIEF *AMICUS CURIAE* OF TAXPAYERS PROTECTION ALLIANCE FOUNDATION

ROSS MARCHAND
Taxpayers Protection
Alliance Foundation
1101 14th Street NW, Suite 500
Washington, DC 20005

DAVID B. SCHWARTZ
Bryan Cave Leighton Paisner LLP
1155 F Street NW
Washington, DC 20004
david.schwartz@bclplaw.com
Tel. (202) 508-6086

BARBARA SMITH TYSON
*Counsel of Record*
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N. Broadway #3600
barbara.smith@bclplaw.com
Tel. (314) 259-2367

JESSICA LIMBAUGH
Bryan Cave Leighton Paisner LLP
211 Bolivar Street #101
Jefferson City, MO 65101

*Attorneys for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* submit this certificate as to parties, rulings, and related cases.

### Parties and Amici

As of April 22, 2026, the date on which this brief was filed, *amicus* is not aware of any other parties, intervenors, or *amicus* who have entered an appearance in this Court, other than those listed in the briefs of Petitioner and Respondents or disclosed by other *amici* to date.

### Rulings Under Review

References to the rulings at issue appear in Addendum A to Petitioner's Emergency Motion for Stay Pending Review.

### Related Cases

*Anthropic, PBC v. United States Department of War, et al.*, No. 26-2011 (9th Cir.). Counsel is unaware of any other related cases currently pending before this Court or any other court.

## STATEMENT REGARDING CONSENT TO FILE AND
## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Federal Rule of Appellate Procedure 29(b), both parties have consented to the filing of amicus briefs in this matter.

Pursuant to Circuit Rule 29(d), a separate brief is necessary. *Amicus* is a nonprofit organization dedicated to limiting government overreach and supporting free market principles. The brief explains why the government action at issue in this case constitutes overreach and addresses the harm that overreach will have on First Amendment rights and the market ecosystem. This brief is substantially different from any other brief submitted by Petitioner or other known *amici*.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, and D.C. Circuit Rule 26.1, *amicus* hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE** ..........................................1

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTION**...................................................3

**SUMMARY OF ARGUMENT** ...................................................4

**BACKGROUND**.........................................................................6

**ARGUMENT** ..............................................................................9

    A.    Respondents' Actions Violate the First Amendment and Threaten the Free Market. ...............................9

        1.    Respondents' Actions Impose Unconstitutional Conditions Outside Relevant Contracting.....................9

        2.    Respondents' First Amendment Violations Will Destabilize Markets. .....................................14

    B.    The "Supply Chain Risk" Designation of Anthropic Ignores the Plain Meaning of 41 U.S.C. § 4713 and Lacks an Intelligible Principle..............................17

**CONCLUSION**...........................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) ...................................................................12

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.,*
  651 F.3d 218 (2d Cir. 2011), *aff'd*, 570 U.S. 205 (2013)................13

*Ass'n of Am. Railroads v. United States Dep't of Transp.,*
  896 F.3d 539 (D.C. Cir. 2018)....................................................20

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) ...................................................................18

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ...................................................................10

*Connick v. Myers,*
  461 U.S. 138 (1983) ...................................................................10

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
  472 U.S. 749 (1985) ...................................................................10

*FCC v. League of Women Voters of Cal.,*
  468 U.S. 364 (1984) ...................................................................12

*Fed. Commc'ns Comm'n v. Consumers' Rsch.,*
  606 U.S. 656 (2025) ...................................................................21

*First Nat'l Bank of Boston v. Bellotti,*
  435 U.S. 765 (1978) ...................................................................10

*Fischer v. United States,*
  603 U.S. 480 (2024) ...................................................................19

*Gundy v. United States,*
588 U.S. 128 (2019) ......................................................................21

*J. W. Hampton, Jr., & Co. v. United States,*
276 U.S. 394 (1928) ......................................................................21

*Nat'l Collegiate Athletic Ass'n v. Alston,*
594 U.S. 69 (2021) ........................................................................17

*NetChoice, LLC v. Fitch,*
145 S. Ct. 2658 (2025) ....................................................................1

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.,*
475 U.S. 1 (1986) ..........................................................................10

*Rust v. Sullivan*
500 U.S. 173 (1991) ................................................................11, 12

*Snyder v. Phelps*
562 U.S. 443 (2011) ......................................................................10

*United States v. Cook,*
594 F.3d 883 (D.C. Cir. 2010)........................................................20

*United States v. Nat'l Lib. Ass'n,*
539 U.S. 194 (2003) ......................................................................11

*United States Postal Serv. v. Konan,*
146 S. Ct. 736 (2026) ......................................................................1

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) ........................................................15

*United States v. Mingo,*
964 F.3d 134 (2d Cir. 2020)..........................................................22

*Whitman v. American Trucking Assns., Inc.*,
531 U.S. 457 (2001) ....................................................................21

**Statutes**

10 U.S.C. § 3252 ........................................................................18

41 U.S.C. § 4713 ..............................8, 17, 18, 19, 20, 21, 22, 23

**Other Authorities**

Exec. Order No. 14365, 90 Fed. Reg. 58499, (Dec. 11, 2025) ................16

*Maliciously*, Black's Law Dictionary (10th ed. 2014) ............................19

*Sabotage*, Black's Law Dictionary (10th ed. 2014) ................................19

**Internet Sources**

*Claude's Constitution*, Anthropic,
https://www.anthropic.com/constitution.......................................11

Congressional Budget Office, *Artificial Intelligence and Its Potential
Effects on the Economy and the Federal Budget* (Dec. 2024),
https://www.cbo.gov/publication/61147 ..........................................6

Njenga Kariuki, *Artificial Intelligence Index Report 2025*, Stanford
Institute for Human-Centered Artificial Intelligence, Chapter 4:
Economy, https://hai.stanford.edu/assets/files/hai_ai-index-report
2025_chapter4_final.pdf................................................................7

President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27,
2026, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/
116144552 969293195 ................................................. 4, 8, 14, 22

Sarah Kreps, *The Global AI Race: Will US Innovation Lead or Lag?*,
Brookings Institution (Dec. 6, 2024), https://www.brookings.
edu/articles/the-global-ai-race-will-us-innovation-lead-or-lag/.......7

Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM),

https://x.com/SecWar/status/2027507717469049070?s=20 ........ 4, 8

*Statement from Dario Amodei on our discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://www.anthropic.com/news/statement-department-of-war ........................................................ 9

*Statement on the comments from Secretary of War Pete Hegseth,* Anthropic (Feb. 26, 2026), https://www.anthropic.com/news/statement-department-of-war ........................................................ 14

# STATUTES AND REGULATIONS

All applicable statues are contained in Petitioner's Brief.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

The Taxpayers Protection Alliance Foundation ("TPAF") is a nonpartisan non-profit 501(c)(3) organization dedicated to protecting free markets and educating the public on the impact of government overreach on the economy. In its role as a watchdog, TPAF holds federal, state, and local bureaucracies accountable through articles, analyses, and congressional testimony. TPAF and its affiliated 501(c)(4) organization, the Taxpayers Protection Alliance ("TPA"), also regularly file amicus briefs in cases that directly implicate free market and limited government principles. For example, TPA has participated in cases with the aim of increasing U.S. Postal Service accountability, *see United States Postal Serv. v. Konan*, 146 S. Ct. 736 (2026), and defending the First Amendment right to participate in anonymous online speech and association without age verification, *see NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025). When government overreach directly encroaches on the lives, livelihoods, and freedoms of citizens, TPAF and TPA stand ready to fight.

TPAF has a strong interest in this appeal because it believes that Respondents' decision to brand Anthropic a "supply chain risk" is

unlawful, and this unlawful action threatens America's vibrant market-based order. When Respondents overstepped the statutory powers and limitations set by Congress, they acted as judge, jury, and executioner, and wholly disregarded the First Amendment in the process. Respondents unlawfully blacklisted Anthropic as a "supply chain risk," preventing it from ever doing business with the government. Aside from doing damage to the separation of powers outlined in the Constitution, those actions jeopardize future American economic prosperity by singling out for punishment a thriving, innovative leader in the AI industry. Respondents' unlawful actions will likely cripple Anthropic's ability to do business, create new and better technologies, and provide services to American businesses and consumers. Critically, Respondents' unlawful actions also harm taxpayers by arbitrarily limiting which AI products government agencies can use to deliver services to citizens. Respondents have sidestepped legal processes in order to punish Anthropic, a pioneer in an essential and emerging industry that will define the next chapter of modern life.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTION

No counsel for a party authored this brief in whole or in part, and no one other than *amicus curiae*, its members, or its counsel made a monetary contribution intended to fund this brief's preparation or submission. The views expressed in this brief are those of TPAF and do not reflect the opinions of any specific individual counselor affiliated with TPAF.

# SUMMARY OF ARGUMENT

Respondents have begun a retaliatory vendetta against Anthropic, which will have dire consequences for innovation, the free market, and American taxpayers. When Respondents "direct[ed] EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology,"[1] in "conjunction" with the Secretary of War's "supply chain risk" designation (to use his own wording),[2] it had the effect of not just denying a strong AI competitor access to necessary scale but also chilling Anthropic's freedom of expression. Then, when Respondents declared that "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic," they cemented Anthropic's status as a pariah in the eyes of its other commercial partners.[3]

---

[1]    President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM), https://truthsocial.com/@realDonald Trump/posts/116144552969293195 (emphasis in original).

[2]    Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 P.M.), https://x.com/SecWar/status/2027507717469049070?s=20.

[3]    *Id.*

What occurred here was not a careful and measured review of a federal contract to assess its utility. The government did not merely terminate Anthropic's contract with the Department of War ("DOW"); Respondents blacklisted and boycotted the company across the government. Due to the severe and public nature of Respondents' actions, the viewpoint-discriminatory retaliation against Anthropic is likely to inflict reputational damage and thereby harm the company's ability to continue to provide cutting-edge technology to benefit American taxpayers and consumers.

Respondents' actions threaten the constitutional order and jeopardize the free-market economic system that has been the engine of tremendous American growth and innovation. Respondents' post-hoc justifications should be rejected. They cannot excuse Respondents' flagrant violations of the First Amendment or their flawed interpretation of the relevant statute. For these reasons, *amicus* urges this Court to hold that Respondents acted unlawfully in their actions against Anthropic.

## BACKGROUND

America's free market, which rewards innovation and growth and promotes shared prosperity, and its robust republican form of government, which protects private actors from government overreach, are essential ingredients to the nation's 250-year success as a self-governing democracy. The economic and political freedoms Americans enjoy have produced world-changing technology like air travel, the electric light bulb, and the internet. Often, these private sector innovations help defend the systems that enabled their creation: they directly support American defense efforts by serving as the foundations of groundbreaking military technology.

Americans' next great innovative leap is AI. "AI could transform society in the same way that technological advances like the steam engine and electrification did in the distant past and as computing and the internet have done over the past few decades."[4] Studies suggest "that if AI's use became more widespread, it would boost economic growth," as

---

[4] Congressional Budget Office, *Artificial Intelligence and Its Potential Effects on the Economy and the Federal Budget* (Dec. 2024), https://www.cbo.gov/publication/61147.

well as "impact … federal spending through [AI's] use in the development of certain products."[5]

On a geopolitical scale, there is a race to develop the most advanced AI tools and deploy those tools to increase efficiencies and innovation.[6] American innovators are taking the lead. In 2024, the United States invested $109.1 billion in AI, nearly 12 times more than China and 24 times more than the United Kingdom.[7] Critically, the United States "has historically relied on the strength of its private sector to drive technological innovation, with breakthroughs in fields like aerospace, semiconductors, and computing often originating in commercial industries before being adapted for national security purposes," and it is continuing to do so in AI development.[8] But China is gaining ground, demonstrating some of the most significant year-over-year growth.[9] It is

---

[5] *Id.*

[6] Sarah Kreps, *The Global AI Race: Will US Innovation Lead or Lag?*, Brookings Institution (Dec. 6, 2024) https://www.brookings.edu/articles/the-global-ai-race-will-us-innovation-lead-or-lag/.

[7] Njenga Kariuki, *Artificial Intelligence Index Report 2025*, Stanford Institute for Human-Centered Artificial Intelligence, Chapter 4: Economy, https://hai.stanford.edu/assets/files/hai_ai-index-report 2025_chapter4_final.pdf.

[8] Sarah Kreps, *supra* n.6.

[9] *Id.*

not doing so with a free market but with "massive state-led investments" and a "strategy of military-civil fusion [through which] China is rapidly integrating advancements from its commercial sector into military operations."[10]

Anthropic and its competitors offer an American answer to this top-down centralized approach. For years, Anthropic has competed to offer groundbreaking technology in service of America's national defense.[11] Such was the case until February 27 when, in the midst of a contract dispute, both the President and the Secretary of War retaliated against Anthropic.[12] By blacklisting Anthropic as a "supply chain risk," Respondents have shut out a pioneer of innovation at a critically important juncture. By barring the company from federal contracts and inflicting reputational damage, Respondents have violated Anthropic's freedom of speech and run afoul of 41 U.S.C. § 4713, which is one statutory authority providing governing "supply chain risk" designations.

---

[10]    *Id.*

[11]    Addendum E to Emergency Motion of Anthropic, ECF No. 2163176, Add. 48-49 ¶¶ 4-6.

[12]    *Supra* nn.1-2.

These actions undermine the rule of law and threaten America's place as the global leader in AI investment and development.

## ARGUMENT

**A. Respondents' Actions Violate the First Amendment and Threaten the Free Market.**

### 1. Respondents' Actions Impose Unconstitutional Conditions Outside Relevant Contracting.

Respondents punished Anthropic for expressing public opinions on the thorny ethical and practical question of how much human oversight AI-fueled defense technology requires. As stated by Anthropic co-founder and CEO Dario Amodei, AI technology has "[s]ome uses"—such as mass domestic surveillance and autonomous weaponization—that lie "outside the bounds of what today's technology can safely and reliably do."[13] This understandable point of view on the current limits of what AI ought to be used for is core First Amendment-protected expression. Thus, a private actor's public expression on the appropriate exercise of a highly-consequential technology is at "'the heart of the First Amendment's

_____

[13] *Statement from Dario Amodei on our discussions with the Department of War*, Anthropic (Feb. 26, 2026) ("Statement from Dario Amodei"), https://www.anthropic.com/news/statement-department-of-war.

protection'" and "'occupies the highest rung of the hierarchy of First Amendment values.'" *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985) (opinion of Powell, J.); *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

The Supreme Court has made clear that "political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978)). That is because "[c]orporations…, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality opinion) (quoting *Bellotti*, 435 U.S. at 783); *see Citizens United*, 558 U.S. at 342-43. Unless said speech implicates fraud or other punishable conduct by companies, corporations' political speech should be protected just as the speech of American "natural persons" are protected. *Id.* at 343 (quoting *Bellotti*, 435 U.S. at 776).

To be sure, the government does not violate the First Amendment by merely choosing not to contract with companies that cannot fulfill the terms of its contracts. In general, the state has no obligation to bankroll any particular business model or any particular exercise of constitutional rights, including all conceivable views. *E.g., United States v. Nat'l Lib. Ass'n*, 539 U.S. 194, 212 (2003) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991))). "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193. In other words, if the government wants to contract with a vendor for a product, it can, and indeed necessarily must, consider the ethical boundaries that a particular vendor might place on the uses of its product. Because Anthropic's stated values, including "[i]ndividual privacy and freedom from undue surveillance,"[14] are part of its

---

[14] *Claude's Constitution*, Anthropic, https://www.anthropic.com/constitution.

constitution and an integral part of its decisions to take on surveillance-related work, some of Anthropic's viewpoints will inevitably play a role in contract determination. Respondents thus could have severed DOW's contract with Anthropic without exceeding DOW's statutory authority and engaging in a government-wide contracting crusade against the company.

The state cannot retaliate against a company's point of view by cutting it off from *all* conceivable contracts, including contracts or programmatic funding that has nothing whatsoever to do with its point of view. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013) (government does not "run afoul of the First Amendment" where it does not "prohibit the recipient from engaging in the protected conduct outside the scope of the federally funded program." (citation modified) (quoting *Rust*, 500 U.S. at 197)). A condition of contracting or funding unconstitutionally jeopardizes First Amendment rights when it "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *Id*. at 206; *see also FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-401 (1984) (finding that the state

12

cannot substantially abridge a broadcaster's speech based on a limited policy interest).

Respondents' retaliation here effectively places an unconstitutional condition on Anthropic's exercise of its First Amendment freedoms. The unconstitutional conditions doctrine covers these "outside the contours" cases, providing that the government may not withhold a benefit—including taxpayer-funded contracts—"on a basis that infringes his constitutionally protected interests." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011) (quotation marks omitted), *aff'd*, 570 U.S. 205 (2013). Here, Respondents are violating Anthropic's First Amendment right to express concerns about the limits of AI by withholding the immense benefit of accessing its contracts. Anthropic's decision to place technical limitations on its tools—which, for example, prevent certain surveillance use cases—is part and parcel of its current philosophy on acceptable AI use. That philosophy includes the following statement: "we believe that mass domestic surveillance of Americans constitutes a violation of fundamental rights."[15]  This is not

---

[15]     *Statement on the comments from Secretary of War Pete Hegseth*, Anthropic (Feb. 27, 2026), https://www.anthropic.com/news /statement-comments-secretary-war.

about Anthropic's ability to carry out any specific contract implicated by that point of view, but rather government-wide retaliation against protected (alleged) "RADICAL LEFT, WOKE"[16] speech and an attempt to chill similar speech going forward.

### 2. Respondents' First Amendment Violations Will Destabilize Markets.

Respondents' unconstitutional actions will have profound economy-wide consequences, hamstringing the markets now fueling the explosive development of groundbreaking AI technology that benefit taxpayers and consumers.

Anthropic's relationships with public and private sector actors have already been impacted outside the defense sector. Following Respondents' actions, the Department of Treasury, Department of State, Department of Health and Human Services, and Department of Energy all announced they would discontinue use of Anthropic's products.[17] Financial services institutions, a national grocery chain, a pharmaceutical company, and a financial technology company have also

---

[16] President Donald J. Trump, *supra* n.1 (emphasis in original).

[17] Addendum F to Emergency Motion of Anthropic, ECF No. 2163176, Add. 70 ¶ 13.

expressed reluctance to continue or commence working with Anthropic.[18] The list is long and growing, and demonstrates that the government's unconstitutional viewpoint discrimination against Anthropic is having unwelcome ripple effects across the U.S. economy, wholly outside the contours of the programs and contracts on which Anthropic and the federal government differ.

Respondents' actions will thus cripple the ability of Anthropic to continue to grow, achieving the necessary scale to benefit taxpayers and consumers. The Trump administration has consistently acknowledged the importance of AI development to American global power and underscored the need to ensure that developers of the technology continue to compete inside and outside of government—free from bureaucratic interference. For example, the White House has declared that AI development "will promote United States national and economic security dominance across many domains."[19]

Despite these public pronouncements about the need for competitive AI, the government's actions punishing Anthropic for

_____

[18]   *Id.* at ¶¶ 16-17.

[19]   Exec. Order No. 14365, 90 Fed. Reg. 58499 (Dec. 11, 2025).

exercising its free speech threaten to reduce competition and harm innovation. Courts have recognized that modern technology benefits from scale, and consumers benefit from digital services that offer many uses and applications. *See United States v. Microsoft Corp.,* 253 F.3d 34, 55 (D.C. Cir. 2001) (en banc) (per curiam). When appropriately used, increased scale allows digital platforms to grow quickly, creating substantial wealth, benefits, and improved quality of life for taxpayers and consumers alike. Blacklisting Anthropic at this pivotal moment in time, when the AI space is so highly competitive, threatens to deprive Anthropic of the access to markets it needs to succeed.

Respondents' actions here directly harm taxpayers, because their denial of scale to Anthropic undercuts innovation across the government. Anthropic—at the moment a leader in AI—now cannot compete for government contracts—defense or otherwise—with other AI innovators on the merits of the product it offers even if it offers the most efficient and innovative option. When AI providers are not free to compete based on the merit of their offerings, America loses the benefit of unfettered competition yielding the best allocation of the Nation's resources to produce the most innovative tools and services. *See Nat'l Collegiate*

16

*Athletic Ass'n v. Alston*, 594 U.S. 69, 73 (2021). The results will be predictable: higher prices, lower quality products, reduced innovation, and a breakdown in rule of law, all in a sector critical for continued American prosperity.

**B.** **The "Supply Chain Risk" Designation of Anthropic Ignores the Plain Meaning of 41 U.S.C. § 4713 and Lacks an Intelligible Principle.**

Beyond Respondents' grievous First Amendment violations and likely economy-wide harms, Respondents' actions cannot be reconciled with the plain meaning of 41 U.S.C. § 4713. Because the Department of War relies on that provision here as the legal basis for its "supply chain risk" designation, it is necessary to examine the ordinary public meaning of key terms found in the statute.[20] *Cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020) ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending

---

[20] Respondents also rely on 10 U.S.C. § 3252 for their "supply chain risk" designation, which a district court enjoined and which Petitioner challenges separately. *See Anthropic v. U.S. Department of War et al.*, No. 26-2011 (9th Cir.).

statutes outside the legislative process reserved for the people's representatives.").

Here, ordinary principles of statutory construction support one conclusion: a domestic company engaged in a contract dispute is not a "supply chain risk." Section 4713 defines "supply chain risk" as "the risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate the design, integrity, manufacturing, production, distribution, installation, operation, maintenance, disposition, or retirement of covered articles so as to surveil, deny, disrupt, or otherwise manipulate the function, use, or operation of the covered articles or information stored or transmitted on the covered articles." 41 U.S.C. § 4713(k)(6). When Congress uses specific terms followed by general ones in a single list, the *ejusdem generis* canon of construction embodies "the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 603 U.S. 480, 487 (2024). Section 4713's initial use of terms like "sabotage" and "maliciously" indicate that Congress intended supply chain risks to be intentional acts by an adversary during a time of war. *See Sabotage,*

Black's Law Dictionary (10th ed. 2014) ("Deliberate damage done to equipment, vehicles, etc. in order to prevent an enemy or adversary from using them; specif., the destruction, damage, or knowingly defective production of materials, premises, or utilities used for national defense or for war."); *Maliciously*, Black's Law Dictionary (10th ed. 2014) ("In a spirit of ill will.").

However, it is entirely unclear how Anthropic's concerns about the use of AI in mass surveillance and automated weapons, openly articulated to the government (and the public) during the normal back and forth of a contract dispute, render it an intentional adversary that is sabotaging the government or U.S. taxpayer. Indeed, ignoring the *ejusdem generis* canon quickly leads to absurd results: a software provider's calling up of performance data during ordinary system monitoring for bugs or other defects could suddenly be transformed into a "supply chain risk." *See* 41 U.S.C. § 4713(k)(6) (including general terms like "extract data" and "surveil" in the definition). If key language such as "manipulate the manufacturing [or] production ... so as to ... otherwise manipulate the function, use, or operation" is not bounded by other, more specific terms in the definition, *any* change, action, or stipulation of use

19

regarding covered services is fair game for a "supply chain risk" designation. Courts do not interpret statutes to produce such absurd interpretations. *United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010) (avoiding an interpretation that "creates an outcome so contrary to perceived social values that Congress could not have intended it.") (citation omitted).

Reading the statute otherwise would strip DOW's "supply chain risk" designation powers of any intelligible or fathomable principle. This Court should avoid any statutory construction that enters these troubled Constitutional waters. *See Ass'n of Am. Railroads v. United States Dep't of Transp.,* 896 F.3d 539, 544 (D.C. Cir. 2018) ("Longstanding principles of constitutional avoidance caution courts against exercising [the] power [to declare an Act of Congress unconstitutional] unless it is strictly necessary to resolve a case.").

A lack of intelligible principle would render 41 U.S.C. § 4713 an unconstitutional delegation of power from the legislative to executive branch. In determining whether the latter has been impermissibly delegated powers from the former, the Court has asked whether Congress has made clear an "intelligible principle" to guide what it has given the

20

agency to do. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). "The 'guidance' needed is greater . . . when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue[.]" *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 475 (2001)). "[I]n examining a statute for the requisite intelligible principle, [courts] have generally assessed whether Congress has made clear both the general policy that the agency must pursue and the boundaries of its delegated authority." *Id.* (citation modified).

Non-delegation principles apply equally to the Department of War as to any coordinate branch. *See United States v. Mingo,* 964 F.3d 134, 137 (2d Cir. 2020) (examining whether a provision allowing the Secretary of War to designate which military offenses constitute sex offenses violates the non-delegation doctrine). If Section 4713, the statute governing supply chain risks in this case, can be invoked whenever there is an adversarial contracting relationship between the government and a private party, there is effectively no limit on the language's grant of powers to the executive branch—setting up DOW and its Secretary as

judge, jury, and executioner and allowing it to ignore the vast body of government contract law and move against a company it disagrees with.

Even if this expansive reading of Section 4713 could survive constitutional scrutiny, the law nowhere allows the federal government authority to ban *other* government agencies from partnering with a contractor (properly designated) a supply chain risk—despite the White House appearing to institute a government-wide ban in direct connection with DOW's "supply chain risk" designation.[21]

Finding for Respondents would give the executive branch unconstitutional leeway in ignoring the plain meaning of Section 4713. Congress cannot, and did not, grant Respondents the power to weaponize a supply chain risk designation to prevent any other government agency from doing business with the named company.

## CONCLUSION

Respondents' actions violate the First Amendment, harm the U.S. economy, ignore the meaning of 41 U.S.C. § 4713 and significantly undermine the rule of law. All these acts will injure taxpayers and consumers and undermine the wider economic order, jeopardizing

---

[21] President Donald J. Trump, *supra* n.1.

current and future AI progress. *Amicus* therefore respectfully urges the

Court to grant the petition.

Respectfully submitted,

DATED: April 22, 2026 /s/ Barbara Smith Tyson

BARBARA SMITH TYSON
*Counsel of Record*
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N. Broadway #3600
barbara.smith@bclplaw.com
Tel. (314) 259-2367


ROSS MARCHAND
Taxpayers Protection
Alliance Foundation
1101 14th Street NW, Suite 500
Washington, DC 20005

DAVID B. SCHWARTZ
Bryan Cave Leighton Paisner LLP
1155 F Street NW
Washington, DC 20004
david.schwartz@bclplaw.com
Tel. (202) 508-6086

JESSICA LIMBAUGH
Bryan Cave Leighton Paisner LLP
211 Bolivar Street #101
Jefferson City, MO 65101

**CERTIFICATE OF COMPLIANCE**

I certify that:

1. This brief complies with the length limits permitted by Fed. R. App. P. 29(a)(5) and D.C. Circuit Rule 29 because the brief contains 3,822 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: April 22, 2026 /S/ Barbara Smith Tyson

BARBARA SMITH TYSON
*Counsel of Record*
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N. Broadway #3600
barbara.smith@bclplaw.com
Tel. (314) 259-2367

ROSS MARCHAND
Taxpayers Protection
Alliance Foundation
1101 14th Street NW, Suite 500
Washington, DC 20005

DAVID B. SCHWARTZ
Bryan Cave Leighton Paisner LLP
1155 F Street NW

Washington, DC 20004
david.schwartz@bclplaw.com
Tel. (202) 508-6086

JESSICA LIMBAUGH
Bryan Cave Leighton Paisner LLP
211 Bolivar Street #101
Jefferson City, MO 65101

# CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I caused the foregoing brief to be served on all parties through the Court's electronic filing system.

DATED: April 22, 2026

/s/ Barbara Smith Tyson

BARBARA SMITH TYSON
*Counsel of Record*
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N. Broadway #3600
barbara.smith@bclplaw.com
Tel. (314) 259-2367

ROSS MARCHAND
Taxpayers Protection
Alliance Foundation
1101 14th Street NW, Suite 500
Washington, DC 20005

DAVID B. SCHWARTZ
Bryan Cave Leighton Paisner LLP
1155 F Street NW
Washington, DC 20004
david.schwartz@bclplaw.com
Tel. (202) 508-6086

JESSICA LIMBAUGH
Bryan Cave Leighton Paisner LLP
211 Bolivar Street #101
Jefferson City, MO 65101