ORAL ARGUMENT SCHEDULED MAY 19, 2026

No. 26-1049

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner,*

*v.*

U.S. DEPARTMENT OF WAR, *et al.,*

*Respondents.*

ON PETITION FOR REVIEW
OF A NOTICE OF THE DEPARTMENT OF WAR UNDER 41 U.S.C. § 4713

**BRIEF OF FREEDOM ECONOMY BUSINESS ASSOCIATION AND VALUES-LED INVESTORS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER AND GRANTING REVIEW**

The Norton Law Firm PC
Josephine K. Petrick
jpetrick@nortonlaw.com
  *Counsel of Record*
Fred Norton
Jo Levy
Celine G. Purcell
Heather Bates
Hayley Landman
Saja Spearman–Weaver
300 Frank H. Ogawa Plaza, Ste. 450
Oakland, CA 94612
510-906-4900

ATTORNEYS FOR *AMICI CURIAE* FREEDOM ECONOMY
BUSINESS ASSOCIATION AND VALUES-LED INVESTORS

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and Circuit Rules 26.1 and 28(a)(1)(A), *Amici* provide the following disclosures.

The full list of *Amici* appears in the accompanying Appendix of *Amici*.

*Amici* Howard Fischer, Thomas Haslett, and John O'Farrell are individuals and have nothing to disclose.

Nine of the *Amici* listed in the Appendix are companies, associations, nonprofit organizations, or other similar entities that have no parent company and in which no publicly held company has a 10% or greater ownership interest.  Those *Amici* are:

- Freedom Economy Business Association

- Candide Group

- Investor Advocates for Social Justice

- The Nathan Cummings Foundation, Inc.

- Pluralize Capital

- Interfaith Center on Corporate Responsibility, and

- Humanize Wealth

2

- Adasina Social Capital

- American Federation of Teachers

Two of the *Amici* listed in the Appendix are companies, associations, nonprofit organizations, or similar organizations that have a parent company and/or in which a publicly held company has a 10% or greater ownership interest.  Those *Amici* are:

- Mission Driven Finance (MDF) – its Parent corporation, MDF AP Holdings, LLC owns more than 10% of MDF's shares.

- Omidyar Network LLC – its Parent corporation, ON Affiliates LLC, owns more than 10% of Omidyar Network LLC's shares.

*See* Cir. R. 26.1(a).

With respect to the *Amici* that are entities, as detailed in the enclosed Interest of *Amici*, their general nature and purpose is to serve as trade organizations of institutional investors, asset managers, asset owners, allocators, and service providers committed to advancing just, equitable, and sustainable investment practices. *See id.* R. 26.1(b).

3

Dated: April 22, 2026

/s/ Josephine K. Petrick
Josephine K. Petrick
Attorneys for *Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................6

BRIEF OF *AMICI CURIAE* IN SUPPORT OF PETITIONER
AND GRANTING REVIEW ...........................................8

INTEREST OF *AMICI*....................................................8

INTRODUCTION...................................................................9

ARGUMENT.........................................................................11

I. The Challenged Actions Exceed Executive Authority
and Violate Federal Law..............................................11

II. The Government's Viewpoint-Based Discrimination
Violates the First Amendment Rights of Both
Anthropic and Its Investors Who Associate Themselves
with Its Views..............................................................19

CONCLUSION ...................................................................24

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITS .......................................................................26

CIRCUIT RULE 29(D) CERTIFICATION...........................27

APPENDIX OF *AMICI*.......................................................28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anthropic PBC v. U.S. Dep't of War*,
No. 26-CV-01996-RFL, 2026 WL 836842 (N.D. Cal. Mar.
26, 2026) ..................................................................*passim*

*Asia Pac. Airlines v. United States*,
68 Fed. Cl. 8 (2005) .............................................................16

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .............................................................20

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......................................................16, 22

*Cigar Ass'n of Am. v. U.S. F.D.A.*,
964 F.3d 56 (D.C. Cir. 2020) ..............................................13

*Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc.*,
682 F.3d 1293 (11th Cir. 2012).............................................21

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023) .....................................20, 21

*Friedler v. Gen. Servs. Admin.*,
271 F. Supp. 3d 40 (D.D.C. 2017)........................................14

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026).........................................................12

*Nat. Res. Def. Council, Inc. v. Pritzker*,
828 F.3d 1125 (9th Cir. 2016)..............................................13

*Nat'l Rifle Ass'n of Am. v. City of L.A.*,
441 F. Supp. 3d 915 (C.D. Cal. 2019) ...............................20

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .........................................................20

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025)....................................20

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ..........................................................22

*Turner Broad. System, Inc. v. FCC*,
   512 U.S. 622 (1994) ..........................................................22

*United States v. Borjesson*,
   92 F.3d 954 (9th Cir. 1996) ..............................................21

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..........................................................12

### Statutes

10 U.S.C. § 3252 ..........................................................13, 15

41 U.S.C. § 3301 ................................................................16

41 U.S.C. § 4713 .................................................1, 11, 12, 14

### Rules

D.C. Cir. R. 29(d) ...............................................................27

Fed. R. App. P. 29(a)(5) ......................................................26

### Regulations

48 C.F.R. § 9.402(b) ...........................................................21

## BRIEF OF *AMICI CURIAE* IN SUPPORT OF PETITIONER AND GRANTING REVIEW

## INTEREST OF *AMICI*[1]

*Amicus Curiae* the Freedom Economy Business Association is a national membership community of more than 150 institutional investors, asset managers, asset owners, allocators, and service providers committed to advancing just, equitable, and sustainable investment practices. Freedom Economy members collectively represent more than $25 billion in assets under management and influence. *Amici* also include ten other entities and three individuals who are values-led investors that rely on rules-based market conditions and a stable legal environment to make their investment decisions. The full list of *Amici* appears in the Appendix of *Amici*.

*Amici* have a direct and substantial interest in the outcome of this litigation. Responsible AI development is one of the most consequential areas of investment activity today, and *Amici* have invested significantly in companies across the AI ecosystem whose valuations

---

[1] No party's counsel authored this brief in whole or in part, and other than *Amici* and their counsel, no person, party, or party's counsel contributed money to fund the preparation or submission of the brief. All parties consent to *Amici* filing this brief.

and long-term viability depend on a predictable regulatory environment and protection from arbitrary government action.  The Administration's retaliatory actions against Anthropic pose a profound threat not only to Anthropic but to the broader investment ecosystem that supports innovation in this sector.

*Amici* thus have a strong interest in the subject-matter of this litigation and submit this *Amicus* brief in the hope of assisting the Court in its deliberation.

## INTRODUCTION

The February 2026 Department of War pronouncement and letter (the "Challenged Actions") targeting Anthropic disrupt not just one company's business but the investment markets that sustain American innovation.  Of course, the government must be free to choose who it does business with, and on what lawful terms.  But it cannot do what the Administration has done here: summarily blacklist a company that declines to offer its products or services on terms the Administration prefers, because the company has expressed a contrary policy view about how those products or services should be used by a responsible government.  The Challenged Actions are ultra vires, arbitrary and

capricious, undertaken without due process, and violate Anthropic's First Amendment right to free expression, as well as the First Amendment rights and associational rights of Anthropic's investors. But the Challenged Actions do not only hurt Anthropic and its investors; they limit any market participant that relies upon process, information transparency, and the rule of law to make informed decisions about where to invest. And they particularly limit values-led investors who align their capital with companies' core values.

Reasonable investors like *Amici* and their members cannot operate in this environment. All investments, especially with government contractors, are now clouded by the threat that the Administration can, at any time and for any reason, designate an American company as an adversary and seek to destroy it. Dean Ball, President Trump's former Senior Policy Advisor for AI and Emerging Tech, reacted to the Challenged Actions bluntly and aptly: "Nvidia, Amazon, Google will have to divest from Anthropic if Hegseth gets his way. This is simply attempted corporate murder. I could not possibly

recommend investing in American AI to any investor; I could not possibly recommend starting an AI company in the United States."[2]

## ARGUMENT

### I.  The Challenged Actions Exceed Executive Authority and Violate Federal Law.

President Trump directed all federal agencies to stop working with Anthropic (the "Presidential Directive").  Secretary of War Hegseth then issued a statement "directing the Department of War to designate Anthropic a Supply-Chain Risk to National Security.  Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic."  Pet. for Rev. Add. 1a (the "Secretarial Order").  The Secretary then issued a letter to Anthropic labeling it a "supply chain risk" under 41 U.S.C. § 4713 (the "Secretarial Letter").  Pet. for Rev. Add. 2a-5a.  The Secretarial Letter seeks to provide a post-hoc justification for the Secretarial Order, which in turn states that it works "in conjunction with" the Presidential Directive.  *See id.*, Add. 1a.

---

[2] Dean Ball (@deanwball), X (Feb. 27, 2026, at 2:46 PM), https://x.com/deanwball/status/2027515599358730315.

"It is the Department of War's prerogative to decide what AI product it uses.  Everyone, including Anthropic, agrees that the Department of War may permissibly stop using Claude and look for a new AI vendor who will allow 'all lawful uses' of its technology.  That is not what this case is about." *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 836842, at *1 (N.D. Cal. Mar. 26, 2026).

The designation of Anthropic as a "supply chain risk" exceeds the authority granted to the Secretary under Section 4713 and fails to comply with the procedural guardrails Congress imposed on these types of decisions when they are actually warranted.  An overreaching directive to all other military contractors to cease all commercial activity with Anthropic—a retaliatory, government-ordered boycott in violation of Anthropic's First Amendment rights—finds no basis in any law.  Executive power must stem from Congress or the Constitution itself.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 586–87 (1952); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026).  The Secretary has no power at all to take the Challenged Actions.

In Title 41, which governs procurement generally, Congress gave federal agencies circumscribed authority in 41 U.S.C. § 4713 to

designate a "supply chain risk."  A near identical provision in Title 10, which concerns the military, likewise provides such authority to the Secretary in particular.  *See* 10 U.S.C. § 3252.  But "[t]hat designation has ***never*** been applied to a domestic company and is directed principally at foreign intelligence agencies, terrorists, and other hostile actors."  *Anthropic PBC*, 2026 WL 836842, at *2 (emphasis added). Further, the power to take that drastic action is subject to both clear limits and detailed procedural safeguards, as reasonable market participants would expect.  One such prerequisite to the supply chain risk designation is a determination that less intrusive measures are not reasonably available. *See id.* § 4713(b)(3)(B).  But the Challenged Actions do not discuss less intrusive measures, such as the Department of War merely ceasing to contract with Anthropic, nor explain why such measures were not reasonably available.  *See Cigar Ass'n of Am. v. U.S. F.D.A.*, 964 F.3d 56, 61 (D.C. Cir. 2020) ("Merely referencing a requirement is not the same as complying with that requirement.  And stating that a factor was considered—or found—is not a substitute for considering or finding it." (citation omitted)); *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016) ("An agency acts

13

contrary to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision." (citation omitted))*; see also Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d 40, 61 (D.D.C. 2017) (Jackson, D.J.) (finding where any agency "ignores its own regulations and imposes a debarment that does not adhere to the procedural due process mandates of FAR 9.406-3, it has acted arbitrarily and capriciously").

Further, Section 4713(k)(6) defines a "supply chain risk" as "the risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate the design, integrity, manufacturing, production, distribution, installation, operation, maintenance, disposition, or retirement of covered articles so as to surveil, deny, disrupt, or otherwise manipulate the function, use, or operation of the covered articles or information stored or transmitted on the covered articles."  But nothing in the Secretarial Order or the Secretarial Letter supports a conclusion that Anthropic's principled refusal to make its generative AI technology perform tasks that technology cannot execute safely is the kind of sabotage, manipulation, or disruption that would create a "supply chain risk."  The military

14

might have all sorts of procurement preferences—firearms without safety switches, vehicles without airbags, or vehicles that use gasoline rather than electric batteries.  A firearms manufacturer that includes safeties on all its weapons, a truck company that installs airbags in every model, or an electric vehicle company that declines to offer internal combustion engines is not a "supply chain risk."  It simply is not an ideal fit for the supply chain preferences the government has expressed.

Further, the fact that such a company expresses the view that a government agency has misplaced priorities in its procurement decisions does not make that company a "supply chain risk."  *See Anthropic PBC*, 2026 WL 836842, at \*18 ("Yet [10 U.S.C.] Section 3252 obviously does not permit DoW to designate IT vendors as 'supply chain risks' whenever they ask probing questions or stubbornly insist on particular contracting terms, even if their doing so causes DoW to doubt their trustworthiness.  Such a breathtakingly broad interpretation of Section 3252 would make its restrictions on the Secretary's discretion meaningless.").

Lawless and arbitrary government action is anathema to investment and an economy based on free enterprise. The comprehensive statutory and regulatory framework for federal procurement exists for a reason. It provides clear standards, fairness, and stability through a policy of "full and open competition." 41 U.S.C. § 3301(a)(1). When the Administration bypasses that framework entirely, it harms investors and markets. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014) ("Protecting corporations from government seizure of their property without just compensation protects all those who have a stake in the corporations' financial well-being."); *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 27 (2005) ("[I]t is well-established that the public interest is well-served by ensuring that the government procurement process is fair."). Investors like *Amici* and their members invest billions of dollars in reliance on the expectation that the government will follow the law, respect property rights, and provide meaningful process before taking adverse action.

The risk that a successful, industry-leading American company can be summarily and arbitrarily excluded, overnight, from all business with all military contractors is a risk that is intolerable to investment

16

and free enterprise.  And given the scale of the federal government's military contracting—over 41,600 defense contractors including large companies such as Lockheed Martin, Boeing and General Dynamics[3]—the Challenged Actions' chilling effect on investment is all the greater.

The Administration's violations of law and their market harms are exacerbated by the fact that the Administration's attack on Anthropic springs from the Company's refusal to offer its generative AI technology for (1) mass surveillance of U.S. citizens or (2) lethal fully autonomous warfare, each of which would violate Anthropic's stated principles as a public benefit corporation.  The Administration's demands are incompatible with Anthropic's mission statement; if Anthropic were to comply, that compliance would weaken its role as a responsible and deliberate leader in the emerging field of AI.  "Nothing in the governing statute supports the Orwellian notion that an American company may be branded a potential adversary and saboteur of the U.S. for

---

[3] *See* Cong. Rsch. Serv., IF10600, *Defense Primer: Department of Defense Contractors* (Feb. 6, 2026), https://www.congress.gov/crs_external_products/IF/PDF/IF10600/IF106 00.18.pdf.

expressing disagreement with the government." *Anthropic PBC,* 2026 WL 836842, at *2.

*Amici* and their members are values-led investors. They deploy their capital to companies that not only provide valuable goods and services for a profit, but do so in accordance with other principles that those companies and their investors believe benefit society as a whole.

Values-led investing does not belong to a single party or political ideology. In 2024, investors of all political stripes invested over $1.5 trillion in capital in companies and funds whose social missions they support.[4] If the ability to contract with the federal government at all is limited to companies that align with a given Administration's policy views, such investment is concerning at best. Worse still, the shifts in policy from administration to administration every four years or so threatens to subject over three quarters of a trillion dollars in government contracting, and still billions more in contracts with government contractors, to a crude form of patronage, in which the

---

[4] Dean Hand *et al.*, *Sizing the Impact Investing Market 2024*, The Global Impact Investing Network (GIIN), New York (2024), *available at* https://s3.amazonaws.com/giin-web-assets/giin/assets/publication/giin-sizingtheimpactinvestingmarket-2024.pdf.

Administration's perceived allies are allowed to participate and its perceived "adversaries" are shut out.  Unlike countries that suffer from that kind of corruption,[5] the United States has long attracted investment capital from all over the globe because its economy is based on merit and ingenuity—not currying favor with the powers that be.

## II.    The Government's Viewpoint-Based Discrimination Violates the First Amendment Rights of Both Anthropic and Its Investors Who Associate Themselves with Its Views.

Even assuming the Administration had authority to undertake the Challenged Actions in whole or in part (it did not), those actions still would be unlawful because the Administration expressly took those actions to punish Anthropic for expressing views the Administration disfavors.

> The government may not enforce the laws in a manner that picks winners and losers in public debates. It would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion.  Neutral regulations may reasonably limit the time, place, and manner of speech, but such

---

[5] *See* Jorge Farinha & Oscar López-de-Foronda, *The impact of corruption on investment and financing in the European Union: new insights*, 30 European J. of Finance 339 (2024), *available at* https://www.tandfonline.com/doi/full/10.1080/1351847X.2023.2240846#d 1e167.

regulations cannot be enforced based on the content or viewpoint of speech.

*Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1142 (D.C. Cir. 2023).

The First Amendment bars the government from "us[ing] the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (*Vullo*). The government violates the First Amendment when it uses regulatory leverage to coerce third parties into suppressing speech, even if the government never directly censors the speech. *Id.* at 197; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (informal censorship and coercion—even absent a formal ban—can constitute a First Amendment violation). "[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *Vullo*, 602 U.S. at 197; *Nat'l Rifle Ass'n of Am. v. City of L.A.*, 441 F. Supp. 3d 915, 942 (C.D. Cal. 2019) (granting plaintiff injunction against an ordinance adopted "in direct response" to the plaintiff's political speech and expression); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 170 (D.D.C. 2025) (holding Administration could not "indirectly"

interfere with attorney-client relationships by pressuring clients).

Moreover, courts have held that federal debarment is not to be

employed as a punitive measure, but only to protect the federal

government.  *See United States v. Borjesson*, 92 F.3d 954, 955 (9th Cir.

1996) (collecting cases); *see also* 48 C.F.R. § 9.402(b).

The Challenged Actions violate this principle.  The Administration

is not simply choosing a different vendor.  It is punishing Anthropic,

designating it a "supply chain risk" and directing a boycott of it by all

military contractors, specifically and expressly because Anthropic

expressed a contrary view on a matter of profound legal, social, and

political importance: the extent to which novel and largely untested

generative AI technology may be used for mass surveillance of U.S.

citizens and for lethal autonomous warfare.  While the Administration

can certainly choose which private companies win a government

contract, *see, e.g., Corey Airport Servs., Inc. v. Clear Channel Outdoor,

Inc.*, 682 F.3d 1293 (11th Cir. 2012), it cannot pick winners and losers

based on viewpoint, *see Frederick Douglass Found.*, 82 F.4th at 1142;

*Anthropic PBC*, 2026 WL 836842, at \*11 ("'But a State's failure to

persuade' its prospective contracting partner to come around to its

views 'does not allow it to hamstring' disagreeing parties." (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578 (2011)).  That is exactly what the Administration seeks to do here, and the First Amendment forbids it.

The Administration's unlawful action by no means harms only Anthropic.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 641 (1994).  The Supreme Court has recognized that both individuals and companies have protected beliefs and guiding principles that are insulated from the preferences of a given Administration.  *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 690 (2014).  Protected rights in those beliefs extend to those "associated with a corporation in one way or another," including investors.  *Id.* at 706–07. Values-led investors choose where to invest their dollars as a form of expression, showing solidarity and support for the principles and values of the companies in which they invest.  But the Challenged Actions target and punish expression of which the

22

Administration disapproves, in violation of investors' own rights of free expression and association.

Worse still, the Administration's abuse harms not only values-led investors—it hampers all investors' abilities to make informed decisions about whether and how to allocate their resources to a safety-oriented AI company, or any company that has expressed a commitment to policy or points of view that an Administration may dislike.  Accordingly, the chilling effect on speech as well as investment extends far beyond Anthropic.  The Challenged Actions send a clear message to every company that does business with the government: disagreement risks debarment.  The market of course amplifies that message, as pragmatic, risk-averse corporate partners and investors flee companies they fear may be targeted (or, in Mr. Ball's trenchant phrasing, "murdered").

If allowed to stand, the Challenged Actions will chill or even silence speech on important legal, social, and political issues by some of the largest and most influential actors in the American economy. Government contractors will learn to say nothing, commit to nothing, and stand for nothing, because any stated principle becomes a liability the moment it conflicts with the political preferences of the party in

power.  Values-led investors like *Amici* and their members will be left to choose between companies that have no principles, those that are too fearful to announce their principles, and those whose stated principles conveniently align with the prevailing wind of the then-current Administration's views.  This barren landscape of corporate speech and expression is the opposite of what a free-market economy and a free market of ideas should produce.

No such result is necessary, no such result would be lawful, and no such result can be reconciled with the values of the First Amendment or the principles on which our market economy relies.

## CONCLUSION

*Amici Curiae* respectfully ask the Court to hold unlawful the Department of War's designation that Anthropic presents a supply chain risk.

Dated: April 22, 2026        Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

The accompanying amicus brief is 3,125 words in length, fewer than a quarter of the 13,000 words allowed for party briefs.  *See* Fed. R. App. P. 29(a)(5); *id.* R. 32(a)(2); Cir. R. 32(a)(2).

Dated: April 22, 2026

*/s/ Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

## CIRCUIT RULE 29(D) CERTIFICATION

Pursuant to D.C. Circuit Rule 29(d), counsel for *Amici* certify that a separate brief is necessary. *Amici*'s perspective as values-led investors is distinct from that of other *amici* supporting Anthropic's petition for review, and a separate brief is necessary to present that perspective to the Court.

Dated: April 22, 2026

/s/ *Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

## APPENDIX OF *AMICI*

Freedom Economy Business Association

Candide Group

Howard Fischer (an individual)

Thomas Haslett (an individual)

Investor Advocates for Social Justice

Mission Driven Finance

The Nathan Cummings Foundation, Inc.

Omidyar Network LLC

Pluralize Capital

Interfaith Center on Corporate Responsibility

Humanize Wealth

John O'Farrell (an individual)

American Federation of Teachers

Adasina Social Capital