ORAL ARGUMENT SCHEDULED FOR MAY 19, 2026
No. 26-1049

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ANTHROPIC PBC,

*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, *et al.*,

*Respondents.*

---

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

---

## BRIEF OF FORMER SENIOR NATIONAL SECURITY GOVERNMENT OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER

---

Harold Hongju Koh
Bruce Swartz
Peter Gruber Rule of Law Clinic
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, Connecticut 06520
(203) 432-4932
harold.koh@ylsclinics.org
bruce.swartz@ylsclinics.org

Alexis Loeb
Anthony Schoenberg
John Ugai
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400
aloeb@fbm.com
tschoenberg@fbm.com
jugai@fbm.com

*Counsel for Amici Curiae*
*Former National Security Government*
*Officials*

## STATEMENT REGARDING SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are former senior national security officials, diplomats, intelligence professionals, and subject-matter experts. Their decades of combined experience in defense procurement, supply chain security, and the protection of the United States' technological advantage in matters of national defense affords them distinct insights into managing supply chain risks within constitutional and applicable statutory frameworks, including 10 U.S.C. § 3252 and 41 U.S.C. § 4713. *Amici*'s experience renders them particularly well situated to explain how the government's actions in this case distort the national security authorities invoked and risk undermining, rather than advancing, U.S. national security interests.

To *amici*'s knowledge, no other *amicus* has filed, or plans to file, a brief providing the Court with insights from similar expertise. Accordingly, overlap between this brief and other *amicus* briefs is unlikely. *Amici*'s separate brief also provides the Court with the benefit of *amici*'s unique views in a clear, concise, and timely manner. *Amici*'s separate brief is thus justified and will serve the Court.

Dated: April 22, 2026

By:    */s/ Alexis Loeb*
      Alexis Loeb

*Counsel for Amici Curiae*
*Former National Security*
*Government Officials*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

Dated: April 22, 2026

By: _*/s/ Alexis Loeb*_

Alexis Loeb

*Counsel for Amici Curiae*
*Former National Security*
*Government Officials*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**I.    Parties and *Amici Curiae***

All parties and intervenors appearing before this Court are listed at Add.1 of the Addendum filed in conjunction with Petitioner's Emergency Motion for Stay Pending Review.

In addition to the *amici* submitting this brief, *amici* include Foundation for Individual Rights and Expression, Electronic Frontier Foundation, Cato Institute, Chamber of Progress, First Amendment Lawyers Association, Former Service Secretaries, Retired Senior Military Officers, Employees of OpenAI and Google in their personal capacities, Foundation for American Innovation, Fifty Years, Fathom, ChinaTalk, Martin Chorzempa, Alex Imas, Pangram, Institute for Progress, Dean Ball, Dwarkesh Patel, Roots of Progress, Saif Khan, Freedom Economy Business Association, Candide Group, Howard Fischer, Thomas Haslett, Investor Advocates for Social Justice, Mission Driven Finance, the Nathan Cummings Foundation, Inc., Omidyar Network LLC, Pluralize Capital, Professor Alan Z. Rozenshtein, the Interfaith Center on Corporate Responsibility, Humanize Wealth, John O'Farrell, 149 Former Judges, ACT | The App Association, American Civil Liberties Union, Dean Ball, Catholic Moral Theologians and Ethicists, Center for Democracy and Technology, Computer & Communications

Industry Association, Democracy Defenders Fund, Information Technology Industry Council, Software & Information Industry Association, and TechNet.

## II.     Action Under Review

References to the actions at issue appear in Petitioner Anthropic PBC's ("Anthropic") Petition for Review, emergency stay motion, and associated exhibits.

## III.     Related Cases

Anthropic has challenged its designation as a supply chain risk in *Anthropic PBC v. U.S. Dep't of War, et al.*, 3:26-cv-01996 (N.D. Cal. Mar. 2026), but that designation arises under a different statutory authority than the actions challenged here. The U.S. District Court for the Northern District of California granted Anthropic's motion for a preliminary injunction in that case, and the defendants have appealed that order. The appeal is currently pending in the U.S. Court of Appeals for the Ninth Circuit in *Anthropic, PBC v. United States Department of War, et al.*, 26-2011 (9th Cir. Apr. 2026). Counsel is unaware of any other related cases currently pending in this Court or any other court.

Dated: April 22, 2026                By:     ___/s/ Alexis Loeb___
                                                      Alexis Loeb

                                                      *Counsel for Amici Curiae*
                                                      *Former National Security*
                                                      *Government Officials*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT ......................................................................2

ARGUMENT .................................................................................................5

I.   THE DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN
     RISK IS PRETEXTUAL AND THEREFORE UNLAWFUL. ......................5

    A.   The Sequence of Events Here Shows That the Designation Was
     Pretextual, and Was Intended as a Punishment of Anthropic,
     Not to Protect the United States. .........................................................6

    B.   The Administration's Failure to Meet the Statutory Standards
     for a Supply Chain Risk Shows the Designation Was
     Pretextual, and Therefore Unlawful. ...................................................8

    C.   The Administration's Failure to Comply with the Statutes'
     Procedural Requirements Shows that the Designation Was
     Pretextual, and Therefore Unlawful. ...................................................9

    D.   The Pretextual Nature of the Designation Is Also Demonstrated
     by the Administration's Failure to Consider the National
     Security Risks the Designation Entailed. ...........................................12

II.  THE DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN
     RISK IS UNCONSTITUTIONAL PUNISHMENT-BY-EXECUTIVE ......20

    A.   The Executive Has No Unilateral Power to Punish. ...........................20

    B.   The First Amendment Forbids Retaliatory Executive
     Punishment. ........................................................................................20

    C.   The Constitution's Bill of Attainder Clause Prohibits Executive
     Punishment. ........................................................................................21

CONCLUSION ............................................................................................27

LIST OF *AMICI CURIAE* ..........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abrego Garcia v. Noem*,
  2025 WL 1135112 (4th Cir. Apr. 17, 2025)........................................................20

*Al-Aulaqi v. Panetta*,
  35 F. Supp. 3d 56 (D.D.C. 2014).......................................................................24

*Amiri v. Kelly*,
  2018 WL 623652 (E.D. Mich. Jan. 30, 2018), *aff'd*, 818 F.App'x
  523 (6th Cir. July 2, 2020)................................................................................24

*Anthropic PBC v. U.S. Dep't of War*,
  2026 WL 836842 (N.D. Cal. Mar. 26, 2026), *appeal filed*, No. 26-
  2011 (9th Cir. Apr. 2026) .........................................................................6, 7, 9, 21

*Anthropic PBC v. U.S. Dep't of War, et al.*,
  3:26-cv-01996 (N.D. Cal.)..................................................................................13

*Davies v. Young*,
  2013 WL 5450308 (D. Colo. Sep. 30, 2013)......................................................24

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)...................................................................................3, 5, 6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020).............................................................................................12

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016).........................................................................................12

*Ex parte Garland*,
  71 U.S. (4 Wall.) 333 (1867) ...........................................................................23

*In re Grand Jury Subpoenas*,
  2026 WL 710202 (D.D.C. Mar. 11, 2026) ........................................................20

*Jamaica Ash & Rubbish Removal Co. v. Ferguson*,
  85 F. Supp. 2d 174 (E.D.N.Y. 2000) ................................................................24

*Jenner & Block LLP v. U.S. Dep't of Just.*,
    784 F. Supp. 3d 76 (D.D.C. 2025).................................................................21

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)..............................................................................23, 24, 25

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012)............................................................24

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995) ....................................................................19

*Korte v. Off. of Pers. Mgmt.*,
    797 F.2d 967 (Fed. Cir. 1986) ...............................................................23

*Kovac v. Wray*,
    2020 WL 6545913 (N.D. Tex. Nov. 6, 2020) .....................................24

*Marshall v. Sawyer*,
    365 F.2d 105 (9th Cir. 1966) .................................................................23

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)...............................................................................23

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025)..................................................21, 24

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    No. 25-5241 (D.C. Cir. Feb. 2026)........................................................21

*Susman Godfrey LLP v. Exec. Off. of President*,
    789 F. Supp. 3d 15 (D.D.C. 2025).........................................................21

*United States v. Brown*,
    381 U.S. 437 (1965)...............................................................................23

*United States v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977) ..................................................................6

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025)........................................................21

*Zaid v. Exec. Off. of the President*,
   2025 WL 3724884 (D.D.C. Dec. 23, 2025) *appeal filed,* No. 26-
   5009 (D.C. Cir. Jan. 2026)......................................................................21, 23, 24

## FEDERAL STATUTES

10 U.S.C.
   § 111(a) ..........................................................................................................5
   § 3252.............................................................................................1, 5, 7, 8, 9, 10
   § 3252(b)(1)-(3) ...........................................................................................10
   § 3252(d)(2)(A)-(C) .....................................................................................10

41 U.S.C.
   § 1321-1328 .................................................................................................8
   § 4713............................................................................... 1, 3, 4, 5, 7, 8, 10, 11
   § 4713(b)...................................................................................................10,11
   § 4713(c) .....................................................................................................11

## FEDERAL REGULATIONS

Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sep. 5, 2025) ...................................5

## LEGISLATIVE MATERIALS

*Confirmation Hearing on the Expected Nomination of Mr. Peter B.
   Hegseth to be Secretary of Defense Before S. Comm. on Armed
   Services*, 119th Cong. (Jan. 14, 2025) ...............................................................19

*Evolving Threats to the Homeland: Hearing Before the Comm. on
   Homeland Security and Governmental Affairs*, S. Hrg. 115-588
   (2018) ...........................................................................................................9

S. Rep. No. 115-408 (2018) ...........................................................................8

## CONSTITUTIONAL PROVISIONS

U.S. Const. Article I, § 9, cl. 3.....................................................................22, 24

U.S. Const. Article VI, cl. 2.............................................................................19

U.S. Constitution, First Amendment ..........................................................4, 20, 21

U.S. Constitution, Article I, Bill of Attainder Clause........................4, 20, 21, 23, 24

## OTHER AUTHORITIES

*Claude's Constitution*, Anthropic (last visited Mar. 8, 2026), https://www.anthropic.com/constitution..........................................................15

Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026), https://www.darioamodei.com/essay/the-adolescence-of-technology#2-a-surprising-and-terrible-empowerment......................................15

Dean W. Ball (@deanwball), X (Feb. 27, 2026, 2:46 PM), https://x.com/deanwball/status/2027515599358730315 ...................................25

Dep't of Defense, *Law of War Manual* (Jun. 2015, updated Jul. 2023)...................19

*The Federalist No*. 69 (Alexander Hamilton)...........................................................23

Filip Timotijia, *Anthropic's Claude Used by Pentagon in War With Iran, Official Confirms*, The Hill (Mar. 24, 2026) ...............................................11

Harold Hongju Koh, Bruce Swartz, Avi Gupta & Brady Worthington, *The War on Anthropic: Pretextual Designation and Unlawful Punishment*, Just Security (Mar. 6, 2026), https://www.justsecurity.org/133247/anthropic-hegseth-unlawful-punishment/..............................................................................................................20

Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Security (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/ ......................................................................................................22

Hegseth, *The War on Warriors* 96 (2024) ...............................................................19

Jared Perlo, *Anthropic Says the Pentagon Has Declared It a National Security Risk*, NBC News (Mar. 5, 2026, 10:07 PM), https://www.nbcnews.com/tech/tech-news/anthropic-says-pentagon-declared-national-security-risk-rcna262013 ...............................14, 15

Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026, at 1:45 PM)...................................................................14

Kenneth Pickthorn, *Early Tudor Government: Henry VII* 119 (1934)....................22

Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, Stern Ctr. for Bus. & Hum. Rts. (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/. .............................................................................................15, 16

Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, Exec. Off. of the President, Accelerating Federal Use of AI through Innovation, Governance, and Public Trust, The White House (Apr. 3, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-21-Accelerating-Federal-Use-of-AI-through-Innovation-Governance-and-Public-Trust.pdf ................................16

Mike Stone, Alexandra Alper & Courtney Rozen, *Defense Contractors, Like Lockheed, Seen Removing Anthropic's AI After Trump Ban*, Reuters (Mar. 4, 2026)...................................................17

*Political Declaration on Responsible Military Use of Artificial Intelligence and Autonomy*, U.S. Dept. State, https://2021-2025.state.gov/political-declaration-on-responsible-military-use-of-artificial-intelligence-and-autonomy/ ........................................................................................18

Raphael Satter & Courney Rozen, *State Department Switches to OpenAI as US Agencies Start Phasing Out Anthropic*, Reuters (Mar. 2, 2026, 11:12 AM)................................................................25

Reuters, *US Security Agency is using Anthropic's Mythos Despite Blacklist, Axios Reports* (Apr. 19, 2026), https://www.reuters.com/business/us-security-agency-is-using-anthropics-mythos-despite-blacklist-axios-reports-2026-04-19/ .................11, 13

Ryan Goodman, Siven Watt, Audrey Balliette, Margaret Lin, Michael Pusic & Jeremy Venook*, The "Presumption of Regularity" in Trump Administration Litigation,* Just Security (Mar. 19, 2026).......................10

Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 Hist. J. 675, 675 (1975) .......................................................22

Suzanne Spaulding, John Bellinger, Mary DeRosa, *et al., The National Security Case for Judicial Review,* Lawfare (Feb. 20, 2026), https://www.lawfaremedia.org/article/the-national-security-case-for-judicial-review ...................................................................................12

Tobias Vestner & Juliette François-Blouin, *Globalizing Responsible AI in the Military Domain by the REAIM Summit*, Just Sec. (Mar. 13, 2023).................................................................................................................18

U.S. General Services Administration, *GSA Stands with President Trump on National Security AI Directive* (Feb. 27, 2026), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-stands-with-president-trump-on-national-security-ai-directive-02272026...............................................................................................25

*Understanding the Impact of AI on National Security*, MIT Mgmt. Exec. Edu. (Feb. 23, 2025), https://executive.mit.edu/Understanding-the-impact-of-AI-on-national-security.html ......................................................................................16

4 William Blackstone, *Commentaries* 373-79 .......................................................22

# GLOSSARY

| | |
|---|---|
| DoD | Department of Defense |
| FASC | Federal Acquisition Security Council |
| FASCSA | Federal Acquisition Supply Chain Security Act |
| GSA | General Services Administration |

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former senior national security officials, diplomats, intelligence professionals, and subject-matter experts with decades of combined experience in defense procurement, supply chain security, and protecting the United States' technological advantage in matters of national defense.

Many *amici* have held senior roles within the White House, National Security Council, Department of State, Department of Defense, Department of Justice, Department of Homeland Security, Office of Management and Budget, and other national security and intelligence institutions, where they implemented or advised on the statutory and constitutional authorities at issue here. Other *amici* have extensive experience evaluating supply chain vulnerabilities, protecting defense systems from infiltration by foreign adversaries, and facilitating responsible integration of emerging technologies into national security operations. *Amici* have no financial interest in the outcome of this litigation.

The perspective of many *amici* is further grounded in their practical experience managing supply chain risks and with the applicable statutory frameworks—including 10 U.S.C. § 3252 and 41 U.S.C. § 4713—and their

---

[1] Pursuant to D.C. Circuit Rule 29(a)(4)(E), counsel for *amici* state that no counsel for a party authored this brief in whole or in part, and that no person other than *amici* or their counsel made a monetary contribution to this brief.  On April 8, 2026, the Court granted *amici*'s motion to participate as *amici curiae*.

professional understanding of the conditions under which advanced technologies—including frontier artificial intelligence systems—can be responsibly incorporated into defense and intelligence operations. *Amici* believe that preserving the integrity of those statutory authorities is a national security imperative. They submit this brief to assist the Court in understanding how the government's actions in this case distort the national security authorities invoked and thereby risk undermining, rather than advancing, U.S. national security interests.

A full list of *amici* and the government positions they formerly held appears at the end of this brief.

## SUMMARY OF ARGUMENT

This case is about pretext and punishment. It presents the question whether the federal government may pretextually invoke national security authorities to punish a private U.S. company for resisting the government's attempts to coerce it into taking positions with which it disagrees as a matter of conscience. The stakes here are thus not simply financial, nor are they limited to a single private company. They instead involve the rule of law and our most fundamental freedoms.

The Administration seeks to force Anthropic to renounce two guardrails regarding the use of its AI system, Claude Gov, that the Department of Defense had previously agreed to: that the system not be used either for mass surveillance of Americans or for lethal autonomous warfare. Anthropic made clear that it could

2

not in good conscience agree to the removal of these safeguards but would help the Department of Defense disengage from the usage of Claude Gov if it needed to seek another contractor. In response, the Department sought to leverage its national security authorities to punish Anthropic. If Anthropic did not yield, the Department threatened, the Department would designate it a supply chain risk. And after refusing to jettison its principles, Anthropic has been so designated—even though the Department continues to use Anthropic's system in military action to this day.

As this sequence of events indicates, the designation of Anthropic is purely pretextual: this is punishment, not agency process. The statutory predicates for designation as a supply chain risk were not met, the statutory procedures were not followed, and the relevant policy tradeoffs were not considered. The designation was arbitrary and capricious, and therefore unlawful. *See Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019).

The designation also violated the Constitution. As a private company, Anthropic has the right to configure its products as it sees fit for lawful uses, just as the Department of Defense has the right to refuse to contract with Anthropic should it prefer a different product. But the Administration's invocations of the supply chain risk statutes to punish Anthropic turn those vital national security authorities on their heads, for it is the Administration—not Anthropic—that has sought to "introduce unwanted function" to Anthropic's AI system. *See* 41 U.S.C.

3

§ 4713. The Administration has attempted to force Anthropic to permit its product to be potentially used for two functions—mass domestic surveillance and lethal autonomous weapons systems—that are not only "unwanted" by Anthropic, but that raise serious issues as to the risks and lawfulness of the uses themselves.

The Administration may, of course, argue that these uses are not dangerous and that they comply with both domestic and international law. But the Administration is plainly forbidden from abusing its national security authorities to punish a private company for not agreeing with these arguments. The First Amendment of the Constitution bars the government from punishing Anthropic based on its speech or political values—including conscientious beliefs regarding the dangers of certain uses of its system. Likewise, the Bill of Attainder Clause forbids punishment without judicial process, as well as the use of the threat of such punishment to try to compel compliance with government demands. Therefore, the Administration's actions here are unlawful for at least two independent reasons: they both fail to meet the requirements of the supply chain risk statutes and violate fundamental constitutional guarantees.

**ARGUMENT**

**I.    THE DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN RISK IS PRETEXTUAL AND THEREFORE UNLAWFUL.**

The Department of Defense ("DoD" or the "Department") invoked both 41 U.S.C. § 4713 and 10 U.S.C. § 3252 to designate Anthropic as a "supply chain risk."[2] But these designations were, in fact, entirely pretextual, as shown by the sequence of events, the failure to satisfy the statutes' substantive and procedural requirements, and the Administration's failure to consider the national security consequences of such designations.

Because it rests on a pretextual basis, the decision here is arbitrary and capricious. *Dep't of Commerce*, 588 U.S. at 784. As in *Department of Commerce*, the government's justification for designating Anthropic a supply chain risk is "incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.* at 785. Indeed, the pretext in this case is even less disguised than in *Department of Commerce*. Whereas the justification offered for the action taken in *Department of Commerce* was plausible on its face—although

---

[2] This brief uses the title "Department of Defense" (or "DoD") as opposed to "Department of War" because the Department of Defense is established by statute, and any formal name change would require congressional approval. *See* 10 U.S.C. § 111(a). The executive order permitting "secondary title[s]" for the Department and Secretary acknowledges as much, stating that "[s]tatutory references to the Department of Defense [and] Secretary of Defense . . . shall remain controlling until changed subsequently by the law." Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sep. 5, 2025). No statutory change has occurred.

belied by the evidence as to *why* the decision was made—the designation here is both entirely implausible *and* refuted by the evidence as to how and why the decision was actually made.[3] Even when reviewing executive action under a deferential standard, this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). So too here: "[T]he evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Commerce*, 588 U.S. at 784.

### A. The Sequence of Events Here Shows That the Designation Was Pretextual, and Was Intended as a Punishment of Anthropic, Not to Protect the United States.

In March 2025, the Department of Defense began usage of Anthropic's AI product, Claude Gov, subject to usage limitations proposed by Anthropic—and agreed to by the Government—that prohibited use of Claude Gov for domestic mass surveillance or lethal autonomous warfare. *See Anthropic PBC v. U.S. Dep't of War*, 2026 WL 836842, at *3 (N.D. Cal. Mar. 26, 2026), *appeal filed*, No. 26-2011 (9th Cir. Apr. 2026). Beginning in the fall of 2025, however, the Department

---

[3] In *Department of Commerce,* the Commerce Department claimed that the citizenship question was added at the request of the DOJ, which said it needed more granular citizenship data to better enforce Section 2 of the Voting Rights Act. 588 U.S. at 761–62. However, the administrative record revealed Secretary of Commerce Wilbur Ross had sought to add the citizenship question from the early days of the administration, and the Voting Rights Act justification was essentially retrofitted onto a decision that had already been made. *Id.* at 785.

took the position that these usage limitations had to be removed and that any AI company contracting with the Department had to permit "any lawful use." *See id.* at \*3–4. Anthropic stated it was unwilling to remove these guardrails but understood this might mean it was not the "right vendor" and would assist in "offboarding" its product. *Id.* at \*4.

Instead of accepting Anthropic's offer to disengage, on February 24, 2026, Secretary of Defense Hegseth told Anthropic that if it did not agree to "all lawful uses" of its products by February 27, 2026, the Department would "immediately designate Anthropic a supply-chain risk and would prevent Anthropic from partnering with [the Department], anyone affiliated with [the Department], or any other agency." *Id.* Anthropic did not agree, and was subsequently designated a supply chain risk, exactly as Secretary Hegseth threatened, under both 41 U.S.C. § 4713 and 10 U.S.C. § 3252.

This sequence of events—government demands during negotiations, threat escalations, Anthropic's refusal to alter its safeguards, and a sudden "supply chain risk" designation announced on social media without any statutory process—demonstrates that the government sought to wield its statutory authority not because Anthropic suddenly emerged as a supply chain risk, but instead as a pretext to punish Anthropic after the breakdown of negotiations over proposed revised terms of use.

**B.    The Administration's Failure to Meet the Statutory Standards for a Supply Chain Risk Shows the Designation Was Pretextual, and Therefore Unlawful.**

Anthropic does not meet the statutory definition of a "supply chain risk" under § 4713, defined as "the risk that any person may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system."[4]

Section 4713 was enacted as part of the Federal Acquisition Supply Chain Security Act (FASCSA, codified at 41 U.S.C. §§ 1321–1328 and 4713). FASCSA was a response to the longstanding threat that "that *foreign governments* may target the Federal ICT supply chain via certain products or services."[5] Senate hearings about FASCSA's drafting likewise focused on foreign supply chain risks: Senator Jones highlighted the risk of a company with "ships all over the world [and] infecting the supplies and those kind of things," and Senator McCaskill worried

---

[4] For the same reasons, it fails to meet the substantive requirements established by Congress for the invocation of § 3252—the DoD-specific supply chain risk authority. Section 3252 parallels its government-wide § 4713 counterpart, but replaces the word "adversary" with "any person." But just as in § 4713, the rest of the § 3252 definition still does not apply here, so this is a distinction without a difference.

[5] S. Rep. No. 115-408, at 2 (2018) (emphasis added).

about F-35 production in Turkey.[6] No such foreign risk has been cited here, nor could it be. Similarly, § 3252—the DoD-specific supply chain risk statute—"has never been applied to a domestic company and is directed principally at foreign intelligence agencies, terrorists, and other hostile actors." *Anthropic PBC*, 2026 WL 836842, at *1.

The designation of Anthropic under these statutes was equally inconsistent with their plain text. The evidence introduced in the preliminary injunction proceedings in the U.S. District Court for the Northern District of California confirms what is apparent: there is no way in which Anthropic could influence the operation of Claude Gov. Nor could the Administration explain how Anthropic might "sabotage, maliciously introduce unwanted function, or otherwise subvert" a DoD system through work with a DoD contractor. *See id.* at *7, *17–18.

### C.    The Administration's Failure to Comply with the Statutes' Procedural Requirements Shows that the Designation Was Pretextual, and Therefore Unlawful.

Secretary Hegseth's threat to designate Anthropic as a supply chain risk— and the subsequent designations themselves—were all made before any of the statutorily mandated procedures for making such designations were completed. Both of DoD's supply chain risk designations—under § 4713 and under § 3252—

---

[6] *Evolving Threats to the Homeland: Hearing Before the Comm. on Homeland Security and Governmental Affairs*, S. Hrg. 115-588 (2018) (Statements of Senator Jones and Senator McCaskill).

were procedurally defective at every turn. The Administration has not followed the process mandated by Congress here, and so the designations are unlawful for that reason as well.

The procedural failures with respect to the Administration's invocation of § 4713(b) have been fully briefed by other parties, and we do not repeat them here.[7] We note only that the Administration's actions defeated the common purpose of both statutes, which is to ensure that supply chain decisions that broadly affect the U.S. government are based on objective national security analyses, rather than on a unilateral agency determination driven by the whims of a particular agency head. DoD's subversion of these procedural frameworks rebuts any presumption of regularity underlying DoD's determinations.[8]

Nor is it an answer to suggest that these statutory procedures can be ignored because the United States is engaged in an active military conflict and thus there is an "urgent national security interest" within the meaning of § 4713(c). In the first

---

[7] The procedural provisions of § 3252 were likewise ignored. *See* 10 U.S.C. § 3252(b)(1)-(3). DoD also has violated post-designation procedures under § 3252, which grants the Secretary no power "beyond excluding a designated company from participating in contractual bidding for a limited set of systems." 10 U.S.C. § 3252(d)(2)(A)-(C).

[8] *See* Ryan Goodman, Siven Watt, Audrey Balliette, Margaret Lin, Michael Pusic & Jeremy Venook, *The "Presumption of Regularity" in Trump Administration Litigation,* Just Security (Mar. 19, 2026) https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/ (collecting cases).

place, the record shows that there was no "urgent" national security issue here; even at the time of the designation, Claude Gov had been used by DoD for months, subject to the agreed-upon guardrails, and the system was highly regarded by DoD. Moreover, the ongoing United States-Iran conflict cannot retroactively excuse Secretary Hegseth's failure to furnish the process required by § 4713(b) because Secretary Hegseth stated that he would designate Anthropic as a supply chain risk *before* the United States entered into hostilities with Iran. Indeed, it has been publicly reported that DoD has been using Anthropic in the Iran conflict and that the Administration continues to seek access to Anthropic products, which undermines any argument that there is an "urgent national security interest" in removing Anthropic's products from DoD systems.[9] Finally, § 4713(c) allows for temporary delay, not negation, of required process. But, as the record shows, no considered process took place here at all.

---

[9] *See* Filip Timotijia, *Anthropic's Claude Used by Pentagon in War With Iran, Official Confirms*, The Hill (Mar. 24, 2026), https://thehill.com/policy/defense/5799136-claude-pentagon-iran-war/; Reuters, *US Security Agency is using Anthropic's Mythos Despite Blacklist, Axios Reports* (Apr. 19, 2026), https://www.reuters.com/business/us-security-agency-is-using-anthropics-mythos-despite-blacklist-axios-reports-2026-04-19/.

11

**D.    The Pretextual Nature of the Designation Is Also Demonstrated by the Administration's Failure to Consider the National Security Risks the Designation Entailed.**

The designation process required by the supply chain statutes is not a mere box-checking exercise—although the Administration would have failed even such a low bar. In the experience of many of the *amici* here, the processes specified by the statutes allow for the essential refinement, and often the resolution, of national security concerns. They require the inclusion of expertise from across relevant agencies and allow time for points of contention to be clarified. And they prevent consequential decisions—such as supply chain risk designations—from turning on disputed or incomplete evidence. Thus, the total lack of analysis of the designation's implications further indicates that it is entirely pretextual.

As an initial matter, DoD did not even attempt to articulate a theory that explains why disabling Anthropic advances national security interests. This failure is fatal. Agencies must articulate a rational connection between the facts found and the choice made. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). And when an agency shirks its duty to provide a "reasoned explanation" for its decision, agency action is arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see* Suzanne Spaulding, John Bellinger, Mary DeRosa, *et al., The National Security Case for Judicial Review,* Lawfare (Feb. 20, 2026), https://www.lawfaremedia.org/article/the-

national-security-case-for-judicial-review (judicial "[s]crutiny of the executive's process also can help ensure the determination reflects a genuine assessment of facts and law.").

In making the supply chain risk determination at issue here, the Administration also failed to consider numerous national security policy issues. In the first place, the designation deprives the government of what Secretary Hegseth himself recognized as the "exquisite capabilities" of Anthropic's AI technology. A*nthropic PBC v. U.S. Dep't of War, et al.*, 3:26-cv-01996 (N.D. Cal.), Compl., ECF No. 1 ¶ 98. Indeed, the Government has sought to gain access to Anthropic's latest AI model even during the pendency of this litigation. *See* Reuters, *US Security Agency is using Anthropic's Mythos Despite Blacklist, Axios Reports* (Apr. 19, 2026), https://www.reuters.com/business/us-security-agency-is-using-anthropics-mythos-despite-blacklist-axios-reports-2026-04-19/.

But beyond the national security issues presented by depriving the federal government of access to Anthropic's systems, a policy process that complied with the statutes at issue here would have considered how the use of supply chain risk designations as tools of political punishment might threaten a host of U.S. national security priorities, including: (1) the innovation ecosystem, (2) U.S.-China strategic competition, (3) responsible AI development, (4) technological superiority, and (5) the defense industrial base.

13

Technology companies have already recognized the harm to the innovation ecosystem that could result from arbitrary supply chain designations. Prior to the issuance of the designation challenged here, the Information Technology Industry Council—which comprises leading technology companies, including Amazon, Apple, and NVIDIA—wrote a letter to Defendant Hegseth expressing that they were "concerned by recent reports regarding the Department of War's consideration of imposing a supply chain risk designation in response to a procurement dispute."[10] As the letter describes, Anthropic's designation threatens "to undermine the government's access to the best-in-class products and services from American companies that serve all agencies and components of the federal government."[11]

This threat to innovation is particularly acute in the context of U.S.-China strategic competition over artificial intelligence. Michael Sobolik, an expert on AI and China, described this decision as "cutting off our nose to spite our own face."[12] "We cannot hobble the most innovative, successful American companies for

---

[10] Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026, at 1:45 PM), https://www.reuters.com/business/retail-consumer/big-tech-group-tells-pentagons-hegseth-they-are-concerned-about-declaring-2026-03-04.

[11] *Id.*

[12] Jared Perlo, *Anthropic Says the Pentagon Has Declared It a National Security Risk*, NBC News (Mar. 5, 2026, 10:07 PM), https://www.nbcnews.com/tech/tech-news/anthropic-says-pentagon-declared-national-security-risk-rcna262013.

14

asking quintessentially American questions about military use and privacy."[13]

The statutory processes required here—had they been followed—would have also considered whether the designation of Anthropic undermined national security by undermining incentives for responsible AI development in accordance with the rule of law. Anthropic, a self-described "ethically-oriented AI company,"[14] created Claude's Constitution to help its AI program Claude avoid taking actions "that are unsafe, unethical, or deceptive."[15] Yet this very commitment to imposing guardrails for safe deployment of AI resulted in the Pentagon's designation, "send[ing] a clear message to the entire industry: responsibility is a liability."[16] By disincentivizing American companies from investing in safe AI governance, the Pentagon's actions incentivize reckless, and potentially unethical, corporate behavior.

---

[13] *Id.*

[14] *See* Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026), https://www.darioamodei.com/essay/the-adolescence-of-technology#2-a-surprising-and-terrible-empowerment.

[15] *Claude's Constitution*, Anthropic (last visited Mar. 8, 2026), https://www.anthropic.com/constitution.

[16] Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, Stern Ctr. for Bus. & Hum. Rts. (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/.

Leadership in AI safety is critical for U.S. national security and technological superiority.[17] Failure to encourage AI governance leaves space for other states to write their own rules, undermining the United States' role as a global leader in technology—in an area where India and the European Union are already stepping in to fill a perceived vacuum.[18] Because of the way that AI algorithms operate, governance is necessary to verify the accuracy of data inputs and produce accurate results.[19] National security depends on trustworthy, cybersecure, and safe AI platforms.

Because it did not follow the statutory processes, the Administration did not consider how Anthropic's designation would undermine AI governance, and therefore national security, by discouraging companies from ethical self-regulation. The Administration also failed to consider how the designation would significantly disrupt national security by forcing companies across the defense industrial base to

---

[17] *See* Memorandum from Russell T. Vought, Dir., Off. of Mgmt. & Budget, Exec. Off. of the President, Accelerating Federal Use of AI through Innovation, Governance, and Public Trust, The White House (Apr. 3, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-21-Accelerating-Federal-Use-of-AI-through-Innovation-Governance-and-Public-Trust.pdf.

[18] Luke Barnes, *The Cost of Conscience: What the Anthropic-Pentagon Feud Means for AI Governance*, Stern Ctr. for Bus. & Hum. Rts. (Feb. 19, 2026), https://bhr.stern.nyu.edu/quick-take/the-cost-of-conscience-what-the-anthropic-pentagon-feud-means-for-ai-governance/.

[19] *Understanding the Impact of AI on National Security*, MIT Mgmt. Exec. Edu. (Feb. 23, 2025), https://executive.mit.edu/Understanding-the-impact-of-AI-on-national-security.html.

16

stop working with Anthropic and redesign their systems using alternative, arguably less effective, AI platforms. Anthropic was the first AI company to deploy models in the government's classified networks and the first to collaborate with national security customers on custom models. But, adhering to the designation, Lockheed Martin committed to following the government's ban,[20] and other contractors are expected to follow suit. Abruptly wrenching Anthropic out of existing programs threatens to harm national security by disrupting the extensive progress already made on AI-driven and AI-enhanced defense innovation and modernization.

Finally, the Administration failed to address why our national security would be advanced by removing the guardrails upon which Anthropic insisted. The designation incentivized Anthropic's competitors to provide DoD with the two functions that Anthropic refused to provide: the ability to conduct mass domestic surveillance and the ability to deploy lethal autonomous weapons systems.

Had the Administration followed the process required by the supply chain statutes, the risks of these functions would have been the subject of debate by policymaking officials. Our national security rests most fundamentally on our civil liberties and our respect for the rule of law. But our civil liberties are directly

---

[20] Mike Stone, Alexandra Alper & Courtney Rozen, *Defense Contractors, Like Lockheed, Seen Removing Anthropic's AI After Trump Ban*, Reuters (Mar. 4, 2026), https://www.reuters.com/sustainability/society-equity/defense-contractors-like-lockheed-seen-removing-anthropics-ai-after-trump-ban-2026-03-04/.

17

implicated by a Department of Defense that can engage in mass domestic surveillance—indeed, the Administration has not even attempted to explain why the Department should have such power, much less how it would exercise that power lawfully.

Similarly, a statutorily-compliant policy process would have considered how the deployment of lethal autonomous weapons systems comports with the United States' commitment to the rule of law. As of November 2024, 57 countries, led by the United States, have endorsed the Political Declaration on Responsible Military Use of Artificial Intelligence and Autonomy, which states that "Military use of AI must be in compliance with applicable international law [and] use of AI in armed conflict must be in accord with States' obligations under international humanitarian law, including its fundamental principles." *See* Tobias Vestner & Juliette François-Blouin, *Globalizing Responsible AI in the Military Domain by the REAIM Summit*, Just Sec. (Mar. 13, 2023); *Political Declaration on Responsible Military Use of Artificial Intelligence and Autonomy*, U.S. Dept. State, https://2021-2025.state.gov/political-declaration-on-responsible-military-use-of-artificial-intelligence-and-autonomy/.

Anthropic—based on its technical expertise as the system's creator—considers it unsafe to use Claude Gov, at this stage of development, for lethal autonomous weapons systems. But even apart from the technical risks identified by

Anthropic, the constraints of U.S. and international law would independently justify caution. While Secretary Hegseth refused to commit in his Senate testimony that the DoD would abide by the Geneva Conventions,[21] all government officials and personnel are of course bound to obey them.[22] Accordingly, a robust policy process—like that required by the supply chain risk statutes—would carefully consider, not dismiss, the question whether deployment of lethal autonomous weapons in these circumstances might violate those Conventions and whether a company's design of its product in a manner consistent with the law (including the Geneva Conventions) should render it a national security risk.

The failure to consider this critical issue further demonstrates the designation of Anthropic was the product of arbitrary fiat, not reasoned decision-making.

---

[21] *Confirmation Hearing on the Expected Nomination of Mr. Peter B. Hegseth to be Secretary of Defense Before S. Comm. on Armed Services*, 119th Cong. 123-124 (Jan. 14, 2025) (statement of Peter B. Hegseth); *see also* Hegseth, *The War on Warriors* 96 (2024) (stating, with regard to the Geneva Conventions, that "[o]ur boys should not fight by rules written by dignified men in mahogany rooms eighty years ago.")

[22] *See* U.S. Const. art. VI, cl. 2 (declaring "Treaties made . . . under the Authority of the United States . . . the supreme Law of the Land"); *Kadic v. Karadzic*, 70 F.3d 232, 242–43 (2d Cir. 1995); *see also* Dep't of Defense, *Law of War Manual* (Jun. 2015, updated Jul. 2023).

## II.  THE DESIGNATION OF ANTHROPIC AS A SUPPLY CHAIN RISK IS UNCONSTITUTIONAL PUNISHMENT-BY-EXECUTIVE.

### A.  The Executive Has No Unilateral Power to Punish.

The Pentagon's use of a supply chain risk designation as an *ad hoc* punishment of Anthropic is contrary to the terms of the governing statutes. It is also flatly unconstitutional. Like other similar punitive actions that have been taken by the Trump Administration—against law firms, universities, and numerous other disfavored individuals and institutions—this designation of Anthropic is an unconstitutional exercise of a claimed power that our Constitution denies the President: the power to arbitrarily punish political enemies.[23] That power is forbidden by both the First Amendment and by the Constitution's Bill of Attainder Clause.

### B.  The First Amendment Forbids Retaliatory Executive Punishment.

The First Amendment bars the government from punishing Anthropic based on its speech or political values. We do not linger on this point, both because it is

---

[23] *See* Harold Hongju Koh, Bruce Swartz, Avi Gupta & Brady Worthington, *The War on Anthropic: Pretextual Designation and Unlawful Punishment*, Just Security (Mar. 6, 2026), https://www.justsecurity.org/133247/anthropic-hegseth-unlawful-punishment/; *In re Grand Jury Subpoenas*, 2026 WL 710202, *10 (D.D.C. Mar. 11, 2026); *cf. Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at * 2 (4th Cir. Apr. 17, 2025) (Wilkinson, J.) ("And what assurance shall there be that the Executive will not train its broad discretionary powers upon its political enemies? The threat, even if not the actuality, would always be present, and the Executive's obligation to 'take Care that the Laws be faithfully executed' would lose its meaning.").

so readily apparent—as the U.S. District Court for the Northern District of

California has held—and because other briefs address this First Amendment issue

at greater length. As the District Court found:

> The record shows Defendants' conduct appears to be driven not by a desire to maintain operational control when using AI in the military but by a desire to make an example of Anthropic for its public stance on the weighty issues at stake in the contracting dispute. Although Anthropic had always applied the usage policies in question to Claude Gov, it had been repeatedly lauded as a partner and passed lengthy national security vetting processes. Only when Anthropic went public with its concerns about DoW's contracting position did Defendants set out to publicly punish Anthropic ….

*Anthropic PBC*, 2026 WL 836842, at *11. This, the Court found, "appears to be

classic First Amendment retaliation." *Id.*[24]

### C.   The Constitution's Bill of Attainder Clause Prohibits Executive Punishment.

Even apart from the First Amendment, the Constitution's Bill of Attainder

---

[24] We also note that similar issues are before this Court in the cases involving law firms and lawyers that have been targeted by unlawful Executive Orders. *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127 (D.D.C. 2025); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15 (D.D.C. 2025). The Administration has appealed these cases, along with *Zaid v. Exec. Off. of the President*, 2025 WL 3724884, (D.D.C. Dec. 23, 2025), and all five cases will be heard by the same panel. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-5241 (D.C. Cir. Feb. 2026).

Clause separately denies the President the unilateral power to punish. Executives ranging from British kings to early colonial governors attempted to wield their power to impose arbitrary punishment without the process afforded by judicial trial.[25] That is what the President seeks to do here. The President has chosen to target Anthropic, a private company, because it refused to adhere to his demands. In doing so, President Trump claims a power to declare Anthropic guilty and impose punishment—a power previously known in English common law and the U.S. Constitution as the power to "attaint."[26]

But the Constitution's categorical ban on attainder forecloses the President's actions here. Our constitutional and common-law tradition has long recognized that no executive, not even the British king, may assert a unilateral power to attaint.[27] Even a British king seeking to attaint needed to convince Parliament to pass a "bill of attainder," which would declare an accused guilty and impose punishment.[28] The Framers would have rebelled at the notion that the President could possess a

---

[25] *See* Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Security (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/.

[26] *See* 4 William Blackstone, *Commentaries* 373–79; U.S. Const. art. I, § 9, cl. 3.

[27] *See* Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 Hist. J. 675, 675 (1975).

[28] In fifteenth-century England, it was clear that "the consent of both branches of Parliament was requisite" for a bill of attainder to be enacted. Kenneth Pickthorn, *Early Tudor Government: Henry VII* 119 (1934).

22

power denied even to the British king.[29]

The Framers saw the prohibition of attainders as key to the separation of powers, to ensure that the power of the judiciary is not usurped. But the judicial province would be no less invaded by an attainder issued by the executive alone than by one issued by the executive and the legislature acting together.[30] As Justice Black explained in *Joint Anti-Fascist Refugee Comm. v. McGrath*, it cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with [the] power to engage in the same tyrannical practices that had made the bill such an odious institution." 341 U.S. 123, 144 (1951) (Black, J., concurring).

The District Court for the District of Columbia came to the same conclusion in *Zaid v. Executive Office of the President*.[31] There, the court held that the plaintiff

---

[29] *See The Federalist No.* 69 (Alexander Hamilton) (declaring that the President's authority would be "in substance much inferior to" "that of the king of Great Britain").

[30] *See id.*; *United States v. Brown*, 381 U.S. 437, 445 (1965) ("The Bill of Attainder Clause was intended . . . as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function."); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1867) ("A bill of attainder is a legislative act which inflicts punishment without a judicial trial."); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) ("A bill of attainder is a law that legislatively determines guilt and inflicts punishment . . . without provision of the protections of a judicial trial.").

[31] *Zaid,* 2025 WL 3724884, at *16, *appeal filed,* No. 26-5009 (D.C. Cir. Jan. 2026); *see also* n. 24, *supra*. Some courts have declined to apply the Bill of Attainder Clause to executive actions. *See Marshall v. Sawyer*, 365 F.2d 105, 111

had plausibly alleged that President Trump's summary revocation of his security clearance violated the Bill of Attainder Clause. As the court stated, "it is hard to imagine the Framers would have prohibited legislative bills of attainder while leaving the executive branch free to attaint whomever it likes."[32]

Finally, it is clear that the designation here is punishment of the type forbidden by the Bill of Attainder Clause. Throughout American history, courts have explained that an unlawful attainder consists of action which (1) applies with specificity and (2) imposes punishment without process. DoD's designation of Anthropic—without evidence or reason—meets both these prongs. It (1) singles out Anthropic, and (2) punishes it.

---

(9th Cir. 1966); *Korte v. Off. of Pers. Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 82 (D.D.C. 2014); *Kovac v. Wray*, 2020 WL 6545913, at *3 (N.D. Tex. Nov. 6, 2020); *Davies v. Young*, 2013 WL 5450308, at *12 (D. Colo. Sep. 30, 2013); *Amiri v. Kelly*, 2018 WL 623652, at *13 (E.D. Mich. Jan. 30, 2018), *aff'd*, 818 F.App'x 523 (6th Cir. July 2, 2020); *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 184-85 (E.D.N.Y. 2000); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 42–43 (D.D.C. 2012).

[32] *Zaid,* 2025 WL 3724884, at *16 (citing *McGrath*, 341 U.S. at 144 (Black, J., concurring)); *see also Perkins Coie LLP*, 783 F. Supp. 3d at 173 n. 36 ("[The] assumption [that the Bill of Attainder Clause applies only to Congress] is called into question, particularly where executive orders appear to stand in for laws, by the constitutional text, which, in art. I, § 9, cl. 3, does not expressly limit the prohibition to the Congress, and then, in the following section 10 applies the prohibition to the States, as well as consideration of the history of bills of attainder . . . .").

Defendants' designation of Anthropic as a supply chain risk punished Anthropic by stripping it of both government contracts and the opportunity to do business with government contractors. The Pentagon replaced Anthropic with OpenAI in a contract of up to $200 million. The leaders of the Departments of State, Treasury, and Health and Human Services told employees to stop using Anthropic's Claude, switching to OpenAI or Google's Gemini.[33] The General Services Administration removed Anthropic from its Multiple Award Schedule, cutting Anthropic off from a platform facilitating $52.5 billion in total sales in FY25 to federal, state, and local governments.[34] One former advisor to President Trump called the designation "attempted corporate murder."[35]

The government's actions here thus "possess almost every quality of [an unlawful] bill[] of attainder." *McGrath*, 341 U.S. at 143–44 (Black, J., concurring). They function as a "prepared and proclaimed government blacklist[]," *id.*, punishing Anthropic without any formal investigation, trial, or even informal

---

[33] Raphael Satter & Courney Rozen, *State Department Switches to OpenAI as US Agencies Start Phasing Out Anthropic*, Reuters (Mar. 2, 2026, 11:12 AM), https://www.reuters.com/business/us-treasury-ending-all-use-anthropic-products-says-bessent-2026-03-02/.

[34] U.S. General Services Administration, *GSA Stands with President Trump on National Security AI Directive* (Feb. 27, 2026), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-stands-with-president-trump-on-national-security-ai-directive-02272026.

[35] Dean W. Ball (@deanwball), X (Feb. 27, 2026, 5:46 PM), https://x.com/deanwball/status/2027515599358730315.

25

process. The Pentagon's decision here had nothing to do with national security. Instead, the President decided to punish Anthropic for perceived political and ideological disloyalty. He then set the entirety of the Executive Branch to the task of fulfilling his will. Allowing the Government to proceed in its campaign of attainder against Anthropic would warp valuable national security devices into tools of political abuse.

In sum, the threat here is not *to* the Department of Defense and its warfighting abilities, as the Administration would have this Court believe. To the contrary, the threat comes *from* the Department of Defense and the Administration itself. That threat is not simply to Anthropic, but also to our country's commitment to the rule of law.

## CONCLUSION

For the foregoing reasons, the Court should grant relief in favor of Petitioner Anthropic PBC in this case.

Dated: April 22, 2026        Respectfully submitted,

By:     */s/ Alexis Loeb*

Harold Hongju Koh[36]
Bruce Swartz
Peter Gruber Rule of Law Clinic[37]
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, Connecticut 06520
(203) 432-4932
harold.koh@ylsclinics.org
bruce.swartz@ylsclinics.org

Alexis Loeb
Anthony Schoenberg
John Ugai
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400
aloeb@fbm.com
tschoenberg@fbm.com;
jugai@fbm.com

*Counsel for Amici Curiae*
*Former National Security*
*Government Officials*

---

[36] Law student interns Kate Ahrens, Mia Alvarez, Elizabeth Bailey, Kate Davidson, Saavni Desai, Avi Gupta, Harry Seavey, and Brady Worthington contributed to this brief's drafting under supervision by counsel for *amici*.

[37] This brief sets forth the position of the signatories, as represented by counsel and law student members of the Peter Gruber Rule of Law Clinic but does not purport to state the views of Yale Law School or Yale University.

## LIST OF *AMICI CURIAE*

The list that follows identifies the individual *amici* and the government positions they formerly held:

- **Donald Ayer –** Deputy Attorney General (1989–1990); Principal Deputy Solicitor General (1986–1988); United States Attorney, Eastern District of California (1982–1986)

- **John B. Bellinger III –** Legal Adviser, Department of State (2005–2009); Senior Associate Counsel to the President and Legal Adviser, National Security Council (2001–2005)

- **Mary DeRosa –** Deputy Counsel to the President and Legal Adviser, National Security Council (2009–2011)

- **Jon Finer –** Principal Deputy National Security Advisor (2021–2025); Director of Policy Planning, Department of State (2016–2017)

- **Stuart Gerson –** Acting Attorney General (1993); Assistant Attorney General (Civil) (1989–1993); Assistant United States Attorney for the District of Columbia (1972–1975)

- **Avril Haines –** Director of National Intelligence (2021–2025); Deputy National Security Advisor (2015–2017)

- **Peter Keisler –** Acting Attorney General (2007); Assistant Attorney General (Civil) (2003–2007)

28

- **Mary B. McCord** – Acting Assistant Attorney General for National Security (2016-2017); Principal Deputy Assistant Attorney General for National Security (2014-2017); Assistant United States Attorney for the District of Columbia (1994-2014)

- **James C. O'Brien –** Assistant Secretary of State for European and Eurasian Affairs (2023–2025); Head, Office of Sanctions Coordination, Department of State (2022–2023); Special Envoy for Hostage Affairs (2015–2017)

- **Nuala O'Connor –** Member, President's Board on Safeguarding Americans' Civil Liberties (2004–2005); Chief Privacy Officer, Department of Homeland Security (2003–2005); Chief Counsel, Technology Administration and Chief Privacy Officer, Department of Commerce (2002–2003); Deputy Director, Policy & Strategic Planning, Department of Commerce (2001–2002)

- **Alan Raul –** Associate Counsel to the President (1986–1988); General Counsel, Office of Management and Budget (1988–1989); Vice Chairman of the Privacy and Civil Liberties Oversight Board (2006–2008)

- **Susan E. Rice –** Domestic Policy Advisor (2021–2023); National Security Advisor (2013–2017); United States Ambassador to the

29

United Nations (2009–2013)

- **Paul Rosenzweig** – Special Advocate, Data Protection Review Court (2023-2025); Deputy Assistant Secretary for Policy, Department of Homeland Security (2005–2009)

- **Nicholas Rostow** – General Counsel and Senior Policy Adviser to the United States Permanent Representative to the United Nations (2001–05); Special Assistant to the President for National Security Affairs and Legal Adviser, National Security Council (1987–93)

- **Wendy Sherman** – Deputy Secretary of State (2021–2023); Undersecretary for Political Affairs, Department of State (2011–2015)

- **Suzanne Spaulding** – Undersecretary, Department of Homeland Security (2013–2017); Minority Staff Director, House Permanent Select Committee on Intelligence (2003–2004); General Counsel, Senate Select Committee on Intelligence (1995–1998); Associate/Assistant General Counsel, Central Intelligence Agency (1989–1995)

- **Jake Sullivan** – National Security Advisor (2021–2025); National Security Advisor to the Vice President (2013–2014); Director of Policy Planning, Department of State (2011–2013)

30

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,490 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: April 22, 2026                    By:      */s/ Alexis Loeb*
                                                   Alexis Loeb

                                                   *Counsel for Amici Curiae*
                                                   *Former National Security*
                                                   *Government Officials*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on April 22, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 22, 2026                    By:     */s/ Alexis Loeb*
                                                  Alexis Loeb

                                                  *Counsel for Amici Curiae*
                                                  *Former National Security*
                                                  *Government Officials*

32