_____

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA

_____

ANTHROPIC, PBC,

*Petitioner*

v.

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*

_____

*On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice*

_____

**BRIEF OF AMICUS CURIAE OF THE ASSOCIATION FOR COMPETITIVE TECHNOLOGY (ACT)**

_____

Chapin Gregor*
Association for Competitive Technology
1401 K St NW (Ste 501)
Washington, DC 20005
(917) 621-5465
cgregor@actonline.org

*Counsel for Amicus Curiae*

Brian Scarpelli
Association for Competitive Technology
1401 K St. Northwest, Ste 501
Washington, DC 20005
(517) 517-1446
bscarpelli@actonline.org

*Counsel for Amicus Curiae*

* Ninth Circuit admission pending

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Except for the following amici curiae appearing in this Court, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioner. This amicus curiae is ACT | The App Association.

### B. Rulings Under Review

Except for the following, references to the rulings at issue appear in the Brief for Petitioner. The ruling under review is the Department of War's March 3, 2026, determination under 41 U.S.C. § 4713 that Anthropic PBC presents a supply chain risk to national security. No Federal Register or other official citation is known to counsel.

### C. Parties and Amici

Counsel is aware of a related case pending in the United States District Court for the Northern District of California: *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-01996-RFL (N.D. Cal. filed Mar. 9, 2026). That action challenges separate but related government actions. Counsel is unaware of any other related cases currently pending in this Court or any other court. Except for the following amici curiae appearing in this Court, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioner.

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, proposed amici curiae state as follows: Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the entity amicus is ACT.

ACT has no parent company, and no publicly held company owns 10% or more of ACT.

ACT is a non-profit advocacy and education organization representing software developers, particularly the small business developer, innovator, and entrepreneur community that creates countless software applications and connected technologies used on mobile devices and in enterprise systems. While ACT's individual members are generally small businesses, their cumulative contribution to the American economy is massive. The economy ACT represents is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[1] ACT members create technology solutions for a wide array of industries, from agriculture to healthcare to manufacturing to consumer products.

ACT members also play an important role in supporting the federal government, including the agencies responsible for national security and defense. Some ACT members are contractors providing products or services directly to the

---

[1] State of the App Economy, ACT | The App Association (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

United States military and government agencies; many provide business-to-business and other enterprise solutions to companies; and still more provide innovative products and services to individual consumers.

# TABLE OF CONTENTS

INTEREST OF THE AMICUS CURIAE…………………………………………….9

SUMMARY……………………………………………………………………11

ARGUMENT…………………………………………………………………...13

    I.     THE GOVERNMENT IGNORED IMPORTANT REQUIREMENTS FOR CONSULTATION, ANALYSIS, AND NOTIFICATION……....13

    II.    THE SECRETARY'S ACTION HAS CREATED WIDESPREAD UNCERTAINTY AND CONFUSION……………………………14

    III.   THE SECRETARY'S ACTION THREATENS TO CAUSE FAR-REACHING HARM…………………………………………16

CONCLUSION…………………………………………………………...18

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

10 U.S.C. § 111(a)........................................................................................11

Health Insurance Portability and Accountability Act.............................17

National Defense Authorization Act of 2019........................................13

**OTHER AUTHORITIES**

Fed. R. App. P. 29(a)(4)(E) .....................................................................9

# RULE 29 STATEMENT

1. Petitioner consents to the filing of this brief. Respondents do not oppose the filing of a timely amicus brief.

2. Amici move for leave to file this brief.

3. No party's counsel authored this brief in whole or in part.

4. No party or party's counsel contributed money intended to fund this brief.

5. No person other than amici or their counsel contributed money intended to fund this brief.

**CERTIFICATE OF COUNSEL UNDER D.C. CIRCUIT RULE 29(d)**

Pursuant to D.C. Circuit Rule 29(d), counsel certifies that this separate amicus brief is necessary. No other submission before the Court addresses the perspective of small business technology firms that develop and supply advanced technology systems, including to the federal government.

To counsel's knowledge, other anticipated amici supporting Petitioner are expected to focus on individual, civil-liberties, large company, and national-security interests. None speaks to the concerns of the small business technology sector and the chilling effect that the agency action under review may have on small businesses' willingness to drive innovation in federal procurement, which is a critical long-term national security concern. Amicus is uniquely situated to present that perspective, and a separate brief is the only means of placing it before the Court.

/s/ Brian Scarpelli

Brian Scarpelli
Counsel for *Amicus Curiae*

**INTEREST OF THE AMICUS CURIAE[2]**

ACT | The App Association ("ACT") submits this brief to assist the Court in deciding whether to preliminarily enjoin the government's ill-founded, sweeping, and unprecedented ban on doing business with Plaintiff, Anthropic PBC. The heavy burden that this ban will otherwise impose on small businesses that supply software to the government and to government contractors—and the resulting disruption of the supply chain for both government and private services—provides an additional, important reason why the public interest militates in favor of granting a preliminary injunction.

ACT, founded in 1998, is a non-profit advocacy and education organization representing software developers, particularly the small business developer, innovator, and entrepreneur community that creates countless software applications and connected technologies used on mobile devices and in enterprise systems. While ACT's individual members are generally small businesses, their cumulative contribution to the American economy is massive. The economy ACT represents is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[3]

---

[2] No party's counsel authored any part of this brief or contributed money intended to fund this brief's preparation or submission.

[3] State of the App Economy, ACT | The ACT (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

ACT members create technology solutions for a wide array of industries, from agriculture to healthcare to manufacturing to consumer products.

ACT members also play an important role in supporting the federal government, including the agencies responsible for national security and defense. Some ACT members are contractors providing products or services directly to the United States military and government agencies; many provide business-to-business and other enterprise solutions to companies; and still more provide innovative products and services to individual consumers.

The strength and effectiveness of the United States military is due in no small part to its ability to leverage complex logistics with the support of private enterprises ranging from huge conglomerates to small entrepreneurial businesses. However, ACT members and similar small businesses specializing in logistics services are particularly vulnerable to large sudden changes in government procedures—especially impulsive changes made without careful consideration of their practicality, consequences, and legality. In order to continue playing their unique and vital part in supporting our national defense, small businesses need clarity and predictability with regard to the requirements that will apply to any given business arrangement. They generally lack the large legal departments or law firms needed to parse unclear and contradictory government decrees, and they do not have the personnel or funds to replace their software code or their artificial intelligence

agents whenever a particular vendor falls out of favor with the current administration. Even if later retracted or overturned, implementation of the ban against Anthropic would have permanent effects on the AI practices of ACT's members and would impose significant costs for which they would never be reimbursed.

## SUMMARY

Secretary of War Hegseth's recent designation of Anthropic's artificial intelligence ("AI") models as a "supply chain risk" is contrary to the applicable statutes and goes far beyond his legal authority.[4] ACT concurs with the arguments made by Anthropic and by other amici curiae that the designation is unlawful and violates the First Amendment. In this brief, we will focus on three reasons why the Secretary's supply chain risk designation and associated actions should be enjoined pending further proceedings, each of which highlights the severe burden that the designation will otherwise impose on the small business developers ACT represents, both within the defense supply chain and in the broader digital economy.

First, the Secretary has made the designation without following multiple statutory preconditions for notice, consultation, and analysis. Far from being a mere formality, this disregard for legal mandates goes to the heart of why the ban

[4] Although in this brief ACT tracks the department name and secretary title used in Anthropic's complaint and motion, their statutory name and title are "Department of Defense" and "Secretary of Defense." 10 U.S.C. § 111(a), (b)(1).

on Anthropic products and services is so damaging to small software developers. No one making the decision bothered to inform themselves about the broad, unnecessary, and even wholly gratuitous harm caused by its ambiguity and overbreadth.

Second, the cryptic scope and dictates of the ban imposed by the government are impossible for small businesses to ascertain and adjust for, leaving them exposed to the whims of whichever government agency or official may later interpret it—and to the fears of customers who may feel it necessary to assume the worst in order to protect their government contracts.

Third, however it may be interpreted, the ban—if allowed to remain in effect—will have far-reaching negative impacts, not only on defense and government contracts, but on the broader digital ecosystem.

**ARGUMENT**

**I.      THE GOVERNMENT IGNORED IMPORTANT REQUIREMENTS FOR CONSULTATION, ANALYSIS, AND NOTIFICATION.**

ACT's members rely on the various forms of policymaking procedures across the federal government that allow for notice and an opportunity to comment. In addition to providing an ability to share our members' views and experiences with policymakers, these processes also allow us to understand what policymakers intend and how they expect regulated entities to comply with new rules. Even when decisions go against our preferences, this information is invaluable for the predictability and clarity it provides.

In the context of national security and designating risks to the defense supply chain, policymakers often afford a significant amount of process and opportunities to be heard. In a recent example, in 2018, a manufacturer of communications equipment was first designated by Congress via language in that year's National Defense Authorization Act. Further action would be taken by the Department of Commerce and the Federal Communications Commission, which undertook several public notice-and-comment rulemaking procedures in 2020 and 2022. Overall, a process analogous to what the Secretary is attempting here took years and allowed for significant information exchange between policymakers and relevant stakeholders.

Here, however, no such procedure took place. The Secretary's letter designating Anthropic's Claude AI products a supply chain risk merely restated the statute. It provided no real-world examples of how Anthropic's products present a risk to the defense supply chain or to national security. Moreover, it provided no evidence that the Secretary had considered how contractors, suppliers, or business partners of the United States military should eliminate usage of Anthropic services as a practical matter, and affected stakeholders had no opportunity for to have any input into the decision.

## II.    THE SECRETARY'S ACTION HAS CREATED WIDESPREAD UN-CERTAINTY AND CONFUSION.

The Secretary has declared both that Claude is such a superior tool that it is a national security risk for the U.S. military *not* to have it, but also, paradoxically, that its use should be banned. Further, the nature and use of AI models requires clarity from the Department of War.

Claude Code serves as a harness around Claude, providing tools, context management, and an execution environment that focuses the general-purpose large language models in the Claude ecosystem on the narrower task of coding. It sits between the model hosted by Anthropic and the programmer's computer, taking actions like writing code, reading files, running commands, running software builds, and researching topics. Code written in this way can be used in software

just like code written by a human programmer. Indeed, the format is the same; code written by Claude Code and code written by a human are the same plain text.

Use of Claude Code is widespread among software developers in all industries. It may be plausible for a small developer contracted to work with the Department of War to abstain from using Claude in its own processes, but is quite implausible for that developer to know whether any of the tools it uses were coded by others using Claude. Based on discussions with our members, a number of common scenarios are implicated. Examples include:

- A two-person startup selling logistics software to a Department of War prime contractor used Claude Code to write their entire testing software; nothing in the final product they ship identifies the use of an AI tool, as it is functionally indistinguishable from hand-written code.

- A defense contractor's developer who pulls in more than 800 open-source dependencies has no way to know which of those packages were refactored, debugged, or documented using Claude Code by their maintainers.

- A mid-tier supplier to a defense prime contractor uses a Software as a Service (SaaS) vendor's project management tool, and that SaaS vendor's engineering team rebuilt their interface using Claude Code last quarter. That

supplier has no knowledge, and no contractual visibility into, how their vendor's software was built. And no tool exists to find out, much less to enable some sort of "remove Claude" option once software has shipped.

Further, the Secretary's statement purporting to ban "conduct[ing] any commercial activity with Anthropic" extends these questions even further than just code directly written by Claude. Most importantly, the statute does not empower the Secretary to impose restrictions on any commercial activity with Anthropic. But the attempt to do so has created confusion for the business community. For example, if an engineer at a defense subcontractor pastes a buggy function into Claude, asks it to identify the issue, then rewrites the fix herself, was that interaction "commercial activity with Anthropic"? If the Secretary's unlawful designation is allowed to stand and directs federal contractors not to use Anthropic's tools in any part of the supply chain, such contractors (and their subcontractors or subordinate vendors) may find themselves in violation of the law without a reasonable means of determining it.

## III. THE SECRETARY'S ACTION THREATENS TO CAUSE FAR-REACHING HARM.

Businesses contracted with the Department of War or other government agencies will not be the only ones unsure of whether they are violating federal law if the Secretary's unlawful designation stands. The lack of clarity surrounding the

practical requirements of the new designation means that developers subcontracting with government contractors serving the Department of War will have to be concerned about being in violation as well. Again, common scenarios based on member discussions illuminate the problem: If a government contractor uses a popular open-source database library and, six months ago, the home hobbyist who works on the project used Claude Code to optimize a query parser, is every downstream contractor now implicated? Does a developer building medical records software for a hospital system, which also has a contract with the Department of Veterans' Affairs, have to consider whether his daily use of Claude Code to write Health Insurance Portability and Accountability Act ("HIPAA")-compliant data handlers puts the hospital system in legal jeopardy? Small businesses downstream of or adjacent to the defense supply chain will likely feel pressured by this uncertainty to develop multiple workstreams with different AI models to try to ensure that Claude isn't used in products for certain customers, resulting in significant increased cost and inefficiency.

The strain on the digital ecosystem will become especially great if supply chain risk designations made in this manner are allowed to become acceptable. If today's premier productivity tool can become illegal to use tomorrow, with no notice and comment period to mitigate the harm associated with the sudden change,

developers will be left with no choice but to reject new products that could increase efficiency and lower cost in favor of outdated tools that are unlikely to draw government attention. Widespread hesitancy to commit to even leading products or services, lest they fall out of favor with the Department of War, could have significant negative effects on the competitiveness of the small businesses that are the engine of innovation in America's digital economy.

## CONCLUSION

For each of these reasons, as well as those cited in Anthropic's moving papers and the other amicus briefs, the public interest will best be served by enjoining the government's ban on Anthropic products and services. The Court should hold unlawful the challenged determination and any covered procurement actions taken under 41 U.S.C. § 4713

# CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 29(a)(5) and 32(f) because it contains 2103 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in 14-point Times New Roman.

/s/ Brian Scarpelli

Brian Scarpelli
Counsel for *Amicus Curiae*