# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## BRIEF OF PETITIONER

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

April 22, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Anthropic PBC submits this Certificate as to Parties, Rulings, and Related Cases:

## A. Parties, Intervenors, and Amici

<u>Petitioner</u>

Petitioner is Anthropic PBC.

<u>Respondents</u>

Respondents are the United States Department of War and Peter B. Hegseth in his official capacity as Secretary of War.

<u>Intervenors</u>

There are no intervenors in this action.

<u>Amici</u>

The following amici participated in support of Anthropic PBC's Motion to Stay, listed in order of their appearance on this Court's docket: Employees of OpenAI and Google in their personal capacities; Foundation for Individual Rights and Expression; Electronic Frontier Foundation; Cato Institute; Chamber of Progress; First Amendment Lawyers Association; Alan Z. Rozenshtein; Freedom Economy Business Association; Candide Group; Howard Fischer; Thomas Haslett; Investor Advocates for Social Justice; Mission Driven Finance; The Nathan Cummings Foundation, Inc.; Omidyar Network LLC; Pluralize Capital; The

Interfaith Center on Corporate Responsibility; Humanize Wealth; John O'Farrell; Foundation for American Innovation, Fifty Years; Fathom; ChinaTalk; Martin Chorzempa; Alex Imas; Pangram; Institute for Progress; Dean Ball; Dwarkesh Patel; Roots of Progress; Saif Khan; Former Service Secretaries; Retired Senior Military Officers; Former Senior National Security Government Officials; American Civil Liberties Union; Center for Democracy and Technology; Catholic Moral Theologians and Ethicists; TechNet; Software & Information Industry Association; Computer & Communications Industry Association; Information Technology Industry Council; ACT – The App Association; 149 Former Judges; and Democracy Defenders Fund.

As of the time this brief was finalized, the following amici had appeared in support of Anthropic's Petition, listed in order of their appearance on this Court's docket: Foundation for American Innovation; Fifty Years; Fathom; ChinaTalk; Martin Chorzempa; Alex Imas; Pangram; Institute for Progress; Dean Ball; Dwarkesh Patel; Roots of Progress; Saif Khan; Michael Sobolik; Steve Newman; and Taren Stinebrickner-Kauffman; Taxpayers Protection Alliance Foundation; Freedom Economy Business Association; Candide Group; Howard Fischer; Thomas Haslett; Humanize Wealth; Investor Advocates for Social Justice; Mission Driven Finance; John O'Farrell; Omidyar Network LLC; Pluralize Capital; The

Interfaith Center on Corporate Responsibility; The Nathan Cummings Foundation, Inc.; American Federation of Teachers; and Adasina Social Capital.

No amici have appeared in this Court in support of Respondents.

### B. Rulings Under Review

Petitioner challenges the Department of War's determination that Anthropic presents a supply-chain risk to national security under the Federal Acquisition Supply Chain Security Act of 2018, 41 U.S.C. § 4713, memorialized in a February 27, 2026 social media post; a "Notice" to Anthropic dated March 3, 2026, but received by Anthropic on March 4, 2026; and a "Determination" dated March 3, 2026, but received by Anthropic on March 19, 2026.

### C. Related Cases

This case has not previously been before this Court, any other federal court of appeals, or any other court in the District of Columbia. This case challenges the designation of Anthropic as a supply-chain risk under 41 U.S.C. § 4713. That is a different statutory authority from 10 U.S.C. § 3252, which the Secretary invoked for a separate supply-chain risk designation preliminarily enjoined in *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-1996, Dkts. 134, 135 (N.D. Cal. Mar. 26, 2026), *appeal docketed*, No. 26-2011 (9th Cir. Apr. 2, 2026).

## RULE 26.1 DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner makes the following disclosures:

Petitioner Anthropic PBC is a privately held public-benefit corporation. It has no parent corporation. Other than the following two entities, no publicly held company owns 10% or more Anthropic PBC's stock: (1) Google LLC, which is a wholly owned subsidiary of Alphabet, Inc.; and (2) Amazon Web Services, Inc., which is a wholly owned subsidiary of Amazon.com, Inc.

Dated: April 22, 2026                    /s/ *Kelly P. Dunbar*
                                         KELLY P. DUNBAR

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

    A.    Parties, Intervenors, and Amici ........................................................ i

    B.    Rulings Under Review ................................................................. iii

    C.    Related Cases ............................................................................. iii

RULE 26.1 DISCLOSURE STATEMENT ............................................ iv

TABLE OF AUTHORITIES ............................................................. vii

GLOSSARY .................................................................................. xiii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 5

STATEMENT OF THE ISSUES ............................................................ 8

STATUTES AND REGULATIONS ......................................................... 8

STATEMENT OF THE CASE ............................................................... 9

    A.    Legal Background ........................................................................ 9

        1.    The Supply Chain Security Act ............................................ 9

        2.    General Executive Branch Procurement Tools ..................... 12

    B.    Factual And Procedural Background ........................................ 13

        1.    Anthropic's Mission To Advance AI Safety ......................... 13

        2.    Anthropic's Commitment To National Security And Collaboration With The Department ........................................ 15

        3.    The Department's About-Face With Respect To Anthropic's Usage Restrictions ................................................. 17

        4.    The Department's Retaliation Against Anthropic ................. 20

        5.    Anthropic's Litigation Against The Secretary ...................... 21

SUMMARY OF ARGUMENT ........................................................................24

STATEMENT OF STANDING ....................................................................28

STANDARD OF REVIEW ..........................................................................29

ARGUMENT ................................................................................................31

I.    THE § 4713 DESIGNATION DEFIES THE STATUTE'S PROCEDURAL AND SUBSTANTIVE REQUIREMENTS AND IS ARBITRARY AND CAPRICIOUS ...........31

    A.    The Secretary Violated Clear-Cut Procedural Requirements And Failed To Qualify For The Statute's Emergency Exception ...............31

    B.    The § 4713 Designation Is Substantively Unlawful Because The Secretary Identified No Actual Supply-Chain Risk And Failed To Consider Less Intrusive Measures ............................................................39

        1.    The Secretary Did Not Identify A Genuine Supply-Chain Risk Consistent With § 4713's Requirements ..........................39

        2.    The Secretary Failed Reasonably To Consider Less Intrusive Measures, Including Narrower Procurement Actions And Operational Controls ...........................................47

II.    THE § 4713 DESIGNATION VIOLATED DUE PROCESS BY FAILING TO AFFORD ANTHROPIC NOTICE OF AND AN OPPORTUNITY TO REBUT THE FACTUAL BASIS FOR THE PROPOSED DESIGNATION ..............................49

III.    THE § 4713 DESIGNATION VIOLATED THE FIRST AMENDMENT BY RETALIATING AGAINST ANTHROPIC FOR CONSTITUTIONALLY PROTECTED EXPRESSION ........................................................................53

CONCLUSION ............................................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES[*]

Page(s)

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001)......................................................35

*American Public Gas Association v. Department of Energy*,
   72 F.4th 1324 (D.C. Cir. 2023)......................................................................35

*Amerijet International, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014)................36

*\*Anthropic PBC v. Department of War*, 2026 WL 836842
   (N.D. Cal. Mar. 26, 2026).............................13, 18, 23-24, 41, 50, 55, 59-60

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ...............................................58

*Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024) ......................................................52

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ....................................56

*California Motor Transport Company v. Trucking Unlimited*,
   404 U.S. 508 (1972).....................................................................................57

*Capital Power Corporation v. FERC*, 156 F.4th 644 (D.C. Cir. 2025) .................29

*Carpenters Industrial Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017).....................28

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) .............................35

*Changji Esquel Textile Company v. Raimondo*, 40 F.4th 716
   (D.C. Cir. 2022) ..........................................................................................30

*\*City of Brookings Municipal Telephone Company v. FCC*,
   822 F.2d 1153 (D.C. Cir. 1987)........................................................ 47-48, 49

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)....................57

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) ........................51

*Department of Commerce v. New York*, 588 U.S. 752 (2019)...........................45, 46

---

[*]     Authorities upon which Anthropic chiefly relies are marked with asterisks.

*Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995) ...........................37

*District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46
    (D.C. Cir. 2015) ....................................................................................45

*Duberry v. District of Columbia*, 924 F.3d 570 (D.C. Cir. 2019) ...........................29

*Environmental Health Trust v. FCC*, 9 F.4th 893 (D.C. Cir. 2021).......................36

*EPA v. Calumet Shreveport Refining, L.L.C.*, 605 U.S. 627 (2025)................... 38-39

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989).......................................................30

*Esparraguera v. Department of the Army*, 101 F.4th 28
    (D.C. Cir. 2024) ...............................................................................36, 51

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ....................................50

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).........................28

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003).....................................28

*Frederick Douglass Foundation, Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023)..........................................................54

*Fuentes v. Shevin*, 407 U.S. 67 (1972)...................................................................52

*Grayscale Investments, LLC v. SEC*, 82 F.4th 1239 (D.C. Cir. 2023) ........ 29-30, 42

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .....................................30

*Horsehead Resource Development Company v. Browner*, 16 F.3d 1246
    (D.C. Cir. 1994)..................................................................................45

*In re NTE Connecticut, LLC*, 26 F.4th 980 (D.C. Cir. 2022) .................................37

*Janus v. American Federation of State, County & Municipal
    Employees, Council 31*, 585 U.S. 878 (2018) ........................................ 55-56

*Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76 (D.D.C. 2025) ....................58, 59

*Kartseva v. Department of State*, 37 F.3d 1524 (D.C. Cir. 1994) ...........................50

*Learning Resources, Inc. v. Trump*, 146 S.Ct. 628 (2026)....................................39

*Logan v. Zimmerman Brush Company*, 455 U.S. 422 (1982) ..................................49

*Louisiana Public Service Commission v. FERC*, 522 F.3d 378
 (D.C. Cir. 2008) ..................................................................36

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012)..................................34

*McDonald v. Smith*, 472 U.S. 479 (1985).................................................57

*MCI Telecommunications Corporation v. AT&T Company*,
 512 U.S. 218 (1994)...............................................................39

*\*Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) .... 28, 54, 57, 58

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ......................................31

*Motor Vehicle Manufacturers Association v. State Farm Mutual
 Automobile Insurance Company*, 463 U.S. 29 (1983) ................................47

*\*National Council of Resistance of Iran v. Department of State*,
 251 F.3d 192 (D.C. Cir. 2001).............................................51, 52, 53

*National Lifeline Association v. FCC*, 983 F.3d 498 (D.C. Cir. 2020) ...................29

*National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024)..............53, 58

*National Tour Brokers Association v. United States*, 591 F.2d 896
 (D.C. Cir. 1978) ...............................................................33, 34

*Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d 156
 (D.C. Cir. 1988) ................................................................ 44-45

*Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031
 (D.C. Cir. 1979) ..................................................................29

*New Jersey, Department of Environmental Protection v. EPA*,
 626 F.2d 1038 (D.C. Cir. 1980)...............................................31, 34

*New York Times Company v. Sullivan*, 376 U.S. 254 (1964) ................................55

*\*Old Dominion Dairy Products, Inc. v. Secretary of Defense*,
 631 F.2d 953 (D.C. Cir. 1980).............................................31, 50, 51

*Pacific Gas & Electric Company v. FERC*, 113 F.4th 943
(D.C. Cir. 2024) ...............................................................39

**People's Mojahedin Organization of Iran v. Department of State*,
613 F.3d 220 (D.C. Cir. 2010)...........................................5

*Public Citizen v. Federal Motor Carrier Safety Administration*,
374 F.3d 1209 (D.C. Cir. 2004)........................................48

**Ralls Corporation v. Committee on Foreign Investment in United
States*, 758 F.3d 296 (D.C. Cir. 2014) ......................30, 50, 51, 53

*Robinson v. Cheney*, 876 F.2d 152 (D.C. Cir. 1989) ..................13

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..............................55

*Sorenson Communications Inc. v. FCC*, 755 F.3d 702
(D.C. Cir. 2014) .........................................................36, 37

*Sprint Nextel Corporation v. FCC*, 508 F.3d 1129 (D.C. Cir. 2007) ......37

*Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89
(D.C. Cir. 2002) ........................................................ 28-29

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994) ..........................58

*Texas v. Johnson*, 491 U.S. 397 (1989) ..............................57

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003)......50

*United States Sugar Corporation v. EPA*, 113 F.4th 984
(D.C. Cir. 2024) ...........................................................29

*United States v. James Daniel Good Real Property*, 510 U.S. 43
(1993).......................................................................52

**United States v. Ross*, 848 F.3d 1129 (D.C. Cir. 2017) ............34, 38

*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749
(D.C. Cir. 2001) ...........................................................35

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013)...........28

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ......................49

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ....................................................30

## DOCKETED CASES

*Anthropic PBC v. Department of War*, No. 3:26-cv-1996-RFL
(N.D. Cal.) ............................................................................... 47

## STATUTES

5 U.S.C. § 706 ...........................................................................30

8 U.S.C. § 1189 ..........................................................................30

10 U.S.C. § 3252 ............................................................21, 23, 28

41 U.S.C.
    § 1322 .................................................................................9
    § 1323 ...............................................................................10
    § 1327 ...........................................5-8, 21, 29-30, 37, 39, 49
    § 4713 .............. 1-12, 21-22, 24-29, 31-41, 45, 47, 49-50, 53-54, 57-58

Del. Code § 362 ...........................................................................14

## REGULATIONS AND LEGISLATIVE MATERIALS

48 C.F.R.
    Part 9.4 ............................................................................13
    § 9.103 .............................................................................13
    § 9.104-1 ..........................................................................13
    § 9.104-4 ..........................................................................13
    § 9.402 .............................................................................13
    § 9.406-3 ..........................................................................13
    § 9.406-4 ..........................................................................13
    § 9.407-3 ..........................................................................13
    § 9.407-4 ..........................................................................13
    § 42.1303 ..........................................................................12
    § 43.103 ............................................................................13
    § 49.101 ............................................................................12
    § 49.402-3 .........................................................................12
    § 52.212-4 .........................................................................12
    § 52.243-4 .........................................................................12
    § 52.242-15 ........................................................................12

§§ 52.249-1 to 52.249-6 ...............................................................................12
App. H..........................................................................................................13

S. Rep. No. 115-408 (2018) ...............................................................9, 10, 11, 40

## OTHER AUTHORITIES

*Oxford English Dictionary* (3d ed. 2025):
    *Malice*, https://tinyurl.com/y666fe86 ........................................................40
    *Manipulation*, https://tinyurl.com/2jfanbc5................................................40
    *Sabotage,* https://tinyurl.com/mt9t87b5 ....................................................40

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2014) .....................................35

# GLOSSARY

| | |
|---|---|
| AI | artificial intelligence |
| Supply Chain Security Act | Federal Acquisition Supply Chain Security Act of 2018 |

**INTRODUCTION**

This is not a case about forcing the Department of War to do business with Anthropic. The Department may choose its contractors, negotiate its contract terms, and manage its contractors and subcontractors using the well-established procurement procedures Congress enacted for those purposes. Anthropic has never challenged that fundamental prerogative.

This case is about something else entirely: The Secretary of War's unprecedented decision to bypass ordinary procurement authorities and invoke a rarely used national-security statute, 41 U.S.C. § 4713—designed to thwart intentional sabotage by hostile, anti-American actors—against an American technology company because of the company's public statements and positions in contract negotiations with the Department regarding appropriate safety restrictions for advanced artificial-intelligence ("AI") tools.

Congress enacted § 4713 as part of the Federal Acquisition Supply Chain Security Act ("Supply Chain Security Act") as a narrow but powerful authority. It empowers the Secretary to address a specific risk that adversaries will "sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate" covered technology systems to "surveil," "deny," "disrupt," or "otherwise manipulate" those systems' operations. 41 U.S.C. § 4713(k)(6). Section 4713 exists to help ensure that hostile nation states and other bad actors cannot exploit

1

federal technology supply chains. In enacting the statute, Congress had prominent recent examples in mind: a Russian cybersecurity vendor with alleged ties to Russian intelligence and Chinese telecommunications firms suspected of enabling Chinese government espionage. To Anthropic's knowledge, the government has never before imposed a § 4713 supply-chain risk designation; indeed, the only publicly known use of the broader Supply Chain Security Act was against a Russian-backed Swiss company praised by the Kremlin.

What happened here bears no resemblance to that statutory paradigm. The Secretary did not uncover a plot to sabotage military systems. He did not discover malicious code, hidden access, or covert ties to a foreign adversary. Instead, he disagreed with Anthropic's refusal to remove two narrow contractual restrictions on the use of its AI model for lethal autonomous warfare and mass surveillance of Americans. These are usage restrictions that the Department had previously accepted and that are grounded in Anthropic's founding commitment to safe and responsible AI development.

When Anthropic publicly defended its position against public attacks by the Department, and declined the Secretary's demand to capitulate, the Secretary responded by directing the Department to designate Anthropic a "Supply-Chain Risk to national security," attacking Anthropic's "ideology," and accusing it of "sanctimonious rhetoric," "betrayal," and "corporate virtue-signaling." App.77.

Days later, he notified Anthropic of his written § 4713 determination that the company was a supply-chain risk and that he was immediately taking all procurement actions authorized by the statute. App.72. He did so despite the fact that Anthropic had been a trusted national-security partner, holding Top Secret clearances and providing AI models that the Secretary had just recently praised as having "exquisite capabilities." App.25.

It is undisputed that the Secretary failed to follow the process that Congress mandated before issuing his designation—including depriving Anthropic of notice and the opportunity to be heard. And his efforts to cure these obvious deficiencies by reliance on an emergency exception, 41 U.S.C. § 4713(c), are misplaced. He has offered no non-conclusory explanation for what special exigency required him to dispense with procedures Congress imposed. Nor could he. The Department has known about and previously accepted Anthropic's usage limitations for more than a year. And when the Secretary designated Anthropic, he simultaneously directed that the company's AI tools remain available for military uses for up to six months and continued to negotiate with Anthropic. Those facts are fundamentally inconsistent with the existence of a new emergency requiring immediate action.

That total failure of process produced deeply flawed substantive results. The designation exceeds the Secretary's statutory authority because it is not grounded in a genuine "supply chain risk." The Secretary's principal theory—that

3

Anthropic's safety guardrails give the company an "operational veto" over military operations—is factually unsupported. Indeed, it is foreclosed by one critical fact: under existing arrangements, once Claude is deployed in classified Department environments, Anthropic has no access to the model, no visibility into how it is used, and no technical means to disable, alter, or influence it.

The related claim that Anthropic is a "hostile party" with the "motive" to sabotage U.S. national security also lacks any factual support. It is contradicted by Anthropic's deep collaboration with the Department and intelligence community. And it is illogical: a real saboteur would have quietly accepted the Department's contract terms without objection and secretly subverted defense supply chains, rather than loudly and publicly holding firm to a contractual negotiating position.

The Secretary's designation likewise countermands § 4713's "less intrusive measures" requirement. Congress intended designations to be a last resort, not a first. Yet the Secretary rushed to impose the broadest designation possible, ignoring a host of more narrowly tailored alternatives, including using standard procurement tools to cut contractual ties with Anthropic.

Further, the Secretary's actions violated the Constitution. He denied Anthropic constitutional due process by impairing Anthropic's protected interests—including freedom from being branded a statutory national-security threat by the government—without any pre-designation process and based on only

conclusory invocations of exigency. And the Secretary violated the First Amendment by punishing Anthropic with a false and disparaging legal designation as an espionage or sabotage risk for exercising its right to speak publicly about AI safety, to advocate for AI usage restrictions, and to decline the Secretary's demand that the company abandon its deeply held principles or pay a price.

Anthropic's commitment to the United States, its government, and those who serve and defend our nation is core to its public-benefit mission and its responsibility as an American company. Anthropic appreciates, however, that if Anthropic and the Department cannot reach agreement about how to work together, then they should not work together. Much as Anthropic cannot (and does not) seek to use litigation to bridge the gap, the Department cannot stretch § 4713 beyond recognition—and past the point the Constitution permits—to retaliate against Anthropic for failing to come to terms and publicly defending its actions. The Court should hold the supply-chain risk designation unlawful.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 41 U.S.C. § 1327 because the Secretary took immediately effective covered procurement actions against Anthropic and Anthropic timely petitioned for review of those actions. Under 41 U.S.C. § 4713(k)(4), "covered procurement action" is a defined phrase that identifies four ways the Secretary may exclude a prospective or actual contractor from working

with the Department, whether as a prime or subcontractor. Before the Secretary may take any or all covered procurement actions under § 4713(a), he must make a supply-chain risk designation under § 4713(b).

On March 4, 2026, the Secretary notified Anthropic that he had determined Anthropic "presents a supply chain risk" and had decided to take "[a]ll" covered procurement actions with respect to "[a]ll" covered procurements as to "[a]ll" of Anthropic's products or services. App.72. Dated March 3, the notification was "effective immediately." App.73. A later-disclosed written determination, also dated March 3, confirms that the Secretary had designated Anthropic a supply-chain risk and had immediately exercised § 4713 authority to take all covered procurement actions the statute identifies. App.177-179; *see* App.77 (February 27 official social media post directing supply-chain risk designation).

Anthropic petitioned for review of those actions on March 9, 2026, well within 60 days after being notified of the Secretary's actions. 41 U.S.C. § 1327(b)(1)-(2). In ordering expedited merits briefing, the Court asked the parties to address two jurisdictional issues. *See* App.265. Anthropic respectfully submits that each is straightforward.

To start, the Secretary has in fact both "directed [and] taken specific covered procurement actions against Anthropic." App.265. By their plain terms, the Secretary's March 4 notice and the March 3 written determination were

6

immediately effective and they immediately directed all covered procurement actions the statute allows. In simple terms, this means that Anthropic is now blacklisted—*de facto* debarred—from existing and future prime and subcontracting opportunities with the Department. As the Secretary has put it, the "effect of that designation is that [Anthropic] may not provide its products or services to the Department and that Department contractors may not use [Anthropic's] products while working on Department contracts." Stay Opp'n 7 (Mar. 19, 2026).

Consistent with that understanding, a March 6 memorandum to senior Department leadership requires all Department components to "discontinue all use of [Anthropic's] products" and to remove Anthropic from all approved product and vendor lists within 180 days. App.80. Restrictions on use of Anthropic must be incorporated "into all current and future contracts" and all contracting officers and defense contractors must be in compliance within 180 days. *Id.* The Secretary has also cancelled a two-year arrangement with Anthropic worth up to $200 million. App.294.

For those same reasons, this Court does have "jurisdiction over Anthropic's petition under 41 U.S.C. § 1327." App.265. Based on his supply-chain risk designation under § 4713(b), the Secretary has imposed already-operative covered procurement actions that bar Anthropic from all existing or future, prime or

subcontracting opportunities with the Department. Anthropic's petition asks this Court to hold those actions unlawful. 41 U.S.C. § 1327(b).

## STATEMENT OF THE ISSUES

The issues presented are:

1.      Whether the Secretary's determination that Anthropic is a supply-chain risk under 41 U.S.C. § 4713, and his decision to dispense with statutory procedural requirements (including notice-and-rebuttal procedures), are arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or otherwise failed to comport with statutory requirements.

2.      Whether the Secretary violated the Fifth Amendment's Due Process Clause by designating Anthropic as a § 4713 supply-chain risk without notice or an opportunity to rebut the factual basis for the designation.

3.      Whether the Secretary retaliated against Anthropic in violation of the First Amendment by designating the company as a § 4713 supply-chain risk based on perceived "ideology" and "rhetoric," including public and private statements by its leadership on matters of profound public concern.

## STATUTES AND REGULATIONS

Pertinent provisions of the Supply Chain Security Act are reproduced in the addendum to this brief.

**STATEMENT OF THE CASE**

A.     **Legal Background**

1.     **The Supply Chain Security Act**

Congress enacted the Supply Chain Security Act to address a specific threat: that "hostile nation states and other bad actors" could "gain unprecedented access to sensitive and classified information via" federal information and communications technology supply chains. S. Rep. No. 115-408, at 2 (2018).

The provision of the Supply Chain Security Act at issue here is 41 U.S.C. § 4713. It authorizes the Secretary (and others) to take specified "covered procurement action[s]" to mitigate "supply chain risk" in the acquisition and use of a "covered article," such as software or information technology services. 41 U.S.C. § 4713(k)(2), (k)(4). Covered procurement actions include: excluding a "source" (that is, a contractor) from existing Department contracts, *id.* § 4713(k)(4)(A)-(B); determining that a contractor is not a "responsible source" and thus ineligible for prime contracts or subcontracts with the Department, *id.* § 4713(k)(4)(C); and excluding an entity from subcontracting, *id.* § 4713(k)(4)(D).

In addition to the authority in § 4713, the statute established the Federal Acquisition Security Council, an inter-agency council responsible for managing supply-chain risk across the government. 41 U.S.C. § 1322(a). As a practical matter, and because the Department of War is represented on the Council, a § 4713 designation by the Secretary could trigger an interagency process resulting in

"exclusion" or "removal" of a designated supply-chain risk across the federal government. *Id.* § 1323(c); *see id.* § 1323(a)(2) (providing for information-sharing across federal agencies).

The power to blacklist defense contractors is an extraordinary one. And the power to banish a contractor from all government supply chains even more so. Consequently, Congress built substantive and procedural safeguards into § 4713.

Substantively, § 4713 may be used only when "necessary to protect national security by reducing supply chain risk" and "less intrusive measures are not reasonably available" to reduce the risk. 41 U.S.C. § 4713(b)(3)(A)-(B). Congress defined "supply chain risk" narrowly, to capture surreptitious and intentionally hostile acts designed to disrupt critical supply chains. "[S]upply chain risk" thus means the risk that hostile actors will "sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate" covered articles, with the goal of "surveil[ing], deny[ing], disrupt[ing], or otherwise manipulat[ing]" the operation of those articles. *Id.* § 4713(k)(6).

The statutory text thus focuses on covert, hostile acts by anti-American actors. Two "recent examples" before Congress "underscored" the "need for th[e] legislation." S. Rep. No. 115-408, at 4. The first was AO Kaspersky Lab, a Russia-based software provider with alleged ties to Russian intelligence agencies that Congress had previously banned federal agencies from using because of a "'risk

10

that the Russian government … could capitalize on access provided by Kaspersky products to compromise'" critical national-security systems. *Id.* at 4-5. The second was Huawei Technologies Company and ZTE Corporation, two China-based telecommunications companies whose "services and equipment" were used "for nefarious purposes … by the Chinese government." *Id.* at 6.

Congress paired § 4713's substantive limits with strict procedural requirements. The Secretary may proceed with issuing a designation "only after": (1) obtaining a "joint recommendation" (including a risk assessment) from the Department's chief acquisition officer and chief information officer identifying a "significant supply chain risk," 41 U.S.C. § 4713(b)(1); (2) providing notice to the targeted entity of the recommendation and (barring special reasons not to) "[the] information that forms the basis for the recommendation," *id.* § 4713(b)(2)(A)-(B); (3) affording the targeted entity 30 days to "submit information and argument in opposition," *id.* § 4713(b)(2)(C); and (4) "making a determination in writing" that the substantive predicates described above are satisfied, *id.* § 4713(b)(3).

Congress created a single, cabined emergency exception from those procedures. If the Secretary "determines that an urgent national security interest requires the immediate exercise" of § 4713(a) authority, he may reorder—but not ignore—those required procedural steps. 41 U.S.C. § 4713(c). That exception

11

allows the Secretary to deviate from required procedures only "to the extent necessary to address such national security interest." *Id.* § 4713(c)(1).

Reflecting its narrow scope, § 4713 has never been used publicly. To Anthropic's knowledge, the Executive Branch has invoked the broader Supply Chain Security Act only once, against a Swiss company that Russian President Vladimir Putin's administration praised as "do[ing] a lot for" Russia and "pay[ing] their debts to the Motherland." App.159. That use of the Supply Chain Security Act to target a foreign company with ties to the Kremlin is the paradigmatic risk Congress intended to combat.

### 2. General Executive Branch Procurement Tools

Congress enacted § 4713 to allow the Executive Branch to address extraordinary and specific supply-chain risks. For other issues that might arise in procuring and managing government contracts, the Department and other executive agencies have broad statutory and regulatory authority. That authority includes:

- Terminating contracts for convenience when a contracting agency determines that termination is "in the Government's interest," 48 C.F.R. §§ 49.101(b), 52.212-4(l), 52.249-1–52.249-6.

- Terminating contracts "for cause" in the case of a breach, *id.* §§ 49.402-3, 52.212-4(m); *see also id.* §§ 42.1303, 52.242-15 (outlining stop-work authority).

- Directing changes "within the general scope" of a contract, including changes to subcontracting arrangements, *id.* § 52.243-4(a).

- Removing a subcontractor through a negotiated modification with a prime contractor, *id.* § 43.103(a).

- Declining to award contracts prospectively based on a determination that a contractor or subcontractor is not "responsible," including because of unsatisfactory "integrity and business ethics," *id.* §§ 9.103, 9.104-1(d); *see id.* § 9.104-4 (subcontractor responsibility).

- In extreme circumstances, pursuing debarment or suspension "for the causes" specified in procurement regulations, *id.* Part 9.4; *id.* § 9.402(b).

These authorities are accompanied by substantive and procedural safeguards. For example, "government contractors who face suspension or a long-term ban … from federal contracting are entitled to a host of procedural protections," including "pre-deprivation notice and a formalized process for opposing a proposed suspension or debarment." *Anthropic PBC v. U.S. Dep't of War*, 2026 WL 836842, at *7 (N.D. Cal. Mar. 26, 2026); *see* 48 C.F.R. §§ 9.406-3, 9.406-4, 9.407-3, 9.407-4; 48 C.F.R. App. H. Those protections help to ensure agencies "impose debarment only in order to protect the Government's proprietary interest and not for the purpose of punishment." *Robinson v. Cheney*, 876 F.2d 152, 160 (D.C. Cir. 1989); *accord* 48 C.F.R. § 9.402(b).

### B. Factual And Procedural Background

### 1. Anthropic's Mission To Advance AI Safety

Anthropic is a leading frontier AI developer whose flagship family of AI models is known as "Claude." Anthropic was founded as a public-benefit corporation—an entity that is "intended to produce a public benefit … and to

operate in a responsible and sustainable manner." 8 Del. Code § 362(a). Its founders established Anthropic based on a core belief that AI technologies should be developed and used for the long-term benefit of humanity; the company's guiding principle is that the most capable AI systems should be the safest and the most responsible. App.4-5. Anthropic and its leaders are prominent voices speaking publicly on AI safety and policy, App.21-22, and they "have supported state and federal legislation advancing those goals," App.5.

Claude is a large language model that interprets and responds to user prompts. In response to user inputs, it can reason, analyze, summarize, code, and create content. App.6-7. Through training on massive datasets, Claude can perform complex tasks that mimic human responses and actions in a fraction of the time humans would require. App.6. Claude may also be configured to do more than engage as a chatbot: Claude can behave "agentically" and take actions on behalf of a user such as retrieving information, undertaking actions online, and carrying out open-ended tasks. In some configurations, Claude can perform tasks with minimal ongoing user input, operating with a degree of autonomy. App.7.

Like all AI models, Claude can generate inaccurate or misguided outcomes, behave unpredictably, and be misused. App.7-8. One tool that Anthropic uses to help manage Claude's risks is the company's Usage Policy. The Usage Policy defines how Claude is allowed to be used, reflecting Anthropic's judgment on how

to strike an optimal balance between enabling beneficial uses of AI while mitigating potential harms. App.9-10. But the Usage Policy is just a contractual limitation. "Anthropic … has never attempted … to employ its Usage Policy to exert authority, control, or command over [its] customers, including the [Department]." App.37.

### 2. Anthropic's Commitment To National Security And Collaboration With The Department

Anthropic is "committed to defending the United States and defeating [the nation's] authoritarian adversaries." App.10. To that end, it has committed to making its AI tools available to defend the United States. App.11-13; *see* App.22-23; App.296-297.

Anthropic designed special "Claude Gov" models specifically for U.S. national-security customers. Those models serve the unique needs of national-security agencies "while maintaining Anthropic's unwavering commitment to safety and responsible AI development." App.140. Claude Gov models also include different safety guardrails from those accompanying standard Claude models. For example, Claude Gov models are trained for superior handling of classified materials compared to standard commercial versions of Claude, which may refuse to work with such sensitive matter based on ordinarily present guardrails. App.140-141.

Consistent with its national-security commitment, Anthropic has done significant work with the Department of War. Anthropic's partnership with the Department began in 2024 and included a 2025 two-year agreement worth up to $200 million. App.278-280, 294.

To ensure that Anthropic can support national-security work, Claude has received stringent security authorizations to handle sensitive federal data. Specifically, it received a high-security federal cloud authorization ("FedRAMP High") and authority to work on systems handling sensitive mission data in controlled environments (Department "Impact Level 4 and 5" workloads). App.35. And after an 18-month vetting process, the Department's Defense Counterintelligence and Security Agency granted Anthropic Top Secret facility and personnel clearances. *Id.* Based on the Department's collaborations with Anthropic, Department officials described Claude as "far and away the best [AI] model" and regularly praised Claude's capabilities. App.23; *see* App.13.

Importantly, once Claude is deployed to support military operations through a partner platform, "Anthropic does not have any ongoing access to models" and "cannot operate or access any classifiers, probes, or other runtime monitoring systems." App.277. In fact, "Anthropic does not have the ability to enforce the usage policy in Department operational deployments or direct visibility into how the model is being used." App.278. Thus, "as a practical matter, Anthropic is able

16

to influence the operation of its models with respect to the Department's uses *only prior* to operational deployment." App.278. And, thereafter, "every model is subject to a rigorous and multilayered testing, evaluation, and approval process by the government" before it is deployed. App.282.

### 3. The Department's About-Face With Respect To Anthropic's Usage Restrictions

Consistent with its foundational commitment to AI safety, and to ensure safe and reliable use, Anthropic has never offered any customer an AI model without a Usage Policy. App.9. When the Department began using Claude Gov models through Anthropic partner platforms, it operated subject to a Usage Policy—with a government-specific addendum—that broadly prohibited Claude's use in connection with lethal autonomous warfare and domestic mass surveillance, among other things. App.9, 11-13.

To Anthropic's knowledge, when the Department began using Claude Gov models, it "did not object" to Anthropic's usage restrictions, which included prohibitions on lethal autonomous warfare and mass domestic surveillance. App.13. The Department instead was "satisfied with [Anthropic's AI] models, embedded them into its operations, and expanded their usage." *Id.* Indeed, the contractual "usage restrictions were in place" when the "Defense Counterintelligence and Security Agency granted Anthropic a Top Secret facility

security clearance enabling it to provide support for classified national security projects, after an 18-month vetting process." *Anthropic*, 2026 WL 836842, at *3.

In September 2025, the government's position abruptly changed. When Anthropic and the Department began negotiating Claude's deployment on the Department's "GenAI.mil" platform, the Department insisted for the first time that it be allowed to use Claude for "all lawful uses." App.13-14.

Anthropic was willing to modify its usage restrictions to help address the Department's needs, subject to maintaining two explicit conditions: Claude could not be used for lethal autonomous warfare or mass surveillance of Americans. App.14, 23-25. Anthropic explained Claude was not safe for either use. In particular, it was not safe for lethal autonomous warfare given the stakes for human life if Claude made an error that contributed to the death of U.S. service members or civilians. And it was not safe for domestic mass surveillance given that current legal frameworks fail to account for what AI can do with enormous quantities of information about Americans. App.14-17. Removing those restrictions would therefore clash with "Anthropic's mission to advance the safe and beneficial development and use of AI." App.17-18.

During negotiations that occurred since September 2025, the Department never "raise[d] any concerns about Anthropic taking technical steps to disrupt the U.S. military." App.236. And at no point did Anthropic state that the company

18

wanted any "sort of approval role in the Department's operational decision chain." App.235-236. Instead, Dr. Dario Amodei, Anthropic's CEO and co-founder, told the Department that he was unaware of any instance in which Anthropic's usage restrictions have ever obstructed military operations. App.25. He nonetheless agreed that the Department should select what it viewed as the right vendor and that Anthropic would assist in an orderly offboarding if the Department chose another vendor. *Id.*

On February 24, 2026, Dr. Amodei traveled to Washington, D.C., to meet with Secretary Hegseth in person. At that meeting, Secretary Hegseth praised Claude's "exquisite capabilities." App.25. The Secretary "never stated that Anthropic's AI models were unsafe, much less subject to compromise by a foreign adversary." App.26. In fact, he stated that he "would love to work with" Anthropic. App.25-26. But he ended the meeting with an ultimatum: unless Anthropic agreed by February 27 to permit "all lawful uses," the Department would designate Anthropic a supply-chain risk or—paradoxically—commandeer Claude for Department use under the Defense Production Act. App.26.

In a public response on February 26, Dr. Amodei emphasized that "the Department of War, not private companies, makes military decisions." App.146. He also explained that "[i]t is the Department's prerogative to select contractors

most aligned with [its] vision." App.147. But he stated that Anthropic could not "in good conscience accede" to the Secretary's demands. *Id.*

### 4. The Department's Retaliation Against Anthropic

The President and the Secretary responded swiftly. On February 27, President Trump posted to TruthSocial, ordering agencies to "IMMEDIATELY CEASE" using Anthropic's technology, branding Anthropic as the "Radical Left," and threatening "civil and criminal consequences." App.153.

"In conjunction with the President's directive," the Secretary issued a decision on his official social media account about an hour later, which was "final" and "[e]ffective immediately." App.77. The decision singled out Anthropic's "ideology" and accused it of "sanctimonious rhetoric," "betrayal," and "corporate virtue-signaling." *Id.* The Secretary directed the Department to designate Anthropic a "Supply-Chain Risk to National Security" and purported to bar military "contractor[s], supplier[s], [and] partner[s]" from "any commercial activity with Anthropic." *Id.* At the same time, he mandated that "Anthropic ... continue to provide … its services for a period of no more than six months" to the military. *Id.*

Despite those directives, Anthropic continued negotiating with the Department to reach a mutually acceptable resolution. App.27-28. On March 4, the Department's chief negotiator (Under Secretary of War for Research and

Engineering Emil Michael) emailed Dr. Amodei, saying, "I think we are very close here," and "I hope this work[s]." App.241.

Later that day, Anthropic received a written "notice" (dated March 3) from the Secretary. App.72. It explained that the Secretary "has determined" that use of Anthropic's "products or services" "presents a supply chain risk" and that "use of the [§] 4713 authority to carry out covered procurement actions is necessary to protect national security." *Id.*; App.44. The supply-chain risk designation covered "all" of Anthropic's "products or services" that meet the relevant statutory definitions. App.72. And the Secretary invoked "[a]ll" covered procurement actions "described in § 4713(k)," "effective immediately." App.72-73. The notice provided no information or factual basis for the designation. Nor did it invoke § 4713(c)'s emergency exception.

When the Secretary provided notice of the § 4713 designation, he also provided notice of a designation under 10 U.S.C. § 3252—a Department-specific authority not subject to this Court's jurisdiction under 41 U.S.C. § 1327.

### 5. Anthropic's Litigation Against The Secretary

The Secretary's supply-chain risk designations, and his immediately effective covered procurement actions, harmed Anthropic irreparably. Anthropic accordingly filed two lawsuits seeking to hold those actions unlawful. Neither lawsuit seeks to force the Department to contract with Anthropic. Anthropic has

21

acknowledged the Department has the right to select and manage its contractual partners through ordinary procurement tools. Rather, each challenges abuse of supply-chain risk authority to publicly brand Anthropic a threat to national security and to punish Anthropic for speaking out publicly on the responsible use of AI.

a.    On March 9, Anthropic petitioned for review of the Secretary's § 4713 designation in this Court. It also filed an emergency motion for stay pending review or, in the alternative, expedited briefing.

On March 19—10 days after Anthropic filed its petition, hours before the Secretary's opposition was due, and 16 days after the designation—the Department first provided Anthropic the materials supplying the purported factual basis for the designation. App.224-232. Those materials included a previously undisclosed written designation by the Secretary (dated March 3), App.225; a joint recommendation from agency officials (also dated March 3), App.226-227; and an (undated) risk analysis memorandum prepared by Under Secretary Michael, App.228-231.

The March 3 determination purports to invoke § 4713(c)'s emergency exception, but contains no analysis of how that standard is satisfied. The entirety of the Secretary's explanation is: "I have determined that an urgent national security interest requires the immediate exercise of the authority in [§] 4713(a) pursuant to [§] 4713(c)." App.177. The accompanying joint recommendation asserts that

Anthropic's usage restrictions "introduce[] significant national security risks to the DoW's supply chain," including the risk that Claude "will be subject to manipulation" by Anthropic. App.178.

The Michael memorandum also focuses on Anthropic's usage restrictions. It claims that Anthropic "seeks to grant itself an operational veto" over military operations. App.181. It does not identify any factual support or explain why the Department "believed Anthropic has 'privileged access,' 'backdoors,' or can otherwise 'control' Claude after its delivery to DoW." *Anthropic*, 2026 WL 836842, at *8 (citing Michael memorandum); *see also* App.182. The memorandum singles out Anthropic's supposed "hostility in negotiations" as well as "public statements of Anthropic's CEO and others." App.181-182. And it claims that Anthropic is a "hostile party" that could "disable its technology" or "surreptitiously alter" Claude "in advance or in the middle of ongoing warfighting operations." App.181-183.

This Court denied a stay but granted expedited briefing, concluding that "Anthropic raises substantial challenges and will likely suffer some irreparable harm during the pendency of th[e] litigation." App.270.

b. In parallel, Anthropic sued in the Northern District of California, challenging the § 3252 designation as well as a secondary boycott ordered by the Secretary and the President's broader directive. The district court granted a

23

preliminary injunction. *Anthropic*, 2026 WL 836842, at \*25. The court also granted the government's unopposed "request for an administrative stay" to allow it to "seek an emergency, expedited stay from the court of appeals." *Id.* at \*24. The government noticed an appeal but has not sought a stay from the Ninth Circuit.

## SUMMARY OF ARGUMENT

I.      The Secretary's designation of Anthropic as a supply-chain risk is both procedurally and substantively unlawful. Congress enacted § 4713 to address sabotage risks to critical supply chains by hostile actors. It carefully cabined the exercise of that authority by imposing mutually reinforcing procedural protections and substantive standards. The Secretary defied those constraints.

Procedurally, the Secretary violated two clear-cut statutory requirements. He directed a supply-chain risk designation before receiving the statutorily required joint recommendation from agency officials. He also circumvented the statute's notice-and-rebuttal procedures, issuing the designation without providing Anthropic meaningful notice, the factual basis for the designation, or any opportunity to respond. In combination, these violations deprived the Secretary of information Congress deemed essential to informed decision-making and deprived Anthropic of its statutory right to be heard before being branded a national-security threat.

The Secretary's reliance on the statute's emergency exception cannot cure these violations. That exception, which must be narrowly construed under this Court's precedents, applies only when an urgent national-security interest requires dispensing with statutory procedures. But the Secretary offered only a conclusory assertion as to why compliance with statutory procedures would cause harm, not any reasoned explanation. Regardless, the record forecloses any asserted exigency. The Department has known about Anthropic's usage limitations for more than a year, and it previously accepted them. Negotiations over those limitations continued for months, including after the written § 4713 determination. And the Secretary ordered that Anthropic's technology remain in military use for up to six months. An agency cannot plausibly claim that a brief notice-and-rebuttal period would pose intolerable risk while tolerating the same asserted risk for half a year.

The Secretary's substantive violations of § 4713 flowed directly from those procedural violations, resulting in a written determination that is threadbare, unsupported, and unreasonable. The statute targets covert sabotage or similar surreptitious and malicious acts by hostile, anti-American actors. That paradigm fits foreign adversaries exploiting hidden access to surveil or disrupt critical U.S. technology systems. It does not remotely apply to a public dispute with an American company over important questions of AI safety.

The Secretary's attempt to recast a policy and contractual disagreement into a national-security threat stretches the statute past its breaking point. His central justification—that Anthropic is a saboteur that seeks and would make use of an alleged "operational veto" to disrupt military operations—has no basis in fact. Once deployed in secure Department environments, Anthropic has no access to its models, no visibility into their use, and no technical ability to alter or disable them. Nor can Anthropic push changes, introduce vulnerabilities, or interfere with operations. It could not veto Department uses even if it wanted to, and it has expressly disavowed any such role. Nor is there any defensible basis for the Secretary's accusation that Anthropic is a hostile actor seeking to disrupt U.S. interests. Indeed, Anthropic has been leading efforts to use AI to protect national-security interests. And the Secretary's own actions foreclose his assertion: it cannot be that Anthropic posed an immediate supply-chain risk while the Department was still negotiating a contractual compromise and simultaneously insisting on using Claude in critical military systems for six more months.

In addition, the Secretary failed to consider less intrusive measures, as § 4713 requires. He ignored an array of obvious, narrower alternatives to banishing Anthropic from the supply chain. For example, the Secretary could have used ordinary procurement tools to cancel existing contracts or decline to enter new ones. Or he could have limited the designation to Department contracts or projects

with some possible nexus to lethal autonomous warfare or mass surveillance of Americans. But the record reflects no meaningful engagement with any alternatives before he imposed the full range of sanctions authorized by § 4713.

II.     The § 4713 designation also violated Anthropic's Fifth Amendment right to due process. By publicly designating Anthropic a threat to national security, the Secretary deprived Anthropic of constitutionally protected liberty and property interests, including in its reputation and its ability to participate in any Department contracting or supply chains. Due process thus required that Anthropic be given notice of the factual basis and a meaningful opportunity to respond before the Secretary designated it a supply-chain risk. Anthropic received neither. And the Secretary's reliance on post-deprivation process is insufficient. Even in the national-security context, pre-deprivation notice and an opportunity to rebut the factual basis of such a designation remain the rule.

III.    Finally, the § 4713 designation violated the First Amendment by retaliating against Anthropic for constitutionally protected speech and petitioning activity. The record makes clear that the Secretary invoked § 4713 not to address a bona fide supply chain risk but to punish Anthropic for its speech and advocacy concerning AI safety and its refusal to abandon those views in negotiations. The Secretary responded to that protected activity with a sweeping, stigmatizing designation that would chill any person of ordinary firmness from speaking again.

The causal connection was explicit: indeed, the Secretary and the Department repeatedly tied the designation to Anthropic's "rhetoric," "ideology," and public stance. The First Amendment forbids the government from wielding extraordinary national-security authorities to punish expression, as it did here.

## STATEMENT OF STANDING

Anthropic has Article III standing. Article III's injury-in-fact requirement includes injury to "constitutional rights," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024), and the designation here violates Anthropic's First and Fifth Amendment rights, *e.g.*, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025). Deprivation of Anthropic's procedural rights is also an injury-in-fact, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013), as is injury to Anthropic's "reputation," *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003); *see* App.49-51. Finally, "a dollar of economic harm is … an injury-in-fact." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). That threshold is easily cleared here. App.62; App.269 ("Anthropic has documented some potentially significant financial losses[.]").

Anthropic's injuries are caused by the § 4713 designation and would be redressed by judicial relief. For procedural injuries, Anthropic need not show that the Secretary would change his mind; it is enough that required "procedural steps" were "connected to the substantive result." *Sugar Cane Growers Coop. of Fla. v.*

*Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). For remaining injuries, redressability is satisfied despite the § 3252 designation because relief here would be "a 'necessary first step on a path that could ultimately lead to relief fully redressing'" the injuries. *Duberry v. District of Columbia*, 924 F.3d 570, 583 (D.C. Cir. 2019); *see Capital Power Corp. v. FERC*, 156 F.4th 644, 650 (D.C. Cir. 2025).

## STANDARD OF REVIEW

The Supply Chain Security Act requires this Court to "hold unlawful" covered procurement actions based on § 4713 designations that are "in excess of statutory jurisdiction," "arbitrary [or] capricious," not supported in the record, "not in accord with procedures required by law," or "contrary to constitutional right." 41 U.S.C. § 1327(b)(2)(A)-(C). This Court reviews "*de novo*" the Department's statutory interpretation of § 4713. *United States Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024) (per curiam). Its review of "procedural compliance" with statutory requirements is *de novo* and "exacting." *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1048 (D.C. Cir. 1979). And it "review[s] constitutional challenges" "*de novo*." *National Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020).

Arbitrary-and-capricious review involves some deference, but agency actions must always be "'reasonable and reasonably explained.'" *Grayscale Invs.,*

*LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023). Although this Court "defer[s] to Executive Branch [national-security] judgments," *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022), "[n]ational-security concerns must not become a talisman used to ward off inconvenient claims," *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017), nor compel "abdication of the judicial role," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see also Ralls Corp. v. Committee on Foreign Inv. in U.S.*, 758 F.3d 296, 314 (D.C. Cir. 2014).

Finally, this Court's review is not confined to the administrative record, which the Secretary completed mere days ago. Section 1327 requires the Secretary to file a record, but Congress did not restrict judicial review to that record—as it knows how to do. *E.g.*, 8 U.S.C. § 1189(c)(2) ("[r]eview … shall be based solely upon the administrative record").[1] Extra-record evidence can be necessary where "procedural defaults" raise serious questions as to whether an agency "considered all relevant factors" or was presented with "both sides of the story." *Esch v. Yeutter*, 876 F.2d 976, 993 (D.C. Cir. 1989). That is certainly the case here, as this Court recognized in directing the parties to brief factual questions regarding how Claude operates once deployed to the Department. App.265.

---

[1]     Congress specified that one basis for challenging a designation is the absence of "substantial support in the administrative record," 41 U.S.C. § 1327(b)(2)(D), but it did not tie any other ground for challenging a designation to the administrative record. *Compare* 5 U.S.C. § 706.

**ARGUMENT**

**I.     THE § 4713 DESIGNATION DEFIES THE STATUTE'S PROCEDURAL AND SUBSTANTIVE REQUIREMENTS AND IS ARBITRARY AND CAPRICIOUS**

Congress constrained the Secretary's supply-chain risk designation authority both procedurally and substantively. Those requirements are mutually reinforcing. As in other contexts, § 4713's procedures help "'ensure the agency has all pertinent information before it when making a decision,'" *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014), promoting "'informed'" decisions and guarding against "'arbitrariness and irrationality,'" *New Jersey, Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *see also Old Dominion Dairy Prods., Inc. v. Secretary of Def.*, 631 F.2d 953, 968 (D.C. Cir. 1980).

Here, the Secretary flouted the statute's procedural requirements in a rush to impose a punitive supply-chain risk designation on Anthropic. The result was a factually unsupported, barely explained determination that branded Anthropic a national-security danger based on a contractual dispute implicating Anthropic's principles—not a genuine concern about sabotage or other covert malicious activity.

**A.     The Secretary Violated Clear-Cut Procedural Requirements And Failed To Qualify For The Statute's Emergency Exception**

1.     Congress established detailed, sequential procedures governing the exercise of § 4713 authority. Two are most relevant here.

First, the Secretary may invoke § 4713 "only after" he receives a "joint recommendation" from his chief acquisition and chief information officers—a recommendation that must include a "risk assessment" establishing "a significant supply chain risk." 41 U.S.C. § 4713(b)(1). Congress intended the provision to ensure that the Secretary would make supply-chain risk determinations based on the informed views of knowledgeable agency officials.

Second, the Secretary must provide "notice" of any "joint recommendation" to a recommended designee, along with "information that forms the basis for the recommendation," and he must allow 30 days for the intended designee to submit "information and arguments in opposition." 41 U.S.C. § 4713(b)(2). Only "after "considering any information submitted" by the designee may the Secretary "mak[e] a determination in writing" that the statute's standards are satisfied. *Id.* § 4713(b)(3). Congress intended this requirement to help ensure that such highly consequential decisions are based on a complete record, including factual information submitted by a prospective designee.

2.      The Secretary violated those clear-cut procedural requirements.

Start with the joint-recommendation requirement. The Secretary's February 27 official social media post "direct[ed] the Department of War to designate Anthropic a Supply-Chain Risk." App.77. That decision, he said, was "[e]ffective immediately" and "final." *Id.* But later-disclosed agency materials

32

establish that the Secretary did not receive a joint recommendation from statutorily authorized agency officials until March 3, App.177-179—four days *after* he had conclusively directed the designation. That is a "procedure conducted in inverse order from that contemplated" by Congress. *National Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C. Cir. 1978). Congress required a recommendation to inform the Secretary's decision—not to ratify it after the fact.

More fundamentally, the Secretary violated the statute's notice-and-rebuttal requirements. The Secretary has acknowledged that he did not provide "notice to [Anthropic]" of the supply-chain risk designation until "after issuing his [§ 4713] determination." Stay Opp'n 8. In fact, prior to the March 3 determination, the Secretary not only did not provide Anthropic required "notice," he did not provide Anthropic any "information … form[ing] the basis for the recommendation." 41 U.S.C. § 4713(b)(2). And he failed to provide Anthropic with a 30-day opportunity to submit "information and argument in opposition to the recommendation" before the designation became effective. *Id*. It was not until March 19—weeks after the March 3 written determination—that Anthropic received the joint recommendation, the determination itself, and other materials purporting to explain the designation. App.224-232.

That critical procedural violation deprived the Secretary of factual information that Anthropic would have provided that was necessary to an informed

decision, including facts regarding Anthropic's inability to exercise an operational veto over Claude. After-the-fact process does not remedy that problem. Congress structured the process "'to ensure that affected parties have an opportunity to … influence agency decisionmaking at an early stage'" *before* an agency's mind is made up. *New Jersey*, 626 F.2d at 1049. "[P]eople naturally tend to be more close-minded and defensive once they have made a 'final' determination." *National Tour Brokers*, 591 F.2d at 902.

3.　　The Secretary's two procedural violations are not excused by § 4713(c). That provision establishes an exception from otherwise-mandatory procedures, but only when "an urgent national security interest requires the immediate exercise" of § 4713 authority, 41 U.S.C. § 4713(c), and only "to the extent necessary to address such national security interest," *id.* § 4713(c)(1).

As an emergency exception, § 4713(c) should be "'narrowly construed and only reluctantly countenanced.'" *United States v. Ross*, 848 F.3d 1129, 1132 (D.C. Cir. 2017); *accord Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). Naturally read, the text and structure of § 4713 establish that the Secretary must point to more than purported interests underlying a § 4713 designation as the justification for abandoning the statute's pre-designation procedural requirements.

Textually, any deviation from § 4713's procedures must be directly tied to an exigency that creates a serious risk of harm from compliance with statutory

34

procedures. "[U]rgent" and "requires" are words of constraint, not flexibility. *E.g.*, *Merriam-Webster's Collegiate Dictionary* 1377 (11th ed. 2014) ("urgent" means "calling for immediate attention: PRESSING"); *id.* at 1058 ("require" means "to demand as necessary or essential: have a compelling need for"). And § 4713(c) specifies that the exception applies only "to the extent necessary to address" an "urgent national security interest."

In related contexts, this Court regularly requires true urgency—not just say-so—before blessing the invocation of an emergency exception. Most analogously, interpreting the APA's good-cause exception, this Court has repeatedly limited the exception to "'emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could … precipitate activity by affected parties that would harm the public welfare.'" *American Pub. Gas Ass'n v. Department of Energy*, 72 F.4th 1324, 1340 (D.C. Cir. 2023); *accord Chamber of Com. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006); *cf. Al-Fayed v. CIA*, 254 F.3d 300, 310-311 (D.C. Cir. 2001) (FOIA "urgency to inform" standard not satisfied without showing "exigency" and delayed FOIA response "would compromise a significant recognized interest").

If not limited to such "'emergency situations,'" § 4713(c) would become an "'escape clause'" from statutory requirements. *Utility Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001). And failure to construe the exception

narrowly risks clashing with constitutional due process protections, given that pre-deprivation process is the constitutional default. *E.g.*, *Esparraguera v. Department of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024); *see infra* pp.51-52.

Against that background, the Secretary's reliance on § 4713(c) is misplaced for at least two reasons. First, the Secretary's invocation of § 4713(c) is facially deficient because it does not reflect "the 'reasoned' explanation" required of agency action. *Environmental Health Tr. v. FCC*, 9 F.4th 893, 909 (D.C. Cir. 2021). The sum total of his explanation is: "I have determined that an urgent national security interest requires the immediate exercise of the authority in Section 4713(a) pursuant to Section 4713(c)." App.177. "[T]hat is not a reason; it is a conclusion." *Louisiana Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 400 (D.C. Cir. 2008) (per curiam). And this Court cannot conclude that the § 4713(c) emergency "exception applies simply because the agency says [it] should." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).

It is axiomatic that, in reviewing agency decisions, "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). Nothing in the Supply Chain Security Act departs from that background principle of administrative law. To the contrary: text and structure confirm that § 4713 is not a check-the-box exercise. Congress required the Secretary to issue a written determination justifying a

§ 4713 designation, 41 U.S.C. § 4713(b)(3); obligated him to provide a "description of the urgent national security interest" to Congress, *id.* § 4713(c)(2)(C), (D); and subjected those decisions to APA-like review, *id.* § 1327(b).

The statutory requirement that the Secretary's actions "'not be arbitrary and capricious includes a requirement that the [Secretary] adequately explain [the] result.'" *Dickson v. Secretary of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). And for this Court to exercise meaningful review, it "require[s] more than a result; [it] need[s] the agency's reasoning for that result." *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132 (D.C. Cir. 2007); *see also In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022). The Secretary's conclusory invocation of § 4713(c) accordingly cannot excuse his departure from statutory process.

Second, setting aside that failure of explanation, the "record is simply too scant" to establish "exigency" warranting bypassing statutory procedures. *Sorenson*, 755 F.3d at 707. In fact, the record forecloses any such claim.

The Department has been aware of Anthropic's usage limitations for more than a year. App.12-13. Until September 2025, the Department accepted those limitations. *Id.* Having later decided to reject the limitations, the Department has been negotiating with Anthropic over the issue for months. App.36. Indeed, negotiations continued even the day *after* the Secretary made a written § 4713

determination. App.241. Longstanding knowledge of the contractual usage restrictions and extended, ongoing negotiations over the same "bely any claim" of "a pressing need for immediate action" sufficient to discard statutory procedures. *Ross*, 848 F.3d at 1132.

Equally significant, the Secretary's mandate that Claude remain in military use for an up-to-six-month transition period, App.77, defeats any claim of special urgency. An agency cannot reasonably insist, on the one hand, that compliance with statutory procedures would cause pressing harm while, on the other hand, choosing to tolerate that asserted risk for half a year. That *six-month* offboarding timeline also contradicts any claim that adhering to a *one-month* notice-and-rebuttal period would create intolerable risk, especially because the Secretary has never claimed any intent—let alone an urgent one—to use Claude for lethal autonomous warfare or domestic mass surveillance.

In short, the Secretary appears to suggest his substantive rationales for the designation—insufficient on their own—also establish an "urgent national security interest." App.177. That cannot be right. Every § 4713 designation invokes "national security." 41 U.S.C. § 4713(b)(3)(A). Yet Congress established default procedures before designations may be imposed. If a generalized interest in a designation satisfied § 4713(c), the "exception [would] swallow the rule." *EPA v.*

*Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 644 (2025); *accord Pacific Gas & Elec. Co. v. FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024).

Courts and agencies alike "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994). A straightforward application of that principle requires the Court to set aside the Secretary's § 4713 designation because it is "not in accord with procedures required by law." 41 U.S.C. § 1327(b)(2)(E).

**B.** **The § 4713 Designation Is Substantively Unlawful Because The Secretary Identified No Actual Supply-Chain Risk And Failed To Consider Less Intrusive Measures**

**1.** **The Secretary Did Not Identify A Genuine Supply-Chain Risk Consistent With § 4713's Requirements**

a. Even in the national-security arena, "Congress rarely gives the [Executive Branch] a 'blank check.'" *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 715 (2026) (Kavanaugh, J., dissenting). Section 4713 is no exception. Congress did not design § 4713 to be an all-purpose procurement tool to manage relationships with actual or prospective contractors. It designed a narrow, powerful means of addressing defined "supply chain risks."

Statutory text compels the conclusion that Congress did not leave "supply chain risk" as an open-ended consideration for the Secretary's discretion. Instead, Congress limited the concept to circumstances where there is "significant" risk a

39

bad actor will "sabotage, maliciously introduce unwanted function, … or otherwise manipulate" technologies with the intent to "surveil, deny, disrupt, or otherwise manipulate" covered defense articles. 41 U.S.C. § 4713(b)(1), (k)(2), (k)(6). "[S]abotage," "malic[e]," and "manipulat[ion]" denote acts that are both intentional and surreptitious.[2] And the phrase "so as to surveil, deny, disrupt, or otherwise manipulate" underscores that the statute focuses on deliberate efforts to impair the operation of covered technology systems.

Context and historical practice reinforce the plain meaning of the text. Congress sought to ensure that "[h]ostile nation states and other bad actors" do not gain "access to sensitive and classified information." S. Rep. No. 115-408, at 2. The bad actors Congress had in mind were foreign companies working at the behest of foreign states, including the federal government's experience with a Russian software vendor and Chinese equipment manufacturers that had facilitated foreign espionage. *See supra* pp.10-11. Consistent with that understanding, the government has publicly used the Supply Chain Security Act only once—against a foreign company that Vladimir Putin's administration lauded as "do[ing] a lot for"

---

[2] *See Sabotage*, *Oxford English Dictionary* (3d ed. 2025) ("[T]o ruin, destroy, or disable deliberately and maliciously (frequently by indirect means)."); *Malice*, *Oxford English Dictionary* (3d ed. 2025) ("The intention or desire to do evil or cause injury to another person; active ill will or hatred."); *Manipulate*, *Oxford English Dictionary* (3d ed. 2025) ("To manage, control, or influence in a subtle, devious, or underhand manner").

Russia and "pay[ing] their debts to the Motherland." App.159. It has never been used against an American company—or any other company—so far as Anthropic is aware.

Section 4713 has no colorable application here. Debate between the Department and an American company over AI safety—even if contentious or passionate—does not make the company a supply-chain risk. The text targets covert, hostile acts, including sabotage, with the purpose of surveilling or disrupting the operation of military systems. Anthropic's disagreements with the Department about the AI safety usage restrictions were not covert. They were openly and publicly stated. And the Department's frustration with Anthropic over its commitment to those contractual limitations does not remotely mean Anthropic has engaged in—or would ever engage in—harmful acts designed to disrupt national-security operations.

There is no simply sound basis for "infer[ring] from Anthropic's forthright insistence on the usage restrictions that it would become a saboteur." *Anthropic*, 2026 WL 836842, at *18. If taking firm positions in negotiations were enough to label a company a saboteur, § 4713 would transform from a narrow tool into an unbounded authority. *Id.*

b.      The Secretary's attempt to recast a disagreement over AI safety limitations into a supply-chain risk designation pushes the statute past its breaking

point. His proffered rationales are neither "'reasonable [nor] reasonably explained.'" *Grayscale*, 82 F.4th at 1245. They are instead conclusory, threadbare, and unpersuasive.

The central justification reflected in the record is a remarkable claim: Anthropic's ex-ante, principle-based "restrictions" on Claude's use create the risk that *after* deploying Claude, Department systems will somehow be "subject to manipulation" by Anthropic "in such a manner as to inhibit DoW's use" of the systems. App.178. The Michael memorandum doubles down on this assertion, explaining that, "[b]y embedding unreasonably restrictive terms" in its contracts, "Anthropic seeks to grant itself an operational veto" over the Department that would allow Anthropic to "'deny, disrupt, or otherwise degrade'" covered systems and military operations. App.181. A newly submitted Michael declaration extends this claim by purporting to identify "ways in which Anthropic can affect the functionality of its models prior to delivery to DoW," App.410, and ways "Anthropic can continue to affect the functioning of its models" "[a]fter delivery to DoW," App.412.

None of this has any basis in fact. "Once a model is deployed inside a government-secure enclave, Anthropic has no ability to access, alter, or shut it down." App.287. It has "no back door or remote kill switch," and Anthropic "personnel cannot log into a Department system to modify or disable a running

model." *Id.* A deployed AI model is "static," meaning it "does not degrade or change on its own; and Anthropic cannot push undisclosed or unsanctioned changes to a model after the Department has deployed it." App.287-288. And before operational deployment by the Department, the government reviews an AI model in detail and independently evaluates it, including having the ability to directly test any aspect of the model's behavior. App.282-290. Plus, any "cleared Anthropic engineers" given access to a Department-deployed model, App.413, would be given that access solely by the Department—and solely to do the Department's bidding, subject to its oversight, App.292-293.

For those reasons, Anthropic could not "veto" particular Department uses of Claude even if it wanted to. App.237. And Anthropic does not want to. *Id.*; *see also* App.17. Indeed, to remove any possible doubt about this, Anthropic proposed contract language disavowing operational veto authority. App.237.

For similar reasons, accusations that Anthropic is a "hostile party" with the "motive, means, and opportunity" to "introduce … vulnerabilities" into Department systems are not merely unsupported—they are implausible and disproven. App.182. Again, Anthropic has no "means" or "opportunity" to introduce such vulnerabilities. Once a model is deployed, "Anthropic does not have any ongoing access to models" and "cannot operate or access any classifiers, probes, or other runtime monitoring systems." App.277.

And the accusation that Anthropic is a "hostile party" with a "motive" to disrupt U.S. military operations is illogical and wildly unsupported. App.182. It is illogical because, if Anthropic were genuinely intent on disrupting American military operations, it simply would have accepted the Department's contractual language and avoided being excluded from the defense supply chain. But that accusation is completely unfounded. Anthropic has proudly and publicly committed to advancing American national-security interests—including through deep, ongoing collaboration with the Department and other national-security agencies. App.10-12; *see also* App.22-23. And it has received security clearances and praise from national-security officials in connection with those efforts. App.10-12; App.22-23; App.52. In nevertheless labeling Anthropic a "hostile party" intent on sabotaging military operations based on nothing more than good-faith contractual disagreements, the memorandum substitutes overheated rhetoric for reasoned analysis.

Unsurprisingly, the Michael memorandum points to no actual attempt by Anthropic to disrupt military operations. Nor does it identify any plausible scenario in which Anthropic would want to do so or could do so. Without real-world evidence or even reasoned explanation supporting a sabotage claim, speculative assertions cannot possibly be enough to designate Anthropic a national-security threat. *See Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir.

1988) ("mere speculation" does not supply "adequate grounds to sustain an agency's action"); *accord Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994). Courts should be especially skeptical of such speculative assertions when an agency stakes out an extraordinary claim that an American company, and previous national-security partner, is a saboteur.

Indeed, the saboteur accusation is belied by the Department's own actions. As explained, the day after the Secretary made the § 4713 written determination, Under Secretary Michael responded to Anthropic's latest contractual offer with a revised counteroffer, saying, "I think we are very close here," and "I hope this work[s]." App.241. If the Department genuinely believed that Anthropic had a motive to maliciously disrupt military operations, continued negotiations over contractual terms would have been unthinkable. A six-month phaseout of military use of Claude would have been equally unfathomable—yet that is precisely what the Secretary ordered.

Such "unexplained inconsistencies" are evidence of "'arbitrary'" decisionmaking. *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59-60 (D.C. Cir. 2015). Taking the record before the Court as a whole, this is a case in which facts "tell[] a story that does not match the explanation the Secretary gave for his decision." *Department of Com. v. New York*, 588 U.S. 752, 784 (2019). "If judicial

review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.* at 785.

c. Stripped of the unfounded "operational veto" and "hostile party" theories, little is left of the Michael memorandum other than a grab-bag of risk factors common to all frontier AI models or labs. For example, a proffered concern about AI model "opacity," App.182; App.410, applies to "all" large language models, App.260-261. A stated concern with AI model "drift," App.182, also implicates all AI models, and misunderstands how Claude works once deployed by the Department, App.287-288. Similarly, concerns about Anthropic's employment of "foreign nationals," App.210-211, apply equally to many leading AI companies, App.262.

An even more fundamental flaw runs through each purported risk factor: The Department does not—and cannot—explain how the differences between Anthropic's contractual usage limitations and the Department's preferred "all lawful uses" language would mitigate any of the risk factors identified in the agency materials. For instance, if Anthropic were in fact a saboteur intent on disrupting the nation's military operations, or if the presence of foreign employees somehow posed a unique national-security risk, those concerns would exist irrespective of the particular AI usage terms in Anthropic's contracts with the government.

But there is no meaningful dispute that the parties' disagreement over contractual terms—not these other considerations—drove the supply-chain risk designation. In fact, the Secretary has said that "had Anthropic agreed to the Government's term, the challenged actions would not have occurred." Opp'n to Pl.'s Mot. for Prelim. Inj. 14, *Anthropic v. Department of War*, No. 3:26-cv-1996-RFL (N.D. Cal. Mar. 17, 2026), Dkt. 96. The absence of a "'rational connection'" between the sanction the Secretary imposed and the problems he identified reflects arbitrary decisionmaking. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 2. The Secretary Failed Reasonably To Consider Less Intrusive Measures, Including Narrower Procurement Actions And Operational Controls

Independently, the § 4713 designation is unlawful because the Secretary failed to identify, much less reasonably assess, "less intrusive measures" before imposing the designation. 41 U.S.C. § 4713(b)(3)(B).

Congress designed the "less intrusive measures" requirement to ensure that a supply-chain risk designation is a last resort and that the Secretary uses that extraordinary tool only when narrower, reasonably available options cannot mitigate a supply-chain risk. An agency generally has "'a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.'" *City of Brookings Mun. Tel. Co. v. FCC*, 822

F.2d 1153, 1169 (D.C. Cir. 1987). The statutory "less intrusive measures" requirement codifies that basic principle of reasoned decisionmaking.

But the record reflects no meaningful identification of alternatives or any reasoned explanation for rejecting such less intrusive measures. Several more targeted steps were readily available, including:

- Declining to award or renew prime contracts with Anthropic (or limiting awards to specific programs) and transitioning to alternative vendors, without issuing a broad designation.
- Addressing any asserted "operational veto" concern through targeted contracting or operational safeguards—such as acceptance criteria, mission-specific deployment constraints, or operational controls tied to specific uses—rather than a categorical contracting ban.
- Regulating downstream contractor or subcontractor use of Claude through tailored contract clauses (including restricting or conditioning particular sensitive use cases), instead of foreclosing use across "any" covered system and "all" covered procurements by all subcontractors.
- Narrowing any restriction to the subset of systems plausibly involving lethal autonomous warfare or domestic mass surveillance.

Any of those options would have addressed the Department's purported concerns—such as an alleged Anthropic "operational veto" over military operations—without branding Anthropic a supply-chain risk and imposing across-the-board procurement restrictions.

Where "Congress says" that consideration of "a factor is mandatory, that expresses" Congress's "judgment" the "factor is important" and one to which an agency must give reasoned consideration. *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004). The Secretary did not come

close to offering such a reasoned explanation here. He offered only conclusory assertions—full stop. *E.g.*, App.177. This Court has "'uniformly" "'revers[ed]'" agency actions for failure to "'consider obvious alternatives.'" *City of Brookings*, 822 F.2d at 1169. It should do the same here.

**II.   THE § 4713 DESIGNATION VIOLATED DUE PROCESS BY FAILING TO AFFORD ANTHROPIC NOTICE OF AND AN OPPORTUNITY TO REBUT THE FACTUAL BASIS FOR THE PROPOSED DESIGNATION**

The Court should also set aside the Secretary's § 4713 designation as "contrary to constitutional right," 41 U.S.C. § 1327(b)(2)(B), because it violated Anthropic's due process rights under the Fifth Amendment. To resolve a due process claim, courts ask (1) whether a person has been "deprived of a protected interest," and (2) "if so, what process" was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Those considerations establish a violation here.

The § 4713 designation impairs constitutionally protected liberty and property interests. By singling out Anthropic as a supply-chain risk, a threat to national security, and a saboteur, the Secretary has impaired Anthropic's liberty interest in its "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). When combined with concrete "legal consequence[s]," the foreseeable "reputational injuries" flowing from government findings of wrongdoing implicate liberty interests protected by the Due Process

Clause. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255 (2012); *see Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003).

In addition, the Secretary deprived Anthropic of protected interests by broadly banishing Anthropic as a contractor or subcontractor throughout the defense supply chain. By "formally or automatically exclud[ing]" Anthropic "from work on some category of future [government] contracts," the § 4713 designation operates as a *de facto* debarment, triggering due process protections. *Kartseva v. Department of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994); *see Old Dominion*, 631 F.2d at 955-956; *Anthropic*, 2026 WL 836842, at *15 (applying D.C. Circuit precedent). And by directing that contractors not use Claude in connection with Department projects, the designation also impairs protected property interests in Anthropic's contracts with commercial partners. *See Ralls*, 758 F.3d at 315-316.

Because the § 4713 designation impaired constitutionally protected interests, Anthropic had the "right to know the factual basis for the" Secretary's action and an "opportunity to rebut the evidence supporting that action." *Ralls*, 758 F.3d at 318. It is undisputed that the Secretary did not afford Anthropic those "essential components of due process." *Id.* In fact, Anthropic did not receive anything resembling a factual basis for the Secretary's designation until 16 days after the designation—and just hours before the Secretary's opposition to Anthropic's stay motion was due. App.224-232.

The Secretary is thus forced to argue that post-designation process was constitutionally sufficient. But it was not. Due process almost always requires notice and an opportunity to rebut the basis for adverse government action *before* it occurs, not *after*. *Ralls*, 758 F.3d at 320; *see Old Dominion*, 631 F.2d at 956 (notice-and-rebuttal must be provided "before adverse action is taken"). This Court's "cases are clear that, absent exigent circumstances not implicated here, the Due Process Clause 'requires … that the government provide notice and some kind of hearing before final deprivation of a property interest.'" *Esparraguera*, 101 F.4th at 40; *see generally Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

Even the Court's terrorist designation precedents reaffirm the "fundamental norm of due process" that "before the government can constitutionally deprive a person of the protected liberty or property interest, it must afford him notice and hearing." *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 205 (D.C. Cir. 2001); *see also People's Mojahedin Org. of Iran v. Department of State*, 613 F.3d 220, 227-228 (D.C. Cir. 2010) (per curiam) ("[D]ue process requires that the [potential designee] be notified of the unclassified material on which the Secretary proposed to rely and an opportunity to respond to that material *before* its redesignation."). If the Due Process Clause requires an entity to receive advance notice of the government's intent to designate it a foreign

terrorist organization, it surely requires a leading American company to receive notice of the factual basis for a supply-chain risk designation before the government brands it a national-security danger.

To be sure, post-deprivation process may sometimes satisfy constitutional standards, but only in "'extraordinary situations'" that "must be truly unusual." *Fuentes v. Shevin*, 407 U.S. 67, 90 (1972). Exceptions are rare precisely because "the right to prior notice and a hearing is central to the Constitution's command of due process." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993). For example, this Court has approved of post-deprivation process where there is a "substantial risk of asset flight" if pre-deprivation process is afforded. *Bello v. Gacki*, 94 F.4th 1067, 1075 (D.C. Cir. 2024). And it has imagined circumstances where "the possibility that alerting" a targeted entity of an "impending designation … might work harm" to national security. *National Council*, 251 F.3d at 208. Neither circumstance is presented here.

It is the Secretary's burden to "make a showing of particularized need," *National Council*, 251 F.3d at 208, to dispense with pre-deprivation process. He has not done so. To this day, he has not explained why it was necessary to deprive Anthropic of *any* notice and opportunity to be heard pre-designation. His claim of exigency is contradicted by the record. *See supra* pp.37-39. And national-security concerns in the abstract are insufficient to sidestep essential due process

protections. *See National Council*, 251 F.3d at 207-208 (rejecting argument that "foreign-policy/national-security nature" of decision "support[ed] the constitutional adequacy of a post-deprivation remedy").[3]

Even in the national-security arena, "lack of process constitutes a clear constitutional violation," regardless of whether "more process would have led to a different" outcome. *Ralls*, 758 F.3d at 320. In any event, the Secretary premised his designation here on multiple errors, including a mistaken and unsupported view that Anthropic sought or could carry out an operational veto. Had Anthropic been afforded constitutionally required due process, it would have been able to refute those errors. App.252-263; App.271-297.

### III. THE § 4713 DESIGNATION VIOLATED THE FIRST AMENDMENT BY RETALIATING AGAINST ANTHROPIC FOR CONSTITUTIONALLY PROTECTED EXPRESSION

Finally, the Secretary's abuse of § 4713 authority "to punish" Anthropic for "disfavored expression" violates the First Amendment. *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Unconstitutional retaliation occurs where (1) a person has engaged in "'conduct protected under the First Amendment'"; (2) the government takes "'retaliatory action sufficient to deter a person of ordinary

---

[3] Anthropic is not asserting a facial constitutional challenge to § 4713(c). It argues only that, in these circumstances, due process forecloses the Secretary from dispensing with pre-designation process. Even if § 4713(c)'s "urgent national security" standard was somehow satisfied as a statutory matter, that would not excuse the constitutional violation here.

firmness … from speaking again'"; and (3) "'a causal link'" ties "the exercise of a constitutional right and the adverse action." *Media Matters*, 138 F.4th at 584. Each element is satisfied here.

To be clear, the First Amendment does not entitle a prospective contractor to compel the government to award it a contract or to accept a contractor's preferred terms. Anthropic is not asking this Court for such relief. But the First Amendment does forbid the government from wielding national-security authorities to punish protected expression. That is what occurred here. The Secretary imposed an unprecedented, sweeping, and stigmatizing § 4713 designation on a domestic company because of protected expression on matters of urgent public importance. Worse, the Secretary penalized Anthropic not just for speaking but for the views that Anthropic expressed; such viewpoint-based discrimination is "'poison'" and "antithetical to a free society." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023).

***Protected expression.*** Anthropic engaged in constitutionally protected First Amendment activity when it advocated for the safe and responsible use of AI in public and in its discussions with the Department.

Since its founding, Anthropic has publicly advocated for AI safety, including by maintaining a Usage Policy that embodies the company's commitment to those goals, publishing essays and other public materials, and

54

supporting or opposing state and federal legislation. *E.g.*, App.4-5, 9-10; App.82-138. Anthropic and its leaders have frequently contributed to discourse on the subject. Dr. Amodei's public defense of Anthropic's position in this dispute is a recent example. He explained that Anthropic could not "in good conscience accede to" the Department's demands because the contemplated AI uses were "outside the bounds of what today's technology can safely and reliably do." App.146-147.

The dispute between Anthropic and the Department over AI safety exemplifies the First Amendment's marketplace of ideas in action. Both parties "publicly staked out their positions and engaged in a public debate about what deployments of Claude are currently unsafe and what rights Anthropic has to allow Claude's use by the government only with certain safety restrictions." *Anthropic*, 2026 WL 836842, at *12. Especially in the context of lethal autonomous warfare and mass surveillance of Americans, speech on the subject of AI safety addresses a "'matter[] of public concern'" that "'occupies the highest rung of the hierarchy of First Amendment values.'" *Snyder v. Phelps*, 562 U.S. 443, 451-452 (2011); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (First Amendment safeguards "uninhibited, robust, and wide-open" "debate on public issues").

That this debate took place against the backdrop of government contract negotiations does not strip First Amendment protection. In *Janus v. American Federation of State, County & Municipal Employees, Council 31*, the Supreme

Court squarely held that the "positions [a] union takes in collective bargaining" with a government are protected "speech" under the First Amendment. 585 U.S. 878, 884-885 (2018); *see also id.* at 893-894. *Janus* thus establishes that communicating views to the government, even in the context of contract negotiations, is speech entitled to First Amendment protection.

This Court need not decide whether all negotiations with the government qualify as protected expression. The negotiations here plainly do. For one thing, Anthropic is not a typical commercial entity; it is a public-benefit corporation whose charter, mission, and advocacy center on safe and responsible use of AI. *See supra* pp.13-14. The Supreme Court has recognized that "benefit corporation[s]" often pursue "altruistic objectives" and "mission[s]" rooted in "'ethical [and] moral … principles.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 701, 712-713 (2014). That is certainly true here. And *Janus* establishes that negotiations with the government involving "matter[s] of public … concern" receive First Amendment protection. 585 U.S. at 910-911. The Court explained, for example, that collective bargaining often "touches on fundamental questions" of "policy," and "controversial subjects" such as "climate change" and "sexual orientation and gender identity." *Id.* at 913. Anthropic's negotiations with the Secretary fit squarely within that framework.

Even if Anthropic's negotiations with the Secretary were conduct, not speech, the conduct was "'sufficiently imbued with elements of communication to fall within'" the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Anthropic certainly "intended" its advocacy "to be communicative." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984). Its negotiating stance, refusal to accede to the Secretary's demands, and public defense of those positions were intended to convey its foundational principles regarding AI safety. *E.g.*, App.146-147. And the "context" of the Secretary's actions demonstrates that he "understood" it to "be communicative." *Clark*, 468 U.S. at 294-295. He accused Anthropic of "sanctimonious rhetoric," App.77, and perceived "brand-building" and "marketing," App.182.

The Petition Clause reinforces the First Amendment's application here. "The right to petition is cut from the same cloth" as other First Amendment protections, *McDonald v. Smith*, 472 U.S. 479, 482 (1985), and "extends to" advocacy directed to "all departments of the Government," *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Anthropic's efforts to persuade the Secretary to adopt Anthropic's usage restrictions—based on firmly held views about AI safety—fall within this protection.

***Chilling effect.*** The § 4713 designation would chill a person of "'ordinary firmness'" from speaking again. *Media Matters*, 138 F.4th at 584. The Secretary is

a high-ranking member of the cabinet and the head of the Department of War. He publicly branded "Anthropic a Supply-Chain Risk to National Security." App.77. Anthropic is the first American company to have been so publicly designated. The scope of the designation is sweeping, as it immediately imposes all statutorily authorized covered procurement actions.

The "bar" for satisfying the ordinary-firmness inquiry is "not a high one," *Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025), *appeal pending*, No. 25-5265 (D.C. Cir.), and the circumstances here easily clear it. The First Amendment protects against "'an act of retaliation as trivial as failing to hold a birthday party for a public employee,'" *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994), or a mere investigation, press release, and civil investigative demand, *Media Matters*, 138 F.4th at 581. It thus surely applies to a § 4713 designation. Few would "feel free to disregard" such "threats" from the Secretary, who has significant power and "direct regulatory and enforcement authority." *Vullo*, 602 U.S. at 191-193; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

***Causal link.*** Finally, the "'causal link'" between the § 4713 designation and Anthropic's protected constitutional activity is undeniable. *Media Matters*, 138 F.4th at 584. The Secretary "expressly tied Anthropic's punishment to its attitude and rhetoric in the press." *Anthropic*, 2026 WL 836842, at *14. He directed the Department to designate Anthropic a supply-chain risk the day after Anthropic

publicly defended its Usage Policy. He accused Anthropic of "corporate virtue-signaling," "sanctimonious rhetoric," and "ideological whims," App.77. In other words, he left no need to guess about the causal linkage. *Cf. Jenner & Block*, 784 F. Supp. 3d at 95 (holding that the plain text of retaliatory executive order "leaves no question that there is *some* causal link").

The Michael memorandum confirms the linkage. That memorandum calls out unidentified "statements made" by Anthropic "during negotiations," App.181; Anthropic's "public[] spat" with the Department, App.182; unidentified "public statements of Anthropic's CEO and others associated with the company," *id.*; and Anthropic's perceived "brand-building" and "marketing," *id.* Michael's litigation declarations also single out Anthropic's discussions with the press. App.212; App.415-416. That is all constitutionally protected expression.

The disproportionality of the sanctions the Secretary imposed confirms the retaliatory motive. If the Secretary had wished only to reject Anthropic's contractual limitations, the Department "would presumably have just stopped using Claude." *Anthropic*, 2026 WL 836842, at *14. Branding Anthropic a supply-chain risk is so disproportionate to any ordinary procurement dispute that the only plausible explanation is the one evident from the record: the Secretary wanted to "make an example of Anthropic for its public stance on the weighty issues at stake in the contracting dispute." *Id.* at *11. Walking away from a contract with

Anthropic would have been permissible, as Anthropic has always said. Unlawfully designating the company a national-security danger and supply-chain risk is not.

## CONCLUSION

The Court should hold unlawful the Secretary's designation of Anthropic as a supply-chain risk and the resulting covered procurement actions.

Dated: April 22, 2026

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

Respectfully submitted.

*/s/ Kelly P. Dunbar*

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,890 words. I further certify that the foregoing brief has been prepared in proportionally spaced typeface using Microsoft Word for Office in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), I have relied upon the word count feature of this word processing system in preparing this certificate.

Dated: April 22, 2026

/s/ *Kelly P. Dunbar*
Kelly P. Dunbar

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Pursuant to Fed. R. App. P. 25(c)(2)(A), I further certify that the foregoing was served to all registered users by filing it with the Court's electronic filing system.

/s/ *Kelly P. Dunbar*
KELLY P. DUNBAR
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com

# ADDENDUM

# Statutory Provisions Relied Upon

**ADDENDUM**
**TABLE OF CONTENTS**

Page

Federal Acquisition Supply Chain Security Act of 2018, 132 Stat. 5178 (2018)

41 U.S.C. § 1322. Federal Acquisition Security Council establishment and membership................................................Add.1

41 U.S.C. § 1323. Functions and authorities. .......................................Add.3

41 U.S.C. § 1327. Judicial review procedures. .......................................Add.9

41 U.S.C. § 4713. Authorities relating to mitigating supply chain risks in the procurement of covered articles................................Add.12

**Federal Acquisition Supply Chain Security Act of 2018,**
**132 Stat. 5178 (2018)**

\*\*\*

**41 U.S.C. § 1322. Federal Acquisition Security Council establishment and membership.**

**(a) Establishment.**—There is established in the executive branch a Federal Acquisition Security Council.

**(b) Membership.**—

    **(1) In general.**—The following agencies shall be represented on the Council:

        **(A)** The Office of Management and Budget.

        **(B)** The General Services Administration.

        **(C)** The Department of Homeland Security, including the Cybersecurity and Infrastructure Security Agency.

        **(D)** The Office of the Director of National Intelligence, including the National Counterintelligence and Security Center.

        **(E)** The Department of Justice, including the Federal Bureau of Investigation.

        **(F)** The Department of Defense, including the National Security Agency.

        **(G)** The Department of Commerce, including the National Institute of Standards and Technology.

        **(H)** Such other executive agencies as determined by the Chairperson of the Council.

    **(2) Lead representatives.**—

        **(A) Designation.**—

**(i) In general.**—Not later than 45 days after the date of the enactment of the Federal Acquisition Supply Chain Security Act of 2018, the head of each agency represented on the Council shall designate a representative of that agency as the lead representative of the agency on the Council.

**(ii) Requirements.**—The representative of an agency designated under clause (i) shall have expertise in supply chain risk management, acquisitions, or information and communications technology.

**(B) Functions.**—The lead representative of an agency designated under subparagraph (A) shall ensure that appropriate personnel, including leadership and subject matter experts of the agency, are aware of the business of the Council.

**(c) Chairperson.**—

**(1) Designation.**—Not later than 45 days after the date of the enactment of the Federal Acquisition Supply Chain Security Act of 2018, the Director of the Office of Management and Budget shall designate a senior-level official from the Office of Management and Budget to serve as the Chairperson of the Council.

**(2) Functions.**—The Chairperson shall perform functions that include—

**(A)** subject to subsection (d), developing a schedule for meetings of the Council;

**(B)** designating executive agencies to be represented on the Council under subsection (b)(1)(H);

**(C)** in consultation with the lead representative of each agency represented on the Council, developing a charter for the Council; and

**(D)** not later than 7 days after completion of the charter, submitting the charter to the appropriate congressional committees and leadership.

**(d) Meetings.**—The Council shall meet not later than 60 days after the date of the enactment of the Federal Acquisition Supply Chain Security Act of 2018 and not less frequently than quarterly thereafter.

***

**41 U.S.C. § 1323. Functions and authorities.**

**(a) In general**.— The [Federal Acquisition Security] Council shall perform functions that include the following:

> **(1)** Identifying and recommending development by the National Institute of Standards and Technology of supply chain risk management standards, guidelines, and practices for executive agencies to use when assessing and developing mitigation strategies to address supply chain risks, particularly in the acquisition and use of covered articles under section 1326(a) of this title.
>
> **(2)** Identifying or developing criteria for sharing information with executive agencies, other Federal entities, and non-Federal entities with respect to supply chain risk, including information related to the exercise of authorities provided under this section and sections 1326 and 4713 of this title. At a minimum, such criteria shall address—
>
>> **(A)** the content to be shared;
>>
>> **(B)** the circumstances under which sharing is mandated or voluntary; and
>>
>> **(C)** the circumstances under which it is appropriate for an executive agency to rely on information made available through such sharing in exercising the responsibilities and authorities provided under this section and section 4713 of this title.
>
> **(3)** Identifying an appropriate executive agency to—
>
>> **(A)** accept information submitted by executive agencies based on the criteria established under paragraph (2);
>>
>> **(B)** facilitate the sharing of information received under subparagraph (A) to support supply chain risk analyses under section 1326 of this

Add.3

title, recommendations under this section, and covered procurement actions under section 4713 of this title;

**(C)** share with the Council information regarding covered procurement actions by executive agencies taken under section 4713 of this title; and

**(D)** inform the Council of orders issued under this section.

**(4)** Identifying, as appropriate, executive agencies to provide—

**(A)** shared services, such as support for making risk assessments, validation of products that may be suitable for acquisition, and mitigation activities; and

**(B)** common contract solutions to support supply chain risk management activities, such as subscription services or machine-learning-enhanced analysis applications to support informed decision making.

**(5)** Identifying and issuing guidance on additional steps that may be necessary to address supply chain risks arising in the course of executive agencies providing shared services, common contract solutions, acquisitions vehicles, or assisted acquisitions.

**(6)** Engaging with the private sector and other nongovernmental stakeholders in performing the functions described in paragraphs (1) and (2) and on issues relating to the management of supply chain risks posed by the acquisition of covered articles.

**(7)** Carrying out such other actions, as determined by the Council, that are necessary to reduce the supply chain risks posed by acquisitions and use of covered articles.

**(b) Program office and committees.**—The Council may establish a program office and any committees, working groups, or other constituent bodies the Council deems appropriate, in its sole and unreviewable discretion, to carry out its functions.

**(c) Authority for exclusion or removal orders.**—

Add.4

**(1) Criteria.**—To reduce supply chain risk, the Council shall establish criteria and procedures for—

> **(A)** recommending orders applicable to executive agencies requiring the exclusion of sources or covered articles from executive agency procurement actions (in this section referred to as "exclusion orders");

> **(B)** recommending orders applicable to executive agencies requiring the removal of covered articles from executive agency information systems (in this section referred to as "removal orders");

> **(C)** requesting and approving exceptions to an issued exclusion or removal order when warranted by circumstances, including alternative mitigation actions or other findings relating to the national interest, including national security reviews, national security investigations, or national security agreements; and

> **(D)** ensuring that recommended orders do not conflict with standards and guidelines issued under section 11331 of title 40 and that the Council consults with the Director of the National Institute of Standards and Technology regarding any recommended orders that would implement standards and guidelines developed by the National Institute of Standards and Technology.

**(2) Recommendations.**—The Council shall use the criteria established under paragraph (1), information made available under subsection (a)(3), and any other information the Council determines appropriate to issue recommendations, for application to executive agencies or any subset thereof, regarding the exclusion of sources or covered articles from any executive agency procurement action, including source selection and consent for a contractor to subcontract, or the removal of covered articles from executive agency information systems. Such recommendations shall include—

> **(A)** information necessary to positively identify the sources or covered articles recommended for exclusion or removal;

> **(B)** information regarding the scope and applicability of the recommended exclusion or removal order;

Add.5

**(C)** a summary of any risk assessment reviewed or conducted in support of the recommended exclusion or removal order;

**(D)** a summary of the basis for the recommendation, including a discussion of less intrusive measures that were considered and why such measures were not reasonably available to reduce supply chain risk;

**(E)** a description of the actions necessary to implement the recommended exclusion or removal order; and

**(F)** where practicable, in the Council's sole and unreviewable discretion, a description of mitigation steps that could be taken by the source that may result in the Council rescinding a recommendation.

**(3) Notice of recommendation and review.**—A notice of the Council's recommendation under paragraph (2) shall be issued to any source named in the recommendation advising—

**(A)** that a recommendation has been made;

**(B)** of the criteria the Council relied upon under paragraph (1) and, to the extent consistent with national security and law enforcement interests, of information that forms the basis for the recommendation;

**(C)** that, within 30 days after receipt of notice, the source may submit information and argument in opposition to the recommendation;

**(D)** of the procedures governing the review and possible issuance of an exclusion or removal order pursuant to paragraph (5); and

**(E)** where practicable, in the Council's sole and unreviewable discretion, a description of mitigation steps that could be taken by the source that may result in the Council rescinding the recommendation.

**(4) Confidentiality.**—Any notice issued to a source under paragraph (3) shall be kept confidential until—

**(A)** an exclusion or removal order is issued pursuant to paragraph (5); and

**(B)** the source has been notified pursuant to paragraph (6).

**(5) Exclusion and removal orders.**—

**(A) Order issuance.**—Recommendations of the Council under paragraph (2), together with any information submitted by a source under paragraph (3) related to such a recommendation, shall be reviewed by the following officials, who may issue exclusion and removal orders based upon such recommendations:

**(i)** The Secretary of Homeland Security, for exclusion and removal orders applicable to civilian agencies, to the extent not covered by clause (ii) or (iii).

**(ii)** The Secretary of Defense, for exclusion and removal orders applicable to the Department of Defense and national security systems other than sensitive compartmented information systems.

**(iii)** The Director of National Intelligence, for exclusion and removal orders applicable to the intelligence community and sensitive compartmented information systems, to the extent not covered by clause (ii).

**(B) Delegation.**—The officials identified in subparagraph (A) may not delegate any authority under this subparagraph to an official below the level one level below the Deputy Secretary or Principal Deputy Director, except that the Secretary of Defense may delegate authority for removal orders to the Commander of the United States Cyber Command, who may not redelegate such authority to an official below the level one level below the Deputy Commander.

**(C) Facilitation of exclusion orders.**—If officials identified under this paragraph from the Department of Homeland Security, the Department of Defense, and the Office of the Director of National Intelligence issue orders collectively resulting in a governmentwide exclusion, the Administrator for General Services and officials at other executive agencies responsible for management of the Federal Supply Schedules, governmentwide acquisition contracts and multi-agency contracts shall help facilitate implementation of such orders by

removing the covered articles or sources identified in the orders from such contracts.

**(D) Review of exclusion and removal orders.**—The officials identified under this paragraph shall review all exclusion and removal orders issued under subparagraph (A) not less frequently than annually pursuant to procedures established by the Council.

**(E) Rescission.**—Orders issued pursuant to subparagraph (A) may be rescinded by an authorized official from the relevant issuing agency.

**(6) Notifications.**—Upon issuance of an exclusion or removal order pursuant to paragraph (5)(A), the official identified under that paragraph who issued the order shall—

**(A)** notify any source named in the order of—

**(i)** the exclusion or removal order; and

**(ii)** to the extent consistent with national security and law enforcement interests, information that forms the basis for the order;

**(B)** provide classified or unclassified notice of the exclusion or removal order to the appropriate congressional committees and leadership; and

**(C)** provide the exclusion or removal order to the agency identified in subsection (a)(3).

**(7) Compliance.**—Executive agencies shall comply with exclusion and removal orders issued pursuant to paragraph (5).

**(d) Authority to request information.**—The Council may request such information from executive agencies as is necessary for the Council to carry out its functions.

**(e) Relationship to other councils.**—The Council shall consult and coordinate, as appropriate, with other relevant councils and interagency committees, including the Chief Information Officers Council, the Chief Acquisition Officers Council, the Federal Acquisition Regulatory Council, and the Committee on Foreign Investment

in the United States, with respect to supply chain risks posed by the acquisition and use of covered articles.

**(f) Rules of construction.**—Nothing in this section shall be construed—

> **(1)** to limit the authority of the Office of Federal Procurement Policy to carry out the responsibilities of that Office under any other provision of law; or

> **(2)** to authorize the issuance of an exclusion or removal order based solely on the fact of foreign ownership of a potential procurement source that is otherwise qualified to enter into procurement contracts with the Federal Government.

***

**41 U.S.C. § 1327. Judicial review procedures.**

**(a) In general.**—Except as provided in subsection (b) and chapter 71 of this title, and notwithstanding any other provision of law, an action taken under section 1323 or 4713 of this title, or any action taken by an executive agency to implement such an action, shall not be subject to administrative review or judicial review, including bid protests before the Government Accountability Office or in any Federal court.

**(b) Petitions.**—

> **(1) In general.**—Not later than 60 days after a party is notified of an exclusion or removal order under section 1323(c)(6) of this title or a covered procurement action under section 4713 of this title, the party may file a petition for judicial review in the United States Court of Appeals for the District of Columbia Circuit claiming that the issuance of the exclusion or removal order or covered procurement action is unlawful.

> **(2) Standard of review.**—The Court shall hold unlawful a covered action taken under sections 1323 or 4713 of this title, in response to a petition that the court finds to be—

>> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> **(B)** contrary to constitutional right, power, privilege, or immunity;

Add.9

**(C)** in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;

**(D)** lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (3); or

**(E)** not in accord with procedures required by law.

**(3) Exclusive jurisdiction.**—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over claims arising under sections 1323(c)(5) or 4713 of this title against the United States, any United States department or agency, or any component or official of any such department or agency, subject to review by the Supreme Court of the United States under section 1254 of title 28.

**(4) Administrative record and procedures.**—

    **(A) In general.**—The procedures described in this paragraph shall apply to the review of a petition under this section.

    **(B) Administrative record.**—

        **(i) Filing of record.**—The United States shall file with the court an administrative record, which shall consist of the information that the appropriate official relied upon in issuing an exclusion or removal order under section 1323(c)(5) or a covered procurement action under section 4713 of this title.

        **(ii) Unclassified, nonprivileged information.**—All unclassified information contained in the administrative record that is not otherwise privileged or subject to statutory protections shall be provided to the petitioner with appropriate protections for any privileged or confidential trade secrets and commercial or financial information.

        **(iii) In camera and ex parte.**—The following information may be included in the administrative record and shall be submitted only to the court ex parte and in camera:

            **(I)** Classified information.

Add.10

**(II)** Sensitive security information, as defined by section 1520.5 of title 49, Code of Federal Regulations.

**(III)** Privileged law enforcement information.

**(IV)** Information obtained or derived from any activity authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.), except that, with respect to such information, subsections (c), (e), (f), (g), and (h) of section 106 (50 U.S.C. 1806), subsections (d), (f), (g), (h), and (i) of section 305 (50 U.S.C. 1825), subsections (c), (e), (f), (g), and (h) of section 405 (50 U.S.C. 1845), and section 706 (50 U.S.C. 1881e) of that Act shall not apply.

**(V)** Information subject to privilege or protections under any other provision of law.

**(iv) Under seal.**—Any information that is part of the administrative record filed ex parte and in camera under clause (iii), or cited by the court in any decision, shall be treated by the court consistent with the provisions of this subparagraph and shall remain under seal and preserved in the records of the court to be made available consistent with the above provisions in the event of further proceedings. In no event shall such information be released to the petitioner or as part of the public record.

**(v) Return.**—After the expiration of the time to seek further review, or the conclusion of further proceedings, the court shall return the administrative record, including any and all copies, to the United States.

**(C) Exclusive remedy.**—A determination by the court under this subsection shall be the exclusive judicial remedy for any claim described in this section against the United States, any United States department or agency, or any component or official of any such department or agency.

**(D) Rule of construction.**—Nothing in this section shall be construed as limiting, superseding, or preventing the invocation of, any

privileges or defenses that are otherwise available at law or in equity to protect against the disclosure of information.

**(c) Definition.**—In this section, the term "classified information"—

**(1)** has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.); and

**(2)** includes—

**(A)** any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation to require protection against unauthorized disclosure for reasons of national security; and

**(B)** any restricted data, as defined in section 11 of the Atomic Energy Act of 1954 (42 U.S.C. 2014).

\*\*\*

**41 U.S.C. § 4713. Authorities relating to mitigating supply chain risks in the procurement of covered articles.**

**(a) Authority.**—Subject to subsection (b), the head of an executive agency may carry out a covered procurement action.

**(b) Determination and notification.**—Except as authorized by subsection (c) to address an urgent national security interest, the head of an executive agency may exercise the authority provided in subsection (a) only after—

**(1)** obtaining a joint recommendation, in unclassified or classified form, from the chief acquisition officer and the chief information officer of the agency, or officials performing similar functions in the case of executive agencies that do not have such officials, which includes a review of any risk assessment made available by the executive agency identified under section 1323(a)(3) of this title, that there is a significant supply chain risk in a covered procurement;

**(2)** providing notice of the joint recommendation described in paragraph (1) to any source named in the joint recommendation advising—

**(A)** that a recommendation is being considered or has been obtained;

**(B)** to the extent consistent with the national security and law enforcement interests, of information that forms the basis for the recommendation;

**(C)** that, within 30 days after receipt of the notice, the source may submit information and argument in opposition to the recommendation; and

**(D)** of the procedures governing the consideration of the submission and the possible exercise of the authority provided in subsection (a);

**(3)** making a determination in writing, in unclassified or classified form, after considering any information submitted by a source under paragraph (2) and in consultation with the chief information security officer of the agency, that—

**(A)** use of the authority under subsection (a) is necessary to protect national security by reducing supply chain risk;

**(B)** less intrusive measures are not reasonably available to reduce such supply chain risk; and

**(C)** the use of such authorities will apply to a single covered procurement or a class of covered procurements, and otherwise specifies the scope of the determination; and

**(4)** providing a classified or unclassified notice of the determination made under paragraph (3) to the appropriate congressional committees and leadership that includes—

**(A)** the joint recommendation described in paragraph (1);

**(B)** a summary of any risk assessment reviewed in support of the joint recommendation required by paragraph (1); and

**(C)** a summary of the basis for the determination, including a discussion of less intrusive measures that were considered and why such measures were not reasonably available to reduce supply chain risk.

Add.13

**(c) Procedures to address urgent national security interests.**—In any case in which the head of an executive agency determines that an urgent national security interest requires the immediate exercise of the authority provided in subsection (a), the head of the agency—

    **(1)** may, to the extent necessary to address such national security interest, and subject to the conditions in paragraph (2)—

        **(A)** temporarily delay the notice required by subsection (b)(2);

        **(B)** make the determination required by subsection (b)(3), regardless of whether the notice required by subsection (b)(2) has been provided or whether the notified source has submitted any information in response to such notice;

        **(C)** temporarily delay the notice required by subsection (b)(4); and

        **(D)** exercise the authority provided in subsection (a) in accordance with such determination within 60 calendar days after the day the determination is made; and

    **(2)** shall take actions necessary to comply with all requirements of subsection (b) as soon as practicable after addressing the urgent national security interest, including—

        **(A)** providing the notice required by subsection (b)(2);

        **(B)** promptly considering any information submitted by the source in response to such notice, and making any appropriate modifications to the determination based on such information;

        **(C)** providing the notice required by subsection (b)(4), including a description of the urgent national security interest, and any modifications to the determination made in accordance with subparagraph (B); and

        **(D)** providing notice to the appropriate congressional committees and leadership within 7 calendar days of the covered procurement actions taken under this section.

**(d) Confidentiality.**—The notice required by subsection (b)(2) shall be kept confidential until a determination with respect to a covered procurement action has been made pursuant to subsection (b)(3).

**(e) Delegation.**—The head of an executive agency may not delegate the authority provided in subsection (a) or the responsibility identified in subsection (f) to an official below the level one level below the Deputy Secretary or Principal Deputy Director.

**(f) Annual review of determinations.**—The head of an executive agency shall conduct an annual review of all determinations made by such head under subsection (b) and promptly amend any covered procurement action as appropriate.

**(g) Regulations.**—The Federal Acquisition Regulatory Council shall prescribe such regulations as may be necessary to carry out this section.

**(h) Reports required.**—Not less frequently than annually, the head of each executive agency that exercised the authority provided in subsection (a) or (c) during the preceding 12-month period shall submit to the appropriate congressional committees and leadership a report summarizing the actions taken by the agency under this section during that 12-month period.

**(i) Rule of construction.**—Nothing in this section shall be construed to authorize the head of an executive agency to carry out a covered procurement action based solely on the fact of foreign ownership of a potential procurement source that is otherwise qualified to enter into procurement contracts with the Federal Government.

**(j) Termination.**—The authority provided under subsection (a) shall terminate on December 31, 2033.

**(k) Definitions.**—In this section:

> **(1) Appropriate congressional committees and leadership.**—The term "appropriate congressional committees and leadership" means—
>
>> **(A)** the Committee on Homeland Security and Governmental Affairs, the Committee on the Judiciary, the Committee on Appropriations, the Committee on Armed Services, the Committee on Commerce, Science, and Transportation, the Select Committee on Intelligence, and the majority and minority leader of the Senate; and

**(B)** the Committee on Oversight and Government Reform, the Committee on the Judiciary, the Committee on Appropriations, the Committee on Homeland Security, the Committee on Armed Services, the Committee on Energy and Commerce, the Permanent Select Committee on Intelligence, and the Speaker and minority leader of the House of Representatives.

**(2) Covered article.**—The term "covered article" means—

**(A)** information technology, as defined in section 11101 of title 40, including cloud computing services of all types;

**(B)** telecommunications equipment or telecommunications service, as those terms are defined in section 3 of the Communications Act of 1934 (47 U.S.C. 153);

**(C)** the processing of information on a Federal or non-Federal information system, subject to the requirements of the Controlled Unclassified Information program; or

**(D)** hardware, systems, devices, software, or services that include embedded or incidental information technology.

**(3) Covered procurement.**—The term "covered procurement" means—

**(A)** a source selection for a covered article involving either a performance specification, as provided in subsection (a)(3)(B) of section 3306 of this title, or an evaluation factor, as provided in subsection (b)(1)(A) of such section, relating to a supply chain risk, or where supply chain risk considerations are included in the agency's determination of whether a source is a responsible source as defined in section 113 of this title;

**(B)** the consideration of proposals for and issuance of a task or delivery order for a covered article, as provided in section 4106(d)(3) of this title, where the task or delivery order contract includes a contract clause establishing a requirement relating to a supply chain risk;

**(C)** any contract action involving a contract for a covered article where the contract includes a clause establishing requirements relating to a supply chain risk; or

**(D)** any other procurement in a category of procurements determined appropriate by the Federal Acquisition Regulatory Council, with the advice of the Federal Acquisition Security Council.

**(4) Covered procurement action.**—The term "covered procurement action" means any of the following actions, if the action takes place in the course of conducting a covered procurement:

**(A)** The exclusion of a source that fails to meet qualification requirements established under section 3311 of this title for the purpose of reducing supply chain risk in the acquisition or use of covered articles.

**(B)** The exclusion of a source that fails to achieve an acceptable rating with regard to an evaluation factor providing for the consideration of supply chain risk in the evaluation of proposals for the award of a contract or the issuance of a task or delivery order.

**(C)** The determination that a source is not a responsible source as defined in section 113 of this title based on considerations of supply chain risk.

**(D)** The decision to withhold consent for a contractor to subcontract with a particular source or to direct a contractor to exclude a particular source from consideration for a subcontract under the contract.

**(5) Information and communications technology.**—The term "information and communications technology" means—

**(A)** information technology, as defined in section 11101 of title 40;

**(B)** information systems, as defined in section 3502 of title 44; and

**(C)** telecommunications equipment and telecommunications services, as those terms are defined in section 3 of the Communications Act of 1934 (47 U.S.C. 153).

Add.17

**(6) Supply chain risk.**—The term "supply chain risk" means the risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate the design, integrity, manufacturing, production, distribution, installation, operation, maintenance, disposition, or retirement of covered articles so as to surveil, deny, disrupt, or otherwise manipulate the function, use, or operation of the covered articles or information stored or transmitted on the covered articles.

**(7) Executive agency.**—Notwithstanding section 3101(c)(1), this section applies to the Department of Defense, the Coast Guard, and the National Aeronautics and Space Administration.