# IN THE UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, *et al.*,

*Respondents.*

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## BRIEF OF FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY AS *AMICI CURIAE* IN SUPPORT OF PETITIONER

Matthew Klapper
Anjali Motgi
Elizabeth Deutsch
Nikita Lalwani
Andrew Cherry
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
mklapper@jenner.com
amotgi@jenner.com
edeutsch@jenner.com
nlalwani@jenner.com
acherry@jenner.com

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici*.** Except for the *amici* represented in this brief, all parties, intervenors, and *amici* appearing before this court are listed at Add.1 of the Addendum filed in conjunction with Petitioner's emergency stay motion, or have been disclosed by other *amici* to date.

**Action Under Review.** References to the actions at issue appear in Petitioner Anthropic PBC's ("Anthropic") Petition for Review, emergency stay motion, and associated exhibits.

**Related Cases.** This case has not previously been before this Court, any other United States court of appeals, or any other court in the District of Columbia. Anthropic has separately challenged its designation as a supply chain risk under 10 U.S.C. § 3252 in *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-01996 (N.D. Cal. filed Mar. 9, 2026).

Dated: April 22, 2026

/s/ Matthew B. Klapper

Matthew B. Klapper

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and Circuit Rules 26.1 and 28(a)(1)(A), *amici curiae* provide the following disclosures: Former Secretary of Defense Leon Panetta is an individual and has nothing to disclose. The Institute for Security and Technology is an association, nonprofit organization, or other similar entity that has no parent company and in which no publicly held company has a 10% or greater ownership interest.

## STATEMENT REGARDING CONSENT TO FILE

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* states that counsel for all parties have consented to the filing of this brief.

**CERTIFICATE OF SEPARATE BRIEF**

Pursuant to Circuit Rule 29(d), a separate brief from *amici* former Secretary of Defense Leon Panetta and the Institute for Security and Technology ("IST") is necessary. Secretary Panetta is deeply committed to the institutional integrity and long-term credibility of the Department of War ("Department") he previously directed and to the appropriate exercise of the Department's authorities, particularly in response to real or perceived threats to national security. IST shares a related and profound commitment to technological advancement that furthers national security and global stability, and is uniquely engaged with research and policy that facilitates the development of technologies that are neither exploitative nor untrustworthy. *Amici* are thus best situated to contextualize the adverse impact on the Department of pretextual and inappropriate use of authorities reserved for only the most extraordinary threats to national security, as well as the profoundly destabilizing impact on the American AI ecosystem and the global AI race that this particular pretextual use of such authorities is likely to have.

To *amici*'s knowledge, no other *amicus* has filed or plans to file a brief sharing similar perspectives or based on similar experience and expertise. Any overlap between this and other *amicus* briefs is thus unlikely. By filing a separate brief, *amici* are able to present their views in a clear, concise, and timely manner. Accordingly, *amici* believe that a separate brief is justified and will serve the Court.

Dated: April 22, 2026

/s/ Matthew B. Klapper

Matthew B. Klapper

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES ...................i

CORPORATE DISCLOSURE STATEMENT ......................................................ii

STATEMENT REGARDING CONSENT TO FILE ...........................................iii

CERTIFICATE OF SEPARATE BRIEF ..........................................................iv

TABLE OF AUTHORITIES ...........................................................................vii

IDENTITIES AND INTERESTS OF *AMICI CURIAE* .........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................3

ARGUMENT ..................................................................................................4

I.     The Department's Supply Chain Risk Designation Was Unjustified and Undermines Its Credibility. .................................................................4

     a.     The Department's Designation of Anthropic Was Pretextual, and Far Exceeded What Was Necessary to Address the Supposed Threat.........................................................................5

     b.     Pretextual Use of this Significant Authority Undermines the Credibility of the Department With Industry and the Public.............12

II.     Improper Designation of Anthropic as a Supply Chain Risk Threatens the U.S.'s Military and Economic Advantage at a Pivotal Moment in U.S.–China Technological Competition...................................16

CONCLUSION ..............................................................................................20

# TABLE OF AUTHORITIES[*]

CASES

*Anthropic PBC v. United States Department of War*, __ F. Supp. 3d __, 2026 WL 836842 (N.D. Cal. Mar. 26, 2026), *appeal docketed*, No. 26-2011 (9th Cir. Apr. 2, 2026)................................................................6

*Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022)..........................................................................................10

*Greer v. Spock*, 424 U.S. 828 (1976)......................................................12

*Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940)..................................10

STATUTES

*41 U.S.C § 4713..................................................................................3, 4

*41 U.S.C. § 4713(b)(3)(B).....................................................................11

*41 U.S.C. § 4713(k)(6).......................................................................5, 6

Federal Acquisition Supply Chain Security Act of 2018, Pub. L. No. 115-390, tit. II, 132 Stat. 5173, 5178...............................................6

LEGISLATIVE MATERIALS

*Evolving Threats to the Homeland: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 115th Cong. (2018).................. 13-14

S. Rep. No. 115-408 (2018)......................................................................7

OTHER AUTHORITIES

48 C.F.R. § 9.103.....................................................................................9

48 C.F.R. § 9.104-1(d).............................................................................9

48 C.F.R. § 9.104-4.................................................................................9

48 C.F.R. § 9.402(b)................................................................................9

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

48 C.F.R. § 42.1303 ......................................................................8

48 C.F.R. § 49.101(b).....................................................................8

48 C.F.R. § 49.402-3 ......................................................................8

48 C.F.R. § 52.212-4(m) .................................................................8

48 C.F.R. § 52.242-15 .....................................................................8

48 C.F.R. § 52.243-4 .......................................................................8

48 C.F.R. § 52.249-1–52.249-6.........................................................8

*2025 Reagan National Defense Survey*, Ronald Regan Inst. (Nov. 2025), https://www.reaganfoundation.org/reagan-institute/centers/ peace-through-strength/survey/2025-reagan-national-defense-survey...........................................................................................13

Dean Ball, *Clawed*, Hyperdimensional (Mar. 2, 2026), https://www. hyperdimensional.co/p/clawed........................................... 19-20

Jake Bleiberg & Margi Murphy, *White House Works to Give US Agencies Anthropic Mythos AI*, Bloomberg (Apr. 16, 2026) ...........................6

Robert Brodsky, *GAO: Major defense contracts cheaper to cancel than continue*, Gov't Exec. (Mar. 19, 2008), https://www.govexec. com/defense/2008/03/air-force-to-perform-first-supersonic-flight-using-synthetic-fuel-blend/26518/.................................................10

Nicholas Carlini et al., *Assessing Claude Mythos Preview's Cybersecurity Capabilities*, Anthropic Red Team (Apr. 7, 2026), https://red.anthropic.com/2026/mythos-preview/ ...........................15

Kyle Chan et al., *Full Stack: China's Evolving Industrial Policy for AI*, RAND (June 26, 2025)....................................................................17

Pablo Chavez, *The Sovereignty Gap in U.S. AI Statecraft*, Lawfare (Feb. 16, 2026), https://www.lawfaremedia.org/article/the-sovereignty-gap-in-u.s.-ai-statecraft.................................................19

Kate Conger & David E. Sanger, *Pentagon Cancels a Disputed $10 Billion Technology Contract*, N.Y. Times (July 6, 2021), https://www.nytimes.com/2021/07/06/technology/JEDI-contract-cancelled.html.................................................................................10

*Leon Panetta*, Panetta Institute, https://www.panettainstitute.org/about-us/institute-people/leon-panetta/.........................................................................................1

Luke Emberson, *Chinese AI Models Have Lagged the US Frontier by 7 Months On Average Since 2023*, Epoch AI (Jan. 2, 2026)............................18

Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026), https://www.reuters.com/business/retail-consumer/big-tech-group-tells-pentagons-hegseth-they-are-concerned-about-declaring-2026-03-04..............................14

Pete Hegseth (@SecWar), X (Feb. 27, 2026), https://x.com/SecWar/status/2027507717469049070 (Pet. for Review at 1a)..............................................................................8

Fatima Faisal Khan, *The Missing Middle*, Inst. for Sec. + Tech. (Oct. 2025)......................................................................................18

*Our Evaluation of Claude Mythos Preview's Cyber Capabilities*, UK AI Sec. Inst.: Blog (Apr. 13, 2026), https://www.aisi.gov.uk/blog/our-evaluation-of-claude-mythos-previews-cyber-capabilities............ 15-16, 17

John Sakellariadis & Brendan Bordelon, *Federal Agencies Skirt Trump's Anthropic Ban to Test its Advanced AI Model*, Politico (Apr. 14, 2026) ..............................................................11

Scott Singer & Matt Sheehan, *China's AI Policy At The Crossroads: Balancing Development and Control in the DeepSeek Era*, Carnegie Endowment for Int'l Peace (July 17, 2025)..............................18

Mike Stone et al., *Hegseth Wants Pentagon to Dump Anthropic's Claude, But Military Users Say It's Not So Easy*, Reuters (Mar. 19, 2026), https://www.reuters.com/business/hegseth-wants-pentagon-dump-anthropics-claude-military-users-say-its-not-so-easy-2026-03-19/..............................................................................15

*To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks (Sept. 6, 2022)................................................................................12

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195 (Pet'r's Emergency Mot. for a Stay Pending Review at Add.170) ..................................................................... 7-8

Nick Wakeman, *Pentagon Hits Accenture, Booz Allen and Deloitte With Contract Cancellations*, Wash. Tech. (Apr. 11, 2025), https://www.washingtontechnology.com/contracts/2025/04/pentagon-hits-accenture-booz-allen-and-deloitte-contract-cancellations/404500/................................................................9

# IDENTITIES AND INTERESTS OF *AMICI CURIAE*[1]

*Amici* have a strong interest in this case that lies at the intersection of significant civilian military authorities and technological advancements, national security, and global stability. They submit this brief to provide the Court with the views and expertise of a former leader of the Department of War ("Department"), and researchers who work to unite policymakers, technology experts, and industry leaders behind the development of trustworthy, non-exploitative, and non-negligent technologies.

*Amicus* former Secretary of Defense Leon Panetta[2] has directed the Nation's military through numerous armed conflicts and has managed countless relationships between the government and the private sector that have materially enhanced American military capabilities. Secretary Panetta helped shepherd emerging technologies into appropriate use and deployment by the Armed Forces and appreciates how essential it is to maintain the trust and cooperation of the private sector partners on whom the Department depends. He understands, through direct experience, the gravity and responsibility of deploying the Department's most severe sanctions, including those designed to address threats to national security, and he is

---

[1] No counsel for any party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

[2] A brief biography of Secretary Panetta can be found at *Leon Panetta*, Panetta Institute, https://www.panettainstitute.org/about-us/institute-people/leon-panetta/.

uniquely positioned to speak to the need to do so in a manner that protects the credibility of the Department in the eyes of industry and the American public.

*Amicus* the Institute for Security and Technology ("IST") is a critical action think tank dedicated to the development of trustworthy technologies that advance national security and global stability, and the study of policy that fosters such technological development and builds trust between industry, civic leaders, technology experts, and government. IST has been especially focused on the impact of the American developers of Artificial Intelligence ("AI") on global stability, and the interaction between those developers and government actors. Through its research, IST has developed a special expertise in AI security and the need to maintain American leadership in AI over China.

*Amici* understand that the government safeguards national security while private industry drives technological innovation—innovation that, in turn, drives American economic and national security. They are profoundly committed to the appropriate deployment of the authorities of the Department in a manner that serves U.S. national security, as well as the need to ensure that advancements in technology – particularly in AI – also advance national security and global stability. *Amici* submit this brief to provide the Court with the perspective of a Department leader charged with safeguarding both national security and the institutional integrity and long-term credibility of the United States military, and of a group dedicated to

2

seizing the opportunities and mitigating the potential harms of technology's impact on national security, global stability, and trust between industry, the government, and the public.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The decision of the Department of War to designate American Artificial Intelligence company Anthropic PBC a supply chain risk under 41 U.S.C § 4713 is a clear misuse of an authority designed to protect government systems from genuine threats to national security. It is a reactive gesture that threatens to upend the stability of the government's relationship with its private sector partners—a stability on which American military and economic power depend. The consequences for the strength and credibility of the government are far-reaching, as the designation risks driving away the companies who provide technological capabilities critical to the functioning of a modern military and, through its punitive reach, undermining the American advantage in the race to develop the world's best AI models.

Section 4713 is a substantial authority that should be used sparingly, and only to protect the country against real and serious risks to the integrity of government systems. It has never been used against an American company—and certainly never so publicly and with such an expansive and detrimental impact on a vital national industry and on the American economy writ large. The designation will let China pull ahead and will make the military seem less trustworthy to its contracting

partners—both of which will make the country less safe. Because that is not what Congress intended, and not how former Secretaries have conceived of the Department's exceptional statutory authorities, like this one, the Court should grant Anthropic's Petition for Review and enjoin the government's section 4713 designation.

## ARGUMENT

When the Department designated Anthropic as a supply chain risk, its justification was pretextual. There is and was no evidence that the company poses any legitimate national security risk to government systems, and the government's own statements suggest that the decision was motivated by a desire to punish the company for staking out a contractual position at odds with the Department's own preferences. Far from protecting U.S. national security, this pretextual designation threatens it in at least two ways: first, by eroding the credibility and efficacy of the Department when trust in the institution could not be more critical, and second, by undercutting the U.S. AI ecosystem and ceding technological leadership to China at a defining moment in geopolitical competition.

## I. The Department's Supply Chain Risk Designation Was Unjustified and Undermines Its Credibility.

The statute at issue in this litigation, 41 U.S.C. § 4713, grants agency heads, including the Secretary of War, the power to take certain procurement actions to reduce "the risk that any person may sabotage, maliciously introduce unwanted

4

function, extract data, or otherwise manipulate" hardware systems, equipment, devices, software, or services "to surveil, deny, disrupt, or otherwise manipulate [their] function, use, or operation." *Id*. § 4713(k)(6). Anthropic posed no such risk, yet the Department invoked this harsh sanction to cripple a company, seemingly out of ideological animus. Such a pretextual designation has far-reaching effects for the Department's integrity, eroding public trust and making it harder for the nation's Armed Forces to do their job.

### a. The Department's Designation of Anthropic Was Pretextual, and Far Exceeded What Was Necessary to Address the Supposed Threat.

The Department's decision to target Anthropic was not motivated by concern about a legitimate supply chain risk. Until negotiations broke down between the Department and Anthropic, the Department appeared to be highly satisfied with both the company and its AI model, Claude. The government consistently granted Anthropic top-level security clearances and authorizations to support sensitive national security projects. As Judge Lin explained in the Northern District of California:

> DoW's Defense Counterintelligence and Security Agency granted Anthropic a Top Secret facility security clearance enabling it to provide support for classified national security projects, after an 18-month vetting process. In June 2025, the General Services Administration ("GSA") and DoW granted Claude authorization through the Federal Risk and Authorization Management Program ("FedRAMP") for use with FedRAMP High and DoD Impact Level 4 and 5 workloads, representing the highest levels of cloud security certification for unclassified and controlled unclassified information. In July 2025,

> Anthropic was awarded a two-year, up to $200 million agreement by DoW's Chief Digital and Artificial Intelligence Office to integrate and optimize AI capabilities across DoW. And in August 2025, Anthropic and GSA announced an agreement to deliver Claude Gov to all three branches of the government—civilian executive, legislative, and judiciary. The unrebutted record shows that, until this dispute, Anthropic "only ever received positive feedback about Claude's performance from [its] governmental customers."

*Anthropic PBC v. U.S. Dep't of War*, __ F. Supp. 3d __, 2026 WL 836842, at *3 (N.D. Cal. Mar. 26, 2026) (internal cited authorities omitted) (alteration in original), *appeal docketed*, No. 26-2011 (9th Cir. Apr. 2, 2026). Even in the wake of the supply chain risk designation, public reporting suggests the U.S. government is moving to make a powerful new version of Claude available to federal agencies to improve their cybersecurity capabilities. *See* Jake Bleiberg & Margi Murphy, *White House Works to Give US Agencies Anthropic Mythos AI*, Bloomberg (Apr. 16, 2026), https://www.bloomberg.com/news/articles/2026-04-16/white-house-moves-to-give-us-agencies-anthropic-mythos-access. This is not the expected behavior of a government facing a national security threat so grave it felt compelled to ban all departments and agencies from contracting with the company.

The novel designation also contravenes the statute in question: the Federal Acquisition Supply Chain Security Act of 2018 ("FASCSA"), Pub. L. No. 115-390, tit. II, 132 Stat. 5173, 5178, codified as Section 4713. The text of the statute focuses on the risk of sabotage and malicious tampering of federal systems, 41 U.S.C. § 4713(k)(6), and the Senate Committee on Homeland Security and Governmental

Affairs tied the need for Section 4713 to specific attempts by "[h]ostile nation states and other bad actors . . . to gain unprecedented access to sensitive and classified information via the Federal ICT supply chains." S. Rep. No. 115-408, at 2 (2018). The Committee identified "several recent examples of supply chain risks discovered within the Federal ICT system" that underscored the need for Section 4713, including the use of cybersecurity and anti-virus software from Kaspersky Lab, Inc., a Russian entity with ties to Russian intelligence and government agencies, and telecommunications equipment made by the Chinese companies Huawei Technologies and ZTE Corporation. S. Rep. No. 115-408, at 2. Such examples are not apposite here, where there is no indication of *any* risk that Anthropic has enabled or could enable "[h]ostile nation states" or "other bad actors" to gain access to "sensitive and classified information." *Id.* Anthropic is neither controlled by a foreign adversary nor has the government publicly disclosed any evidence that its products are otherwise compromised by foreign control or espionage activities. Further, there is no indication that Anthropic's products are uniquely vulnerable to espionage activities.

The unprecedented public statements accompanying the designation reveal its true purpose: animus toward Anthropic, and a desire to retaliate against the company for disagreeing with the government about the operational use of its technology. *See, e.g.*, Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026),

https://truthsocial.com/@realDonaldTrump/posts/116144552969293195 (Pet'r's Emergency Mot. for a Stay Pending Review at Add.170) (excoriating Anthropic as a "RADICAL LEFT, WOKE COMPANY" filled with "Leftwing nut jobs"); Pete Hegseth (@SecWar), X (Feb. 27, 2026), https://x.com/SecWar/status/2027507717 469049070 (Pet. for Review at 1a) (accusing Anthropic of "attempt[ing] to strong-arm the United States military into submission—a cowardly act of virtue-signaling that places Silicon Valley ideology above American lives"). For this alleged "betrayal," *see* Pet. for Review at 1a, the Department escalated a straightforward contractual dispute into a far more dangerous accusation of national security risk.

The Department's reaction was not only unjustified but also wildly disproportionate. The Department bypassed without considering – as required by statutory directive and by general prudence – the many ordinary tools the government has at its disposal to terminate or cabin its relationships with contractors. The government can terminate a contract for convenience when it is in its interest. *See* 48 C.F.R. §§ 49.101(b), 52.249-1–52.249-6. It can terminate a contract for cause in case of breach. *See id.* §§ 49.402-3, 52.212-4(m). It can direct changes "at any time" to the general scope of a contract, including the manner, method, or performance of the work, *id.* § 52.243-4, or suspend work on a contract, including to realign with its programs, *id.* §§ 42.1303, 52.242-15. It can also decline to award a contract based on a determination that a contractor or subcontractor is not

responsible, *id.* §§ 9.103, 9.104-1(d), 9.104-4, and in more extreme cases can debar or suspend a contractor if in the public interest and with appropriate procedural safeguards, *id.* § 9.402(b). These are just a few of the authorities the Department can leverage to bring an end to a current or potential future relationship with a contractor it deems untrustworthy or otherwise problematic, all of which stop far short of the extraordinary remedy deployed here.

The Department regularly utilizes the tools available to it to shape or limit its relationships with contractors, including when it deems a restriction on a contracted good or service to be at odds with its mission. Across every service branch, and for reasons as varied as cost overruns, shifting strategic priorities, technological overambition, or other performance failures, the Department has terminated contracts, or declined to exercise options under them, or deemed a contractor no longer responsible. For instance, in 2025, Secretary Hegseth announced over $5 billion in cancelled contracts, including nearly $2 billion in cuts at the Defense Health Agency to contracts held by consulting firms, as part of a DOGE-driven effort to reduce overall spending at the Department.[3] Sometimes, when priorities shift, it costs the Department less to terminate a major weapons systems contract than to

---

[3] Nick Wakeman, *Pentagon Hits Accenture, Booz Allen and Deloitte with Contract Cancellations*, Wash. Tech. (Apr. 11, 2025), https://www. washingtontechnology.com/contracts/2025/04/pentagon-hits-accenture-booz-allen-and-deloitte-contract-cancellations/404500/. A separate $1.4 billion reselling contract for Air Force enterprise cloud IT services was terminated around this time.

complete it, even when a settlement must then be paid to a contractor.[4]   And on

occasion, the Department will cancel high-dollar-value technology contracts if they

"no longer [meet] the requirements to fill the D.O.D.'s capability gaps"—another

way of framing the Department's stated objections to Anthropic last month.[5]

Moreover, the government's power over procurement has long been

recognized by the Supreme Court.  *See Perkins v. Lukens Steel Co.*, 310 U.S. 113,

127 (1940) ("Like private individuals and businesses, the Government enjoys the

unrestricted power to produce its own supplies, to determine those with whom it will

deal, and to fix the terms and conditions upon which it will make needed

purchases."); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1292 n.5 (11th Cir.

2022) (observing that *Perkins'* "propositions. . . hold true").  If the government is

unhappy with a contractor, it can simply cease buying goods or services from them.

In this case, the Department could simply have decided not to contract with

Anthropic, deeming the restrictions it imposed on its AI model no longer in the

interests of the U.S. military.  That is how the break-up of this kind of contractual

relationship generally occurs; the Department can't make a company change its

---

[4] Robert Brodsky, *GAO: Major Defense Contracts Cheaper to Cancel Than Continue*, Gov't Exec. (Mar. 19, 2008), https://www.govexec.com/defense/2008/03/gao-major-defense-contracts-cheaper-to-cancel-than-continue/26527.
[5] Kate Conger & David E. Sanger, *Pentagon Cancels a Disputed $10 Billion Technology Contract*, N.Y. Times (July 6, 2021), https://www.nytimes.com/2021/07/06/technology/JEDI-contract-cancelled.html.

product or its values, but it can decide, with few restrictions, that company or its product isn't right for the military.

Yet no less drastic measure appears to have been considered and deemed insufficient in this case, notwithstanding the unambiguous statutory mandate to determine whether "less intrusive measures" are "reasonably available," 41 U.S.C. § 4713(b)(3)(B). That statutory language imposes a procedural and substantive safeguard against improper use of this weighty authority. As a procedural matter, the government must indicate, in some fashion, that it has considered less restrictive means—and no such indication exists here. As a substantive matter, that language unmistakably directs the Department to designate supply chain risks under this authority sparingly, judiciously, and only when absolutely necessary for reasons of national security—not for punitive reasons or to achieve, more loudly, what it could already have achieved through standard procurement authorities.

The use of this designation under these circumstances, without considering any lesser alternatives, was an extreme measure. In an ironic twist, however, Anthropic's technology may be too useful for the government to stay away for long; public reports suggest that at least two federal agencies have reached out to Anthropic to test and incorporate its latest model, Claude Mythos. *See* John Sakellariadis & Brendan Bordelon, *Federal Agencies Skirt Trump's Anthropic Ban to Test its Advanced AI Model*, Politico (Apr. 14, 2026). If the government continues

using Claude, that will be all the more evidence that the supply-chain designation was pretextual and not motivated not by any legitimate statutory considerations.

### b. Pretextual Use of this Significant Authority Undermines the Credibility of the Department With Industry and the Public.

The credibility of the Department and our Armed Forces depends on political neutrality and commitment to the rule of law. *See Greer v. Spock*, 424 U.S. 828, 839 (1976) (noting the "American constitutional tradition of a politically neutral military establishment under civilian control"); *To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks, para. 15 (Sept. 6, 2022) (open letter signed by Secretary Panetta) ("Military and civilian leaders must be diligent about keeping the military separate from partisan political activity."). If the Department takes significant action that falls outside the bounds of the authority conferred by Congress—particularly where, as here, its decisions appear motivated by political retribution or animus—it risks upending public trust in the military and the decisions of its civilian leaders.

By undermining this trust, this supply chain risk designation could undermine America's military supremacy and damage its ability to do its job. *First*, retaliatory and vindictive actions by Department leaders that appear to be motivated by partisan political disagreements undermine the public's trust and confidence in the Pentagon's civilian leaders and in the military as an institution. Public trust in the military is the foundation from which any military action derives its legitimacy. The

fallout from the Anthropic designation will make the public less likely to trust the Department and the military overall, which will have ripple effects for recruitment and for Department morale. This is particularly concerning at present, since public confidence in the institution is already fragile; less than 50 percent of Americans currently report a great deal of confidence in the military, down 21 points from 2018. *See* 2025 Reagan National Defense Survey, Ronald Regan Inst. at 5 (Nov. 2025), https://www.reaganfoundation.org/reagan-institute/centers/peace-through-strength/survey/2025-reagan-national-defense-survey.

*Second*, a pretextual supply chain risk designation undermines the public's confidence in all future supply chain risk designations. This, in turn, undermines the very national security interests that FASCSA was designed to protect. If the government's supply chain designations are viewed as suspect, private citizens and businesses may not follow the government's lead in severing their personal and commercial connections to the companies and technologies that pose legitimate supply chain risks, exposing industry and the public to threats from malicious actors and hostile foreign powers. As one witness at the Senate Committee hearing on FASCSA observed, private companies play an important role in defending against cyber-attacks because critical domestic infrastructure is often controlled by private parties rather than the government. *See Evolving Threats to the Homeland: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 115th Cong. at 5

(2018) (Testimony of Kevin Mandia, CEO of Fireeye, Inc.) (noting that critical infrastructure is mostly "in the hands of the private sector, and during times of duress or outright war, if we need to do 'shields up' in a joint defense, we are going to need to cooperate between the government and the private sector").

*Third*, public companies that work with the military must have confidence that the government will be a reliable and trustworthy partner that adheres to the governing legal and regulatory frameworks. Unpredictability is bad for business. This is especially true for companies that develop emerging technologies, who may now hesitate before partnering with the military, given the possibility that unforeseen disputes about technology use could drive the Department to impose crippling sanctions. In early March, the Information Technology Industry Council, a technology industry group whose members include Nvidia, Amazon, and Apple, expressed exactly these concerns to Secretary Hegseth, lamenting that misuse of supply-chain designation authorities could "undermine the government's access to the best-in-class products and services from American companies that serve all agencies and components of the federal government."[6] The Department could find itself cut off from the most capable AI systems precisely as such systems become

---

[6] *See* Karen Freifeld, *Big Tech Group Tells Pentagon's Hegseth They Are 'Concerned' About Anthropic Supply-Chain Risk Designation*, Reuters (Mar. 4, 2026), https://www.reuters.com/business/retail-consumer/big-tech-group-tells-pentagons-hegseth-they-are-concerned-about-declaring-2026-03-04.

most consequential to military operations.  It is no surprise that public reporting confirms that "Pentagon staffers, former officials and IT contractors who work closely with the U.S. military say they are reluctant to give up Anthropic's AI tools, which they view as superior to alternatives."  Mike Stone et al., *Hegseth Wants Pentagon to Dump Anthropic's Claude, But Military Users Say It's Not So Easy*, Reuters (Mar. 19, 2026), https://www.reuters.com/business/hegseth-wants-pentagon-dump-anthropics-claude-military-users-say-its-not-so-easy-2026-03-19/.

The military maintains its technological supremacy through partnerships with America's businesses that enable it to leverage American ingenuity and technological innovation.  Undermining this trust and the partnerships that rely on it jeopardizes America's national security by cutting off military personnel from critical technologies and the companies supplying those technologies.

This is all the more damaging as powerful new AI systems emerge with critical national security applications.  Anthropic's new model, Mythos, is reportedly able to identify and exploit—but also patch—zero-day cybersecurity vulnerabilities in major operating systems and web browsers—making it a uniquely valuable tool for national defense. *See* Nicholas Carlini et al., *Assessing Claude Mythos Preview's Cybersecurity Capabilities*, Anthropic Red Team (Apr. 7, 2026), https://red.anthropic.com/2026/mythos-preview/; *see also*, *Our Evaluation of Claude Mythos Preview's Cyber Capabilities*, UK AI Sec. Inst.: Blog (Apr. 13,

2026), https://www.aisi.gov.uk/blog/our-evaluation-of-claude-mythos-previews-cyber-capabilities. The government is trying to make Mythos available to federal agencies so that they may test and use the model to patch cyber vulnerabilities in an extremely time sensitive moment for national defense in a time of war, but the supply chain designation of Anthropic threatens to make this difficult, if not impossible. What's more, critical infrastructure providers who also contract with the government are highly likely to be reluctant to engage with Anthropic to test Mythos's capabilities, over fears that association with the company will damage their competitiveness for future contracts with the federal government. The Department's actions are therefore actively preventing critical infrastructure owners and operators, including in the military, from strengthening their cyber defenses—thereby undermining the credibility and safety of government systems at a time when the United States is engaged in active hostilities with a foreign nation.

## II. Improper Designation of Anthropic as a Supply Chain Risk Threatens the U.S.'s Military and Economic Advantage at a Pivotal Moment in U.S.–China Technological Competition.

The United States is engaged in a high-stakes AI competition with China, the outcome of which will have profound consequences for American military and economic strength. The nation that leads in AI will also gain substantial advantages on the battlefield, as "frontier AI" systems—the most cutting-edge AI models—are increasingly capable of accelerating intelligence collection and analysis, supporting

weapons development, and conducting offensive and defensive cyber operations. Anthropic's latest model, Mythos, provides a case in point. The UK AI Security Institute, a leading British government institution dedicated to evaluating the safety and security of advanced AI models, performed an independent evaluation of Mythos's cyber capabilities and found that it was able to "execute multi-stage attacks on vulnerable networks and discover and exploit vulnerabilities autonomously." *Our Evaluation of Claude Mythos Preview's Cyber Capabilities*, UK AI Sec. Inst.: Blog (Apr. 13, 2026), https://www.aisi.gov.uk/blog/our-evaluation-of-claude-mythos-previews-cyber-capabilities. The U.S. military has already reportedly used earlier Claude models to plan and execute sensitive military operations. In the hands of U.S. adversaries, such capabilities present a frightening proposition. Beyond military advantages, the winner of the AI race may also benefit from significant gains in economic productivity and related GDP growth.

China understands these stakes and has invested accordingly. *See* Kyle Chan et al., *Full Stack: China's Evolving Industrial Policy for AI*, RAND (June 26, 2025) (noting that "China wants to become the global leader in artificial intelligence (AI) by 2030" and is "deploying industrial policy tools across the full AI technology stack, from chips to applications," to achieve that goal). Although the United States remains ahead in technical capabilities, Beijing is catching up. For the past few years, Chinese AI models have been just half a year behind the top U.S. models on

average.  *See* Luke Emberson, *Chinese AI Models Have Lagged the US Frontier by 7 Months On Average Since 2023*, Epoch AI (Jan. 2, 2026).  A Chinese lead in frontier AI would give Beijing a decisive advantage in military planning, cyber operations, and intelligence analysis at precisely the moment those capabilities are becoming most consequential.

The United States cannot outcompete China by playing by its rules. Washington's advantage comes not from out-spending or out-planning Beijing, but from maintaining a flourishing private sector, governed by stable and predictable rules, that drives technological innovation at scale.  *See* Fatima Faisal Khan, *The Missing Middle*, Inst. for Sec. + Tech. at 32-33 (Oct. 2025) (the United States maintains "clear leadership in artificial intelligence" because "[t]ransparent governance attracts the global capital that China's opacity repels").  China has enduring strengths in AI talent and energy infrastructure, and it is pouring resources into its AI ecosystem. What China cannot replicate, however, is the stability of the relationship in the United States between the public and private sectors, which allows companies to innovate, commercialize, and grow without fear of interference or reprisal.  *See* Scott Singer & Matt Sheehan, *China's AI Policy at the Crossroads: Balancing Development and Control in the DeepSeek Era*, Carnegie Endowment for Int'l Peace (July 17, 2025) (noting that China has exercised strict control over its AI sector by "systematically reassert[ing] its power over China's leading technology

18

companies through antitrust investigations, stricter regulations, record-breaking fines, and, in some cases, the acquisition of board seats by state entities"). This stability and predictability is why the world's leading frontier AI models—including Anthropic's Claude—are American. It is also why American AI systems are the technology of choice for allied governments and global companies. The relationship between the Department and the private sector is not only vital to ensuring that American AI development outpaces Chinese AI development; it is also key to translating private-sector innovations into economic and battlefield advantages.

Moreover, when the Department deploys its substantial authorities to punish a leading technology company, it signals that doing business in the United States is risky, and that frontier AI labs should take their business elsewhere. And, at the same time, the designation could accelerate efforts by foreign countries to diversify away from American AI, weakening the country's AI ecosystem on which its modern-day military and economic dominance depends. If it appears that Silicon Valley is at the mercy of the U.S. government, it may create an environment in which foreign countries are more likely to adopt Chinese AI or build their own sovereign capabilities—an outcome that would run directly counter to U.S. national security interests. *See*, *e.g.*, Pablo Chavez, *The Sovereignty Gap in U.S. AI Statecraft*, Lawfare (Feb. 16, 2026), https://www.lawfaremedia.org/article/the-sovereignty-gap-in-u.s.-ai-statecraft; Dean Ball, *Clawed*, Hyperdimensional (Mar. 2, 2026),

https://www.hyperdimensional.co/p/clawed.  The Department's supply chain risk designation of Anthropic is a live demonstration of what foreign AI purchasers fear: that reliance on American AI exposes them to the shifting and mercurial impulses of the U.S. Executive Branch.

Much damage has already been done.  If Anthropic's designation as a supply chain risk is not reversed, it is likely that Washington will come to regret unilaterally kneecapping itself in the most important geopolitical competition of our age.

## CONCLUSION

For the foregoing reasons, the Court should grant Anthropic's Petition for Review and enjoin the Government's Section 4713 designation.

Respectfully submitted,

Dated: April 22, 2026

/s/ Matthew B. Klapper
Matthew B. Klapper
Anjali Motgi
Elizabeth Deutsch
Nikita Lalwani
Andrew Cherry
JENNER & BLOCK LLP
1099 New York
Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
mklapper@jenner.com
amotgi@jenner.com
edeutsch@jenner.com
nlalwani@jenner.com
acherry@jenner.com

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

**CERTIFICATE OF COMPLIANCE**

1.      I hereby certify that this brief complies with the length limits set forth in Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 4,510 words.

2.      I further certify that this brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5)(A) and with the type-style requirements set forth in Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using 14-point Times New Roman font in Microsoft Office Word 365.

Dated: April 22, 2026                    /s/ Matthew B. Klapper
                                         Matthew B. Klapper

                                         *Counsel for Amici Curiae Leon*
                                         *Panetta and the Institute for*
                                         *Security and Technology*

# CERTIFICATE OF SERVICE

1.      On April 22, 2026, I filed this brief with the Clerk of this Court via the CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished through that system.

Dated: April 22, 2026

/s/ Matthew B. Klapper  
Matthew B. Klapper

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*