**ORAL ARGUMENT SCHEDULED FOR MAY 19, 2026**

**No. 26-1049**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

**APPENDIX VOLUME 1 (App.1–App.65)**

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

April 22, 2026

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

**TABLE OF CONTENTS**

Page

**Volume 1**[1]

Declaration of Jared Kaplan (Mar. 10, 2026) ......................................................App.1

Declaration of Sarah Heck (Mar. 10, 2026)......................................................App.19

Declaration of Thiyagu Ramasamy (Mar. 11, 2026).........................................App.29

Declaration of Paul Smith (Mar. 10, 2026) ......................................................App.47

Declaration of Krishna Rao (Mar. 10, 2026) ....................................................App.59

**Volume 2**

Declaration of Kelly P. Dunbar (Mar. 11, 2026)..............................................App.66

    Exhibit 1: Department of War 41 U.S.C. § 4713 Notice to Anthropic
(Mar. 3, 2026) ...................................................................................................App.71

    Exhibit 2: Post by Secretary Hegseth (@SecWar), X (Feb. 27, 2026,
2:14 PM PT), https://tinyurl.com/yvtpje9b .......................................................App.76

    Exhibit 3: CBS Department of War Memorandum Attachment,
*Internal Pentagon Memo Orders Military Commanders to Remove
Anthropic AI Technology from Key Systems*, CBS News (Mar. 10,
2025), https://tinyurl.com/mtyuanfd ..................................................................App.78

---

[1] For the convenience of the Court, Volumes 1-3 of the Appendix include (i) materials previously included by the parties in addenda to filings made in connection with Anthropic's stay motion; (ii) this Court's order and per curiam opinion regarding that motion; and (iii) a declaration addressing the questions posed in this Court's stay order. Volume 4 includes the administrative record supplied by the Department to Anthropic in the format produced by the Department.

Exhibit 4: Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026), https://tinyurl.com/2cbcmfz7 .................................................................App.81

Exhibit 5: *A Statement from Dario Amodei on Anthropic's Commitment to American AI Leadership*, Anthropic (Oct. 21, 2025), https://tinyurl.com/4ncsm5w4 ............................................................App.133

Exhibit 6: *Claude Gov Models for U.S. National Security Customers*, Anthropic (Jun. 6, 2025), https://tinyurl.com/ynyc82bw ....................App.139

Exhibit 7: *Statement from Dario Amodei on Our Discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://tinyurl.com/54pw9684.................................................................App.145

Exhibit 8: Post by President Donald J. Trump (@realDonaldTrump), TruthSocial (Feb. 27, 2026, 12:47 PM PT), https://tinyurl.com/5n7ucwpw ..........................................................App.152

Exhibit 9: Joseph Menn, *U.S. Intelligence Probing Russian Investors in U.S. Tech.*, Washington Post (Dec. 19, 2022).................................App.154

Exhibit 10: Dave Lawler, et al., *Exclusive: Pentagon Threatens Anthropic Punishment*, Axios (Feb. 16, 2026), https://tinyurl.com/bdddw5r7 ............................................................App.162

Exhibit 11: Cade Metz, *Anthropic's and Open AI's Dance with the Pentagon: What to Know*, N.Y. Times (Mar. 7, 2026), https://tinyurl.com/ycyhnbdd.............................................................App.169

## Volume 3

Determination Under 41 U.S.C. § 4713 (Mar. 3, 2026) ................................App.177

Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC (Mar. 3, 2026).......................App.178

Memorandum for the Record (Attachment 1a to Joint Recommendation) ...App.180

Section 4713 Scoping Analysis for Anthropic, PBC (Attachment 2 to Joint
Recommendation)................................................................................App.185

Congressional Notifications of Designation under 41 U.S.C. § 4713
(Mar. 3, 2026) ................................................................... App.187

Memorandum for Senior Pentagon Leadership Regarding Artificial
Intelligence Strategy for the Department of War (Jan. 9, 2026).........App.202

Declaration of Emil Michael (Mar. 19, 2026) ...............................App.208

Copy of Article Cited at Emil Michael Declaration 5 n.2 ............App.220

Supplemental Letter to Petitioner (Mar. 19, 2026).......................App.224

Declaration of Sarah Heck (Mar. 23, 2026)...................................App.233

Exhibit 1: Email from Emil Michael to Dario Amodei Re: Agreement
with Department of War (Mar. 4, 2026) ........................................ App.240

Exhibit 2: Email and two attachments from Anthony Fuscellaro to
Dario Amodei Re: Official Correspondence from the Department
of War to Anthropic (Mar. 4, 2026) ...................................................App.242

Declaration of Thiyagu Ramasamy (Mar. 22, 2026)....................App.252

Order and Opinion Regarding Emergency Motion for Stay Pending Review
and Expedited Briefing, *Anthropic PBC v. U.S. Department of War*,
No. 26-1049 (D.C. Cir. Apr. 8, 2026) ..................................App.264

Declaration of Thiyagu Ramasamy (Apr. 22, 2026) ....................App.271

**<u>Volume 4</u>**[2]

Deepa Seetharaman, et al., *Pentagon Clashes with Anthropic Over Military AI Use, Sources Say*, Reuters (Jan. 29, 2026) ......................................App.298

Keach Hagey, et al., *Anthropic-Pentagon Clash Over Limits on AI Puts $200 Million Contracts at Risk*, Wall Street Journal (Jan. 29, 2026) ..........App.306

Ross Douthat, *Anthropic's Chief on A.I.: "We Don't Know if the Models are Conscious"*, New York Times (Feb. 12, 2026)....................................App.314

Anthropic § 4713 Determination Package.......................................................App.367

U.S. Federal Government Usage Policy Addendum for Anthropic Partner (Aug. 16, 2025) ...................................................................................App.391

Declaration of Emil Michael (Apr. 20, 2026)................................................App.408

---

[2] The Department's production of the administrative record also included an identical copy of material already reproduced at App.81-App.132 (Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026)).

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF JARED KAPLAN

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

I, Jared Kaplan, pursuant to 28 U.S.C. § 1746, declare as follows:

**Personal Background**

1.      I am one of the co-founders of Anthropic PBC ("Anthropic"), an artificial intelligence ("AI") company based in San Francisco, California.

2.      Since 2023, my title has been Chief Science Officer. In that role, I oversee the company's research in model development and safety, which is at the core of Anthropic's mission. Under model development, my responsibilities include overseeing the fine-tuning and reinforcement-learning-driven capabilities that shape each new generation of models. I also oversee teams working on interpretability, which is the study of how large language models ("LLMs") work by observing their internal operations. As part of my safety portfolio, I supervise teams working on "alignment," a term that broadly refers to efforts to make AI systems' goals, behaviors, and outputs reliably follow human values and intentions. I also oversee the safeguards implemented in and around deployed models.

3.      As of 2024, I have also served as Anthropic's Responsible Scaling Officer. In that role, I am responsible for overseeing the implementation of Anthropic's Responsible Scaling Policy, which is a series of technical and organizational protocols that aim to manage the risks associated with developing increasingly capable AI systems.

1

**Add.19**
**App.2**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

4.     Before co-founding Anthropic, I was a consultant at OpenAI and contributed to the development and analysis of LLM research. During that time, I was involved in the research and development efforts to introduce some of OpenAI's early LLM models, such as GPT-3 and Codex.

5.     I began my career as a theoretical physicist, with a focus on effective field theory, particle physics, cosmology, scattering amplitudes, and the conformal field theory bootstrap. Since 2012 and continuing to today, I have been a professor in the Department of Physics and Astronomy at Johns Hopkins University.

6.     During a sabbatical from my work in theoretical physics, I began collaborating with computer scientists to research machine learning and the development of LLMs, which are text-based AI systems trained on extremely large datasets to develop a functional understanding of language and generate new text. Since then, I have taught courses and published over 60 scholarly articles on a mixture of theoretical physics, machine learning, and LLMs.

7.     I have extensive personal knowledge regarding Anthropic's core research and safety objectives, including how Anthropic's AI models are developed and trained, their technical capabilities and risks, our approach to safety research and safe deployment, and how our mission informs our work across all of these domains. In my role as Chief Science Officer, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my

2

**Add.20**
**App.3**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

review of information and records gathered by Anthropic personnel, and could testify thereto.

**Anthropic's Background As An AI Safety Company**

8.     We founded Anthropic because we anticipated how powerful AI could become and believed it could reshape society in profound ways. From our own experience working with LLMs and scaling laws, it became clear that AI capabilities were advancing rapidly and could soon rival or surpass human performance across many areas. At the same time, we did not yet know how to reliably make these systems both helpful and safe, and we anticipated that speed, competition, and social disruption could push people to deploy AI before its capabilities and risks were understood and sufficiently mitigated. This is why we built Anthropic—to put safety at the center as AI progress accelerates, to study these questions on the most advanced models where they matter most, and to build an organization that could turn careful, empirical safety research into real-world practice. That conviction is embedded in Anthropic's very structure as a public benefit corporation.

9.     Our mission to build safe, beneficial AI is the foundation of everything we do—from model development to safety science to policy engagement.

**Add.21**
**App.4**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

10.     Anthropic began as a research-first company and, for its first two years, focused exclusively on foundational AI research, the science of AI safety, and AI policy work. We regularly publish pioneering research on alignment, interpretability, and the societal impacts of LLMs.

11.     Anthropic aims to develop models that are safe, ethical, and helpful. Our safety work is grounded in empiricism, rigorous research, and humility. Because we have invested deeply in understanding the capabilities and limitations of our systems, we have unique insights into what guardrails are necessary for safe deployment.

12.     While we initially developed AI models to support safety research, we expanded the company's focus to include commercial deployments which began in early 2023. We believe this matters because a safe AI system that is not used cannot fully demonstrate the benefits of responsibly developed frontier AI. By showing that AI can be both safe and commercially successful, we aim to pull the broader industry toward higher safety standards—what we call the race to the top.

13.     We also engage in public advocacy for transparency and safety in AI development and have supported state and federal legislation advancing those goals.

4

**Add.22**

**App.5**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

**Anthropic's LLM Claude And The Role Of Guardrails**

14.    Anthropic's signature model is a general-purpose LLM called Claude. We make Claude available to individual users, small businesses, and large organizations through a variety of offerings. We continually develop and release increasingly capable versions of Claude, most recently Claude Sonnet 4.6 in February 2026.

15.    LLMs like Claude are algorithmic systems trained on massive datasets to identify patterns and associations in language and to generate outputs and take actions that resemble human responses and actions. Through training, models acquire predictive power and the transformative ability to take a range of actions in a fraction of the time it would take humans to perform them.

16.    Claude is a versatile technology, much like an actual human mind. When paired with a chatbot interface, Claude is capable of interpreting and responding to a wide range of user inputs, or "prompts," in an intelligent, human-like manner. In this medium, Claude can analyze and summarize large volumes of text, write and edit content, generate and debug source code, and reason through complex and multi-step problems. Claude can also be given access to tools so that it can behave "agentically," meaning it can not only respond to users' prompts but actually take actions on their behalf. Simple actions could include sending emails, deploying code, and navigating the Internet. Claude can

5

**Add.23**
**App.6**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

also power more sophisticated agentic work. For instance, someone planning a vacation can direct Claude to compare flight and hotel options against specified constraints, assemble a day-by-day itinerary, make reservations, send confirmation emails and calendar invites, and produce a summary of the plan and costs. With some configurations, Claude can even act autonomously, executing tasks without requiring ongoing user direction. Using AI systems to power agents is understandably of particular interest to many users, including certain government users, even though agentic usage poses heightened risks relative to the traditional chatbot form.

17.     Because Claude is a dual-use technology, the risks that it poses depend on the specific context in which it is used. Many tools are dual use: For example, a chef's knife is a useful device in the kitchen and a dangerous weapon in a violent conflict. When it comes to AI, the same capabilities that drive medical breakthroughs, accelerate scientific research, and enhance human creativity can, in other contexts, also enable dangerous actors to develop new weapons or automate complex, malicious activities. The dual-use nature of AI makes it difficult to restrict "dangerous capabilities" while promoting "beneficial ones"—they are often the same capability applied to different ends.

18.     Although AI systems pose the potential for tremendous benefits, they also create novel risks. Among other concerns, LLMs can produce responses that

**Add.24**
**App.7**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

diverge from the goals of the people that trained them or reflect skewed or mistaken judgments embedded in their training data. To address the novel risks, we have pursued a multilayered approach to safety, implementing safety mitigations at the model layer, the safeguards layer, and the policy layer.

19.     At the model layer, we seek to embed safety considerations directly into the model itself through a variety of training techniques. A central focus of our research is on solving the challenge of alignment to make AI systems reliably follow human values and intentions. One of our key techniques is Constitutional AI, which trains models to evaluate and revise their own outputs against a set of normative principles, like balancing helpfulness against harm avoidance, and respecting values such as individual privacy and political freedom. In addition to Constitutional AI, we use reinforcement learning from human feedback (RLHF) to reduce the likelihood of harmful outputs. RLHF is a training technique in which human reviewers rank pairs of model outputs; those preferences are used to train the model to generate responses that better align with human judgments.

20.     The safeguards layer consists of technical measures that stack on top of the model itself. As appropriate, our tools may include classifiers and probes that detect harmful activity in real time, targeted interventions that reduce the likelihood of harmful outputs, as well as monitoring systems that help us identify when our systems are being misused at scale. We continually calibrate which

7

**Add.25**
**App.8**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

measures are appropriate based on the circumstances of the deployment, the type of harm we are trying to prevent, and other factors.

21.    At the uppermost layer, our Usage Policy defines how Claude is permitted to be used. Claude is only available subject to Terms of Service that incorporate its Usage Policy. At a high level, our policy informs the development of our technical safety measures, provides users with clarity on the scope of permissible usage, and steers them away from using our models in risky ways, including ways we, as Claude's creator, understand that it has not been developed for and/or is not ready for.

22.    For commercial and civilian users, the Usage Policy reflects our judgment—based on technical expertise, our experience at the frontier of AI development, and our values as a company—on how to strike an optimal balance between enabling beneficial uses of AI while mitigating potential harms. The Usage Policy generally prohibits uses that pose unacceptable risks, including surveillance, compromising computer systems or networks, and designing weapons or other systems to cause harm or loss of human life. The Usage Policy is an agreement we enter with our users so that we both understand how Claude should and should not be used. The Usage Policy is critical because technical safeguards alone cannot prevent all dangerous uses: they do not necessarily have access to the full context that determines whether a given request falls within or outside the lines

8

**Add.26**
**App.9**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

set by the Usage Policy, and in certain environments, such as classified settings, there may be very limited visibility into how the systems are being used. As a result, the Usage Policy is a critical mechanism for clearly articulating safety boundaries to users and serves as an important last line of defense.

23. Severing Claude from the usage limitations we have determined are essential would erode the very purpose for which our company was founded and contradict our deeply held values.

**Anthropic's Commitment To Supporting National Security Engagements While Maintaining Critical Safeguards**

24. Any assertion that Anthropic is aligned with, or poses risks of subversion from, adversaries of the United States could not be further from the truth. We are committed to defending the United States and defeating our authoritarian adversaries. For example, we have consistently taken steps to *prevent* our models from being used by U.S. adversaries and to prioritize U.S. national security over narrow commercial self-interest. As examples, Anthropic has gone to significant lengths to prevent the use of its technology by entities linked to the Chinese Communist Party, has shut down attempts to abuse Claude for state-sponsored cyber operations, and has advocated for strong export controls on the most powerful chips used to train AI, all to preserve the U.S. lead in frontier AI development.

9

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

25.    We have been aligned with the U.S. government's priority to sustain and enhance America's global AI dominance to promote economic growth, human flourishing, and national security.

26.    Since as early as 2024, Anthropic has led the field in supporting U.S. national security priorities. We collaborated closely with national security stakeholders on a variety of initiatives to advance our shared goal of building safe AI systems. These include collaboration with federal partners on AI safety research, evaluation frameworks, and strategic cloud partnerships as AI assumed a more prominent national security role. As a result, Anthropic's AI models were the first ever to be used by American warfighters on classified systems. Today, Claude is reportedly the Department of War's ("DoW" or the Department") most widely deployed frontier AI model and the only one currently on classified systems.

27.    We were also the first to proactively work to align our AI system with the government's national security needs. Anthropic developed Claude Gov, a dedicated model for national security users to address real-world operational needs that also includes a government-specific addendum to the Usage Policy described above. While Claude Gov underwent the same rigorous safety testing as all other Claude models, it was designed to fulfill the missions of our national security customers and is more likely to comply with requests that are appropriate in a military context. For example, some standard versions of Claude refuse to analyze

10

**Add.28**
**App.11**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

documents that appear to be classified, such as materials marked Top Secret. That restriction is appropriate for ordinary commercial users, but it would be incompatible with legitimate national security uses by government personnel, and Claude Gov will not refuse to analyze Top Secret documents.

28.    The government-specific Usage Policy addendum was designed to strike a balance between enabling national security beneficial uses and mitigating potential harms. For example, whereas ordinary civilians do not conduct foreign intelligence analysis, the government's military and intelligence communities do. As a result, the government-specific addendum does not impose the same restrictions on national security use as it does on civilian customers. In our recent negotiations discussed below, for example, we made clear that we were prepared to authorize use of our models for additional purposes for the DoW—such as developing more effective weapons—but we have never allowed regular users to use Claude to assist with weapons development.

29.    Anthropic partnered closely with national security prime contractors to enable the provision of our models on their platforms, through which DoW and other government national security customers access AI systems. DoW gained access to Claude Gov for the first time in March 2025 via Anthropic partner platforms—and its usage was governed by Anthropic's Usage Policy and the government-specific addendum. During this period, the government-specific

11

**Add.29**
**App.12**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

addendum imposed broad restrictions that would have prohibited mass surveillance of Americans and lethal autonomous warfare. DoW assented to these terms by using Claude Gov through the platforms of Anthropic's partners and, to my knowledge, did not object to them at any point.

30.    In July 2025, Anthropic engaged in a separate negotiation with DoW regarding how the Department might further expand its usage of our models by accessing them directly from Anthropic rather than through our partners. These discussions never advanced beyond scoping out potential work; because we did not reach the implementation phase, the terms of a Usage Policy were not discussed.

31.    Meanwhile, throughout this period, DoW continued to use our models through partner platforms, subject to the broad restrictions of the government-specific addendum to the Usage Policy described above. DoW was satisfied with our models, embedded them into its operations, and expanded their usage.

32.    In the fall of 2025, DoW and Anthropic began negotiations regarding a new deployment of our models on DoW's GenAI.mil platform. The discussion contemplated various types of deployments, including some that, if implemented, might require a direct contractual relationship between DoW and Anthropic, including with respect to the Usage Policy. During these negotiations, DoW asked Anthropic to remove its Usage Policy not just with respect to the GenAI.mil platform but across all existing and future offerings and to permit DoW, and its

12

**Add.30**
**App.13**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

contractors and subcontractors, to use all versions of Claude for "all lawful uses." Anthropic engaged in these negotiations in an effort to support DoW's national security priorities in a manner consistent with the company's core principles. As part of these efforts, the Department sent partial contract language incorporating this term to Anthropic and delivered an ultimatum: Anthropic must agree to the revised term or lose all current and future Department business. Contract modifications for facility and personnel clearances and classified work have been frozen since then as the parties continue to discuss the Department's demand.

33.    Anthropic ultimately agreed to allow DoW, and its contractors and subcontractors, to use Claude without a broad set of restrictions that had previously applied to all DoW usage. However, Anthropic set two critical exceptions: mass surveillance of Americans and lethal autonomous warfare. With those two limitations, Anthropic agreed to "all lawful uses" of Claude. This change, if accepted, would have shifted the structure of the government-specific addendum from a "whitelist" approach—under which broad prohibitions applied with limited authorized exceptions—to a "blacklist" approach, under which all lawful uses were permitted except for these two prohibitions.

34.    First, we would not agree to the use of Claude to carry out mass surveillance of Americans. It is my understanding that existing surveillance laws were written before the advent of frontier AI systems. Tools like Claude enable

13

**Add.31**
**App.14**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

aggregation and analysis of massive datasets at unprecedented scale, potentially facilitating practices inconsistent with Americans' rights even if they appear arguably compliant with laws written before the advent of AI and interpreted by courts only in a pre-AI context. For example, while there is generally no expectation of privacy in public spaces, powerful AI could enable the government to aggregate and analyze millions of public surveillance camera feeds into real-time, population-scale tracking—capabilities not contemplated or addressed by existing federal law. Our legal frameworks have not yet adapted to these novel technologies. Especially in a moment where technology has so outpaced legal frameworks, we at Anthropic, based on our distinctive understanding of what this technology can effectuate, do not believe it is safe or responsible for an AI developer to knowingly enable large-scale surveillance of Americans. Permitting such use would risk Claude being misused in ways that seriously infringe Americans' rights. Moreover, removing these limitations would also create a risk of inadvertent harm, such as by Claude collecting more information about U.S. persons than the user intended. For example, a user might ask Claude to obtain a specific piece of information about a U.S. person that is lawful to query, but because Claude is operating in an unsafe context, it could inadvertently collect or synthesize a far broader set of information about that individual—including information that the U.S. government is not permitted to collect or query for

14

**Add.32**
**App.15**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

certain purposes—even absent any intent by the user to violate rules designed to safeguard civil liberties.

35.    Second, we would not agree to the use of Claude for lethal autonomous warfare. Lethal autonomous warfare consists of using AI to control weapons without any human oversight when human lives are at risk. Such applications include, for example, an AI-controlled aerial system that independently identifies and classifies an object as a military target, determines engagement criteria are satisfied, and launches a weapon strike without any human reviewing, approving, or having the ability to override decisions made by AI. In our view, today's AI systems—including Claude—are not capable of reliably carrying out lethal autonomous warfare; this is why we have insisted on meaningful human oversight. As anyone who has used a generative AI tool knows, Claude can make errors. In the context of military options, these errors could have grave consequences, jeopardizing the success of military operations or potentially costing the lives of American soldiers or innocent civilians. For example, it is possible that an AI system could misidentify an American soldier as a terrorist operative. Using Claude in this manner would place America's warfighters and innocent civilians at unacceptable risk.

36.    Because we trained, and have extensively red-teamed our models, we have a unique understanding of Claude's capabilities and therefore have a deep

15

**Add.33**
**App.16**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

technical understanding of its limitations. From the perspective of that expertise, we have emphatically concluded that Claude is not yet safe for those uses.

37.    To be clear, we will not and have never second-guessed the government's national security judgments or missions. Anthropic fully respects that any decisions about military operations rest with DoW. Anthropic also fully respects that because of Claude's limitations and safeguards, DoW may opt to work with another company that better suits its needs. Anthropic has not sought, and would not seek, to dictate how the government conducts its missions and who it works with.

38.    At the same time, acceding to DoW's demand that we remove these two policy-layer safeguards limitations would undercut Anthropic's core identity and competitive advantage. Anthropic has built its identity, reputation, and trust with customers, partners, investors, and the public on a principled commitment to safety. Stripping away those safeguards would erode internal and external trust, weaken the company's culture, and threaten its ability to attract and retain the expertise and commitment necessary to build innovative, cutting-edge AI systems—harms that extend well beyond the immediate technical effects of lifting the two use restrictions at issue here.

39.    Maintaining these restrictions on Claude's use in military operations is essential to Anthropic's mission to advance the safe and beneficial development

16

**Add.34**
**App.17**

Docusign Envelope ID: 779235D0-5330-4415-9C0A-3FD9874F880F

and use of AI. That is why we articulated these two critical use limitations to DoW: given the current state of our systems, allowing Claude to be used for mass surveillance of Americans or for lethal autonomous warfare would not only contravene our expert technical judgment but also the very principles on which Anthropic was founded.

*     *     *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the above is true and correct to the best of my knowledge.

Executed on March 10, 2026.

Jared Kaplan
Co-Founder, Anthropic

17

**Add.35**
**App.18**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as
Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF SARAH HECK

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-
gronke@wilmerhale.com

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

I, Sarah Heck, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Sarah Heck. I am the Head of Policy at Anthropic PBC ("Anthropic"), where I have worked since June 2024. Before joining Anthropic, I held senior roles at Stripe, the White House's National Security Council, and the U.S. Department of State.

2.      In my role as Head of Policy, I lead Anthropic's public policy engagement, government relationships, strategic partnerships, and government communications, including engagements and initiatives that address the intersection of artificial intelligence ("AI"), national security, and economic policy. This includes being involved in communications between Anthropic and the government.

3.      As the Head of Policy, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

**Anthropic Has Maintained A Strong Relationship With The Federal Government**

4.      Partnerships with private and public sector entities are central to Anthropic's mission, business model, public policy goals, and overall success. Our partners range from Fortune 500 companies and U.S. government agencies to small

1

**Add.37**

**App.20**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

businesses and local municipalities. These partnerships are core to Anthropic and essential to advancing its policy objectives of promoting the responsible deployment of AI, supporting democratic institutions, and ensuring that powerful AI systems are developed and used safely and in ways that benefit society.

5.　　One of Anthropic's most important partnerships is with the federal government. Anthropic has consistently supported the U.S. government's goal of maintaining global AI dominance and its efforts to ensure that American AI systems are widely adopted across the federal government and throughout the private sector at home and abroad. Anthropic publicly supported the Trump administration's efforts to promote AI adoption throughout the federal government as part of its AI Action Plan for America. Anthropic has also partnered with the National Institute of Standards and Technology's Center for AI Standards and Innovation ("CAISI") to undertake collaborative research evaluating and mitigating safety risks. It has advocated in support of the bipartisan Future of AI Innovation Act, which supports CAISI's initiatives and promotes strong partnerships between private and public stakeholders to advance AI research and innovation.

6.　　Importantly, in developing its relationship with the government, Anthropic has strived to build a reputation as a nonpartisan advocate dedicated to building a safer AI ecosystem. In addition to supporting the bipartisan Future of AI

2

**Add.38**
**App.21**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

Innovation Act, Anthropic recently donated over $20 million to Public First Action, a bipartisan nonprofit co-founded and co-led by Republican and Democratic former lawmakers, which supports public education about AI, promotes safeguards, and works to ensure America leads in the AI race. Anthropic has also actively engaged with bipartisan legislative efforts on Capitol Hill, including advocacy in support of the CREATE AI Act of 2025 and the GAIN Act of 2025—both bipartisan safety bills that align with the company's policy priorities. And the company deliberately maintains a bipartisan lobbying effort, with an in-house team that includes former senior staffers from both sides of the aisle and a roster of Republican-aligned and Democratic-aligned outside lobbying firms. Anthropic invests in and undertakes this public policy work because it is committed to AI safety and the policies that underpin it. Based on my experience, collaboration across the political spectrum is critical to policy progress.

7.      Anthropic has also been committed to developing its AI systems to advance U.S. national security interests and has partnered with national security components of the government, including the Department of War ("DoW" or the "Department") and intelligence agencies, to do so. To that end, Anthropic also formed a National Security and Public Sector Advisory Council composed of former senior defense and intelligence officials, in part to strengthen the

3

**Add.39**
**App.22**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

company's understanding of government needs and become a more effective partner.

8.    Throughout my engagements with the federal government in my capacity as Anthropic's Head of Policy, various officials and government staff have repeatedly conveyed that the government values its partnership with Anthropic and acknowledged that competitors' AI models lag behind Anthropic's capabilities. A wide range of senior intelligence community officials have emphasized to us that Claude's capabilities are unique, and that Claude is "widely recognized as the leading model for coding and autonomous tool use." Department of War staff themselves have described Claude as "far and away the best model" in briefings attended by the Policy team and warned that losing this capability would set the Department back several years. These characterizations are consistent with the ones set forth in the Declaration of Thiyagu Ramasamy.

9.    Anthropic appreciates this recognition and has, in turn, repeatedly and publicly expressed its willingness to continue providing Claude for the full range of lawful national security applications, subject to two narrow usage restrictions that reflect the company's expert, considered judgment on the nature of the AI model and its safe and reliable use: namely, restrictions on the use of Claude for mass surveillance of Americans and for lethal autonomous warfare.

4

**Add.40**
**App.23**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

**Secretary Of War Pete Hegseth Issued An Ultimatum Threatening Consequences If Anthropic Adhered To Its Fundamental Commitments**

10. Over the last few months, Anthropic and DoW had been discussing an agreement to continue their partnership. I understand that the crux of the discussions focused on two specific limitations that would restrict DoW's ability to use Claude for purposes of mass surveillance of Americans and lethal autonomous warfare. During that time, I engaged with DoW on behalf of Anthropic and was included in discussions between Anthropic CEO Dario Amodei and Emil Michael, Under Secretary of War for Research and Engineering and Chief Technology Officer. The conversations throughout this process remained respectful, and the parties remained committed to finding a path forward to harness Anthropic's technology to fulfill the Department's important national security goals.

11. Both parties agreed that neither wanted to enter into a begrudging partnership. At one point, Dr. Amodei stressed to Under Secretary Michael that if Anthropic's position on these two guardrails meant that Anthropic was not the right vendor for the Department's needs, then he would respect that decision. Dr. Amodei further emphasized that, if Anthropic and the Department failed to come to an agreement, Anthropic stood ready to assist in an orderly offboarding from the Department's systems.

5

**Add.41**
**App.24**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

12.     On February 24, 2026, I attended a meeting held between Secretary of War Pete Hegseth and Dr. Amodei, among others. At that meeting, Secretary Hegseth said that Claude had "exquisite capabilities." He then objected to Anthropic's unwillingness to remove the two usage restrictions noted above.

13.     During the meeting, Dr. Amodei reiterated that Anthropic maintains a strong partnership with national security agencies, including the DoW and intelligence community. He stated that Anthropic has had no intention of dictating national security operations. Dr. Amodei emphasized that the company's commitment to the safe use of its AI models, as reflected in the agreement, has permitted—and would continue to permit—DoW to use Anthropic's products for all lawful uses, save for those two important exceptions. Dr. Amodei noted that these two exceptions have never obstructed DoW's operations to his knowledge, and Combatant Commanders he has spoken to have been pleased with Anthropic's partnership and models.

14.     As to autonomous uses, Dr. Amodei clarified that, while Anthropic has been open to certain autonomous applications of its technologies, at this stage, AI systems cannot yet capably or reliably perform lethal autonomous warfare without appropriate oversight.

15.     Secretary Hegseth stated that Dr. Amodei's concerns were "understandable" and further stated that "they don't do mass domestic

6

**Add.42**

**App.25**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

surveillance." While Secretary Hegseth expressed that DoW "would love to work with [Amodei]," he stated that DoW had many other vendors to choose from that have never raised these types of concerns and would never hold any veto power over DoW.

16.   At the end of the meeting, Secretary Hegseth presented Anthropic with what appeared to be an ultimatum: if Anthropic did not agree to "all lawful uses" of its system by 5 p.m. on Friday, February 27, 2026, DoW would issue a statement at 5:01 p.m. that they would designate Anthropic a supply-chain risk—preventing Anthropic from partnering with DoW, anyone affiliated with the Department, or any other agency—or invoke the Defense Production Act to compel Anthropic to comply with the Secretary's demands.

17.   During this meeting, Secretary Hegseth never stated that Anthropic's AI models were unsafe, much less subject to compromise by a foreign adversary. I am unaware of anyone at DoW ever suggesting Anthropic's models are somehow insecure or have been compromised. Moreover, I understand that these two restrictions have never previously been a barrier to the DoW's adoption and use of our models to date. Nor has anyone else articulated such a use to me.

18.   Conversations continued even after Dr. Amodei's meeting with Secretary Hegseth. They remained cordial and amicable. Dr. Amodei continued to seek a resolution prior to Secretary Hegseth's deadline during the afternoon of

7

**Add.43**
**App.26**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

Friday, February 27, 2026, during which he provided Under Secretary Michael his redline edits on DoW's latest offer, alongside a detailed explanation of the same, still attempting to engage in earnest while ensuring that Anthropic's two guardrails core to its principles would be retained. Under Secretary Michael did not respond in kind with written edits. At that same time, President Trump directed all agencies, by posting on Truth Social, to cease use of Anthropic's AI system immediately. Shortly thereafter, Secretary Hegseth posted on X.com designating Anthropic a supply chain risk. Throughout these discussions, Dr. Amodei remained firm in expressing Anthropic's unmovable guardrails as essential to the Company's mission to offer safe, reliable AI tools.

### Secretary Hegseth Notified Anthropic Of His "Supply Chain Risk" Designation

19.    The following week, as agencies across the federal government moved to implement the Presidential Directive, Dr. Amodei continued negotiating in good faith with senior Department officials. Those discussions were still ongoing when, at 8:48 p.m. ET on March 4, Dr. Amodei received a letter from Secretary Hegseth, expanding on the Secretarial Order's "supply chain risk designation." That letter (the "Secretarial Letter"), dated March 3, asserted that the Department of War had "determined" that Anthropic's technology "presents a supply chain risk" and that exercising the authority granted by 41 U.S.C. § 4713

8

**Add.44**
**App.27**

Docusign Envelope ID: A3BA6486-2D1C-47CB-A825-8BB976019089

against Anthropic is "necessary to protect national security." The letter pronounced that this determination covers all Anthropic "products" and "services," including any that "become available for procurement." And it asserted that "less intrusive measures are not reasonably available" to mitigate the risks that Anthropic's products and services supposedly pose to national security.

*    *    *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 10, 2026.

Sarah Heck

Sarah Heck
Head of Policy, Anthropic

9

<strong>Add.45</strong>
<strong>App.28</strong>

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

No. 26-1049

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF THIYAGU RAMASAMY

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

I, Thiyagu Ramasamy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Head of Public Sector at Anthropic PBC. I have held that position since January 2025. Before joining Anthropic, I worked for Amazon Web Services, where I was a Principal Lead for Data, Analytics, and Artificial Intelligence/Machine Learning and was responsible for, among other things, the implementation of Anthropic's AI models—called Claude—for public sector customers, and the deployment of Claude in classified federal government networks. My current duties and responsibilities at Anthropic include overseeing the team of employees that sell Claude to U.S. federal, state, and local government agencies.

2.      As the Head of Public Sector for Anthropic, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

**Anthropic's Positive Relationship With The U.S. Government**

3.      Anthropic is a public benefit corporation whose mission is to ensure that the transition to powerful artificial intelligence ("AI") benefits humanity. We view partnering with the U.S. government as an important way to achieve that mission. During my time at Anthropic, we have aggressively pursued opportunities to empower the U.S. government to use Claude. Our government customers

1

**Add.47**
**App.30**

include the Department of War ("DoW" or the "Department") and agencies in the Intelligence Community.[1]

4.    Anthropic began working with the U.S. government as early as 2024. In April 2024, Anthropic became the first frontier AI lab to collaborate with the Department of Energy ("DoE") National Laboratories and the National Nuclear Security Administration to evaluate one of Anthropic's models in a Top Secret classified environment to determine how large language models may contribute to or help to address national security risks in the nuclear domain.[2] Anthropic later expanded its partnership with the DoE National Laboratories by deploying Claude to 10,000 scientists at Lawrence Livermore National Laboratory to help bolster research across nuclear deterrence, energy, materials science, and energy security.[3]

5.    In November 2024, Anthropic expanded its relationship with the U.S. government via a partnership with the software company Palantir Technologies.[4]

---

[1] The Intelligence Community comprises 18 organizations, including elements of the DoW (such as the National Security Agency) and other departments and agencies (such as the Department of Energy's Office of Intelligence and Counterintelligence) as well as independent agencies (such as the Central Intelligence Agency). *See Members of the IC*, Off. of Dir. of Nat'l Intel., https://www.dni.gov/index.php/what-we-do/members-of-the-ic.

[2] *See Anthropic partners with U.S. National Labs for first 1,000 Scientist AI Jam*, Anthropic (Feb. 28, 2025), https://www.anthropic.com/news/anthropic-partners-with-u-s-national-labs-for-first-1-000-scientist-ai-jam.

[3] *See Lawrence Livermore National Laboratory expands Claude for Enterprise use to empower scientists and researchers*, Anthropic (July 9, 2025), https://www.anthropic.com/news/lawrence-livermore-national-laboratory-expands-claude-for-enterprise-to-empower-scientists-and.

[4] *See Anthropic and Palantir Partner to Bring Claude AI Models to AWS for U.S. Government Intelligence and Defense Operations*, Palentir: Investors (Nov. 7, 2024),

2

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

Anthropic and Palantir partnered to provide intelligence and defense capabilities to U.S. intelligence and defense agencies. That partnership has allowed Claude to be used to support government operations, including rapidly processing large datasets; autonomously completing complex software engineering projects related to offensive and defensive cyber operations and vulnerability detection; supporting military operations; performing intelligence analysis and threat assessments; and handling national security workflows and other mission-critical tasks integral to national security.

6.    We have only deepened our relationship with the DoW and the Intelligence Community since then. In June 2025, we announced a custom set of Claude models built exclusively for U.S. national security customers.[5] We developed these "Claude Gov" models based on direct feedback from our national security partners to address real-world needs. In particular, these models were fine-tuned so that they would not refuse requests that regular Claude models—those for civilian enterprise or consumer use—would refuse.[6] And as with all our other Claude models, we rigorously tested these models for safety. In July 2025,

---

https://investors.palantir.com/news-details/2024/Anthropic-and-Palantir-Partner-to-Bring-Claude-AI-Models-to-AWS-for-U.S.-Government-Intelligence-and-Defense-Operations/.
[5] *See Claude Gov models for U.S. national security customers*, Anthropic (June 6, 2025), https://www.anthropic.com/news/claude-gov-models-for-u-s-national-security-customers.
[6] *See id.*

3

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

alongside other frontier AI labs including Google, OpenAI, and xAI, Anthropic was awarded a two-year, up to $200 million agreement by the DoW's Chief Digital and Artificial Intelligence Office ("CDAO"), the primary office within the DoW responsible for integrating and optimizing AI capabilities across the DoW.[7] As part of that agreement, we expanded our commitment to work with the DoW to explore and prototype frontier AI capabilities that advance U.S. national security. In announcing the award of these contracts to Anthropic and the other frontier AI labs, the CDAO emphasized that it was "leveraging commercially available solutions" to "accelerate the use of advanced AI" in service of the DoW's mission.[8] Anthropic worked diligently under that agreement, scoping out potential ways that the Department could best be served by Claude and related Anthropic professional services. During this period, the Department conveyed to Anthropic that Claude was the best solution for some of the proposals.

7.    We have also partnered with the General Services Administration ("GSA"), the civilian agency responsible for centralized procurement and shared services across the federal government. In August 2025, Anthropic and GSA

---

[7] *See CDAO Announces Partnerships with Frontier AI Companies to Address National Security Mission Areas*, CDAO (July 14, 2025), https://www.ai.mil/latest/news-press/pr-view/article/4242822/cdao-announces-partnerships-with-frontier-ai-companies-to-address-national-secu/.

[8] *See id*.

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

announced a first-of-its-kind OneGov agreement to deliver Claude Gov to all three branches of the government—civilian executive, legislative, and judiciary—for a nominal fee of $1 per agency. As GSA announced at the time, "This trailblazing partnership directly supports the White House's *America's AI Action Plan* and positions the United States as the global leader in government AI adoption, ensuring that the federal workforce can tap into the transformative power of AI to modernize operations, improve decision-making, and deliver better results for taxpayers."[9]

8.    Throughout, we have maintained our commitment to supporting the national security of the United States and its allies. I have a team of 15 individuals who manage relationships with our federal government customers, including national security customers. This team includes individuals with security clearances who drew on their past experience training AI models for the DoW and Intelligence Community to help lead the development of Anthropic's Claude Gov models. My team partners closely with dozens of other Anthropic employees across other parts of the company, including Product, Applied AI, Legal, and Policy. And recently, to help the company identify and develop high-impact

---

[9] *See* Press Release, Gen. Servs. Admin, *GSA Strikes Another OneGov Deal with Anthropic to Offer Claude AI to all Branches of Gov for Just $1*, (Aug. 12, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-strikes-onegov-deal-with-anthropic-08122025.

5

**Add.51**

**App.34**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

applications that strengthen U.S. and close allies' capabilities in areas like cybersecurity and intelligence analysis, on August 27, 2025, we introduced the Anthropic National Security and Public Sector Advisory Council, a group of leading bipartisan national security and public policy experts.

9.     As one would expect, our many partnerships with the U.S. government have involved intense security reviews and thorough vetting. Last year, the DoW's Defense Counterintelligence and Security Agency granted Anthropic a Top Secret facility security clearance, after an 18-month vetting process, along with several personnel clearances for Anthropic employees and management, to enable continued support for classified national security projects.

10.     In June 2025, GSA and the DoW granted Claude authorization through the Federal Risk and Authorization Management Program ("FedRAMP") for use with FedRAMP High and DoD Impact Level 4 and 5 workloads, representing the highest levels of cloud security certification for unclassified and controlled unclassified information.

11.     To my knowledge, at no point in any of those processes did the DoW identify any potential supply chain risk posed by Anthropic, its employees, or its products and services.

12.     In fact, to my knowledge, we have only ever received positive feedback about Claude's performance from our governmental customers. For

6

**Add.52**
**App.35**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

example, a technology leader at a large civilian agency informed us that their agency had used Claude to resolve legacy system issues that had been stuck for years (with one five-year-old bug fixed within days), build internal tools within days rather than waiting through year-long procurement processes, and modernize applications that have not been updated since the 2000s to current technology stacks within hours. The leader of another organization shared that they named Claude their "top model" and planned to grow usage as quickly as possible: "We want to move as fast as possible with you guys." Similarly, senior leaders within a part of the Intelligence Community reported that they were "hammering away" at Claude once they obtained access to their networks.

**The Current Negotiations With The Department of War**

13.    In September 2025, Anthropic began negotiations with the DoW for a deployment on the DoW's GenAI.mil AI platform. As part of those discussions, the DoW began to ask that Anthropic remove its Usage Policy as applicable to the DoW contracts and subcontracts.

14.    Use of Claude is expressly subject to and conditioned upon compliance with Anthropic's Terms of Service,[10] which incorporate our Usage

---

[10]*Available at* https://www.anthropic.com/legal/consumer-terms (Consumer Terms of Service) and at https://www.anthropic.com/legal/commercial-terms (Commercial Terms of Service).

7

**Add.53**
**App.36**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

Policy.[11] The Usage Policy is intended to help our users stay safe and promote the responsible use of our products and services. By establishing reasonable limitations on the appropriate uses for our products and services, the Usage Policy effectively defines Anthropic's commercial offerings.

15.    To be clear, Anthropic does not attempt—and has never attempted—to employ its Usage Policy to exert authority, control, or command over our customers, including the DoW and its military operations. Anthropic's Usage Policy does not give it insight into how the DoW uses Claude. That said, if Anthropic's Usage Policy restrictions do not meet the DoW's needs, the DoW is of course able to use any other AI system that better meets its requirements.

16.    Over the past several months, Anthropic's leadership has engaged in extensive discussions with the DoW leadership regarding the Usage Policy. Anthropic was willing to and did alter its Usage Policy to meet the specific needs of the DoW (for example, we have made clear that the Department can engage in offensive cyber operations). Although the DoW throughout that time demonstrated willingness to negotiate—leadership for both parties held in-person meetings and exchanged redlines and emails at a regular cadence—the DoW has more recently anchored on a demand that Anthropic must remove its Usage Policy and permit

---

[11] Anthropic's Usage Policy is available online at https://www.anthropic.com/legal/aup.

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

"all lawful uses" of Claude. I understand that the DoW has been or is exerting similar pressure on other leading AI labs to agree to similar demands, as reflected in Secretary Hegseth's memorandum of January 9, 2026, directing Department leadership to incorporate "any lawful use" language into DoW contracts for AI services.[12]

17.     As negotiations began to break down over the last several weeks, the DoW began threatening to designate Anthropic a "supply chain risk." Aside from the public and private threats from the DoW in the last two weeks, which contain no specifics and which I believe were delivered to increase leverage in negotiations with the company, no government customer—or commercial customer or any other person—ever informed me or, to my knowledge, anyone else at Anthropic, that they considered Anthropic or our AI models a supply chain risk or more generally a threat to safety or national security. Nor has any government or commercial customer or any other person ever informed me or, to my knowledge, anyone else at Anthropic, that there is any risk that an adversary to the United States may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a system into which Anthropic's offerings are integrated, so as to

---

[12] *See* Memorandum from Sec'y of War, Artificial Intelligence Strategy for the Department of War 5 (Jan. 9, 2026).

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system.

**The President's And The DoW's Orders**

18. On February 27, 2026, the President and the Secretary of War converted prior threats into directives designed to harm Anthropic's business.

19. First, at 3:47 p.m. Eastern time, President Trump, on his Truth Social platform, "direct[ed] EVERY Federal Agency in the United States Government to IMMEDIATELY CEASE all use of Anthropic's technology."[13] The President also called Anthropic an "out-of-control" and "RADICAL LEFT, WOKE COMPANY" of "Leftwing nut jobs" who "have no idea what the real World is all about," and cited the company's "selfishness" and "DISASTROUS MISTAKE trying to STRONG-ARM the Department of War," and threatened that "Anthropic better get their act together" or he would "use the Full Power of the Presidency to make them comply, with major civil and criminal consequences to follow."[14]

20. Shortly thereafter, Secretary Hegseth, acting on "the President's directive," "direct[ed] the Department of War to designate Anthropic a Supply-

---

[13] Donald J. Trump (@realDonaldTrump), TruthSocial (Feb. 27, 2026, 3:47 PM ET), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.
[14] *Id*.

10

**Add.56**
**App.39**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

Chain Risk to National Security."[15] In his post, the Secretary denounced what he considered to be "Silicon Valley ideology," "defective altruism," and "corporate virtue-signaling," and called Anthropic's actions a "textbook case of how not to do business with the United States Government or the Pentagon."[16] He concluded: "Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic."[17] At the same time, he stated that he is requiring Anthropic to continue providing services to the DoW, for up to six months.[18]

21.    I refer to these statements by the President and Secretary Hegseth as the "Government's Actions."

**Other Agencies' Actions In Response To The Trump And Hegseth Directives**

22.    Other agencies have also begun to take action in response to the Government's Actions. On Friday, February 27, 2026, following the Government's Actions, the GSA removed Anthropic from the agency's AI platform USAi.gov, the primary centralized means for federal agencies to access and adopt AI tools, as well as from the agency's Multiple Award Schedule contracts, through which

---

[15] Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM ET), https://x.com/SecWar/status/2027507717469049070.
[16] *Id.*
[17] *Id.*
[18] *Id.*

11

**Add.57**
**App.40**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

Anthropic provided $1 Claude subscriptions to the executive, legislative, and judicial branches of the Government as part of its "OneGov" agreement.[19] This decision cuts off sales opportunities for many federal agencies, including the U.S. Departments of Veterans Affairs, Health and Human Services ("HHS"), State, Labor, and Interior, in addition to the federal judiciary and many state and local governments that procure through the Multiple Award Schedules.

23.    On Monday, March 2, 2026, the U.S. Department of the Treasury and the Federal Housing Finance Agency (which oversees Fannie Mae and Freddie Mac) announced they were terminating all use of Claude.[20]

24.    A technology leader at a federal civilian agency has also informed me that the DoW advised his agency, and is advising all other civilian agencies, to stop using Claude.

25.    We also understand that other agencies, including the Department of State and HHS, have issued internal statements saying they will follow the President's directive.

---

[19] Press Release, Gen. Servs. Admin, G*SA Stands with President Trump on National Security AI Directive*, (Feb. 27, 2026), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-stands-with-president-trump-on-national-security-ai-directive-02272026.

[20] Scott Bessent (@SecScottBessent), X (Mar. 2, 2026, 10:57 AM ET), https://x.com/secscottbessent/status/2028499953283117283?s=46; William Pulte (@pulte), X (Mar. 2, 2026, 11:12 AM ET), https://x.com/pulte/status/2028503809299779866.

**Add.58**
**App.41**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

26.     The AI leadership of one portion of the Intelligence Community informed us that they were preparing for "complete detachment" from Claude based on the "directive" they had received.

27.     The Lawrence Livermore National Laboratory, a nuclear weapons research and development center funded by the Department of Energy, also informed Anthropic that it was shutting down Claude.

28.     Many of these customers—and others, particularly in the Intelligence Community—have continued to express how much they value their partnership with Anthropic and how harmful losing access to our models will be (setting back their work months or even years). They have also expressed, however, feeling like they have little choice in the matter.

**Irreparable Harm To Anthropic**

29.     The Government's Actions immediately and irreparably harm Anthropic. The designation also impugns Anthropic's integrity and reputation as a trusted partner, having a real but incalculable effect on sales to non-governmental customers. All told, Anthropic will suffer considerable financial and reputational harm.

30.     Being labeled as a "supply chain risk" affects our ability to sell our products and services to our U.S. government customers and others. Even before the Government's Actions, in response to the public threats from the DoW,

13

**Add.59**
**App.42**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

Anthropic had already started receiving requests from government customers to provide new contractual terms allowing those customers to terminate if Anthropic received a supply chain risk designation. The DoW has now accelerated this process by issuing the Government's Actions and directing firms to assess their reliance on Anthropic AI models.[21]

31.    Anthropic maintains a sizable and accelerating public sector business, driven largely by fast adoption rates at the DoW and within the Intelligence Community. For example, from just December 2025 to the end of January 2026, we have experienced a fourfold increase in annual recurring revenue ("ARR")[22] run rate from public sector customers. Before the year began, we projected several hundred million dollars in Public Sector ARR in 2026 and have since revised these projections upward based on the pace of growth in the first two months alone. Based on current adoption rates, we project our Public Sector business in the next five years could increase to multiple billions in ARR.

32.    The Government's Actions are an existential threat to all of this. By expressly excluding Anthropic from sales directly to the DoW or through its contractors, we estimate the immediate loss of more than $150 million ARR in

---

[21] Dave Lawler et al., *Scoop: Pentagon takes first step toward blacklisting Anthropic*, Axios (Feb. 25, 2026), https://www.axios.com/2026/02/25/anthropic-pentagon-blacklist-claude.
[22] ARR is the predictable yearly revenue associated with subscription-based software fees under active contracts.

14

**Add.60**
**App.43**

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

existing and expected DoW contracts. That includes the $200 million CDAO agreement, which the Department has now cancelled, under which we anticipated over $50 million in ARR this year. It also includes Anthropic's substantial sales to the DoW through contractors, resellers, and systems integrators, which comprise a sizable portion of our Public Sector sales revenue.

33.    Although I understand that there is no legal authority for the scope of the Government's Actions, we have seen, and expect to continue to see, the effects of these directives spread to the Intelligence Community and other U.S. federal agencies. Harm is already occurring. The dispute with the DoW has caused significant delays or pauses in six national security contracts or contract pipelines. In at least one instance, a customer at a strategic command center directed a partner to work with xAI or Google instead of Anthropic. These impacts are real and ongoing. In a sector where counterparties are risk-averse and dependent on government contracting, even the appearance of regulatory or political disfavor can be enough to cause disengagement. Defense contractors performing work under government contracts are assessing—and in many cases looking to terminate— their reliance on Anthropic, effectively eliminating an important market.[23] If that

---

[23] *See* Lora Kolodny, Ari Levy, Samantha Subin, *Defense tech companies are dropping Claude after Pentagon's Anthropic blacklist* (Mar. 4, 2026) (quoting the managing partner for a government and defense-focused venture capital firm as saying their portfolio companies involved in defense contracts "are very strict in their interpretation of the requirements" and

15

Add.61
App.44

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

happens, we estimate Anthropic's more than half-a-billion dollar expected Public Sector ARR in 2026 to shrink substantially or disappear altogether. That loss of revenue includes the OneGov GSA agreement, which we anticipated generating close to $100 million in ARR this year. And it likely includes not only federal agencies, but state and local government customers as well, some of which also purchase through the GSA agreement, and others of which will reconsider purchasing Anthropic products after the company has been blacklisted as a purported "supply chain risk" by the federal government.

34.    For similar reasons, the Government's Actions will also irreparably harm Anthropic's ability to forge new business partnerships and attract new customers in the future.

*        *        *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

---

"have backed off their use of Claude for defense use cases and are in active processes to replace the service with another one"), *available at* https://www.cnbc.com/2026/03/04/pentagon-blacklist-anthropic-defense-tech-claude.html.

16

Docusign Envelope ID: D59937CE-F0FA-4A96-A149-F41C541FCE8D

Executed on March 11, 2026.

_Thiyagu Ramasamy_

Thiyagu Ramasamy
Head of Public Sector, Anthropic

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF PAUL SMITH

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
 HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-
gronke@wilmerhale.com

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

I, Paul Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Paul Smith. I am the Chief Commercial Officer ("CCO") of Anthropic PBC ("Anthropic"), where I have worked since 2025. As Anthropic's CCO, I am responsible for driving the trusted enterprise adoption of Anthropic's AI systems and for maintaining long-term customer confidence to deploy Anthropic's large language model ("LLM"), Claude, in their highly-regulated and business-critical environments.

2.      Prior to joining Anthropic, I spent the last thirty years in senior commercial leadership roles at major enterprise technology companies, focusing on building and scaling their global go-to-market strategies. Most recently, I served as the President of Global Customer and Field Operations at ServiceNow, where I oversaw worldwide sales and customer operations. Prior to that role, I held senior leadership roles at Salesforce and Microsoft.

3.      As the CCO for Anthropic, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4.      I understand that Anthropic and the Department of War (the "Department") had been discussing a direct agreement to deploy our AI models on

1

**Add.65**
**App.48**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

classified systems. Despite ongoing negotiations, on February 27, 2026, President Trump posted on Truth Social, directing all agencies to cease use of Anthropic's AI system immediately. Secretary of War Pete Hegseth then posted on X.com that he was designating Anthropic "a supply chain risk," which he claimed would prohibit contractors, suppliers, and partners that conduct business with the United States military from engaging commercially with Anthropic. On March 4, 2026, Anthropic received two letters signed by Secretary Hegseth and dated March 3, 2026, that notified the company of its purported designation. I refer to these actions collectively below as the "Government's Actions."

**The Government's Actions And Statements Have Tarnished Anthropic's Reputation**

5.    The Government's Actions attempt to blacklist Anthropic. They send a clear message to the market: do not associate with Anthropic, or else. The Government's Actions signal that Anthropic is *persona non grata* in the eyes of the government, a message that threatens to reverberate across the broader market. Like any complex, large business, Anthropic depends on an interconnected network of relationships—including with government agencies, prime contractors, commercial partners, cloud providers, investors, current or prospective employees, customers, and the public. Reputation underpins each of these relationships, and

2

**Add.66**

**App.49**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

harm to Anthropic's reputation in one context inevitably damages its reputation in others.

6. Anthropic has highly prioritized enterprise adoption of Claude, and the majority of our revenue comes through enterprise customer contracts. Among its offerings, Anthropic makes its Claude models available to customers via an application programming interface–also called an API–for customer integration into their own products. Some customers in turn sell these Claude-integrated products to the U.S. government. In fact, our customers sell Claude-integrated products and services that span the economy in industries including healthcare, education, financial services, manufacturing, retail, software, and energy, just to name a few.

7. The unfounded designation of Anthropic as a purported "supply chain risk" is a direct attack on the company's reputation. I understand that the statutes governing "supply chain risk" relate to foreign adversaries that may harm U.S. national security and, specifically, pose a risk to the Department's information systems, not to U.S. companies that do not present such a threat.

8. The practical effect of the Government's Actions is to brand Anthropic as akin to a foreign adversary and, in turn, to signal to all American companies that, if they work with Anthropic, they have chosen an unacceptable counterparty. This designation, should it stand, carries a powerful stigma and risks

3

**Add.67**

**App.50**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

Anthropic's partnerships with all kinds of firms, not only ones that do business with the government.

9.      The manner in which the government has claimed to designate Anthropic a supply chain risk significantly exacerbates the risk of reputational harm to the company. The President's social media post exclaimed that Anthropic's employees were "Leftwing nut jobs" whose "selfishness is putting AMERICAN LIVES at risk, our Troops in danger, and our National Security in JEOPARDY." The post further labeled Anthropic as an "out-of-control, Radical Left AI company run by people who have no idea what the real World is all about." Secretary Hegseth's statements echoed these false and derogatory claims, asserting that Anthropic had "attempted to strong-arm the United States military into submission - a cowardly act of corporate virtue-signaling that places Silicon Valley ideology above American lives," and characterizing Anthropic's position on permissible uses of Claude as "fundamentally incompatible with American principles."

10.     The accusations at the heart of the Government's Actions do not reflect in any way what Anthropic does or who we are. Yet these statements reinforce a false narrative that Anthropic is untrustworthy and unpatriotic, and they endeavor to signal to customers and counterparties that we are a company to be avoided.

4

**Add.68**
**App.51**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

**The Government's Actions, If Allowed To Stand, Will Have Significant Consequences On Anthropic's Business Partnerships**

11.     The Government's Actions will have far-reaching detrimental effects on Anthropic's partnerships, not only with Department contractors that currently partner with Anthropic, but also with other Anthropic partners that work with different components of the executive branch and, more broadly, with commercial partners whose interests are unrelated to the national security sector.

12.     First, the designation has already harmed our relationships with the Department's contractors, which have been integral to our development as a frontier AI lab supporting U.S. national security objectives. Anthropic was founded and has been led with the core mission of developing safe and beneficial AI that can be used to advance U.S. national security. The Government's Actions put that mission at risk. Over the last several years, our company has invested significant time and resources in building trust with national security stakeholders and demonstrating that our models can effectively serve the military and intelligence community. The government is now demanding that Anthropic sever those relationships entirely, instantly unsettling carefully cultivated partnerships in the national security arena. As just one example, Anthropic has maintained a multi-year relationship with a defense technology provider that permits Anthropic to offer Claude to Department end-users working on classified datasets. Following

5

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

the Government's Actions, that defense technology provider has indicated it intends to move all U.S. government work to other generative AI model providers as soon as possible.

13.     Second, the Government's Actions are likely to impair Anthropic's ability to engage with other components of the federal government and their contractors. On the same day President Trump and Secretary Hegseth issued their directives, the General Services Administration ("GSA") announced that it was removing Anthropic from USAi.gov, the centralized platform for federal agencies to access and adopt AI tools. That decision cuts off Anthropic's government procurement opportunities with numerous federal entities, including the U.S. Departments of Veterans Affairs, Health and Human Services ("HHS"), State, Labor, Interior, as well as the federal judiciary. A few days later, on March 2, 2026, Secretary of Treasury Scott Bessent announced on X.com that the Department of Treasury would terminate all use of Anthropic's AI models in compliance with President Trump's directive. The Department of State and HHS subsequently issued internal statements announcing the same. The Lawrence Livermore National Laboratory, a nuclear weapons research and development center funded by the Department of Energy, likewise informed Anthropic that it was shutting down Claude, expressing hope that it might one day be permitted to return to the facility.

6

**Add.70**
**App.53**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

14. Worse still, government contractors for other components of the federal government have been directed to cut ties with Anthropic and to stop using Claude. One partner, which has a multi-million-dollar annual contract, immediately switched from Claude to a competing generative AI model for a deployment by their end customer, the U.S. Food and Drug Administration. That switch instantly eliminated an anticipated revenue pipeline worth more than one hundred million dollars. The government told one electronics testing firm that it must stop using Anthropic for any work related to its government contract. A software security company was likewise instructed by its government client to immediately terminate access to Anthropic's AI models. Despite acknowledging that there was no legal basis for the directive—only political pressure—the company stated that it had no choice but to comply. These developments make clear that Anthropic's relationships with entities outside the national security sector are already beginning to erode as a result of the government's pressure. This harm will only intensify with the issuance of Secretary Hegseth's recent letters that attempt to implement his February 27 directive posted on X.com.

15. Third, based on my understanding, the Government's Actions attempt to expand their impacts beyond Anthropic's ability to provide services to the Department—or even other government agencies—by sowing doubt and uncertainty across Anthropic's commercial partnerships more broadly. In doing so,

7

**Add.71**
**App.54**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

the Government's Actions cast a long shadow of uncertainty across our business, eroding Anthropic's carefully cultivated relationships with companies in industries including healthcare, education, financial services, manufacturing, retail, software, and energy, just to name a few, and causing our customers to question whether they can engage with Anthropic in any commercial context.

16. Indeed, this risk is already materializing. Even before the March 4 letters, in response to the government's February 27, 2026, public threats, many large enterprise customers signaled that publicly doing business with Anthropic had become more costly than working with Anthropic's competitors. This reluctance has taken several forms, including delays in contract discussions; customers and prospects declining to continue evaluating Claude alongside competing LLMs; cancelled sales meetings; withdrawal from planned co-marketing efforts and demands for new contractual protections. For example, our negotiations with three leading financial services institutions have been impacted since the Government's Actions, one of which is valued at one hundred million dollars and had been on the verge of closing. Two of the other firms have made clear that they cannot close their anticipated deals, valued together at over eighty million dollars, unless they obtain newly requested provisions allowing for unilateral contract termination. A national grocery chain cancelled a sales meeting, explicitly noting that it needed to assess the business impacts of the

8

**Add.72**
**App.55**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

Administration's public statements. Customers across industries as varied as healthcare and cybersecurity have also withdrawn from joint press releases.

17.    Other contract negotiations with multiple companies have likewise become more challenging. One current financial services customer paused negotiations on a contract worth fifteen million dollars while their legal team engaged in supply-chain-risk-designation "diligence." One of the world's largest pharmaceutical companies is seeking to shorten the intended duration of its contract by ten months. A current financial technology customer explicitly tied cutting a $10 million contract to $5 million, noting that "the DoW situation" had made them unwilling to commit to spending more on Claude.

18.    Since the Government's Actions, several customers have begun pivoting their evaluation or deployment of LLMs from Claude to models offered by Anthropic's competitors. These competitive losses include a state higher-education system comprising more than 20 schools, a customer in the business-to-business collaboration software industry, and a telecommunications/media customer that is switching its pilot from Claude Code to a competing AI coding tool.

19.    Consistent with examples provided above, many companies are also now seeking contractual provisions to protect against uncertainty, when they had not previously done so. For example, as previously noted, a household-name

9

**Add.73**
**App.56**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

financial services company is now stalling negotiations over a deal valued at well over $50 million, seeking to add a termination-for-convenience provision to its contract. And a legal-technology company in the midst of a million-dollar contract negotiation sought to change the structure of its contract from committed spending to a pay-for-use structure, citing its investment in government relationships and the perceived risk created by the Government's Actions. Some have described these provisions as a precautionary measure in the event the government orders them to stop working with Anthropic. Other customers requesting these provisions have stated they would intend to exercise their newly obtained termination rights in the event of a formal government directive designating Anthropic a supply chain risk—we expect they will now do so, in light of the Government's Actions. And, from the beginning of this dispute, all have taken steps that reflect deep distrust and a growing fear of associating with Anthropic while the Government's Actions loom.

20.    All told, Anthropic has received inquiries regarding the Government's Actions from over one hundred enterprise customers expressing deep fear, confusion, and doubt about Anthropic and the repercussions of associating with our company. For example, a multi-billion-dollar software company expressed uncertainty about its ability to continue using Claude because it maintains a shared codebase across work for the Department and other clients. A large customer that

10

**Add.74**
**App.57**

Docusign Envelope ID: FD59B79C-FD42-43B2-A001-87E74F3B8E88

spends hundreds of millions of dollars annually with Anthropic asked whether Claude might be removed from its cloud service provider, and indicated it would require significant additional technical work to serve government customers if a broad ban were imposed that prevented its end customers from using Claude. A Fortune 20 company stated that its lawyers were "freaked out" about working with Anthropic because it does significant government business. And the list goes on.

21.    Importantly, this harm is extremely challenging to reverse if the designation of Anthropic persists. These relationships were built over years through sustained investment, trust, and repeated engagement. If severed, they will be extraordinarily difficult—and in some cases impossible—to rebuild, particularly for companies whose core business depends on government contracting.

*    *    *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 10, 2026.

*Paul Smith*
_____
Paul Smith
Chief Commercial Officer, Anthropic

11

**Add.75**
**App.58**

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

No. 26-1049

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF KRISHNA RAO

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

I, Krishna Rao, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Krishna Rao. I am the Chief Financial Officer ("CFO") at Anthropic PBC ("Anthropic"), where I have worked since May 2024. As CFO, I am responsible for overseeing Anthropic's financial strategy and operations, including capital allocation, financial risk assessment, investor relationships, capital raising, and ensuring that Anthropic maintains the financial discipline and operational stability necessary to support the responsible development and deployment of safe, advanced artificial intelligence ("AI") systems.

2.      Before joining Anthropic, I was the CFO of Fanatics Commerce (a licensed consumer products sports platform) and the first CFO at Cedar (a healthcare payments and patient engagement platform). Prior to those roles, I served as Global Head of Corporate and Business Development and led Corporate and Operations FP&A (Financial Planning and Analysis) at Airbnb. Earlier in my career, I was a private equity investor at Blackstone and a strategy consultant at Bain & Company. I received a J.D. from Yale Law School and an A.B. in Economics from Harvard College.

3.      As the CFO for Anthropic, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of

**Add.77**
**App.60**

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

information and records gathered by Anthropic personnel, and could testify thereto.

### The Uncertainty Created By The Government's Actions Is Concretely Harming Anthropic

4.      Recent actions by the government have created significant uncertainty in the market. For example, over the weekend after the President Trump's and Secretary Hegseth's social media posts, a major investor in Anthropic informed me that the Department of War (the "Department") had contacted several of its portfolio companies about their use of Claude. Those companies have grown worried and uncertain about their ability to use Claude. A different Anthropic investor forwarded me market analysis, which called Anthropic's supposed designation as a supply chain risk a "sanction" and opined that any company that wants to serve as a federal contractor cannot do business with Anthropic. I have seen multiple client alerts from law firms describing the potentially far-reaching nature of the government's actions and suggesting that Department contractors may be best served by reevaluating their relationship with Anthropic. Public reporting has been similarly confused. For example, a *Yahoo* article mistakenly asserts that Secretary Hegseth "ordered the Pentagon to bar its contractors *and their partners* from any commercial activity with Anthropic." Jen Judson, et al., *US bars Anthropic products from agencies, contractors for rejecting US military*

2

**Add.78**
**App.61**

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

*offer*, Yahoo Finance (Feb. 27, 2026), https://sg.finance.yahoo.com/news/us-bars-anthropic-products-agencies-213459254.html (emphasis added).

5.      The uncertainty the government's actions have created is already inflicting a wide range of challenges and problems on Anthropic.

6.      My team has estimated revenue exposure across a range of potential customer interpretations of the government's actions. Insofar as customers adopt a narrow reading—where the government's actions are understood to prohibit only the use of Claude in work performed for the Department—we estimate that hundreds of millions of 2026 revenue is at risk. Insofar as significant swaths of customers' risk calculations sweep broader—where customers believe that doing business with Anthropic at all would jeopardize their ability to contract with U.S. agencies—the impact is significantly larger and will vary by customer type. Defense contractors and others with financial dependence on the Department are most likely to adopt the maximal interpretation, and we estimate it could reduce revenue from those customers by 50–100 percent. Across Anthropic's entire business, and adjusting for how likely any given customer is to take a maximal reading, the government's actions could reduce Anthropic's 2026 revenue by multiple billions of dollars.

7.      When it comes to Anthropic's investors, even if they recognize the true scope of the relevant authorities being invoked by the government, the mere

3

**Add.79**

**App.62**

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

fact of the purported designation—combined with President Trump's and Secretary Hegseth's public statements—risks substantially undermining market confidence and Anthropic's ability to raise the capital critical to train next-generation models and maintain its position in a very competitive race at the AI frontier. Compounding the problem is the threat of mounting fear and uncertainty among customers. These effects reinforce one another: investors withdraw from companies losing customers, and customers avoid companies perceived as struggling to attract capital or sustain growth.

8.      In a field as competitive as frontier AI, this feedback loop—if allowed to persist—could result in harm well beyond the immediate consequences of the government's actions. Training and serving frontier-level models like Claude requires extraordinary computational resources. Anthropic has already spent over $10 billion on model training and inference (serving the model to end users) and expects to spend many billions more in the coming years. Although the company has generated substantial revenue since entering the commercial market— exceeding $5 billion to date—it has nonetheless had to raise more than $60 billion in outside capital to fund its operations. Anthropic has raised this capital by issuing investors equity stakes in the company. We also have funded substantial critical technology infrastructure ("compute") purchases via long-term financing arrangements, where it is critical that our counterparties believe that Anthropic can

4

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

and will repay or otherwise fulfill its financial obligations. This need for capital is inherent to the frontier AI business: although commercial adoption is continuing to grow, even companies with strong commercial traction cannot yet self-fund the required infrastructure. Investors supply this capital because they believe Anthropic's models will remain at or near the frontier.

9.    The uncertainty created by the government's actions serves to undermine investors' confidence in Anthropic. Faltering investor confidence, if it goes on for long enough, will increase Anthropic's costs to raise the funds it needs to operate. And this will put us at a competitive disadvantage relative to other frontier AI labs because of an escalating inability on Anthropic's part to acquire sufficient compute for research and development, serve our customers, and satisfy investor expectations. If investors opt not to invest in Anthropic in the future, Anthropic will be unable to train the next generation of models, further eroding its commercial position and investor confidence.

10.    If the government's actions are allowed to stand, and if the ripple effect described above comes to pass, it would be almost impossible to reverse.

*    *    *

5

**Add.81**
**App.64**

Docusign Envelope ID: 11B9CA55-54C6-4603-B938-17B71254B5CE

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 10, 2026.

*krishna Rao*

_____

Krishna Rao
Chief Financial Officer, Anthropic

**Add.82**
**App.65**