**ORAL ARGUMENT SCHEDULED FOR MAY 19, 2026**

**No. 26-1049**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

**APPENDIX VOLUME 3 (App.177–App.297)**

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

April 22, 2026

**TABLE OF CONTENTS**

Page

**Volume 1**[1]

Declaration of Jared Kaplan (Mar. 10, 2026) ....................................................App.1

Declaration of Sarah Heck (Mar. 10, 2026)......................................................App.19

Declaration of Thiyagu Ramasamy (Mar. 11, 2026).........................................App.29

Declaration of Paul Smith (Mar. 10, 2026) ......................................................App.47

Declaration of Krishna Rao (Mar. 10, 2026) ....................................................App.59

**Volume 2**

Declaration of Kelly P. Dunbar (Mar. 11, 2026)...............................................App.66

Exhibit 1: Department of War 41 U.S.C. § 4713 Notice to Anthropic (Mar. 3, 2026) ...........................................................................................App.71

Exhibit 2: Post by Secretary Hegseth (@SecWar), X (Feb. 27, 2026, 2:14 PM PT), https://tinyurl.com/yvtpje9b .........................................App.76

Exhibit 3: CBS Department of War Memorandum Attachment, *Internal Pentagon Memo Orders Military Commanders to Remove Anthropic AI Technology from Key Systems*, CBS News (Mar. 10, 2025), https://tinyurl.com/mtyuanfd ...................................................App.78

---

[1] For the convenience of the Court, Volumes 1-3 of the Appendix include (i) materials previously included by the parties in addenda to filings made in connection with Anthropic's stay motion; (ii) this Court's order and per curiam opinion regarding that motion; and (iii) a declaration addressing the questions posed in this Court's stay order. Volume 4 includes the administrative record supplied by the Department to Anthropic in the format produced by the Department.

i

Exhibit 4: Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026), https://tinyurl.com/2cbcmfz7 .................................................................App.81

Exhibit 5: *A Statement from Dario Amodei on Anthropic's Commitment to American AI Leadership*, Anthropic (Oct. 21, 2025), https://tinyurl.com/4ncsm5w4 ............................................................App.133

Exhibit 6: *Claude Gov Models for U.S. National Security Customers*, Anthropic (Jun. 6, 2025), https://tinyurl.com/ynyc82bw ....................App.139

Exhibit 7: *Statement from Dario Amodei on Our Discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://tinyurl.com/54pw9684.................................................................App.145

Exhibit 8: Post by President Donald J. Trump (@realDonaldTrump), TruthSocial (Feb. 27, 2026, 12:47 PM PT), https://tinyurl.com/5n7ucwpw .............................................................App.152

Exhibit 9: Joseph Menn, *U.S. Intelligence Probing Russian Investors in U.S. Tech.*, Washington Post (Dec. 19, 2022)..................................App.154

Exhibit 10: Dave Lawler, et al., *Exclusive: Pentagon Threatens Anthropic Punishment*, Axios (Feb. 16, 2026), https://tinyurl.com/bdddw5r7 ..............................................................App.162

Exhibit 11: Cade Metz, *Anthropic's and Open AI's Dance with the Pentagon: What to Know*, N.Y. Times (Mar. 7, 2026), https://tinyurl.com/ycyhnbdd...............................................................App.169

## Volume 3

Determination Under 41 U.S.C. § 4713 (Mar. 3, 2026) ...............................App.177

Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC (Mar. 3, 2026).......................App.178

Memorandum for the Record (Attachment 1a to Joint Recommendation) ...App.180

Section 4713 Scoping Analysis for Anthropic, PBC (Attachment 2 to Joint Recommendation)................................................................App.185

Congressional Notifications of Designation under 41 U.S.C. § 4713 (Mar. 3, 2026) ............................................................ App.187

Memorandum for Senior Pentagon Leadership Regarding Artificial Intelligence Strategy for the Department of War (Jan. 9, 2026).........App.202

Declaration of Emil Michael (Mar. 19, 2026) ...............................App.208

Copy of Article Cited at Emil Michael Declaration 5 n.2 .............App.220

Supplemental Letter to Petitioner (Mar. 19, 2026)........................App.224

Declaration of Sarah Heck (Mar. 23, 2026)...................................App.233

Exhibit 1: Email from Emil Michael to Dario Amodei Re: Agreement with Department of War (Mar. 4, 2026) ............................................ App.240

Exhibit 2: Email and two attachments from Anthony Fuscellaro to Dario Amodei Re: Official Correspondence from the Department of War to Anthropic (Mar. 4, 2026) .....................................................App.242

Declaration of Thiyagu Ramasamy (Mar. 22, 2026)....................App.252

Order and Opinion Regarding Emergency Motion for Stay Pending Review and Expedited Briefing, *Anthropic PBC v. U.S. Department of War*, No. 26-1049 (D.C. Cir. Apr. 8, 2026) ....................................App.264

Declaration of Thiyagu Ramasamy (Apr. 22, 2026) .....................App.271

**Volume 4**[2]

Deepa Seetharaman, et al., *Pentagon Clashes with Anthropic Over Military AI Use, Sources Say*, Reuters (Jan. 29, 2026) ......................................App.298

Keach Hagey, et al., *Anthropic-Pentagon Clash Over Limits on AI Puts $200 Million Contracts at Risk*, Wall Street Journal (Jan. 29, 2026) ..........App.306

Ross Douthat, *Anthropic's Chief on A.I.: "We Don't Know if the Models are Conscious"*, New York Times (Feb. 12, 2026)....................................App.314

Anthropic § 4713 Determination Package.....................................................App.367

U.S. Federal Government Usage Policy Addendum for Anthropic Partner (Aug. 16, 2025) ....................................................................................App.391

Declaration of Emil Michael (Apr. 20, 2026)................................................App.408

---

[2] The Department's production of the administrative record also included an identical copy of material already reproduced at App.81-App.132 (Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026)).



CUI

**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

### DETERMINATION

In accordance with Section 4713(c) of title 41, United States Code (U.S.C.), ("Section 4713"), and pursuant to the recommendation provided by the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO), I hereby determine that (i) the use of the authority set forth in Section 4713(a) with respect to a covered procurement involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity"), is necessary to protect national security by reducing significant supply chain risk, (ii) less intrusive measures are not reasonably available to reduce such supply chain risk; and (iii) the use of such authorities will apply to a class of covered procurements.

**Determination.** In accordance with Section 4713(b)(3), based on the scoping analysis, mitigation considerations, and the joint recommendation of the DoW CIO and the USW(A&S) (Attached), I make the following determinations:

- **Covered Procurement Actions Are Necessary to Protect National Security**: The use of any of the Covered Entity's covered products or services in any DoW covered system presents a significant supply chain risk, and the use of the authority in Section 4713(a) is necessary to protect national security by reducing that supply chain risk.

- **No Less Intrusive Measures Are Reasonably Available:** There are no less intrusive measures that are reasonably available to reduce the supply chain risk associated with the use of the Covered Entity's products or services in any DoW covered system.

- **Class Determination:** The use of Section 4713 authorities will apply to all covered procurement actions involving the Covered Entity.

**Scope and Applicability.** This Determination is applicable to all of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

**Urgent National Security Interest.** I have determined that an urgent national security interest requires the immediate exercise of the authority in Section 4713(a) pursuant to Section 4713(c). As such, DoW will take all action as required by Section 4713(b)-(c) following announcement of this determination.

Attachment:
As stated

Controlled By: OUSW(A&S) OASW(IBP)
CUI Category: OPSEC, PROPIN
LDC: D
POC: Vy Nguyen, Vy.K.Nguyen.civ@mail.mil



**Add.194**
CUI

**App.177**

C̶U̶I̶



**OFFICE OF THE SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

## Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC

### Summary

This document sets forth the joint recommendation of the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO) for action to be undertaken pursuant to Section 4713 of title 41, United States Code (U.S.C.) ("Section 4713").

In accordance with Section 4713(b)(1), the USW(A&S) and DoW CIO consulted with procurement and other relevant officials within DoW and jointly recommend that there is a significant supply chain risk in a covered procurement[1] involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity").

The Covered Entity's restrictions on the use of its products and services introduces significant national security risks to the DoW's supply chain.

### Joint Recommendation by USW(A&S) and DoW CIO

**Risk Analysis:** The DoW CIO and USW(A&S) have determined the Covered Entity's restrictions on the use of its products and services pose unacceptable risk to the DoW. Specifically, there is significant risk, based upon the statements and actions of the Covered Entity, that use of its products and services and, as a result, the products and services of other entities with which DoW contracts, will be subject to manipulation in such a manner as to inhibit the DoW's use thereof. This creates significant risk to DoW's supply chain as the relevant products and services are integral to DoW's operational capabilities, as well as the functioning of various activities across the DoW. The DoW CIO and USW(A&S) therefore believe there is an urgent national security interest in mitigating the significant supply chain risk created by the Covered Entity as soon as practicable.

**Joint USW(A&S)/DoW CIO Class Recommendation to Mitigate Supply Chain Risk**: On the basis of this risk analysis and consultation with relevant DoW officials, the USW(A&S) and the DoW CIO jointly recommend that there is a significant supply chain risk associated with the use of the Covered Entity's products and services in any DoW covered system. DoW CIO and USW(A&S) therefore recommend invocation of the authorities codified at Section 4713(c) to urgently mitigate this risk as soon as practicable while minimizing disruption to the DoW.

---

[1] "Covered procurement" is defined at Section 4713(k)(3).

C̶U̶I̶
**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1**

Add.195

**App.178**

CUI

SIGNED:

HON Michael P. Duffey
Under Secretary of War for
Acquisition and Sustainment

Date: ___3/3/26___

HON Kirsten Davies
Department of War Chief
Information Officer

Date: ___3 MARCH 2026___

Attachment:
ATTACHMENT 1a – Urgent Supply Chain Risk Analysis on Anthropic PBC (CUI)
ATTACHMENT 1b – Due Diligence Preliminary Report on Anthropic (CUI//PROPIN)
ATTACHMENT 2 – Section 4713 Scoping Analysis for Anthropic, PBC

CUI
UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1

Add.196

# ATTACHMENT 1a

CUI



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

RESEARCH
AND ENGINEERING

MEMORANDUM FOR THE RECORD

SUBJECT: Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use

1. Summary

This analysis outlines the significant and unacceptable supply chain risk posed by Anthropic's unwillingness to agree to the U.S. government's use of its artificial intelligence (AI) models for lawful warfighting purposes. This unreasonableness endangers the strategic implementation and technical integrity of the Department of War's (DoW) information and related systems. Thus, this is not a mere contractual dispute. Anthropic's actions represent a direct challenge to the government's ability to control its own lawful operations and a threat to the security of the DoW's critical technology infrastructure. Anthropic's behavior therefore squarely meets the definition of "supply chain risk" as defined in both 10 U.S.C. § 3252 and 41 U.S.C. § 4713 and requires immediate mitigatory action.

2. The Operational and Strategic Threat

The government must ensure its technology assets are reliable, secure, and effective. Were DoW to accede to Anthropic's demands, the sought-after contract language would introduce a vendor-imposed point of failure. This is untenable. By embedding unreasonably restrictive terms that restrict DoW's warfighting operations beyond the limitations imposed by law, Anthropic seeks to grant itself an operational veto. This triggers the legal definition of supply chain risk at 10 U.S.C. § 3252(d)(4), which explicitly includes the risk that an entity may "deny, disrupt, or otherwise degrade the function, use, or operation" of a covered system. A contractual provision that unnecessarily restricts the use of a system to diminish functionality and limit DoW's warfighting capabilities introduces, by definition, an unreliable and compromised component into our warfighting mission.

This is compounded by demonstrated hostility in negotiations with DoW. Based on statements made during negotiations, Anthropic appears to be taking a negotiation posture meant principally to benefit its public perception that is not centered on truth or fact. In addition, during our negotiations, one of Anthropic's executives questioned the propriety of the potential use of their software for a sensitive military operation abroad despite that use being permitted under the existing Terms of Service. This led to alarm by the DoW and the prime contractor who provides Anthropic software, and raised material doubts as to whether they would cause their software to stop working or cause some other disastrous action that would put our warfighters lives in danger. The DoW recognizes that its suppliers are often for-profit corporations that intend both to help the warfighters and American public and turn a profit. However, a vendor that raises the prospect of disallowing its software to function in critical military operations, and treats its

CUI

**Add.198**

**App.181**

~~CUI~~



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

**RESEARCH
AND ENGINEERING**

negotiations with the DoW primarily as tools for brand-building cannot be trusted, particularly when that marketing campaign is openly hostile to the DoW and duplicitous. By ceding to Anthropic's terms, the DoW would be allowing the very corporate decisionmakers who have opted to publicly spat with DoW into its technical and operational warfighting infrastructure, thereby introducing unnecessary risk into DoW supply chains. The American people have vested elected officials and military and civilian leadership with warfighting authorities; it is untenable and unlawful to insert unelected corporate bureaucrats into this process.

3. The Underlying Technical Vulnerability of AI

This strategic risk is magnified by the unique, opaque nature of the technology itself. Unlike traditional software, AI models are probabilistic systems which are understood to "drift" or degrade as new data is introduced and require constant tuning, the integrity of which, is fundamentally based on the trustworthiness of the vendor to ensure the model continues to perform accurately and fairly.

The DoW cannot trust Anthropic to ensure the integrity of its models. As research demonstrates,[1] AI systems are acutely vulnerable to manipulation. Privileged access with malintent can subtly poison the training data to maliciously introduce unwanted function, or otherwise subvert the design, integrity, and operation of the model. Research shows such attacks can degrade accuracy by over 27% and introduce targeted misclassifications at an alarming rate.[2] Anthropic's ability to unilaterally alter system guardrails and model weights without DoW consent could fundamentally change the system's function and creates a significant operational risk. This could create catastrophic downstream consequences, such as a critical defense system failing to engage due to an unapproved, vendor-side modification. In August 2025, Anthropic itself disclosed that hackers had used its chatbot, Claude, to write code capable of carrying out cyberattacks against at least 17 organizations, including government entities noting that Agentic AI has been weaponized.[3]

A vendor like Anthropic, which has already demonstrated a hostile and non-cooperative stance on the use of its product, has the motive, means, and opportunity to introduce such vulnerabilities. Its refusal to partner in good faith makes it impossible to establish the deep trust required for security collaboration. The DoW would be forced to operate a black box controlled by a hostile party, which could contain hidden biases or backdoors. A vendor that seeks to control the use of its product so as to restrict DoW's lawful use thereof cannot be trusted. Given the public statements of Anthropic's CEO and others associated with the company, the

---

[1] See e.g. 2025 Photonics & Electromagnetics Research Symposium, Abu Dhabi, UAE, 4-8 May PIERS Detecting and Preventing Data Poisoning Attacks on AI Models

[2] Id.

[3] anthropic.com/news/detecting-countering-misuse-aug-2025#:~:text=No-code%20malware:%20selling%20AI,with%20third-party%20safety%20teams.

~~CUI~~

**Add.199**

**App.182**





**RESEARCH
AND ENGINEERING**

**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

Department must assume that Anthropic can and would impose its moral and policy judgments on the warfighting capabilities of the DoW, and therefore there is a substantial risk that Anthropic could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations, if it feels that its "redlines" are crossed. The threat of such an action is unacceptable.

4. Progression of Risk

The DoW institutes the U.S. Government standard Risk Management Framework (RMF) across all layers of technology, assets, data, processes, and supply chain. In accordance with the DoW RMF, assessments result in areas of risk across the DoW ecosystem (including vendors). Though an individual vendor may have only limited risk in individual categories, the aggregation of risk across categories can result in a vendor being deemed high risk. In other words, the culmination of unmitigable risks lead to a vendor having a material level of risk. The vendor can then be deemed a "supply chain risk," at which time they typically are removed from applicable systems to mitigate issues and threats.

In the instant case, Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them. Given the nature of AI systems and Anthropic's privileged access as the AI model's developer, curator and maintainer, there was a baseline risk given the potential harmful actions this privileged technical access makes possible. The supply chain risk level increased when Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law. This risk further increased when Anthropic asserted in the negotiations that it have an approval role in the operational decision chain, which would require the DoW to accept significant operational risk. Then during the final weeks of negotiations, it became clear that Anthropic was leveraging the DoW's ongoing good faith negotiations for Anthropic's own public relations, and they began engaging in an increasingly hostile manner through the press, despite the ongoing private negotiations with DoW leadership. Finally, this hostile posture was even further compounded when, during a time of active military operations, Anthropic leadership questioned the use of their technology in our warfighting systems clearly permitted under the Terms of Service of their existing contract with our Prime contractor. This collective set of actions represents a fully mature supply chain risk – including increased potential for model poisoning, insider threat risk, data exfiltration, and denial of service – posing a direct, intolerable, and material risk to our warfighting capability which warrants the designation of Anthropic as a supply chain risk.

**Add.200**

CUI



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC  20301-3030**

**RESEARCH
AND ENGINEERING**

5. Conclusion and Justification for Action

Anthropic's position is not a simple policy disagreement; it is an active demonstration of the exact risks our supply chain risk management laws were written to prevent. Use of Anthropic's products or services introduces significant risk to the DoW's covered systems, as the vendor, by maintaining the ability and necessity to continuously update and tune the product enables the potential for the vendor to subvert the design and/or functionality of their product or service. Such ability by the vendor could be used to implement changes in alignment with the vendor's ideology, putting the Department's lawful use of the capability at risk.

Therefore, Anthropic's unwillingness to permit the use of its technology to the extent permitted by law creates a clear and present supply chain risk as defined in 10 U.S.C. § 3252 and 41 U.S.C. § 4713.

Emil Michael

CUI

**Add.201**

# ATTACHMENT 2

UNCLASSIFIED

ATTACHMENT
Section 4713 Scoping Analysis for Anthropic, PBC

This document supports the use of section 4713 of title 41, United States Code ("Section 4713') authorities. The Secretary of War, pursuant to the recommendation of the Under Secretary of War for Acquisition and Sustainment and the Department of War Chief Information Officer, has determined the following as the appropriate scope for use of Section 4713 authorities necessary to address the supply chain risk related to the use of covered products or services of Anthropic, PBC:

• **Covered Entity:** Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity").

• **Covered Products or Services:** All of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

• **Covered Procurements:** All DoW procurements described in Section 4713(k)(3).

• **Covered Procurement Actions:** All actions described in Section 4713(k)(4).



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

The Honorable Mike D. Rogers
Chairman
Committee on Armed Services
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security. This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk. Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Adam Smith
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.204**

**App.187**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Roger F. Wicker
Chairman
Committee on Armed Services
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Jack Reed
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.205**

**App.188**



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

The Honorable Susan M. Collins
Chair
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Madam Chair:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security. This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk. Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Patty L. Murray
Vice Chair

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.206**

**App.189**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Tom J. Cole
Chairman
Committee on Appropriations
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Rosa L. DeLauro
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.207**

**App.190**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Rick Crawford
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Jim Himes
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.208**

**App.191**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR — 3 2026

The Honorable Tom Cotton
Chairman
Select Committee on Intelligence
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

    In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

    I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

    I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Mark Warner
Vice Chairman

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR − 3 2026

The Honorable Rand Paul
Chairman
Committee on Homeland Security and
    Governmental Affairs
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Gary C. Peters
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.210**

**App.193**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR – 3 2026

The Honorable James R. Comer
Chairman
Committee on Oversight and Government Reform
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Robert Garcia
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

Add.211



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Chuck Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Dick Durbin
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.212**

**App.195**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR − 3 2026

The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Jamie Raskin
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.213**

**App.196**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR – 3 2026

The Honorable Andrew Garbarino
Chairman
Committee on Homeland Security
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman,

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Bennie G. Thompson
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.214**

**App.197**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable Ted Cruz
Chairman
Committee on Commerce, Science, and Transportation
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Maria Cantwell
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.215**

**App.198**



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

The Honorable Brett Guthrie
Chairman
Committee on Energy and Commerce
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security. This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk. Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Frank Pallone, Jr.
Ranking Member

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.216**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

The Honorable John Thune
Senate Majority Leader
United States Senate
Washington, DC 20510

Dear Mr. Majority Leader:

In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security. This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk. Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

I am sending identical letters to Congress and the appropriate congressional committees.

Sincerely,

cc:
The Honorable Charles E. Schumer
Minority Leader

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.217**

**App.200**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR – 3 2026

The Honorable Mike Johnson
Speaker of the House
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Speaker:

      In accordance with title 41, U.S. Code, section 4713, I am notifying you of my determination that the use of products or services of Anthropic, PBC, including its subordinate, subsidiary, and affiliated offices or entities, doing business under various names, and all successors or assigns thereof (the "Covered Entity") in Department of War (DoW) covered procurements[1] presents a significant supply chain risk and that the use of section 4713 authorities is necessary to protect our national security.  This determination is based in part on a risk analysis by the DoW and input from senior DoW personnel that the Covered Entity's restrictions on the use of its products and services introduces national security risks to the DoW's supply chain.

      I have consulted with procurement and other relevant officials within DoW regarding the Covered Entity and determined that (i) use of the authority provided in section 4713 to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.  Accordingly, this letter is providing notice of a section 4713 determination regarding the products and services of the Covered Entity.

      I am sending identical letters to Congress and the appropriate congressional committees.

                    Sincerely,

cc:
The Honorable Hakeem Jeffries
Minority Leader

---

[1] Section 4713(k)(3).
[2] Section 4713(k)(4).

**Add.218**

**App.201**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JAN - 9 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
        COMMANDERS OF THE COMBATANT COMMANDS
        DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT:  Artificial Intelligence Strategy for the Department of War

**Accelerating America's Military AI Dominance**

President Trump makes clear in Executive Order 14179, "It is the policy of the United States to sustain and enhance America's global Artificial Intelligence (AI) dominance in order to promote human flourishing, economic competitiveness, and national security." In the national security domain, AI-enabled warfare and AI-enabled capability development will re-define the character of military affairs over the next decade.  This transformation is a race — fueled by the accelerating pace of commercial AI innovation coming out of America's private sector.  The United States Military must build on its lead over our adversaries in integrating this technology, established during President Trump's first term, to make our Warfighters more lethal and efficient.  To this end, aligned with America's AI Action Plan, I direct the Department of War to accelerate America's Military AI Dominance by becoming an "AI-first" warfighting force across all components, from front to back.

The Department will achieve this objective by:

- Unleashing experimentation with America's leading AI models Department-wide, and rewarding AI-first re-conceptions of legacy approaches;

- Aggressively identifying and eliminating bureaucratic barriers to deeper integration, which are vestiges of legacy information technology and modes of warfare;

- Focusing our investment to leverage America's core asymmetric advantages in AI computing, model innovation, entrepreneurial dynamism, capital markets, and combat-proven operational data from two decades of military and intelligence operations that no other military can replicate; and

- Executing a set of "Pace-Setting Projects" (PSPs) that will demonstrate the accelerated pace of execution, focus, and ethos we need to stay ahead.  The PSPs will also serve as tangible, outcome-oriented vehicles for rapidly completing our buildout of the foundational AI enablers (infrastructure, data, models, policies, and talent) needed to accelerate AI integration across the entire Department.

OSD070946-25/CMD018427-25

**Add.219**

**App.202**

The seven initial PSPs outlined below establish the new execution standard: single accountable leaders, aggressive timelines, measurable outcomes, and rapid iteration where failure accelerates learning and improvement.

**Acceleration Approach**

The means we will employ to pursue this strategy will continue to encompass our substantial program funding and workforce focused on AI across the Services and Components. We will also use the timely financial resources provided by Congress in the form of One Big Beautiful Bill, along with expanded budget withhold (Joint Acceleration Reserve) flexibility, to catalyze our accelerated pace of Military AI integration in the immediate term. And we will leverage the access, capabilities, investments, and insights of America's allies and partners to support our shared objectives, consistent with the President Trump's AI Action Plan to "Lead in International AI Diplomacy and Security".

We will re-focus the Chief Digital and AI Office (CDAO) and these enhanced resources to unlock critical foundational enablers needed to accelerate war-winning efforts across the Department, starting with enabling the set of seven PSPs listed below in fiscal year 2026. These PSPs will address key opportunities for enhanced military AI advantage across Warfighting, Intelligence, and Enterprise mission areas:

- **Warfighting:**

  1. Swarm Forge: Competitive mechanism to iteratively discover, test, and scale novel ways of fighting with and against AI-enabled capabilities — combining America's elite Warfighting units with elite technology innovators.

  2. Agent Network: Unleashing AI agent development and experimentation for AI-enabled battle management and decision support, from campaign planning to kill chain execution.

  3. Ender's Foundry: Accelerating AI-enabled simulation capabilities — and sim-dev and sim-ops feedback loops — to ensure we stay ahead of AI-enabled adversaries.

- **Intelligence:**

  4. Open Arsenal: Accelerating the TechINT-to-capability development pipeline, turning intel into weapons in hours not years.

  5. Project Grant: Enabling transformation of deterrence from static postures and speculation to dynamic pressure with interpretable results.

- **Enterprise:**

  6. GenAI.mil: Democratizing AI experimentation and transformation across the

Department by putting America's world-leading AI models directly in the hands of our three million civilian and military personnel, at all classification levels.

7. Enterprise Agents: Building the playbook for rapid and secure AI agent development and deployment to transform enterprise workflows.

The PSPs will each be led by an exemplary program leader in partnership with a sponsoring organization. Progress will be demonstrated monthly to the Deputy Secretary of War (Deputy Secretary) and Under Secretary of War for Research and Engineering (USW(R&E)), with initial demonstration by transition-partner user(s) to occur within six months from the date of this memorandum.

The CDAO will also ensure all foundational enablers unlocked by these projects are made available to programs Department-wide in real-time, so accelerated execution by PSPs will enable projects across the Department to accelerate their pace along with them. Therefore, I direct each Military Department, combatant command, and defense agency and field activity to identify within 30 days at least three projects they will prioritize to fast-follow these PSPs. Efforts under the Department's six Critical Technology Areas – including autonomy, C-C5ISRT, and advanced manufacturing — must continue to push the pace for the Department of War (DoW). And the special initiatives outlined in classified annexes, including those in the Classified Annex provided by separate cover to this memorandum, will also be accelerated. CDAO will track and rank this extended pack of AI efforts by speed and impact, and progress will be reported monthly to the Deputy Secretary and USW(R&E).

**AI Compute.** As part of our AI and Autonomy acceleration investments, the Department will invest substantial resources in the expansion of our access to AI compute infrastructure, from datacenters to the edge. We will leverage the hundreds of billions in private sector capital investment being made in America's AI sector through our growing array of creative partnerships with America's world-leading companies. We will work with interagency partners to establish technical standards for new secure datacenters. And we will support and leverage the American Science and Security Platform being developed by President Trump's Genesis Mission for science and technology innovation, so our warfighters and capability developers have the full benefit of America's AI compute resources and latest innovations.

**Data Access.** I direct the CDAO to enforce, and all DoW Components to comply with, the 'DoD Data Decrees' to further unlock our data for AI exploitation and mission advantage. Military Departments and Components will establish, maintain, and update federated data catalogs exposing their system interfaces, data assets, and access mechanisms across all classification levels, as mandated by the Department's May 2021 memorandum, "Creating Data Advantage." They will deliver their current catalogs — with all available updates — to the CDAO within 30 days of the date of this memorandum. The Under Secretary of War for Intelligence and Security will ensure intelligence data receives parallel treatment, with exploitation pathways established within the same timeframe. The CDAO is authorized to direct release of any DoW data to cleared users with valid purpose, consistent

with security guidelines. Effective immediately, denials of CDAO data requests must be justified to the USW(R&E) within seven (7) days, who will remediate or escalate to the Deputy Secretary. Our data advantage is meaningless if our developers and operators cannot exploit it.

**Talent.** Finally, I believe the best American talent will see this accelerated posture of AI capability development and adoption at the DoW, and I expect each Service and Component to attract and retain this talent. To that end, I direct use of special hiring and pay authorities Department-wide, as well as novel talent programs from the Office of Personnel and Management and other partners, to accelerate our pace of technical talent hiring into AI roles. And I direct each Component to provide AI hiring and talent development plans to the Under Secretary of War for Personnel and Readiness within 60 days of this memo for approval, denial or modification within 30 days thereafter.

**Acceleration Expectations**

This strategy will accelerate our advantage, and we must implement it with the Warrior Ethos. Consistent with the refocusing of the Department onto a wartime footing, I expect the following approaches to become internalized as essential elements of our execution in this race to maintain Military AI Dominance:

**Speed Wins.** We must internalize that Military AI is going to be a race for the foreseeable future, and therefore speed wins. We must weaponize learning speed, and measure and manage cycle time and adoption rates as decisive variables in the AI era. We must accept that the risks of not moving fast enough outweigh the risks of imperfect alignment. I direct CDAO to establish deployment velocity and operational cycle-time metrics for all PSPs, to be a focus of their monthly reporting to the Deputy Secretary and USW(R&E).

**AI Model Parity.** We are seeing unprecedented velocity in the evolution of the frontier AI models. These models are becoming smarter and more robust every day. The Department cannot be working off models that are months or years old. We must have the latest and greatest AI models deployed for our warfighters. Deploying these capabilities across all echelons is simply not enough, we must be able to support and sustain rapid model updates across all echelons. I direct CDAO to establish a delivery and integration cadence with AI vendors that enables the latest models to be deployed within 30 days of public release. This shall be a primary procurement criterion for future model acquisition.

**Wartime Approach to Blockers.** We must eliminate blockers to data sharing, Authorizations to Operate (ATOs), test and evaluation and certification, contracting, hiring and talent management, and other policies that inhibit rapid experimentation and fielding. We must approach risk tradeoffs, "equities", and other subjective questions as if we were at war. To this end, I expect our CDAO to act as a Wartime CDAO and work with the Chief Information Officer to fully leverage statutory and delegated authorities to accelerate AI capability delivery, including cross-domain data access and rapid ATO reciprocity on behalf of pace-pushing leaders across the Department. The USW(R&E) will establish a monthly "Barrier Removal Board" with authority to waive non-statutory requirements and escalate

blockers for immediate resolution.

**Competition > Centralized Planning.** As America's AI ecosystem demonstrates, robust competition by small teams, with transparent metrics for results, is the engine of commercial AI leadership. We must bring this model into the Department and encourage robust competition to spur faster military AI integration. Small, accountable teams will win over process in a race characterized by dynamic and unpredictable innovation. We will measure success through continuous field experimentation: putting AI capabilities in operators' hands, gathering feedback within days not years, and pushing updates faster than the enemy can adapt. I direct CDAO to establish AI system usage and mission impact metrics for evaluating the success of these AI acceleration efforts. To enable market dynamics to drive resourcing, decisions about future resourcing and deprecation of associated capabilities will principally be made on the basis of these metrics.

**AI-Native Warfighting.** Together with capability innovation, we must more fully incorporate AI and Autonomy into military planning; tactics, techniques and procedures (TTP) development; and experimentation processes. I direct each Service Chief and Combatant Commander to designate an AI Integration Lead within 30 days, who will work with the CDAO and be responsible for the co-evolution of AI-enabled capabilities with warfighting concepts and experimentation. I direct CDAO to establish criteria for robust experimentation with AI capabilities. And I direct the Joint Staff to designate a senior official to monitor Service AI warfighting concept development and workflow optimization, and provide me with progress reports on a quarterly basis. We must put aside legacy approaches to combat and ensure we use this disruptive technology to compound the lethality of our military. Exercises and experiments that do not meaningfully incorporate AI and autonomous capabilities will be reviewed by the Director of Cost Assessment and Program Evaluation for resourcing adjustment.

**Modular Open Architectures.** In the AI arms race, system architectures must enable component replacement at commercial velocity to maintain overmatch. I direct Military Department and Component Program Managers acquiring AI capabilities to enforce Modular Open System Architectures (MOSA) along with the "DoD Data Decrees," exposing modular interfaces and associated documentation sufficient for third-party integration without prime contractor support.

**Clarifying "Responsible AI" at the DoW — Out with Utopian Idealism, In with Hard-Nosed Realism.** Diversity, Equity, and Inclusion and social ideology have no place in the DoW, so we must not employ AI models which incorporate ideological "tuning" that interferes with their ability to provide objectively truthful responses to user prompts. The Department must also utilize models free from usage policy constraints that may limit lawful military applications. Therefore, I direct the CDAO to establish benchmarks for model objectivity as a primary procurement criterion within 90 days, and I direct the Under Secretary of War for Acquisition and Sustainment to incorporate standard "any lawful use" language into any DoW contract through which AI services are procured within 180 days. I also direct the CDAO to ensure all existing AI policy guidance at the Department aligns with the directives laid out in this memorandum.

**Becoming An AI-First Department**

The time is now to accelerate AI integration, and we will put the full weight of the Department's leadership, resources, and expanding corps of private sector partners into accelerating America's Military AI Dominance.

Becoming an "AI-First" warfighting force requires more than integrating AI into existing workflows. It requires re-imagining how existing workflows, processes, TTPs, and operational concepts would be designed if current AI technology existed when they were created — and then re-inventing them accordingly.

We must drive this transformation across every aspect of the Department. The expectations outlined above must become technological "AI fitness standards" for our Joint Force. 2026 will be there year we emphatically raise the bar for Military AI Dominance.

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Anthropic PBC,

Petitioner,

v.

U.S. Department of War, *et al.*,

Respondents.

No. 26-1049

**DECLARATION OF EMIL MICHAEL**

Pursuant to 28 U.S.C. § 1746, I, Emil Michael, declare as follows:

1. I am the Under Secretary of War for Research and Engineering (USW(R&E)) and Chief Technology Officer for the Department of War (DoW). I have held this position since May 20, 2025.

2. In my current position, I am responsible for spearheading the Department's efforts to ensure U.S. military technological superiority and keep DoW at the forefront of innovation. I provide strategic direction and oversight for DoW's entire research, development, and prototyping enterprise, which includes providing critical input on the acquisition, implementation, and use of cutting-edge technologies such as artificial intelligence (AI).

3. This declaration is based on my personal knowledge as well as

**Add.225**

**App.208**

information made available to me through reasonable diligence in the course of my official duties.

### DoW's Procurement Authorities and Processes

4. Organized under Title 10 of the United States Code, DoW is the largest government agency of the United States. DoW oversees the United States' armed services and coordinates the national defense. In service of the national defense, DoW awards contracts to and sets terms and policies with various entities that supply the Department with the technologies needed to advance U.S. military and national defense capabilities.

5. As part of its acquisition and procurement authorities, DoW conducts supply chain risk assessments of covered procurements involving covered systems and covered items of supply, including pursuant to 10 U.S.C. § 3252 and 41 U.S.C. § 4713. If DoW determines that there is a significant supply chain risk to a covered system, the Secretary of War is authorized to take covered procurement actions, including as defined by Section 4713, to exclude the source of the risk from covered systems to protect national security.

### Supply Chain Risk and Harms to National Security

6. As outlined in the Urgent Supply Risk Analysis (the "Analysis") provided to the Secretary of War, Anthropic PBC has become a supply chain

2

**Add.226**

**App.209**

risk following a progression of risk that reached a saturation point as a result of the behavior of its leadership during the course of contract negotiations with DoW in late 2025 and early 2026. As explained in the Analysis, the relatively opaque nature of large language model (LLM) technology that DoW procures from Anthropic creates a baseline risk. That risk escalated due to the unusual degree of control that Anthropic insists on retaining over the model in contracts with the Department, as compared to its competitors, as well as Anthropic's adversarial posture towards DoW's statutory mission and the manner in which it is conducted. This technical opacity makes it difficult for DoW to assess technological features that may be encoded into the LLM product and that may cause it to subvert the appropriate execution of mission applications, also known as "model poisoning," or to fail to perform altogether. While this is, at least in part, a common concern with all LLMs, the risk is significantly elevated in this instance by the actions of Anthropic's leadership, detailed below.

7. In addition, the federal government has identified AI as a field that requires technology transfer restrictions, per the Technology Alert list. Anthropic employs a large number of foreign nationals to build and support its LLM products, including many from the Peoples Republic of China (PRC), which increases the degree of adversarial risk should those employees comply

3

**Add.227**

**App.210**

with the PRC's National Intelligence Law.    Although other major U.S. AI labs that provide LLM products to DoW may present similar risks, the technical and security assurances of the other labs' leadership, along with their consistently responsible and trustworthy behavior during their engagement with DoW, mitigate these risks.    Anthropic's case, however, is different.    A series of additional risks came to light in 2026, when DoW and the company engaged in contract negotiations to expand DoW's use of Anthropic's LLM products.

8.    First, Anthropic's leadership demonstrated an intent to prevent the U.S. military's lawful use of their LLM product, Claude, despite the company's publicly stated knowledge that adversarial nation states have a practice of stealing Anthropic's LLM technology for their own unrestricted use.[1]    This asymmetrical reality, imposed by Anthropic, disadvantages the U.S. military vis-à-vis its adversaries.    During the 2026 contract negotiations, Anthropic's leadership insisted on multiple redlines that it would not allow the U.S. military to cross when using Claude.    The company's leadership insisted on imposing restrictions on DoW's lawful military capability development, operations, and intelligence missions, even

---

[1] https://www.anthropic.com/news/detecting-and-preventing-distillation-attacks.

4

**Add.228**

**App.211**

though it would impair the capabilities of the U.S. military relative to our adversaries.    In short, Anthropic made clear that it will not allow the Government to deploy Claude for multiple lawful uses.    Determinations about lawful military uses, however, must rest solely with DoW and not with a private company.

9.    Second, Anthropic's leadership confirmed in an internal company memorandum published in February that the company sought to impose multiple restrictions over the Government's lawful use of Claude, including safety mechanisms that may be outside the control of DoW.[2]

10.    Third, the company's leadership demonstrated bad faith by sharing with the press unclassified but sensitive details of private conversations with DoW leadership in order to exert public pressure on DoW to concede to Anthropic's demands.

11.    Fourth, the Department learned that in 2025, the U.S. Centers for Disease Control's (CDC) lawful use of Anthropic's LLM technology to support its infectious disease prevention research mission was limited by Anthropic's use of safety filters in the LLM product CDC was using.    The company did not inform the agency of these filters, and they caused the product to stop

---

[2]  https://www.theinformation.com/articles/read-anthropic-ceos-memo-attacking-openais-mendacious-pentagon-announcement.

5

functioning normally for various sensitive, but research-aligned queries.

12. Fifth, the Department learned that an Anthropic executive expressed concern to one of DoW's primary operational support software vendors about the potential use of Anthropic's LLM products by U.S. military analysts in support of an overseas military operation. The Department was made aware of this conversation between cleared individuals by the primary vendor. During later discussions with Anthropic leaders, not all of whom have the requisite security clearances, an Anthropic executive repeated this information, raising serious concerns about their processes and procedures for operational security. The same information subsequently appeared in the news media. In light of these incidents, it is reasonably likely that Anthropic's leadership would alter or even shut off DoW's use of Claude if Anthropic believes that the model may be used for purposes it deems, in its sole discretion, to extend beyond the company's unilaterally imposed boundaries before or during a military operation, which could endanger the lives of U.S. military personnel and civilians and compromise the United States' warfighting mission. Continuing to use Anthropic's technology under the current contract structures in any echelon in DoW's supply chain, namely the covered systems, thus presents a significant risk.

13. Taken together, this collection of risks demonstrates the clear

6

**Add.230**

**App.213**

technical capability and adversarial intent for Anthropic's leadership to potentially undermine lawful U.S. national security activities and objectives. Anthropic leadership's adversarial behavior has elevated the supply chain risks to a saturation point. DoW uses Anthropic's model in multiple ways, including in ongoing military operations. If Anthropic were to interfere during an operation, whether by shutting off access to the model or altering its functionality, such interference could cause serious harm to national security and loss of human life. Indeed, such interference with active operations could occur even without Anthropic deciding to intervene in real time. A limitation that Anthropic previously built into the model, and failed to disclose to the Department, such as with the CDC, could prevent or alter certain functions during an active operation, leading to these serious consequences. This risk within a covered system is intolerable and warrants the designation under 41 U.S.C. § 4713.

14. This risk is not limited only to Anthropic and its model's standalone presence in DoW systems or as a subcontractor to DoW. The model's interactions with other technology and covered systems create additional risk to the DoW supply chain. When Anthropic's model is layered into other applications, there is a substantial risk that any company-imposed restrictions or alterations to the model would be transferred and impact

7

**Add.231**

**App.214**

mission applications, including in weapons systems development and other products or services that ultimately perform DoW activities.

15.    As an example, if Anthropic's technology is used as a plug-in to a larger application, it may limit the functionality of that larger system to the internal limitations built into or added to the Anthropic system.    This would directly impair other covered systems by reducing their functionality to the same level as Anthropic's system.

16.    AI is functionally a tool to assist DoW in its national security mission.    It is imperative that DoW be able to fully trust the functionality of its tools.    Here, there are significant concerns due to Anthropic's demonstrated willingness to modify or restrict its model's functionality for DoW purposes.    All lawfulness determinations are vested with DoW, which ensures the integrity of the chain of command, especially during active combat operations.    Anthropic's demonstrated willingness to interfere with that chain of command is a significant risk.

17.    In assessing these significant supply chain risks and harms to national security, DoW considered whether less restrictive means than exclusion and removal could mitigate the supply chain risk and national security harm.    While each risk identified above may not, standing alone, have necessitated exclusion and removal of plaintiff from DoW's supply chain,

8

**Add.232**

**App.215**

when considered in the aggregate, a significant supply chain risk exists.    The only potential mitigation to this collective set of risks—acquisition of LLM products with the usage terms and technical and service delivery specifications DoW requires—was not an option to which Anthropic would agree.

18.    These risks and possible mitigation options were considered in the aggregate and in light of the escalating tension over the key differences concerning authority to determine DoW's lawful use of Claude during DoW's contract negotiations with Anthropic.    DoW ultimately determined that Anthropic's conduct constituted a fully mature and significant supply chain risk—including increased potential for AI model manipulation, insider threat risk, data exfiltration, and denial of service—that posed a direct, unmitigable risk to DoW's warfighting capabilities and national security mission.

19.    While Anthropic presents a supply chain risk, it is technically and operationally infeasible to remove the technology from all DoW systems immediately, particularly in the midst of active operations.    Because of this reality, the designation allows a 180-day offramp to remove Anthropic's Claude model from its systems and migrate to alternative LLM products without impacting operational readiness.    This is a significantly compressed timeline to ensure that this risk is removed from DoW's systems, particularly

9

**Add.233**

**App.216**

because of the need to integrate another vendor's products and services, including the associated requisite security clearance.

20.    This reality is expressed in a March 5, 2026, memorandum issued by the DoW Chief Information Officer.    In this memorandum, the Chief Information Officer determined that "DoW Components will discontinue all use of the Covered Company's products across all DoW systems within 180 days."    The memorandum adds that new procurements involving Anthropic's products are disallowed, as these products are no longer authorized for installation in DoW covered systems.

21.    As noted, Claude is used in a variety of functions throughout DoW. This is a result of Claude being the first AI model that was available to function in DoW's classified networks and one of the first AI models integrated through Amazon Web Services (AWS), which was awarded the first contract in 2016. This placed Claude in the lead on multiple fronts.    However, other companies have been closing the gaps.

22.    DoW expects that within 180-days, barring any significant change in necessity, it will be able to create the digital space needed for another system and prepare for a seamless handoff from Claude to ensure that the risk is efficiently removed from DoW networks.

23.    This process has already been initiated.    Any stay of the

10

**Add.234**

**App.217**

Secretary's designation that had the effect of pausing this process would in and of itself be a significant threat to the national security of the United States.

24. A court order preventing the removal of Anthropic's technology from DoW systems as soon as possible would result in an ongoing threat to national security remaining on DoW's systems, and allowing contractors to continue to engage with Anthropic as a subcontractor to DoW would itself create an additional intolerable risk. As a subcontractor, Anthropic poses the same threats as it would as a prime contractor. The incorporation of Anthropic's systems into a product on DoW systems would cause the same risks regardless of whether it flows directly to DoW systems or through a prime contractor.

25. During this transition period, DoW is taking additional measures to mitigate the supply chain risk and national security harms presented by Anthropic leadership's behavior with regard to DoW systems. The Department is working with third-party cloud service providers to ensure Anthropic leadership cannot make unilateral changes to the containerized version of its LLM product that DoW currently uses. DoW is also working with its counterintelligence and law enforcement partners to assess the potential risk that Anthropic's LLM products may contain technical exploits, including ones that could have been embedded by foreign nationals, given the

11

**Add.235**

**App.218**

leadership's pattern of behavior.    Finally, DoW is communicating its risk saturation findings with the other U.S. government departments and agencies to support their own risk mitigation efforts.

26.    DoW has an obligation and a duty to ensure the integrity of its operations and the safety and security of its personnel, including from any risks that may be presented through its supply chain to its covered systems. Supply chain security is national security.    Therefore, the Department took action to ensure the integrity of its covered systems.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 19th day of March, 2026, at Washington, DC.

Emil Michael

12

**Add.236**

**App.219**

https://www.theinformation.com/articles/read-anthropic-ceos-memo-attacking-openais-mendacious-pentagon-announcement

*Anthropic CEO Dario Amodei sent a 1,600-word memo to employees Friday as OpenAI announced a deal to provide AI to the Pentagon. The OpenAI move came hours after the Pentagon said it would sever ties with Anthropic over the company's safety requirements. In the strongly worded memo, Amodei heavily criticized OpenAI's actions and the initial deal it announced with the Pentagon.*

*Below is Amodei's memo, which has been edited to include clarifications in brackets and paragraph breaks:*

I want to be very clear on the messaging that is coming from OpenAI, and the mendacious nature of it. This is an example of who they really are, and I want to make sure everything sees it for what it is. Although there is a lot we don't know about the contract they signed with DoW [shorthand for the Department of Defense] (and that maybe they don't even know as well — it could be highly unclear), we do know the following:

Sam [Altman]'s description and the DoW description give the strong impression (although we would have to see the actual contract to be certain) that how their contract works is that the model is made available without any legal restrictions ("all lawful use") but that there is a "safety layer", which I think amounts to model refusals, that prevents the model from completing certain tasks or engaging in certain applications.

"Safety layer" could also mean something that partners such as Palantir [Anthropic's business partner for serving U.S. agency customers] tried to offer us during these negotiations, which is that they on their end offered us some kind of classifier or machine learning system, or software layer, that claims to allow some applications and not others. There is also some suggestion of OpenAI employees ("FDE's" [shorthand for forward deployed engineers]) looking over the usage of the model to prevent bad applications.

Our general sense is that these kinds of approaches, while they don't have zero efficacy, are, in the context of military applications, maybe 20% real and 80% safety theater. The basic issue is that whether a model is conducting applications like mass surveillance or fully autonomous weapons depends substantially on wider context: a model doesn't "know" if there's a human in the loop in the broad situation it is in (for autonomous weapons), and doesn't know the provenance of the data is it analyzing (so doesn't know if this is US domestic data vs foreign, doesn't know if it's enterprise data given by customers with consent or data bought in sketchier ways, etc).

We also know — those in safeguards know painfully well — that refusals aren't reliable and jailbreaks are common, often as easy as just misinforming the model about the data it is

**Add.237**

**App.220**

analyzing. An important distinction here that makes it much harder than the safeguards problem is that while it's relatively easy to, for example, determine if a model is being used to conduct cyberattacks from inputs and outputs, it's very hard to determine the nature and context of the cyber attacks, which is the kind of distinction needed here. Depending on the details this task can be difficult or impossible.

The kind of "safety layer" stuff that Palantir offered us (and presumably offered OpenAI) is even worse: our sense was that it was almost entirely safety theater, and that Palantir assumed that our problem was "you have some unhappy employees, you need to offer them something that placates them or makes what is happening invisible to them, and that's the service we provide".

Finally, the idea of having Anthropic/OpenAI employees monitor the deployments is something that came up in discussion within Anthropic a few months ago when we were expanding our classified AUP [acceptable use policy] of our own accord. We were very clear that this is possible only in a small fraction of cases, that we will do it as much as we can, but that it's not a safeguard people should rely on and isn't easy to do in the classified world. We do, by the way, try to do this as much as possible, there's no difference between our approach and OpenAI's approach here.

So overall what I'm saying here is that the approaches OAI [shorthand for OpenAI] is taking mostly do not work: the main reason OAI accepted them and we did not is that they cared about placating employees, and we actually cared about preventing abuses. They don't have zero efficacy, and we're doing many of them as well, but they are nowhere near sufficient for purpose. It is simultaneously the case that the DoW did not treat OpenAI and us the same here.

We actually attempted to include some of the same safeguards as OAI in our contract, in addition to the AUP which we considered the more important thing, and DoW rejected them with us. We have evidence of this in the email chain of the contract negotiations (I'm writing this with a lot to do, but I might get someone to follow up with the actual language). Thus, it is false that "OpenAI's terms were offered to us and we rejected them", at the same time that it is also false that OpenAI's terms meaningfully protect them against domestic mass surveillance and fully autonomous weapons.

Finally, there is some suggestion in Sam/OpenAI's language that the red lines we are talking about, fully autonomous weapons and domestic mass surveillance, are already illegal and so an AUP about these is unnecessary. This mirrors and seems coordinated with DoW's messaging. It is however completely false.  As we explained in our statement yesterday, the

**Add.238**

**App.221**

DoW does have domestic surveillance authorities, that are not of great concern in a pre-AI world but take on a different meaning in a post-AI world.

For example, it is legal for DoW to buy a bunch of private data on US citizens from vendors who have obtained that data in some legal way (often involving hidden consents to sell to third parties) and then analyze it at scale with AI to build profiles of citizens, their loyalties, movement patterns in physical space (the data they can get includes GPS data, etc), and much more.

Notably, near the end of the negotiation the DoW offered to accept our current terms if we deleted a specific phrase about "analysis of bulk acquired data", which was the single line in the contract that exactly matched this scenario we were most worried about. We found that very suspicious. On autonomous weapons, the DoW claims that "human in the loop is the law", but they are incorrect. It is currently Pentagon policy (set during the Biden admin[istration]) that a human has to be in the loop of firing a weapon. But that policy can be changed unilaterally by Pete Hegseth, which is exactly what we are worried about. So it is not, for all intents and purposes, a real constraint.

A lot of OpenAI and DoW messaging just straight up lies about these issues or tries to confuse them.

I think these facts suggest a pattern of behavior that I've seen often from Sam Altman, and that I want to make sure people are equipped to recognize:

He started out this morning by saying he shares Anthropic's redlines, in order to appear to support us, get some of the credit, and not be attacked when they take over the contract. He also presented himself as someone who wants to "set the same contract for everyone in the industry" — e.g. he's presenting himself as a peacemaker and dealmaker.

Behind the scenes, he's working with the DoW to sign a contract with them, to replace us the instant we are designated a supply chain risk. But he has to do this in a way that doesn't make it seem like he gave up on the red lines and sold out when we wouldn't. He is able to superficially appear to do this, because (1) he can sign up for all the safety theater that Anthropic rejected, and that the DoW and partners are willing to collude in presenting as compelling to his employees, and (2) the DoW is also willing to accept some terms from him that they were not willing to accept from us. Both of these things make it possible for OAI to get a deal when we could not.

The real reasons DoW and the Trump admin do not like us is that we haven't donated to Trump (while OpenAI/Greg [Brockman, OpenAI's president] have donated a lot), we haven't given dictator-style praise to Trump (while Sam has), we have supported AI regulation which is against their agenda, we've told the truth about a number of AI policy issues (like

**Add.239**

**App.222**

job displacement), and we've actually held our red lines with integrity rather than colluding with them to produce "safety theater" for the benefit of employees (which, I absolutely swear to you, is what literally everyone at DoW, Palantir, our political consultants, etc, assumed was the problem we were trying to solve).

Sam is now (with the help of DoW) trying to spin this as we were unreasonable, we didn't engage in a good way, we were less flexible, etc. I want people to recognize this as the gaslighting it is.

Vague justifications like "person X was hard to work with" are often used to hide real reasons that look really bad, like the reasons I gave above about political donations, political loyalty, and safety theater. It's important that everyone understand this and push back on this narrative at least in private, when talking to OpenAI employees.

Thus, Sam is trying to undermine our position while appearing to support it. I want people to be really clear on this: he is trying to make it more possible for the admin to punish us by undercutting our public support.  Finally, I suspect he is even egging them on, though I have no direct evidence for this last thing.

I think this attempted spin/gaslighting is not working very well on the general public or the media, where people mostly see OpenAI's deal with DoW as sketchy or suspicious, and see us as the heroes (we're #2 in the App Store now!). [Anthropic's Claude chatbot later rose to no. 1 on one of Apple's App Store download rankings.] It is working on some Twitter morons, which doesn't matter, but my main worry is how to make sure it doesn't work on OpenAI employees.

Due to selection effects, they're sort of a gullible bunch, but it seems important to push back on these narratives which Sam is peddling to his employees.

**Add.240**

**App.223**



**OFFICE OF THE SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR 19 2026

Mr. Dario Amodei
Chief Executive Officer
Anthropic, PBC
548 Market Street
San Francisco, CA 94104

Dear Anthropic, PBC Executive Leadership:

This letter supplements the Secretary of War's letter of March 3, 2026, which provided notice to Anthropic, Public Benefit Corporation (PBC), and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity" or "Anthropic") that he had determined that the use of Anthropic's products and services in Department of War (DoW) covered procurements presents a significant supply chain risk. Pursuant to 41 U.S.C. § 4713(b)(2), please find a copy of the joint recommendation of the Under Secretary of War for Acquisition and Sustainment and the DoW Chief Information Officer that a significant supply chain risk exists in a covered procurement involving Anthropic. Along with the enclosed recommendation, please find a risk analysis by the Under Secretary of War for Research and Engineering, as well as a 41 U.S.C. § 4713 scoping analysis.

You may submit information or arguments in opposition to this notice within 30 days of receipt. The relevant DoW offices will review any such information and within 30 days of the submission issue a final decision regarding any appropriate modifications to the original determination.

Sincerely,

Anthony C. Fuscellaro
COL, USA
Executive Secretary

Enclosures:
As stated

**Add.241**

**App.224**



~~CUI~~

**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR – 3 2026

**DETERMINATION**

In accordance with Section 4713(c) of title 41, United States Code (U.S.C.), ("Section 4713"), and pursuant to the recommendation provided by the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO), I hereby determine that (i) the use of the authority set forth in Section 4713(a) with respect to a covered procurement involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity"), is necessary to protect national security by reducing significant supply chain risk, (ii) less intrusive measures are not reasonably available to reduce such supply chain risk; and (iii) the use of such authorities will apply to a class of covered procurements.

**Determination.** In accordance with Section 4713(b)(3), based on the scoping analysis, mitigation considerations, and the joint recommendation of the DoW CIO and the USW(A&S) (Attached), I make the following determinations:

- **Covered Procurement Actions Are Necessary to Protect National Security**: The use of any of the Covered Entity's covered products or services in any DoW covered system presents a significant supply chain risk, and the use of the authority in Section 4713(a) is necessary to protect national security by reducing that supply chain risk.

- **No Less Intrusive Measures Are Reasonably Available:** There are no less intrusive measures that are reasonably available to reduce the supply chain risk associated with the use of the Covered Entity's products or services in any DoW covered system.

- **Class Determination:** The use of Section 4713 authorities will apply to all covered procurement actions involving the Covered Entity.

**Scope and Applicability.** This Determination is applicable to all of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

**Urgent National Security Interest.** I have determined that an urgent national security interest requires the immediate exercise of the authority in Section 4713(a) pursuant to Section 4713(c). As such, DoW will take all action as required by Section 4713(b)-(c) following announcement of this determination.

Attachment:
As stated

Controlled By: OUSW(A&S) OASW(IBP)
CUI Category: OPSEC, PROPIN
LDC: D
POC: Vy Nguyen, Vy.K.Nguyen.civ@mail.mil



~~CUI~~
**Add.242**

CUI



**OFFICE OF THE SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

### Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC

**Summary**

This document sets forth the joint recommendation of the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO) for action to be undertaken pursuant to Section 4713 of title 41, United States Code (U.S.C.) ("Section 4713").

In accordance with Section 4713(b)(1), the USW(A&S) and DoW CIO consulted with procurement and other relevant officials within DoW and jointly recommend that there is a significant supply chain risk in a covered procurement[1] involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity").

The Covered Entity's restrictions on the use of its products and services introduces significant national security risks to the DoW's supply chain.

**Joint Recommendation by USW(A&S) and DoW CIO**

**Risk Analysis:** The DoW CIO and USW(A&S) have determined the Covered Entity's restrictions on the use of its products and services pose unacceptable risk to the DoW. Specifically, there is significant risk, based upon the statements and actions of the Covered Entity, that use of its products and services and, as a result, the products and services of other entities with which DoW contracts, will be subject to manipulation in such a manner as to inhibit the DoW's use thereof. This creates significant risk to DoW's supply chain as the relevant products and services are integral to DoW's operational capabilities, as well as the functioning of various activities across the DoW. The DoW CIO and USW(A&S) therefore believe there is an urgent national security interest in mitigating the significant supply chain risk created by the Covered Entity as soon as practicable.

**Joint USW(A&S)/DoW CIO Class Recommendation to Mitigate Supply Chain Risk:** On the basis of this risk analysis and consultation with relevant DoW officials, the USW(A&S) and the DoW CIO jointly recommend that there is a significant supply chain risk associated with the use of the Covered Entity's products and services in any DoW covered system. DoW CIO and USW(A&S) therefore recommend invocation of the authorities codified at Section 4713(c) to urgently mitigate this risk as soon as practicable while minimizing disruption to the DoW.

---

[1] "Covered procurement" is defined at Section 4713(k)(3).

CUI
**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1**
**Add.243**

**App.226**

~~CUI~~

SIGNED:

HON Michael P. Duffey
Under Secretary of War for
Acquisition and Sustainment

Date: 3/3/26

HON Kirsten Davies
Department of War Chief
Information Officer

Date: 3 MARCH 2026

Attachment:
ATTACHMENT 1a – Urgent Supply Chain Risk Analysis on Anthropic PBC (~~CUI~~)
ATTACHMENT 1b – Due Diligence Preliminary Report on Anthropic (CUI//PROPIN)
ATTACHMENT 2 – Section 4713 Scoping Analysis for Anthropic, PBC

~~CUI~~
**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1**

**Add.244**

CUI



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

RESEARCH
AND ENGINEERING

MEMORANDUM FOR THE RECORD

SUBJECT:   Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use

1. Summary

This analysis outlines the significant and unacceptable supply chain risk posed by Anthropic's unwillingness to agree to the U.S. government's use of its artificial intelligence (AI) models for lawful warfighting purposes. This unreasonableness endangers the strategic implementation and technical integrity of the Department of War's (DoW) information and related systems. Thus, this is not a mere contractual dispute. Anthropic's actions represent a direct challenge to the government's ability to control its own lawful operations and a threat to the security of the DoW's critical technology infrastructure. Anthropic's behavior therefore squarely meets the definition of "supply chain risk" as defined in both 10 U.S.C. § 3252 and 41 U.S.C. § 4713 and requires immediate mitigatory action.

2. The Operational and Strategic Threat

The government must ensure its technology assets are reliable, secure, and effective. Were DoW to accede to Anthropic's demands, the sought-after contract language would introduce a vendor-imposed point of failure. This is untenable. By embedding unreasonably restrictive terms that restrict DoW's warfighting operations beyond the limitations imposed by law, Anthropic seeks to grant itself an operational veto. This triggers the legal definition of supply chain risk at 10 U.S.C. § 3252(d)(4), which explicitly includes the risk that an entity may "deny, disrupt, or otherwise degrade the function, use, or operation" of a covered system. A contractual provision that unnecessarily restricts the use of a system to diminish functionality and limit DoW's warfighting capabilities introduces, by definition, an unreliable and compromised component into our warfighting mission.

This is compounded by demonstrated hostility in negotiations with DoW. Based on statements made during negotiations, Anthropic appears to be taking a negotiation posture meant principally to benefit its public perception that is not centered on truth or fact. In addition, during our negotiations, one of Anthropic's executives questioned the propriety of the potential use of their software for a sensitive military operation abroad despite that use being permitted under the existing Terms of Service. This led to alarm by the DoW and the prime contractor who provides Anthropic software, and raised material doubts as to whether they would cause their software to stop working or cause some other disastrous action that would put our warfighters lives in danger. The DoW recognizes that its suppliers are often for-profit corporations that intend both to help the warfighters and American public and turn a profit. However, a vendor that raises the prospect of disallowing its software to function in critical military operations, and treats its

CUI

CUI



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

RESEARCH
AND ENGINEERING

negotiations with the DoW primarily as tools for brand-building cannot be trusted, particularly when that marketing campaign is openly hostile to the DoW and duplicitous. By ceding to Anthropic's terms, the DoW would be allowing the very corporate decisionmakers who have opted to publicly spat with DoW into its technical and operational warfighting infrastructure, thereby introducing unnecessary risk into DoW supply chains. The American people have vested elected officials and military and civilian leadership with warfighting authorities; it is untenable and unlawful to insert unelected corporate bureaucrats into this process.

3. The Underlying Technical Vulnerability of AI

This strategic risk is magnified by the unique, opaque nature of the technology itself. Unlike traditional software, AI models are probabilistic systems which are understood to "drift" or degrade as new data is introduced and require constant tuning, the integrity of which, is fundamentally based on the trustworthiness of the vendor to ensure the model continues to perform accurately and fairly.

The DoW cannot trust Anthropic to ensure the integrity of its models. As research demonstrates,[1] AI systems are acutely vulnerable to manipulation. Privileged access with malintent can subtly poison the training data to maliciously introduce unwanted function, or otherwise subvert the design, integrity, and operation of the model. Research shows such attacks can degrade accuracy by over 27% and introduce targeted misclassifications at an alarming rate.[2] Anthropic's ability to unilaterally alter system guardrails and model weights without DoW consent could fundamentally change the system's function and creates a significant operational risk. This could create catastrophic downstream consequences, such as a critical defense system failing to engage due to an unapproved, vendor-side modification. In August 2025, Anthropic itself disclosed that hackers had used its chatbot, Claude, to write code capable of carrying out cyberattacks against at least 17 organizations, including government entities noting that Agentic AI has been weaponized.[3]

A vendor like Anthropic, which has already demonstrated a hostile and non-cooperative stance on the use of its product, has the motive, means, and opportunity to introduce such vulnerabilities. Its refusal to partner in good faith makes it impossible to establish the deep trust required for security collaboration. The DoW would be forced to operate a black box controlled by a hostile party, which could contain hidden biases or backdoors. A vendor that seeks to control the use of its product so as to restrict DoW's lawful use thereof cannot be trusted. Given the public statements of Anthropic's CEO and others associated with the company, the

---

[1] See e.g. 2025 Photonics & Electromagnetics Research Symposium, Abu Dhabi, UAE, 4-8 May PIERS Detecting and Preventing Data Poisoning Attacks on AI Models
[2] Id.
[3] anthropic.com/news/detecting-countering-misuse-aug-2025#:~:text=No-code%20malware:%20selling%20AI,with%20third-party%20safety%20teams.

CUI

**Add.246**

CUI



**RESEARCH AND ENGINEERING**

**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

Department must assume that Anthropic can and would impose its moral and policy judgments on the warfighting capabilities of the DoW, and therefore there is a substantial risk that Anthropic could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations, if it feels that its "redlines" are crossed. The threat of such an action is unacceptable.

4. Progression of Risk

The DoW institutes the U.S. Government standard Risk Management Framework (RMF) across all layers of technology, assets, data, processes, and supply chain. In accordance with the DoW RMF, assessments result in areas of risk across the DoW ecosystem (including vendors). Though an individual vendor may have only limited risk in individual categories, the aggregation of risk across categories can result in a vendor being deemed high risk. In other words, the culmination of unmitigable risks lead to a vendor having a material level of risk. The vendor can then be deemed a "supply chain risk," at which time they typically are removed from applicable systems to mitigate issues and threats.

In the instant case, Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them. Given the nature of AI systems and Anthropic's privileged access as the AI model's developer, curator and maintainer, there was a baseline risk given the potential harmful actions this privileged technical access makes possible. The supply chain risk level increased when Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law. This risk further increased when Anthropic asserted in the negotiations that it have an approval role in the operational decision chain, which would require the DoW to accept significant operational risk. Then during the final weeks of negotiations, it became clear that Anthropic was leveraging the DoW's ongoing good faith negotiations for Anthropic's own public relations, and they began engaging in an increasingly hostile manner through the press, despite the ongoing private negotiations with DoW leadership. Finally, this hostile posture was even further compounded when, during a time of active military operations, Anthropic leadership questioned the use of their technology in our warfighting systems clearly permitted under the Terms of Service of their existing contract with our Prime contractor. This collective set of actions represents a fully mature supply chain risk – including increased potential for model poisoning, insider threat risk, data exfiltration, and denial of service – posing a direct, intolerable, and material risk to our warfighting capability which warrants the designation of Anthropic as a supply chain risk.

CUI

**Add.247**

**App.230**

CUI



**RESEARCH AND ENGINEERING**

**UNDER SECRETARY OF WAR**
3030 DEFENSE PENTAGON
WASHINGTON, DC 20301-3030

## 5. Conclusion and Justification for Action

Anthropic's position is not a simple policy disagreement; it is an active demonstration of the exact risks our supply chain risk management laws were written to prevent. Use of Anthropic's products or services introduces significant risk to the DoW's covered systems, as the vendor, by maintaining the ability and necessity to continuously update and tune the product enables the potential for the vendor to subvert the design and/or functionality of their product or service. Such ability by the vendor could be used to implement changes in alignment with the vendor's ideology, putting the Department's lawful use of the capability at risk.

Therefore, Anthropic's unwillingness to permit the use of its technology to the extent permitted by law creates a clear and present supply chain risk as defined in 10 U.S.C. § 3252 and 41 U.S.C. § 4713.

Emil Michael

CUI

**Add.248**

**App.231**

**UNCLASSIFIED**

**ATTACHMENT**
**Section 4713 Scoping Analysis for Anthropic, PBC**

This document supports the use of section 4713 of title 41, United States Code ("Section 4713') authorities. The Secretary of War, pursuant to the recommendation of the Under Secretary of War for Acquisition and Sustainment and the Department of War Chief Information Officer, has determined the following as the appropriate scope for use of Section 4713 authorities necessary to address the supply chain risk related to the use of covered products or services of Anthropic, PBC:

- **Covered Entity:** Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity").

- **Covered Products or Services:** All of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:** All DoW procurements described in Section 4713(k)(3).

- **Covered Procurement Actions:** All actions described in Section 4713(k)(4).

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as
Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## DECLARATION OF SARAH HECK

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
 HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-
gronke@wilmerhale.com

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

I, Sarah Heck, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I previously submitted a declaration in this case on March 10, 2026, describing Anthropic PBC's ("Anthropic") relationship and communications with the U.S. Government, including the Department of War ("Department").  I submit this supplemental declaration in support of Anthropic's Reply Brief in Support of Plaintiff's Motion for a Preliminary Injunction.

2.     As stated in my March 10 declaration, my understanding of Anthropic's relationship and communications with the Department is based on my experience in my role as Head of Policy. In that role, I lead Anthropic's public policy engagement, government relationships, strategic partnerships, and government communications, including engagements and initiatives that address the intersection of Artificial Intelligence ("AI"), national security, and economic policy. This includes being involved in communications between Anthropic and the government.

3.     I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4.     As I described in my original declaration, Anthropic and the Department had been negotiating a partnership for several months. I participated personally in these negotiations. This includes attending the in-person meeting on

1

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

February 24, 2026, where the Department Chief Technology Officer and Under Secretary of War Emil Michael and Secretary of War Pete Hegseth met with Anthropic CEO Dr. Dario Amodei.

5.      I explained in my prior declaration that Anthropic's negotiations with the Department did not end after the February 27, 2026, directives issued by President Donald Trump and Secretary Hegseth attacking Anthropic. In the days following those directives, the parties continued to work towards an agreement, even as the Department—unbeknownst to Anthropic—was drafting materials claiming that Anthropic posed risks of sabotage, data exfiltration, and other serious harms. At no point in these conversations did Under Secretary Michael or anyone at Department share with Anthropic its apparently grave concerns or suggest that they were an impediment to a deal. To the contrary, the Department and Anthropic were still engaged in negotiations on March 4, 2026—the day *after* the Department completed its formalization of the supply-chain risk designation (but before Anthropic received that formal notice).[1]

6.      In reviewing the materials the government has filed in this case, I was struck by its repeated claim that Anthropic insisted during negotiations that the company have some sort of approval role in the Department's operational decision

---

[1] Attached hereto as **Exhibit 1** is a true and correct copy of a March 4, 2026 email from Emil Michael to Dario Amodei.

**Add.252**
**App.235**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

chain. That is false. At no time during Anthropic's negotiations with the Department did I or any other Anthropic employee state that the company wanted that kind of role. We do not want it now, either.

7.     Likewise, at no point during the negotiations did any party raise any concerns about Anthropic taking technical steps to disrupt the U.S. military.  This is a new purported concern that was raised, for the first time, in the government's filings in this case. Had this concern been raised in a manner allowing Anthropic to respond, we would have explained, among other things, the technical impossibility of such disruption. Second Declaration of Thiyagu Ramasamy ("Second Ramasamy Decl.") ¶¶13-20. As I understand from Thiyagu Ramasamy's supplemental declaration, Anthropic is unable to alter an AI model after deployment without the Department's knowledge or consent. Second Ramasamy Decl. ¶17.

8.     Additionally, it is my understanding that the Department had previously expressed concerns that Anthropic had objected—after the fact—about how Anthropic's models were being used in the Department operations and those concerns are now reprised in the government's materials. But this concern was and is misplaced, as Anthropic has made very clear. Indeed, when Secretary Hegseth raised this topic at the February 24th in-person meeting, Dr. Amodei clarified that the company had not objected to the use of its tools as reported. Dr. Amodei

3

**Add.253**
**App.236**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

further explained that Anthropic has no interest in interfering with the Department operations more generally. Dr. Amodei publicly reiterated that stance in a February 26, 2026, blog post, explaining that Anthropic "understands that the Department of War, not private companies, makes military decisions" and underscoring that Anthropic has "never raised objections to particular military operations nor attempted to limit use of our technology in an ad hoc manner."[2]

9.      In an effort to be responsive to the Department's apparent concerns that Anthropic desired an approval role in operations, Anthropic was willing to make contractual commitments as further reassurance. In a draft agreement transmitted to the Department on March 4, 2026, Anthropic included language stating: "For the avoidance of doubt, [Anthropic] understands that this license does not grant or confer any right to control or veto lawful Department of War operational decision-making." Anthropic included this language to clarify that it did not seek to be, and would not be, part of any operational decision chain.[3]

10.      I was also surprised to read in the government's materials that Anthropic's beliefs that Claude should not be used for autonomous lethal warfare

---

[2] *See Statement from Dario Amodei on Our Discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://www.anthropic.com/news/statement-department-of-war.

[3] Attached hereto as **Exhibit 2** is a true and correct copy of a March 4, 2026 email and two attachments from Anthony Fuscellaro to Dario Amodei Re: Official Correspondence from the Department of War to Anthropic.

4

**Add.254**
**App.237**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

or mass surveillance of Americans are part of what makes the company a danger to national security. I find this rationale puzzling for two reasons: (1) when negotiations broke down, the parties were very near agreement on language that would address Anthropic's concerns regarding autonomous lethal warfare and (2) Secretary Hegseth himself referred to Anthropic's concerns regarding autonomous lethal warfare and mass surveillance of Americans as "understandable." That was echoed mere days later by the Commander of U.S. Central Command, who told a media outlet, "Humans will always make final decisions on what to shoot and what not to shoot." And a recent threat assessment from the Office of the Director of National Intelligence, reflecting the collective views of the U.S. Intelligence Community, further confirms that at least some portions of the Administration believe "it is essential to make sure that humans maintain control of the [AI models] and how AI is used." Indeed, on March 4, 2026 — after the Secretarial Letters were drafted, Under Secretary Michael emailed Dr. Amodei to say "I think we are very close here" regarding these two issues.[4]

---

[4] *See* Ex. 1.

5

**Add.255**
**App.238**

Docusign Envelope ID: D1359624-9FF1-4D3D-9565-8A9DBCF385C8

* * *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 23, 2026.

Sarah Heck
Head of Policy, Anthropic

6

Add.256
App.239

# EXHIBIT 1

3/19/26, 11:59 AM                                      Anthropic Mail - Redline

 Gmail

**Sarah Heck <heck@anthropic.com>**

---

## Redline

---

**Michael, Emil HON (USA)** <emil.g.michael.civ@mail.mil>                    Wed, Mar 4, 2026 at 9:24 AM
To: Dario Amodei <dario@anthropic.com>
Cc: "sheck@anthropic.com" <sheck@anthropic.com>, "Kliger, Gavin I CIV (USA)" <gavin.i.kliger.civ@mail.mil>

Hi Dario,

After reviewing with our attorneys and seeing your last draft (thanks for being fast), I think we are very close here. I was able to take 'unlawful' out of the bulk collection section which essentially reverts that clause to your language from last night. Therefore, the only change we would require would be "in accordance with" as opposed to "only as permitted under." See option 1 in the attached. We believe this goes above and beyond and we have made significant concessions. I hope this work as I am running out of time.

[Quoted text hidden]

---

📄 **3.4 Usage Term FINAL.docx**
2837K

**Add.258**
**App.241**

# EXHIBIT 2

**From: Fuscellaro, Anthony COL USARMY OSW SECWAR (USA)** anthony.fuscellaro1.mil@war.mil

**Subject:** Official Correspondence from the Department of War to Anthropic

**Date:** March 4, 2026 at 5:49 PM

**To:** dario@anthropic.com

**Cc:** jbleich@anthropic.com, Matthews, Earl G HON (USA) earl.g.matthews.civ@mail.mil

Mr. Amodei,

Please see the attached letters as official notification from the Department of War regarding Anthropic. Hard copies will follow via official mail.

Please acknowledge receipt and direct all responses through the Department of War General Counsel, Honorable Earl Matthews. Thank you.

**v/r,**
**COL Tony Fuscellaro, USA**
**Executive Secretary**
**Department of War**

> **Notice to Anthropic Pursuant to Title 10 U.S.C. Section 3252...**
> **OSD002275-26 RESFI NAL.pdf**

> **Notice to Anthropic Pursuant to Title 41 U.S.C. Section 4713...**
> **OSD002275-26 RES FINAL.pdf**





**Add.260**

**App.243**



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

Mr. Dario Amodei
Chief Executive Officer
Anthropic, PBC
548 Market Street
San Francisco, CA  94104

Dear Anthropic, PBC Executive Leadership:

This letter provides notice to Anthropic, Public Benefit Corporation (PBC), and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity") that, pursuant to title 41, United States Code (U.S.C.), section 4713 ("Section 4713"), the Department of War (DoW) has determined that (i) the use of the Covered Entity's products or services in DoW covered procurements[1] presents a supply chain risk and that the use of the Section 4713 authority to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

**Scope of Authorized Covered Procurement Actions**

This Determination is necessary to reduce supply chain risk and applies to the Covered Entity, Covered Products or Services, Covered Procurements, and Covered Procurement Actions as follows:

- **Covered Entity:**  Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof.

- **Covered Products or Services:**  All of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service.  This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:**  All DoW procurements described in Section 4713(k)(3).

- **Covered Procurement Actions:**  All actions described in Section 4713(k)(4).

---

[1] 41 U.S.C. § 4713(k)(3)
[2] 41 U.S.C. § 4713(k)(4)

**Effective Date**

This Determination is effective immediately and shall remain in effect until modified or terminated in writing by the Section 4713 Authorized Official.

**Request for Reconsideration**

If the Covered Entity wishes to request that the DoW reconsider this Determination, the Covered Entity must submit in writing to the undersigned within 30 days of receipt of this letter, notice of such request for reconsideration. For additional information, requirements, and procedures governing such request, see the enclosed Requirements and Procedures for Requesting Reconsideration of a Section 4713 Determination.

Sincerely,

Enclosure:
As stated

2

**Add.262**
**App.245**

**UNCLASSIFIED**

**ATTACHMENT 1**
**Requirements and Procedures for Requesting Reconsideration of a Section 4713**
**Determination**

The following requirements and procedures govern a Covered Entity's request for reconsideration of a Section 4713 determination:

1. **Notice of Request for Reconsideration:** Within thirty (30) days of receiving the Section 4713 Authorized Official's letter notifying the Covered Entity of the Section 4713 determination, the Covered Entity may submit in writing to the Section 4713 Authorized Official notice of the Covered Entity's request for reconsideration. Such notice should identify the specific relief or remedy being requested (e.g., specific modifications to, or termination in whole or in part, of any elements of the determination). All notices and written information must be submitted to osd.mc-alex.ousd-a-s.mbx.10-usc-section-3252-determinations@mail.mil.

2. **Opportunity to Submit and Present Information**: If the Covered Entity submits a timely notice of request for consideration, the Covered Entity will be afforded an additional thirty (30) calendar days (from the date the Section 4713 Authorized Official received such timely notice) to submit in writing, and to appear and present, additional information and arguments in support of such request for reconsideration. The Covered Entity must either send, or make arrangements to appear and present, the information to representatives of the Section 4713 Authorized Official within the thirty (30) day period. The Section 4713 Authorized Official may extend the time to appear and submit documentary evidence upon written request by the Covered Entity.

3. **Flexible Procedures**: The Section 4713 Authorized Official may use flexible procedures to allow the Covered Entity to submit and present information in support of the request for reconsideration. In so doing, the Section 4713 Authorized Official is not required to follow formal rules of evidence or procedures in creating an official record of the request for reconsideration and the Official's disposition of that and request.

4. **Content of Submissions/Presentations**: When submitting and presenting information in support of a request for reconsideration, the Covered Entity should, to the maximum extent practicable, identify specific facts that contradict statements contained in the Section 4713 Covered Entity notification, and provide detailed rationale for any arguments in support of the request and the remedy or relief being requested. A general denial is insufficient to support reconsideration of a Section 4713 determination.

5. **Appearing and Presenting Information:** An appearance and presentation is an informal meeting that is non-adversarial in nature. When electing to appear and present information, the representative(s) of the Covered Entity may choose to appear with counsel. Any information to be presented should be provided in written form at least 5 working days in advance of the presentation. Usually, all matters in opposition should be presented in a single proceeding. Any information not submitted in advance, but provided orally during an appearance, must also be submitted in writing after the appearance for the information to be

**UNCLASSIFIED**

**Add.263**
**App.246**

**UNCLASSIFIED**

considered. The representative(s) of the Section 4713 Authorized Official, and/or other agency representatives, may ask questions of the Covered Entity's representative(s) making the presentation. Federal rules of evidence do not govern the appearance and presentation.

6. **Notice Regarding False Statements**: Any material information submitted in response to this action will be considered a statement or representation to a government official concerning a matter within the jurisdiction of the executive branch of the government. To that end, please note that an individual making any materially false, fictitious, or fraudulent statement or representation to a Government official may be subject to prosecution under 18 U.S.C. § 1001.

**UNCLASSIFIED**

**Add.264**
**App.247**



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR - 3 2026

Mr. Dario Amodei
Chief Executive Officer
Anthropic, PBC
548 Market Street
San Francisco, CA 94104

Dear Anthropic, PBC Executive Leadership:

This letter provides notice to Anthropic, Public Benefit Corporation (PBC), and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity") that, pursuant to title 10, United States Code (U.S.C.), section 3252 ("Section 3252"), the Department of War (DoW) has determined that (i) the use of the Covered Entity's products or services in DoW covered systems[1] presents a supply chain risk and that the use of the Section 3252 authority to carry out covered procurement actions[2] is necessary to protect national security by reducing supply chain risk, and (ii) less intrusive measures are not reasonably available to reduce such supply chain risk.

**Scope of Authorized Covered Procurement Actions**

This Determination is necessary to reduce supply chain risk and applies to the Covered Entity, Covered Products or Services, Covered Procurements, and Covered Procurement Actions as follows:

- **Covered Entity:** Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof.

- **Covered Products or Services:** All of the Covered Entity's products or services that meet the definition of a "covered item of supply" or that would be procured as part of a "covered system," as those terms are defined at 48 C.F.R. § 239.7301, whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:** All DoW procurements for which 48 C.F.R. Subpart 239.73 is applicable, in accordance with 48 C.F.R. § 239.7302.

- **Covered Procurement Actions:** All actions authorized in accordance with 48 C.F.R. § 239.7305.

---

[1] 10 U.S.C. § 3252(d)(5)
[2] 10 U.S.C. § 3252(d)(2)

Add.265
App.248

**Effective Date**

This Determination is effective immediately and shall remain in effect until modified or terminated in writing by the Section 3252 Authorized Official.

**Request for Reconsideration**

If the Covered Entity wishes to request that the DoW reconsider this Determination, the Covered Entity must submit in writing to the undersigned within 30 days of receipt of this letter, notice of such request for reconsideration. For additional information, requirements, and procedures governing such request, see the enclosed Requirements and Procedures for Requesting Reconsideration of a Section 3252 Determination.

Sincerely,

Enclosure:
As stated

2

**Add.266**
**App.249**

**UNCLASSIFIED**

**ATTACHMENT 1**
**Requirements and Procedures for Requesting Reconsideration of a Section 3252**
**Determination**

The following requirements and procedures govern a Covered Entity's request for reconsideration of a Section 3252 determination:

1. **Notice of Request for Reconsideration:** Within thirty (30) days of receiving the Section 3252 Authorized Official's letter notifying the Covered Entity of the Section 3252 determination, the Covered Entity may submit in writing to the Section 3252 Authorized Official notice of the Covered Entity's request for reconsideration. Such notice should identify the specific relief or remedy being requested (e.g., specific modifications to, or termination in whole or in part, of any elements of the determination). All notices and written information must be submitted to osd.mc-alex.ousd-a-s.mbx.10-usc-section-3252-determinations@mail.mil.

2. **Opportunity to Submit and Present Information**: If the Covered Entity submits a timely notice of request for consideration, the Covered Entity will be afforded an additional thirty (30) calendar days (from the date the Section 3252 Authorized Official received such timely notice) to submit in writing, and to appear and present, additional information and arguments in support of such request for reconsideration. The Covered Entity must either send, or make arrangements to appear and present, the information to representatives of the Section 3252 Authorized Official within the thirty (30) day period. The Section 3252 Authorized Official may extend the time to appear and submit documentary evidence upon written request by the Covered Entity.

3. **Flexible Procedures**: The Section 3252 Authorized Official may use flexible procedures to allow the Covered Entity to submit and present information in support of the request for reconsideration. In so doing, the Section 3252 Authorized Official is not required to follow formal rules of evidence or procedures in creating an official record of the request for reconsideration and the Official's disposition of that and request.

4. **Content of Submissions/Presentations**: When submitting and presenting information in support of a request for reconsideration, the Covered Entity should, to the maximum extent practicable, identify specific facts that contradict statements contained in the Section 3252 Covered Entity notification, and provide detailed rationale for any arguments in support of the request and the remedy or relief being requested. A general denial is insufficient to support reconsideration of a Section 3252 determination.

5. **Appearing and Presenting Information:** An appearance and presentation is an informal meeting that is non-adversarial in nature. When electing to appear and present information, the representative(s) of the Covered Entity may choose to appear with counsel. Any information to be presented should be provided in written form at least 5 working days in advance of the presentation. Usually, all matters in opposition should be presented in a single proceeding. Any information not submitted in advance, but provided orally during an appearance, must also be submitted in writing after the appearance for the information to be

**UNCLASSIFIED**

**Add.267**
**App.250**

**UNCLASSIFIED**

considered. The representative(s) of the Section 3252 Authorized Official, and/or other agency representatives, may ask questions of the Covered Entity's representative(s) making the presentation. Federal rules of evidence do not govern the appearance and presentation.

6. **Notice Regarding False Statements**: Any material information submitted in response to this action will be considered a statement or representation to a government official concerning a matter within the jurisdiction of the executive branch of the government. To that end, please note that an individual making any materially false, fictitious, or fraudulent statement or representation to a Government official may be subject to prosecution under 18 U.S.C. § 1001.

**UNCLASSIFIED**

**Add.268**
**App.251**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## SECOND DECLARATION OF THIYAGU RAMASAMY

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-
gronke@wilmerhale.com

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

I, Thiyagu Ramasamy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I previously submitted a declaration in this case on March 11, 2026, describing Anthropic PBC's ("Anthropic's") relationship with the U.S. Government, including the Department of War ("DoW"). I submit this supplemental declaration in support of Anthropic's Reply Brief in Support of its Emergency Motion for Stay Pending Review.

**Background and Purpose of Supplemental Testimony**

2.      As stated in my March 11 declaration, my understanding of Anthropic's public sector partnerships is based on my experience as Anthropic's Head of Public Sector. As I explained there, I previously worked at Amazon Web Services ("AWS") as a Principal Lead for Data, Analytics, and Artificial Intelligence/Machine Learning. In that role, I was responsible for, among other things, implementing Anthropic's AI models, Claude, for AWS's public sector customers, including AWS's deployment of Claude in classified government networks. Together, my prior experience and current role give me a detailed understanding of Anthropic's relationship with the U.S. government, the technical capabilities of Anthropic's AI models, how third-party cloud providers deploy Claude to government customers, and how those customers access and integrate Claude in their workflows.

1

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

3.      I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

4.      My original declaration explained that I had never seen or heard any explanation for why Anthropic would be considered a supply-chain risk. I understand that the DoW has since offered multiple rationales in an attempt to support its determination that Anthropic poses a supply chain risk to national security. Those rationales are set forth in (1) the March 17, 2026 declaration of Under Secretary of War Emil Michael and (2) an undated "Memorandum for the Record" documenting his analysis of the purported "Urgent Supply Chain Risk" arising from Anthropic's refusal to agree to DoW's insistence that Anthropic permit the use of its models for "all lawful purposes."

**<u>The Government's Factual Errors And Misunderstanding Of Anthropic's Technology</u>**

5.      Neither I nor anyone else at Anthropic had seen Under Secretary Michael's memorandum or declaration until the Department of Justice publicly filed them in this matter. Those materials reflect a fundamental misunderstanding of how Anthropic's tools are deployed in classified systems and otherwise made available to the government, and they contain multiple factual misstatements. Had

2

**Add.271**
**App.254**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

the DoW disclosed its rationales before designating Anthropic a supply chain risk, I and other Anthropic subject-matter experts could have corrected these errors.

6.    Most fundamentally, Under Secretary Michael's declaration and memorandum suggest that Anthropic has, over time, proven to be an increasingly untrustworthy partner to DoW. In my experience, however, the opposite is true. Anthropic has consistently worked to deepen its relationship with DoW and to support DoW's specific needs and use cases.

## The Government's Adoption of Anthropic's Models in Classified Environments

7.    Beginning in early 2024, Anthropic worked with a third-party cloud provider to support deployment of Anthropic's commercial AI models in classified cloud environments. By May 2024, Claude Sonnet was available on a provider's Top Secret cloud and was being used by Intelligence Community ("IC") and DoW customers. As government users adopted the commercial version of Claude in classified settings, Anthropic received feedback that its commercial models, appropriately trained to decline discussion of classified materials with the general public, sometimes applied those same protections to IC and DoW users in secure environments. In response, Anthropic engaged directly with government stakeholders, including through classified discussions led by Anthropic engineers

3

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

holding security clearances, to understand operational needs and identify appropriate technical solutions.

8.    In December 2024, the updated commercial version of Claude (Sonnet 3.5) was launched in classified cloud environments. To be clear, in these arrangements, once Anthropic gives its models to the third-party cloud provider, Anthropic has no access to, or control over, the model as deployed or used by government customers.

9.    In early 2025, Anthropic—on its own initiative and at its own expense—assigned cleared personnel to develop a version of Claude tailored to national-security needs. In March 2025, that tailored national-security model, called Claude Gov, was made available to IC and DoW customers through classified cloud environments. Government users reported that Claude Gov performed significantly better than the commercial version and did not refuse tasks that were otherwise restricted but appropriate to the national security mission, such as reviewing classified documents or supporting military planning. Adoption increased rapidly across the IC, and government customers expressed strong appreciation for Anthropic's proactive approach to national-security partnerships.

10.    In June 2025 and then again in November 2025, Anthropic deployed new, improved versions of the Claude Gov models. Before each deployment, DoW customers conducted extensive testing to confirm that the new model performed as

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

expected before the prior version was retired and replaced. Anthropic closely collaborated with its government and third-party partners to ensure a seamless transition throughout this process.

11.     Within weeks of the November 2025 release, nearly all IC and DoW customers had adopted the updated version of Claude Gov. Government users praised this model as a major technical advance, citing significant improvements in reasoning, agentic tool use, and coding. These improvements enabled customers to fully leverage air-gapped deployment of Claude Code, Anthropic's agentic coding tool, which is now widely used across the IC and DoW.

12.     Anthropic's sustained investment and close collaboration with its government partners have made Claude Gov a mission critical capability across classified systems. Anthropic has remained a trusted partner to DoW and the IC at every step, consistently delivering mission-oriented and safety-focused models and supporting AI adoption.

## Anthropic Lacks the Technical Ability to Interfere With DoW Operations

13.     A central theme of the DoW's belated rationale is the concern that Anthropic could interfere with DoW operations. As I explained in my original declaration, Anthropic has never sought, and has never asserted, any role in DoW's operational decision making. I emphasize here that, apart from the fact that our

5

**Add.274**
**App.257**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

company has no desire to interfere with DoW activities, Anthropic is not technically capable of exercising the type of "operational veto" the DoW suggests.

14. Once Claude is deployed in support of DoW's mission, Anthropic has never had the ability to cause Claude to stop working, alter its functionality, shut off access, or otherwise influence or imperil military operations. Even if it wanted to do so—which it does not—Anthropic could not do so as a technical matter. Claude has always been deployed for DoW by a third party, and Anthropic does not have the access required to disable the technology or alter the model's behavior before or during ongoing operations.

15. More specifically, as Claude is deployed in DoW environments—such as through air gapped, classified cloud systems operated by third-party defense contractors—Anthropic has no ability to access, alter, or shut down the deployed model. Anthropic does not maintain any back door or remote "kill switch" in Claude. Anthropic personnel cannot, for example, log into a DoW system to modify or disable the models during an operation; the technology simply does not function that way. In these deployments, only the Government and its authorized cloud provider have access to the running system. Anthropic's role is limited to providing the model itself and delivering updates only if and when requested or approved by the customer. Anthropic does not have ongoing connectivity to, or

6

**Add.275**
**App.258**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

control over, model instances running in DoW secure networks. Model weights are also not automatically modified or updated based on DoW's usage.

16.    For these reasons, Anthropic also cannot exfiltrate DoW data or conduct surveillance of DoW activities. Anthropic does not have access to DoW's Claude prompts; because we lack any access to this customer data, there is nothing that we could exfiltrate or inspect. Any suggestion that Anthropic could engage in "data exfiltration" of DoW information is unfounded.

17.    Under Secretary Michael's declaration and memorandum also suggest that Anthropic could alter its AI models after deployment without DoW's knowledge or consent, including by changing model guardrails or model weights. Anthropic is not capable of doing so. By "guardrails," I mean the safety and security controls designed to ensure a model behaves as intended. "Model weights" are the internal numerical parameters that shape how the model behaves by determining how strongly different inputs influence a model's outputs. Once a model is running inside a government-secure enclave, Anthropic cannot unilaterally alter these features. To change guardrails or model weights, Anthropic would have to provide an entirely new version of the model, which would require DoW's approval and affirmative action to install.

18.    Changing model weights or guardrails is analogous to ordering a cake at a restaurant. Once the cake is served, the diner cannot adjust the recipe at the

7

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

table, and the chef cannot reach into the dining room–secretly or otherwise–to change it either. Even if the cake is missing only a teaspoon of baking soda, it must be made again from scratch with the correct ingredients baked in. Here, Anthropic is the chef. If changes to model behavior are desired, whether small or large, Anthropic can prepare a new version of the model with those changes built in. But that new version is not automatically substituted. Before deployment, the third-party cloud provider and DoW security reviewers inspect and approve it to ensure it is safe and appropriate. Only after that approval, and only after the customer confirms the new version performs as expected, can it retire the prior model.

19.    I also understand the government has assessed risk based on the belief that AI models may "drift" or degrade over time, leaving the DoW reliant on Anthropic to ensure continued accuracy and fairness. That concern reflects another fundamental misunderstanding of how AI models operate. Once a model like Claude is trained and deployed by DoW, it is static; it does not change or degrade on its own. The model's parameters remain fixed unless and until a newer version is deployed. Anthropic does not, and cannot, push unsupported or undisclosed updates to a model once deployed by DoW.

20.    Finally, Under Secretary Michael's memorandum and declaration cite the "relatively opaque nature of large language model technology" as a baseline risk requiring heightened trust in Anthropic. It is true that large language models

8

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

("LLMs") are probabilistic, not deterministic, as Anthropic's Chief Science Officer has explained, and there is some legitimacy to DoW's concern about the opacity of these systems generally. But that characteristic applies to all LLMs. Compared to other AI labs, Anthropic is uniquely transparent. We maintain a publicly available set of normative principles— "Claude's Constitution" —a human readable document that explains the values and rules our AI is trained to follow. Anthropic is also at the forefront of interpretability research aimed at making the behavior of models like Claude easier to understand. If anything, Anthropic presents a lower baseline risk than other AI labs, not a higher one.

### The Government's Other Alleged Concerns are Misplaced

21.     I understand that the government references Anthropic deployment issues at the Center for Disease Control and Prevention ("CDC") as a factor in its designation. While I cannot be certain which incident Under Secretary Michael is referencing, to the extent it relates to CDC work of which I am aware, that characterization reflects a misunderstanding. My understanding is that the issue arose from the CDC's use of a general commercial model whose standard safeguards—appropriately designed for public users—limited certain interactions related to biomedical research to mitigate public safety risks. Once Anthropic became aware of the issue, we worked promptly with our third-party partners and the government to enable use of the model in a manner appropriate to the CDC's

9

**Add.278**
**App.261**

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

mission and expertise. As noted above, safeguards suitable for commercial deployments may not be appropriate for government uses, and some government deployments require customization or parameter adjustments. That collaborative, iterative process—balancing safety in commercial settings with valid government uses—is a core tenet of Anthropic's AI safety approach. That is precisely how we addressed the CDC issue once identified, supporting important CDC research while preventing individual users from engineering dangerous biological weapons.

22.     The Michael Declaration also suggests Anthropic's employment of foreign nationals increases "adversarial risk." Anthropic, like many cutting-edge AI companies, employs a globally diverse team of highly skilled researchers and engineers. Anthropic has undergone extensive U.S. Government security vetting in connection with its classified work and takes seriously its obligation to comply with all security and technical requirements for safeguarding sensitive government information. To my knowledge, Anthropic is the only AI company where cleared personnel have led the development of AI models tailored to be deployed in classified environments. As discussed above, for the past two years, Anthropic has been the government's closest and most-trusted partner in driving the adoption of AI models in classified environments.

10

Docusign Envelope ID: 6DE9D405-EA57-4B46-A216-76C6D85C21F6

\*    \*    \*

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on March 22, 2026.

*Thiyagu Ramasamy*

Thiyagu Ramasamy
Head of Public Sector, Anthropic

11

**Add.280**
**App.263**

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 26-1049**                                    **September Term, 2025**

**DOD-03/03/2026 Order**

**Filed On:** April 8, 2026

Anthropic PBC,

      Petitioner

    v.

United States Department of War and Peter
B. Hegseth, in his official capacity as
Secretary of War,

      Respondents


**BEFORE:**   Henderson, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for a stay pending review, which includes an alternative request for expedition, the opposition thereto, the reply, and the Rule 28(j) letter; the motions for leave to participate as amicus curiae and the lodged amicus briefs submitted by Foundation for American Innovation, et al., the Former Service Secretaries and Retired Senior Military Officers, the American Civil Liberties Union Foundation, et al., ACT | The App Association, Catholic Moral Theologians and Ethicists, Former Senior National Security Government Officials, TechNet, et al., and Former Judges and Democracy Defenders Fund; the notices of intention to participate as amicus curiae, which the court construes as motions to participate as amicus curiae, the amicus brief submitted by Employees of OpenAI and Google in their personal capacities, and the amicus brief submitted by Professor Alan Z. Rozenshtein; and the amicus briefs submitted by Foundation for Individual Rights and Expression, et al., and the Freedom Economy Business Association, et al., which the court construes as including motions to participate as amicus curiae, it is

**ORDERED** that the motions to participate as amicus curiae be granted. The Clerk is directed to file the lodged amicus briefs. It is

**FURTHER ORDERED** that the motion for a stay be denied. For the reasons discussed in the attached per curiam statement, petitioner has not satisfied the stringent requirements for a stay pending court review. See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2025). It is

**FURTHER ORDERED** that the request for expedition be granted. The following

**App.264**

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 26-1049**                    **September Term, 2025**

briefing schedule will apply:

| | |
|---|---|
| Petitioner's Opening Brief | April 22, 2026 |
| Appendix | April 22, 2026 |
| Brief(s) of Amicus Curiae, if any, Supporting Petitioner | April 22, 2026 |
| Respondents' Brief | May 6, 2026 |
| Brief(s) of Amicus Curiae, if any, Supporting Respondents | May 6, 2026 |
| Petitioner's Reply Brief | May 13, 2026 |

The Clerk is directed to calendar this case for oral argument on May 19, 2026, at 9:30 a.m.  It is

**FURTHER ORDERED** that, while not otherwise limited, the parties are directed to address in their briefs the following issues:

(1) whether we have jurisdiction over Anthropic's petition under 41 U.S.C. § 1327, which provides for review of "covered procurement actions" taken under 41 U.S.C. § 4713;

(2) whether the government has, through the Determination or Notice or otherwise, directed or taken specific covered procurement actions against Anthropic;

(3) whether, and if so how, Anthropic is able to affect the functioning of its artificial-intelligence models before or after the models, or updates to them, are delivered to the Department.

The court reminds the parties that:

In cases involving direct review in this court of administrative actions, the brief of the appellant or petitioner must set forth the basis for the claim of standing. . . . The brief must include arguments and cite evidence establishing by a "substantial probability" the claim of standing.

See D.C. Cir. Rule 28(a)(7); Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002).

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

## No. 26-1049                                    September Term, 2025

Petitioner should raise all issues and arguments in the opening brief.  The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms.  While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not widely known.  See D.C. Circuit Handbook of Practice and Internal Procedures 43-44 (2025); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

Parties are strongly encouraged to hand deliver the paper copies of their briefs to the Clerk's office on the date due.  Filing by mail may delay the processing of the brief.  Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail.  See Fed. R. App. P. 25(a).  All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover.  See D.C. Cir. Rule 28(a)(8).

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Michael C. McGrail
Deputy Clerk

**App.266**

*Per Curiam*: Anthropic PBC develops Claude, a family of advanced artificial-intelligence models. In 2024, the Department of Defense (which now calls itself the Department of War) began using Claude in connection with various military operations. But on March 3, 2026, Secretary of War Pete Hegseth determined that procuring AI goods or services from Anthropic presents a supply-chain risk to national security under 41 U.S.C. § 4713. The impetus for the determination was Anthropic's refusal to contractually authorize the Department to use Claude for mass domestic surveillance or lethal autonomous warfare. As a result, the Department has canceled its contracts with Anthropic, begun to remove Claude from its systems, and prohibited its other contractors from using Anthropic as a subcontractor on work performed for the Department. The Department has not prohibited contractors from using Claude for work performed for entities other than the Department.

Anthropic seeks review of the Secretary's determination under section 4713 to bar the company from providing goods or services to the Department. It claims that the determination was contrary to law, unconstitutional, and arbitrary. Anthropic seeks a stay pending review on the merits or, in the alternative, expedited consideration of the merits.

Four considerations govern whether Anthropic is entitled to the extraordinary remedy of a stay pending review: (1) whether it has made a "strong showing" that it is likely to succeed on the merits; (2) whether it will suffer irreparable harm without a stay; (3) whether a stay will injure the Department; and (4) whether the public interest supports a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (cleaned up). Because the respondents are government agencies or officers, the third and fourth factors merge into a single inquiry. *Id.* at 435.

**App.267**

2

Anthropic's petition raises novel and difficult questions, including what counts as a supply-chain risk under section 4713 and what qualifies as an urgent national-security interest justifying the use of truncated statutory procedures. In addition, we must consider whether Anthropic's petition targets a "covered procurement action" reviewable at this time under the governing judicial-review scheme, 41 U.S.C. § 1327(b). The parties vigorously contest many of these issues, and we have found no judicial precedent shedding much light on the questions presented. But we do not broach the merits at this time, for Anthropic has not shown that the balance of equities cuts in its favor.

We begin by acknowledging that Anthropic will likely suffer some degree of irreparable harm absent a stay. Anthropic casts its interests partly in constitutional terms, but those interests seem primarily financial in nature. Anthropic seeks a pre-deprivation hearing under the Fifth Amendment, yet such a hearing would be valuable to the company only as a means for preserving financially beneficial contracts. Anthropic also claims ongoing harms from retaliation for its constitutionally protected speech. But Anthropic does not show that its speech has been chilled during the pendency of this litigation, so these ongoing harms are also financial effects of the Department's actions against the company.

The precise amount of Anthropic's financial harm is not fully clear. Anthropic's CEO, Dario Amodei, has publicly stated that the "vast majority" of Anthropic's customers will be "unaffected" by the designation, since it "plainly applies only to the use of Claude by customers *as a direct part of* contracts with the Department of War, not all use of Claude by customers who have such contracts." Anthropic, *Where Things Stand with the Department of War* (Mar. 5, 2026), https://perma.cc/8ZQT-UVYH. And some record evidence

**App.268**

3

suggests that Anthropic has financially benefited from its refusal to accede to the Department's request for permission to deploy Claude for all lawful uses. Add. 240 (Amodei statement to employees that "the general public or the media … see us as the heroes (we're #2 in the App store now!)"); *see also* Scanlon, *In Graphic Detail: How Anthropic's Pentagon Refusal Is Paying Off in Downloads, Brand Trust, and Enterprise Deals*, Digiday (Mar. 9, 2026), https://perma.cc/2B54-855B ("The $200 million [Anthropic] walked away from by refusing the Pentagon's demands may turn out to be the best marketing spend in Silicon Valley for years."). Nonetheless, Anthropic has documented some potentially significant financial losses, particularly if other federal agencies follow the Department's lead in removing Claude from their own supply chains. Absent any mechanism for Anthropic to recover these losses if it should prevail on the merits, these financial harms qualify as irreparable. *See In re NTE Conn., LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022).

There are weighty governmental and public interests on the other side of the ledger. Most obviously, granting a stay would force the United States military to prolong its dealings with an unwanted vendor of critical AI services in the middle of a significant ongoing military conflict. As the Department explains, Anthropic has now conclusively barred uses that the Department recently deemed essential. *See* Add. 223 (Hegseth memo to senior Department leadership, dated Jan. 9, 2026, stating that "[t]he Department must also utilize models free from usage policy constraints that may limit lawful military applications"). Moreover, the Department relies on Anthropic to provide regular updates to Claude, which contains built-in "safeguards" designed to prevent uses that Anthropic considers harmful. Add. 19, 25–26. Furthermore, Anthropic and the Department recently disagreed about uses of Claude for military operations that the Department claimed were

**App.269**

4

permitted under the existing usage policy.  Add. 198, 200.  And the Department's relationship with Anthropic has deteriorated to the extent that Anthropic's CEO has publicly described the Department's statements regarding the controversy as "completely false" and "just straight up lies."  Add. 238–39.  Under these circumstances, requiring the Department to prolong its use of Anthropic's AI technology, whether directly or through contractors, strikes us as a substantial judicial imposition on military operations.  And, of course, we do not lightly override the Department's judgments on matters involving national security.  *See*, *e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 704 (2018).

In our view, the equitable balance here cuts in favor of the government.  On one side is a relatively contained risk of financial harm to a single private company.  On the other side is judicial management of how, and through whom, the Department of War secures vital AI technology during an active military conflict.  For that reason, we deny Anthropic's motion for a stay pending review on the merits.[1]  Nonetheless, because Anthropic raises substantial challenges to the determination and will likely suffer some irreparable harm during the pendency of this litigation, we agree with Anthropic that substantial expedition is warranted.  A briefing schedule will issue forthwith.

*It is so ordered.*

---

[1]  Our decision to deny a stay makes it unnecessary to address the government's suggestion that the relevant judicial-review provision, 41 U.S.C. § 1327(b), deprives us of authority to grant one.

**App.270**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

No. 26-1049

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## THIRD DECLARATION FOR THIYAGU RAMASAMY

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

I, Thiyagu Ramasamy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Head of Public Sector at Anthropic PBC. I have held that position since January 2025. Before joining Anthropic, I worked for Amazon Web Services ("AWS"), where I was a Principal Lead for Data, Analytics, and Artificial Intelligence/Machine Learning. In that role, I was responsible for, among other things, implementing Anthropic's AI models, Claude, for AWS's public sector customers, including AWS's deployment of Claude in classified government networks. Together, my prior experience and current role give me a detailed understanding of Anthropic's relationship with the U.S. government, the technical capabilities of Anthropic's AI models, how third-party cloud providers deploy Claude to government customers, and how those customers access and integrate Claude in their workflows.

2.      I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Anthropic personnel, and could testify thereto.

**Purpose Of Declaration**

3.      I understand that the Court has ordered the parties to address whether, and if so how, Anthropic can influence the operation of its AI models before or after those models, or updates to them, are delivered to the Department of War (the "Department").

1

**App.272**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

4.　　I submit this declaration to explain how Anthropic's models are trained, function, and are deployed, and to describe the technical limits on Anthropic's ability to access, control, or modify those models once they are delivered for use by the Department.

5.　　I previously submitted two declarations in this matter, one on March 11, 2026 in support of Anthropic's Motion for Stay and another on March 22, 2026 in support of Anthropic's reply to the government's opposition. To assist the Court, I have restated here certain relevant information from those declarations, as well as from declarations submitted by my colleagues, in order to fully address the Court's question.

6.　　I understand that on April 20, 2026, almost two months after the government announced Anthropic's designation as a supply chain risk, the government submitted a new declaration from Under Secretary of War Emil Michael to support its supply chain risk designation. I have reviewed the declaration and attempt to clarify specific assertions made in that declaration to assist the Court.

### Background On Claude

7.　　As explained in prior declarations, Anthropic's signature product is Claude, a general-purpose large language model ("LLM"). Like other LLMs, Claude can interpret and respond to diverse user prompts, including analyzing

2

**App.273**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

large volumes of text, generating and debugging code, and reasoning through complex, multi-step problems. It can also be configured to act "agentically" by taking actions on a user's behalf—from simple tasks like sending emails to complex workflows executed with limited ongoing user direction.

8.     LLMs like Claude are dual-use technology: the same capabilities that drive medical breakthroughs, accelerate scientific research, and enhance human creativity can also be misused by malicious actors, making it difficult to restrict harmful applications without undermining beneficial ones. LLMs can also produce outputs that diverge from their users' intentions or reflect errors embedded in training data.

9.     To address these risks, Anthropic has implemented a multilayered safety framework operating at three levels: the model layer, the safeguards layer, and the policy layer (with the last effectuated partly through contract terms). The sections below explain how each layer functions in commercial deployments and how it is adapted for national security deployments, where many commercial-use safety mechanisms may not be appropriate.

*The Model Layer*

10.     At the model layer, Anthropic embeds safety directly through training. The product of that training process is a set of model weights, which are numerical parameters that encode Claude's learned behaviors and capabilities and

3

**App.274**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

that govern how Claude responds to any given input. One key technique is what we call "Constitutional AI," which trains the model to evaluate and revise its outputs against a set of normative principles, such as balancing being helpful against avoiding harm. We publish "Claude's Constitution" to be transparent about those principles and how Claude has been trained to behave. We also use techniques like reinforcement learning from human feedback, in which human reviewers rank model outputs to train the model toward responses that better align with human judgment. Through these techniques, Anthropic also embeds guardrails into the model weights, which are specific behavioral constraints that Claude is trained to follow regardless of how it is subsequently deployed or configured. For example, Claude is trained to refuse to generate child exploitation material under any circumstances.

11.    Anthropic has adapted its model-layer training to account for the specific needs of national security users. As described in detail below, Anthropic engaged directly with government stakeholders to understand operational needs and develop a version of Claude specifically tailored for national security use. That model, Claude Gov, retains the same baseline alignment and safety testing as commercial models, but is trained to specifically perform in classified environments where users can be trusted with prompting the model in ways that, ordinarily, the model would refuse to be responsive to.

4

**App.275**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

12.     Model training is the primary mechanism through which Anthropic can influence the behavior of models used by the Department because it is the only technical safety layer that operates before deployment. Once a model is delivered to a third-party cloud provider and deployed inside a government-secure enclave, Anthropic has no ability to access it, alter it, or shut it down. Any subsequent change to the model's behavior requires preparing and delivering an entirely new version of the model, a process that requires the Department's approval and is described in detail below. Anthropic does not engage in ongoing administration of models operationally deployed by the Department.

*The Safeguards Layer*

13.     For commercial deployments, Anthropic applies a safeguards layer on top of the model at runtime. This consists of technical controls, including classifiers and probes that detect harmful activity in real time, targeted interventions to reduce harmful outputs, and monitoring systems to identify misuse at scale. Generally speaking, classifiers engage in monitoring functions or intervening functions. A monitoring classifier looks at prompts to assign and record a risk score but does not impact system behavior. An intervening classifier operates like an automated filter that reads Claude's output before it reaches the user—if the output appears to provide instructions for synthesizing a dangerous

5

**App.276**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

substance, for example, the classifier triggers an intervention that blocks or rewrites the unsafe response before it is delivered.

14.    While the safeguards layer is very important in Anthropic's commercial deployments, it is far less relevant when it comes to the Department. From a technical standpoint, because Anthropic does not have any ongoing access to models deployed in the Department's classified environments, it cannot operate or access any classifiers, probes, or other runtime monitoring systems. The Department's cloud-provider does deploy a monitoring classifier that records risk scores for prompts (though not the text of the prompt itself), but it does not impact the behavior of the model. Anthropic does not control the monitoring classifier in such operational deployment and cannot access any risk score information. Furthermore, there are no intervening classifiers in use in Department deployments.

*The Policy Layer*

15.    The policy layer consists of Anthropic's Usage Policy, which governs how Claude may be used. Claude is available to any user only under Terms of Service that incorporate the Usage Policy. The policy defines the scope of permissible use and steers users away from applications for which Claude has not been developed or is not ready. For commercial users, the Usage Policy generally prohibits uses that pose unacceptable risks, including using Claude to conduct

6

**App.277**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

surveillance, to compromise computer systems, or to design weapons or other systems intended to cause harm or loss of human life. The Usage Policy is critical because technical safeguards alone cannot prevent all dangerous uses of such a powerful, novel technology.

16.     The contractual usage restrictions at the policy layer are both substantively and technically different for Department deployments. Substantively, Anthropic has adapted its Usage Policy over time, in consultation with government partners, specifically to support national security uses. When Claude was first deployed for national security use in early 2024, the applicable Usage Policy was identical to the commercial policy. In June 2024, Anthropic issued its first government-specific addendum to allow analysis of foreign intelligence; a subsequent January 2026 addendum further expanded permissible government uses to include offensive cyber operations and certain intelligence collection. Technologically, Anthropic does not have the ability to enforce the Usage Policy in Department operational deployments or direct visibility into how the model is being used. However, these usage restrictions are nevertheless critical to articulate the boundaries of safe usage.

17.     In summary, as a practical matter, Anthropic is able to influence the operation of its models with respect to the Department's uses *only prior* to operational deployment. Specifically, it can influence behavior through model

7

**App.278**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

training and can negotiate contract-based but technically unenforceable limitations on use. In both contexts, Anthropic has sought to be exceptionally transparent. It has presented its usage limitations directly to the Department and has worked collaboratively with the government in adjusting model-layer safeguards for national security purposes. Below I describe model training for national security purposes and the Department's rigorous testing, evaluation, and approval process to assess the security, capability, and behavior of models prior to operational deployment.

### Claude Gov Tailored National Security Model

18.     To understand the ways in which Anthropic has used model training to shape the operation of its models in Department deployments, it is useful to step back to explain the evolution of the Department's operational deployments of Anthropic tools.

19.     Anthropic began deploying commercial Claude models in classified cloud environments in early 2024. By May 2024, Claude Sonnet was available on a Top Secret cloud and was in active use by customers from the Department and the Intelligence Community ("IC"). Anthropic quickly received feedback, however, that its commercial models were applying public-facing content restrictions to IC and Department users operating in those secure environments, causing the model to refuse tasks that were appropriate in a national security context—such as

8

**App.279**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

summarizing threat assessments, processing classified documents, or translating intercepted materials describing violence.

20.     In order to better assist the national security components of the U.S. government in using Claude to fulfill their mission, Anthropic engaged directly with government stakeholders, including through classified discussions led by cleared Anthropic engineers, to understand operational needs and develop appropriate technical solutions. In early 2025, Anthropic assigned cleared personnel to develop Claude Gov, a version of Claude specifically tailored for national security use and designed to operate in a high-trust classified environment.

21.     Claude Gov retains the same baseline alignment and safety testing as commercial models but is trained to understand what entity is making use of it and what legal framework governs that work. Specifically, Claude Gov is instructed to assume that it is working with a cleared U.S. military or intelligence officer acting under lawful authority. Claude Gov was developed based on extensive collaboration with government partners regarding applicable policies and operational use cases. It is trained to perform tasks appropriate to the national security context while remaining within the rules governing intelligence and military activities.

22.     Claude Gov was made available to IC and Department customers through classified cloud environments in March 2025. Government users reported

9

**App.280**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

that it performed significantly better for classified uses than the commercial version, including now completing tasks that were appropriate to the national security mission—such as reviewing classified documents and supporting military planning—which it had previously refused. Adoption of Claude Gov increased rapidly. Anthropic deployed new, improved versions of Claude Gov in June 2025 and again in November 2025, after significant testing and explicit approvals from government stakeholders as described in detail below.

23.     I understand that Under Secretary Michael's new declaration states that "Anthropic has specially built a 'Gov wrapper' around their commercial models that was controlled exclusively by Anthropic's Gov team." Second Michael Decl. ¶ 8. It is accurate that Anthropic conducted the fine-tuning of Claude Gov, after consulting extensively with government national security partners and in order to serve those partners more effectively. However, Claude Gov is a distinct version of the Claude model, specifically trained to operate appropriately in a national security context. Claude Gov does not include any additional "wrapper" layer that could provide Anthropic with access to, or control over, the model's operation or that inserts any additional safeguards or restrictions.

10

**App.281**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

**The Department Tests and Approves All Models Prior to Deployment and Anthropic Cannot Alter Models After Delivery to the Department**

24.     As described above, Claude Gov is operationally deployed in Department environments through classified cloud systems operated by third-party defense contractors. Anthropic's role is limited to providing the model and delivering new versions that are deployed only when approved by the government.

25.     Before deployment to the Department, every model is subject to a rigorous and multilayered testing, evaluation, and approval process by the government. That process proceeds in distinct stages, each of which must be completed before the next begins.[1]

26.     First, Anthropic provides the trained model to the third-party cloud provider responsible for deploying the model for government use. Before any deployment may occur, the cloud provider must submit a Significant Change Request ("SCR") to the government agency sponsoring the relevant cloud region. In air-gapped, classified regions, the government agency that is the region sponsor must approve any system, software, or model before it may be introduced into the region. The cloud provider submits detailed information about the proposed

---

[1] My understanding of the testing and evaluation steps described in this section is based on my extensive personal experience with the Department's processes as they existed prior to February 2026.

11

**App.282**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

change, including architecture diagrams and security descriptions, as part of the SCR.

27.     The region sponsor assigns the proposed change a complexity level—low, medium, or high—which determines the length of the approval process. Low-complexity changes may be approved in days; high-complexity changes may take months. The government customer and its cloud provider determine the applicable complexity level based on the nature of the technical change. This entire review is completed before the model is introduced into the classified ("high-side") environment.

28.     Once the region sponsor approves the SCR, the cloud provider transfers the model from the unclassified ("low-side") environment to the high-side environment for further evaluation and testing. The cloud provider owns and controls this transition pipeline. Anthropic's involvement in the Department's operational deployment of Claude Gov ends entirely at the low side; Anthropic does not access, interact with, or modify the model on the high side in any manner.

29.     After transferring the model to the classified environment, the cloud provider conducts required security testing—including reliability, availability, and load performance checks—and validates that all safeguards are functioning as intended.

12

**App.283**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

30.    After this validation, the model is made available to the Department for independent evaluation. This evaluation occurs at the individual program level: each office or program assesses the model against its own specific operational needs and use cases, and a model is approved for transition by program officials only after the Department determines it is appropriate for their program's requirements. This rigorous testing typically begins by releasing the new model to a limited number of users on a program-specific basis. During this period, users evaluate the new model to determine whether it meets or exceeds the prior model's performance on all key tasks relevant to their operational responsibilities.

31.    The Department develops formal evaluations tailored to its own defined expectations of model behavior and performance and tests each new model against them. For example, one basic type of evaluation examines refusals by prompting the model to determine if it improperly refuses any task it is expected to perform. Other types of evaluations involve human-to-model comparisons. For example, an evaluation might involve an analytical task in which a human analyst would be expected to identify a defined set of conclusions based on a particular information set—the evaluation would assess whether the model identified the same key elements and thus appeared to perform as well as, or better than, a human analyst. Through these and similar evaluations, the Department independently

13

**App.284**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

verifies model behavior within the context of operational activities before any model is approved for such use.

32.    This evaluation process equips the Department to identify and address any concern it may have about potential limitations in a model's performance. While Anthropic does not know the specific form or substance of every evaluation the Department conducts, the Department has the ability to directly test any aspect of the model's behavior. For example, if the Department were concerned that the model may be trained in a way that caused the model to refuse tasks the Department deemed appropriate to its lawful mission, or to override the Department's judgement that an activity is permissible, the Department could directly test the model on those specific tasks. For example, Under Secretary Michael's new declaration asserts a concern that Anthropic's model might refuse to answer, or inaccurately answer, a physics-related question regarding the performance of a missile propulsion system in a way that could undermine the safety or performance of the weapon. Second Michael Decl. ¶ 19. But the Department could and surely would test the model for such use directly by asking the model questions related to missile systems and evaluating its responses. Anthropic actively recommends that the Department conduct evaluations and testing before deploying systems in operational environments—particularly for highly consequential use cases—and makes its cleared engineers available to

14

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

support that testing as needed to ensure the government has sufficient confidence in, and understanding of, the system.

33. If the model failed to perform as intended, the Department could assess whether the issue could be resolved—for instance, by refining the prompts to provide additional context enabling the model to correctly recognize the request as authorized. If the concern could not be resolved, the Department could decline to approve the model, either for the particular activity in question or for Department-wide use. It could also provide feedback to Anthropic and request we address the issue in training future models (which we have done on multiple occasions).

34. The evaluation process has matured over the course of successive model deployments. Through its experience with earlier models, the Department has developed a baseline understanding of how each model performs particular tasks and maintains records of example prompts alongside the corresponding outputs produced by both human analysts and the model. Using this baseline, the Department evaluates outputs from new models, identifies instances where the model falls short of expected performance, and determines whether corrections are required. Where corrections are necessary, the Department implements them through prompt refinement—adjusting the instructions provided to the model—and related controls. Once the Department determines that a model is safe, effective,

15

**App.286**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

and performs as expected for the specific operational requirements of an individual program, the model is approved for use and the prior model may be retired.

35.     Each Department component conducts its own testing and is not required to retire the prior version until it is satisfied that the new version meets or exceeds the prior version's performance for its specific mission requirements. For example, some components continued to use Claude Gov Sonnet 3.5 after Claude Gov Sonnet 3.7 was released because they preferred its functionality for their particular needs. By contrast, Claude Gov Sonnet 4.5 (released in November 2025) represented a significant enough advance that nearly every Department component adopted it within weeks of release.

36.     Once a model is deployed inside a government-secure enclave, Anthropic has no ability to access, alter, or shut it down. Anthropic maintains no back door or remote kill switch, and Anthropic personnel cannot log into a Department system to modify or disable a running model. Only the government and its authorized cloud provider have access to the deployed system. If the government requires the assistance of any Anthropic employee with respect to the deployed model, it would need to request and facilitate that individual's access to the Department's systems directly.

37.     A deployed model is static. The model weights and guardrails remain fixed unless and until a newer version is deployed to replace it. A model does not

16

**App.287**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

degrade or change on its own; and Anthropic cannot push undisclosed or unsanctioned changes to a model after the Department has deployed it.

38.    I understand that the undated Urgent Supply Chain Risk memorandum, March 19, 2026 declaration of Under Secretary Michael, and latest April 20, 2026 declaration of Under Secretary Michael suggest that Anthropic could alter its models after deployment, without the Department's knowledge or consent, by modifying model guardrails or model weights. That is incorrect. Once a model is running inside a government-secure enclave, Anthropic has no ability to unilaterally alter the guardrails or the model weights. Any such change would require Anthropic to produce an entirely new version of the model, which the Department must approve and take affirmative steps to install—the Department retains complete discretion to decline to install any new model, for any reason or for no reason at all.

39.    For this reason, the term "update" is a misnomer in this context. Unlike conventional software, a model cannot be updated in place through patches or other changes pushed to a running system. The only way to alter a deployed model's behavior is to replace it with a new version.

40.    I understand that Under Secretary Michael's new declaration alleges that Anthropic is able "continue to affect the functioning of its models" after delivery to the Department through model updates and "ongoing operational

17

**App.288**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

alterations for an existing model that could turn 'refusals' or 'guardrails' on or off" and further alleges that Anthropic historically incorporated the Department's real-time "feedback to tweak certain model behaviors, such as a refusal to perform a particular function, by altering the model weights." Second Michael Decl. ¶ 10.

41.     To clarify, Anthropic is not able to make ongoing alterations to existing models to turn refusals or guardrails off. In some instances when a model produces unwanted refusals, the Department is able to resolve the issue through prompt engineering—that is, through adjusting how a request is phrased so that the model responds more effectively. This is akin to trying out a different phrase for a Google search if the phrase one tried before failed to yield the desired results. It is something all AI users do when a model does not answer a question or otherwise respond to a prompt as desired; and it does not constitute altering the model itself, and it does not turn off refusals or guardrails. When basic techniques like prompt adjustments are insufficient to resolve an issue, the only option for any company's AI model is to train and deploy an entirely new model—which are not simple "tweaks." *See* Second Michael Decl. ¶ 10. As I explained in my prior declaration, the process for updating a deployed model is analogous to ordering a cake at a restaurant: once the cake is served, no one can adjust the recipe at the table. Even if the cake is missing only a teaspoon of baking soda, it must be made again from scratch. Similarly, any change to Claude's behavior requires Anthropic to prepare

18

**App.289**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

an entirely new version of the model with those changes built in, which the Department then tests consistent with the policies and procedures for all new model deployments and can choose to deploy or reject.

42.     Every "update" is therefore, in fact, a brand new deployment subject to the same testing and approval processes discussed above. A new model version cannot be deployed without the approval of the third-party cloud provider and Department security reviewers, and the prior version is not retired until the customer confirms the new version performs as expected—and Department components are free to continue to use the prior version indefinitely. Indeed, as I stated above, some components continued to use Claude Gov Sonnet 3.5 even after a newer model was available because they preferred it for their operational needs. Neither the Department nor any Department program is compelled to adopt a new model if it is not fully satisfied with the evaluation and testing process, and the existing model will continue to perform without degradation.

43.     In sum, every model is rigorously tested by the Department before deployment. After deployment, Anthropic has no ability to access or alter the model in any way, and the model cannot degrade or change on its own.

**The Use of Claude by Government Contractors**

44.     The processes and technical limitations described above apply equally when defense contractors use Claude Gov in performing Department contracts.

19

**App.290**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

Once Claude Gov is deployed in a classified cloud environment, it can be accessed via an application programming interface ("API"), which allows the model to be used for various purposes by cleared defense contractors. Defense contractors may use Claude Gov directly as a chatbot, use it to process their own dataflows, or integrate it into systems and platforms they develop for the military and intelligence community.

45. For example, a major defense contractor might embed Claude Gov in an intelligence fusion system used by the military that ingests satellite images and signals intercepts from a large number of sources and integrates it into a unified operational picture. Claude Gov would serve as the analytical layer within such a system. Rather than manually reviewing reports and cross-referencing sources, a military user would be able to query Claude Gov in plain English to request summaries, ask targeted questions, or identify threats. Claude Gov could synthesize incoming data, generate written assessments, and deliver structured, actionable intelligence within seconds.

46. Claude Gov is still hosted by third-party cloud providers in these kinds of deployments, and Anthropic would not have ongoing access to the model. Anthropic could not alter the model, change its behavior, or monitor its use. All models—whether accessed directly by Department users or embedded in contractor systems—are subject to the same rigorous testing and evaluation

20

**App.291**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

process described above and must be confirmed to perform as expected before being authorized for use.

47. I understand that Under Secretary Michael's new declaration alleges that the government's cloud provider, AWS, "provided approximately twelve cleared Anthropic engineers with administrative access, which allowed them to affect the functioning of the model by pushing updates or changing its functionality, including the ability to remove the model from the system or shut it down altogether." Second Michael Decl. ¶ 11. The declaration further asserts that, through such access, it would be "technologically possible for Anthropic to make simultaneous, unrequested changes of which DoW would not be aware or know to test." *Id.*

48. These statements are incorrect. AWS has not provided Anthropic or any of its employees with administrative access to the model or with any access to the Department's operational systems.

49. Anthropic does employ certain personnel who hold security clearances. Those clearances exist solely to allow these individuals to participate in classified discussions with the Department and others regarding model functionality, to receive feedback, and to provide training to assist the Department in using the model effectively. These individuals do not have access to operational systems. Cleared Anthropic personnel would have access to the Department's

21

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

operational systems only if the Department itself specifically requested and facilitated such access, and only for the limited purpose of performing functions at the Department's direction.

50.    Defense contractors might also use Claude Gov to perform work on Department contracts in classified environments without embedding or integrating Claude Gov into any operational system. For example, a defense contractor might use Claude Gov to write a line of computer code for military software or edit a report being drafted as part of a Department contract. In such cases, the outputs generated by Claude Gov are entirely separate from the model itself and exist as ordinary, static data. Once Claude Gov produces an output—such as a line of code or a document—that output has no connection to the model weights, no link back to Anthropic's systems, and no mechanism by which the model or Anthropic could later access or modify the data. I am not aware of the Department identifying any form of supply chain or security risk, either to Anthropic directly or in court filings, related to this type of use of Claude Gov in Department contracts.

51.    In his new declaration, Under Secretary Michael points to Anthropic's prior usage restrictions with its partners as evidence that Anthropic has "attempted to control how DoW may lawfully employ its technology." Second Michael Decl. ¶ 19. As I have already stated, this suggestion is undermined by the fact that the Department conducts extensive testing and review of any potential usage

22

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

limitations before approving Anthropic's model for deployment on Department systems. Moreover, as best I can tell, the usage restrictions referenced in Under Secretary Michael's declaration relate solely to the standard government addendum and do not account for Anthropic's negotiations with the Department, where Anthropic indicated it was prepared to remove all usage limitations except those covering lethal autonomous warfare and mass domestic surveillance.

### The Department's Designation Has Affected Anthropic's Contracts, Reputation, And Mission

52.    The Department's designation has impaired Anthropic's government contracts and partnerships with government contractors. As one example, the Department's Chief Digital and Artificial Intelligence Office ("CDAO") awarded Anthropic in July 2025, alongside other frontier AI labs, a two-year, up to $200 million agreement. The government cancelled the arrangement with CDAO after only a few months because of the usage term negotiations. During that short period, Anthropic had assessed and recommended ways its services could best support the Department's mission—recommendations which the Department communicated it was interested in moving forward with. Absent these usage term negotiations and resulting supply chain risk designation, it is almost certain that Anthropic would have continued to develop its relationship with CDAO and received the remainder of its award.

23

**App.294**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

53.     As a result of the negotiations and supply chain designation, Anthropic also lost the opportunity to be deployed on genAI.mil, the Department's secure, official generative AI platform to provide its personnel with access to cutting-edge AI models. Anthropic began negotiations with the Department for this deployment in September 2025. As a result of the usage term negotiations and subsequent supply chain risk designation, Anthropic was no longer in consideration to be deployed on the Department's genAI.mil platform. Two other AI vendors have instead deployed their AI models on the Department's platform—one in December 2025 and another in February 2026.

54.     The supply chain risk designation has also frustrated Anthropic's contracts with prime contractors that perform services for the Department. For example, Anthropic has maintained a multi-year relationship with a defense technology provider that permits Anthropic to offer Claude to the Department for classified purposes. Anthropic also works closely with a cloud service provider that offers Claude to government agencies, including the Department. Both partners have indicated that, pursuant to Department leadership directives, they need to discontinue using Anthropic as a subcontractor on Department contracts and have begun doing so. Anthropic has invested significant time and resources in building relationships with these national security stakeholders and the supply chain risk designation demands that those relationships be severed.

24

**App.295**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

55.     The supply chain risk designation has caused not only financial harm but also concrete and continuing harm to Anthropic's reputation and customer relationships that will be difficult to undo. As Chief Commercial Officer Paul Smith stated in his March 10, 2026 declaration, Anthropic depends on an interconnected network of relationships—with government agencies, prime contractors, commercial partners, cloud providers, and investors—and its reputation underpins each of them. Harm to Anthropic's reputation in one context invariably damages its reputation in others.

56.     The Department of War's public branding of Anthropic as a supply chain risk signals to enterprise customers and counterparties that Anthropic is a company to be avoided. These consequences flow directly from the reputational harm caused by the designation, which becomes increasingly difficult to unwind the longer it remains in effect.

57.     Anthropic is a company that has invested deeply in our relationship with the federal government, and with the IC and the Department in particular. Supporting the national security of the United States and allied democracies has been a deliberate choice—one we have made because it is central to our mission of developing AI for the benefit of humanity. While we are proud of our commitment to our founding values under these difficult circumstances, and are gratified by indications of some public support, we certainly do not welcome this dispute,

25

**App.296**

Docusign Envelope ID: 10382CBE-CF0D-4204-826B-72ED0FC96695

which we long sought to avoid, including through good-faith negotiations with the Department. While we respect that decisions about the use of AI in military applications belong to the Department, we are harmed by the lost opportunity to continue to support the national security mission directly, and we believe the country and its national security are harmed as well. Notably, we developed these tools specifically for use by the national security components of the federal government at our own initiative and at significant expense. Being branded a threat to the national security of our own country therefore inflicts more than financial harm.

*     *     *

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed on April 22, 2026.

_Thiyagu Ramasamy_
_____
Thiyagu Ramasamy
Head of Public Sector, Anthropic

26

**App.297**