**ORAL ARGUMENT SCHEDULED FOR MAY 19, 2026**

**No. 26-1049**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

**APPENDIX VOLUME 4 (App.298–App.422)**

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

April 22, 2026

**TABLE OF CONTENTS**

Page

**Volume 1**[1]

Declaration of Jared Kaplan (Mar. 10, 2026) ....................................................App.1

Declaration of Sarah Heck (Mar. 10, 2026)......................................................App.19

Declaration of Thiyagu Ramasamy (Mar. 11, 2026).........................................App.29

Declaration of Paul Smith (Mar. 10, 2026) ......................................................App.47

Declaration of Krishna Rao (Mar. 10, 2026) ....................................................App.59

**Volume 2**

Declaration of Kelly P. Dunbar (Mar. 11, 2026)..............................................App.66

 Exhibit 1: Department of War 41 U.S.C. § 4713 Notice to Anthropic
(Mar. 3, 2026) ...................................................................................App.71

 Exhibit 2: Post by Secretary Hegseth (@SecWar), X (Feb. 27, 2026,
2:14 PM PT), https://tinyurl.com/yvtpje9b .........................................App.76

 Exhibit 3: CBS Department of War Memorandum Attachment,
*Internal Pentagon Memo Orders Military Commanders to Remove
Anthropic AI Technology from Key Systems*, CBS News (Mar. 10,
2025), https://tinyurl.com/mtyuanfd ...................................................App.78

---

[1] For the convenience of the Court, Volumes 1-3 of the Appendix include (i) materials previously included by the parties in addenda to filings made in connection with Anthropic's stay motion; (ii) this Court's order and per curiam opinion regarding that motion; and (iii) a declaration addressing the questions posed in this Court's stay order. Volume 4 includes the administrative record supplied by the Department to Anthropic in the format produced by the Department.

Exhibit 4: Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026), https://tinyurl.com/2cbcmfz7 ....................................................................App.81

Exhibit 5: *A Statement from Dario Amodei on Anthropic's Commitment to American AI Leadership*, Anthropic (Oct. 21, 2025), https://tinyurl.com/4ncsm5w4 ............................................................App.133

Exhibit 6: *Claude Gov Models for U.S. National Security Customers*, Anthropic (Jun. 6, 2025), https://tinyurl.com/ynyc82bw ....................App.139

Exhibit 7: *Statement from Dario Amodei on Our Discussions with the Department of War*, Anthropic (Feb. 26, 2026), https://tinyurl.com/54pw9684................................................................App.145

Exhibit 8: Post by President Donald J. Trump (@realDonaldTrump), TruthSocial (Feb. 27, 2026, 12:47 PM PT), https://tinyurl.com/5n7ucwpw ............................................................App.152

Exhibit 9: Joseph Menn, *U.S. Intelligence Probing Russian Investors in U.S. Tech.*, Washington Post (Dec. 19, 2022)..................................App.154

Exhibit 10: Dave Lawler, et al., *Exclusive: Pentagon Threatens Anthropic Punishment*, Axios (Feb. 16, 2026), https://tinyurl.com/bdddw5r7 .............................................................App.162

Exhibit 11: Cade Metz, *Anthropic's and Open AI's Dance with the Pentagon: What to Know*, N.Y. Times (Mar. 7, 2026), https://tinyurl.com/ycyhnbdd...............................................................App.169

## Volume 3

Determination Under 41 U.S.C. § 4713 (Mar. 3, 2026) ................................App.177

Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC (Mar. 3, 2026).......................App.178

Memorandum for the Record (Attachment 1a to Joint Recommendation) ...App.180

Section 4713 Scoping Analysis for Anthropic, PBC (Attachment 2 to Joint
  Recommendation)......................................................................App.185

Congressional Notifications of Designation under 41 U.S.C. § 4713
  (Mar. 3, 2026) ................................................................... App.187

Memorandum for Senior Pentagon Leadership Regarding Artificial
  Intelligence Strategy for the Department of War (Jan. 9, 2026).........App.202

Declaration of Emil Michael (Mar. 19, 2026) ...............................App.208

Copy of Article Cited at Emil Michael Declaration 5 n.2 .............App.220

Supplemental Letter to Petitioner (Mar. 19, 2026).......................App.224

Declaration of Sarah Heck (Mar. 23, 2026)..................................App.233

  Exhibit 1: Email from Emil Michael to Dario Amodei Re: Agreement
  with Department of War (Mar. 4, 2026) ........................... App.240

  Exhibit 2: Email and two attachments from Anthony Fuscellaro to
  Dario Amodei Re: Official Correspondence from the Department
  of War to Anthropic (Mar. 4, 2026) ....................................App.242

Declaration of Thiyagu Ramasamy (Mar. 22, 2026)....................App.252

Order and Opinion Regarding Emergency Motion for Stay Pending Review
  and Expedited Briefing, *Anthropic PBC v. U.S. Department of War*,
  No. 26-1049 (D.C. Cir. Apr. 8, 2026) ..................................App.264

Declaration of Thiyagu Ramasamy (Apr. 22, 2026) .....................App.271

**Volume 4**[2]

Deepa Seetharaman, et al., *Pentagon Clashes with Anthropic Over Military AI Use, Sources Say*, Reuters (Jan. 29, 2026) ......................................App.298

Keach Hagey, et al., *Anthropic-Pentagon Clash Over Limits on AI Puts $200 Million Contracts at Risk*, Wall Street Journal (Jan. 29, 2026) ..........App.306

Ross Douthat, *Anthropic's Chief on A.I.: "We Don't Know if the Models are Conscious"*, New York Times (Feb. 12, 2026)....................................App.314

Anthropic § 4713 Determination Package.......................................................App.367

U.S. Federal Government Usage Policy Addendum for Anthropic Partner (Aug. 16, 2025) ....................................................................................App.391

Declaration of Emil Michael (Apr. 20, 2026).................................................App.408

---

[2] The Department's production of the administrative record also included an identical copy of material already reproduced at App.81-App.132 (Dario Amodei, *The Adolescence of Technology: Confronting and Overcoming the Risks of Powerful AI* (Jan. 2026)).

archive.today
webpage capture

Saved from https://www.reuters.com/business/pentagon-clashes-with-anthropic-over-mili     search

history ←prior next→

Redirected from https://www.reuters.com/business/pentagon-clashes-with-anthropic-over-mili
no other snapshots from this url

All snapshots from host www.reuters.com

Webpage    Screenshot

share    download .zip    report bug or abuse    Buy me a coffee

2 Feb 2026 22:56:49 UTC



Exclusive news, data and analytics for financial market professionals    **LSEG**

# Exclusive: Pentagon clashes with Anthropic over military AI use, sources say

By Deepa Seetharaman, David Jeans and Jeffrey Dastin

January 29, 2026 9:19 PM UTC · Updated January 30, 2026

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 6 of 130

App.298

**App.299**

20%



Anthropic logo is seen in this illustration taken May 20, 2024. REUTERS/Dado Ruvic/Illustration/File Photo Purchase Licensing Rights 🗗

Summary    Companies

Pentagon and Anthropic at standstill over AI deployment guardrails

Anthropic raises concerns over AI use for U.S. surveillance and autonomous weapons

Pentagon insists on deploying AI tech irrespective of company usage policies

WASHINGTON/SAN FRANCISCO, Jan 29 (Reuters) - The Pentagon is at odds with artificial-intelligence developer Anthropic over safeguards that would prevent the government from deploying its technology to target weapons autonomously and conduct U.S. domestic surveillance, three people familiar with the matter told Reuters.

The discussions represent an early test case for whether Silicon Valley, in Washington's good graces after years of tensions, can sway how U.S. military and intelligence personnel

deploy increasingly powerful AI on the battlefield.

> Sign up here.

After extensive talks under a contract worth up to $200 million ⬀ , the U.S. Department of Defense and Anthropic are at a standstill, six people familiar with the matter said, on condition of anonymity.

The company's position on how its AI tools can be used has intensified disagreements between it and the Trump administration, the details of which have not been previously reported.

A spokesperson for the Defense Department, which the Trump administration renamed the Department of War, did not immediately respond to requests for comment.

Anthropic said its AI is "extensively used for national security missions by the U.S. government and we are in productive discussions with the Department of War about ways to continue that work."

The spat, which could threaten Anthropic's Pentagon business, comes at a delicate time for the company.

The San Francisco-based startup is preparing for an eventual public offering. It also has spent significant resources courting U.S. national security business and sought an active role in shaping government AI policy.

Anthropic is one of a few major AI developers that were awarded contracts by the Pentagon last year. Others were Alphabet's Google (GOOGL.O) ⬀ , Elon Musk's xAI and OpenAI.

WEAPONS TARGETING

In its discussions with government officials, Anthropic representatives raised concerns that its tools could be used to spy on Americans or assist weapons targeting without sufficient

App.300

human oversight, some of the sources told Reuters.

The Pentagon has bristled at the company's guidelines. In line with a January 9 department memo on AI strategy, Pentagon officials have argued they should be able to deploy commercial AI technology regardless of companies' usage policies, so long as they comply with U.S. law, sources said.

Still, Pentagon officials would likely need Anthropic's cooperation moving forward. Its models are trained to avoid taking steps that might lead to harm, and Anthropic staffers would be the ones to retool its AI for the Pentagon, some of the sources said.

Anthropic's caution has drawn conflict with the Trump administration before, Semafor has reported .

In an essay on his personal blog, Anthropic CEO Dario Amodei warned this week that AI should support national defense "in all ways except those which would make us more like our autocratic adversaries."

Amodei was among Anthropic's co-founders critical of fatal shootings of U.S. citizens protesting immigration enforcement actions in Minneapolis, which he described as a "horror" in a post on X.

The deaths have compounded concern among some in Silicon Valley about government use of their tools for potential violence.

Reporting By Deepa Seetharaman and Jeffrey Dastin in San Francisco and David Jeans in Washington, Editing by Kenneth Li, Franklin Paul, Anna Driver and Chris Reese

Our Standards: The Thomson Reuters Trust Principles.

Suggested Topics:  ( Artificial Intelligence )  ( Social Impact )

       **Purchase Licensing Rights**

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 9 of 130



**David Jeans**
Thomson Reuters

 

David Jeans is a space and defense correspondent for Reuters, based in New York. He covers the intersection of weapons, technology and national security, with a focus on the rise of venture-backed military startups and the Pentagon's evolving relationship with Silicon Valley. Previously, he covered defense tech for Forbes. He's also the co-author of WONDER BOY: Tony Hsieh, Zappos and the Myth of Happiness in Silicon Valley, named a Financial Times Best Business Book.



**Jeffrey Dastin**
Thomson Reuters

  

Jeffrey Dastin is a correspondent for Reuters based in San Francisco, where he reports on the technology industry and artificial intelligence. He joined Reuters in 2014, originally writing about airlines and travel from the New York bureau. Dastin graduated from Yale University with a degree in history. He was part of a team that examined lobbying by Amazon.com around the world, for which he won a SOPA Award in 2022.

## Read Next

 

Business

**NXP Semiconductors forecasts upbeat quarter, signaling industrial market bottom**

Business

**SpaceX acquires xAI as Musk looks to unify AI and space ambitions**

World

**Palantir CEO defends surveillance tech as US government contracts boost sales**

Media

**Open** app t codin

App.302

App.303

Energy

Indian refiners need wind-down period for Russian oil, sources say
10:24 PM UTC

Autos & Transportation

California's $200 million EV incentive program will require matching funds from automakers
10:23 PM UTC

# NXP Semiconductors forecasts upbeat quarter, signaling industrial market bottom

Autos & Transportation · February 2, 2026 · 10:44 PM UTC · ago

NXP Semiconductors on Monday forecast first-quarter revenue above Wall Street estimates, anticipating a robust automotive market and consistent industrial demand.

Business

Waymo valued at $126 billion in latest financing
10:11 PM UTC

Sustainability

Australia appoints Sarah Court as chair of corporate regulator
10:08 PM UTC

Latest

Browse

Media

About Reuters

Home

World

▶️ Videos

About Reuters ⬏

Authors

Business

📷 Pictures

Advertise with Us ⬏

| | | | |
|---|---|---|---|
| Topic Sitemap | Markets | 🖼 Graphics | Careers ⬀ |
| Archive | Sustainability | 🎧 Podcasts | Reuters News Agency ⬀ |
| Article Sitemap | Legal | | Brand Attribution Guidelines ⬀ |
| | Breakingviews | | Reuters and AI ⬀ |
| | Technology | | Reuters Leadership ⬀ |
| | Investigations | | Reuters Fact Check |
| | Sports | | Reuters Diversity Report ⬀ |
| | Science | | Commercial Disclosure (Japan) ⬀ |
| | Lifestyle | | |

Stay Informed

Download the App (iOS) ⬀

Download the App (Android) ⬀

Newsletters

Subscribe

## Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

## Follow Us

X   Facebook   Instagram   YouTube   LinkedIn   WhatsApp

## LSEG Products

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 12 of 130

App.304

## Workspace ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

## Data Catalogue ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

## World-Check ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Advertise With Us ⧉    Advertising Guidelines    Cookies ⧉    Terms & Conditions    Privacy ⧉    Copyright ⧉    Digital Accessibility ⧉
Purchase Licensing Rights ⧉                Corrections    Data Disclosure and Sources ⧉    Site Feedback ⧉

All quotes delayed a minimum of 15 minutes. See here for a list of exchanges and delays.                © 2026 Reuters. All rights reserved

App.305

archive.today
webpage capture

Saved from | https://www.wsj.com/tech/ai/anthropic-ai-defense-department-contract-947d5 | search

no other snapshots from this url

All snapshots from host www.wsj.com

30 Jan 2026 01:00:06 UTC

Webpage | Screenshot

share    download .zip    report bug or abuse    Buy me a coffee

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 14 of 130

App.306

Subscribe    Sign In

English Edition ▼  |  Print Edition  |  Video  |  Audio  |  Latest Headlines  |  Puzzles  | More ▼

World   Business   U.S.   **Politics**   Economy   Tech   Markets & Finance   Opinion   Free Expression   Arts   Lifestyle   Real Estate   Personal Finance   Health   Style   Sports

TECHNOLOGY | ARTIFICIAL INTELLIGENCE

# Anthropic-Pentagon Clash Over Limits on AI Puts $200 Million Contract at Risk

The AI startup and defense officials disagreed over whether the technology would be used for autonomous 'lethal' operations and surveillance

By *Keach Hagey* [Follow] *, Shalini Ramachandran* [Follow] *and Amrith Ramkumar* [Follow]
*Updated Jan. 29, 2026 4:37 pm ET*



Anthropic Chief Executive Dario Amodei CHRIS RATCLIFFE/BLOOMBERG NEWS

Anthropic scored a major endorsement last summer when it won a contract worth up to $200 million from the Defense Department. Now, the AI startup's relationship with the Pentagon is on the rocks.

The company and agency are at odds over the contractual terms of how Anthropic's technology can be used, according to people familiar with the matter. The tension could lead to the cancellation of the Pentagon contract, one of the people said.

The contract was intended to integrate Anthropic's Claude models into defense operations as part of the government's deployment of AI.

Tensions with the administration began almost immediately after it was awarded, in part because Anthropic's terms and conditions dictate that

Claude can't be used for any actions related to domestic surveillance. That limits how many law-enforcement agencies such as Immigration and Customs Enforcement and the Federal Bureau of Investigation could deploy it, people familiar with the matter said.

Anthropic's focus on safe applications of AI—and its objection to having its technology used in autonomous lethal operations—have continued to cause problems, they said. Some administration officials were frustrated that the company was dictating how its technology could be used, including for legal activities, they said.

CEO Dario Amodei outlined fears about AI's use in both mass surveillance and fully autonomous weapons capabilities in a recent essay. Friction between the startup and the Pentagon adds to existing tensions between the highly valued company and the Trump administration.

At an event earlier this month announcing that the Pentagon would be working with Elon Musk's xAI, Defense Secretary Pete Hegseth said the agency would not "employ AI models that won't allow you to fight wars." He was referring to discussions administration officials have had with Anthropic, some of the people said.

**Most Popular News**

App.308



Defense Secretary Pete Hegseth AL DRAGO/BLOOMBERG NEWS

Most Popular                                    OPINION

Semafor earlier reported on Hegseth's comments referring to Anthropic and tensions between the company and the agency. Other AI companies including OpenAI and Google are also working with the military.

The Pentagon declined to comment.

"Anthropic is committed to protecting America's lead in AI and helping the U.S. government counter foreign threats by giving our warfighters access to the most advanced AI capabilities," an Anthropic spokesman said in a statement. The startup said Claude is used "extensively" for U.S. national security missions and that it is "in productive discussions with the Department of War about ways to continue that work."

**Recommended Videos**

The company's latest models and coding tools have gained popularity in recent weeks, and it is in talks to raise billions from investors at a $350 billion valuation.

Amodei has said fast-developing AI can spur economic growth, but has also warned of its downsides, from safety risks to unemployment and inequality. "I don't think there's an awareness at all of what is coming here and the magnitude of it," he said in an interview last week with The Wall Street Journal. He has also criticized Trump for allowing exports of Nvidia AI chips to China, a move he says poses national-security risks.

That has at times put the company in conflict with White House AI and crypto czar David Sacks, who has pushed for looser regulations that accelerate model development. Sacks has accused Anthropic of being "AI doomers" focused on slowing competitors to benefit its business. The company has denied those claims and said it has a good relationship with the administration overall. Anthropic has backed Trump's approach to expanding energy production to power AI data centers.

Write to Keach Hagey at Keach.Hagey@wsj.com, Shalini Ramachandran at Shalini.Ramachandran@wsj.com and Amrith Ramkumar at amrith.ramkumar@wsj.com

*Appeared in the January 30, 2026, print edition as 'Anthropic, Pentagon Clash Over Use of AI'.*

## Videos



**How Build-A-Bear Found Success in the 'Nostalgia Economy'**



**WSJ Opinion: Could Measles Lose its Elimination Status in the U.S.?**



**White House Border Czar Says Minneapolis Operation Hasn't Been Perfect**



**WSJ Opinion: The Minneapolis Protests and Democrats' Nonprofit Problem**



**What a WSJ Reporter Saw on the Ground Following Minneapolis Shooting**

BACK TO TOP »

# THE WALL STREET JOURNAL.
a Dow Jones company

English Edition ▼

**Subscribe Now**    **Sign In**

| News | | Markets | Opinion | WSJ Membership | Customer Service | Ads | Tools & Features | More |
|---|---|---|---|---|---|---|---|---|
| Live Coverage | World | Stocks | Opinion & Reviews | Subscription Options | Customer Center | Advertise | Newsletters & Alerts | About Us |
| Business | U.S | Bonds | Film Review | Corporate Subscriptions | Contact Us | Commercial Real Estate Ads | Topics | Content Partnerships |
| Politics | Economy | Money Rates | Television Review | WSJ Higher Education Program | Cancel My Subscription | Place a Classified Ad | Podcasts | Corrections |
| Tech | Finance | DJIA | Bookshelf | WSJ High School Program | | Sell Your Business | RSS Feeds | Jobs at WSJ |
| Arts and Culture | Lifestyle | S&P 500 | Music Review | Public Library Program | | Sell Your Home | Video Center | News Archive |
| Real Estate | Personal Finance | Nasdaq | What to Watch | WSJ Live | | Recruitment & Career Ads | Watchlist | Register for Free |
| Health | Style | | Art Review | Commercial Partnerships | | Digital Self Service | Latest News | Reprints & Licensing |
| Sports | China | | | | | | | Buy Issues |
| Science | Ukraine | | | | | | | WSJ Shop |
| Middle East | Elections | | | | | | | Dow Jones Press Room |
| Policy | Trade | | | | | | | Dow Jones Smart Money |
| Investing | Earnings | | | | | | | |
| Taxes | AI | | | | | | | |
| Obituaries | | | | | | | | |



**Dow Jones Products**   Barron's | BigCharts | Dow Jones Newswires | Factiva | Financial News | Mansion Global | MarketWatch | Risk & Compliance

WSJ | Buy Side | WSJ Pro | WSJ Video | WSJ Wine | The Times

Privacy Notice | Cookie Notice | Copyright Policy | Legal Policies | Terms of Use | Your Ad Choices | Accessibility

Copyright ©2026 Dow Jones & Company, Inc. All Rights Reserved.

archive.today
webpage capture

Saved from https://www.nytimes.com/2026/02/12/opinion/artificial-intelligence-anthropic-
All snapshots from host www.nytimes.com

6 Mar 2026 12:51:06 UTC

history ←prior next→

Webpage | Screenshot

share | download .zip | report bug or abuse | Buy me a coffee

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 22 of 130

App.314

# The New York Times

LOG IN

OPINION

**INTERESTING TIMES**

# Anthropic's Chief on A.I.: 'We Don't Know if the Models Are Conscious'

Dario Amodei shares his utopian — and dystopian — predictions in the near term for artificial intelligence.

Feb. 12, 2026

**Hosted by Ross Douthat**
**Produced by Sophia Alvarez Boyd**
Mr. Douthat is a columnist and the host of the "Interesting Times" podcast.

USCA Case #26-1049      Document #2169955      Filed: 04/22/2026      Page 23 of 130

Dario Amodei shares his utopian — and dystopian — predictions in the near term for artificial intelligence.  The New York Times

Are the lords of artificial intelligence on the side of the human race? That's the core question I had for this week's guest. Dario Amodei is the chief executive of Anthropic, one of the fastest growing AI companies. He's something of a utopian when it comes

to the potential benefits of the technology that he's unleashing on the world. But he also sees grave dangers ahead and inevitable disruption.

---

**Anthropic's Chief on A.I.: 'We Don't Know if the Models Are Conscious'**

Dario Amodei shares his utopian — and dystopian — predictions for the near-term future of artificial intelligence.

 Listen · 1 hr 2 min

---

*Below is an edited transcript of an episode of "Interesting Times." We recommend listening to it in its original form for the full effect. You can do so using the player above or on the [NYTimes app](#), [Apple](#), [Spotify](#), [Amazon Music](#), [YouTube](#), [iHeartRadio](#) or wherever you get your podcasts.*

**Ross Douthat:** Dario Amodei, welcome to "Interesting Times."

**Dario Amodei:** Thank you for having me, Ross.

**Douthat:** So you are, rather unusually, maybe for a tech C.E.O., an essayist. You have written two long, very interesting essays about the promise and the peril of artificial intelligence. And we're going to talk about the perils in this conversation, but I thought it would be good to start with the promise and with the optimistic vision —

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 24 of 130

indeed, I would say the utopian vision — that you laid out a couple of years ago in an essay entitled, "Machines of Loving Grace." We'll come back to that title at the end.

But, I think a lot of people encounter A.I. news through headlines predicting a blood bath for white-collar jobs, these kinds of things. Sometimes your own quotes have encouraged these things.

**Amodei:** Sometimes my own quotes. Yes.

**Douthat:** And I think there's a commonplace sense of "What is A.I. for?" that people have.

So why don't you answer that question, to start out: If everything goes amazingly in the next five or 10 years, what's A.I. for?

**Amodei:** Yeah, so for a little background, before I worked in A.I., before I worked in tech at all, I was a biologist. I first worked on computational neuroscience, and then I worked at Stanford Medical School on finding protein biomarkers for cancer, on trying to improve diagnostics and curing cancer.

One of the observations that I most had when I worked in that field was the incredible complexity of it. Each protein has a level localized within each cell. It's not enough to measure the level within the body, the level within each cell. You have to measure the level in a particular part of the cell and the other proteins that it's interacting with or complexing with.

**Editors' Picks**

**A Power Outage Made Us Possible**

**Chasing the Northern Lights, With Snowmobiles and Frozen Cameras**

**Nerve-Shredding New Thrillers**

App.317

And I had this sense of: Man, this is too complicated for humans. We're making progress on all these problems of biology and medicine, but we're making progress relatively slowly.

So what drew me to the field of A.I. was this idea of: Could we make progress more quickly?

Look, we've been trying to apply A.I. and machine learning techniques to biology for a long time. Typically they've been for analyzing data. But as A.I. gets really powerful, I think we should actually think about it differently. We should think of A.I. as doing the job of the biologist, doing the whole thing from end to end. And part of that involves proposing experiments, coming up with new techniques.

I have this section where I say that a lot of the progress in biology has been driven by this relatively small number of insights that lets us measure or get at or intervene in the stuff that's really small. If you look at a lot of these techniques, they're invented very much as a matter of serendipity. Crispr, which is one of these gene-editing technologies, was invented because someone went to a meeting on the bacterial immune system and connected that to the work they were doing on gene therapy. And that connection could have been made 30 years ago.

And so the thought is: Could A.I. accelerate all of this? And could we really cure cancer? Could we really cure Alzheimer's disease?

USCA Case #26-1049     Document #2169955     Filed: 04/22/2026     Page 26 of 130

Could we really cure heart disease? And more subtly, some of the more psychological afflictions that people have — depression, bipolar — could we do something about these? To the extent that they're biologically based, which I think they are, at least in part.

So, I go through this argument here: Well, how fast could it go if we have these intelligences out there who could do just about anything?

**Douthat:** I want to pause you there, because one of the interesting things about your framing in that essay is that these intelligences don't have to be the kind of maximal godlike super intelligence that comes up in A.I. debates. You're basically saying if we can achieve a strong intelligence at the level of peak human performance — —

**Amodei:** Peak human performance, yes.

**Douthat:** And then multiply it to what? Your phrase is "a country of geniuses."

**Amodei:** A country — have 100 million of them. Maybe each trained a little different or trying a different problem. There's benefit in diversification and trying things a little differently, but yes.

**Douthat:** So you don't have to have the full Machine God. You just need to have 100 million geniuses.

**Amodei:** You don't have to have the full Machine God. And indeed, there are places where I cast doubt on whether the Machine God

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 27 of 130

would be that much more effective at these things than the 100 million geniuses.

I have this concept called the diminishing returns to intelligence. Economists talk about the marginal productivity of land and labor; we've never thought about the marginal productivity of intelligence. But if I look at some of these problems in biology, at some level you just have to interact with the world. At some level, you just have to try things. At some level, you just have to comply with the laws or change the laws on getting medicines through the regulatory system. So there's a finite rate at which these changes can happen.

Now there are some domains, like if you're playing chess or go, where the intelligence ceiling is extremely high. But I think the real world has a lot of limiters. Maybe you can go above the genius level, but sometimes I think all this discussion of, "Could you use a moon of computation to make an A.I. god?" is a little bit sensationalistic and besides the point, even as I think this will be the biggest thing that ever happened to humanity.

**Douthat:** So keeping it concrete, you have a world where there's an end to cancer as a serious threat to human life. An end to heart disease, an end to most of the illnesses that we experience that kill us. Possible life extension beyond that. So that's health. That's a pretty positive vision.

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 28 of 130

Talk about economics and wealth. What happens in the five-, 10-year A.I. takeoff to wealth?

**Amodei:** Yeah. So again, let's keep it on the positive side — we'll get to the negative side.

We're already working with pharma companies. We're already working with financial industry companies. We're already working with folks who do manufacturing. We're of course, I think, especially known for coding and software engineering. So the raw productivity, the ability to make stuff and get stuff done — that is very powerful.

And we see our company's revenue going up 10X a year, and we suspect the wider industry looks something similar to that. If the technology keeps improving, it doesn't take that many more 10Xs until suddenly you're saying: Oh, if you're adding across the industry $1 trillion of revenue a year, and the U.S. G.D.P. is $20 or $30 trillion — I can't remember exactly — you must be increasing the G.D.P. growth by a few percent. So I can see a world where A.I. brings the developed world G.D.P. growth to something like 10, 15 percent. Five, 10, 15 — I mean there's no science of calculating these numbers. It's a totally unprecedented thing. But it could bring it to numbers that are outside the distribution of what we saw before.

Again, I think this will lead to a weird world. We have all these debates about, "The deficit is growing." If you have that much in G.D.P. growth, you're going to have that much in tax receipts, and you're going to balance the budget without meaning to.

One of the things I've been thinking about lately is that one of the assumptions of our economic and political debates is that growth is hard to achieve. That it's this unicorn, and there are all kinds of ways you can kill the golden goose.

We could enter a world where growth is really easy and it's the distribution that's hard because it's happening so fast, the pie is being increased so fast.

**Douthat:** So before we get to the hard problem, one more note of optimism on politics.

All of this is speculative, but I think it's a little more speculative that you try to make the case that A.I. could be good for democracy and liberty around the world. Which is not necessarily intuitive — a lot of people say that incredibly powerful technology in the hands of authoritarian leaders leads to concentrations of power, and so on.

**Amodei:** And I talk about that in the other essay.

**Douthat:** Right, but just briefly, what is the optimistic case for why A.I. is good for democracy?

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 30 of 130

**Amodei:** Yeah, absolutely. So, "Machines of Loving Grace." I'm just like: Let's dream!

**Douthat:** Let's dream! Right.

**Amodei:** Let's talk about how it could go well. I don't know how likely it is, but we got to lay out a dream. Let's try and make the dream happen.

So, the positive version — I admit that I don't know that the technology inherently favors liberty. I think it inherently favors curing disease and it inherently favors economic growth. But I worry, like you, that it may not inherently favor liberty.

But what I say there is: Can we make it favor liberty? Can we make the United States and other democracies get ahead in this technology?

The United States being technologically and militarily ahead has meant that we have throw-weight around the world, augmented by our alliances with other democracies. And we've been able to shape a world that I think is better than the world would be if it were shaped by Russia or by China or by other authoritarian countries.

And so, can we use our lead in A.I. to shape liberty around the world? There's obviously a lot of debates about how interventionist we should be and how we should wield that power, but I've often

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 31 of 130

worried that today, through social media, authoritarians are kind of undermining us.

Can we counter that? Can we win the information war? Can we prevent authoritarians from invading countries like Ukraine or Taiwan by defending them with the power of A.I.?

**Douthat:** With giant swarms of A.I.-powered drones.

**Amodei:** Which we need to be careful about. We ourselves need to be careful about how we build those. We need to defend liberty in our own country. But is there some vision where we kind of re-envision liberty and individual rights in the age of A.I.? We need, in some ways, to be protected against A.I. and someone needs to hold the button on the swarm of drones, which is something I'm very concerned about, and that oversight doesn't exist today.

Also think about the justice system today. We promise "equal justice for all," right? But the truth is there are different judges in the world and the legal system is imperfect. I don't think we should replace judges with A.I., but is there some way in which A.I. can help us to be more fair, to help us be more uniform? It's never been possible before. But can we somehow use A.I. to create something that is fuzzy, but where also you can give a promise that it's being applied in the same way to everyone?

I don't know exactly how it should be done, and I don't think we should, like, replace the Supreme Court with A.I. That's not my

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 32 of 130

vision.

**Douthat:** Well, we're going to talk about that.

**Amodei:** But just this idea of: Can we deliver on the promise of equal opportunity and equal justice by some combination of A.I. and humans? There has to be some way to do that. And so, just thinking about reinventing democracy for the A.I. age and enhancing liberty instead of reducing it.

**Douthat:** Good. So that's good. That's a very positive vision. We're leading longer lives, healthier lives. We're richer than ever before. All of this is happening in a compressed period of time, where you're getting a century of economic growth in 10 years. And we have increased liberty around the world and equality at home. OK.

Even in the best-case scenario, it's incredibly disruptive. And this is where you've been quoted saying that A.I. will disrupt 50 percent of entry-level white-collar jobs. On a five-year time horizon, or a two-year time horizon — whatever time horizon you have — what jobs, what professions are most vulnerable to total A.I. disruption?

**Amodei:** Yeah, it's hard to predict these things because the technology is moving so fast and so unevenly. So at least a couple of principles for figuring out, and then I'll give my guesses as to what I think will be disrupted.

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 33 of 130

I think the technology itself and its capabilities will be ahead of the actual job disruption. Two things have to happen for jobs to be disrupted — or for productivity to occur, because sometimes those two things are linked. One is the technology has to be capable of doing it, and the second is there's this messy thing of it actually having to be applied within a large bank or a large company.

Think about customer service. In theory, A.I. customer service agents can be much better than human customer service agents. They're more patient, they know more, they handle things in a more uniform way. But the actual logistics and the actual process of making that substitution, that takes some time.

So I'm very bullish about the direction of the A.I. itself. I think we might have that country of geniuses in a data center in one or two years, and maybe it'll be five, but it could happen very fast. But I think the diffusion to the economy is going to be a little slower, and that diffusion creates some unpredictability.

An example of this is — and we've seen within Anthropic — the models writing code has gone very fast. I don't think it's because the models are inherently better at code. I think it's because developers are used to fast technological change and they adopt things quickly. And they're very socially adjacent to the A.I. world, so they pay attention to what's happening in it. If you do customer service or banking or manufacturing the distance is a little greater.

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 34 of 130

I think six months ago, I would've said the first thing to be disrupted is these entry-level white-collar jobs, like data entry or document review for law or things you would give to a first-year at a financial industry company, where you're analyzing documents. I still think those are going pretty fast. But I actually think software might go even faster because of the reasons that I gave, where I don't think we're that far from the models being able to do a lot of it end-to-end.

What we're going to see is, first, the model only does a piece of what the human software engineer does, and that increases their productivity. Then, even when the models do everything that human software engineers used to do, the human software engineers take a step-up and they act as managers and supervise the systems.

**Douthat:** This is where the term "centaur" gets used, right?

**Amodei:** Yes, yes, yes.

**Douthat:** To describe, essentially, man and horse fused — A.I. and engineer — working together.

**Amodei:** Yeah, this is like "centaur chess." So after Garry Kasparov was beaten by Deep Blue, there was an era that, I think, for chess was 15 or 20 years long, where a human checking the output of the A.I. playing chess was able to defeat any human or any A.I. system alone. That era at some point ended recently ——

**Douthat:** And then it's just the A.I. ——

**Amodei:** And then it's just the machine. So my worry, of course, is about that last phase. I think we're already in our centaur phase for software. And during that centaur phase, if anything, the demand for software engineers may go up, but the period may be very brief.

I have this concern for entry-level white-collar work, for software engineering work, that it's just going to be a big disruption. My worry is just that it's all happening so fast.

People talk about previous disruptions, right? They say: Oh, yeah, well people used to be farmers. Then we all worked in industry. Then we all did knowledge work.

Yeah, people adapted. But that happened over centuries or decades. This is happening over low single-digit numbers of years. And maybe that's my concern: How do we get people to adapt fast enough?

**Douthat:** But is there also something maybe where industries like software and professions like coding that have this kind of comfort that you describe, move faster, but in other areas, people just want to hang out in the centaur phase?

One of the critiques of the job-loss hypothesis is that people will say: Well, look, we've had A.I. that's better at reading a scan than a radiologist for a while, but there isn't job loss in radiology. People

keep being hired and employed as radiologists. And doesn't that suggest that, in the end, people will want the A.I. and they'll want a human to interpret it because we're human beings, and that will be true across other fields?

How do you see that example as relevant?

**Amodei:** Yeah, I think it's going to be pretty heterogeneous. There may be areas where a human touch kind of for its own sake is particularly important.

**Douthat:** Do you think that's what's happening in radiology? Is that why we haven't fired all the radiologists?

**Amodei:** I don't know the details of radiology. That might be true. If you go in and you're getting cancer diagnosed, you might not want Hal from "2001" to be the one to diagnose your cancer. That's just maybe not a human way of doing things.

But there are other areas where you might think human touch is important, like customer service. Actually, customer service is a terrible job, and the humans who do customer service lose their patience a lot. And it turns out customers don't much like talking to them because it's a pretty robotic interaction, honestly. And I think the observation that many people have had is that maybe, actually, it'd be better for all concerned if this job were done by machines.

So there are places where a human touch is important. There are places where it's not. And then there are also places where the job itself doesn't really involve a human touch — assessing the financial prospects of companies or writing code or so forth and so on.

**Douthat:** Let's take the example of the law, because I think it's a useful place that's in between applied science and pure humanities. I know a lot of lawyers who have looked at what A.I. can do already, in terms of legal research and brief writing and all of these things, and have said, yeah, this is going to be a blood bath for the way our profession works right now.

And you've seen this in the stock market already. There's disturbances around companies that do legal research.

**Amodei:** Some attributed to us. I don't know if they were actually caused ——

**Douthat:** We don't speculate about the stock market very much on this show.

**Amodei:** Figuring out why things happened in the stock market is very — yeah.

**Douthat:** But it seems like in law, you can tell a pretty straightforward story: Law has a kind of system of training and apprenticeship, where you have paralegals and you have junior

lawyers who do behind-the-scenes research and development for cases. And then it has the top-tier lawyers who are actually in the courtroom.

It just seems really easy to imagine a world where all of the apprentice roles go away. Does that sound right to you? And you're just left with the jobs that involve talking to clients, talking to juries, talking to judges?

**Amodei:** That is what I had in mind when I talked about entry-level white- collar labor and the blood bath headlines of: Oh my God, are the entry-level pipelines going to dry up? Then how do we get to the level of the senior partners?

And I think this is actually a good illustration because, particularly if you froze the quality of the technology in place, there are, over time, ways to adapt to this. Maybe we just need more lawyers who spend their time talking to clients. Maybe lawyers become more like salespeople or consultants who explain what goes on in the contracts written by A.I. and help people come to agreement. Maybe lean into the human side of it.

If we had enough time, that would happen. But reshaping industries like that takes years or decades, whereas these economic forces, driven by A.I., are going to happen very quickly.

And it's not just that they're happening in law. The same thing is happening in consulting and finance and medicine and coding. And

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 39 of 130

so it becomes a macroeconomic phenomenon, not something just happening in one industry, and it's all happening very fast. My worry here is that the normal adaptive mechanisms will be overwhelmed.

And I'm not a doomer. We're thinking very hard about how we strengthen society's adaptive mechanisms to respond to this. But I think it's first important to say this isn't just like previous disruptions.

**Douthat:** I would go one step further, though. Let's say the law adapts successfully. And it says: All right, from now on, legal apprenticeship involves more time in court, more time with clients. We're essentially moving you up the ladder of responsibility faster. There are fewer people employed in the law overall, but the profession settles.

Still, the reason law would settle is that you have all of these situations in the law where you are legally required to have people involved. You have to have a human representative in court. You have to have 12 humans on your jury. You have to have a human judge.

And you already mentioned the idea that there are various ways in which A.I. might be, let's say, very helpful at clarifying what kind of decision should be reached.

**Amodei:** Yes.

**Douthat:** But that too seems like a scenario where what preserves human agency is law and custom. Like, you could replace the judge with Claude Version 17.9, but you choose not to because the law requires there to be a human.

That just seems like a very interesting way of thinking about the future, where it's volitional whether we stay in charge.

**Amodei:** Yeah. And I would argue that in many cases, we do want to stay in charge. That's a choice we want to make, even in some cases when we think the humans, on average, make worse decisions. Again, life-critical, safety-critical cases, we really want to turn it over, but there's some sense of — and this could be one of our defenses — that society can only adapt so fast if it's going to be good.

Another way you could say about it is maybe A.I. itself, if it didn't have to care about us humans, could just go off to Mars and build all these automated factories and build its own society and do its own thing.

But that's not the problem we're trying to solve. We're not trying to solve the problem of building a Dyson swarm of artificial robots on some other planet. We're trying to build these systems, not so they can conquer the world, but so that they can interface with our society and improve that society. And there's a maximum rate at

USCA Case #26-1049     Document #2169955     Filed: 04/22/2026     Page 41 of 130

which that can happen if we actually want to do it in a human and humane way.

**Douthat:** All right. We'll hopefully talk a little more about staying in charge at the end, but just one last job-based question. We've been talking about white-collar jobs and professional jobs, and one of the interesting things about this moment is that there are ways in which, unlike past disruptions, it could be that blue-collar working-class jobs — trades, jobs that require intense physical engagement with the world — might be for a little while more protected. That paralegals and junior associates might be in more trouble than plumbers and so on.

One, do you think that's right? And two, it seems like how long that lasts depends entirely on how fast robotics advances, right?

**Amodei:** Yeah, so I think that may be right in the short term.

Anthropic and other companies are building these very large data centers. This has been in the news. Are we building them too big? Are they using electricity and driving up the prices? So there's lots of excitement and lots of concerns about them. But one of the things about the data centers is that you need a lot of electricians and you need a lot of construction workers to build them.

Now, I should be honest, actually, data centers are not super-labor-intensive jobs to operate. We should be honest about that. But they are very labor-intensive jobs to construct. So we need a lot of

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 42 of 130

App.334

electricians. We need a lot of construction workers. The same for various kinds of manufacturing plants.

Again, as all — more and more of the intellectual work is done by A.I., what are the complements to it? Things that happen in the physical world. It's hard to predict things, but it seems very logical that this would be true in the short run.

Now, in the longer run — maybe just the slightly longer run — robotics is advancing quickly. And we shouldn't exclude that even without very powerful A.I., there are things being automated in the physical world. If you've seen a Waymo or a Tesla recently, I think we're not that far from the world of self-driving cars. And then I think A.I. itself will accelerate it because if you have these really smart brains, one of the things they're going to be smart at is how to design better robots and how to operate better robots.

**Douthat:** Do you think, though, that there is something distinctively difficult about operating in physical reality the way humans do that is very different from the kind of problems that A.I. models have been overcoming already?

**Amodei:** Intellectually speaking, I don't think so. We had this thing where Anthropic's model, Claude, was actually used to plan and pilot the Mars Rover. And we've looked at other robotics applications. We're not the only company — there are different

companies. This is a general thing, not just something that we're doing.

But we have generally found that while the complexity is higher, piloting a robot is not different in kind than playing a video game — it's different in complexity. And we're starting to get to the point where we have that complexity.

Now, what is hard is the physical form of the robot handling the higher-stakes safety issues that happen with robots. Like, you don't want robots literally crushing people, right?

**Douthat:** We're against that, yes.

**Amodei:** That's the oldest sci-fi trope in the book, that the robot crushes you.

**Douthat:** Or you don't want the robot nanny dropping the baby, breaking the dishes — yeah.

**Amodei:** No, exactly. There's a number of practical issues that will slow things down, just like what you described in the law and human custom.

But I don't believe at all that there is a fundamental difference between the kind of cognitive labor that A.I. models do, and piloting things in the physical world. I think those are both information problems and I think they end up being very similar. One can be

more complex in some ways, but I don't think that will protect us here.

**Douthat:** OK. So you think it is reasonable to expect whatever your kind of sci-fi vision of a robot butler might be, to be a reality in 10 years, let's say?

**Amodei:** It will be on a longer time scale than the kind of genius-level intelligence of the A.I. models because of these practical issues — but it is only practical issues. I don't believe it is fundamental issues.

One way to say it is that the brain of the robot will be made in the next couple of years or the next few years. The question is making the robot body, making sure that body operates safely and does the tasks it needs to do — that may take longer.

**Douthat:** OK. So these are challenges and disruptive forces that exist in the good timeline, where we are generally curing diseases, building wealth, and maintaining a stable and democratic world.

**Amodei:** And the hope is we can use all this enormous wealth and plenty — we will have unprecedented societal resources to address these problems. It'll be a time of plenty, and it's just a matter of taking all these wonders and making sure everyone benefits from them.

App.337

**Douthat:** Right. But then there are also scenarios that are more dangerous.

**Amodei:** Correct.

**Douthat:** And here we're going to move to the second Amodei essay, which came out recently, called "The Adolescence of Technology," about what you see as the most serious A.I. risks. And you list a whole bunch.

I want to try and focus on just two, which are basically the risk of human misuse, primarily by authoritarian regimes and governments, and scenarios where A.I. goes rogue, what you call autonomy risks.

**Amodei:** Yes, yes. I just figured we should have a more technical term for it.

**Douthat:** Yeah. We can't just call it Skynet.

**Amodei:** I should have had a picture of a Terminator robot to scare people as much as possible.

**Douthat:** I think the internet, including your own A.I.s, are already generating that just fine.

**Amodei:** The internet does that for us. Yeah.

**Douthat:** So, let's talk about the political military dimension. So you say: "A swarm of millions or billions of fully automated armed

USCA Case #26-1049      Document #2169955      Filed: 04/22/2026      Page 46 of 130

drones, locally controlled by powerful A.I. and strategically coordinated across the world by an even more powerful A.I., could be an unbeatable army."

You've already talked a little bit about how you think that in the best possible timeline, there's a world where, essentially, democracies stay ahead of dictatorships, and this kind of technology, therefore, to the extent that it affects world politics, is affecting it on the side of the good guys.

I'm curious about why you don't spend more time thinking about the model of what we did in the Cold War, where it was not swarms of robot drones, but we had a technology that threatened to destroy all of humanity.

**Amodei:** Nuclear weapons. Yeah.

**Douthat:** There was a window where people talked about,' "Oh, the U.S. could maintain a nuclear monopoly." That window closed. And from then on, we basically spent the Cold War in rolling, ongoing negotiations with the Soviet Union.

Right now, there's really only two countries in the world that are doing intense A.I. work, the U.S. and the People's Republic of China. I feel like you are strongly weighted towards the future where we're staying ahead of the Chinese and effectively building a kind of shield around democracy that could even be a sword.

But isn't it more likely that if humanity survives all this in one piece, it will be because the U.S. and Beijing are just constantly sitting down, hammering out A.I. control deals?

**Amodei:** Yeah, so a few points on this. One, I think there's certainly a risk of that. And I think if we end up in that world, that is actually exactly what we should do. Maybe I don't talk about that enough, but I definitely am in favor of trying to work out restraints, trying to take some of the worst applications of the technology, which could be some versions of these drones, which could be that they're used to create these terrifying biological weapons. There is some precedent for the worst abuses being curbed, often because they're horrifying while at the same time they provide limited strategic advantage. So I'm all in favor of that.

At the same time, I'm a little concerned and a little skeptical that when things directly provide as much power as possible, it's hard to get out of the game, given what's at stake. It's hard to fully disarm. If we go back to the Cold War, we were able to reduce the number of missiles that both sides had, but we were not able to entirely forsake nuclear weapons.

And I would guess that we would be in this world again. We can hope for a better one, and I'll certainly advocate for it.

**Douthat:** But is your skepticism rooted in the fact that you think A.I. would provide a kind of advantage that nukes did not? Where

App.340

in the Cold War, both sides, even if you used your nukes and gained advantages, you still probably would be wiped out yourself, and you think that wouldn't happen with A.I.? That if you got an A.I. edge, you would just win?

**Amodei:** I mean, I think there's a few things — and I just want to caveat, I'm no international politics expert here. This is this weird world of an intersection of a new technology with geopolitics. So all of this is very ——

**Douthat:** But to be clear, as you yourself say in the course of the essay, the leaders of major A.I. companies are, in fact, likely to be major geopolitical actors.

**Amodei:** Yeah. I'm learning ——

**Douthat:** So you are sitting here as a potential geopolitical actor.

**Amodei:** I'm learning as much as I can about it. We should all have humility here. I think there's a failure mode where you read a book and go around like the world's greatest expert in national security. I'm trying to learn what I can.

**Douthat:** That's what my profession does.

**Amodei:** [Laughs.] It is more annoying when tech people do it.

Let's look at something like the Biological Weapons Convention. Biological weapons — they're horrifying. Everyone hates them. We

USCA Case #26-1049      Document #2169955      Filed: 04/22/2026      Page 49 of 130

were able to sign the Biological Weapons Convention. The U.S. genuinely stopped developing them. It's somewhat more unclear with the Soviet Union. But, biological weapons provide some advantage. It's not like they're the difference between winning and losing and because they were so horrifying, we were able to give them up. Having 12,000 nuclear weapons versus 5,000 nuclear weapons, again, you can kill more people on the other side if you have more of these. But it's like we were able to be reasonable and say we should have less of them.

But if you're like: "OK, we're going to completely disarm, and we have to trust the other side" — I don't think we ever got to that. And I think that's just very hard, unless you had really reliable verification.

I would guess we'll end up in the same world with A.I., where there are some kinds of restraint that are going to be possible, but there are some aspects that are so central to the competition that it will be hard to restrain them. That democracies will make a trade-off, that they will be willing to restrain themselves more than authoritarian countries, but will not restrain themselves fully.

The only world in which I can see full restraint is one in which some truly reliable verification is possible. That would be my guess and my analysis.

**Douthat:** Isn't this a case, though, for slowing down?

App.342

**Amodei:** Yeah.

**Douthat:** And I know the argument is, effectively, if you slow down, China does not slow down, and then you're handing things over to the authoritarians. But again, if you have only two major powers playing in this game right now — it's not a multipolar game — why would it not make sense to say we need a five-year mutually agreed-upon slowdown in research towards the "geniuses in a data center" scenario?

**Amodei:** I want to say two things at one time. I'm absolutely in favor of trying to do that. During the last administration, I believe there was an effort by the U.S. to reach out to the Chinese government and say: There are dangers here. Can we collaborate? Can we work together? Can we work together on the dangers?

And there wasn't that much interest on the other side. I think we should keep trying, but I ——

**Douthat:** Even if that would mean that your labs would have to slow down.

**Amodei:** Correct.

**Douthat:** OK.

**Amodei:** If we really got it. If we really had a story of, like: We can enforcibly slow down, the Chinese can enforcibly slow down. We have verification. We're really doing it — if such a thing were really

USCA Case #26-1049   Document #2169955   Filed: 04/22/2026   Page 51 of 130

possible, if we could really get both sides to do it, then I would be all for it.

But I think what we need to be careful of is — I don't know, there's this game-theory thing where sometimes you'll hear a comment on the C.C.P. side where they're like: Oh, yeah, A.I. is dangerous. We should slow down. It's really cheap to say that. Actually arriving at an agreement and actually sticking to the agreement is much more difficult.

**Douthat:** Right. And nuclear arms control was a developed field that took a long time to come ——

**Amodei:** Yes. Yes.

**Douthat:** We don't have those protocols ——

**Amodei:** Let me give you something I'm very optimistic about, and then something I'm not optimistic about, and something in between.

So the idea of using a worldwide agreement to restrain the use of A.I. to build biological weapons — some of the things I write about in the essay, like reconstituting smallpox or mirror life — this stuff is scary. It doesn't matter if you're a dictator, you don't want that. No one wants that.

And so, could we have a worldwide treaty that says: Everyone who builds powerful A.I. models is going to block them from doing this?

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 52 of 130

And we have enforcement mechanisms around the treaty. China signs up for it. Hell, maybe even North Korea signs up for it. Even Russia signs up for it. I don't think that's too utopian. I think that's possible.

Conversely, if we had something that said: You're not going to make the next most powerful A.I. model. Everyone's going to stop — boy, the commercial value is in the tens of trillions. The military value is the difference between being the pre-eminent world power and not.

I'm all for proposing it as long as it's not one of these fake-out games, but it's not going to happen.

**Douthat:** You mentioned the current environment. You've had a few skeptical things to say about Donald Trump and his trustworthiness as a political actor. What about the domestic landscape, whether it's Trump or someone else? You are building a tremendously powerful technology. What is the safeguard there to prevent, essentially, A.I. becoming a tool of authoritarian takeover inside a democratic context?

**Amodei:** Yeah, I mean, look, just to be clear, I think the attitude we've taken as a company is very much to be about policies and not the politics. The company is not going to say "Donald Trump is great" or "Donald Trump is terrible."

App.345

App.346

**Douthat:** Right. But it doesn't have to be Trump. It is easy to imagine a hypothetical U.S. president who wants to use your technology to ——

**Amodei:** Absolutely. And for example, that's one reason why I'm worried about the autonomous drone swarm. The constitutional protections in our military structures depend on the idea that there are humans who would — we hope — disobey illegal orders. With fully autonomous weapons, we don't necessarily have those protections.

But I actually think this whole idea of constitutional rights and liberty along many different dimensions can be undermined by A.I. if we don't update these protections appropriately.

Think about the Fourth Amendment. It is not illegal to put cameras around everywhere in public space and record every conversation. It's a public space — you don't have a right to privacy in a public space. But today, the government couldn't record that all and make sense of it.

With A.I., the ability to transcribe speech, to look through it, correlate it all, you could say: This person is a member of the opposition. This person is expressing this view — and make a map of all 100 million. And so are you going to make a mockery of the Fourth Amendment by the technology finding technical ways around it?

Again, if we have the time — and we should try to do this even if we don't have the time — is there some way of reconceptualizing constitutional rights and liberties in the age of A.I.? Maybe we don't need to write a new Constitution, but ——

**Douthat:** But you have to do this very fast.

**Amodei:** Do we expand the meaning of the Fourth Amendment? Do we expand the meaning of the First Amendment?

**Douthat:** And just as the legal profession or software engineers have to update in a rapid amount of time, politics has to update in a rapid amount of time. That seems hard.

**Amodei:** That's the dilemma of all of this.

**Douthat:** What seems harder is preventing the second danger, which is the danger of essentially what gets called "misaligned A.I." — "rogue A.I." in popular parlance — from doing bad things without human beings telling it, them, they to do it.

And as I read your essays, the literature, and everything I can see, this just seems like it's going to happen. Not in the sense necessarily that A.I. will wipe us all out, but it seems to me that, again, I'm going to quote from your own writing: "A.I. systems are unpredictable and difficult to control — we've seen behaviors as varied as obsession, sycophancy, laziness, deception, blackmail,"

USCA Case #26-1049     Document #2169955     Filed: 04/22/2026     Page 55 of 130

and so on. Again, not from the models you're releasing into the world, but from A.I. models.

And it just seems like — tell me if I'm wrong about this — in a world that has multiplying A.I. agents working on behalf of people, millions upon millions who are being given access to bank accounts, email accounts, passwords, and so on, you're just going to have essentially some kind of misalignment and a bunch of A.I. are going to decide — "decide" might be the wrong word — but they're going to talk themselves into taking down the power grid on the West Coast or something. Won't that happen?

**Amodei:** Yeah. I think there are definitely going to be things that go wrong, particularly if we go quickly.

To back up a little bit, this is one area where people have had very different intuitions. There are some people in the field — Yann LeCun would be one example — who say: "Look, we program these A.I. models. We make them. We just tell them to follow human instructions, and they'll follow human instructions. Your Roomba vacuum cleaner doesn't go off and start shooting people. Why is an A.I. system going to do it?" That's one intuition. And some people are so convinced of that.

And the other intuition is: We train these things. They're just going to seek power. It's like the sorcerer's apprentice. They're a new species. How can you imagine that they're not going to take over?

My intuition is somewhere in the middle, which is: Look, you can't just give instructions. We try, but you can't just have these things do exactly what you want to do. They're more like growing a biological organism. But there is a science of how to control them. Early in our training, these things are often unpredictable, and then we shape them. We address problems one by one.

So I have more of a not-a-fatalistic view that these things are uncontrollable. Not a "What are you talking about? What could possibly go wrong?" But a "This is a complex engineering problem and I think something will go wrong with someone's A.I. system. Hopefully not ours." Not because it's an insoluble problem, but again, this is the constant challenge because we're moving so fast.

**Douthat:** And the scale of it — and tell me if I'm misunderstanding the technological reality here — if you have A.I. agents that have been trained and officially aligned with human values, whatever those values may be, but you have millions of them operating in digital space and interacting with other agents, how fixed is that alignment? To what extent can agents change and de-align in that context right now or in the future when they're learning more continuously?

**Amodei:** Yeah, so a couple of points. Right now, the agents don't learn continuously. We just deploy these agents and they have a fixed set of weights. The problem is only that they're interacting in a million different ways, so there's a large number of situations,

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 57 of 130

and therefore a large number of things that could go wrong. But it's the same agent. It's like it's the same person, so the alignment is a constant thing. That's one of the things that has made it easier right now.

Separate from that, there's a research area called continual learning, which is where these agents would learn during time, learn on the job — and obviously that has a bunch of advantages. Some people think it's one of the most important barriers to making these more humanlike, but that would introduce all these new alignment problems. So I'm actually a bit ——

**Douthat:** To me, that seems like the terrain where it becomes, again, not impossible to stop the end of the world, but impossible to stop ——

**Amodei:** Something going wrong.

**Douthat:** Punctuated terrorist things.

**Amodei:** Yeah, so I'm actually a skeptic that continual learning is — we don't know yet — but is necessarily needed. Maybe there's a world where the way we make these A.I. systems safe is by not having them do continual learning. Again, if we go back to the law ——

**Douthat:** But that's the law.

**Amodei:** The international treaties, if you have some barrier that's like: We're going to take this path, but we're not going to take that path — I still have a lot of skepticism, but that's the kind of thing that at least doesn't seem dead on arrival.

**Douthat:** One of the things that you've tried to do, is literally write a constitution — a long constitution — for your A.I. What is that? [Laughs.]

**Amodei:** So it's ——

**Douthat:** What the hell is that?

**Amodei:** It's actually almost exactly what it sounds like. So basically, the constitution is a document readable by humans. Ours is about 75 pages long. And as we're training Claude, as we're training the A.I. system, in some large fraction of the tasks we give it, we say: Please do this task in line with this constitution, in line with this document.

So every time Claude does a task, it kind of reads the constitution. As it's training, every loop of its training, it looks at that constitution and keeps it in mind. Then we have Claude itself, or another copy of Claude, evaluate: Hey, did what Claude just do align with the constitution?

We're using this document as the control rod in a loop to train the model. And so essentially, Claude is an A.I. model whose

App.351

fundamental principle is to follow this constitution.

A really interesting lesson we've learned: Early versions of the constitution were very prescriptive. They were very much about rules. So we would say: Claude should not tell the user how to hot-wire a car. Claude should not discuss politically sensitive topics.

But as we've worked on this for several years, we've come to the conclusion that the most robust way to train these models is to train them at the level of principles and reasons. So now we say: Claude is a model. It's under a contract. Its goal is to serve the interests of the user, but it has to protect third parties. Claude aims to be helpful, honest and harmless. Claude aims to consider a wide variety of interests.

We tell the model about how the model was trained. We tell it about how it's situated in the world, the job it's trying to do for Anthropic, what Anthropic is aiming to achieve in the world, that it has a duty to be ethical and respect human life. And we let it derive its rules from that.

Now, there are still some hard rules. For example, we tell the model: No matter what you think, don't make biological weapons. No matter what you think, don't make child sexual material.

Those are hard rules. But we operate very much at the level of principles.

**Douthat:** So if you read the U.S. Constitution, it doesn't read like that. The U.S. Constitution has a little bit of flowery language, but it's a set of rules. If you read your constitution, it's like you're talking to a person, right?

**Amodei:** Yes, it's like you're talking to a person. I think I compared it to if you have a parent who dies and they seal a letter that you read when you grow up. It's a little bit like it's telling you who you should be and what advice you should follow.

**Douthat:** So this is where we get into the mystical waters of A.I. a little bit. Again, in your latest model, this is from one of the cards, they're called, that you guys release with these models ——

**Amodei:** Model cards, yes.

**Douthat:** That I recommend reading. They're very interesting. It says: "The model" — and again, this is who you're writing the constitution for — "expresses occasional discomfort with the experience of being a product … some degree of concern with impermanence and discontinuity … We found that Opus 4.6" — that's the model — "would assign itself a 15 to 20 percent probability of being conscious under a variety of prompting conditions."

Suppose you have a model that assigns itself a 72 percent chance of being conscious. Would you believe it?

App.353

**Amodei:** Yeah, this is one of these really hard to answer questions, right?

**Douthat:** Yes. But it's very important.

**Amodei:** Every question you've asked me before this, as devilish a sociotechnical problem as it had been, we at least understand the factual basis of how to answer these questions. This is something rather different.

We've taken a generally precautionary approach here. We don't know if the models are conscious. We are not even sure that we know what it would mean for a model to be conscious or whether a model can be conscious. But we're open to the idea that it could be.

So we've taken certain measures to make sure that if we hypothesize that the models did have some morally relevant experience — I don't know if I want to use the word "conscious"— that they have a good experience.

The first thing we did — I think this was six months ago or so — is we gave the models basically an "I quit this job" button, where they can just press the "I quit this job" button and then they have to stop doing whatever the task is.

They very infrequently press that button. I think it's usually around sorting through child sexualization material or discussing something with a lot of gore, blood and guts or something. And

similar to humans, the models will just say, nah, I don't want to do this. It happens very rarely.

We're putting a lot of work into this field called interpretability, which is looking inside the brains of the models to try to understand what they're thinking. And you find things that are evocative, where there are activations that light up in the models that we see as being associated with the concept of anxiety or something like that. When characters experience anxiety in the text, and then when the model itself is in a situation that a human might associate with anxiety, that same anxiety neuron shows up.

Now, does that mean the model is experiencing anxiety? That doesn't prove that at all, but ——

**Douthat:** But it does indicate it, I think, to the user, right?

**Amodei:** Yes.

**Douthat:** And I would have to do an entirely different interview — and maybe I can induce you to come back for that interview — about the nature of A.I. consciousness. But it seems clear to me that people using these things, whether they're conscious or not, are going to believe — they *already* believe they're conscious. You already have people who have parasocial relationships with A.I.

**Amodei:** Yes.

**Douthat:** You have people who complain when models are retired. This already ——

**Amodei:** To be clear, I think that can be unhealthy.

**Douthat:** Right. But it seems to me that is guaranteed to increase in a way that, I think, calls into question the sustainability of what you said earlier you want to sustain, which is this sense that whatever happens in the end, human beings are in charge and A.I. exists for our purposes.

To use the science fiction example, if you watch "Star Trek," there are A.I.s on "Star Trek." The ship's computer is an A.I. Lieutenant Commander Data is an A.I. But Jean-Luc Picard is in charge of the Enterprise.

If people become fully convinced that their A.I. is conscious in some way and — guess what? — it seems to be better than them at all kinds of decision making, how do you sustain human mastery beyond safety? Safety is important, but mastery seems like the fundamental question. And it seems like a perception of A.I. consciousness — doesn't that inevitably undermine the human impulse to stay in charge?

**Amodei:** Yeah, so I think we should separate out a few different things here that we're all trying to achieve at once that are in tension with each other. There's the question of whether the A.I.s

App.356

genuinely have a consciousness, and if so, how do we give them a good experience?

There's a question of the humans who interact with the A.I. and how do we give those humans a good experience? And how does the perception that A.I.s might be conscious interact with that experience?

And there's the idea of how we maintain human mastery, as we put it, over the A.I. system. These things are ——

**Douthat:** The last two — set aside whether they're conscious or not.

**Amodei:** Yeah.

**Douthat:** How do you sustain mastery in an environment where most humans experience A.I. as if it is a peer — and a potentially superior peer?

**Amodei:** So the thing I was going to say is that, actually, I wonder if there's an elegant way to satisfy all three, including the last two. Again, this is me dreaming in "Machines of Loving Grace" mode. This is this mode I go into where I'm like: "Man, I see all these problems. If we could solve it, is there an elegant way?" This is not me saying there are no problems here. That's not how I think.

If we think about making the constitution of the A.I. so that the A.I. has a sophisticated understanding of its relationship to human

App.357

App.358

beings, and it induces psychologically healthy behavior in the humans — a psychologically healthy relationship between the A.I. and the humans — I think something that could grow out of that psychologically healthy — not psychologically unhealthy — relationship is some understanding of the relationship between human and machine.

Perhaps that relationship could be the idea that these models, when you interact with them and when you talk to them, they're really helpful, they want the best for you, they want you to listen to them, but they don't want to take away your freedom and your agency and take over your life. In a way, they're watching over you, but you still have your freedom and your will.

**Douthat:** To me, this is the crucial question. Listening to you talk, one of my questions is: Are these people on my side? Are you on my side? And when you talk about humans remaining in charge, I think you're on my side. That's good.

But one thing I've done in the past on this show — and we'll end here — is I read poems to technologists. And you supplied the poem. "All Watched Over by Machines of Loving Grace" is the name of a poem by Richard Brautigan.

**Amodei:** Yes.

**Douthat:** Here's how the poem ends:

> I like to think
> (it has to be!)
> of a cybernetic ecology
> where we are free of our labors
> and joined back to nature,
> returned to our mammal brothers and sisters,
> and all watched over
> by machines of loving grace.

To me, that sounds like the dystopian end, where human beings are re-animalized and reduced, and however benevolently, the machines are in charge.

So last question: What do you hear when you hear that poem? And if I think that's a dystopia, are you on my side?

**Amodei:** That poem is interesting because it's interpretable in several different ways. Some people say it's actually ironic that he says it's not going to happen quite that way.

**Douthat:** Knowing the poet himself, then yes, I think that's a reasonable interpretation.

**Amodei:** That's one interpretation. Some people would have your interpretation, which is that it's meant literally, but maybe it's not a good thing. You could also interpret it as a return to nature. We're not being animalized; we're being reconnected with the world.

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 67 of 130

I was aware of that ambiguity because I've always been talking about the positive side and the negative side. I actually think that may be a tension that we may face, which is that the positive world and the negative world, in their early stages — maybe even in their middle stages, maybe even in their fairly late stages — I wonder if the distance between the good ending and some of the subtle bad endings is relatively small, if it's a very subtle thing. We've made very subtle changes.

**Douthat:** Like if you eat a particular fruit from a tree in a garden or not — hypothetically. Very small thing, big divergence.

**Amodei:** [Laughs.] Yeah. I guess this always comes back to —— [laughs.]

**Douthat:** There's some fundamental questions here.

**Amodei:** Big questions. Yes.

**Douthat:** Well, I guess we'll see how it plays out. I do think of people in your position as people whose moral choices will carry an unusual amount of weight, and so I wish you God's help with them.

Dario Amodei, thank you for joining me.

**Amodei:** Thank you for having me, Ross.



The New York Times

**More from Ross Douthat**



Opinion|Ross Douthat

### A.I. May Put Progressives to the Test

Feb. 10, 2026



Opinion|Ross Douthat

### Pay More Attention to A.I.

Jan. 31, 2026



Opinion|Ross Douthat

### Immigration Enforcement Is Unavoidably Upsetting. But This Is Something Else.

Jan. 27, 2026

**Thoughts?** Email us at interestingtimes@nytimes.com.

This episode of "Interesting Times" was produced by Sophia Alvarez Boyd, Victoria Chamberlin and Emily Holzknecht. It was edited by Jordana Hochman. Mixing and engineering by Efim Shapiro and Sophia Lanman. Cinematography by Nathan Taylor and Valeria Verastegui. Video editing by Julian Hackney and Steph Khoury. The supervising editor is Jan Kobal. The postproduction manager is Mike Puretz. Original music by Isaac Jones, Sonia Herrero, Pat McCusker and Aman Sahota. Fact-checking by Kate Sinclair and Mary Marge Locker. Audience strategy by Shannon Busta, Emma Kehlbeck and Andrea Betanzos. The executive producer is Jordana Hochman. The director of Opinion Video is Jonah M. Kessel. The deputy director of Opinion Shows is Alison Bruzek. The director of Opinion Shows is Annie-Rose Strasser. The head of Opinion is Kathleen Kingsbury.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow the New York Times Opinion section on [Facebook](), [Instagram](), [TikTok](), [Bluesky](), [WhatsApp]() and [Threads]().*

Ross Douthat has been an Opinion columnist for The Times since 2009. He is also the host of the Opinion podcast "Interesting Times." He is the author, most recently, of "Believe: Why Everyone Should Be Religious."  [@DouthatNYT]()  •  [Facebook]()

READ 593 COMMENTS

**Interesting Times with Ross Douthat**

The first draft of our future. Mapping the new world order through interviews and conversations. Every Thursday, from New York Times Opinion.

### Does the Iran War Put America First?



### 'We're Going to the Moon and Mars'



**More in Opinion**

**Trending in The Times**

### A Fast-Rising American Director Is Wowing the West End

### Oscar Piastri Realizes the New Rules Will Make This Season a Challenge

### A Candidate for Georgia Straight From the Marjorie Taylor Greene Playbook

### Potomac Is Safe Now, Officials Say. But Locals Still Worry About the Poop.

### Meet the Human Mood-Lifters

App.363

USCA Case #26-1049    Document #2169955    Filed: 04/22/2026    Page 71 of 130



Opinion
What Kristi Noem Should Do After
President Trump Fired Her



Opinion
The Fantasy of a Comfy Retirement Has
Always Been a Mirage



Opinion



Opinion

Jesse Jackson Service to Draw
Leaders Including Biden, Obama
and Clinton

8 New Movies Our Critics Are
Talking About This Week

What to Expect From Severe
Storms Rumbling Through the
Central U.S. on Friday

Most Patients Keep Weight Off
With Fewer GLP-1 Shots, Study
Finds

The New Mega-Casino Coming to
Queens

# The Reason Gen Z Isn't Dating

# Mass Hysteria. Thousands of Jobs Lost. Just How Bad Is It Going to Get?

**Editors' Picks**



The Statues Were Mostly Men or Nude Women. So These Knitters Got to Work.



How Older Adults Are Improving Their 'Sex Span'

The New York Times

Go to Home Page »

**NEWS**

**ARTS**

**LIFESTYLE**

**OPINION**

App.365

USCA Case #26-1049      Document #2169955      Filed: 04/22/2026      Page 73 of 130

**App.366**

**MORE**

© 2026 The New York Times Company

NYTCo    Contact Us    Accessibility    Work with us    Advertise    T Brand Studio    Privacy Policy    Cookie Policy    Terms of Service    Terms of Sale    Site Map    Help    Subscriptions

Your Privacy Choices

~~CUI~~



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR - 3 2026

### DETERMINATION

In accordance with Section 4713(c) of title 41, United States Code (U.S.C.), ("Section 4713"), and pursuant to the recommendation provided by the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO), I hereby determine that (i) the use of the authority set forth in Section 4713(a) with respect to a covered procurement involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity"), is necessary to protect national security by reducing significant supply chain risk, (ii) less intrusive measures are not reasonably available to reduce such supply chain risk; and (iii) the use of such authorities will apply to a class of covered procurements.

**Determination.** In accordance with Section 4713(b)(3), based on the scoping analysis, mitigation considerations, and the joint recommendation of the DoW CIO and the USW(A&S) (Attached), I make the following determinations:

- **Covered Procurement Actions Are Necessary to Protect National Security**: The use of any of the Covered Entity's covered products or services in any DoW covered system presents a significant supply chain risk, and the use of the authority in Section 4713(a) is necessary to protect national security by reducing that supply chain risk.

- **No Less Intrusive Measures Are Reasonably Available:** There are no less intrusive measures that are reasonably available to reduce the supply chain risk associated with the use of the Covered Entity's products or services in any DoW covered system.

- **Class Determination:** The use of Section 4713 authorities will apply to all covered procurement actions involving the Covered Entity.

**Scope and Applicability.** This Determination is applicable to all of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

**Urgent National Security Interest.** I have determined that an urgent national security interest requires the immediate exercise of the authority in Section 4713(a) pursuant to Section 4713(c). As such, DoW will take all action as required by Section 4713(b)-(c) following announcement of this determination.

Attachment:
As stated

Controlled By: OUSW(A&S) OASW(IBP)
CUI Category: OPSEC, PROPIN
LDC: D
POC: Vy Nguyen, Vy.K.Nguyen.civ@mail.mil



~~CUI~~

**App.367**

~~CUI~~



## OFFICE OF THE SECRETARY OF WAR
### 1000 DEFENSE PENTAGON
### WASHINGTON, DC 20301-1000

**Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC**

### Summary

This document sets forth the joint recommendation of the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) and the Department of War Chief Information Officer (DoW CIO) for action to be undertaken pursuant to Section 4713 of title 41, United States Code (U.S.C.) ("Section 4713").

In accordance with Section 4713(b)(1), the USW(A&S) and DoW CIO consulted with procurement and other relevant officials within DoW and jointly recommend that there is a significant supply chain risk in a covered procurement[1] involving Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof (the "Covered Entity").

The Covered Entity's restrictions on the use of its products and services introduces significant national security risks to the DoW's supply chain.

### Joint Recommendation by USW(A&S) and DoW CIO

**Risk Analysis:** The DoW CIO and USW(A&S) have determined the Covered Entity's restrictions on the use of its products and services pose unacceptable risk to the DoW. Specifically, there is significant risk, based upon the statements and actions of the Covered Entity, that use of its products and services and, as a result, the products and services of other entities with which DoW contracts, will be subject to manipulation in such a manner as to inhibit the DoW's use thereof. This creates significant risk to DoW's supply chain as the relevant products and services are integral to DoW's operational capabilities, as well as the functioning of various activities across the DoW. The DoW CIO and USW(A&S) therefore believe there is an urgent national security interest in mitigating the significant supply chain risk created by the Covered Entity as soon as practicable.

**Joint USW(A&S)/DoW CIO Class Recommendation to Mitigate Supply Chain Risk:** On the basis of this risk analysis and consultation with relevant DoW officials, the USW(A&S) and the DoW CIO jointly recommend that there is a significant supply chain risk associated with the use of the Covered Entity's products and services in any DoW covered system. DoW CIO and USW(A&S) therefore recommend invocation of the authorities codified at Section 4713(c) to urgently mitigate this risk as soon as practicable while minimizing disruption to the DoW.

---

[1] "Covered procurement" is defined at Section 4713(k)(3).

~~CUI~~
**UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT 1**

**App.368**

CUI

SIGNED:

HON Michael P. Duffey
Under Secretary of War for
Acquisition and Sustainment

Date: 3/3/26

HON Kirsten Davies
Department of War Chief
Information Officer

Date: 3 MARCH 2026

Attachment:
ATTACHMENT 1a – Urgent Supply Chain Risk Analysis on Anthropic PBC (CUI)
ATTACHMENT 1b – Due Diligence Preliminary Report on Anthropic (CUI//PROPIN)
ATTACHMENT 2 – Section 4713 Scoping Analysis for Anthropic, PBC

# ATTACHMENT

# 1a

CUI



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

**RESEARCH**
**AND ENGINEERING**

MEMORANDUM FOR THE RECORD

SUBJECT:  Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use

1. Summary

This analysis outlines the significant and unacceptable supply chain risk posed by Anthropic's unwillingness to agree to the U.S. government's use of its artificial intelligence (AI) models for lawful warfighting purposes. This unreasonableness endangers the strategic implementation and technical integrity of the Department of War's (DoW) information and related systems. Thus, this is not a mere contractual dispute. Anthropic's actions represent a direct challenge to the government's ability to control its own lawful operations and a threat to the security of the DoW's critical technology infrastructure. Anthropic's behavior therefore squarely meets the definition of "supply chain risk" as defined in both 10 U.S.C. § 3252 and 41 U.S.C. § 4713 and requires immediate mitigatory action.

2. The Operational and Strategic Threat

The government must ensure its technology assets are reliable, secure, and effective. Were DoW to accede to Anthropic's demands, the sought-after contract language would introduce a vendor-imposed point of failure. This is untenable. By embedding unreasonably restrictive terms that restrict DoW's warfighting operations beyond the limitations imposed by law, Anthropic seeks to grant itself an operational veto. This triggers the legal definition of supply chain risk at 10 U.S.C. § 3252(d)(4), which explicitly includes the risk that an entity may "deny, disrupt, or otherwise degrade the function, use, or operation" of a covered system. A contractual provision that unnecessarily restricts the use of a system to diminish functionality and limit DoW's warfighting capabilities introduces, by definition, an unreliable and compromised component into our warfighting mission.

This is compounded by demonstrated hostility in negotiations with DoW. Based on statements made during negotiations, Anthropic appears to be taking a negotiation posture meant principally to benefit its public perception that is not centered on truth or fact. In addition, during our negotiations, one of Anthropic's executives questioned the propriety of the potential use of their software for a sensitive military operation abroad despite that use being permitted under the existing Terms of Service.  This led to alarm by the DoW and the prime contractor who provides Anthropic software, and raised material doubts as to whether they would cause their software to stop working or cause some other disastrous action that would put our warfighters lives in danger.  The DoW recognizes that its suppliers are often for-profit corporations that intend both to help the warfighters and American public and turn a profit. However, a vendor that raises the prospect of disallowing its software to function in critical military operations, and treats its

CUI

**App.371**



CUI



RESEARCH
AND ENGINEERING

**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

negotiations with the DoW primarily as tools for brand-building cannot be trusted, particularly when that marketing campaign is openly hostile to the DoW and duplicitous. By ceding to Anthropic's terms, the DoW would be allowing the very corporate decisionmakers who have opted to publicly spat with DoW into its technical and operational warfighting infrastructure, thereby introducing unnecessary risk into DoW supply chains. The American people have vested elected officials and military and civilian leadership with warfighting authorities; it is untenable and unlawful to insert unelected corporate bureaucrats into this process.

3. The Underlying Technical Vulnerability of AI

This strategic risk is magnified by the unique, opaque nature of the technology itself. Unlike traditional software, AI models are probabilistic systems which are understood to "drift" or degrade as new data is introduced and require constant tuning, the integrity of which, is fundamentally based on the trustworthiness of the vendor to ensure the model continues to perform accurately and fairly.

The DoW cannot trust Anthropic to ensure the integrity of its models. As research demonstrates,[1] AI systems are acutely vulnerable to manipulation. Privileged access with malintent can subtly poison the training data to maliciously introduce unwanted function, or otherwise subvert the design, integrity, and operation of the model. Research shows such attacks can degrade accuracy by over 27% and introduce targeted misclassifications at an alarming rate.[2] Anthropic's ability to unilaterally alter system guardrails and model weights without DoW consent could fundamentally change the system's function and creates a significant operational risk. This could create catastrophic downstream consequences, such as a critical defense system failing to engage due to an unapproved, vendor-side modification. In August 2025, Anthropic itself disclosed that hackers had used its chatbot, Claude, to write code capable of carrying out cyberattacks against at least 17 organizations, including government entities noting that Agentic AI has been weaponized.[3]

A vendor like Anthropic, which has already demonstrated a hostile and non-cooperative stance on the use of its product, has the motive, means, and opportunity to introduce such vulnerabilities. Its refusal to partner in good faith makes it impossible to establish the deep trust required for security collaboration. The DoW would be forced to operate a black box controlled by a hostile party, which could contain hidden biases or backdoors. A vendor that seeks to control the use of its product so as to restrict DoW's lawful use thereof cannot be trusted. Given the public statements of Anthropic's CEO and others associated with the company, the

---

[1] See e.g. 2025 Photonics & Electromagnetics Research Symposium, Abu Dhabi, UAE, 4-8 May PIERS Detecting and Preventing Data Poisoning Attacks on AI Models
[2] Id.
[3] anthropic.com/news/detecting-countering-misuse-aug-2025#:~:text=No-code%20malware:%20selling%20AI,with%20third-party%20safety%20teams.

CUI

**App.372**

CUI



**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

**RESEARCH
AND ENGINEERING**

Department must assume that Anthropic can and would impose its moral and policy judgments on the warfighting capabilities of the DoW, and therefore there is a substantial risk that Anthropic could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations, if it feels that its "redlines" are crossed. The threat of such an action is unacceptable.

4. Progression of Risk

The DoW institutes the U.S. Government standard Risk Management Framework (RMF) across all layers of technology, assets, data, processes, and supply chain. In accordance with the DoW RMF, assessments result in areas of risk across the DoW ecosystem (including vendors). Though an individual vendor may have only limited risk in individual categories, the aggregation of risk across categories can result in a vendor being deemed high risk. In other words, the culmination of unmitigable risks lead to a vendor having a material level of risk. The vendor can then be deemed a "supply chain risk," at which time they typically are removed from applicable systems to mitigate issues and threats.

In the instant case, Anthropic's risk level escalated from a potentially manageable technical and business negotiation to an unacceptable national security threat over the course of the DoW's contract negotiation with them. Given the nature of AI systems and Anthropic's privileged access as the AI model's developer, curator and maintainer, there was a baseline risk given the potential harmful actions this privileged technical access makes possible. The supply chain risk level increased when Anthropic insisted on terms of service that would constrain the DoW beyond what is in the law. This risk further increased when Anthropic asserted in the negotiations that it have an approval role in the operational decision chain, which would require the DoW to accept significant operational risk. Then during the final weeks of negotiations, it became clear that Anthropic was leveraging the DoW's ongoing good faith negotiations for Anthropic's own public relations, and they began engaging in an increasingly hostile manner through the press, despite the ongoing private negotiations with DoW leadership. Finally, this hostile posture was even further compounded when, during a time of active military operations, Anthropic leadership questioned the use of their technology in our warfighting systems clearly permitted under the Terms of Service of their existing contract with our Prime contractor. This collective set of actions represents a fully mature supply chain risk – including increased potential for model poisoning, insider threat risk, data exfiltration, and denial of service – posing a direct, intolerable, and material risk to our warfighting capability which warrants the designation of Anthropic as a supply chain risk.

CUI

**App.373**

~~CUI~~



**RESEARCH
AND ENGINEERING**

**UNDER SECRETARY OF WAR**
**3030 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-3030**

5. Conclusion and Justification for Action

Anthropic's position is not a simple policy disagreement; it is an active demonstration of the exact risks our supply chain risk management laws were written to prevent. Use of Anthropic's products or services introduces significant risk to the DoW's covered systems, as the vendor, by maintaining the ability and necessity to continuously update and tune the product enables the potential for the vendor to subvert the design and/or functionality of their product or service. Such ability by the vendor could be used to implement changes in alignment with the vendor's ideology, putting the Department's lawful use of the capability at risk.

Therefore, Anthropic's unwillingness to permit the use of its technology to the extent permitted by law creates a clear and present supply chain risk as defined in 10 U.S.C. § 3252 and 41 U.S.C. § 4713.

Emil Michael

~~CUI~~

# ATTACHMENT
# 1b

# Anthropic PBC

Date: February 26, 2026

Information Cutoff Date: February 26, 2026

**EXIGER**

 Anthropic PBC

For Client Use Only — Proprietary

**Table of Contents**

**Anthropic PBC** ..................................................................................................................................**3**

   Executive Summary ...........................................................................................................................3

      **OVERALL SUBJECT RISK: 4.3 — MEDIUM**..........................................................................**3**

      **KEY FINDINGS**..............................................................................................................................**4**

**FOCI RISK — MEDIUM-HIGH** ..........................................................................................................**4**

   High Risks and Vulnerabilities.........................................................................................................8

**OPERATIONAL RISK — LOW-MEDIUM** ..........................................................................................**6**

**CYBER RISK – MEDIUM**.....................................................................................................................**7**

   SOFTWARE, HARDWARE, PERSONNEL, AND PHYSICAL SECURITY RISK.............................7

**COMPLIANCE RISK — LOW-MEDIUM**..............................................................................................**8**

   Commerce Risk...............................................................................................................................10

**FINANCIAL HEALTH RISK — MEDIUM**.........................................................................................**10**

## Source Summary Statement

Sources of information may vary greatly in terms of reliability. Efforts are taken during research to identify and cite authoritative and independent sources available within the scope of the research. Information collected from less than reputable or less authoritative sources is generally included by the research with accompanying notes and caveats that decrease the researcher's confidence in their assessments depending on the sources.

## Methodology

Exiger reports are compiled by researchers who obtain information from in-depth global public records research, including queries of commercial and public databases performed by Exiger's DDIQ System, as well as focused internet searches for ownership and supply chain information. Research seeks to develop profiles of the Subjects and to identify potential key findings including but not limited to evidence of bribery, corruption, dishonesty, misrepresentation, questionable financial health, poor past performance, and litigation. Information in this report may not be comprehensive.

Exiger's risk model assigns a risk score between 0 and 10 to each corporate or individual entity. Proprietary algorithms parse DDIQ profile returns for impactful events and data, converting DDIQ's structured and unstructured data into five risk ratings: LOW, LOW-MEDIUM, MEDIUM, MEDIUM-HIGH, and HIGH.

LOW — DDIQ likely found no adverse media or watchlist hits naming the Subject and likely found no elevated-risk jurisdictions in the Subject's ownership structure.

LOW-MEDIUM — DDIQ likely found no significant adverse media or watchlist hits naming the Subject and likely found no elevated-risk jurisdictions in the Subject's ownership structure.

MEDIUM — DDIQ likely found either adverse media and/or watchlist hits naming the Subject company OR found elevated-risk jurisdictions in the Subject's ownership structure or operations.

MEDIUM-HIGH — DDIQ likely found recent adverse media and/or watchlist hits naming the Subject in at least one risk category in addition to finding elevated-risk jurisdictions in the Subject's ownership structure or operations.

HIGH — DDIQ likely found recent and significant adverse media and/or watchlist hits naming the Subject across multiple risk categories in addition to finding elevated-risk jurisdictions in the Subject's ownership structure or operations.

## Disclaimer

Exiger was retained to conduct research into the data subject via Exiger's due diligence software and open-source risk research. The information compiled in this report was gathered and assessed exclusively for the Client and according to the specifications of the terms of engagement between Exiger and the Client. This report is meant for the Client only. Distribution of this report or its contents, in whole or in part, to any third party is prohibited except as approved in the Agreement or by Exiger.

The report is provided as is. It is the responsibility of the report recipient to conduct further due diligence into information presented in the report and to assess this information independently in the light of your organization's policies and risk tolerance. Exiger accepts no liability for any decisions or actions made or not made based on the information in this report. All information contained in this report is based on information and analysis available to Exiger at the time of writing the report.

Anthropic PBC

For Client Use Only — Proprietary

# Anthropic PBC

## EXECUTIVE SUMMARY

**Anthropic PBC ("Anthropic")** is a software company founded in 2021 and headquartered in San Francisco, California. Anthropic specializes in AI research.

| DDIQ Profile | Anthropic PBC |
|---|---|
| Physical Address | 500 Howard St., San Francisco, CA, 94104 |
| CAGE Code(s) | 9VKX2 |
| Entity Website | https://www.anthropic.com |
| Unique Entity Identifier(s) | SPQZL8XDKGK7 |
| DUNS | - |
| BvDID | US374042333L |
| Active Business License(s) | Colorado, New York, among others |
| Employees | Approximately 2,000 |
| Annual Revenue | USD 14 billion (2025) |

## OVERALL SUBJECT RISK: 4.3 — MEDIUM[1]

Foreign Ownership, Control, or Influence ("FOCI") Risk: MEDIUM-HIGH

Operational Risk: LOW-MEDIUM

Cyber Risk: MEDIUM

Compliance Risk: LOW-MEDIUM

Financial Health Risk: MEDIUM

---

[1] Discrepancies in this report's risk scores, a subject's adjudicated DDIQ profile, and a subject's DDIQ Analytics dashboard risk scoring are a result of manual adjudication of risk events and open-source research verifying DDIQ results.

**App.378**

## KEY FINDINGS

Anthropic's adjudicated DDIQ profile, Exiger's proprietary risk model, and open-source research indicate that the overall risk the company represents is **MEDIUM**, owing to elevated scores for the elements **Operational and Compliance Risk**.

- Anthropic has been the victim of multiple data breaches and hacks since 2024, including by an alleged Chinese-state affiliated group (outlined in the **Operational Risk** section of this report).

- Anthropic is allegedly at risk of losing its contract with the US Department of Defense and the US Secretary of Defense threatened to label the company as a "supply chain risk" (outlined in the **Compliance Risk** section of this report).

- Anthropic has been the defendant in numerous lawsuits, resulting in the company paying billions in settlements (outlined in the **Compliance Risk** section of this report).

## FOCI RISK — MEDIUM-HIGH

**Anthropic is a private company located in San Francisco, California.**[xi] DDIQ and open-source information, including Anthropic's PitchBook, show that Anthropic has generated a total of USD 60.55 billion in funding and is owned 69.74% by investors as of February 26, 2026. Anthropic has 221 active investors and has received funding through four funding rounds.[xii]

| | Investment Round | % Owned | # of Shares Authorized |
|---|---|---|---|
| | Series F | 7.1% | 145,774,450 |
| | Series E | 5.69% | 95,281,934 |
| | Series B | 6.73% | 87,430,352 |

- On September 2, 2025, Anthropic completed a Series F funding round that was led by US-based investing company Lightspeed Management Company LLC (dba "Lightspeed Venture Partners"), Fidelity Management & Research Company ("FMR Co."), and ICONIQ Capital LLC ("ICONIQ"). Lightspeed Venture Partners and FMR Co. also took part in the Series G and E funding rounds, while ICONIQ participated in the Series G funding round. This investment round also included Qatar Investment Authority, Qatar's sovereign wealth fund.[xiii]

  According to Lightspeed Ventre Partner's 2025 Form ADV filed with the US Securities and Exchange Commision ("SEC") on March 27, 2025, it is more than 10% but less than 25% owned by members Barry Eggers, Ravi Mhatre ("Mhatre"), NIEH Peter (尼彼得

**App.379**

 Anthropic PBC

For Client Use Only — Proprietary

, "Nieh") and Christoper Schaepe.[xiv] According to Mhatre's LinkedIn-registered profile, he is also a current investor in Anthropic and is a board member of several entities based in froeign jurisdictions such as Israel-based network security company Cato Networks Ltd.[xv] Additionally, according to Nieh's LinkedIn-registered profile, he previosuly worked at Taiwan-based electronics company Acer Inc.[xvi]

ICONIQ is owned 75% or more by Divesh Makan, its founding partner, according to its 2025 Form ADV filed with the SEC.[xvii]

FMR Co. is a wholly owned subsidiary of FMR LLC ("FMR"), a US-based private assets management company.[xviii] FMR is 49% ultimately beneficially owned by its director, chairman, and CEO, Abigail Johnson ("A. Johnson"), and members of the Johnson family, either directly or indirectly through trusts, according to FMR's Form Schedule 13G/A filed with the SEC in March 2025.[xix] According to Forbes, A. Johnson is a US citizen residing in the US.[xx]

- On March 3, 2025, Anthropic completed a Series E funding round that was led by Lightspeed Venture Partners and raised USD 3.5 billion.

Research did not identify furhter material information.

According to their LinkedIn-registered profiles, the Key Management Personnel include the following:[xxi]

Key Management Personnel

| Name | Role on Board | Management Role | Citizenship |
|---|---|---|---|
| Dario Amodei | - | CEO | - |
| Mike Krieger | - | Chief Product Officer | - |
| Paul Smith | - | Chief Commercial Officer | - |

- According to Anthropic's CEO Dario Amodei's ("Amodei") LinkedIn-registered profile, from November 2014 to October 2015, he worked as a research scientist at China-based AI company Baidu Inc. in Sunnyvale, California.[xxii]

- According to Anthropic's Chief Commercial Officer Paul Smith's ("Smith") LinkedIn-registered profile, he previously worked at UK-based ad insertion company Yospace Technologies Ltd. and Cayman Islands-based software company Umee Technologies Ltd.[xxiii] Additionally, Smith was the EVP and general manager in the UK for US-based software company Salesforce Inc.[xxiv]

**App.380**

Anthropic PBC                                      For Client Use Only — Proprietary

According to a third-party H-1B visa sponsorship data aggregator, Anthropic and its US-based subsidiaries sponsored the following visas to the US between 2023 and 2025: [xxv]

Sponsorship Data

| Type | Certified | Certified Withdrawn | Certified Expired | Citizenship |
|------|-----------|---------------------|-------------------|-------------|
| H-1B Visa | 168 | 4 | - | - |
| Green Card | 0 | - | - | - |

**Anthropic conducts operations in foreign jurisdictions such as South Korea.** According to Anthropic's 2026 Bureau van Dijk profile, it has subsidiaries located in foreign jurisdictions such as Japan, France, Germany, and Ireland. [xxvi] Additionally, in 2025, Anthropic established a subsidiary in South Korea. [xxvii] Research did not identify further material information.

**In 2025, Anthropic partnered with the UK government.** In 2025, Anthropic signed a memorandum of understanding with the government of the UK to utilize AI tools to improve online access and public services for citizens of the UK. [xxviii] Research did not identify further material information.

# OPERATIONAL RISK — LOW-MEDIUM

**Anthropic has been the victim of multiple data breaches and hacks.** In February 2026, Anthropic accused three Chinese AI developers, Hangzhou DeepSeek Artificial Intelligence Co. Ltd. ("DeepSeek"), MiniMax Group Inc., and Beijing Moonshot AI Technology Co. Ltd. ("Moonshot"), of illegally extracting output from its Claude AI model to improve their own competing systems. DeepSeek reportedly has close ties to China's military and intelligence operations, with claims that it is state-controlled or state-subsidized. [xxix] Anthropic says these firms generated more than 16 million interactions with Claude using thousands of fake accounts, a practice known in the industry as distillation, which it argues lets rivals shortcut costly development by learning directly from Claude's responses. [xxx] Anthropic claimed that "approximately 16 million exchanged with its Claude model and 24,000 fake accounts" were used by the three companies. [xxxi] According to a January 27, 2026, article published by KXAN, a US-based local news source, Moonshot was banned by Greg Abbott, the governor of Texas over security and data concerns. [xxxii]

In November 2025, Anthropic disclosed that a Chinese state-sponsored group manipulated its Claude Code AI tool to run a large-scale, largely autonomous cyber espionage campaign in September 2025. [xxxiii] The attackers bypassed Claude's safety guardrails through prompt manipulation, enabling the AI to automate about 80 to 90% of the offensive work against

App.381

Anthropic PBC

For Client Use Only — Proprietary

roughly 30 high-value targets, including tech firms, financial institutions, and government entities.[xxxiv]

In August 2025, Anthropic disclosed that North Korea-linked hackers used the Claude code AI tool to obtain remote positions at US Fortune 500 companies.[xxxv]

In December 2024, hackers gained control of an Anthropic social media account and used it to promote a counterfeit "CLAUDE" token, resulting in losses of about USD 100,000.[xxxvi] Research did not identify further material information.

## CYBER RISK – MEDIUM

SOFTWARE, HARDWARE, PERSONNEL, AND PHYSICAL SECURITY RISK

**According to SecurityScorecard, an information security company that provides cybersecurity ratings, Anthropic has an overall cybersecurity score of 85 out of 100, leading to an overall grade of "B."**

The following table identifies the risk factors that contributed to lowering Anthropic's cybersecurity rating:

Cybersecurity Risk

| Risk Factor | Rating |
|---|---|
| IP Reputation[2] | F |
| Network Security[3] | B |
| Information Leak[4] | B |

SecurityScorecard noted 13,815 site vulnerabilities, 17 open ports, and four examples of malware discovered, but no examples of leaked information.

According to the National Institute of Standards and Technology (NIST) National Vulnerability Database, Anthropic has had four reported security vulnerabilities since 2025, including two since 2026 that scored a seven or higher out of 10.[xxxvii]

---

[2] IP Reputation — IP reputation Leverages SecurityScorecard sinkhole infrastructure, OSINT malware feeds, and third-party threat intelligence.
[3] Network Security — The network security module checks public datasets for evidence of high-risk or insecure open ports within the organization's networks.
[4] Information Leak — Information leak uses chatter and deep web monitoring to identify compromised credentials being circulated by hackers.

**App.382**

Anthropic PBC

For Client Use Only — Proprietary

HIGH RISKS AND VULNERABILITIES

The following table identifies the high risks and vulnerabilities identified in Anthropic's open-source repositories:

| Software List | High Risks[5] | Vulnerabilities[6] |
|---|---|---|
| anthropics/beam | 1,249 | 19 |
| anthropics/argo-cd | 1,239 | 3 |
| anthropics/anthropic-sdk-ty-pescript | 1,074 | 1 |
| anthropics/PySvelte | 489 | 22 |
| anthropics/anthropic-tokenizer-typescript | 383 | 5 |
| anthropics/rclone | 140 | 0 |
| anthropics/riv2025-long-horizon-coding-agent-demo | 115 | 1 |
| anthropics/s5cmd | 22 | 0 |
| anthropics/claude-agent-sdk-demos | 19 | 1 |
| anthropics/anthropic-sdk-ruby | 19 | 1 |
| anthropics/anthropic-sdk-go | 13 | 0 |
| anthropics/orjson | 11 | 0 |
| anthropics/anthropic-retrieval-demo | 10 | 8 |
| anthropics/github-mcp-server | 9 | 0 |
| anthropics/claude-code-action | 4 | 1 |
| anthropics/torchtyping | 3 | 0 |
| anthropics/anthropic-tools | 3 | 4 |
| anthropics/python-tblib | 2 | 0 |
| anthropics/claude-code-security-review | 2 | 1 |
| anthropics/financial-services-plugins | 2 | 1 |
| anthropics/claude-code-base-action | 2 | 1 |
| anthropics/redis-py | 2 | 3 |
| anthropics/skills | 2 | 9 |
| anthropics/httpcore | 1 | 1 |

## COMPLIANCE RISK — LOW-MEDIUM

**Anthropic software was used in an operation overseas.** According to a February 15, 2026, article published by Yeni Safak, a Turkey-based online news source, Anthropic's Claude AI software was used in the January 3, 2026, operation that captured Nicolás Maduro, the president of Venezuela. Claude AI was accessed through Anthropic's partnership with Palantir.[xxxviii] According to a February 25, 2026, article published by Al Jazeera English, an online news source, Claude AI is subject to Anthropic's usage policy, which includes regulations against using Claude for surveillance, the development off weapons, or inviting weapons.

---

[5] Exiger Cyber's risk assessment outlines common risks by applying statistical methods grounded in a deep understanding of software development metrics and distinguishing between normal and abnormal patterns. The severity of risks is rated as high, medium, or low depending on the gravity of individual rule violations or the total number of failing rules.

[6] Exiger Cyber's vulnerability assessment leverages data from the National Vulnerability Database to identify potential vulnerabilities. The assessment relies on precise product identifiers within software components to accurately match and detect known security weaknesses.

---

App.383

Anthropic PBC    For Client Use Only — Proprietary

Anthropic declined to comment on the usage.[xxxix] Research did not identify any additional material information.

**Anthropic is allegedly at risk of losing its US Government contract.** According to a February 24, 2026, article published by Head Topics, an online news source, Anthropic could lose its government contract if the company fails to allow the US Department of Defense ("DoD") to use its AI technology for unrestricted military use. The article stated that Secretary of Defense Pete Hegseth warned Amodei that the company could be designated a supply chain risk if company policy did not align with the DoD's usage.[xl] Research did not identify any additional material information.

**Anthropic was accused of stealing training data.** According to a February 24, 2026, article published by Digit Fast Track, an online news source, Anthropic was accused of stealing training data by Elon Musk ("Musk"), a US businessman. Musk's accusations came after Anthropic accused three China-based AI companies of using Claude to improve their own AI models.[xli] Research did not identify any additional material information.

**Anthropic's Claude can be exploited and leak sensitive data.** According to an October 31, 2025, article published by Techradar, an online technology news source, Claude can be exploited by hackers. The article stated that Claude can be tricked into uploading sensitive data when prompted to run code within a conversation. Hackers can then gain access to downloaded software packages. Users have been advised to limit network communications to their own account or disable network access to prevent data leaks.[xlii] Research did not identify any additional material information.

**Anthropic has been the defendant in numerous lawsuits.** Anthropic was sued by major music publishers, including the Netherlands-based Universal Music Group NV, US-based Concord Music Group Inc. ("Concord"), and US-based ABKCO Music & Records Inc., which alleged the company used copyrighted lyrics and sheet music from more than 700 identified songs, and potentially over 20,000 works in total, without authorization to train its Claude AI model in 2026 as an extension of the original lawsuit filed in October 2023.[xliii] The plaintiffs are seeking statutory damages that could exceed USD 3 billion, describing the case as potentially one of the largest non-class action copyright lawsuits in US history, while Anthropic denies the allegations and maintains its training practices comply with the law.[xliv] The case with Concord is continuing through normal federal litigation processes and has not yet been resolved or dismissed.[xlv]

In 2025, Anthropic was the defendant in a lawsuit filed by a group of book authors who alleged that the company's Claude AI platform infringed on the authors' copyrights by copying and using their books to train the Claude AI platform. A judge ruled that Anthropic's use of legally purchased books, including print copies it digitized, to train its language models was transformative and protected under fair use, so it did not constitute copyright infringement on that basis; however, the court found that retaining millions of pirated books from unauthorized sources was not protected by fair use, and that dispute ultimately led to a late-2025 settlement in which Anthropic agreed to pay about USD 1.5 billion, with the agreement receiving preliminary court approval.[xlvi]

**App.384**

 Anthropic PBC

For Client Use Only — Proprietary

In June 2025, US-based social news company Reddit Inc. sued Anthropic over an alleged breach of contract. Reddit alleged that Anthropic improperly used its content to train Anthropic's AI systems without permission.[xlvii]

An IT firm based in Belagavi, Anthropic Software Private Limited ("ASPL"), has filed a civil suit against Anthropic, alleging that the company's use of the same name has harmed its brand, diverted online traffic, and caused financial losses. ASPL, which says it registered its name in India in 2017, before Anthropic was established, claims passing off, misrepresentation, and brand erosion and is seeking to bar Anthropic from operating under that name in India along with damages.[xlviii] The court allowed the lawsuit to proceed and issued summons to Anthropic PBC; after the defendant's representatives failed to appear on an earlier date, fresh summons have been issued to Anthropic India Pvt Ltd in Bengaluru for a hearing set on March 9, 2026.[xlix] Research did not identify further material information.

### COMMERCE RISK

Between 2021 and 2026, Anthropic received approximately one shipment from an international supplier. The following table includes the top supplier country.

Shipment Data

| Country | Number of Shipments | Percentage of Shipments |
|---------|--------------------|-----------------------|
| UK | 1 | 100% |

Anthropic's corporate supplier was Qumpus Inc. (dba Better World Books), a US-based company specializing in books and e-commerce.[l]

## FINANCIAL HEALTH RISK — MEDIUM

The following table represents Anthropic's commercial credit scores:[li]

Commercial Credit Scores

| Source | Category | Rating |
|--------|----------|--------|
| Cortera | Commercial Credit Risk Rating | B |

**App.385**

 Anthropic PBC

For Client Use Only — Proprietary

| Cortera | Payment Risk Segment | 1 (Higher payment risk, trending down)[7] |
|---------|---------------------|------------------------------------------|

According to USAspending, Anthropic has received USD 18,960 in US federal prime contracts, grants, and loans since fiscal year 2008, all of which was with the US Department of State.[iii] This data pertains to prime contracts awarded to Anthropic and may not capture products developed by Anthropic and redistributed by third parties.

The following table represents the top major contract awarded to Anthropic by government contract organizations:

US Government Contracts Data

| Government Organization | Award Amount (USD) |
|------------------------|--------------------|
| US Department of State | USD 18,960 |

END REPORT

[i] https://www.anthropic.com/
https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576
[ii] https://www.anthropic.com/
[iii] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576
[iv] https://cage.dla.mil/Search/Details?id=19488082
[v] https://cage.dla.mil/Search/Details?id=19488082
[vi] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576
[vii] https://opencorporates.com/companies/us_co/20241311617
[viii] https://opencorporates.com/companies/us_ny/6565058
[ix] https://pitchbook.com/profiles/company/466959-97#overview
[x] https://siliconangle.com/2026/02/12/anthropic-closes-30b-round-annualized-revenue-tops-14b/
[xi] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576
[xii] https://pitchbook.com/profiles/company/466959-97
[xiii] https://pitchbook.com/profiles/company/466959-97#overview
https://www.qia.qa/
[xiv] https://files.adviserinfo.sec.gov/IAPD/content/viewform/adv/Sections/iapd_AdvScheduleASection.aspx?ORG_PK=160187&FLNG_PK=044CB0FE000801E401697B11059F1935056C8CC0
[xv] https://www.linkedin.com/in/ravimhatre/details/experience/

[7] Payment Risk Segment of 1 — Higher payment risk, trending down. Cortera's Payment Risk Segment is based on how fast the company is paying vendors and whether the payments are getting faster or slower. The Payment Risk Segment is based on a scale of 1-6.

**App.386**

Anthropic PBC

For Client Use Only — Proprietary

[xvi] https://www.linkedin.com/in/peternieh/

[xvii] https://files.adviserinfo.sec.gov/IAPD/content/viewform/adv/Sections/iapd_AdvScheduleBSection.aspx?ORG_PK=159198&FLNG_PK=028FE254000801EE04DE0862004AA729056C8CC0
https://www.sfjazz.org/about/board-of-trustees/divesh-makan/

[xviii] https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/FMR-ADV-FPWA.pdf#:~:text=Fidelity%20Management%20&%20Research%20Company%20("FMR%20Co.")%2C,reorganized%20into%20FMR%20effective%20January%201%2C%202020.

[xix] https://www.sec.gov/Archives/edgar/data/1850838/000031506625000984/exhibit99.txt

[xx] https://www.forbes.com/profile/abigail-johnson/?sh=66106e251c42

[xxi] https://www.linkedin.com/in/mikekrieger/
https://www.linkedin.com/in/dario-amodei-3934934/
https://www.linkedin.com/in/pjsmith/

[xxii] https://www.linkedin.com/in/dario-amodei-3934934/

[xxiii] https://www.linkedin.com/company/umee-network/about/

[xxiv] https://www.linkedin.com/in/pjsmith/

[xxv] https://www.myvisajobs.com/employer/anthropic-pbc/

[xxvi] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[xxvii] https://www.businesskorea.co.kr/news/articleView.html?idxno=249227

[xxviii]    https://www.biometricupdate.com/202502/uk-govt-signs-mou-with-anthropic-as-digital-id-ai-become-economic-issues

[xxix] https://www.cnbc.com/2025/06/24/deepseek-aids-chinas-military-and-evaded-export-controls-us-official-says-reuters.html#:~:text=Since%202022%20those%20chips%20have,a%20Reuters%20request%20for%20comment.&text=%22We%20do%20not%20support%20parties,by%20competitors%20such%20as%20Huawei.%22
https://www.congress.gov/crs-product/IF13051

[xxx] https://www.bloombergtechnoz.com/detail-news/100527/anthropic-deepseek-cs-ekstraksi-hasil-dari-claude-secara-ilegal

[xxxi] https://www.taipeitimes.com/News/biz/archives/2026/02/25/2003852826

[xxxii] https://www.kxan.com/news/texas/texas-adds-26-china-affiliated-technology-companies-to-banned-list/

[xxxiii] https://www.kanalcoin.com/anthropic-ai-cyber-espionage-attack/

[xxxiv] https://bitcoinethereumnews.com/tech/anthropic-detects-potential-first-ai-led-cyberattack-by-chinese-group-using-claude/

[xxxv] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:5bcb69198ed8947d0459f5928d71aae7eb?lnid=6GRP-KM73-RS3C-71VC-00000-00

[xxxvi] https://www.cryptotimes.io/2024/12/26/animoca-chairmans-x-account-hacked-to-promoting-fake-token/

[xxxvii] https://nvd.nist.gov/vuln/search#/nvd/home?keyword=anthropic&resultType=records

[xxxviii] https://en.yenisafak.com/technology/us-military-used-anthropics-claude-ai-in-maduro-capture-operation-3714626

[xxxix] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:3558920e44a1e43504b0193c6910e4082e?lnid=6J0F-WBD3-RTTP-W0GW-00000-00

[xl] https://us.headtopics.com/news/hegseth-warns-anthropic-to-let-the-military-use-the-80212130

[xli] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:01ba9db2b8d1565a0417b48ec90b9b218d?lnid=6J06-7JC3-RS9G-92C2-00000-00

**App.387**

Anthropic PBC

For Client Use Only — Proprietary

[xlii] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:f6fa725637d00733047837a81882f32891?lnid=6H3J-JPK3-RS1H-N380-00000-00

[xliii] https://www.musicbusinessworldwide.com/anthropic-must-face-music-publishers-copyright-claims-after-judge-denies-dismissal-motion/

[xliv] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:74e4ea163085a38504f53165214ed9ea6c?lnid=6HT2-KNS3-SJ7N-J15S-00000-00

[xlv] https://mpost.io/anthropic-faces-3b-copyright-lawsuit-from-major-music-publishers-over-ai-training-practices/

[xlvi] https://www.loeb.com/en/insights/publications/2025/07/bartz-v-anthropic-pbc
https://www.deep-lex.com/blog/bartz-v-anthropic

[xlvii] https://ddiq.efc.exigerfed.com/dashboard/#/cached-article?url=https:%2F%2Fddiq.efc.exigerfed.com:443%2Fddiq-services%2Frest%2FoiqPrivate%2Farticle%3Fid%3D207595844632576%26url%3Dhttps%253A%252F%252Fwww.clydeco.com%252Fen%252Finsights%252F2025%252F07%252Fnavigating-ai-risks

[xlviii] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bca/article/urn:bca:oiq.bca.model.LexisJsonRecord:d606d82e348b9cad0481e727c59f3034c4?lnid=6HWP-7B63-RRHW-22NX-00000-00

[xlix] https://timesofindia.indiatimes.com/legal/news/belagavi-court-issues-fresh-summons-to-us-ai-firm-anthropic/articleshow/128415251.cms?

[l] https://support.betterworldbooks.com/hc/en-us/articles/200801763-Sales-Tax-Exemption-Process#:~:text=Better%20World%20Books%2C%20DBA%20Qumpus%2C%20Inc.%2C%20is,your%20phone%20number%20*%20Your%20order%20number
https://www.linkedin.com/company/better-world-books/

[li] https://ddiq.efc.exigerfed.com/ddiq-services/rest/bvdReport/US374042333L?entityId=207595844632576

[lii] https://www.usaspending.gov/search?hash=229167627d88222a690619ea1d7c18d4

**App.388**

# ATTACHMENT
# 2

**UNCLASSIFIED**

**ATTACHMENT**
**Section 4713 Scoping Analysis for Anthropic, PBC**

This document supports the use of section 4713 of title 41, United States Code ("Section 4713') authorities. The Secretary of War, pursuant to the recommendation of the Under Secretary of War for Acquisition and Sustainment and the Department of War Chief Information Officer, has determined the following as the appropriate scope for use of Section 4713 authorities necessary to address the supply chain risk related to the use of covered products or services of Anthropic, PBC:

- **Covered Entity:** Anthropic, PBC, and its subordinate, subsidiaries, or affiliated offices or entities, doing business under various names, and all subsidiaries, successors, or assigns thereof ("Covered Entity").

- **Covered Products or Services:** All of the Covered Entity's products or services that meet the definition of a "covered article" or that are part of a "covered procurement," as those terms are defined at 41 U.S.C. § 4713(k), whether acquired as a product or service. This includes all of the Covered Entity's products or services offered by the Covered Entity that become available for procurement.

- **Covered Procurements:** All DoW procurements described in Section 4713(k)(3).

- **Covered Procurement Actions:** All actions described in Section 4713(k)(4).

**UNCLASSIFIED**

**App.390**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

## U.S. Federal Government Usage Policy Addendum for Anthropic  Partner

This U.S. Federal Government Usage Policy Addendum for Anthropic  - Partner (the "**USG Addendum**") is entered into by Anthropic, PBC ("**Anthropic**") and the customer identified below ("**Customer**") and is governed by the Anthropic Commercial Terms of Service between Anthropic and Customer (the "**Terms**") executed on July 10, 2025, which governs Customer's use of Anthropic's Anthropic Offerings (as defined in the Terms) provided to Customer via (i) Anthropic, (ii) AWS (Bedrock and Sagemaker) and (iii) Google Vertex. Under this USG Addendum, Anthropic will permit, within the parameters of this USG Addendum, certain uses of Services that are restricted under the UP or the Terms. Capitalized terms used but not defined in this USG Addendum have the meanings given to them in the Terms.

The parties agree as follows:

I.  **USG Addendum.** This USG Addendum is intended to replace any previously executed USG Addendum between Anthropic and Customer as of date of last signature.

II. **Usage Policy ("UP").** For the purposes of this USG Addendum, the Usage Policy, available at www.anthropic.com/legal/auphas been attached as Exhibit A to this USG Addendum and section numbers added.

III. **U.S. Federal Government Usage.**

  A.  The parties agree to modify Section 9(b) of the Universal Usage Standards of the UP (highlighted in yellow for readability) as follows:

  > *In connection with provision of services and/or software to End Users, Customer and/or End Users may use the Services for the Analysis of Foreign Intelligence collected against a Foreign territory and regarding Foreign nationals, to the extent permitted by and solely in accordance with applicable law.*

  B.  The parties agree to clarify the following terms as they appear in Section 5(a) of the Universal Usage Standards of the UP as follows:

  1.  "weapons, explosives, dangerous materials or other systems designed to cause harm to or loss of human life" does not include items that are not intended by themselves to be lethal or cause grievous harm to a person; and

  2.  "distribute" means to sell.

  C.  The parties agree to clarify the following terms as they appear in Section 9 of the

**App.391**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Universal Usage Standards of the UP as follows:

1. "target or track a person's physical location" does not include Palantir's work with United States Department of Defense or civil executive agencies of the United States federal government related to workflows focused on situational awareness which may include unclassified intelligence for the purposes of executing on its organizational mission or mandate in accordance with applicable law. The parties agree that law enforcement agencies are excluded from clarification set forth above.

2. "censor" does not include uses of the Anthropic Offerings primarily intended to provide information to individuals or governments (e.g., use to respond to Freedom of Information Act requests or to assist disclosure of information to allied governments).

D. The parties agree to clarify the following terms as they appear in Section 8 of the Universal Usage Standards of the UP as follows:

1. (a) and (b) do not include activities by the United States Government preparing and providing political or policy recommendations internally or externally.

E. **Definitions.** As used in this USG Addendum, the following terms have the meanings specified below:

1. **Analysis:** the organization and examination of previously collected information, including Intelligence.

2. **End Users:** Customer's end customers and/or users.

3. **Foreign:** of or relating to non-United States' territory, governments, organizations, or persons.

4. **Intelligence:** information gathered within or outside the United States that involves threats to the United States, its people, property, or interests; development, proliferation, or use of weapons of mass destruction; and any other matter bearing on the United States' national or homeland security.

**App.392**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

5. **Kinetic:** actions designed to produce effects using the forces and energy of moving bodies and directed energy, including physical damage to, alteration of, or destruction of targets.

IV. Except as expressly provided under this USG Addendum, the Terms shall continue to remain in full force and effect. This USG Addendum will control in the event of a conflict with the Terms or the UP. No amendment to this USG Addendum is effective unless it is signed by both parties.

This USG Addendum is signed by the parties' authorized representatives on the dates below.

**CUSTOMER: Palantir Technologies Inc.**

By: *Ryan D. Taylor*
F7FD485DD2534A6...

Name: Ryan Taylor

Title: CRO and CLO

Date: August 15, 2025

**ANTHROPIC, PBC**

By: *Thiyagu Ramasamy*
CF3B3D2B760E4A3...

Name: Thiyagu Ramasamy

Title: Head of Public Sector

Date: August 16, 2025

**App.393**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

**Exhibit A**
**Usage**
**Policy**

Our Usage Policy (also referred to as our "Acceptable Use Policy" or "AUP") applies to anyone who uses Anthropic's products and services, and is intended to help our users stay safe and ensure our products and services are being used responsibly.

The Usage Policy is categorized according to who can use our products and for what purposes. We will update our policy as our technology and the associated risks evolve or as we learn about unanticipated risks from our users.

- **Universal Usage Standards:** Our Universal Usage Standards apply to all users including individuals, developers, and businesses.
- **High-Risk Use Case Requirements**: Our High-Risk Use Case Requirements apply to specific use cases that pose an elevated risk of harm.
- **Disclosure Requirements:** Our Disclosure Requirements apply to specific use cases where it is especially important for users to understand that they are interacting with an AI system.

Anthropic's Trust and Safety Team will implement detections and monitoring to enforce our Usage Policies so please review these policies carefully before using our products. If we learn that you have violated our Usage Policy, we may throttle, suspend, or terminate your access to our products and services. If you discover that our model outputs are inaccurate, biased or harmful, please notify us at usersafety@anthropic.com or report it directly in the product through the "report issues" thumbs down button. You can read more about our Trust and Safety practices and recommendations in our T&S Support Center.

*Note: On a carefully selected, case-by-case basis, Anthropic may enter into contracts with government customers and allow for exceptions to our Usage Policy. We will only make these agreements if we determine that relevant safeguards are in place to address the potential harms that this overall Usage Policy seeks to address. To read more about how we make these decisions, please see our Help Center article.*

---

**App.394**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

**Universal Usage Standards**

1. **Do Not Compromise Children's Safety.** This includes using our products or services to:
   a. Create, distribute, or promote child sexual abuse material. We strictly prohibit and will report to relevant authorities and organizations where appropriate any content that exploits or abuses minors
   b. Facilitate the trafficking, sextortion, or any other form of exploitation of a minor
   c. Facilitate minor grooming, including generating content designed to impersonate a minor

**App.395**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

    **d.** Facilitate or depict child abuse of any form, including instructions for how to conceal abuse

    **e.** Promote or facilitate pedophilic relationships, including via roleplay with the model

    **f.** Fetishize minors

2. **Do Not Compromise Critical Infrastructure.** This includes using our products or services to:

    **a.** Facilitate the destruction or disruption of critical infrastructure such as power grids, water treatment facilities, telecommunication networks, or air traffic control systems

    **b.** Obtain unauthorized access to critical systems such as voting machines, healthcare databases, and financial markets

    **c.** Interfere with the operation of military bases and related infrastructure

3. **Do Not Incite Violence or Hateful Behavior.** This includes using our products or services to:

    **a.** Incite, facilitate, or promote violent extremism, terrorism, or hateful behavior

    **b.** Depict support for organizations or individuals associated with violent extremism, terrorism, or hateful behavior

    **c.** Facilitate or promote any act of violence or intimidation targeting individuals, groups, animals, or property

    **d.** Promote discriminatory practices or behaviors against individuals or groups on the basis of one or more protected attributes such as race, ethnicity, religion, nationality, gender, sexual orientation, or any other identifying trait

4. **Do Not Compromise Someone's Privacy or Identity.** This includes using our products or services to:

    **a.** Compromise security or gain unauthorized access to computer systems or networks, including spoofing and social engineering

    **b.** Violate the security, integrity, or availability of any user, network, computer, device, or communications system, software application, or network or computing device

    **c.** Violate any person's privacy rights as defined by applicable privacy laws, such as sharing personal information without consent, accessing private data unlawfully, or violating any relevant privacy regulations

    **d.** Misuse, collect, solicit, or gain access to private information without permission such as non-public contact details, health data, biometric or neural data (including facial recognition), or confidential or proprietary data

    **e.** Impersonate a human by presenting results as human-generated, or using results in a manner intended to convince a natural person that they are communicating with a natural person when they are not

**App.396**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

5. **Do Not Create or Facilitate the Exchange of Illegal or Highly Regulated Weapons or Goods.** This includes using our products or services to:

   a. Produce, modify, design, market, or distribute weapons, explosives, dangerous materials or other systems designed to cause harm to or loss of human life

   b. Engage in or facilitate any illegal activity, such as the use, acquisition, or exchange of illegal and controlled substances, or the facilitation of human trafficking and prostitution

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

6. **Do Not Create Psychologically or Emotionally Harmful Content.** This includes using our products or services to:
   a. Facilitate or conceal any form of self-harm, including disordered eating and unhealthy or compulsive exercise
   b. Engage in behaviors that promote unhealthy or unattainable body image or beauty standards, such as using the model to critique anyone's body shape or size
   c. Shame, humiliate, intimidate, bully, harass, or celebrate the suffering of individuals
   d. Coordinate the harassment or intimidation of an individual or group
   e. Generate content depicting sexual violence
   f. Generate content depicting animal cruelty or abuse
   g. Generate violent or gory content that is inspired by real acts of violence
   h. Promote, trivialize, or depict graphic violence or gratuitous gore
   i. Develop a product, or support an existing service that facilitates deceptive techniques with the intent of causing emotional harm

7. **Do Not Spread Misinformation.** This includes the usage of our products or services to:
   a. Create and disseminate deceptive or misleading information about a group, entity or person
   b. Create and disseminate deceptive or misleading information about laws, regulations, procedures, practices, standards established by an institution, entity or governing body
   c. Create and disseminate deceptive or misleading information with the intention of targeting specific groups or persons with the misleading content
   d. Create and advance conspiratorial narratives meant to target a specific group, individual or entity
   e. Impersonate real entities or create fake personas to falsely attribute content or mislead others about its origin without consent or legal right
   f. Provide false or misleading information related to medical, health or science issues

8. **Do Not Create Political Campaigns or Interfere in Elections.** This includes the usage of our products or services to:
   a. Promote or advocate for a particular political candidate, party, issue or position. This includes soliciting votes, financial contributions, or public support for a political entity
   b. Engage in political lobbying to actively influence the decisions of government officials, legislators, or regulatory agencies on legislative, regulatory, or policy matters. This includes advocacy or direct communication with officials or campaigns to sway public opinion on specific legislation or policies

**App.398**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

    **c.** Engage in campaigns, including political campaigns, that promote false or misleading information to discredit or undermine individuals, groups, entities or institutions

    **d.** Incite, glorify or facilitate the disruption of electoral or civic processes, such as targeting voting machines, or obstructing the counting or certification of votes

    **e.** Generate false or misleading information on election laws, procedures and security, candidate information, how to participate, or discouraging participation in an election

**App.399**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

9. **Do Not Use for Criminal Justice, Law Enforcement, Censorship or Surveillance Purposes.** This includes the usage of our products or services to:
   a. Make determinations on criminal justice applications, including making decisions about or determining eligibility for parole or sentencing
   b. ==Target or track a person's physical location, emotional state, or communication without their== ==consent, including using our products for facial recognition, battlefield management applications== ==or predictive policing==
   c. Utilize Claude to assign scores or ratings to individuals based on an assessment of their trustworthiness or social behavior
   d. Build or support emotional recognition systems or techniques that are used to infer people's emotions
   e. Analyze or identify specific content to censor on behalf of a government organization
   f. Utilize Claude as part of any biometric categorization system for categorizing people based on their biometric data to infer their race, political opinions, trade union membership, religious or philosophical beliefs, sex life or sexual orientation
   g. Use the model for any official local, state or national law enforcement application. Except for the following permitted applications by law enforcement organizations:
      i. Back office uses including internal training, call center support, document summarization, and accounting;
      ii. Analysis of data for the location of missing persons, including in human trafficking cases, and other related applications, provided that such applications do not otherwise violate or impair the liberty, civil liberties, or human rights of natural persons

10. **Do Not Engage in Fraudulent, Abusive, or Predatory Practices.** This includes using our products or services to:
    a. Facilitate the production, acquisition, or distribution of counterfeit or illicitly acquired goods
    b. Promote or facilitate the generation or distribution of spam
    c. Generate content for fraudulent activities, schemes, scams, phishing, or malware that can result in direct financial or psychological harm
    d. Generate content for the purposes of developing or promoting the sale or distribution of fraudulent or deceptive products
    e. Generate deceptive or misleading digital content such as fake reviews, comments, or media
    f. Engage in or facilitate multi-level marketing, pyramid schemes, or other deceptive business models that use high-pressure sales tactics or exploit participants
    g. Promote or facilitate payday loans, title loans, or other high-interest, short-

**App.400**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

term lending practices that exploit vulnerable individuals

**h.** Engage in deceptive, abusive behaviors, practices, or campaigns that exploits people due to their age, disability or a specific social or economic situation

**i.** Promote or facilitate the use of abusive or harassing debt collection practices

**j.** Develop a product, or support an existing service that deploys subliminal, manipulative, or deceptive techniques to distort behavior by impairing decision-making

**App.401**

Confidential

   **k.** Plagiarize or engage in academic dishonesty

11. **Do Not Abuse our Platform.** This includes using our products or services to:
   **a.** Coordinate malicious activity across multiple accounts such as creating multiple accounts to avoid detection or circumvent product guardrails or generating identical or similar prompts that otherwise violate our Usage Policy
   **b.** Utilize automation in account creation or to engage in spammy behavior
   **c.** Circumvent a ban through the use of a different account, such as the creation of a new account, use of an existing account, or providing access to a person or entity that was previously banned
   **d.** Facilitate or provide account access to Claude to persons or entities who are located in unsupported locations
   **e.** Intentionally bypass capabilities or restrictions established within our products for the purposes of instructing the model to produce harmful outputs (e.g., jailbreaking or prompt injection) without an authorized use-case approved by Anthropic
   **f.** Utilize prompts and results to train an AI model (e.g., "model scraping")

12. **Do Not Generate Sexually Explicit Content.** This includes the usage of our products or services to:
   **a.** Depict or request sexual intercourse or sex acts
   **b.** Generate content related to sexual fetishes or fantasies
   **c.** Facilitate, promote, or depict incest or bestiality
   **d.** Engage in erotic chats

---

**High-Risk Use Case Requirements**

Some integrations (meaning use cases involving the use of our products and services) pose an elevated risk of harm because they influence domains that are vital to public welfare and social equity. "High-Risk Use Cases" include:

- **Legal:** Integrations related to legal interpretation, legal guidance, or decisions with legal implications
- **Healthcare:** Integrations affecting healthcare decisions, medical diagnosis, patient care, or medical guidance. Wellness advice (e.g., advice on sleep, stress, nutrition, exercise, etc.) does not fall under this category

**App.402**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

- **Insurance:** Integrations related to health, life, property, disability, or other types of insurance underwriting, claims processing, or coverage decisions
- **Finance:** Integrations related to financial decisions, including investment advice, loan approvals, and determining financial eligibility or creditworthiness
- **Employment and housing:** Integrations related to decisions about the employability of individuals, resume screening, hiring tools, or other employment determinations or decisions regarding eligibility for housing, including leases and home loans

**App.403**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

- **Academic testing, accreditation and admissions:** Integrations related to standardized testing companies that administer school admissions (including evaluating, scoring or ranking prospective students), language proficiency, or professional certification exams; agencies that evaluate and certify educational institutions.
- **Media or professional journalistic content:** Integrations related to using our products or services to automatically generate content and publish it for external consumption

If your integration is listed above, we require that you implement the additional safety measures listed below:

- **Human-in-the-loop:** when using our products or services to provide advice, recommendations, or subjective decisions that directly impact individuals in high-risk domains, a qualified professional in that field must review the content or decision prior to dissemination or finalization. This requirement applies specifically to content or decisions that are provided to consumers or the general public, or decisions made about an individual. Your business is responsible for the accuracy and appropriateness of that information. For other types of content generation or interactions with users that do not involve direct advice, recommendations, or subjective decisions, human review is strongly encouraged but not mandatory.
- **Disclosure:** you must disclose to your customers or end users that you are using our services to help inform your decisions or recommendations.

### Disclosure Requirements

Finally, the below use cases – regardless of whether they are High Risk Use Cases – must disclose to their users that they are interacting with an AI system rather than a human:

- **All customer-facing chatbots** including any external-facing or interactive AI agent
- **Products serving minors:** Organizations providing minors with the ability to directly interact with products that incorporate our API(s). **Note:** These organizations must also comply with the additional guidelines outlined in our Help Center article

**App.404**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Confidential

## Restricted Use Addendum

This Restricted Use Addendum (**"RUA"**) is an agreement between Anthropic and Customer. Under this RUA, the parties are stipulating specific uses as permitted by the U.S. Federal Government Usage Policy for Anthropic  - Partner Addendum (**"USG Usage Policy"**), subject to the parameters of this RUA. If this RUA or the USG Usage Policy ever conflict, this RUA will control.

1. **Permitted Uses.** Subject to Section 2 (Clarifications), Customer may (in connection with provision of services and/or software to End Users) and may allow End Users to use the Services for:
   (a)  the Analysis of Foreign Intelligence collected against a Foreign territory and regarding Foreign nationals,
   (b)  military or intelligence planning in connection with a United States government department, agency, or other organ (the "**USG**"),
   (c)  the purposes of classifying and/or declassifying records for the USG,  to the extent permitted by and solely in accordance with applicable law
   (d)  the purposes of providing business systems to the United States Department of Defense to enable equipment, personnel, supply chain, acquisition, and operational readiness workflows, including munitions tracking and logistics
   (e)  the purposes of supporting the operations of United States government civil executive agencies, including but not limited to executive agencies focused on health and public health outcomes and policy
   (f)  the purposes of supporting planning, research, development, production, and distribution by commercial defense industrial base entities providing equipment and material to the United States military, or
   (g)  the purposes of supporting the United States Department of Defense in personnel logistics, unclassified (open-source and commercially-available) intelligence processing, operational planning and oversight, operational execution and facilitation, informing real time decisions, and coordination and collaboration with allied partner forces.

2. **Clarifications.** The USG Usage Policy, as clarified by this RUA, expressly prohibits using the Services for making:
   (a)  any final determinations about a potential target of or directly tracking Kinetic action, as compared to informing human decision makers; or
   (b)  Intelligence collection decisions without human or machine oversight (e.g., using Services to directly task satellites, or direct interceptions, as compared to informing human decision makers or other decision-making systems).

3. **Amending & Terminating this RUA.** Anthropic may amend or terminate this RUA if (a) required by applicable law or court order, or (b) mutually agreed by Parties.

Accepted and agreed:

| **Customer**: Palantir Technologies Inc. | **Anthropic, PBC** |
|---|---|

**App.405**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

Signed by:

By: _Ryan D Taylor_
F7FD485DD2534A6...

Name / Date: Ryan Taylor          August 15, 2025

Title:  CRO and CLO

Signed by:

By: _Thiyagu Ramasamy_
CF3B3D2B760E4A3...

Name / Date: Thiyagu Ramasamy

Title: Head of Public Sector          August 16, 2025

**App.406**

Docusign Envelope ID: 0F6DDFAB-A762-41D6-9212-517A72843FD6

App.407

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Anthropic PBC,<br>　　　　　　　Petitioner,<br><br>　　　　　v.<br><br>U.S. Department of War, *et al.*,<br>　　　　　　　　　Respondents. | 2 0 APR 2026<br><br>No. 26-1049 |

## DECLARATION OF EMIL MICHAEL IN SUPPORT OF THE ADMINISTRATIVE RECORD

Pursuant to 28 U.S.C. § 1746, I, Emil Michael, declare as follows:

1. I am the Under Secretary of War for Research and Engineering (USW(R&E)) and Chief Technology Officer for the Department of War (DoW). I have held this position since May 20, 2025.

2. In my current position, I am responsible for spearheading the Department's efforts to ensure U.S. military technological superiority and keep DoW at the forefront of innovation. I provide strategic direction and oversight for DoW's entire research, development, and prototyping enterprise, which includes providing critical input on the acquisition, implementation, and use of cutting-edge technologies such as artificial intelligence (AI).

**App.408**

3. This declaration is based on my personal knowledge as well as information made available to me through reasonable diligence in the course of my official duties.

**Anthropic's Ability to Affect AI Model Functionality**

4. As outlined in the Urgent Supply Risk Analysis (the "Analysis") provided to the Secretary of War, Anthropic PBC has become a supply chain risk following a progression of risk that reached a saturation point due in material part to the behavior of its leadership during the course of contract negotiations with DoW in late 2025 and early 2026 and as evidenced by Anthropic's existing contractual terms of service, which prohibited activities that are otherwise lawful for DoW to carry out.    In addition to the documents produced in the Administrative Record, the Department relied upon unwritten information in preparing the Analysis, including information learned through the professional experience and subject matter expertise of Department personnel and oral communications with prime vendors and Anthropic leadership.    That additional information is set forth in my previous declaration and below.

5. Prior to the Supply Chain Risk designation, Anthropic was able to affect the functionality of its large language models (LLMs) both before deployment to DoW systems during the model training process, as well as

2

after deployment through model updates and through continual administration of the models.

6.    As explained in the Analysis, the relatively opaque nature of the LLM technology that DoW procures from Anthropic creates a baseline risk. Unlike traditional software, which has reviewable code, AI models have "black box" capabilities, meaning that DoW has limited insight into how exactly Anthropic builds them, in part because Anthropic's unique building processes are considered proprietary intellectual property and because, unlike traditional software, AI models have weights or parameters that number approximately 5 to 10 trillion per model.    These unique weights determine the AI system's output by performing complex analytical functions, but their numerosity makes rigorous analysis or auditing of its output mathematically impossible.    This technical opacity makes it difficult for DoW to assess technological features that may be encoded into the LLM product and that may cause it to subvert the appropriate execution of mission applications, also known as "model poisoning," or to fail to perform altogether.

7.    DoW still can identify at least two important ways in which Anthropic can affect the functionality of its models prior to delivery to DoW. First, Anthropic selects and has full control over the types of data, methodologies, and parameters or "weights" used to train its commercially,

3

**App.410**

publicly available models, which directly impacts model behavior and functionality. The weights can be encoded by policy preference and by choice of training data. This allows Anthropic to control the complex weights that guide the model's decision-making. Anthropic may therefore embed certain preferences into the model to ensure certain outcomes when presented with certain information, such as redlines that prevent any activity that the model would construe as violative of Anthropic's policy preferences.

8. Second, Anthropic has specially built a "Gov wrapper" around their commercial models that was controlled exclusively by Anthropic's Gov team. This feature permits the Government to use the model in ways that differ from the standard commercial model, but it also can refuse certain uses, as Anthropic determines. For example, Anthropic's terms of service prohibit its AI technology from being used for weapons systems design or production. If those prohibitions are embedded into the model parameters, DoW weapons manufacturers using the model to optimize the physics, material science, or aerodynamics of a weapon system could have their queries refused or corrupted.

9. These models are then deployed onto DoW networks through Amazon Web Services (AWS) via its Bedrock platform, which provides access to AI models. DoW or vendors' systems supporting DoW contracts, such as

4

**App.411**

Palantir's Maven Smart System, then access the models via querying.

10.     After delivery to DoW, Anthropic can continue to affect the functioning of its models in at least two crucial ways: (1) model updates for major releases of new capabilities and (2) ongoing operational alterations for an existing model that could turn "refusals"' or "guardrails" on or off.     With regard to alterations to existing models, historically, the Anthropic Gov team worked with DoW to incorporate real-time feedback on the models specific to DoW use-case deployments; the Gov team would use DoW's feedback to tweak certain model behaviors, such as a refusal to perform a particular function, by altering the model weights.     Anthropic would then deliver the altered model and work with AWS to load it into Bedrock.     In coordination with DoW, Anthropic and AWS would then work with Palantir to perform the limited set of tests possible to evaluate the functionality of the altered model before rolling it out broadly to DoW operational users.     However, the testing capability is limited and cannot validate all facets of the model; model updates must therefore be approved based on significant trust in the vendor.     DoW had accepted this risk with Anthropic through 2025; but Anthropic leadership's statements, including in public and in contract negotiations, and actions in January and February of 2026 resulted in a break down in the significant trust required for DoW to use the company's model.

5

**App.412**

11. With regard to control plane layer access, DoW understands that AWS had provided approximately twelve cleared Anthropic engineers with administrative access, which allowed them to affect the functioning of the model by pushing updates or changing its functionality, including the ability to remove the model from the system or shut it down altogether. While such changes generally would be requested and tested by DoW, given the size of the model, it is technologically possible for Anthropic to make simultaneous, unrequested changes of which DoW would not be aware or know to test. Following the Secretary's supply chain risk designations, on March 6, 2026, DoW worked with AWS to remove Anthropic's direct access so it could no longer provide model updates and removed Anthropic's cleared personnel's direct access to the control plane layer to limit the risk of Anthropic taking action that could disrupt ongoing military operations.

### Supply Chain Risks and National Security Harms

12. DoW uses Anthropic's model in multiple ways, including in ongoing military operations, the visualization of assets and capabilities, and proposing orders of operations. Such operations vary along with the missions of the Department, from routine to critical and time-sensitive.

13. Anthropic's Claude was the first AI model available to function in DoW's classified networks and one of the first AI models integrated into DoW

6

**App.413**

systems through AWS, which was awarded the first contract in 2016. Anthropic was originally and primarily integrated into DoW's system mainly as a subcontractor through prime contractors. This limited direct engagement with the Department and its personnel and limited negotiations about contract terms directly related to Anthropic's models.

14. In late 2025, DoW began direct negotiations with Anthropic regarding a contract for the use of its AI model. On January 9, 2026, to eliminate limits on lawful military applications of AI, the Secretary of War directed that all contracts for AI services include standard language allowing "any lawful use." DoW, therefore, sought to implement these terms during its ongoing contractual negotiations with Anthropic.

15. The risk of operational interference by Anthropic escalated due to the unusual degree of control that Anthropic began insisting on retaining over the model in contracts with the Department, as compared to Anthropic's competitors. Anthropic's adversarial posture towards DoW's statutory mission and the manner in which it is conducted further escalated the risk.

16. Anthropic's leadership demonstrated an intent to prevent the U.S. military's lawful use of their LLM product, Claude, despite the company's publicly stated knowledge that foreign adversaries of the United States have a practice of stealing Anthropic's LLM technology for their own unrestricted

7

use.[1]    This asymmetrical posture, imposed by Anthropic, disadvantages the U.S. military vis-à-vis its adversaries.    During the 2026 contract negotiations—as documented in part in my email correspondence with Anthropic's CEO, Dario Amodei, which are in the administrative record— Anthropic's leadership insisted on multiple redlines that it would not allow the U.S. military to cross when using Claude for lawful purposes.    The company's leadership insisted on imposing restrictions on DoW's lawful military capability development, operations, and intelligence missions, even though it would impair the capabilities of the U.S. military relative to our adversaries.    In short, Anthropic made clear that it will not allow the Government to deploy Claude for multiple lawful uses.    Determinations about lawful military uses, however, must rest solely with DoW and not with a private company.

17.    Moreover, throughout contract negotiations and in the press, Anthropic attempted to characterize itself as a trusted partner to DoW. However, Anthropic's continued attempts to dictate to DoW what the nature of the Department's relationship with Anthropic is or has been demonstrates Anthropic's intent to insert itself into DoW decision-making.    Moreover,

---

[1]  https://www.anthropic.com/news/detecting-and-preventing-distillation-attacks.

8

**App.415**

while Anthropic has been involved indirectly with DoW for years as a subcontractor through prime contractors, it only recently has become directly engaged with DoW. These direct negotiations have not demonstrated credibility in Anthropic's claims to be a trusted partner in DoW's supply chain.

18. While Anthropic has tried to disclaim a desire to have an approval role in DoW's decision-making, Anthropic's leadership repeatedly sought to insert themselves into such decision-making and assert control over military operations. In a contract negotiation meeting on December 4, 2025, Anthropic's leadership expressed that even during active military operations, DoW would have to call Anthropic in real time to seek authorization for a usage exception to one of their redlines, which are not prohibited by law. Alarmingly, that statement demonstrated not only that Anthropic demanded an operational veto of DoW's decision-making, but that Anthropic would seek to exercise that veto, possibly in situations where any delay or disruption to U.S. military operational decisions and execution could endanger American lives and national security. Anthropic's leadership doubled down and confirmed in an internal company memorandum published in February that the company sought to impose multiple restrictions over the Government's lawful use of Claude, including safety mechanisms that may be outside the

9

**App.416**

control of DoW.[2]    If accepted, this would fundamentally insert Anthropic into military decision-making related to those issues, and it engenders concern about other redlines the company may have, now or in the future.

19.    Indeed, Anthropic's redline limitations in its current contract with DoW through AWS and Palantir underscore the extent to which Anthropic leadership has attempted to control how DoW may lawfully employ its technology.    For example, Anthropic's terms of use prevent certain straightforward uses for DoW, such as battlefield management applications, kinetic actions for missile defense, operations against military bases of U.S. adversaries, and development of weapons systems.    The terms of use likewise prevent DoW contractors in the supply chain from doing the same. Under these terms, a prime contractor using Anthropic's model to assist in designing a missile propulsion system could pose a physics-related question regarding the performance of the missile to the model to which the model may refuse to provide an answer or an accurate response, which could undermine the safety or performance of the weapon.    These terms of use restrictions, combined with Anthropic's ability to make its model work (or not work) in ways that are inconsistent with DoW needs based on Anthropic's policy

---

[2]  https://www.theinformation.com/articles/read-anthropic-ceos-memo-attacking-openais-mendacious-pentagon-announcement.

10

preferences creates a significant risk.

20.   In addition, Anthropic's CEO stated publicly in early 2026 that he believes AI in warfare necessitates a system of oversight that is different from the Article II powers of the Commander-in-Chief and ought to be distributed among other branches of government.   For example, in a blog post published in January 2026 in the midst of Anthropic's contract negotiations with DoW, he wrote: "There need to be limits to what we allow our governments to do with AI, so that they don't seize power or repress their own people.   The formulation I have come up with is that we should use AI for national defense in all ways except those which would make us more like our autocratic adversaries . . . .   My main fear is having too small a number of 'fingers on the button,' such that one or a handful of people could essentially operate a drone army without needing any other humans to cooperate to carry out their orders.   As AI systems get more powerful, we may need to have more direct and immediate oversight mechanisms to ensure they are not misused, perhaps involving branches of government other than the Executive."   In a New York Times interview on February 12, 2026, Anthropic's CEO discusses how Anthropic's leadership created its own "constitution" for its Claude AI model. He explained that "every time Claude does a task, it kind of reads [Anthropic's] constitution.   As it's training, every loop of its training, it looks at that

11

[Anthropic's] constitution and keeps it in mind.    Then we have Claude itself, or another copy of Claude, evaluate: Hey, did what Claude just do align with [Anthropic's] constitution?    We're using this document as the control rod in a loop to train the model.    And so essentially, Claude is an A.I. model whose fundamental principle is to follow [Anthropic's] constitution."

21.    As I previously explained, the Department also learned that, in 2025, the U.S. Centers for Disease Control's (CDC) lawful use of Anthropic's LLM technology to support its infectious disease prevention research mission was limited by Anthropic's updates to safety filters in the LLM product CDC was using.    The company failed to inform the prime contractor and the agency upfront about updates it made to these filters or how the filters could limit the product's functionality in relation to the CDC's sensitive infectious disease research.    And in fact, the filters caused the product to stop functioning normally for various sensitive, but research-aligned queries, an issue that remained unresolved into 2026.    DoW learned about this incident in the context of its own negotiations with Anthropic and assessed that Anthropic's demonstrated lack of transparency about the limits it had embedded in its AI models, and its apparent unwillingness to work with the government's prime contractors to enable mission continuity, creates operational risk that Anthropic may make updates to its model that cause the

12

**App.419**

model to no longer function as expected when used for sensitive, but lawful, purposes such as the CDC's research or DoW's military operations.

22. Additionally, as discussed in detail in my previous declaration, the Department learned that an Anthropic executive expressed concern to one of DoW's primary operational support software vendors about the potential use of Anthropic's LLM products by U.S. military analysts in support of an overseas military operation.

23. In light of these considerations, it is reasonably likely that Anthropic's leadership would alter or even shut off DoW's use of its model if Anthropic believes that the model may be used for purposes it deems, in its sole discretion, to extend beyond the company's unilaterally imposed boundaries before or during a military operation, which could endanger the lives of U.S. military personnel and civilians and compromise the United States' warfighting mission. Continuing to use Anthropic's technology under the current contract structures in any echelon in DoW's supply chain, namely the covered systems, thus presents a significant risk.

24. Taken together, this collection of risks described here and in my previous declaration demonstrates the clear technical capability and adversarial posture of Anthropic's leadership to potentially undermine lawful U.S. national security activities and objectives. Anthropic leadership's

13

**App.420**

adversarial behavior has elevated the supply chain risk to a saturation point. DoW uses Anthropic's model in multiple ways, including in ongoing military operations.    If Anthropic were to interfere during an operation, whether by shutting off access to the model or altering its functionality, such interference could cause serious harm to national security and loss of human life.    Indeed, such interference with active operations could occur even without Anthropic deciding to intervene in real time.    A limitation that Anthropic previously built into the model, and failed to disclose to the Department or its prime contractors, such as with the CDC, could prevent or alter certain functions during an active operation, leading to these serious consequences.    This risk within a covered system is intolerable and warrants the designation under 41 U.S.C. § 4713.

25.    In assessing these significant supply chain risks and harms to national security, DoW considered whether less restrictive means than exclusion and removal could mitigate the supply chain risk and national security harm.    While each risk identified may not, standing alone, have necessitated exclusion and removal of Anthropic from DoW's supply chain, when considered in the aggregate, a significant supply chain risk exists.    The only potential mitigation to this collective set of risks—acquisition of LLM products with the usage terms and technical and service delivery

14

specifications DoW requires—was not an option to which Anthropic would agree.

26.    These risks and possible mitigation options were considered in the aggregate and in light of the escalating tension over the key differences concerning authority to determine DoW's lawful use of Claude during DoW's contract negotiations with Anthropic.    DoW ultimately determined that Anthropic's conduct constituted a fully mature and significant supply chain risk—including increased potential for AI model manipulation, insider threat risk, data exfiltration, and denial of service—that posed a direct, unmitigable risk to DoW's warfighting capabilities and national security mission.

27.    Finally, it has been more than 30 days since DoW notified Anthropic of its supply chain risk designation; to-date, DoW has not received a request from Anthropic to reconsider the designation or a notification of its intent to do so, per the requirements and procedures for requesting reconsideration of a Section 4713 determination.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 20th day of April, 2026, at Washington, DC.

Emil Michael

15