**ORAL ARGUMENT SCHEDULED FOR MAY 19, 2026**

**No. 26-1049**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ANTHROPIC PBC,
*Petitioner,*

v.

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF WAR,
*Respondents.*

---

On Petition for Review of Department of War 41 U.S.C. § 4713 Notice

---

**CONSENT *AMICI CURIAE* BRIEF OF INDUSTRY TRADE
ASSOCIATIONS IN SUPPORT OF PETITIONER**

---

Daniel W. Wolff
Sharmistha Das
Matthew F. Ferraro
Alexandra L. Barbee-Garrett
Stephanie L. Crawford
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
dwolff@crowell.com

*Counsel for Amici Curiae*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici*.** *Amici* are not aware of any other parties, intervenors, or *amici* who have entered an appearance in this Court, other than those listed in Addendum A of Petitioner's emergency stay motion or disclosed by other *amici* to date.

**Action Under Review.** References to the actions at issue in this case appear in Anthropic PBC's Petition for Review, emergency stay motion, and associated exhibits.

**Related Cases.** To date and to *amici*'s knowledge and belief, this case has not previously been before this Court, any other United States Court of Appeals, or any other court in the District of Columbia. Anthropic has challenged its designation as a supply-chain risk under a distinct statutory authority in *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-01996 (N.D. Cal. complaint filed Mar. 9, 2026), which is currently on appeal in *Anthropic PBC v. U.S. Department of War*, No. 26-2011 (9th Cir. appeal filed Apr. 2, 2026).

Dated: April 22, 2026                                    /s/ Daniel W. Wolff
                                                                    Daniel W. Wolff

i

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amici curiae* certify the following:

TechNet does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in TechNet.

The Software & Information Industry Association ("SIIA") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in SIIA.

The Computer & Communications Industry Association ("CCIA") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in CCIA.

The Information Technology Industry Council ("ITI") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in ITI.

# CERTIFICATION OF SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel certifies that a separate brief is necessary to provide the unique perspective of representatives of technology sector companies, including those that contract with the U.S. Government, on the risks that the government's supply-chain risk determination of Anthropic pose to the enterprise of federal procurement. No other *amici* are able to provide this perspective. This brief is meaningfully different from the briefing submitted by Petitioner and not likely to be submitted by any other *amici curiae*.

Dated: April 22, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff

## TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES.................................................................................i

DISCLOSURE STATEMENT..................................................... ii

CERTIFICATION OF SEPARATE BRIEF ............................................ iii

GLOSSARY ............................................................... viii

IDENTITY AND INTEREST OF *AMICI CURIAE*................................1

INTRODUCTION .............................................................2

SUMMARY OF ARGUMENT.................................................5

BACKGROUND.............................................................8

ARGUMENT ...............................................................11

I.    ANTHROPIC HAS STANDING TO CHALLENGE THE DETERMINATION, AND THIS COURT HAS JURISDICTION TO HEAR THE CHALLENGE. .......................11

II.   THE DETERMINATION THREATENS TECHNOLOGY COMPANIES' ABILITY TO PROVIDE PRODUCTS AND SERVICES TO THE GOVERNMENT ...............................................14

    A.    The Use of Pretextual National Security Determinations in Disagreements Over Commercial Contract Terms Is Contrary to Law...............15

    B.    DoW's National Security Justifications Are Unsupported, Compounding Its Adverse Effect on Commercial Contracting.....................................18

III.  THE DEPARTMENT OF WAR'S FAILURE TO USE ESTABLISHED PROCESSES DESTABILIZES GOVERNMENT CONTRACTING AND THE TECHNOLOGY INDUSTRY. ...................................21

A.    The Department of War Failed to Follow the Requisite Process Under Section 4713. ....................22

B.    The Department of War Failed to Provide the Requisite Process to Effectively Debar a Company....................................................................24

IV.    THE AMBIGUITY AND INTERNAL CONTRADICTIONS OF THE ADMINISTRATION'S ACTIONS HARM THE BROADER TECHNOLOGY SECTOR....................................................................26

A.    The Determination Imposes Significant Compliance Burdens................................................28

B.    The Harm to Industry Has No Justified Connection to DoW's Underlying Dispute with Anthropic. ........................................................32

V.    THE ADMINISTRATION'S ACTIONS THREATEN *AMICI'*S MEMBERS' FIRST AMENDMENT RIGHTS. .............33

CONCLUSION .......................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anthropic PBC v. U.S. Dep't of War*,
 No. 26-CV-01996, 2026 WL 836842 (N.D. Cal. Mar. 26,
 2026), *appeal filed*, No. 26-2011 (9th Cir. Apr. 2, 2026) .............. 10, 19

*Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*,
 785 F.3d 1 (D.C. Cir. 2015), *as amended* (July 21, 2015) .................... 5

*Miami Herald Publ'g Co. v. Tornillo*,
 418 U.S. 241 (1974) ................................................................... 32

*Nat'l Rifle Ass'n of Am. v. Vullo*,
 602 U.S. 175 (2024) ................................................................... 33

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
 631 F.2d 953 (D.C. Cir. 1980) .................................................... 25

*Sebelius v. Auburn Reg'l Med. Ctr.*,
 568 U.S. 145 (2013) ................................................................... 13

**Statutes**

10 U.S.C. § 3252 ............................................................................ 3

10 U.S.C. § 3452 .......................................................................... 16

10 U.S.C. § 3453 ..................................................................... 14, 16

41 U.S.C. §§ 107 .......................................................................... 32

41 U.S.C. § 1323 ................................................................. 8, 10, 12

41 U.S.C. § 1327 ............................................................. 10, 13, 23

41 U.S.C. § 1906 .......................................................................... 16

41 U.S.C. §§ 3306 ........................................................................ 32

41 U.S.C. § 3307 .................................................................. 14, 16

41 U.S.C. § 4713 ............................................. 3, 8, 9, 11, 19, 22, 23, 24, 26

Pub. L. No. 103-355, § 8104, 108 Stat. 3243 (1994) ................................ 13

Pub. L. No. 119-60, 139 Stat. 718 (2025) ........................................ 14

**Regulations**

41 C.F.R. Part 201-1 Subpart C .................................................. 8

48 C.F.R. § 9.402(b) .......................................................... 24

48 C.F.R. § 52.204-29 ....................................................... 9, 29

48 C.F.R. § 52.204-30 ..................................................... 9, 28, 29

**Other Authorities**

S. Rep. No. 103-258 (1994), *reprinted in* 1994 U.S.C.C.A.N.
  2561 ...................................................................... 14

# GLOSSARY

| | |
|---|---|
| AI | Artificial Intelligence |
| FASCSA | The Federal Acquisition Supply Chain Security Act |
| SIIA | The Software & Information Industry Association |
| CCIA | The Computer & Communications Industry Association |
| ITI | The Information Technology Industry Council |

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating for a federal and state policy agenda across the country.

The Software & Information Industry Association ("SIIA") is the principal trade association for those in the business of information, including developers of artificial intelligence ("AI") models and applications.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms.

The Information Technology Industry Council ("ITI") is the premier global advocate for technology, representing the world's most innovative companies, including those that are driving American leadership in AI.

*Amici* industry trade associations submit this brief because the government actions that Anthropic PBC ("Anthropic") challenges in this

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *amici*, their members, or their counsel funded the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

1

petition carry immediate and concrete consequences for *amici*'s members and for the legal framework on which the entire government contracting community depends. Many of *amici*'s members contract with the U.S. Government, including the Department of War ("DoW"),[2] to provide mission-critical products and services, including AI technology. The designation of a major domestic AI firm as a supply-chain risk, without the thorough risk assessment required by statute, engenders uncertainty throughout the broader industry. Treating an American technology company as a foreign adversary, rather than an asset, will chill U.S. innovation and further embolden China's efforts to export its own government-backed AI technology. *Amici* respectfully request that this Court grant the petition for review.

## INTRODUCTION

On February 27, 2026, all federal agencies were directed "to IMMEDIATELY CEASE all use of Anthropic's technology" and this action was because Anthropic, the directive posited, was "forc[ing]" DoW

---

[2] The U.S. Department of War is the secondary name for the U.S. Department of Defense.

2

"to obey [Anthropic's] Terms of Service instead of our Constitution."[3] Roughly 90 minutes later, Secretary of War Hegseth announced on social media that he was directing DoW "to designate Anthropic a Supply-Chain Risk to National Security," and that "[e]ffective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic."[4] Six days after the social media activity, DoW delivered two formal determinations to Anthropic, declaring the company a supply-chain risk under both 10 U.S.C. § 3252 ("Section 3252") and 41 U.S.C. § 4713 ("Section 4713"), enacted as part of the Federal Acquisition Supply Chain Security Act ("FASCSA") (collectively, the "Determinations"). In this proceeding, Anthropic seeks review of the Determination under Section 4713 (the "Section 4713 Determination").

Section 4713 provides substantive and procedural considerations for supply-chain risk determinations. The Administration issued the

---

[3] President Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 27, 2026, 3:47 PM) ("Presidential Directive"), https://truthsocial.com/@realDonaldTrump/posts/116144552969293195.
[4] Secretary Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM) ("Secretarial Order"), https://x.com/SecWar/status/202750717469049070.

3

Presidential Directive, the Secretarial Order, and the Determinations on a basis substantively at odds with the FASCSA, and without completing the statutory procedural requirements. The consequences have been swift: contracts terminated, partnerships frozen, workflows thrown into disarray, and *amici* member companies facing a compliance crisis with no clear guidance on applicable requirements in situations where Anthropic-assisted work product is embedded into their offerings. The uncertainty coursing throughout the broader technology industry risks undermining the credibility of the U.S. AI sector and the Administration's own national and economic security objectives.

As industry trade associations with members that are government contractors and technology companies, many of which use Anthropic's signature offering, the AI model Claude, as part of or to help create products and services sold to the government, *amici* write separately to highlight the Section 4713 Determination's practical impacts on American industry. These impacts range from the challenges in continuing to provide cutting-edge commercial products and services to the government to the need for *amici*'s member companies to reengineer

their government offerings to maintain their DoW contracts. These harms affect the entire technology industry, not just Anthropic.

## SUMMARY OF ARGUMENT

As a threshold matter, *amici* support the petitioner's rights to be heard by this Court for two principal reasons. *First*, Congress provided explicit procedural steps that must be followed before taking the extraordinary step of designating any firm, let alone an American firm, as a supply-chain risk. Those steps were not followed. As the target of the Section 4713 Determination, Anthropic's injury is both "concrete" and "particularized," and that injury generates downstream effects for all of *amici*'s members that have contracts with the government and who have implemented Anthropic's models. *See Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 7 (D.C. Cir. 2015), *as amended* (July 21, 2015). As representatives of the technology industry, *amici* support Anthropic's ability to pursue its claims in this Court, as would be the case for other companies in substantially similar circumstances. Anthropic has standing for a *second* reason. It has alleged that the government has violated its First Amendment rights by impermissibly retaliating against it. *Amici* agree with Anthropic that those rights have been violated and

5

have a particular interest in Anthropic's standing to bring those claims before this Court: *amici* and their members are often involved in First Amendment cases relating to technology and its effects, including the validity of age-verification requirements, government restrictions on editorial control over algorithmic content delivery, and social media bans.

On the merits, *amici* request that the Court set aside the Section 4713 Determination for four principal reasons. *First*, the Section 4713 Determination elevates a contract dispute about commercial contracting terms to a supply-chain risk determination that affects the entire industry, imperiling the commercial contracting practices on which the government and industry have relied for decades to deliver timely and modern solutions to the government.

*Second*, the Presidential Directive, the Secretarial Order, and the Section 4713 Determination threaten the entire enterprise of federal procurement for the technology industry by disregarding the carefully constructed legal structure that *amici*'s members rely upon to make reasoned business decisions. If an executive branch agency may convert a contract dispute into a government-wide supply-chain risk determination, disregarding procedural safeguards Congress prescribed,

6

then the procurement framework Congress built protects no one. Members of the domestic technology sector will rationally recalculate whether providing products and services to the government is worth the business risk.

*Third*, to this day, the reach and effect of the government's actions are so unclear that they are causing immediate and substantial harm to the technology industry. Over the past several weeks, DoW contractors, including *amici*'s members, devoted time and resources to parsing the meaning of social media posts, inconsistent and shifting Administration statements, and vague directions on whether their offerings must be reengineered to comply with the Section 4713 Determination.

*Fourth*, the conduct in question raises serious concerns that DoW has violated Anthropic's First Amendment rights, including by compelling the company to alter its expressive product and retaliating against the company for its perceived viewpoint. *Amici*'s member companies also have an interest in preserving their rights to constitutionally protected speech.

7

## BACKGROUND

Section 4713 is part of the FASCSA, a broader law that created the Federal Acquisition Security Council ("FASC") to investigate and respond to supply-chain risk. The FASCSA authorizes two types of supply-chain security actions: (1) the Secretary of War, the Secretary of Homeland Security, and the Director of National Intelligence may issue broad "exclusion or removal orders" to prohibit agencies from sourcing (exclusion) or require removal of already-installed (removal) "covered articles," 41 U.S.C. § 1323, and (2) any federal agency may take a "covered procurement action," a process by which the issuing agency may exclude "covered articles" in a "covered procurement," *id.* § 4713(a), (k). The FASCSA defines "covered articles" broadly to include all information technology, including cloud computing services; telecommunications systems; the "processing of information [through] a system, subject to the requirements of the Controlled Unclassified Information program;" and "hardware, systems, devices, software, or services that include embedded or incidental information technology [("IT")]." *Id.*, § 4713(k)(2).

Before invoking either type of FASCSA order, the issuing agency must comply with the FASCSA's relevant substantive and procedural

8

requirements. 41 U.S.C. § 1323(c)(5)(A) and 41 CFR Part 201-1 Subpart C (procedures for "exclusion or removal orders," requiring agency to receive recommendations from, and consult with, the FASC; consider multiple, statutorily defined factors related to the safety, reliability, and security of the product or service; provide 30-day notice and an opportunity to respond); 41 U.S.C. § 4713 (procedures for "covered procurement actions," including requirement for agency to provide 30-day notice and an opportunity to respond).

While "exclusion or removal orders" are broadly applicable across all of the procurements under the order-issuing agency's purview, Section 4713 is limited to "covered procurement actions"—*i.e.*, (A) exclusion of a source that fails qualification requirements to reduce supply-chain risk; (B) exclusion of a source that fails to achieve an acceptable supply-chain risk evaluation rating; (C) finding a source non-responsible based on supply-chain risk; and (D) exclusion or withholding approval of a source as a subcontractor, *id.* § 4713(k)(4). These actions may occur on "a single covered procurement or a class of covered procurements[.]" *Id.* § 4713(b)(3)(C).

DoW cited Section 4713, authorizing "covered procurement actions," to issue the Section 4713 Determination to Anthropic. Section 4713, like the rest of the FASCSA, is implemented by mandatory clauses applicable to nearly all solicitations for government contracts, 48 C.F.R. § 52.204-29, and government contracts, 48 C.F.R. § 52.204-30. Under the governing regulations, a Section 4713 determination applies to anything "use[d] as part of the performance of the" contract to which the determination applies. 48 C.F.R. § 52.204-30.

DoW issued a nearly identical determination under Section 3252, which the U.S. District Court for the Northern District of California preliminarily enjoined. *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996, 2026 WL 836842, at *8 (N.D. Cal. Mar. 26, 2026), *appeal filed*, No. 26-2011 (9th Cir. Apr. 2, 2026). As relevant here, the district court found that DoW had failed to justify a supply-chain risk determination using the same, or substantively identical underlying documents as those supporting the Section 4713 Determination at issue in this lawsuit.

10

## ARGUMENT

### I. Anthropic has standing to challenge the Section 4713 Determination, and this Court has jurisdiction to hear the challenge.

Under FASCSA's plain text, Anthropic has standing to challenge the Section 4713 Determination under 41 U.S.C. § 1327, which provides that the U.S. Court of Appeals for the D.C. Circuit has "exclusive jurisdiction over claims arising under section[] . . . 4713[.]," 41 U.S.C. § 1327(b)(3), and "60 days after a party is notified of an exclusion or removal order under section 1323(c)(6) of this title or a covered procurement action under section 4713 of this title," it may file a petition for review. *Id.*, § 1327(b)(1).

First, DoW invoked Section 4713 governing "covered procurement actions" when it issued the Section 4713 Determination; thus this claim "arises under" Section 4713, squarely sounding in the judicial review provision's plain text. Moreover, as the Court's *per curiam* order acknowledges, DoW took "covered procurement actions" as defined by Section 4713(k)(3)(C) by terminating contracts and directing contractors not to use Anthropic as a subcontractor. *See, e.g.*, Order at 1 ("As a result, the Department has canceled its contracts with Anthropic . . . and prohibited its other contractors from using Anthropic as a subcontractor

on work performed for the Department."); Declaration of Emil Michael ("Michael Decl.") ¶¶ 19-24, Dkt. No. 2164558, at Add. 233-235 (stating that the process of excluding and removing Anthropic from DoW systems "has [ ] been initiated"). In addition, even if the Section 4713 Determination were procedurally proper (it is not), any contract termination or subcontractor denial that relies on that Determination is a "covered procurement action" that this Court may review.

Second, even if no "covered procurement action" had yet occurred, that the Determination invokes Section 4713 and directs such covered procurement actions sufficiently triggers the judicial review provision. The plain text of the FASCSA provides this Court "exclusive jurisdiction over claims arising under section[] . . . 4713," 41 U.S.C. § 1327(b)(3), acknowledging that there can be claims under Section 4713 other than the challenges to "covered procurement actions" detailed in Section 1327(b)(1). Interpreting otherwise would subvert the plain text of Section 1327(b)(3) and the principle that Congress does not implicitly foreclose judicial review. Nothing on the face of the statute suggests that Section 4713 determinations may be issued, yet be unreviewable until DoW takes the preliminary step of a "covered procurement action."

12

Third, despite citing only to that provision, the Section 4713 Determination appears to effectuate an "exclusion or removal order" under Section 1323(c)(5) for *all DoW procurements* without the need for the procedural steps that the FASCSA requires. That is how government contractors, including *amici*'s members, are experiencing the Section 4713 Determination: it is being used to justify solicitation and contract actions that will require them to remove or exclude Anthropic from their DoW offerings. *See* 41 U.S.C. § 1323(c)(5). To deny judicial review for the Section 4713 Determination would enable Defendants to use Section 4713 to upend entire industries with neither basic procedural safeguards nor any remedies required by the FASCSA when either mechanism is invoked. This result would cause Anthropic and *amici*'s members to continue experiencing harm indefinitely, with no path to relief.

Regardless of the references to "exclusion or removal orders" and "covered procurement actions" in Section 1327, Congress made its intent for this Court to have exclusive jurisdiction over all FASCSA-related claims clear in Section 1373(b)(3). Congress intended to ensure judicial review of all claims arising under Section 4713 and offer affected parties a means of challenging the government's actions, and Congress intended

13

for that review to take place in this Court. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (requiring Congress to "clearly state[ ]" that a statutory provision is jurisdictional).

## II. The Section 4713 Determination threatens technology companies' ability to provide products and services to the government.

For over thirty years, Congress has required federal agencies, to the maximum extent practicable, to procure commercially available technology to meet their needs. *See* Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 8104, 108 Stat. 3243 (1994) (codified as amended at 10 U.S.C. § 3453 and 41 U.S.C. § 3307). Congress mandated this focus on commercial contracting to "eliminate the need for research and development, minimize acquisition leadtime, and reduce the need for detailed design specifications or expensive product testing." S. Rep. No. 103-258, at *5 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2566. Just last year, Congress directed DoW to further leverage commercially available technology. *See* National Defense Authorization Act for Fiscal Year 2026 §§ 1801, 1821-28, Pub. L. No. 119-60, 139 Stat. 718, 1221-25, 1245-52 (2025). Accordingly, *amici*'s member companies sell products

and services to the government using commercial terms and conditions, much as Anthropic has.

DoW's unsupported designation of Anthropic as a supply-chain risk because of a disagreement with Anthropic's commercial terms imperils the industry's ability to continue using commercial contracting to deliver innovative products and services to the government. First, converting a dispute over commercial terms and conditions to a supply-chain risk determination is contrary to law. Second, the national security justifications proffered to support the Section 4713 Determination are plainly pretextual. Allowing the Section 4713 Determination to stand would risk the commercial contracting practices upon which the government and industry have relied for decades.

### A. The use of pretextual national security determinations in disagreements over commercial contract terms is contrary to law.

The Section 4713 Determination, like the Presidential and Secretarial Directives that it implements, is the result of a contract dispute between DoW and Anthropic over Anthropic's commercial terms and conditions, which DoW claims were overly restrictive. The Secretarial Directive specifically cited "The Terms of Service of

Anthropic's defective altruism" as "unacceptable" before "directing the Department of War to designate Anthropic a Supply-Chain risk to National Security." [5] DoW's own record evidence before the Court establishes that its officials settled on the supply-chain risk determination only as contract negotiations deteriorated between the parties. *See* DoW, "Urgent Supply Chain Risk Analysis: Anthropic's Refusal to Permit Lawful AI Use" Memorandum (undated) ("Risk Memo"), Dkt. 2164558 at Add. 198-201; DoW, Joint Recommendation, Concurrence, and Determination to Use Section 4713 of Title 41, United States Code, Authorities to Mitigate Supply Chain Risk Related to Anthropic, PBC (undated) ("Joint Recommendation"), Dkt. 2164558 at Add. 243.

Federal law unquestionably underscores the importance of commercial contracting to ensure the government has access to the best products and services available on the market. *See, e.g.*, 10 U.S.C. § 3453 (DoW preference for commercial products and commercial services); *id.* § 3452 (incorporating 41 U.S.C. § 1906); 41 U.S.C. § 3307 (preference for

---

[5] Secretarial Order, *supra* n.4.

commercial products and commercial services); *id.* § 1906 (list of laws inapplicable to procurements of commercial products and commercial services). Commercial contracting traditionally relies on the use of commercial terms and conditions, supplemented only with "those contract clauses that are required to implement provisions of law or executive orders applicable to acquisitions of commercial products, commercial components, or commercial services; or determined to be consistent with standard commercial practice." 41 U.S.C. § 3307(e)(2); *see also* 10 U.S.C. § 3452. Nothing in FASCSA or other federal procurement law permits DoW to designate a supply-chain risk based on a dispute over commercial contract terms. And with good reason. The use of commercial contracting terms allows companies to meet the government's procurement needs quickly and inexpensively.

Consistent with the commercial contracting preferences enshrined in law, many of *amici*'s members are DoW contractors that proudly sell their commercial offerings to DoW under commercial terms and conditions. *Amici*'s members would be harmed if their ability to sell commercial offerings to DoW were interrupted, or if commercial terms and conditions were subject to protracted negotiation. Furthermore, if

17

DoW, or any agency, can use the specter of a supply-chain risk determination to dispute commercial terms and conditions, made without the legally required findings or process, it may adversely affect a company's ability to engage in commercial contracting with the government.

### B. DoW's national security justifications are unsupported, compounding its adverse effect on commercial contracting.

The Section 4713 Determination's lack of justification compounds its deleterious impact on the continued ability of industry and the government to benefit from commercial contracting. The Section 4713 Determination resulted from a contract dispute between DoW and Anthropic, see Risk Memo at Add. 198-201, but DoW cites no evidence that Anthropic has taken any action to justify that Determination. Instead, DoW declares that the Department is still "working with its counterintelligence and law enforcement partners to assess the *potential* risk that Anthropic's LLM products *may contain* technical exploits, including ones that *could have been* embedded by foreign nationals[.]" Michael Decl. ¶ 25, Dkt. 2164558, at Add. 235 (emphases added). To the

18

extent that there exists a *bona fide* national security concern, DoW has yet to find it, let alone clearly identify it.

The lack of logic in DoW's position also supports the conclusion that the Section 4713 Determination is a pretext. On the one hand, DoW asserts that Anthropic is an "urgent" national security risk, 41 U.S.C. § 4713(b), and directs that, "immediately," "no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with [it]."[6] On the other, DoW orders Anthropic to continue to provide this supposedly risky service to DoW for six months,[7] and has reportedly expanded its use of Anthropic's latest model, Mythos, amid this litigation and in apparent tension with the Determination.[8]

Notably, the U.S. District Court for the Northern District of California, reviewing essentially the same record in Anthropic's parallel

---

[6] *Id.*

[7] *Id.*

[8] Maria Curi, Sam Sabin, *Scoop: NSA using Anthropic's Mythos despite blacklist*, Axios (Apr. 19, 2026), https://www.axios.com/2026/04/19/nsa-anthropic-mythos-pentagon; Ashley Capoot, *Trump says Anthropic is shaping up and a deal is 'possible' for Department of Defense use*, CNBC (Apr. 21, 2026) https://www.cnbc.com/2026/04/21/trump-anthropic-department-defense-deal.html.

challenge to the Section 3252 Determination, concluded that DoW's proffered rationales for the national security determination "appear pretextual." *Anthropic PBC*, 2026 WL 836842, at \*21. The timing of the administrative record gave rise to the district court's inference that it was created "to justify the foreordained conclusion ordered in Secretary Hegseth's mandate to 'designate Anthropic a Supply-Chain Risk to National Security' on February 27." *Id.* (citation omitted).

The district court also drew an inference of pretext from "inconsistencies" in the DoW record. On one day, DoW proffered evidence purporting to show officials preparing various documents to support the Section 3252, but a day after that determination was finalized and before DoW transmitted it to Anthropic, a DoW official "cordially exchanged drafts of Anthropic's usage terms" with Anthropic, writing, "'After reviewing with our attorneys and seeing your last draft (thanks for being fast), I think we are very close here.'" *Id.* (citation omitted). "In sum, the contradictory positions, the procedural defects, and the rushed process following a public declaration of the foreordained conclusion all indicate that the actions were arbitrary and capricious," the court held. *Id.*

20

The same is true for the Section 4713 Determination, which is premised on the same record. The evidence shows the Section 4713 Determination is an outcome in search of a justification. Allowing such a determination premised on unsubstantiated national security concerns to eclipse the traditional commercial contracting model favored by law and policy harms not only *amici*'s members, but also the government customers that commercial contracting is intended to serve.

## III. The Department of War's failure to use established processes destabilizes government contracting and the technology industry.

Many of *amici*'s members, like other government contractors, participate in government contracting because executive agencies and contractors are mutually bound in a procurement system with stable rules, predictable terms, and legal channels for dispute resolution. But the Section 4713 Determination short-circuits that carefully crafted process by effectively excluding the company from DoW contracting. Doing so is a *de facto* debarment or, at a minimum, a *de facto* exclusion order designed to functionally ban Anthropic from the government contracting ecosystem. Because it has this authority, DoW must follow the processes established by law and DoW's decision to take those actions

21

outside the statutory process for debarment cannot be shielded from judicial review.

Both Section 4713 and the law governing debarment require substantive and procedural safeguards that provide pre-deprivation rights to contractors and prevent the government from taking punitive action. In this instance, DoW did not provide the requisite process under either Section 4713 or the debarment authorities.

### A. The Department of War failed to follow the requisite process under Section 4713.

Defendants claim that they provided Anthropic with sufficient post-deprivation process under Section 4713. Defendants claim that Secretary Hegseth relied on the procedures to address "urgent national security interests" described in 41 U.S.C. § 4713(c), which enable, according to Defendants, "an immediately effective designation." Opp. to Motion for Emergency Stay ("Opp.") at 22, Dkt. No. 2164558.

Section 4713 requires—before taking any covered procurement action—an executive agency to consult with procurement officials, obtain a joint recommendation that there is a significant supply-chain risk, provide the designated entity with notice and an opportunity to respond, prepare a written determination justifying that the restriction is the least

restrictive means to accommodate the supply-chain risk, and notify Congress. But Defendants substantively and procedurally violated Section 4713(b) and (c) by failing to:

- obtain a joint determination that considered any "risk assessment made available" under the FASCSA process *before* undertaking the determination, Section 4713(b)(1), also required under the emergency procedures in Section 4713(c);

- provide Anthropic notice and an opportunity to comment, and incorporating Anthropic's response into a final justification for the determination, Section 4713(b)(2), required under the emergency procedures under Section 4713(c) "as soon as practicable after addressing the urgent national security interest[,]" "including a description of the urgent national security interest," Section 4713(c)(2)(C);

- consider "less intrusive measures" and determine that they are "not reasonably available to reduce such supply chain risk," Section 4713(b)(3), also required under the emergency procedures under Section 4713(c); and

23

- apply the determination "to a single covered procurement or a class of covered procurements," Section 4713(b)(3)(C), also required under the emergency procedures under Section 4713(c).

Instead, the Section 4713 Determination was issued after the Secretarial Directive, justified only by the "risks" in Anthropic's commercial terms (*see* § II, *supra*), applicable to all Anthropic products and services and all DoW procurements, Dkt. No. 2164558, at Add. 203. By issuing the overbroad Section 4713 Determination without following the required process, DoW introduced a new and unbounded risk into every company's calculus about whether to do business with the federal government.

## B. The Department of War failed to provide the requisite process to effectively debar a company.

DoW's actions were akin to debarment, and DoW failed to provide the requisite process for a debarment as well. Before the government may exclude a company from federal contracting, the law requires a set list of procedural safeguards: notice of the factual basis for the action, an opportunity to respond, and a written determination grounded in law and fact. *See, e.g.*, 48 C.F.R. § 9.402(b) (debarment may "*not*" be used "for purposes of punishment") (emphasis added).

24

Defendants claim that "[t]he permissibility of this statutory post-designation process is particularly clear in this government-contracting context" and argue that broader due process principles do not apply because the government did not debar Anthropic or broadly preclude it from a "chosen trade or business." Opp. at 22-23 (internal quotation marks and citation omitted). Not so. The Section 4713 Determination functionally bars Anthropic from DoW work (at least, once the six-month transition period expires) and, far from impacting Anthropic alone, the Section 4713 Determination prohibits contractors, including *amici*'s members, from incorporating or using Anthropic offerings in their own products and services provided to DoW. To that end, DoW is now effectuating the Section 4713 Determination through "covered procurement actions" under recent solicitations and their active contracts. Together, these actions mean that Anthropic will have virtually no way to access the DoW market at the end of transition period.

Moreover, contractors, including *amici*'s members that use Anthropic's offerings to support their offerings to DoW, rely upon due-process protections to protect themselves when contracting with the government. *See Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631

25

F.2d 953, 961-67 (D.C. Cir. 1980) (holding that contractor's due process right was violated when it was not provided notice and an opportunity to respond to a "stigmatizing governmental defamation having an immediate and tangible effect on its ability to do business"). The Section 4713 Determination does not "merely preclude[] petitioner's software from being used in the performance of Department contracts," Opp. at 23; it functionally bars Anthropic's participation in the Department's supply chain, including through the provision of "incidental information technology" services. *See* 41 U.S.C. § 4713(k)(2). Further, DoW has appeared to interpret the effect of Section 4713 more broadly, to bar Anthropic from all present and future DoW contracting work.

## IV.  The ambiguity and internal contradictions of the Administration's actions harm the broader technology sector.

The Section 4713 Determination cannot be treated as a simple vendor swap; Anthropic's offerings have a pervasive, foundational role in cutting-edge technologies, so the Section 4713 Determination's practical consequences for *amici*'s members have been sweeping and immediate. Understanding why the Section 4713 Determination imposes such extraordinary burdens on *amici*'s members requires understanding how

26

Claude functions within the technology ecosystem. Claude is not a plug-in application that a company can uninstall and easily replace. It is incorporated into the technology stack—the collection of infrastructure, operations, and data through which companies build, test, and deliver their products and services. In addition to productivity tools and process automation, companies use Claude to write code incorporated into other applications at every level of the stack. Once that code is embedded, it cannot be cleanly extracted, and in many instances a contractor cannot readily determine whether a given line of code or software component originated with Claude's assistance. Other companies use Claude to test the security and performance of their existing offerings, including testing for compliance with the government security certifications that many of *amici*'s members are required to hold. And more recently, certain *amici* member companies are also using Claude to discover and remediate potential software vulnerabilities. Claude's pervasive, foundational role is also why the Section 4713 Determination's costs and disruptions are so severe.

27

**A.  The Section 4713 Determination imposes significant compliance burdens.**

The known requirements stemming from the Section 4713 Determination are already causing *amici*'s members to expend significant resources on compliance and contingencies. The Section 4713 Determination is not limited to what a government contractor delivers to DoW, but it also covers how that contractor "builds" its offerings and performs its work. For government contractors, like many *amici* members that use Claude in the development of their products or other workflows, the compliance question is not simply "did we sell Claude to DoW?" but "is Claude touching, in any way, anything we do to perform this contract?" *See* Michael Decl. ¶ 24.

The DoW Memorandum signed by DoW Chief Information Officer Kirsten Davies on March 6, 2026 ("DoW Memo") [9] imposed nearly immediate implementation deadlines, directing senior leadership to incorporate the restriction into "all current and future contracts" and instructs contracting officers to notify contractors within 30 days of the

---

[9] Mem. from Dep't of War Chief Info. Off. to Senior Pentagon Leadership et al., *Removal of Anthropic, PBC Products in DoW Systems*, Dep't of War 2 (Mar. 6, 2026), https://www.cbsnews.com/news/pentagon-ai-anthropic-memo-remove-from-key-systems/.

new requirement. The DoW Memo further mandates that all DoW Components and Defense Industrial Base ("DIB") partners represent their full compliance in writing to their contracting officer within 180 days.[10] At the same time, the DoW Memo explicitly "prohibits waivers," making the DoW CIO the sole authority for granting a temporary exemption in "rare and extraordinary circumstances"—and only where the requesting Component submits a comprehensive risk mitigation plan demonstrating that no viable alternative exists. That near-total prohibition on relief significantly narrows the existing regulatory waiver framework. *See* 48 C.F.R. § 52.204-30(b)(4)-(5).

While the DoW Memo suggested a 180-day compliance deadline, the experience of *amici*'s members is that DoW is requiring government contractors to begin the complex process of coming into compliance far sooner—within days or weeks—in order to make the representations that contracting officers may now demand under every individual contract. *See* 48 C.F.R. § 52.204-30(b)(4). As a result, while DoW itself has 180 days to comply, contractors must accomplish an arguably more complex task

---

[10] *Id.*

in a fraction of that time: identifying every point of contact between Claude and their DoW work, designing a path to replace it, and certifying under each applicable contract that such work is done.

The compliance process itself is resource-intensive. *Amici*'s members must assess the contractual and technical impact of excluding or removing Anthropic products and services from their offerings across their portfolios of DoW contracts. Contractors are required to review new DoW solicitations to either request a waiver or redesign their DoW offerings to exclude any "covered articles" from being provided to DoW or used to perform the resulting DoW contract. *See* 48 C.F.R. § 52.204-29(e). And where DoW has applied the Section 4713 Determination to a specific contract, the contractor must then identify its risk-mitigation actions, await potential contract modification by DoW, and then potentially modify their offerings or contracts to remove Anthropic products and services delivered to DoW or used in contract performance. *See* 48 C.F.R. § 52.204-30(b)(4), (c)(3).

The downstream commercial consequences are severe. *Amici*'s member companies that have collaborated with Anthropic to build cutting-edge commercial offerings may be unable to provide those

30

products, as built, to DoW. Given the pervasive, foundational role of Claude in many of *Amici*'s members' offerings, many have found no viable substitute for some Claude workflows, leaving them with alternatives that, at a minimum, will require extensive re-development and training, and even then, may still not be fit-for-purpose. As a result, these *amici* members may be forced to rebuild mature and long-tested offerings, under compressed timelines and substantial cost. Indeed, contractors, including *amici*'s members, have already begun to incur some of those costs, including the costs of re-engineering and re-procurement and the associated legal and administrative burdens. Rather than innovate or improve, *amici*'s members are forced to invest time, personnel hours, and money into modifying and rebuilding offerings that incorporate Anthropic's products and services, and confirming their updated offerings meet the contractual requirements. For those *amici* member companies that use Anthropic, replacing its models would require, in some instances, at least six months of development (including lost productivity) and model training to achieve the same level of security that the current model offers.

31

**B.    The harm to industry has no justified connection to DoW's underlying dispute with Anthropic.**

*Amici*'s members are bearing real costs to address DoW's perception of risk posed by Anthropic, even though DoW's concerns with Anthropic relate entirely to its commercial terms and conditions. *Amici*'s members are actively receiving outreach from DoW seeking compliance with the exclusion and removal requirements, and contractors are being pushed to modify contracts and restructure their offerings even as the legal validity of the Section 4713 Determination is subject to litigation.

The issue is compounded by the unresolved scope of the Secretarial Order, which raises questions the Section 4713 Determination alone does not address. As a result, *amici*'s members must stake consequential business decisions today without any authoritative guidance. Contractors are grappling with many unanswered questions: Is the ban on "commercial activity" still incoming, separate from and broader than the Section 4713 Determination's implementation? If so, does it reach Claude-generated code already incorporated into a product currently shipping to commercial customers? Does a cloud platform that hosts Claude alongside dozens of other AI models qualify as a "partner that does business with the United States military," and if so, is it prohibited

32

from hosting Claude for customers with no government connection? These questions have no clear answers. They describe the actual uncertainty in which *amici*'s members are making immediate, material, irreversible business decisions.

## V. The Administration's actions threaten *amici*'s members' First Amendment rights.

*Amici*'s members engage in speech through their incorporation of Anthropic, an expressive product, into their own offerings, through competition for government and commercial business; and through government contracting. DoW's designation of Anthropic as a supply-chain risk compels member company speech with regard to the message of their expressive offerings, and in their associations with business partners. *Amici*'s members engage in a wide range of speech: through expressive products and services, algorithmic speech, competition for commercial and government business, government contracting, and terms of use.

First, if the government's actions amount to compelling a contractor to alter the message embodied in an expressive product, like Claude, those actions raise serious compelled-speech concerns. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974). DoW's designation also

33

creates an unjustified, restrictive barrier to competition, 41 U.S.C. §§ 107, 3306(a)(2)(B), based on a government contractor's willingness to participate in the government's compelled speech by excluding Anthropic.

Second, the Section 4713 Determination is pretextual. If the government retaliated against Anthropic based on the perceived viewpoint of the company and its leadership, that retaliation is constitutionally impermissible regardless of whether the government characterizes its actions as procurement decisions. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180-81 (2024); *id.* at 203-04 (Jackson, J., concurring). *Amici*'s members also have First Amendment rights that they wish to exercise, and have an absolute right to exercise, without the threat of unlawful governmental interference.

# CONCLUSION

*Amici* respectfully request that the Court grant Anthropic's petition for review.

April 22, 2026

Respectfully submitted,

/s/ Daniel W. Wolff
Daniel W. Wolff
Sharmistha Das
Matthew F. Ferraro
Alexandra L. Barbee-Garrett
Stephanie L. Crawford
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
dwolff@crowell.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(e)(3) because it contains 5,961 words, excluding the portions exempted by Rule 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook.

/s/ Daniel W. Wolff
Daniel W. Wolff

April 22, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on April 22, 2026, I have caused the foregoing to be filed electronically with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Daniel W. Wolff
Daniel W. Wolff