**[ORAL ARGUMENT SCHEDULED MAY 19, 2026]**

**No. 26-1049**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ANTHROPIC PBC,
Petitioner,

v.

UNITED STATES DEPARTMENT OF WAR, et al.,
Respondents.

———————————

On Petition for Review of Agency Action

———————————

**BRIEF FOR RESPONDENTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

SHARON SWINGLE
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.   Parties and Amici

Petitioner is Anthropic PBC.

Respondents are the United States Department of War and Peter B. Hegseth, in his official capacity as Secretary of War.

Amici in this Court are employees of OpenAI and Google in their personal capacities; Joel Thayer, Senior Fellow at the America First Policy Institute; Foundation for Individual Rights and Expression; Electronic Frontier Foundation; Cato Institute; Chamber of Progress; First Amendment Lawyers Association; Alan Z. Rozenshtein; Freedom Economy Business Association; Candide Group; Howard Fischer; Thomas Haslett; Investor Advocates for Social Justice; Mission Driven Finance; The Nathan Cummings Foundation, Inc.; Omidyar Network LLC; Pluralize Capital; The Interfaith Center on Corporate Responsibility; Humanize Wealth; John O'Farrell; 149 former judges; ACT | The App Association; American Civil Liberties Union; Dean Ball; Catholic Moral Theologians and Ethicists; Center for Democracy and Technology; ChinaTalk; Martin Chorzempa;

Computer & Communications Industry Association; Democracy Defenders Fund; Fathom; Taxpayers Protection Alliance Foundation; Fifty Years; former senior national security government officials; former Service Secretaries; Leon E. Panetta, Former Secretary of Defense; Foundation for American Innovation; Institute for Security and Technology; Alex Imas; Faith Family Technology Network; Information Technology Industry Council; Institute for Progress; Saif Khan; Pangram; Dwarkesh Patel; retired senior military officers; Roots of Progress; Software & Information Industry Association; TechNet; and James Lakner.

### B. Rulings Under Review

The agency actions under review are the covered procurements actions taken to effectuate the Secretary of War's March 3, 2026, determination under 41 U.S.C. § 4713 that petitioner presents a national-security supply-chain risk.

### C. Related Cases

This case was not previously before this Court. This Court denied petitioner's motion for a stay pending appeal and expedited this appeal on April 8, 2026. Related issues are pending before the Ninth Circuit in *Anthropic PBC v. U.S. Department of War*, No. 26-2011 (9th Cir.), though

that appeal has been held in abeyance pending the disposition here.

*/s/ Sean R. Janda*
Sean R. Janda

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 4

STATEMENT OF THE ISSUES ........................................................... 5

PERTINENT STATUTES ..................................................................... 5

STATEMENT OF THE CASE ............................................................... 5

    A.    Legal Background ................................................................5

    B.    Factual and Procedural Background ...................................8

SUMMARY OF ARGUMENT ..............................................................22

ARGUMENT .........................................................................................26

I.    The Secretary's Supply Chain Risk Determination Complied with the Statute and Was Amply Justified ...................................26

    A.    The Determination Addresses Significant National-Security Risks Stemming from Petitioner's Product Remaining on Department Systems ....................................26

    B.    Petitioner's Procedural Objections Provide No Basis to Vacate the Determination .................................................30

    C.    Petitioner's Substantive Objections Are Misplaced .....39

II.    The Determination Comported with the Constitution ...........................55

    A.    Petitioner's Due-Process Objections Are Meritless .....55

B.    The Determination Does Not Reflect Impermissible
Retaliation for Petitioner's Protected Speech ...............................62

CONCLUSION...............................................................................................69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*American Fed'n of Gov't Emps., AFL-CIO v. Reagan,*
    870 F.2d 723 (D.C. Cir. 1989) ................................................................ 67

*Anthropic PBC v. U.S. Dep't of War*, No. 26-1049,
    2026 WL 1042493 (D.C. Cir. Apr. 8, 2026) ................ 21, 22, 27, 28, 30, 46, 59

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) ................................................................ 62

*Association of Am. Physicians & Surgeons v. Sebelius,*
    746 F.3d 468 (D.C. Cir. 2014) ................................................................ 38

*Barry v. Barchi,*
    443 U.S. 55 (1979) ................................................................................. 57

*Board of Regents of State Colls. v. Roth,*
    408 U.S. 564 (1972) ...............................................................................61

*Brogan v. United States,*
    522 U.S. 398 (1998) ............................................................................... 40

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ................................................................. 38

*Camp v. Pitts,*
    411 U.S. 138 (1973)............................................................................... 43

*Cathedral Rock of N. Coll. Hill, Inc. v. Shalala,*
    223 F.3d 354 (6th Cir. 2000) ................................................................. 57

*China Telecom (Ams.) Corp. v. Federal Commc'ns Comm'n,*
    57 F.4th 256 (D.C. Cir. 2022) ................................................................ 50

*Dixon v. Love,*
    431 U.S. 105 (1977) ............................................................................... 57

*FDIC v. Mallen,*
    486 U.S. 230 (1988) ........................................................................... 56, 57

*Flytenow, Inc. v. FAA,*
808 F.3d 882 (D.C. Cir. 2015) ........................................................ 65

*Gilbert v. Homar,*
520 U.S. 924 (1997) .......................................................... 56, 57, 58

*Hartman v. Moore,*
547 U.S. 250 (2006) .............................................................. 65, 66

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
586 U.S. 63 (2019) ...................................................................... 40

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ............................................ 29, 34, 43, 46, 50

*Kartseva v. Department of State,*
37 F.3d 1524 (D.C. Cir. 1994) .................................................. 61

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020) .............................................................. 32, 38

*Lujan v. G & G Fire Sprinklers, Inc.,*
532 U.S. 189 (2001) .................................................................... 62

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
923 F.3d 209 (1st Cir. 2019) .................................................... 38

*National Council of Resistance of Iran v. Department of State,*
251 F.3d 192 (D.C. Cir. 2001) .............................................. 59, 60

*Natural Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n,*
680 F.2d 810 (D.C. Cir. 1982) ............................................... 38-39

*Nieves v. Bartlett,*
587 U.S. 391 (2019) .................................................................... 65

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
613 F.3d 220 (D.C. Cir. 2010) .................................................. 58

*Perkins v. Lukens Steel Co.,*
310 U.S. 113 (1940) .................................................................... 61

*Seven Cnty. Infrastructure Coal. v. Eagle County,*
605 U.S. 168 (2025) .............................................................. 42, 43

*Shinseki v. Sanders,*
    556 U.S. 396 (2009) ......................................................... 38

*TikTok Inc. v. Garland,*
    604 U.S. 56 (2025).......................................................... 50-51

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ....................................................... 46, 66

*Wayte v. United States,*
    470 U.S. 598 (1985) ........................................................ 65

*Webster v. Doe,*
    486 U.S. 592 (1988) ........................................................ 33

*Zevallos v. Obama,*
    793 F.3d 106 (D.C. Cir. 2015) ......................................... 56

**Statutes:**

Federal Acquisition Supply Chain Security Act of 2018,
    Pub. L. No. 115-390, tit. II, 132 Stat. 5173, 5178 ..............................5
        41 U.S.C. § 1327(b) ................................................... 4, 20
        41 U.S.C. § 1327(b)(1) ................................................ 8
        41 U.S.C. § 1327(b)(2) ................................................ 8, 43
        41 U.S.C. § 1327(b)(2)(D) ........................................... 43
        41 U.S.C. § 1327(b)(4) ............................................... 43
        41 U.S.C. § 1327(b)(4)(B)(i) ........................................ 43
        41 U.S.C. § 4713 ..................................................... 4
        41 U.S.C. § 4713(a) .................................................. 6
        41 U.S.C. § 4713(b) .................................................. 6
        41 U.S.C. § 4713(b)(1) ............................................... 7, 30
        41 U.S.C. § 4713(b)(2) ............................................... 7, 19
        41 U.S.C. § 4713(b)(2)(C) ........................................... 44
        41 U.S.C. § 4713(b)(3)(A)-(B) ....................................... 7
        41 U.S.C. § 4713(b)(3)(C) ........................................... 7
        41 U.S.C. § 4713(b)(4) ............................................... 7
        41 U.S.C. § 4713(c) ........................................ 8, 23, 33, 55, 57
        41 U.S.C. § 4713(c)(1) ............................................... 33, 37

41 U.S.C. § 4713(c)(1)(A) ...................................................... 31

41 U.S.C. § 4713(c)(1)(B) ...................................................... 31

41 U.S.C. § 4713(c)(2) ........................................................... 58

41 U.S.C. § 4713(c)(2)(A)-(B) ...................................... 19, 31, 37

41 U.S.C. § 4713(c)(2)(A)-(C) ................................................ 8

41 U.S.C. § 4713(c)(2)(B) ............................................... 32, 44

41 U.S.C. § 4713(k)(4) .................................................. 6, 19, 53

41 U.S.C. § 4713(k)(6) ............................ 6, 22, 26, 39, 40, 41, 42

Protecting Americans from Foreign Adversary Controlled
Applications Act,
Pub. L. No. 118-50, div. H, 138 Stat. 895, 955-60 (2024) ...........................40

5 U.S.C. § 553(b)(B) ............................................................... 33

5 U.S.C. § 706 ........................................................................ 38

5 U.S.C. § 706(2) .................................................................... 43

28 U.S.C. § 2111 .................................................................... 38

50 U.S.C. § 4565(a)(4)(B) ....................................................... 40

50 U.S.C. § 4565(d)(1) ............................................................ 40

## Legislative Material:

S. Rep. No. 115-408 (2018) .................................................5, 41

## Other Authorities:

Anthropic, *Claude's New Constitution* (Jan. 22, 2026),
https://perma.cc/9PCS-X6ER .......................................................12

*Manipulate*, The American Heritage Dictionary of the English
Language (5th ed. 2016) .......................................................42

U.S. Dep't of War, *Classified Networks AI Agreements*
(May 1, 2026), https://perma.cc/NJE7-ZZGM..................................................10

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| App. | Appendix |
| AI | Artificial intelligence |
| CEO | Chief Executive Officer |
| Department | Department of War |
| Pet. | Petition |
| Secretary | Secretary of War |

## INTRODUCTION

Petitioner Anthropic PBC's artificial-intelligence models have been integrated into the U.S. military's most sensitive systems, including its classified systems, and used in active military operations. Because of the nature of that technology, petitioner may encode limitations into its model that restrict the Department of War's ability to use the model for all lawful uses, without any practical ability for the Department to monitor for such manipulation. Indeed, the record describes occasions where petitioner's model has refused to perform tasks for the Department and another government client because of such pre-encoded limitations.

Given those circumstances, the Department can only permit the use of petitioner's model in its sensitive information-technology systems so long as it can trust that petitioner will not attempt to manipulate the model to restrict the Department's use. The Secretary of War has recently determined, however, that petitioner's behavior has undermined the substantial trust required to sustain that relationship and given rise to the risk that petitioner may unilaterally manipulate its model to enforce its own moral and policy judgments about the military's appropriate use of the technology. As a result, the Secretary has determined that the continued

integration of petitioner's model into the Department's systems presents an untenable national-security risk.

The effect of that determination is limited:  it prohibits the Department from contracting with petitioner when procuring certain items and prohibits Department contractors from subcontracting with petitioner for the performance of certain Department contracts.  It does not, however, prohibit petitioner from contracting with other entities, including other federal agencies and Department contractors.

Nonetheless, petitioner now asks this Court to countermand the Secretary's considered national-security judgment.  In petitioner's view, the Secretary's determination is procedurally, substantively, and constitutionally invalid.  Petitioner is wrong on all levels.  The Secretary's decision to exclude petitioner from the Department's systems is amply supported by the record and the Secretary's considered national-security judgment.  Petitioner does not seriously dispute that it has the capability to build limitations into its model that could restrict the Department's ability to use that model; to the contrary, petitioner forthrightly admits its ability to encode "normative principles" and "guardrails" into the model that constrain the model's behavior "regardless of how it is subsequently deployed or configured."

2

App.275.  Nor does petitioner dispute that, if such "guardrails" were to surface while the Department is using petitioner's model in ongoing military operations, the national-security consequences could be catastrophic.

At base, then, petitioner is left to question the Secretary's assessment of the substantial risk that petitioner would engage in such conduct.  But the Secretary's assessment is well-grounded in concrete concerns that have arisen from petitioner's behavior over several months, as well as the government's previous experience with petitioner's model.  And such predictive national-security assessments are precisely the arena where judicial deference to the Secretary's considered judgment is at its apex.

Beyond that, the Secretary properly followed statutory procedures expressly authorizing him to act quickly when national security so requires, and any perceived error in the timing or sequencing of that process would be harmless in any event.  Congress's decision to permit the Secretary in these circumstances to provide notice and opportunity to respond after, rather than before, the designation comports with due process.  And the administrative record makes clear that the Secretary's determination is based on concerns about petitioner's conduct, not its protected speech.

The petition should be denied.

## STATEMENT OF JURISDICTION

On March 3, 2026, the Secretary determined, pursuant to 41 U.S.C. § 4713, that the use of petitioner's products in the Department's information-technology systems presents a national-security supply-chain risk.  App.367. The Secretary directed the Department to take all covered procurement actions with respect to all of petitioner's covered products and services.  *See* App.390.  On March 6, 2026, the Department implemented the Secretary's determination by directing "the phased removal of all" of petitioner's "products and services" from Department systems, as well as from lists of approved products and services.  App.79-80.

On March 9, 2026, petitioner filed a timely petition for review of the Secretary's actions, invoking this Court's jurisdiction under 41 U.S.C. § 1327(b).  *See* Pet. 1; *see also* 41 U.S.C. § 1327(b) (vesting this Court with "exclusive jurisdiction over claims arising under" § 4713 and providing that a party has 60 days after being notified of "a covered procurement action" to petition for review).  The government agrees with petitioner that this Court has jurisdiction, because the Secretary has directed the Department to take all applicable covered procurement actions and the Department has in fact excluded petitioner from covered procurement opportunities and begun the

4

process of removing petitioner's model from the Department's covered systems.  *See* Pet. Br. 6-8.

## STATEMENT OF THE ISSUES

The issues presented are:

1.  Whether the Secretary's national-security supply-chain risk determination comported with the procedural and substantive statutory requirements;

2.  Whether the Secretary's determination was reasonable and reasonably explained; and

3.  Whether the Secretary's determination comported with due process and the First Amendment.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to petitioner's brief.

## STATEMENT OF THE CASE

### A.  Legal Background

The Federal Acquisition Supply Chain Security Act of 2018, Pub. L. No. 115-390, tit. II, 132 Stat. 5173, 5178, seeks to mitigate the risk that contractors may tamper with technologies incorporated in government systems.  *See* S. Rep. No. 115-408, at 1-2 (2018).  To accomplish that goal, the

statute provides agency heads with authority to take certain procurement-related actions generally aimed at ensuring that contractors who present a supply-chain risk do not have access to the agency's information-technology and telecommunications systems.

The statute defines supply-chain risk as "the risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate the design, integrity, manufacturing, production, distribution, installation, operation, maintenance, disposition, or retirement" of the relevant technology "so as to surveil, deny, disrupt, or otherwise manipulate the function, use, or operation" of the technology or "information stored or transmitted" thereon. 41 U.S.C. § 4713(k)(6). If an agency head determines that a source presents a supply-chain risk with respect to certain covered procurements, *see id.* § 4713(b), the agency head is authorized to take specified "covered procurement action[s]," *id.* § 4713(a). These actions include ordering "exclusion of [the] source" from covered procurements and "withhold[ing] consent for a contractor to subcontract with [the] particular source" on covered procurements. *Id.* § 4713(k)(4).

Congress has provided that exercise of this authority should comport with certain procedural requirements. In general, the agency head first

"obtain[s] a joint recommendation" from certain agency officials with an assessment "that there is a significant supply chain risk." 41 U.S.C. § 4713(b)(1). Then, the agency "provid[es] notice of the joint recommendation" and the "basis for the recommendation" to "any source named in the joint recommendation" and gives the source 30 days to "submit information and argument in opposition to the recommendation." *Id.* § 4713(b)(2). After considering the recommendation and any information provided by the source, the agency head then "mak[es] a determination in writing" that excluding the source "is necessary to protect national security by reducing supply chain risk" and that "less intrusive measures are not reasonably available to reduce" that risk. *Id.* § 4713(b)(3)(A)-(B). The written determination "specifies the scope of the determination," including the types of procurements covered. *Id.* § 4713(b)(3)(C). And the agency provides notice to certain congressional committees. *Id.* § 4713(b)(4).

Although this process will by default unfold before the agency head orders exclusion of the source, Congress has recognized that national security may sometimes require a different procedural sequence. Thus, if the agency head "determines that an urgent national security interest requires" immediate action, the agency head is authorized to "temporarily

7

delay" notice to the excluded source and to Congress "to the extent necessary to address such national security interest." 41 U.S.C. § 4713(c). In such a circumstance, the agency must, "as soon as practicable after addressing the urgent national security interest," "provid[e] the notice" to the source (and to Congress), "promptly consider[] any information submitted by the source," and "mak[e] any appropriate modifications to the determination based on such information." *Id.* § 4713(c)(2)(A)-(C).

A party claiming that a "covered procurement action" taken under § 4713 "is unlawful" may "file a petition for judicial review in" this Court. 41 U.S.C. § 1327(b)(1); *see also id.* § 1327(b)(3) (providing this Court with "exclusive jurisdiction over claims arising under" § 4713). This Court "shall hold unlawful a covered action" that is "arbitrary, capricious," "contrary to constitutional right," "in excess of statutory jurisdiction," "lacking substantial support in the administrative record taken as a whole," or "not in accord with procedures required by law." *Id.* § 1327(b)(2).

### B. Factual and Procedural Background

1. Petitioner is an artificial-intelligence company that has developed an AI model called Claude. App.6. Since 2024, the government has employed petitioner's model for various uses, through direct contracts with petitioner

and through subcontracts where other government contractors have integrated petitioner's model into products or services that they have provided to government customers. *See* App.31-33. Petitioner's model has been deployed by the Department for highly sensitive uses, including for classified work and to support ongoing military operations. *See* App.11; *see also* App.413 (explaining that the Department has used Claude in "multiple ways"—ranging "from routine" to "critical and time-sensitive" uses— "including in ongoing military operations, the visualization of assets and capabilities, and proposing orders of operations").

Originally, Claude was "primarily integrated into" the Department's systems "as a subcontractor through prime contractors," which "limited direct engagement" between petitioner and the Department. App.413-14. In fall 2025, however, petitioner and the Department began direct negotiations around deployment of petitioner's model on the Department's GenAI.mil platform, including discussing deployments that "might require a direct contractual relationship between" the Department and petitioner. App.13.

In January 2026, as discussions between petitioner and the Department were ongoing, the Secretary developed and issued broader internal instructions regarding the Department's AI strategy. That guidance

9

explained the Secretary's view that moving to "AI-enabled warfare and AI-enabled capability development" is "a race" between the United States and its adversaries, and that accelerating and maintaining American "military AI dominance" will be critically important to national security over the coming years. App.202 (formatting altered); *see also* App.205. As part of that broader approach to ensuring the most effective integration of AI into the military's operational capabilities, the Secretary determined that the Department must "utilize models free from usage policy constraints that may limit lawful military applications." App.206. The Secretary thus directed the relevant Under Secretary "to incorporate standard" language permitting "any lawful use" of the relevant technology "into any [Department] contract through which AI services are procured." *Id.* (quotation omitted).

Consistent with the Secretary's determination, the Department requested as part of contract negotiations that petitioner permit the Department, "and its contractors and subcontractors, to use all versions of Claude for 'all lawful uses.'" App.13-14. Petitioner refused to agree to that term. *See* App.14; *cf.* U.S. Dep't of War, *Classified Networks AI Agreements* (May 1, 2026), https://perma.cc/NJE7-ZZGM (announcing that the Department "entered into agreements with eight of the world's leading

10

frontier artificial intelligence companies" to "deploy their advanced AI capabilities on the Department's classified networks for lawful operational use"). And over the course of negotiations, petitioner's behavior led to concerns within the Department. In the Department's view, petitioner's insistence on maintaining limitations on the lawful use of its model—along with its apparent unease about the possibility that Claude had been used in a particular military operation and its generally hostile posture in negotiations with the Department—raised concerns that petitioner might manipulate its model to enforce its own policy judgments about the Department's appropriate use of the technology beyond what the law requires. *See* App.371-74.

2. Unable to resolve those issues, the Secretary on February 27 made a post on social media directing the Department to begin the process of designating petitioner a supply-chain risk pursuant to § 4713. App.77. The Department evaluated the risks and ultimately determined that continued use of petitioner's model reflected a significant supply-chain risk. That risk stems from the potential that petitioner will manipulate its model to restrict or "inhibit the [Department's] use," which would cause significant harm to the Department's "operational capabilities." App.368.

a. At the outset, the Department's determination stemmed from the "unique" risks presented by AI models because the "opaque nature of the technology" renders such models "acutely vulnerable to manipulation." App.372. Those risks begin with the system's development. As petitioner has explained, petitioner embeds its policy preferences into its model "directly through training"; the result of the "training process is a set of model weights, which are numerical parameters that encode Claude's learned behaviors and capabilities and that govern how Claude responds to any given input." App.274-75. Those model weights may encode "a set of normative principles" and "guardrails" crafted by petitioner, imposing "specific behavioral constraints that Claude is trained to follow regardless of how it is subsequently deployed or configured." App.275. Petitioner has stated that Claude's "constitution"—a "detailed description of [petitioner's] vision for Claude's values and behavior"—is "the final authority on how [petitioner] want[s] Claude to be and to behave" and "directly shapes Claude's behavior." Anthropic, *Claude's New Constitution* (Jan. 22, 2026), https://perma.cc/9PCS-X6ER.

Petitioner's interaction with the model continues after the model is initially deployed, as petitioner works to refine and update the model.

"Unlike traditional software," an AI model "require[s] constant tuning." App.372. Particularly given the "unprecedented velocity" with which AI models are evolving, the Secretary has determined that it is imperative to national security that the Department have access to "rapid model updates" and not be "working off models that are months or years old." App.205; *see also id.* (directing the Department to use as "a primary procurement criterion for future model acquisition" the ability to deploy "the latest models" within "30 days of public release").

In short, a party with "[p]rivileged access" to the model—such as the AI vendor—can "subvert the [model's] design, integrity, and operation." App.372. Those modifications occur before the initial deployment of the model and as the model is refined and updated on an ongoing basis. As a result, the "integrity" of the model "is fundamentally based on the trustworthiness of the vendor." *Id.* And the Department has an extremely limited capability to monitor any subversion that may be incorporated into the model. The Department "has limited insight into how exactly" petitioner builds its model, and AI models generally have "5 to 10 trillion" weights and parameters "per model"—a number that "makes rigorous analysis or auditing of [the model's] output mathematically impossible." App.410. Given

limits on testing capability and the need for access to the latest models, the Department lacks the ability to "validate all facets of the model" every time it is updated; instead, model updates must "be approved based on significant trust in the vendor." App.412.

These risks are not theoretical. The record reveals at least two instances of petitioner's model refusing to perform activities required by government clients based on guardrails that petitioner had embedded into the model and that were unknown to the government clients until they experienced real-time refusals. First, when petitioner initially deployed its model in classified settings, the model sometimes "decline[d] discussion of classified materials" based on protections that petitioner had built into the commercial model. App.255. Second, in a different incident, certain filters built into petitioner's model caused it "to stop functioning normally" for "sensitive infectious disease research" that the U.S. Centers for Disease Control and Prevention was conducting. App.419. Petitioner had "failed to inform the prime contractor and the agency upfront about updates it made to these filters or how the filters could limit the product's functionality." *Id.*

The Department has determined that significant harms to national security could result if petitioner were to similarly encode other limitations

into its model, particularly without the Department's knowledge or agreement. If petitioner were "to unilaterally alter" the model's design "without [the Department's] consent," those alterations could "fundamentally change the [model]'s function and create[] a significant operational risk." App.372. And given the ways in which petitioner's AI models are integrated into the Department's most sensitive capabilities— including ongoing military operations—those risks could materialize with "catastrophic downstream consequences, such as a critical defense system failing to engage." *Id.*; *see also* App.421 (reflecting the Department's conclusion that it "could cause serious harm to national security and loss of human life" if petitioner were to build limitations into its model that "prevent[ed] or alter[ed] certain functions during an active operation").

b. Against that backdrop, petitioner's conduct over time led the Department to doubt that petitioner is a trustworthy partner whose AI model can be relied on, particularly in the Department's extremely sensitive national-security systems. First, the Department concluded that petitioner's attempt to contractually limit the lawful uses for which the Department may employ its model reflects an "untenable" position that would improperly "restrict [the Department's] warfighting operations beyond the limitations

imposed by law" and effectively grant petitioner "an operational veto" over the Department's most sensitive operations. App.371. And petitioner's efforts to impose its own judgments about the government's appropriate use of its model through contractual limits indicated that petitioner might develop additional "redlines" and further restrict the Department's ability to use the model, possibly without the Department's awareness or consent. *See* App.371-73 (quotation omitted).

Those concerns were compounded when one of petitioner's executives contacted a prime contractor and "questioned the propriety of the potential use of [petitioner's model] for a sensitive military operation abroad despite that use being permitted under the existing Terms of Service." App.371. Petitioner's reaction to certain uses of its model "led to alarm by" both the Department and the prime contractor, raising "doubts" about whether— beyond the contractual limitations that petitioner continued to insist on— petitioner might "disallow[] its [model] to function in critical military operations" based on its own policy judgment. App.371-72; *cf.* App.17-18 (explaining that petitioner's attempts to limit the Department's use of its model reflect petitioner's own "judgment" and "principles").

And those reservations were further reinforced by the Department's judgment that petitioner's negotiation posture was "meant principally to benefit its public perception," even at the Department's expense. App.371. Petitioner's co-founder admits that petitioner resisted the Department's all-lawful-uses contractual term in part because acquiescing could undermine petitioner's standing "with customers, partners, investors, and the public," as well as its ability "to attract and retain" employees. App.17. As the Department determined, treating "negotiations with the [Department] primarily as tools for brand-building"—including in ways "openly hostile" to the Department—indicates a risk that petitioner will restrict the Department's ability to use petitioner's model and thus undermines the necessary trust that must exist in this context. App.371-72.

Based on the combination of that series of actions, the Department determined that it was unable "to establish the deep trust required for security collaboration" with petitioner. App.372. Instead, the Department assessed that petitioner "can and would impose its moral and policy judgments on the warfighting capabilities of the" Department by manipulating or restricting its model. App.372-73. Thus, the Department concluded that "there is a substantial risk" that petitioner "could attempt to

17

disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations" to enforce its "redlines." App.373 (quotation omitted).

3. For those reasons, on March 3, the Under Secretary of War for Acquisition and Sustainment and the Department's Chief Information Officer jointly recommended that the Secretary invoke § 4713(c) to immediately designate petitioner a supply-chain risk. *See* App.368-69. The same day, the Secretary issued written determinations that: (1) the use of petitioner's products or services in the Department's systems "presents a significant supply chain risk" and the use of the § 4713(a) authority "is necessary to protect national security by reducing that" risk; (2) "no less intrusive measures" are "reasonably available to reduce" that risk; and (3) "an urgent national security interest requires the immediate exercise of the authority in Section 4713(a) pursuant to Section 4713(c)." App.367. The Secretary determined that the designation would apply to all of petitioner's products and services covered by the statute and that the Secretary would take "all covered procurement actions" identified in the statute. *Id.*

The effect of the designation is that—with respect to covered procurements relating to sensitive information-technology systems—

18

petitioner may not provide its products or services to the Department and Department contractors may not subcontract with petitioner. *See* 41 U.S.C. § 4713(k)(4). Since the designation, the Department and its contractors have begun the process of implementing the designation. *See* Pet. Br. 6-8. The designation does not, however, prohibit petitioner from contracting or subcontracting with other federal agencies. *See* 41 U.S.C. § 4713(k)(4). Nor does the designation prohibit Department contractors from themselves contracting or subcontracting with petitioner, except as related to their work on covered Department procurements. *See id.*

In a letter dated March 3, the Secretary provided notice of the determination to petitioner. *See* App.72-73. The letter explained that petitioner was entitled to request reconsideration of the determination and to submit any information or arguments regarding such a request that it wished the Department to consider. *See* App.73-75; *see also* 41 U.S.C. § 4713(b)(2), (c)(2)(A)-(B). The letter informed petitioner that it had 30 days to submit notice of its request for reconsideration (and additional time to submit relevant information or arguments if petitioner timely submitted such a notice). App.73-74.

On March 19, just over two weeks after the determination, the Department also—following internal review procedures required for releasing sensitive information—provided petitioner with the Secretary's determination and supporting materials.  *See* App.224-32.  That supplemental letter indicated that petitioner "may submit information or arguments in opposition . . . within 30 days of receipt" and committed that the Department would "review any such information and within 30 days of the submission issue a final decision regarding any appropriate modifications to the original determination."  App.224.  Although more than 30 days have passed since both the March 3 letter and the March 19 letter, the Department "has not received a request from [petitioner] to reconsider the designation or a notification of its intent to" submit such a request.  App.422.

4.  Petitioner filed this petition for review of the covered procurement actions in this Court.  *See* 41 U.S.C. § 1327(b).  Petitioner claims that the Secretary's designation did not comport with the statute, was arbitrary and capricious, and violated the First and Fifth Amendments.  *See* Pet. 2.

Petitioner sought a stay of the Secretary's designation pending review. This Court denied that motion—without "broach[ing] the merits" of petitioner's claims—because petitioner had "not shown that the balance of

equities cuts in its favor." *Anthropic PBC v. U.S. Dep't of War*, No. 26-1049, 2026 WL 1042493, at *3 (D.C. Cir. Apr. 8, 2026) (per curiam). The Court recognized the "weighty governmental and public interests" that cautioned against "granting a stay." *Id.* The public interest did not favor "forc[ing] the United States military to prolong its dealings with an unwanted vendor of critical AI services in the middle of a significant ongoing military conflict." *Id.*

And the Court catalogued various reasons for the Department's determination about the security risks of using petitioner's model for highly sensitive military operations, including that petitioner "has now conclusively barred uses" of its model "that the Department recently deemed essential"; that the Department relies on petitioner "to provide regular updates to" its model, which also "contains built-in 'safeguards' designed to prevent uses that [petitioner] considers harmful"; that petitioner and the Department have "disagreed about uses of Claude for military operations," including uses that "were permitted under the existing usage policy"; and that the relationship between petitioner and the Department had "deteriorated to the extent that [petitioner's] CEO has publicly described the Department's statements regarding the controversy as 'completely false' and 'just straight

up lies.'" *Anthropic PBC*, 2026 WL 1042493, at *3. Given that background, the Court concluded that it would be "a substantial judicial imposition on military operations" to "requir[e] the Department to prolong its use of [petitioner's] AI technology, whether directly or through contractors." *Id.* at *3-4. The Court expedited consideration of the appeal on the merits. *See id.* at *4.

## SUMMARY OF ARGUMENT

The Secretary issued the supply-chain risk designation in this case based on his assessment that petitioner may encode limitations into its artificial-intelligence model that restrict the Department's ability to use the model for all lawful uses, without any practical ability for the Department to monitor for such manipulation. Petitioner's model has been used by the Department to support vital military operations and other missions critical to national security. The Secretary therefore exercised his authority to remove petitioner's product from the Department's sensitive systems in light of the substantial risk that petitioner may "maliciously introduce unwanted function" or "otherwise manipulate" the technology to "deny" or "disrupt" its use. 41 U.S.C. § 4713(k)(6).

The Secretary's determination complied with the procedures prescribed by statute. The Secretary based his determination on a joint recommendation and risk assessment prepared by the relevant officials. The Department provided the determination and the supporting materials to petitioner as soon as they were cleared for release, with an invitation for petitioner to submit responsive information for the Department's consideration. The statute expressly authorizes delaying notice and the opportunity to respond where, as here, the agency head "determines that an urgent national security interest [so] requires." 41 U.S.C. § 4713(c). Petitioner cannot overcome the Secretary's discretionary invocation of these procedures, particularly when no prejudice resulted from providing notice after the designation was issued.

Petitioner's challenge on the substance is equally unavailing. Petitioner acknowledges that it encodes limitations into its AI model that reflect petitioner's own views about the technology's appropriate use. There can be no real debate that the consequences for the nation's security could be catastrophic if a pre-encoded restriction prevented the Department from using the model at a pivotal moment during critical warfighting or other military operations. The Department's predictive analysis regarding the

23

substantial risk that petitioner would engage in such conduct is a core national-security assessment that courts do not lightly second-guess. Petitioner fails to meaningfully grapple with the Department's central justifications and the administrative record, much less provide any basis to disturb the Secretary's informed judgment.

The Secretary's determination also comported with the Constitution. The Secretary provided petitioner with any constitutionally required process. Petitioner received notice and an opportunity to respond after the designation, consistent with the procedures outlined in the statute. Petitioner does not contest that the substance of those procedures was adequate; instead, petitioner argues only that the Secretary was required to provide the process before, rather than after, the designation.

Petitioner is incorrect. The Supreme Court has repeatedly recognized that post-deprivation process may be constitutionally adequate where an important government interest demands prompt action. Under controlling precedent, such important interests include the government's interests in the integrity of horse racing, safety on the roads, and the effective delivery of Medicare and Medicaid. The national-security interests underlying this case more than suffice to justify Congress's decision to allow for post-designation

process and the Secretary's decision to use those statutory procedures here. That conclusion is only confirmed by the prompt provision of process, the relatively limited effect of the designation, and the government-contracting context in which this case arises.

The Secretary's determination also does not retaliate against petitioner for its protected speech. The administrative record makes clear the reason for the Secretary's decision: the Department has assessed a substantial risk that petitioner may manipulate its AI model to enforce limitations on the Department's use, in ways that could cause serious harm to national security. That risk concerns petitioner's conduct, not its speech.

Moreover, although petitioner notes that the administrative record references some of petitioner's speech, those references do not suggest any impetus to retaliate for that speech. Instead, the Department has simply considered petitioner's speech as evidence that is probative of the conduct that petitioner may engage in. Such non-retaliatory uses of speech do not offend the First Amendment.

## ARGUMENT

### I. The Secretary's Supply-Chain Risk Determination Complied with the Statute and Was Amply Justified

#### A. The Determination Addresses Significant National-Security Risks Stemming from Petitioner's Product Remaining on Department Systems

The Secretary determined that the use of petitioner's products or services in Department systems "presents a significant supply chain risk" that affects "urgent national security interest[s]" warranting immediate designation. App.367. The risk identified by the Department is the potential that petitioner will modify its AI model "in such a manner as to inhibit the [Department's] use," which could jeopardize "operational capabilities" essential to the country's security. App.368. Such threats fall in the heartland of the statute, which authorizes agencies to make supply-chain designations based on the "risk" that "any person" may "maliciously introduce unwanted function" or "otherwise manipulate" technologies incorporated into government systems in ways that "deny" or "disrupt" the use of those technologies. 41 U.S.C. § 4713(k)(6).

The Under Secretary's memorandum—which was provided to petitioner as soon as it was cleared for release—outlines the sound basis for the Department's national-security concerns. "AI systems are acutely

vulnerable to manipulation" due to the "opaque nature of the technology." App.372. In building and training its AI models, petitioner has the "ability to unilaterally alter system guardrails and model weights," including by "embedding unreasonably restrictive terms." App.371-72. The Department has limited visibility into that process given petitioner's role "as the AI model's developer, curator and maintainer." App.372-73. In such an ongoing relationship where the vendor not only delivers the initial product but also "continuously update[s] and tune[s] the product," the Department must establish and maintain confidence that the vendor will not add limitations that interfere with the Department's use of the product. App.374; *see Anthropic PBC v. U.S. Dep't of War*, No. 26-1049, 2026 WL 1042493, at \*3 (D.C. Cir. Apr. 8, 2026) (per curiam) (observing that "the Department relies on [petitioner] to provide regular updates to Claude").

Here, the Department developed strong doubts that petitioner could continue to serve as a trusted partner whose products are integrated into the Department's most sensitive systems. In contract negotiations with the Department, petitioner "conclusively barred uses that the Department recently deemed essential." *Anthropic*, 2026 WL 1042493, at \*3; *see* App.371. That conduct was problematic on its own, but it also revealed that petitioner

was driven to include "safeguards" that would restrict uses of the model based on petitioner's views about which uses it "considers harmful." *Anthropic*, 2026 WL 1042493, at *3 (quotation omitted). In the Department's view, that level of control amounted to "an operational veto" countermanding the Department's expert judgments about what "warfighting capabilities" are necessary to protect and defend the nation. App.371.

Other aspects of petitioner's behavior compounded these concerns. Notably, one of petitioner's executives contacted a prime contractor to "question[] the propriety of the potential use of [petitioner's model]" in support of "a sensitive military operation abroad." App.371. Both the Department and the prime contractor were alarmed by this "disagree[ment] about" allowable uses of Claude because such uses were clearly "permitted under the existing usage policy." *Anthropic*, 2026 WL 1042493, at *3; *see* App.373. Moreover, petitioner's "demonstrated hostility in negotiations" and pursuance of its "public perception" at the Department's expense further undermined "the deep trust required for security collaboration." App.371-72. Taken together, these circumstances led the Department to assess a significant prospect that petitioner might "disallow[] its [model] to function in critical military operations." App.371. This "evaluation of the facts by the

Executive" on matters of national security "is entitled to deference."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010).

The grave potential harms to national security only underscore the sensitive nature of the judgments at issue.  The "strategic implementation and technical integrity" of the Department's systems is at stake because petitioner's model has been deployed by the Department for highly sensitive uses, including in ongoing military operations.  App.371.  For example, "an unapproved, vendor-side modification" could result in "a critical defense system failing to engage" at a pivotal moment.  App.372.  Similarly, petitioner could encode limitations that unexpectedly "cause [its model] to stop working or cause some other disastrous action," App.371, while the Department is "in the middle of ongoing warfighting operations," App.373.  The Secretary's decision to remove petitioner's products from Department systems sought to avoid putting the lives of servicemembers "in danger" or otherwise imperiling critical mission objectives.  App.371.

The effects of the designation are also tailored to the underlying risks.  The central concern is the presence of petitioner's AI model within the Department's hardware and software systems, and the designation accordingly applies to "[t]he use of any of [petitioner's] covered products or

29

services in any [Department] covered system." App.367. As the Court recognized, the Department has not prohibited Department contractors "from using [petitioner] as a subcontractor" other than on "work performed for the Department," nor has the Department prohibited contractors "from using Claude for work performed for entities other than the Department." *Anthropic*, 2026 WL 1042493, at \*2. Petitioner and its declarants accept that the Secretary may permissibly decide to cease the Department's dealings with petitioner. *See, e.g.*, Pet. Br. 5, 19; App.17 ("[B]ecause of Claude's limitations and safeguards, [the Department] may opt to work with another company that better suits its needs."). The designation efficiently accomplishes that goal by disallowing petitioner from working on certain Department contracts and thereby removing its risky products from the Department's critical information-technology systems.

### B. Petitioner's Procedural Objections Provide No Basis to Vacate the Determination

The determination plainly complied with the procedures prescribed by statute. The Secretary issued the designation "only after" receiving "a joint recommendation" from the appropriate agency officers. 41 U.S.C. § 4713(b)(1). Those officers assessed "a significant supply chain risk" and "an urgent national security interest" in "mitigat[ing] this risk as soon as

practicable." App.368-69.  The Under Secretary submitted a detailed

memorandum, *see* App.371-74, and a due-diligence report, *see* App.376-88, to

support the analysis.  And the Secretary repeatedly referenced this official

recommendation in reaching his final decision.  *See* App.367 (noting that the

determination was based on "the joint recommendation").

The statute also expressly authorizes the Secretary to "temporarily

delay the notice" to petitioner where, as here, he "determines that an urgent

national security interest requires the immediate exercise" of the designation

authority.  41 U.S.C. § 4713(c)(1)(A).  Section 4713(c) is crystal clear that the

Secretary is empowered to "make the determination" before notice "has

been provided" and before petitioner "has submitted any information in

response."  *Id.* § 4713(c)(1)(B).  In this case, at the recommendation of the

relevant officers, *see* App.368, the Secretary found "an urgent national

security interest" and invoked § 4713(c)'s procedures to make the

designation immediately effective, App.367.  In accord with the statutory

duty to provide notice and an opportunity to respond "as soon as practicable

after addressing the urgent national security interest," 41 U.S.C.

§ 4713(c)(2)(A)-(B), the Department sent the Secretary's determination and

supporting materials to petitioner within a matter of weeks, after completing the internal review process required for releasing sensitive information.

Petitioner's procedural objections are flawed from the outset. Petitioner repeatedly seeks to impose on the Secretary new or different obligations that appear nowhere in the statute.  For example, petitioner deems improper (Br. 32-33) the Secretary's social-media post that preceded the designation and directed his subordinates to initiate the designation process.  *See* App.77.  More broadly, petitioner insists (Br. 33-34) that the Secretary's early involvement without petitioner's responsive evidence could taint the later decision.  Those are policy arguments that have no basis in the statute.  *See* 41 U.S.C. § 4713(c)(2)(B) (contemplating that the agency will "mak[e] any appropriate modifications to the determination based on" later-acquired information from the source).  Courts have rejected analogous efforts to graft atextual requirements onto a reticulated procedural scheme crafted by Congress.  *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 591 U.S. 657, 685 (2020) (rejecting "the open-mindedness test" as a "'judge-made procedur[e]'" that went beyond "the APA's mandates" (quotation omitted)).

Petitioner's arguments against the applicability of § 4713(c) fail several times over. The "determin[ation]" about the need for "urgen[cy]" to protect "national security interest[s]" is textually committed to the relevant agency head—here, the Secretary. 41 U.S.C. § 4713(c). That feature is missing from the APA's good-cause exception, on which petitioner heavily relies (Br. 35-36). In that context, a court can judge the agency's "statement of reasons" for finding good cause against the objective standard whether notice and comment would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Here, expedited action is warranted whenever the Secretary "determines" it "necessary" for national security, 41 U.S.C. § 4713(c)(1), and the statute lacks any indication that courts may second-guess such discretionary judgments on national-security matters traditionally entrusted to the Executive Branch. *See Webster v. Doe*, 486 U.S. 592, 600 (1988) (describing statute at issue as "exud[ing] deference to the" agency decisionmaker regarding "his views of the Nation's security").

Moreover, the analysis underlying the joint recommendation describes the exigent circumstances justifying "invocation of the authorities codified at Section 4713(c)." App.368. The Department uses petitioner's model to, among other things, assist with "critical military operations." App.371; *see*

App.413 (describing various uses). For the Department to have cutting-edge, state-of-the-art technical capabilities, petitioner must "continuously update and tune the product" for the Department's use. App.374; *see* App.205 ("The Department cannot be working off models that are months or years old."). Each iteration of the constantly evolving technology provides a fresh opportunity to introduce changes that "subvert the [model's] design and/or functionality" in ways that jeopardize "the Department's lawful use of the [model's] capability." App.374; *see* App.412 (explaining that petitioner can "continue to affect the functioning of its models" through "model updates" and "ongoing operational alterations").

Against that backdrop, the Secretary determined that continued use of petitioner's model raises pressing national-security concerns, and petitioner's own beliefs about how much risk is tolerable cannot override the Secretary's calculated national-security judgment. *See Holder*, 561 U.S. at 33-35 (deferring to national-security judgments by the political branches). Petitioner misses the point in observing (Br. 37-38) that the Department previously used Claude with certain limitations and that the Department continued negotiations after the designation was issued. The parties' months-long debate over contractual terms was probative primarily because

34

it exposed that petitioner would write restrictions into its AI models reflecting its normative views about the use of those models. *See* App.373 (explaining that "[petitioner's] risk level escalated . . . to an unacceptable national security threat over the course of the . . . contract negotiation"). The prospect that petitioner might eventually be convinced to compromise in no way undermined the Secretary's conclusion that petitioner's unyielding stance about the propriety of restricting its products created a present danger that necessitated initiating the discontinuance of those products.

In a similar vein, petitioner wrongly asserts (Br. 38) that the Secretary's invocation of § 4713(c)'s procedures is inconsistent with his decision to permit a six-month transition away from petitioner's products. Exercising his national-security expertise, the Secretary determined that removing petitioner's products from the Department's systems immediately—in the middle of active military operations and before the arrangement of suitable replacements—posed a greater threat to national security than did providing for an orderly transition period. *See* App.216-18. Petitioner's amici recognize that these kinds of decisions affecting "technologies that are already integrated into ongoing U.S. military operations" carry the potential to "disrupt operational planning and place

35

servicemembers at risk." Former Service Secretaries Br. 16. And in the meantime, the Department "is taking additional measures to mitigate the supply chain risk," including by "working with third-party cloud service providers to ensure [petitioner's] leadership cannot make unilateral changes to the" version of the model used by the Department during the phaseout period. App.218.

Petitioner also objects to (Br. 36-37) the determination's conciseness. But § 4713(c) imposes no requirement that the Secretary repeat the description in the underlying risk analysis or include an explanation of any specific length. While this Court has construed the good-cause exception not to excuse notice and comment in swaths of run-of-the-mill rulemakings, *see* Pet. Br. 34, that same interpretive approach does not carry over to this context where, by design, the statute commits decisions implicating national-security considerations to the agency. Regardless, contrary to petitioner's contention (Br. 38), the Secretary's action did not rest on "generalized" circumstances. Rather, the decision to make the designation immediately effective was tied to the specific concerns involving continued use of petitioner's products.

Any perceived error in the reliance on § 4713(c)'s procedures would be harmless in any event.  As noted above, § 4713(c) allows the Secretary to change the default sequencing by providing notice and a 30-day response period after, rather than before, the designation.  *See* 41 U.S.C. § 4713(c)(1).  The March 3 letter allowed petitioner to provide additional materials and seek reconsideration, and the March 19 supplemental letter reminded petitioner of the option to submit any "information or arguments" that it wished the Department to review "within 30 days of receipt."  App.224; *see* App.73.  And the agency was obligated to "promptly consider[] any information submitted by the source in response" and "mak[e] any appropriate modifications to the determination based on such information."  41 U.S.C. § 4713(c)(2)(A)-(B).  Yet petitioner apparently chose to forgo that process altogether.  As noted in the Under Secretary's April 20 declaration, the Department had not received anything from petitioner by that date, "more than 30 days" after the March 19 letter.  App.422.

Petitioner can hardly complain (Br. 33-34) that it was unable to participate in the process or that the record was imperfect when petitioner made a voluntary decision not to utilize available procedures.  Conversely, the agency can hardly be faulted for failing to take into account facts that

were never submitted and arguments that were never presented. Petitioner's argument flunks the harmless-error rule that "ordinarily appl[ies] in civil cases," including "administrative cases." *Shinseki v. Sanders*, 556 U.S. 396, 406-07 (2009). There is no basis to disturb the Secretary's determination when the error asserted is one that has no material bearing on the ultimate outcome. *Cf.* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); 28 U.S.C. § 2111 (instructing appellate courts to review "the record without regard to errors or defects which do not affect the substantial rights of the parties").

Courts routinely decline to review procedural challenges like the one at issue here. The Supreme Court found no need to address whether agencies "lacked good cause to promulgate" interim final rules when the agencies properly issued superseding final rules, even though "the final rules made only minor alterations" and "le[ft] their substance unchanged." *Little Sisters*, 591 U.S. at 685, 686 n.14. This Court and other courts across the country have followed that same approach. *See, e.g.*, *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221 (1st Cir. 2019); *California v. Azar*, 911 F.3d 558, 569 (9th Cir. 2018); *Association of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472-73 (D.C. Cir. 2014); *Natural Res. Def.*

*Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982). Here, particularly when petitioner elected not to submit additional materials, there could be no demonstrable prejudice in the Secretary's decision to provide notice soon after the designation became effective.

### C. Petitioner's Substantive Objections Are Misplaced

1. Petitioner barely engages with § 4713's text. Petitioner does not meaningfully dispute (Br. 39-40) that the Secretary, as an agency head, can issue a designation based on the "risk" that "any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate" petitioner's product "so as to surveil, deny, disrupt, or otherwise manipulate" the product's use or the "information stored or transmitted" on the product. 41 U.S.C. § 4713(k)(6). Petitioner qualifies as "any person" with the capability to "maliciously introduce unwanted function" or "otherwise manipulate" its AI models that are delivered to the Department. And the restrictions that petitioner can embed into the model threaten to "deny" or "disrupt" its use when deployed in the Department's systems for warfighting efforts and other military operations. The terms of the statute are readily satisfied.

Petitioner's statutory arguments largely consist of a misguided effort to "engraft [its] own exceptions onto the statutory text." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 70 (2019); *see also Brogan v. United States*, 522 U.S. 398, 408 (1998) ("Courts may not create their own limitations on legislation[.]").  There is no textual basis for petitioner's suggestion that § 4713 may be invoked only to mitigate risks posed by "foreign companies working at the behest of foreign states."  Pet. Br. 40. The statute is explicit that the relevant risk may arise from the actions of "any person," 41 U.S.C. § 4713(k)(6)—in contrast to other statutes where Congress has authorized measures to address risks arising from activities of a "foreign person," *see, e.g.*, 50 U.S.C. § 4565(a)(4)(B), (d)(1), or a "foreign adversary," *see, e.g.*, Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 895, 955-60 (2024).  That the government has not had cause in the seven-and-a-half years since § 4713's enactment to invoke the authority with frequency or to designate another "American company," Pet. Br. 41, provides no basis for injecting nonexistent limitations into the statutory language.  That fact more likely reflects the novel nature of petitioner's technology and the unusual

course of the parties' negotiations and exchanges over that technology's use in sensitive Department systems.

Petitioner likewise contorts the statutory language in claiming that § 4713 covers only "acts that are both intentional and surreptitious." Pet. Br. 40. The statute does not hinge on subjective intent, and it would be startling to conclude that suppliers can "modif[y]" products to cause them to "fail" or to "compromise" their "integrity" so long as they do so openly. S. Rep. No. 115-408, at 2 (quotation omitted). Rather, the statute focuses on various forms of tampering—such as "sabotag[ing]," "maliciously introduc[ing] unwanted function," and "otherwise manipulat[ing] the design" or "operation"—that affect the product's "function" or "use." 41 U.S.C. § 4713(k)(6). The statute also encompasses "extract[ing] data," which carries no negative connotation of the sort that petitioner erroneously tries to ascribe (Br. 40) to the other terms.

Encoding undesired limitations in an AI model "maliciously introduce[s] unwanted function" and "manipulate[s] the design, integrity, [or] operation" of the product. Indeed, this activity satisfies even petitioner's preferred understanding of "manipulate," not to mention more fitting definitions of the word, all of which involve changing or altering something to

achieve one's own objectives.  *See* Pet. Br. 40 n.2 ("To manage, control, or influence in a subtle, devious, or underhand manner"); *Manipulate*, The American Heritage Dictionary of the English Language 1068 (5th ed. 2016) ("To move, arrange, operate, or control by the hands . . . or by mechanical means, especially in a skillful manner").  Petitioner's unduly narrow reading also fails to appreciate that the statute does not require a certainty that the listed acts have been or will be committed, but instead asks whether there is a "risk" that someone "may" engage in such acts.  41 U.S.C. § 4713(k)(6).  And in all events, as described more fully below, this case meets petitioner's more-stringent test: the Secretary's determination reflected the "substantial risk" that petitioner might "preemptively and surreptitiously alter the behavior of the model" in ways that could be detrimental to "ongoing warfighting operations."  App.373.

2.  Petitioner's real dispute is over whether § 4713 has "application here" because petitioner believes the risk that it would "engage in" acts that "disrupt national-security operations" is sufficiently slight.  Pet. Br. 41.  That question "does not turn on the meaning of" any statutory term; "instead, it involves primarily issues of fact" about the extent of the risk.  *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 181 (2025) (quotation

42

omitted).  The Secretary's exercise of his discretionary authority is subject to the "deferential arbitrary-and-capricious standard" and "should not be excessively second-guessed by a court." *Id.* at 180-81.  Searching judicial review is especially inappropriate for the national-security assessments and predictions at issue here, which "must often be based on informed judgment rather than concrete evidence." *Holder*, 561 U.S. at 34-35.

Like any ordinary challenge to agency action, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  Petitioner's cursory argument (Br. 30) to the contrary is unfounded.  The authorizing statute not only borrows the standard of review nearly verbatim from the APA, *compare* 41 U.S.C. § 1327(b)(2), *with* 5 U.S.C. § 706(2), but also makes clear that the challenged action can be overturned only if it "lack[s] substantial support in the administrative record taken as a whole," 41 U.S.C. § 1327(b)(2)(D).  In fact, the statute includes an entire paragraph titled "administrative record and procedures," *id.* § 1327(b)(4), that specifies the process for filing any unclassified and classified "information that the appropriate official relied upon," *id.* § 1327(b)(4)(B)(i).  The purported need to proffer "[e]xtra-record

43

evidence," Pet. Br. 30, is exceptionally weak in this context where petitioner was offered, but refused, the opportunity to put whatever information it desired in front of the agency, *see* 41 U.S.C. § 4713(b)(2)(C), (c)(2)(B).

The administrative record amply supports the Department's rational determination about the acute national-security risks stemming from continued use of petitioner's products. Indeed, the essential facts appear to be undisputed or, at a minimum, not subject to reasonable debate. All seem to agree that petitioner has the technical capability to "alter the behavior of [its AI] model." App.373. As the developer, petitioner can "unilaterally" modify its products and incorporate limitations into the model weights and guardrails so that Claude will obey petitioner's "moral and policy judgments." App.372-73. Petitioner's co-founder has made clear that petitioner feels the imperative to add such "safeguards" and "limitations" into the model based on petitioner's own "technical judgment" and "principles." App.17-18. As petitioner admits, it accomplishes this objective by training the model to follow "a set of normative principles" set by petitioner and by encoding "specific behavioral constraints that Claude is trained to follow regardless of how it is subsequently deployed or configured." App.275.

It is undeniable that petitioner has ongoing opportunities to encode these functions into its AI model. Petitioner acknowledges (Br. 42) that it can impose "ex-ante, principle-based 'restrictions' on Claude's use" before the model is deployed in the Department's systems. *See* App.278 (noting that petitioner can "influence the operation of its models with respect to the Department's uses . . . *prior* to operational deployment"). And due to the nature of the technology, the AI model needs "constant tuning" by petitioner to make sure that the model performs properly. App.372. As part of this iterative process, petitioner makes requested changes to the model and provides the new version to the Department. *See* App.289-90. The need to "continuously update and tune the product enables the potential for" petitioner to "implement changes" that interfere with the Department's use of the product without the Department's knowledge. App.374.

If a limitation previously built into petitioner's AI model were to inhibit the Department's use of the model at an inopportune moment, the effects could be drastic. Petitioner's model has been deployed in the Department's highly sensitive and classified systems. *See* App.11. The uses include "critical and time-sensitive" missions, such as "ongoing military operations, the visualization of assets and capabilities, and proposing orders of

operations."  App.413.  The country could face "catastrophic downstream consequences" in a situation where "a critical defense system fail[ed] to engage," App.372, or where a restriction in the model "prevent[ed] or alter[ed] certain functions during an active operation," App.421.  The Department sought to avoid the "serious harm to national security and loss of human life" that could be wrought by such interference.  *Id.*

The main crux of petitioner's submission (Br. 42-45) is to question the degree of certainty associated with these risks.  But the Secretary's judgments in this regard are precisely the kinds of predictive national-security assessments that are best made by the political branches and that courts do not "lightly override."  *Anthropic*, 2026 WL 1042493, at *3; *see Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (holding that a court's "inquiry into matters of . . . national security is highly constrained").  In the national-security sphere where "information can be difficult to obtain and the impact of certain conduct difficult to assess," the government must have latitude to "draw[] factual inferences" and make conclusions "based on informed judgment."  *Holder*, 561 U.S. at 34-35.

The Department had a robust foundation for its concerns that unapproved limitations could manifest at ill-timed moments.  The record

reveals multiple instances in which petitioner's model declined to perform activities required by government clients based on guardrails that petitioner had embedded into the model and that were unknown to the government clients until the model's refusals in real time. As petitioner's declarant recounts, when the model was first deployed on Department systems, it "refuse[d] tasks that were appropriate in a national security context," such as "summarizing threat assessments" and "processing classified documents," because of protections that petitioner had built into the commercial model. App.279-80. And in another incident involving the U.S. Centers for Disease Control and Prevention, petitioner "failed to inform the prime contractor and the agency upfront" about updates to the model that caused it "to stop functioning normally for" the agency's "sensitive infectious disease research." App.419.

These examples refute petitioner's repeated efforts to recast this case as a perfunctory "disagreement over contractual terms." Pet. Br. 47. Petitioner's professed intent to prevent specific uses by the Department was not only alarming for its own sake; it also signaled that petitioner might develop additional "redlines" regarding the technology's appropriate uses and restrict the Department's ability to use the model for those purposes.

App.371-73 (quotation omitted).  Nor was the Department obligated to tolerate these risks or to credit petitioner's expressed "commit[ment] to advancing American national-security interests," Pet. Br. 44, particularly when petitioner's views about what that entails conflict with the Department's.  *See* App.418 (interpreting public statements from petitioner's CEO to suggest a belief that the use of "AI in warfare necessitates a system of oversight that is different from the Article II powers of the Commander-in-Chief").

Petitioner ignores reality in asserting (Br. 43) that the Department can uncover any unwanted limitations by conducting rigorous testing of each new version of petitioner's AI model.  Petitioner's commentary on the Department's internal testing is of little utility when petitioner admittedly "does not know the specific form or substance of every evaluation the Department conducts."  App.285.  And even putting aside that limited insight, petitioner overlooks the vast and nontransparent nature of the technology at issue.  *See* App.372.  Because AI models like petitioner's often have "5 to 10 trillion" weights and parameters, "rigorous analysis or auditing of [the model's] output" becomes "mathematically impossible."  App.410.  Although petitioner's declarant proclaims that the Department can prompt

the model with discrete questions, *see* App.285, the Department cannot ensure that the model would perform accurately and reliably in every possible permutation of situations in which it could be deployed.  By the time that the Department discovers a debilitating limitation, it could be "in the middle of ongoing warfighting operations" or other critical military missions. App.373.

Contrary to petitioner's assertion, the Department cannot resolve these issues by simply "declin[ing] to approve [a] model" whenever it "falls short of expected performance."  App.286.  The Department cannot technically or practically perform time-intensive rounds of testing until a model is acceptable across all possible use cases.  *See* App.412.  Given the "unprecedented velocity" with which AI models are evolving, the Secretary has determined that it is imperative to national security that the Department have access to "rapid model updates" and not be "working off models that are months or years old."  App.205.  In general, the Department seeks to deploy "the latest models" within "30 days of public release."  *Id.*  That is one of the various reasons why this sort of "security collaboration" over technology deployed in the Department's sensitive systems requires a "deep trust" between the Department and an AI vendor.  App.371-73.

Although petitioner may think (Br. 45) that "continued negotiations over contractual terms" and "[a] six-month phaseout of military use of Claude" should have been "unthinkable" and "unfathomable" in light of the Secretary's concerns, neither casts doubt on the Secretary's determination. As explained earlier, it was eminently sensible for the Department to position itself to remove petitioner's products from the system as soon as possible in case the parties were unable to reach a resolution that addressed the Department's concerns. And it was similarly logical for the Secretary to recognize that, particularly during an active military conflict, national-security interests were best served by being poised to finish carrying out that process once replacement products were lined up. *See supra* pp. 35-36.

More broadly, petitioner insists (Br. 44) that the government cannot proceed in the absence of "real-world evidence," such as an "actual attempt by [petitioner] to disrupt military operations." Binding precedent squarely rejects that proposition, characterizing such demands for "'specific evidence'" and "hard proof" in the national-security arena as unworkable and "dangerous." *Holder*, 561 U.S. at 34. And it is axiomatic that agencies can act without "wait[ing] for a risk to materialize." *China Telecom (Ams.) Corp. v. Federal Commc'ns Comm'n*, 57 F.4th 256, 266 (D.C. Cir. 2022); *see TikTok*

*Inc. v. Garland*, 604 U.S. 56, 75 (2025) (per curiam) ("Even if China has not yet leveraged its relationship with ByteDance Ltd. to access U.S. TikTok users' data, petitioners offer no basis for [discrediting] the Government's determination that China might do so[.]").  That principle is particularly apt in this case, where the Secretary sought to mitigate security risks that threaten to disrupt the Department's critical military operations.  Section 4713 speaks of supply-chain "risks," not certainties.

3.  Even if this Court were to consider petitioner's extra-record evidence, none of that evidence calls into question the fundamental underpinnings of the Secretary's determination.  Petitioner spends pages of its brief and a new declaration seeking to establish the point that petitioner has no access to an AI model while it is deployed on the Department's systems.  *See* Pet. Br. 42-43; App.287-90.  As an initial matter, petitioner does not contest that a vendor could introduce a "backdoor[]" into an AI model if the vendor wished to do so.  App.372.  Regardless, petitioner's argument on this score misapprehends the Department's true concern.

Even if there is no ability to alter the model after deployment, petitioner is still able to make modifications *before* the deployment of each new version.  As explained more fully above, petitioner could incorporate

changes that reflect petitioner's own beliefs about the appropriate limits on the model's use, possibly without the Department's consent or knowledge. And the Department may be unable to root out all of the adverse issues created by those changes through its limited ability to test discrete questions and in the compressed time for testing. Instead, a newly inserted limitation may manifest for the first time when the Department queries Claude to assist in an ongoing operation. *See* App.373 (describing the "substantial risk that [petitioner] could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations").

Petitioner's declarant fares no better in quibbling over immaterial word choices. He does not dispute that petitioner periodically delivers "new model version[s]" at the Department's request. App.290. Nevertheless, he claims that "the term 'update'" is inaccurate in this context because petitioner supposedly must start from scratch and "prepare an entirely new version of the model." App.288-90. Nothing turns on that largely semantic distinction. Whether the modifications are conceived as "push[ing]" "patches or other changes . . . to a running system" or instead as "replac[ing]" a deployed model "with a new version," App.288, the relevant point is that, in

the course of those modifications, petitioner can make function-altering changes that impede the Department's use.

4. Petitioner's fleeting discussion of alternative measures (Br. 47-49) only underscores the mistakes in its approach. In accord with the requirement in § 4713(b)(3)(B), the Secretary concluded that "[t]here are no less intrusive measures that are reasonably available to reduce the supply chain risk associated with the use of [petitioner's] products or services in any [Department] covered system." App.367. Petitioner identifies no other measure that fits this mold.

In substantial part, petitioner's argument boils down to the notion that the Secretary should have "cancel[ed] existing contracts or decline[d] to enter new ones." Pet. Br. 26. Petitioner lists "[d]eclining to award or renew prime contracts with [petitioner]" and "transitioning to alternative vendors" as its lead alternative. Pet. Br. 48. But that alternative is not "less intrusive" than the designation itself. In fact, petitioner basically restates the effect of the designation, which orders "exclusion of" petitioner from covered procurements and "withhold[s] consent for a contractor to subcontract with" petitioner on covered procurements. 41 U.S.C. § 4713(k)(4). If the Department were required to proceed contract-by-contract merely because

the designation reflects the label "supply-chain risk," Pet. Br. 48, § 4713 would cease to be a useful tool to take swift and definitive action to oust a vendor like petitioner who poses acute security concerns.

The shortcomings in petitioner's other recited measures are apparent on their face. The suggestion to prohibit use of petitioner's products only in specific subsystems where the limitations could come into play, Pet. Br. 48, is unworkable and fails to mitigate the risk. When petitioner's model is "layered into other applications," such as being "used as a plug-in to a larger application," the model can "limit the functionality of that larger system." App.214-15. Also, while this case began with a disagreement over certain limitations, the Department's broader concern is that petitioner can encode all manner of limitations based on its evolving views about safe and responsible uses of its AI technology. *See* App.371-73. Petitioner's vague gestures (Br. 48) to "tailored contract clauses" and "operational safeguards" suffer from these same flaws, as these options do not reduce the risk that petitioner-imposed modifications will surface when the Department is undertaking vital military missions, with potentially catastrophic consequences for the nation's security.

## II. The Determination Comported with the Constitution

### A. Petitioner's Due-Process Objections Are Meritless

Petitioner contends that the Secretary's issuance of the designation before—rather than after—providing petitioner with notice and an opportunity to respond violated petitioner's Fifth Amendment right to procedural due process.  Petitioner is incorrect.

As an initial matter, even assuming petitioner possessed a constitutionally protected interest implicated by the designation, the Department has provided all of the process that was due.  Petitioner asserts a "right to know the factual basis for the Secretary's action and an opportunity to rebut the evidence supporting that action."  Pet. Br. 50 (quotation omitted).  But it is undisputed that petitioner was provided the requisite notice and opportunity to respond after the Secretary's designation (even if petitioner has apparently chosen to forgo using those procedures, *see* App.422).  Providing post-designation process is consistent with the procedures outlined in the statute, which permits the Secretary to "temporarily delay" providing notice when he finds (as he did here) "an urgent national security interest" requiring immediate action.  41 U.S.C. § 4713(c).

Because petitioner does not contest that the post-designation procedures provided adequate notice and an opportunity to be heard, it is reduced to arguing (Br. 51-52) that the timing of those procedures offended due process. But the Supreme Court "has recognized, on many occasions, that where [the government] must act quickly," the Due Process Clause is satisfied by the provision of "postdeprivation process." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Deferring process "until after the initial deprivation" is permissible where "[a]n important government interest" demands "prompt action" and there is "a substantial assurance that the deprivation is not baseless or unwarranted." *Id.* at 930-31 (quoting *FDIC v. Mallen*, 486 U.S. 230, 240 (1988)); *see also, e.g.*, *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) (recognizing that, where the government "must act quickly," "postdeprivation process satisfies the requirements of the Due Process Clause" (quotation omitted)).

The Supreme Court and the courts of appeals have applied that principle in a wide variety of contexts to conclude that post-deprivation process satisfies constitutional requirements. For example, the Supreme Court has held that the government "interest in preserving the integrity of" horse racing justifies suspending the license of a horse trainer whose horse

fails a drug test "without a presuspension hearing." *Barry v. Barchi*, 443 U.S. 55, 63-65 (1979). So too does the "public interest in safety on the roads and highways" justify suspending the license of a driver who is convicted of certain traffic offenses without any pre-suspension process. *Dixon v. Love*, 431 U.S. 105, 112-15 (1977). Similarly, the Court has concluded that the government may suspend without pay employees who have been criminally charged (but not convicted) without pre-deprivation process. *See Gilbert*, 520 U.S. at 931-35; *Mallen*, 486 U.S. at 240-41. And the courts of appeals have repeatedly held that Medicare and Medicaid providers may be terminated from participation in those programs without pre-termination process given the government's interests in "insuring the safety and care of" patients and the ability of the provider to continue "receiv[ing] payments from the care of private patients." *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 364-66 (6th Cir. 2000) (quotation omitted) (collecting cases).

Those precedents make clear that the procedures used here satisfy any applicable constitutional requirements. Congress has expressly authorized the Secretary to delay providing notice and the opportunity to respond if he determines that "an urgent national security interest requires" an immediately effective designation. 41 U.S.C. § 4713(c). Here, the Secretary

invoked that statutory procedure, and his determination regarding the national-security imperative for prompt action was—like his underlying substantive determination regarding the risks posed by petitioner's model—reasonable and reasonably explained. *See supra* pp. 33-36. That weighty national-security interest plainly justifies deferring the relevant notice and opportunity to respond until after the initial designation, at least as much as does the interest in the integrity of horse racing, the safety of roads, or the effective delivery of healthcare services. *Cf. People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227 n.4 (D.C. Cir. 2010) (per curiam) (recognizing that "advance notification" of adverse action is not required where such "notification would impinge upon the security and other foreign policy goals of the United States" (quotation omitted)).

The permissibility of the deferred process here is further confirmed by the circumstances of this case. *Cf. Gilbert*, 520 U.S. at 932 (taking account of "the length and finality of the deprivation," as well as its magnitude (emphases and quotation omitted)). The Secretary is directed to—and did—provide the relevant process "as soon as practicable after addressing the urgent national security interest," 41 U.S.C. § 4713(c)(2), which minimizes any negative consequences from an erroneous initial designation. And the

effect of the designation (and follow-on covered procurement actions) is limited; petitioner is precluded from contracting or sub-contracting on a relatively limited set of Department procurements but remains free to otherwise engage in its business. *Cf. Anthropic*, 2026 WL 1042493, at *3 (observing that "some record evidence suggests that Anthropic has financially benefited from its refusal to accede to the Department's request for permission to deploy Claude for all lawful uses").

In nonetheless contending that the designation (and, necessarily, the statute expressly authorizing the deferral of notice in these circumstances) violates its due-process rights, petitioner relies (Br. 51-52) primarily on this Court's decision in *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), in which the Court held that the government had acted unconstitutionally in not providing process before designating an entity as a foreign terrorist organization. But that case does not advance petitioner's position. There, the Court expressly recognized that forgoing pre-deprivation process would be permissible if "the foreign policy goals of the government" were "impaired by" that process but explained that the government "ha[d] made no attempt at" demonstrating such impairment "in the present case." *Id.* at 208. Here, by contrast, the Secretary expressly

made such a determination.  Moreover, the designation there broadly deprived the entity of the rights to (among other things) "hold bank accounts" and "receive material support or resources from anyone within the jurisdiction of the United States."  *Id.* at 204.  The substantially narrower consequences of the designation here further underscore the permissibility of the post-designation process contemplated by the statute.

Moreover, although petitioner complains (Br. 53) that it could have "refute[d]" purported "errors" underlying the Secretary's designation if it had been provided pre-designation process, petitioner nowhere explains why pre-designation—rather than post-designation—process was necessary to allow it to present its evidence and arguments to the Secretary on these points.  And on the merits, petitioner's complaints are substantially undermined by its choice not to take advantage of the post-designation process that it was provided.

In addition, this statutory post-designation process is particularly appropriate in this government-contracting context.  In general, the government—like "private individuals and businesses"—"enjoys the unrestricted power" to "determine those with whom it will deal" and to "fix the terms and conditions upon which it will make needed purchases."

*Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).  Although petitioner

claims (Br. 49-50) a protected liberty interest in its reputation and its ability

to pursue Department contracts (as well as a property interest in its

contracts with other commercial partners), petitioner has failed to establish

any significant impairment of the relevant interests.

For one, it is unclear to what extent petitioner's reputation has been

impaired by the designation at all.  *See* App.223 (petitioner's CEO stating

that "the general public" and "the media" "see us as the heroes").

Regardless, petitioner possesses no independent liberty interest in its

reputation that would be implicated apart from the imposition of "a stigma or

other disability that foreclosed" petitioner's "freedom to take advantage of"

business opportunities.  *Kartseva v. Department of State*, 37 F.3d 1524, 1527

(D.C. Cir. 1994) (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S.

564, 573 (1972)).  And as explained, any such foreclosure in this case is

limited, applying only to a certain set of Department procurements.

Similarly, although this Court's precedent holds that a party's liberty

interests are implicated by a "formal[] or automatic[]" exclusion "from work

on some category of future" government contracts, *id.* at 1528, the formal

exclusion here is quite limited.  Finally, to the extent that petitioner has a

protected interest in various specific contracts, the boundaries of that interest are defined by the relevant contracts and may be adequately protected through its ability to seek redress for any breach of those contracts. *See Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196-97 (2001) (holding that "an ordinary breach-of-contract suit" provides due process sufficient to safeguard any protected contractual interests).

## B. The Determination Does Not Reflect Impermissible Retaliation for Petitioner's Protected Speech

Petitioner is also incorrect to contend that the Secretary's § 4713 determination impermissibly retaliates against petitioner for its constitutionally protected speech. To make out such a claim, petitioner would need to demonstrate that it "engaged in conduct protected under the First Amendment," that the Secretary "took some retaliatory action" against petitioner, and that "a causal link" existed between the retaliation and the protected activity. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation omitted). Here, petitioner's claim fails because the Secretary's designation does not reflect any impermissible motive to retaliate against petitioner for its speech but instead rests on the Secretary's determinations about the conduct that petitioner may engage in.

Petitioner spends much of its argument (Br. 54-57) reciting the speech that it has engaged in "[s]ince its founding"—such as "publishing essays and other public materials" and "contribut[ing] to discourse" on AI safety. In petitioner's view, the Secretary's designation impermissibly reflects a desire to retaliate against petitioner "for its public stance on the[se] weighty issues." Pet. Br. 59 (quotation omitted).

But that characterization is not supported by the facts. To the contrary, the administrative record makes clear that the Secretary's determination was not rooted in any retaliatory motive toward petitioner's speech. The national-security risk presented by petitioner stems from the Department's conclusion that "there is a substantial risk" that petitioner "could attempt to disable its technology or preemptively and surreptitiously alter the behavior of the model in advance or in the middle of ongoing warfighting operations" to enforce its own judgments about the technology's appropriate use. App.373; *see also, e.g.*, App. 368 (discussing potential that petitioner will manipulate the model to "inhibit the [Department's] use"); App.372 (expressing concern that petitioner could "subvert the design, integrity, and operation of the model"); *id.* (relating concern about possibility petitioner will "unilaterally alter" the design of the model without the

Department's knowledge or consent); App.372-73 (reflecting the Department's assessment that petitioner "can and would impose its moral and policy judgments on the warfighting capabilities of the" Department by manipulating or restricting its model); App. 421 (reflecting the Department's conclusion that it "could cause serious harm to national security and loss of human life" if petitioner were to build limitations into its model that "prevent[ed] or alter[ed] certain functions during an active operation").

In short, the record makes clear that the basis for the Secretary's determination was his assessment of the substantial risk that petitioner would manipulate or modify its model to restrict the ways in which the Department could use the model. Such modification of petitioner's product would plainly be conduct—not protected speech—and petitioner nowhere contends otherwise. Thus, the determination and supporting materials on their face refute petitioner's assertion that the Secretary retaliated against petitioner for its protected speech.

In arguing otherwise, petitioner observes (Br. 59) that the administrative record mentions some of petitioner's speech-related activity, including various statements that petitioner has made during negotiations and in public. But official action is not unconstitutional simply because it is

informed by First Amendment-protected activity.  Instead, in many contexts, "protected speech" can be a "wholly legitimate consideration" underlying official action.  *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) (quotation omitted).  For that reason, the "causal inquiry" required for retaliation claims is "complex," *id.*; at a minimum, a party claiming such retaliation must demonstrate that "the impetus to retaliate"—not merely the protected speech itself—is "the but-for cause" of the official action, *Hartman v. Moore*, 547 U.S. 250, 260 (2006).

Here, the Department's consideration of petitioner's statements does not reflect any impermissible impetus to retaliate.  Instead, the Department considered those statements as evidence that petitioner might engage in the conduct about which the Department is concerned.  Such evidentiary use of speech is not impermissibly retaliatory but is instead "fully compatible with the First Amendment."  *Flytenow, Inc. v. FAA*, 808 F.3d 882, 894 (D.C. Cir. 2015); *see also, e.g.*, *Wayte v. United States*, 470 U.S. 598, 612-13 (1985) (noting the permissibility of considering letters of protest written to the Selective Service as "strong, perhaps conclusive evidence of the nonregistrant's intent not to comply" with the statutory registration requirement).  And even if the Court were to believe that the record

reflected some evidence of retaliatory intent, petitioner could not—in light of the substantial national-security justifications underlying the designation, *see supra* pp. 26-30—establish that retaliation was the "but-for cause" of the designation. *Hartman*, 547 U.S. at 260.

In addition, to the extent petitioner takes issue (Br. 55-56) with the government's consideration of petitioner's negotiating positions, that concern is especially misplaced. Whatever First Amendment protection those positions might have in other contexts, petitioner cites nothing in precedent or logic to support the remarkable view that the government could violate the First Amendment by taking account of the contract terms that a potential counter-party will agree to in determining whether to do business with that party.

Given that the determination and administrative record themselves reflect the Department's concerns in terms that do not bespeak any retaliatory impetus, to have any chance of succeeding on its retaliation claim, petitioner would have to ask this Court to look behind the record and "probe the sincerity of the stated justifications." *Trump*, 585 U.S. at 701-02. But any such request would be extremely difficult to sustain; "in the absence of clear evidence to the contrary, courts presume that [public officers] have

properly discharged their official duties." *American Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) (quotation omitted). Apart from passing references (Br. 58-59) to a social-media post that has no legal effect and is not subject to review in this case, and to the purported "disproportionality" of the designation, petitioner does not even attempt to carry that formidable burden.

Regardless, the circumstances here would refute any such attempt. Petitioner has been engaging in the relevant public advocacy "[s]ince its founding." Pet. Br. 54. Yet, the Department was willing to contract with petitioner—with full knowledge of that advocacy—until the combination of circumstances led the Department to assess that petitioner "can and would impose its moral and policy judgments on the warfighting capabilities of the" Department by manipulating or restricting its model. App.372-73. The natural inference from that sequence is that the Department was truly concerned about petitioner's conduct, not its advocacy.

Moreover, petitioner's objection that the designation is "disproportionate" and that the Secretary could have just "[w]alk[ed] away from" any "contract with" petitioner, Pet. Br. 59-60, misunderstands the effect of the designation. As explained, the legal effect of the designation

(and follow-on covered procurement actions) is to exclude petitioner from consideration as a contractor (or subcontractor) for certain procurements related to the Department's information-technology systems. That exclusion is directly responsive to the concerns articulated by the Department about petitioner's potential manipulation of its model to restrict the Department's use. The close link between the designation's effects and those concerns undermines, rather than supports, any argument that the designation stems from retaliatory animus.

**CONCLUSION**

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney
General*

SHARON SWINGLE

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff
Civil Division, Room 7260
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3388
sean.r.janda@usdoj.gov*

May 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,966 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
Sean R. Janda

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Sean R. Janda*
Sean R. Janda