# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

## REPLY BRIEF OF PETITIONER

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

May 13, 2026

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................... ii

GLOSSARY ............................................................................................. vi

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ............................................................................................ 4

I. THE DESIGNATION VIOLATED § 4713'S PROCEDURAL REQUIREMENTS ................................................................................ 4

    A. Section 4713(c) Does Not Excuse The Procedural Violations ........................................................................ 5

    B. The Procedural Violations Were Prejudicial, Not Harmless .......................................................................... 10

II. THE DESIGNATION VIOLATED § 4713'S SUBSTANTIVE CONSTRAINTS ..................................................................... 13

    A. The Secretary Failed To Identify A Genuine Supply-Chain Risk ...................................................................... 13

        1. Contractual Disagreements Are Not Supply-Chain Risks ............................................................. 13

        2. The "Operational Veto" Theory Is Untenable ......................... 15

    B. The Secretary Failed To Consider Less Intrusive Measures ........................................................................ 21

III. THE DESIGNATION VIOLATED THE DUE PROCESS CLAUSE ........................... 22

IV. THE DESIGNATION VIOLATED THE FIRST AMENDMENT ............................... 27

CONCLUSION ....................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**CASES** [*]

Page(s)

*Allina Health Services v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014)........................10

*Barry v. Barchi*, 443 U.S. 55 (1979)..........................................................................25

*Bond v. United States*, 572 U.S. 844 (2014) ..............................................................14

*Braniff Airways, Inc. v. Civil Aeronautics Board*, 379 F.2d 453
    (D.C. Cir. 1967) .................................................................................................17

*Cigar Association of America v. FDA*, 132 F.4th 535 (D.C. Cir. 2025) .................12

*Consolidated Rail Corporation v. Surface Transportation Board*,
    93 F.3d 793 (D.C. Cir. 1996).............................................................................19

*Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028 (D.C. Cir.
    2022) .................................................................................................................10

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ......................6, 7, 18

*Dixon v. Love*, 431 U.S. 105 (1977) ...........................................................................25

*El-Shifa Pharmaceutical Industries Company v. United States*,
    607 F.3d 836 (D.C. Cir. 2010)............................................................................7

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989)........................................................17

*Esparraguera v. Department of the Army*, 101 F.4th 28 (D.C. Cir.
    2024) .................................................................................................................23

*FDIC v. Mallen*, 486 U.S. 230 (1988) ......................................................................25

*Finnbin, LLC v. Consumer Product Safety Commission*, 45 F.4th 127
    (D.C. Cir. 2022) ..................................................................................................6

*Fischer v. United States*, 603 U.S. 480 (2024) .................................................13, 14

---

[*]    Authorities upon which Anthropic chiefly relies are marked with asterisks.

*Flytenow, Inc. v. FAA*, 808 F.3d 882 (D.C. Cir. 2015)..............................................29

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) .....................................................11

*Gilbert v. Homar*, 520 U.S. 924 (1997) .....................................................................25

*Hartman v. Moore*, 547 U.S. 250 (2006) ...................................................................28

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................10

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123
    (1951) ....................................................................................................................26

*Kartseva v. Department of State*, 37 F.3d 1524 (D.C. Cir. 1994) .............................25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)..............................................................................................11

*Louisiana Public Service Commission v. FERC*, 522 F.3d 378
    (D.C. Cir. 2008) ................................................................................................ 7-8

*\*Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir.
    2025) ................................................................................................................27, 28

*\*National Council of Resistance of Iran v. Department of State*,
    251 F.3d 192 (D.C. Cir. 2001)......................................................................6, 23, 24

*\*National Fuel Gas Supply Corporation v. FERC*, 468 F.3d 831
    (D.C. Cir. 2006) ................................................................................................1, 16

*National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024) .....................27

*Oglala Sioux Tribe v. Nuclear Regulatory Commission*, 896 F.3d 520
    (D.C. Cir. 2018) ..............................................................................................10, 12

*\*Old Dominion Dairy Products, Inc. v. Secretary of Defense*,
    631 F.2d 953 (D.C. Cir. 1980)...........................................................................23, 25

*People's Mojahedin Organization of Iran v. Department of State*,
    613 F.3d 220 (D.C. Cir. 2010)..............................................................................23

*\*Ralls Corporation v. Commission on Foreign Investment in United
    States*, 758 F.3d 296 (D.C. Cir. 2014)...........................................................22, 23, 26

iii

*Safari Club International v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017) .........................12

*Schneider v. Smith*, 390 U.S. 17 (1968)..................................................................19

*Shinseki v. Sanders*, 556 U.S. 396 (2009)...............................................................11

*Solondz v. FAA*, 141 F.4th 268 (D.C. Cir. 2025) .....................................................10

*Southern California Edison Company v. FERC*, 603 F.3d 996
    (D.C. Cir. 2010) ................................................................................... 22-23

*United States v. Emor*, 785 F.3d 671 (D.C. Cir. 2015)............................................17

*United States v. Ross*, 848 F.3d 1129 (D.C. Cir. 2017)............................................8

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................................5

*Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015)................................................24

## CONSTITUTION AND STATUTES

U.S. Const. Art. 1, § 8.................................................................................................7

5 U.S.C.
    § 701 .............................................................................................................5, 6
    § 702 ..............................................................................................................12
    § 706 ..............................................................................................................11

38 U.S.C. § 7261 .......................................................................................................11

41 U.S.C.
    § 1323 ............................................................................................................22
    § 1327 ...................................................................................................2, 5, 12
    § 4713 ........................................................................................................4, 21

## LEGISLATIVE MATERIALS

S. Rep. No. 115-408 (2018) ......................................................................................14

## OTHER AUTHORITIES

Bray, Samuel L., *The Mischief Rule*, 109 Geo. L.J. 967 (2021)..............................14

*Oxford English Dictionary* (3d ed. 2025) ................................................................14

Scalia, Antonin & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...............................................................................6

# GLOSSARY

| | |
|---|---|
| AI | artificial intelligence |
| APA | Administrative Procedure Act |
| CDC | Centers for Disease Control and Prevention |
| FAA | Federal Aviation Administration |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Secretary's brief confirms that this is a supply-chain risk designation in search of a justification. The Secretary purported to blacklist Anthropic as a threat to national security based in significant part on the factual assertion that Anthropic possesses an "operational veto" over Claude after it is deployed in the Department's classified systems—a demonstrably false premise that he now abandons. *See*, *e.g.*, App.278, 287; Secretary Br.51-53. Instead, the Secretary falls back to a different justification. He now claims that his "true concern" is that Anthropic in the future will surreptitiously encode model limitations "*before*" Claude's "deployment" that the Department's testing might not catch. Secretary Br.51. That theory fails on its own, both factually and legally.

Although far from the § 4713 designation's only flaw, the Secretary's retreat alone renders his action unlawful. Where an agency has relied on a cumulative rationale with multiple components, one of which is now clearly deficient, this Court vacates the agency decision. *See National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (Kavanaugh, J.). That principle controls this case. Indeed, Under Secretary Michael's declaration acknowledges that the underlying risk analysis was cumulative and that "each risk identified" "standing alone" may not "have necessitated" the designation. App.421.

The Secretary's shifting justification also underscores the prejudice caused by his procedural violations—each of which independently requires reversing the designation. The Secretary bypassed every safeguard Congress built into § 4713, designating Anthropic a supply-chain risk without providing notice of the factual basis or an opportunity to respond. Had he followed those procedures, Anthropic would have corrected the factual errors the Secretary now tacitly concedes. Congress required pre-deprivation process precisely to prevent this kind of mistaken basis for governmental action. The Secretary's repeated claim that these errors were harmless because Anthropic purportedly failed to make post-designation submissions is legally meritless. It is also factually mistaken, as the Secretary recently acknowledged to the Court.

Nor does the Secretary persuasively defend his reliance on § 4713(c)'s emergency exception to those procedures. His own actions contradict his claims: despite the purported urgency, he simultaneously ordered that Claude remain in military use for up to six months. If the asserted supply-chain risk could be tolerated for half a year, it could be tolerated for 30 days to carry out the procedures Congress required. Recognizing the Secretary's inconsistency does not override deference to national-security judgments, as the Secretary contends. It merely respects Congress's directive that this Court hold unlawful any designation that is "not in accord with procedures required by law." 41 U.S.C. § 1327(b)(2)(E).

Moreover, the Secretary's designation defies the substantive requirements of the statute. Section 4713 is not a blank check or an all-purpose procurement tool. It is a narrow and extraordinary authority Congress created in response to foreign sabotage threats posed by Kremlin-linked Kaspersky Lab and Chinese military-linked Huawei. It empowers the Executive Branch to thwart covert, intentional acts designed to undermine national-security systems—not to retaliate for, or gain leverage in, disputes with private-sector partners about contractual terms. The Secretary urges this Court to credit his predictive and forward-looking assertion that Anthropic's expressed commitment to AI safety creates a "substantial risk" (Secretary Br.3) that in the future Anthropic would secretly encode limitations in Claude to disrupt U.S. military operations. But that inferential leap has no foundation in the record, and it is neither reasonable nor reasonably explained. It also is readily addressable through a less intrusive measure: the Secretary could simply decline to procure new models of Claude going forward.

Finally, the designation violates the Constitution. The Secretary concedes that he deprived Anthropic of protected interests without the pre-deprivation notice or opportunity to respond ordinarily required by the Due Process Clause. Although he argues that post-designation process sufficed here, that argument runs headlong into Circuit precedent that he largely ignores. And his own words attacking Anthropic's "ideology," "sanctimonious rhetoric," and "corporate virtue-

3

signaling," App.77, confirm that the designation was motivated by retaliatory animus in violation of the First Amendment.

The Court should hold the designation unlawful.

## ARGUMENT

### I. THE DESIGNATION VIOLATED § 4713'S PROCEDURAL REQUIREMENTS

The Secretary does not dispute that he designated Anthropic a supply-chain risk without providing the company "notice" of a recommendation, "information that form[ed] the basis for the recommendation," or an opportunity to submit "information and argument in opposition." 41 U.S.C. § 4713(b)(2); *see* Secretary Br.31-32. Those manifest process failures resulted in a rushed designation premised on factual errors, like the now-abandoned assertion that Anthropic holds an "operational veto" over how the Department uses Claude after deployment. That is just the type of error that pre-designation process would have corrected.[2]

The Secretary responds that § 4713(c)'s emergency exception excuses his process failures and that the violations were harmless. Secretary Br.30-39. Both arguments fail.

_____

[2] The Secretary only halfheartedly defends his additional failure to receive a "joint-recommendation" (41 U.S.C. § 4713(b)(1)) before he publicly announced his decision via social media on February 27. Anthropic Br.32-33. That announcement did not "initiate the designation process." Secretary Br.32. It was a "final" decision, "[e]ffective immediately," that "direct[ed]" the outcome. App.77. Identifying these deficiencies is hardly a "policy argument," Secretary Br.32; it is a claim the Secretary violated procedural requirements.

**A.      Section 4713(c) Does Not Excuse The Procedural Violations**

In exigent circumstances, § 4713(c) permits the Secretary to dispense with statutorily required process when an "urgent national security interest requires" it. But the circumstances here foreclose any argument that the Secretary properly invoked that exception. Anthropic Br.34-39.

1.      At the threshold, the Secretary contends that § 4713(c) "textually commit[s]" the emergency determination to himself and that "the statute lacks any indication that courts may second-guess such … judgments." Secretary Br.33. That position cannot be squared with statutory text, structure, or precedent.

Congress directed this Court to "hold unlawful" § 4713 actions that are issued "not in accord with procedures required by law" or that are arbitrary and capricious. 41 U.S.C. § 1327(b)(2)(A), (E). Those are familiar standards of judicial review, and Congress enacted no exception for § 4713(c) emergency determinations. Congress knows how to preclude review of discretionary agency decisions—as it did in the APA, 5 U.S.C. § 701(a)(2)—but it failed to enact a similar bar here, despite borrowing other aspects of APA review. *Compare Webster v. Doe*, 486 U.S. 592, 600 (1988) (applying § 701(a)(2)).

The Secretary notes that the APA's good-cause exception requires a "'statement of reasons.'" Secretary Br.33. But so does § 4713. Specifically, § 4713(c)(2)(C) requires a written "description of the urgent national security

interest" to Congress—a description Congress understood would be part of the record and a basis for judicial review. And interpreting § 4713(c) to require a "showing of particularized need," subject to judicial review, is independently necessary to satisfy due process. *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 208 (D.C. Cir. 2001); *see infra* pp.23-24.

Statutory structure confirms this point. If the Secretary could bypass Congress's carefully drawn procedures simply by asserting urgency with no judicial review, that would render § 4713(b)'s procedural protections and § 1327(b)(2)'s judicial review provision ineffective. Future Secretaries would be free to sidestep critical procedural protections based only on their say-so. That cannot be the law. Instead, this Court presumes Congress enacts statutes "to work rather than fail." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012); *accord Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 134 (D.C. Cir. 2022).

Even accepting the analogy to 5 U.S.C. § 701(a)(2), which excludes agency actions from APA review when "committed to agency discretion by law," the Secretary's claim of unreviewable discretion here clashes with precedent. Section 701(a)(2) is "'narrow[]'" and applies only in "'rare circumstances,'" such as where there is "'no meaningful standard'" or "'law to apply.'" *Department of Com. v. New York*, 588 U.S. 752, 772-773 (2019). Although § 4713(c) may "leave

6

much to the Secretary's discretion," his discretion is not "unbounded." *Id.* at 771-772. Congress used words of constraint ("urgent" and "requires"); it directed this Court to review § 4713 designations for procedural compliance and substantive reasonableness; and this Court has a developed body of law reviewing invocations of emergency exceptions. Anthropic Br.34-38. There is ample law to apply.

Acknowledging that § 4713(c) determinations are subject to judicial review does not mean this Court would be withholding appropriate deference to national-security judgments. Deference is not abdication. Article III obligates this Court to enforce congressionally imposed procedural and substantive limits on delegated authority unless those limits offend Article II. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 857 (D.C. Cir. 2010) (Kavanaugh, J., concurring). "If a court refused to give effect to a statute that regulated Executive conduct," it would necessarily be holding that Congress cannot constitutionally regulate that conduct. *Id.* But the Secretary does not and could not make such a claim here given that Congress has robust Article I authority over military procurement. *See* U.S. Const. Art. 1, § 8 cls. 1 (Spending Clause), 12-13 (Army and Navy Clauses), 14 (Land and Naval Forces Clause), 18 (Necessary and Proper Clause).

2.      On the merits, the Secretary's reliance on § 4713(c) fails for two reasons. First, his one-sentence explanation is "not a reason; it is a conclusion." *Louisiana Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 400 (D.C. Cir. 2008) (per

curiam); Anthropic Br.36-37. Second, the Secretary's "own behavior" "be[lies] any claim that there existed a pressing need for immediate action as to warrant brushing aside" § 4713's procedural requirements. *United States v. Ross*, 848 F.3d 1129, 1132-1133 (D.C. Cir. 2017); Anthropic Br.37-38.

The Secretary does not defend the adequacy of his own, single-sentence explanation. Instead, he relies on Under Secretary Michael's "risk analysis" to supply the reasoning missing from his determination. Secretary Br.36. But even with the benefit of those materials, the Secretary's claim of urgency cannot stand. To start, the risk analysis attempts to justify the § 4713 designation generally, not its timing. Risk and timing are separate statutory questions. Even if the materials adequately explained a supply-chain risk, *but see infra* Part II.A, they identify no emergency that required dispensing with statutory process. For example, they do not advance any concern that notifying Anthropic of a designation would allow it to evade later controls. Permitting the Secretary to invoke a generalized discussion of national-security risk as a basis to evade § 4713's procedures would transform the exception into the rule. Anthropic Br.38-39.

Furthermore, the Secretary's "own behavior" forecloses his claim of urgency. *Ross*, 848 F.3d at 1133. For one thing, the Secretary acknowledges he has long known about and used Claude subject to Anthropic's usage restrictions; indeed, he engaged in "months-long" negotiations over them. Secretary Br.34. This

was a drawn-out disagreement, the opposite of an emergency and inconsistent with a claim Anthropic suddenly presented a "pressing" danger. Secretary Br.34.

More critically, asserting a need to exercise § 4713(a) authority immediately is logically incompatible with mandating a half-year transition period away from Claude. The transition period shows this is not a case in which the Secretary uncovered a risk of imminent sabotage or anything comparable. If the Secretary could wait 180 days to remove Claude from military operations—including during Operation Epic Fury—there is no sound basis for concluding that a pre-designation period of 30 days to carry out the required process would risk particularized harm.

The Secretary's attempts to explain away that illogic fall short. If current uses of Claude raised "national-security concerns," Secretary Br.34, the Secretary's decision to accept that risk for six months defeats his claim that a 30-day notice period would have been intolerable. If the concern was with future "iteration[s]" of Claude, *id.*, the Secretary could have exercised ordinary authorities to forgo new Claude models while allowing Anthropic notice and an opportunity to be heard. Indeed, as explained below, if new models were the Secretary's concern, there was zero basis for *any* designation, much less an *immediate* one. The Secretary could have decided not to procure new models.

This Court need not second-guess the Secretary's "national-security expertise" regarding the need for a "transition period" to recognize this logical

flaw. Secretary Br.35. It is one thing to defer to Congress's and the Executive's logical and supported judgment that material "support to a designated foreign terrorist organization" "bolsters [its] terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010). It is another to identify "material gaps" in an "agency's articulated rationale." *Solondz v. FAA*, 141 F.4th 268, 278 (D.C. Cir. 2025). This Court properly exercises its Article III responsibilities in identifying such analytical gaps—even when significant deference is due. *Id.* In this case, the contradiction between the Secretary's transition timeline and his own rationale for invoking § 4713(c) presents an obvious, material analytical gap. *E.g., Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1043 (D.C. Cir. 2022) (even where "'great deference'" is owed, agency must "demonstrate" "markers of 'principled and reasoned'" decisionmaking).

### B. The Procedural Violations Were Prejudicial, Not Harmless

Nor may the Secretary's procedural violations be excused under the "harmless-error rule." Secretary Br.38. To start, the Secretary identifies no textual basis for applying harmless-error principles here. Such principles are creatures of statute. *See Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 533 (D.C. Cir. 2018); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). Congress created no harmless-error exception to § 1327(b)(2)(E), as it

10

knows how to do. *E.g.*, 5 U.S.C. § 706 ("rule of prejudicial error"); *accord* 38 U.S.C. § 7261(b)(2) (discussed in *Shinseki v. Sanders*, 556 U.S. 396 (2009)).

Regardless, the Secretary's errors were not harmless. Under APA precedent, "[t]o show [an] error was prejudicial," Anthropic must demonstrate "with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity." *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002). Anthropic has done just that. *E.g.*, App.254-262. It need not show the Secretary would "have changed [his] decision"; it is enough Anthropic could "'mount a credible challenge'" if afforded process and was "prejudiced by the absence of an opportunity to do so." *Norton*, 294 F.3d at 184.

Anthropic has established that a central rationale for the designation—post-deployment "operational veto" capabilities—is factually unfounded. Had Anthropic been afforded process, it would have made that showing to the Secretary before he acted based on a factual mistake. Prejudicial error is manifest in such circumstances, particularly given Under Secretary Michael's statement that "each risk identified may not, standing alone, have necessitated exclusion." App.421.

The Secretary's reliance on *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657 (2020), and similar cases is misplaced. Secretary Br.38. Those cases stand for the proposition that a final, superseding regulation may moot procedural challenges to interim rules. Here, the Secretary

11

has issued a single, final § 4713 designation. The more analogous cases are those holding that notice-and-comment violations are not "'harmless if there is any uncertainty at all'" about their effect. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 335 (D.C. Cir. 2017).[3]

Finally, the Secretary's repeated observation (Secretary Br.37, 39) that Anthropic did not "submit additional materials" after the designation is both wrong and irrelevant. It is wrong—as the Secretary has now acknowledged—because Anthropic did submit responsive materials both in its March 9 request that the Secretary stay his designation and in its April 17 request that he rescind the designation. It is irrelevant because the statute imposed no obligation on Anthropic to seek reconsideration. The Secretary cites no authority supporting his view that failure to seek legally deficient, after-the-fact reconsideration is even a factor in harmless-error analysis, much less dispositive of it.

## II. THE DESIGNATION VIOLATED § 4713'S SUBSTANTIVE CONSTRAINTS

Predictably, the Secretary's procedural violations resulted in a rushed and

---

[3] The Secretary does not ask this Court to remand without holding the designation unlawful. Nor could he. APA remand-without-vacatur practice is based on § 702's text, which preserves equitable authority. *Oglala Sioux Tribe*, 896 F.3d at 536. Section 1327 contains no analogous reservation. To the contrary, § 1327(b)'s hold unlawful remedy is "exclusive." 41 U.S.C. § 1327(b)(4)(C). Besides, the designation's "deficiencies are serious," and there would be minimal disruption to the Department in light of ordinary procurement tools. *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 541 (D.C. Cir. 2025).

flawed § 4713 designation. Indeed, as explained above, the designation rested on factual predicates that the Secretary's brief now abandons. Even apart from that concession, the Secretary's designation of Anthropic as a "supply chain risk" exceeds statutory limits and is neither reasonable nor reasonably explained. Anthropic Br.39-47. Nor did the Secretary meaningfully grapple with the "less intrusive measures" requirement. Anthropic Br.47-49. His efforts now to defend those substantive flaws are unpersuasive. Secretary Br.39-54.

### A. The Secretary Failed To Identify A Genuine Supply-Chain Risk

Properly construed, § 4713 does not apply to transparent, good-faith contractual disagreements between vendors and the Department. The Secretary's contrary theory is neither consistent with statutory text nor supported by the record.

### 1. Contractual Disagreements Are Not Supply-Chain Risks

The Secretary misreads § 4713(k) in asserting that "[t]he statute does not hinge on subjective intent" (Secretary Br.41) of the designee. In fact, key verbs in § 4713(k)(6)—including "sabotage," "manipulate," "surveil," "deny," and "disrupt"—connote purposeful misconduct. Anthropic Br.40.[4] The phrase "so as to" reinforces that § 4713(k) is focused on entities that act with the nefarious

---

[4]     Contrary to the Secretary's claim, Secretary Br.41, the phrase "extract data" should be similarly read, to "avoid[] ascribing to one word a meaning so broad that it is inconsistent with the company it keeps." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (internal quotation marks omitted).

purpose of disrupting the operation of covered technology systems. *E.g.*, *So As*, *Oxford English Dictionary* (3d ed. 2025) ("Expressing result, consequence, or purpose: in such a way that; so that, in order that.").

The focus on intent in § 4713(k) makes sense given Congress's stated concern with "[h]ostile nation states and other bad actors" exploiting those systems. S. Rep. No. 115-408, at 2 (2018). Hostility is, of course, a form of malign intent. Contrary to the Secretary's contention, considering the exemplars before Congress when it enacted § 4713 does not "inject[] nonexistent limitations into the statutory language." Secretary Br.40. It is a conventional way to interpret text "in light of the context from which the statute arose." *Bond v. United States*, 572 U.S. 844, 860, (2014); *see* Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021). The specific examples that prompted Congress to enact the legislation—Kaspersky's ties to Russian intelligence and Huawei's facilitation of Chinese government espionage—define the outer limits of § 4713's text. *See Fischer*, 603 U.S. at 491-492 (looking to "history of the provision," including problems specific to Enron that prompted Sarbanes-Oxley Act).

Against that backdrop, the Secretary's insistence that § 4713 is not focused on covert acts (Secretary Br.41) is untenable. If companies were "openly" (*id.*) embedding surveillance tools for foreign governments in their products, either commercial actors in the supply chain would remedy the problem themselves or

14

the Department's ordinary procurement tools would suffice. Section 4713 exists to address supply-chain risks that are not widely known—including risks identified by federal agencies with access to classified information.

Put simply, § 4713(k) targets covert and subversive acts. Anthropic Br.41. An open disagreement over contract terms is worlds removed from that scenario.

### 2. The "Operational Veto" Theory Is Untenable

The Secretary's attempt to recast this contract dispute into a supply-chain risk designation is neither reasonable nor reasonably explained. Anthropic Br.41-47. His brief abandons the *post*-deployment "operational veto" theory he previously advanced. *E.g.*, Secretary Br.51-52.[5] That alone requires holding the designation unlawful. And his pivot to *pre*-deployment risks—that Anthropic would supposedly encode limits in future models to subvert national security—is unsupported and provides no basis for a supply-chain risk designation.

a.      The Secretary based his designation on the theory that Anthropic possessed—and intended to use—the technical capability to exercise an "operational veto" over Claude after deployment in classified systems. App.181. That theory rested on specific, interlocking factual claims. Under Secretary Michael's litigation declaration asserted, for example, that "Anthropic's leadership

---

[5] The Secretary makes passing reference to a "backdoor" in Claude, Secretary Br.51, but that assertion is contradicted by the record, App.287 (Anthropic has no "backdoor or remote kill switch").

would alter or even shut off DoW's use of Claude," including "during a military operation." App.213; *see* App.214 (worrying Anthropic could "interfere during an operation"). He claimed that Anthropic could "make unilateral changes to" the model the Department "currently uses," App.218; that it could manipulate Claude post-deployment "through … administration of the models," App.409-410; that Anthropic "built a 'Gov wrapper' around [its] commercial models," App.411; that Anthropic could make "ongoing operational alterations" to "turn 'refusals' or 'guardrails' on or off," App.412; *see also* App.420; and that "twelve cleared Anthropic" employees have "administrative access" to deployed versions of Claude, App.413.

Every one of those claims is wrong. App.276, 281-292. Indeed, after Anthropic identified those factual errors, the Secretary opted not to defend his original post-deployment veto theory before this Court. His brief now pivots to concerns about pre-deployment model manipulation. Secretary Br.51-53. Those claims fail on their own terms, as explained below.

But the tacit concession that the Secretary's original premise was flawed is fatal to the designation. It is axiomatic that where an agency "has relied on multiple rationales (and has not done so in the alternative)" and one "is deficient," this Court should "vacate the [action] unless" it is "certain that [the agency] would have adopted it even absent the flawed rationale." *National Fuel*, 468 F.3d at 839;

16

*see also Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 466 (D.C. Cir. 1967). That rule is dispositive given Under Secretary Michael's acknowledgment that his risk analysis was cumulative and that "each risk … may not, standing alone, have necessitated" the designation. App.421. If the Secretary had known key factual assertions underlying the risk assessment were false, it is far from "certain" that he could (or would) have reached the same result.

The Secretary's complaints about "extra-record evidence" (Secretary Br.51) are misdirected. Section 1327 does not textually confine review to the administrative record. And the need for this Court to consider information beyond that record is a problem of the Secretary's own making. Had he followed statutory procedure, this Court could review a decision that "considered all relevant factors" and "both sides of the story." *Esch v. Yeutter*, 876 F.2d 976, 993 (D.C. Cir. 1989); *see also* App.265 (directing additional briefing on technical questions related to Claude's deployment). This Court is not powerless to redress a designation based on factual errors resulting from the Secretary's own procedural violations: that would be an untenable "heads the government wins and tails [Anthropic] loses" proposition. *United States v. Emor*, 785 F.3d 671, 673 (D.C. Cir. 2015).

b.      Having abandoned his primary rationale, the Secretary's brief pivots to a different theory: in the future, Anthropic will secretly and maliciously "encode limitations" into Claude during training before deployment to evade Department

testing and subvert U.S. military operations. Secretary Br.22; *see* Secretary Br.26-30, 44-53. This claim has no footing in the record. Although judicial review of the Secretary's rationale "is deferential," if such review "is to be more than an empty ritual, it must demand something better than the explanation offered" here. *Department of Com.*, 588 U.S. at 785.

The Secretary's fallback theory depends on conjuring Anthropic's "adversarial intent," App.214 but "the evidence tells a story that does not match th[at] explanation," *Department of Com.*, 588 U.S. at 784. And common sense forecloses it. If the Secretary genuinely believed Anthropic were a "hostile" actor, App.182, continued negotiations to reach terms for a new contract would be inconceivable—yet the Secretary oversaw negotiations that continued after his § 4713 designation. App.237-238, 241. And the Secretary fails to confront the illogic of his position. No saboteur would publicly decline the Secretary's terms and offer to help transition to alternative vendors; rather, it would *accept* his demands, then work covertly to undermine the Department. Anthropic Br.44.

The Secretary's principal support for conjecturing "adversarial intent" is Anthropic's public and private insistence on two contractual usage restrictions. To conclude from that fact that Anthropic would surreptitiously design future versions of Claude to disrupt military operations requires a series of unsupported inferences. "'[H]ard proof'" may not be needed in the national-security context, Secretary

Br.50, but an agency acts unreasonably where, as here, it "'draw[s] inferences that are 'arbitrary' in relation to the facts found.'" *Consolidated Rail Corp. v. Surface Transp. Bd.*, 93 F.3d 793, 799 (D.C. Cir. 1996). The Secretary leaps from his premise (Anthropic would not agree to the Secretary's terms) to his conclusion (Anthropic intends to covertly disrupt military operations) without any logical or evidentiary bridge. Official charges of disloyalty to the United States must be based on sterner stuff. *Cf., e.g.*, *Schneider v. Smith*, 390 U.S. 17, 26 (1968) (sabotage-risk could not be inferred based on past Communist-Party affiliation).

Far from providing a "robust foundation" for this claim, Secretary Br.46-47; *see* Secretary Br.1, 14, the Secretary's two examples refute his claim of "adversarial intent" by illustrating Anthropic's collaboration with federal partners to advance government AI uses. The first example relates to early deployments of commercial models of Claude in classified environments in 2024. App.279. Anthropic received feedback that those models "were applying public-facing content restrictions" to government users, including refusing to process "classified documents." App.279-280. Anthropic worked with its national-security partners to develop special "Claude Gov" models that address such concerns and meet the government's needs. App.280. The second example reinforces the point. Without Anthropic's knowledge, CDC used a "general commercial model whose standard safeguards—appropriately designed for public users—limited" uses related to

potentially unsafe biomedical research. App.261. Once Anthropic became aware of that mismatch between Claude's public-facing safeguards and its functionality for CDC public-health uses, it worked with the government to address the issue. App.262. In his reimagining of these events, the Secretary ignores what each example actually demonstrates: Anthropic's commitment to public safety, national security, and working collaboratively with federal partners.

Repeated invocation of the word "trust" (Secretary Br.13-14, 17, 27-28, 49) does not change any of this analysis. A breakdown in "trust" may justify the Secretary declining to contract with a vendor; it does not make the vendor a saboteur or otherwise create a supply-chain risk under § 4713.

Lastly, the pre-deployment theory founders on the Department's own testing regime—exactly the type of mechanism Congress would expect the Secretary to exhaust before using § 4713. App.282-290. Doubts about the efficacy of the Department's testing protocols are unconvincing. First, any such doubts apply to all frontier AI developers; they are intrinsic to the technology, not specific to Anthropic. Second, references to "trillion[s of model] weights" are a distraction. Secretary Br.13-14. No one evaluates an AI model by testing individual weights. Like other complex systems, models are evaluated by their performance, not their multitudinous components. That is what the Department's testing regime does. App.282-287. Third, the Secretary's claim that testing is challenging because

Claude must be "tune[d]" and "continuously update[d]" (Secretary Br.34) is factually wrong. Once deployed, a model's guardrails and weights are static; it cannot be tuned or tweaked, and certainly not by Anthropic in air-gapped classified environments. App.288-290. Finally, and perhaps most obviously, if the Secretary does not want to procure new models of Claude, he can make that decision without designating Anthropic a national-security risk.

## B. The Secretary Failed To Consider Less Intrusive Measures

The Secretary also has no persuasive defense of his failure to reasonably consider "less intrusive measures." 41 U.S.C. § 4713(b)(3)(B); Anthropic Br.47-49. Multiple alternatives were readily available, including not procuring new models, limiting subcontractor exclusion to certain uses of Claude, enhancing model testing criteria, closely supervising model training, enhancing training disclosures, and using ordinary procurement tools to replace Claude in military systems.

The Secretary claims to be confused about why ordinary procurement authorities would be "'less intrusive' than supply-chain "designation itself." Secretary Br.53. But the differences between designating Anthropic a national-security risk under § 4713 and using ordinary procurement tools are night and day. The designation immediately and categorically makes Anthropic ineligible for covered Department contracting. 41 U.S.C. § 4713(k)(4)(C). And by branding

Anthropic as a national-security threat and ordering all defense contractors to stop using Claude for work on government projects, the designation both damages Anthropic's reputation and risks predictable cascading effects across the commercial marketplace. App.47-58; App.294-297; *see also* App.80 (barring Claude from "all [Department] systems and networks" and "all … contracts"). What is more, the § 4713 designation risks broader exclusions across the federal government. *See* 41 U.S.C. § 1323; App.219 ("DoW is communicating" designation findings to "other U.S. government departments and agencies").

Even in circumstances (unlike these) where a genuine supply-chain risk exists, Congress made clear a designation should be a last, not first, resort. The Secretary's sweeping designation countermands that congressional instruction.

## III.   THE DESIGNATION VIOLATED THE DUE PROCESS CLAUSE

The Secretary also contravened the Fifth Amendment by impairing constitutionally protected interests without providing pre-deprivation notice and an opportunity to rebut. *See* Anthropic Br.49-53. In response, the Secretary does not contest that the § 4713 designation deprives Anthropic of "interest[s] in 'property' or liberty'" protected by the Fifth Amendment. *Ralls Corp. v. Committee on Foreign Inv. in the U.S.*, 758 F.3d 296, 315 (D.C. Cir. 1980); *see* Secretary Br.55. Any such contention is forfeited, *Southern Cal. Edison Co. v. FERC*, 603 F.3d 996,

1000 (D.C. Cir. 2010), and inconsistent with binding precedent in any event, *see* Anthropic Br.49-50.

Instead, the Secretary insists that post-designation process is sufficient. Secretary Br.55-56. It is not. As Anthropic has explained, the Constitution's default command is that notice and an opportunity to rebut a government action be afforded "before adverse action is taken"—not after. *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 956 (D.C. Cir. 1980); *see Esparraguera v. Department of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024); *Ralls*, 758 F.3d at 320. Remarkably, the Secretary addresses none of those decisions.

Although "'post-deprivation process[es]'" may sometimes satisfy due process, Secretary Br.56, those circumstances are rare. And this Court's decisions establish that the Secretary bears the burden to "make a showing of particularized need" to bypass pre-designation process. *National Council*, 251 F.3d at 208; *see also People's Mojahedin Organization of Iran v. Department of State*, 613 F.3d 220, 227-228 (D.C. Cir. 2010). Those cases make clear, moreover, that this "particularized need" standard applies despite "the foreign-policy/national-security nature" of a government designation. *National Council*, 251 F.3d at 207-208.

The Secretary has not made and could not make that showing. He does not claim, for example, that advance notice would have permitted Anthropic to evade later regulation, to destroy evidence, to force premature disclosure of sensitive

intelligence, or to move assets. *Compare Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) (identifying asset-flight risk). And for the same reasons the Secretary cannot satisfy § 4713(c)'s standard, the Secretary cannot show particularized need here. Above all, if the asserted supply-chain risk could be managed for 180 days during active military operations, it could have been managed for a short period of time to permit Anthropic to exercise procedural rights the Constitution guarantees. *See* Anthropic Br.37-39, 52; *supra* p.9.

The Secretary is wrong that "consequences of the designation" are "substantially narrower" than in *National Council.* Secretary Br.60. Blacklisting an American company from covered Department contracts on the ground that it is a national-security threat is at least as consequential as prohibiting the People's Mojahedin of Iran from holding a "small" bank account or receiving material support from within the United States. *National Council*, 251 F.3d at 201. It defies credulity to contend that a foreign terrorist organization would be entitled to pre-deprivation process in that context while a leading American technology company should receive only post-deprivation process here.

Equally misdirected is the claim that "post-designation process is particularly appropriate in th[e] government-contracting context." Secretary Br.60. For one thing, the Secretary disregards the concrete reputational consequences of being branded a national-security risk. *E.g.*, App.296-297. In addition, his position

ignores *Old Dominion*, which required pre-designation process precisely in a government-contracting context. 631 F.2d at 956. And far from supporting the Secretary, *Kartseva v. Department of State*, 37 F.3d 1524 (D.C. Cir. 1994), undermines his assurance that the deprivation "here is quite limited." Secretary Br.61. There, this Court recognized that disqualifying a person from all contracts "of some predetermined type" with a federal agency—as occurred here—effects a change in "status sufficient to implicate a liberty interest, with attendant needs for due process protections." *Kartseva*, 37 F.3d at 1529.

None of the Secretary's preferred post-deprivation cases help him. Secretary Br.56-57. Many involved an objective, independently verifiable trigger from an entity separate from the government decisionmaker that minimized risk of error: a grand jury probable-cause finding, *FDIC v. Mallen*, 486 U.S. 230, 241 (1988); an arrest and formal felony charge by an "independent third party," *Gilbert v. Homar*, 520 U.S. 924, 934 (1997); an expert's post-horse-race drug test, *Barry v. Barchi*, 443 U.S. 55, 64-65 (1979); a record of prior unchallenged convictions, *Dixon v. Love*, 431 U.S. 105, 113 (1977). Several cases involved "temporary" actions. *Gilbert*, 520 U.S. at 932; *see Mallen*, 486 U.S. at 242 (suspension capped at 90 days); *Barry*, 443 U.S. at 64 ("interim suspension"). And in each, the government identified a concrete reason why pre-deprivation process would risk specific

harm—for example, a drugged horse that could race again, a dangerous driver on the road, a charged officer with access to depositors' funds.

This case shares none of those features. There is no independent verification—the Secretary is the accuser and decisionmaker. And the Secretary's subjective risk assessment is the type of contested judgment for which pre-deprivation process matters most. Nor is the deprivation temporary or limited: it is a final statutory determination that Anthropic is a national-security threat, carrying indefinite exclusion from covered Department contracting with cascading reputational consequences. And the Secretary has identified no concrete reason—none—why 30 days of pre-deprivation process was infeasible.

Finally, Anthropic has "explain[ed] why pre-designation—rather than post-designation—process was necessary." *Contra* Secretary Br.60; *see* Anthropic Br.3-4, 24-25, 33-34, 53. Pre-designation process is required even in the face of "uncertainty that more process would have led to a different … decision." *Ralls*, 758 F.3d at 320. But here there is ample reason to believe process would have mattered given that the designation rests on factual errors the Secretary's brief does not defend. Truth and fairness "can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring). This case confirms that insight. Had Anthropic been provided notice and an opportunity to

rebut the § 4713 designation, it would have highlighted the defects underlying it. *See supra* Part II.A.1; Anthropic Br.53.

## IV.    THE DESIGNATION VIOLATED THE FIRST AMENDMENT

Finally, while the First Amendment permits the Secretary to "share [his] views freely," it forbids him from wielding "the power of the State to punish or suppress disfavored expression." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). He did that here in imposing an unprecedented, punitive § 4713 designation on Anthropic. Anthropic has established its protected expression, the Secretary's retaliatory response, and the connection between them. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); Anthropic Br.53-60. This is textbook retaliation.

The Secretary has one core defense, repackaged in different ways. The supply-chain risk designation, he claims, "rests on the Secretary's determinations about" malicious "conduct [Anthropic] may engage in," not retaliation for Anthropic's "speech." Secretary Br.62. The record establishes otherwise.

Start with the Secretary's own words. His February 27 announcement ordering the designation accused Anthropic of "sanctimonious rhetoric," "corporate virtue-signaling," and "ideological whims." App.77. That was issued shortly after, and "[i]n conjunction with," *id.*, the President's own announcement, which referred to Anthropic as "WOKE," "Leftwing nut jobs," and a "Radical Left

27

AI company," App.153. Contrary to the Secretary's position, Secretary Br.63, 67, it is impossible to understand those statements without reference to Anthropic's public advocacy regarding AI safety, including its public and private communications with the Department. Identifying retaliatory animus here does not require "look[ing] behind" or "'prob[ing]'" the Secretary's "'stated justifications.'" Secretary Br.66. It requires taking him at his word.[6]

The underlying risk analysis underscores that Anthropic's protected expression was a "but-for cause" of the designation. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Under Secretary Michael's memorandum focuses on "public statements of Anthropic's CEO and others associated with the company," App.182, "statements made during negotiations," App.181, perceived "marketing campaign[s]" and "brand-building" by Anthropic, App.182, and outreach to "the press," App.183. That is all expressive activity.

The timing and scope of the Secretary's response reinforce that retaliatory animus drove his designation. Anthropic Br.58-60. The Secretary's post came just three days after Anthropic's CEO met with the Secretary in person to express the company's views about two usage restrictions, and one day after Anthropic

---

[6] Whether or not the Secretary's February 27 post has "legal effect," Secretary Br.67, his eight-paragraph explanation for why he directed a supply-chain risk designation is certainly probative of retaliatory motive. *E.g.*, *Media Matters*, 138 F.4th at 580 (noting "ample evidence" of retaliation based in part on press release and interview statements).

28

publicly defended its principled stand. App.146-147. The Secretary's response was wholly disproportionate to Anthropic's refusal to accept his preferred contract terms. If the Secretary was dissatisfied with Claude or Anthropic's terms, he was free to walk away. The Secretary instead chose an extreme tool—a supply-chain risk designation that blacklists Anthropic. That mismatch is a hallmark of retaliation. It shows that the Secretary sought to send a message to others that public expression at odds with the preferences of the Department will be punished.

Finally, the Secretary's reliance on cases allowing appropriate "evidentiary use" of speech (Secretary Br.65) in criminal or civil enforcement is misplaced. In *Flytenow, Inc. v. FAA*, 808 F.3d 882, 894 (D.C. Cir. 2015), for example, this Court held that the FAA could consider a website advertising unlicensed commercial flights as "evidence that pilots are offering service that exceeds the limits of their certifications." The FAA had authority to regulate that unlawful conduct regardless of what anyone said. *Flytenow* illustrates the principle that speech may be used as evidence of wrongdoing. But it does not allow speech to be treated as wrongdoing. And it certainly does not allow the Secretary to retaliate against Anthropic for its public and private expression about AI safety.

## CONCLUSION

The Court should hold the § 4713 actions unlawful.

Dated: May 13, 2026

Respectfully submitted.

*Kelly P. Dunbar*

MICHAEL J. MONGAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000
michael.mongan@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
emily.barnet@wilmerhale.com

KELLY P. DUNBAR
JOSHUA A. GELTZER
KEVIN M. LAMB
ANNEKE DUNBAR-GRONKE
SAMSON F. COHEN
MEGAN O. GARDNER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com
joshua.geltzer@wilmerhale.com
kevin.lamb@wilmerhale.com
anneke.dunbar-gronke@wilmerhale.com
samson.cohen@wilmerhale.com
megan.gardner@wilmerhale.com

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,465 words. I further certify that the foregoing brief has been prepared in proportionally spaced typeface using Microsoft Word for Office in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), I have relied upon the word count feature of this word processing system in preparing this certificate.

Dated: May 13, 2026                      /s/ *Kelly P. Dunbar*
                                            Kelly P. Dunbar

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Pursuant to Fed. R. App. P. 25(c)(2)(A), I further certify that the foregoing was served to all registered users by filing it with the Court's electronic filing system.

/s/  *Kelly P. Dunbar*
KELLY P. DUNBAR
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com