**ORAL ARGUMENT NOT YET SCHEDULED**
No. 26-1049

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ANTHROPIC PBC,

*Petitioner,*

v.

U.S. DEPARTMENT OF WAR AND PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents*.

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Covered Procurement Actions

# [PROPOSED] *AMICI CURIAE* BRIEF OF EMPLOYEES OF OPENAI AND GOOGLE IN THEIR PERSONAL CAPACITIES IN SUPPORT OF PETITION FOR REHEARING

Ori Lev
AI for Democracy Action Lab at
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW
Suite 163
Washington DC 20006
(202) 579-4582
ori.lev@protectdemocracy.org

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1), the *amici curiae* submit this certificate as to parties, rulings, and related cases.

### A. PARTIES AND *AMICI*

As of October 20, 2026, the date on which this brief was filed, *amici* are not aware of any other parties, intervenors, or *amici* who have entered an appearance in this Court, other than those listed in the briefs of Respondents and Petitioner or disclosed by other *amici* to date.

### B. RULINGS UNDER REVIEW

*Amici curiae* are aware of no rulings under review other than those listed in the briefs of Respondents and Petitioner or disclosed by other *amici* to date.

### C. RELATED CASES

*Amici curiae* are aware of no pending related cases other than those listed in the briefs of Respondents and Petitioner or disclosed by other *amici* to date.

Dated: October 20, 2026

*/s/ Ori Lev*
Ori Lev
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* are each individuals, not corporate entities, and are not subject to Rule 26.1.

## STATEMENT REGARDING CONSENT TO FILE

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* states that counsel for all parties have consented to the filing of this brief.

## CERTIFICATE OF SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary for the following reasons. The contents of this brief provides the unique perspective of scientists and other professionals employed by Anthropic's competitors on the risks that frontier AI systems present when deployed to enable domestic mass surveillance or the operation of autonomous lethal weapons systems without human oversight and on the need for guardrails for such systems. No other *amici* are able to provide this perspective. This brief is meaningfully different from the briefing submitted by Petitioner and likely to be submitted by any other *amici curiae*.

Dated: October 20, 2026

*/s/ Ori Lev*
Ori Lev
*Counsel for Amici Curiae*

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

STATEMENT REGARDING CONSENT TO FILE ............................................ iii

CERTIFICATE OF SEPARATE BRIEFING ....................................................... iv

TABLE OF AUTHORITIES ........................................................................... vi

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 3

ARGUMENT ................................................................................................ 4

I. The "Supply Chain Risk" Designation Is Improper Retaliation That Harms the Public Interest. ........................................................ 4

II. The Concerns Underlying Anthropic's "Red Lines" Are Real and Require a Response. ................................................................ 6

III. Mass Domestic Surveillance Powered by AI Poses Profound Risks to Democratic Governance—Even in Responsible Hands. ......... 7

IV. Fully Autonomous Lethal Weapons Systems Present Risks That Also Must Be Addressed. .............................................................. 10

CONCLUSION ............................................................................................ 11

APPENDIX: LIST OF INDIVIDUAL AMICI CURIAE ..................................... 13

# TABLE OF AUTHORITIES

## Cases

*Hartman v. Moore*, 547 U.S. 250 (2006) ........ 6

## Statutes

41 U.S.C. § 4713 ........ 5

National Defense Authorization Act of 2026, Pub. L. 119-60, tit. XV, § 1532 ....... 5

Posse Comitatus Act, 18 U.S.C. § 1385 ........ 9

Secure and Trusted Networks Security Act of 2019, 47 U.S.C. §1601 *et seq.* ........ 5

## Other Authorities

Exec. Order No. 13873, 84 Fed. Reg. 22689 (May 17, 2019) ........ 5

Jonathon W. Penney, *Chilling Effects: Online Surveillance and Wikipedia Use*, 31 Berkeley Tech. L.J. 117 (2016) ........ 9

Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S. Rep. No. 94-755, Book III (1976) ....... 8

U.S. Bureau of Labor Statistics, *Beyond the Numbers: Artificial Intelligence—Taking on a Bigger Role in Our Future Security* (May 3, 2021), https://www.bls.gov/opub/btn/volume-10/investigation-and-security-services.htm ........ 7

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are engineers, researchers, and other professionals employed at U.S. frontier AI laboratories. We build, train, and study the large-scale AI systems serving a range of users and deployments, including in the domains of national security, law enforcement, and military operations. We submit this brief in our individual capacities as professionals with direct knowledge of these systems' capabilities, and what is at stake when their deployment outpaces the legal and ethical frameworks governing them.

As a group, we are diverse in our politics and philosophies, but united in the conviction that today's frontier AI systems present risks when deployed for domestic mass surveillance or the operation of autonomous lethal weapons systems without human oversight, and those risks require guardrails. That conviction reflects no particular set of ideological or political commitments, but follows from any reasonable evaluation of the capabilities and limitations of current frontier systems. We respectfully submit this brief, in the hopes that our understanding of the technology at issue, and unique perspective as employees of companies in fierce competition with Anthropic, will shed light on the stakes of this case.

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than amici contributed money to fund this brief's preparation or submission.

Individual *amici*, listed in the Appendix, sign in their personal capacities only; their companies and titles are included to provide a sense of the perspectives they bring to this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case arises from the Pentagon delivering on its threat to designate Anthropic a "supply chain risk" if the company declined to agree to remove limitations on the use of its AI systems for domestic mass surveillance or fully autonomous lethal weapons systems. If Respondents were not satisfied with the terms of its contract with Anthropic, they could have canceled the contract and hired another AI company. Instead, Respondents recklessly invoked national security authorities intended to protect the procurement process from interference by foreign adversaries. If allowed to proceed, this effort to punish a leading U.S. AI company will harm the United States' competitiveness in AI and beyond. And it will chill open deliberation in our field about the risks and benefits of today's AI systems. We submit this brief because we understand the risks of frontier systems, the need for guardrails, and the importance of speaking openly about both.

We offer three arguments.

First, the government's designation of Anthropic as a supply chain risk was an improper and arbitrary use of power with serious ramifications for our industry. While not privy to the details of how Anthropic and the Pentagon's contractual relationship broke down, we are concerned Respondents' action harms public debate on AI as well as U.S. competitiveness in the field of AI and innovation broadly.

Second, the technical concerns animating Anthropic's "red lines" are legitimate and widely recognized within our community. The best available AI systems cannot safely or reliably handle fully autonomous lethal targeting, and should not be available for domestic surveillance. Guardrails may take various forms, but must be in place.

Third, the risks of the two use cases at issue are profound. AI-enabled mass domestic surveillance would transform the fragmented data ecosystem that surrounds American life into a unified, real-time monitoring instrument. Even the awareness that such capability exists creates a chilling effect on democratic participation. Currently, autonomous lethal weapons systems cannot reliably distinguish combatants from civilians, explain their targeting decisions, or engage in human accountability structures.

For these reasons, we urge the Court to grant the relief requested by Anthropic.

## ARGUMENT

### I. The "Supply Chain Risk" Designation Is Improper Retaliation That Harms the Public Interest.

This case poses a question of seismic importance for our industry, national security, and democracy: What happens when the government uses its national security authorities to punish a private company for maintaining safeguards on certain uses of its AI systems while speaking to why those safeguards matter?

In March 2026, the Pentagon designated Anthropic a supply chain risk. While we are not privy to their negotiations' details, Respondents could have dropped Anthropic's contract if they no longer wished to be bound by its terms. The supply chain risk designation is a mechanism for excluding from the defense industrial base vendors who pose a genuine threat to military systems' integrity.[2] It is used in rare cases with foreign-adversary–controlled companies, compromised suppliers, and contractors whose products create exploitable vulnerabilities,[3] whereas Anthropic is a domestic AI developer[4] that has worked with the Pentagon on military applications of AI systems since last year.

The Pentagon's decision to reach for supply chain risk authority in response to Anthropic's negotiations introduces an unpredictability in our industry that undermines American innovation. It chills debate on frontier AI systems and how related risks can be addressed. The U.S. leads the world in AI largely due to the competition and flow of ideas among AI companies. Silencing one lab diminishes the industry's capacity to innovate. The resulting harm has constitutional

---

[2] *See* 41 U.S.C. § 4713 (supply chain security authority); *see also* Secure and Trusted Networks Security Act of 2019, 47 U.S.C. § 1601 *et seq.*

[3] *See, e.g.*, Exec. Order No. 13873, 84 Fed. Reg. 22689 (May 17, 2019) (authorizing import bans on technology threats under emergency trade authorities, aimed at Chinese vendors Huawei and ZTE).

[4] Congress has largely prohibited acquisition of AI systems from China, Russia, North Korea, and Iran. National Defense Authorization Act of 2026, Pub. L. 119-60, tit. XV, § 1532. There is no equivalent provision for U.S.-based systems providers. *Id.*

dimensions as well, undermining the freedom to engage in debate about how powerful technologies should be governed. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.").

## II. The Concerns Underlying Anthropic's "Red Lines" Are Real and Require a Response.

Frontier AI could have many benefits but also carries many risks. These risks are not hypothetical, but structural. They follow from the nature of the technology and from what happens when institutions, however well-intentioned, acquire capabilities that exceed the oversight mechanisms to check them.

That is why guardrails are needed in the domains in which current systems carry intolerable risk. A tricycle can be driven on an interstate, but we do not allow it because of the risks. Mass domestic surveillance and autonomous lethal weapons systems are the equivalently reckless domains for today's frontier models. The considered judgment, shared widely across the AI development community, is these applications carry risks and harms so severe that guardrails are necessary absent robust governance frameworks. For a vendor to insist those boundaries be honored as a condition of access to its software is not arbitrary, anticompetitive, or contrary to the public interest.

The legal vacuum in which these contractual terms exist makes them more important. The U.S. has no comprehensive federal law governing AI use by

military or intelligence agencies in domestic contexts. There is no statutory framework requiring transparency, judicial oversight, or meaningful accountability for AI-driven mass surveillance. There is no enforceable legal standard governing when an autonomous weapons system may select and engage a target. Absent public law, the requirements AI developers impose on their systems' use represent vital safeguards.

### III. Mass Domestic Surveillance Powered by AI Poses Profound Risks to Democratic Governance—Even in Responsible Hands.

AI-enabled mass surveillance offers the ability to monitor, analyze, and act on the behavior of a population continuously in real time. The devices and data streams required to do this exist. As of 2018,[5] there were approximately 70 million surveillance cameras operating in the U.S. Every smartphone broadcasts location data to carriers and dozens of applications. Social media platforms log what people post, read, and how long they browse. Employers, insurers, and data brokers have behavioral profiles on most American adults that are often available for government purchase without a warrant. What does not yet exist is the AI layer that transforms this fragmented landscape into a unified, real-time surveillance apparatus. Today, these streams are siloed, inconsistent, and require significant

[5] U.S. Bureau of Labor Statistics, *Beyond the Numbers: Artificial Intelligence—Taking on a Bigger Role in Our Future Security* (May 3, 2021), https://www.bls.gov/opub/btn/volume-10/investigation-and-security-services.htm.

effort to connect. An AI system used for mass surveillance could dissolve those silos, correlating face-recognition data with location history, social graphs, and behavioral patterns across hundreds of millions of people.

The mere existence of such a capability in government hands changes the character of public life. Behavioral scientists and legal scholars have documented the "panopticon effect": when people believe they may be observed, they modify their behavior, regardless of whether anyone is watching. The journalist thinks twice before calling a military source. The activist softens her messaging, calculating that visibility carries risk it didn't before. The academic avoids certain search terms. None of these people have been targeted or punished. But their behavior has been constrained, and with it the democratic functions they serve.

History offers ample warning. The FBI's COINTELPRO program demonstrated how domestic intelligence powers justified by security concerns were turned against civil rights leaders, journalists, and political dissidents. The program did not merely surveil its targets. It fabricated evidence, tipped off employers, and worked to discredit Martin Luther King, Jr. after he received the Nobel Peace Prize.[6] AI does not merely replicate those dangers—it multiplies them by orders of magnitude.

---

[6] *See* Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S. Rep. No. 94-755, Book III, at 3, 8, 26, 138, 143—144 (1976).

The risk is compounded because the Pentagon operates under a legal framework oriented toward external threats and warfighting, not domestic civil life. The Posse Comitatus Act, passed in 1878 in direct response to the use of federal troops to police American civilians during Reconstruction, reflects a constitutional tradition of keeping military power separate from domestic governance.[7] When the Pentagon acts domestically, it operates in legal territory it was not designed for, with oversight structures not built to catch domestic abuses. That is partly why the bulk data collection programs by the Pentagon's own National Security Agency (NSA), revealed by Edward Snowden in 2013, were shocking and produced measurable chilling effects. One study found significant drops in traffic to Wikipedia articles on terrorism-related topics following the revelations, likely as people adjusted their behavior after learning searches might be monitored.[8]

The harms from building this infrastructure are not easily undone. Data collected on a population does not expire. A database of location records, behavioral profiles, and social graphs built today will exist years from now, accessible to whoever controls it under whatever political conditions prevail. That

---

[7] Posse Comitatus Act, 18 U.S.C. § 1385 (originally enacted 1878) (prohibiting use of the military to execute civilian laws except as expressly authorized by the Constitution or Act of Congress).
[8] Jonathan W. Penney, *Chilling Effects: Online Surveillance and Wikipedia Use*, 31 Berkeley Tech. L.J. 117 (2016).

data would feed into an AI-powered surveillance infrastructure that, once constructed, tends to expand rather than contract. Agencies find new uses for capabilities, authorities get quietly reinterpreted, and the political cost of dismantling something is almost always higher than the cost of letting it grow. As the Snowden revelations showed, technology built for international espionage has a way of being used for domestic surveillance without clear legal boundaries. The boundary the Posse Comitatus Act was designed to protect, once eroded by the establishment of a Pentagon-controlled domestic surveillance apparatus, may prove impossible to restore.

We do not suggest that Respondents intend to misuse such capabilities. Intent is the wrong question. Democratic governance does not rest on the good intentions of those in power. It rests on structural constraints that make abuse difficult. AI-enabled domestic surveillance, deployed without legal constraints and independent oversight, removes those structural protections in ways that no amount of good faith can replace.

## IV. Fully Autonomous Lethal Weapons Systems Present Risks That Also Must Be Addressed.

Current AI models are not reliable enough to make lethal targeting decisions and the risks of their deployment for that purpose require guardrails.

Lethal autonomous weapons systems are not hypothetical. They are already being deployed with decreasing levels of human involvement, and their failures are

documented. Our experience convinces us that current AI systems have limitations, as pattern-matching systems trained on historical data, that create an unacceptable risk of deployment in fully autonomous forms. While expert pattern-matching systems perform well in conditions that resemble their training environment, they have significant potential to degrade in novel, ambiguous conditions. They cannot be trusted to identify targets with perfect accuracy, and they cannot make the subtle tradeoffs between achieving an objective and accounting for collateral effects that a human can. While AI systems can assemble and evaluate information quickly for human decisionmakers, they can hallucinate, meaning a human must be able to verify critical information before a lethal munition is fired. Their chain of reasoning is often hidden from their operators, and their internal workings are opaque even to their developers. Even if fully autonomous weapons systems are inevitable, they cannot be safely deployed without guardrails to make their use reasonable. That is a technical judgment, not a political one.

## CONCLUSION

The government has legitimate interests in ensuring that AI capabilities are available to serve national security. But national security is not served by recklessly designating the military's American technology partners as a "supply chain risk" or suppressing public discourse on AI safety. Nor is the U.S.' competitiveness in AI served by Respondents' retaliation against one of the leading

American AI companies. Until a legal framework exists to contain the risks of deploying frontier AI systems, the ethical commitments of AI developers—and their willingness to defend those commitments—are not obstacles to good governance or innovation. They are contributions to it.

Respectfully submitted,

Dated: October 20, 2026

*/s/ Ori Lev*
Ori Lev
AI for Democracy Action Lab at
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW
Suite 163
Washington DC 20006
(202) 579-4582
ori.lev@protectdemocracy.org

*Counsel for Amici Curiae*

**APPENDIX: LIST OF INDIVIDUAL AMICI CURIAE**

- Grant Birkinbine, Member of Technical Staff – Security Engineer, OpenAI
- Anna-Luisa Brakman, Member of Technical Staff, OpenAI
- Michael Dennis, Senior Research Scientist, Google DeepMind
- Rasmi Elasmar, Senior Research Engineer, Google DeepMind
- Aaron Friel, Member of Technical Staff – Software Engineer, OpenAI
- Leo Gao, Member of Technical Staff, OpenAI
- Edward Grefenstette, Director of Research, Google DeepMind
- Alexander Irpan, Research Scientist, Google DeepMind
- Manas Joglekar, Member of Technical Staff, OpenAI
- Kathy Korevec, Director, Product, Google
- Shrinu Kushagra, Research Scientist, Google
- Sharon Lin, Research Engineer, Google DeepMind
- Soukaina Mansoor, Creative Community Lead, OpenAI
- Roman Novak, Research Scientist, OpenAI
- Zach Parent, Forward Deployed Engineer, OpenAI
- Andrew Schmidt, Model Designer, OpenAI
- Jordan Sitkin, Member of Technical Staff, OpenAI
- Chang Sun, Member of Data Science Staff, OpenAI
- Sean Talts, Staff Software Engineer, Google

- Alexander Matt Turner, Research Scientist, Google DeepMind
- Cody Marie Wild, Research Engineer, Google DeepMind
- Jason Wolfe, Member of Technical Staff, OpenAI
- Kate Woolverton, Senior Software Engineer, Google DeepMind
- Gabriel Wu, Member of Technical Staff – Research Engineer, OpenAI
- Cathy Yeh, Member of Technical Staff, OpenAI
- Jelle Zijlstra, Member of Technical Staff, OpenAI

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 29(a)(4), that the attached amicus brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,564 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: October 20, 2026

*/s/ Ori Lev*
Ori Lev
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, I electronically filed the foregoing document using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be served through the CM/ECF system.

Dated: October 20, 2026

*/s/ Ori Lev*
Ori Lev
*Counsel for Amici Curiae*