ORAL ARGUMENT WAS HELD ON MAY 19, 2026

**Nos. 26-1049, 26-1162**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ANTHROPIC PBC,

*Petitioner*,

v.

U.S. DEPARTMENT OF WAR,
PETER B. HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF WAR,

*Respondents*.

---

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

---

**BRIEF FOR FAITH FAMILY TECHNOLOGY NETWORK AS *AMICUS CURIAE* IN SUPPORT OF ANTHROPIC PBC'S PETITION FOR REHEARING OR REHEARING EN BANC**

---

Rakesh Kilaru
Caroline Li
Oluwatitomi Akinmola
Grace Driggers
WILKINSON STEKLOFF LLP
2001 M St NW, 10th Floor
Washington, DC 20036
Tel.: (202) 847-4000
Fax: (202) 847-4005
rkilaru@wilkinsonstekloff.com

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* submits this certificate as to parties, rulings, and related cases.

**Parties and *Amici*.** As of October 20, 2026, the date on which this brief was filed, *amicus* is not aware of any other parties, intervenors, or *amici* who have entered an appearance in this Court, other than those listed in the briefs of Petitioner and Respondents or disclosed by other *amici* to date.

**Rulings Under Review.** The ruling at issue is the panel opinion issued September 25, 2026, in Anthropic PBC v. United States Department of War, Nos. 26-1049 and 26-1162. References to the ruling appear in the Addendum to Anthropic PBC's Petition for Rehearing or Rehearing En Banc.

**Related Cases.** *Anthropic PBC v. U.S. Dep't of War, et al.*, 3:26-cv-01996 (N.D. Cal.) (filed Mar. 9, 2026), No. 26-2011 (9th Cir.) (appeal stayed as of Apr. 27, 2026, Dkt. No. 17). Counsel is unaware of any other related cases currently pending before this Court or any other court.

Dated: October 20, 2026

*/s/ Rakesh Kilaru*
Rakesh Kilaru

*Counsel for Amicus Curiae*

**STATEMENT REGARDING CONSENT TO FILE, INTEREST IN CASE, AND CERTIFICATE REGARDING SEPARATE BRIEFING**

Faith Family Technology Network ("FFTN") has notified counsel for all parties of its intent to file this brief, and all parties have consented to the filing.

Pursuant to Circuit Rule 29(d), *amicus* FFTN certifies that a separate brief is necessary. FFTN is a non-partisan, interfaith organization[1] with a vested interest in preserving the right of religious organizations and people of faith to take moral stances without fear of retribution from the Government. This brief will provide this Court with the perspective of a coalition of those of Jewish, Christian, and Muslim faith who regularly engage with questions at the intersection of faith, family, and technology.

To the undersigned's knowledge, no other *amicus* has filed, or plans to file, a brief expressing similar views or based on similar experiences of interfaith communities. *Amicus* believes that a separate brief will serve the Court.

Dated: October 20, 2026

*/s/ Rakesh Kilaru*
Rakesh Kilaru

*Counsel for Amicus Curiae*

[1] This brief represents the views of FFTN and its alliance members, and does not entail endorsement by its host institution, the Institute for Family Studies.

**STATEMENT REGARDING AUTHORSHIP**

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, no party or counsel for any party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

Dated: October 20, 2026

*/s/ Rakesh Kilaru*
Rakesh Kilaru

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus* is not a publicly held corporation, does not issue stock, and does not have a parent corporation.

Dated: October 20, 2026

*/s/ Rakesh Kilaru*
Rakesh Kilaru

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

Certificate as to Parties, Rulings, and Related Cases ........................................... i

Statement Regarding Consent to File, Interest in Case, and Certificate Regarding Separate Briefing ........................................................................................ ii

Statement Regarding Authorship.......................................................................... iii

Corporate Disclosure Statement ........................................................................... iv

Table of Contents .....................................................................................................v

Table of Authorities ............................................................................................... vi

Introduction and Summary of Argument.................................................................1

Argument ..................................................................................................................2

I. The Constitution Places Matters Of Conscience Beyond The Reach Of Government Coercion.........................................................................2

A. The Government's Actions Threaten Freedom of Conscience— the Foundation of American Religious Liberty. ..................................2

B. The Government's Proposed "All Lawful Purposes" Constraint Does Not Adequately Protect Freedom of Conscience. ........................5

II. Anthropic's Viewpoint That The Value Of Human Life Requires Human Accountability When Lethal Force Is Used Is A Matter Of Conscience Consistent With Religious Teachings And Protected By The First Amendment. ....................................................................6

III. Anthropic's Viewpoint That Mass Domestic Surveillance Violates Basic Human Dignity Is A Matter Of Conscience Consistent With Religious Teachings And Protected By The First Amendment. ................8

Conclusion ..............................................................................................................13

Certificate of Compliance......................................................................................14

Certificate of Service .............................................................................................15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 4

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .......... 6

*Anthropic PBC v. U.S. Dep't of War*,
2026 WL 836842 (N.D. Cal. Mar. 26, 2026) .......... 1, 8

*Anthropic PBC v. U.S. Dep't of War*,
2026 WL 2534714 (N.D. Cal. Aug. 27, 2026) .......... 12

*Cantwell v. Connecticut.*,
310 U.S. 296 (1940) .......... 3

*Girouard v. United States,*
328 U.S. 61 (1946) .......... 3

*Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*,
585 U.S. 878 (2018) .......... 4

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 3

*Wooley v. Maynard*,
430 U.S. 705 (1977) .......... 4

**Statutes**

42 U.S.C. §§ 2000bb–2000bb-4 .......... 4

**Other Authorities**

S. Rep. No. 94-755 .......... 10

## INTRODUCTION AND SUMMARY OF ARGUMENT

What is at stake in this case is whether the Government can seek to destroy a company for setting moral limits on the use of its products. It is undisputed that Anthropic has broken no law, having instead refused to allow the Government to use its product in ways that conflict with its deeply held moral principles. In response, the Government has taken sweeping actions that would, in the words of one federal judge, "cripple Anthropic," if not amount to "attempted corporate murder." *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 836842, at *1 (N.D. Cal. Mar. 26, 2026).

Allowing the Government's actions to stand—and leaving in place the panel majority's ruling rejecting Anthropic's challenges to them—will set a dangerous precedent. Left uncorrected, the panel's ruling permits an unprecedented mechanism of state compulsion that will discourage other companies from acting consistent with morality and conscience. And it will chill religious organizations and religiously affiliated entities from freely expressing their beliefs—publicly or privately—when interacting with the Government. As an organization composed of people of faith, FFTN believes America is at its best when individuals and institutions remain free to speak and act according to conscience, especially when their beliefs diverge from the Government's desires. The Constitution and federal law permit no less.

Consistent with these principles and the criteria for en banc review, this Court should grant rehearing for three separate reasons: *First*, the Constitution and federal law place matters of conscience beyond the reach of government coercion, prohibiting penalties against those who refuse to take actions contradicting moral convictions. *Second*, Anthropic's viewpoint that the value of human life requires human accountability when lethal force is used is a matter of conscience consistent with religious teachings and protected by the First Amendment. And *Third*, Anthropic's viewpoint that mass domestic surveillance violates basic human dignity is likewise a protected matter of conscience consistent with religious teachings.

## ARGUMENT

### I. THE CONSTITUTION PLACES MATTERS OF CONSCIENCE BEYOND THE REACH OF GOVERNMENT COERCION.

#### A. The Government's Actions Threaten Freedom of Conscience—the Foundation of American Religious Liberty.

From our Nation's earliest days, freedom of conscience has been recognized as a fundamental limit on state power. The Founders articulated that principle even before the Constitution was drafted and ratified. James Madison described conscience as "unalienable" in his Memorial and Remonstrance of 1785, emphasizing that a person's convictions "cannot follow the dictates of other men."[2]

[2] James Madison, *A Memorial and Remonstrance Against Religious Assessments* (1785), ENCYCLOPEDIA VIRGINIA [https://perma.cc/QT2C-TBEC].

And Thomas Jefferson echoed the same point in the Virginia Statute for Religious Freedom (1786), condemning government efforts to force conduct against belief as "sinful and tyrannical."[3] These statements reflect Founding-Era consensus that conscience stands beyond the state's reach.

These principles animate the First Amendment. As the Supreme Court explained in *Cantwell v. Connecticut*, the First Amendment "embraces two concepts—freedom to believe and freedom to act." 310 U.S. 296, 303–04 (1940) (describing the "freedom to believe" as "absolute"). The Free Exercise Clause protects the right to live out one's convictions while the Free Speech Clause protects the right not to speak or act in ways that violate conscience. Together, they guarantee that the Government may not enforce ideological conformity. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 514, 524 (2022).

The Court has extended that same protection to refusals to act. In *Girouard v. United States*, for instance, the Court held the Government cannot deny citizenship to an applicant based on his refusal, on religious conscience grounds, to promise to bear arms as part of the naturalization oath. 328 U.S. 61, 70 (1946). In *Wooley v. Maynard*, the Court held that citizens cannot be forced to display messages they

[3] *An Act for Establishing Religious Freedom* (1786), ENCYCLOPEDIA VIRGINIA [https://perma.cc/5GZP-CT6K].

reject, recognizing that compelled conduct may violate conscience just as surely as compelled words would. 430 U.S. 705, 715 (1977) ("The First Amendment protects the right of individuals to . . . refuse to foster . . . an idea they find morally objectionable."). And more recently, in *303 Creative LLC v. Elenis*, the Court reaffirmed that the state may not "compel an individual to create speech she does not believe." 600 U.S. 570, 579 (2023); *see also Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) ("[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all." (cleaned up)).

Congress has similarly granted conscience full protection. The Religious Freedom Restoration Act of 1993 ("RFRA") provides that the Government may not "substantially burden" religious exercise unless it can show that its decision to burden a person's religious exercise furthers a compelling governmental interest and is "the least restrictive means" possible of doing so. 42 U.S.C. §§ 2000bb–2000bb-4. RFRA's basic promise reflects the principle that the Government cannot conscript action that contravenes moral or religious beliefs.[4]

[4] That is not to say that companies should weaponize a purported freedom of conscience to resist common-sense technology regulation aimed at protecting human life and dignity. Anthropic's conscience-based objection to enabling autonomous killing or mass surveillance of Americans does not extend to resisting, *for instance, laws* limiting child-abuse materials or trafficking. *See, e.g.*, Natasha Singer, *Silicon*

### B. The Government's Proposed "All Lawful Purposes" Constraint Does Not Adequately Protect Freedom of Conscience.

The Government's insistence that Anthropic must support the use of its AI for "all lawful purposes" ignores Anthropic's conscience-based objection. The law is a floor, not a ceiling, for ethical responsibility. In areas touching human life and dignity, positive law does not draw the outer limits of moral principles. Religious and moral traditions recognize that ethical responsibility often demands more.[5] The Government's contrary view—that companies must support any lawful use of their technology—would collapse the protected space between legality and morality that the First Amendment safeguards. It would convert every conscientious refusal into

---

*Valley Battles States Over New Online Safety Laws for Children*, NYT, Jan. 31, 2024 [https://perma.cc/YB3S-4LRS].

[5] In the Christian tradition, the Apostle Paul cautioned that "all things are lawful, but not all things are beneficial." *1 Corinthians* 10:23. Jewish law (halakha) recognizes a duty to act *lifnim mishurat hadin*—beyond the strict letter of the law — precisely because legal permission does not confer moral license. *See, e.g.*, *Bavli Bava Metzia* 30b; *Ramban on Deuteronomy* 6:18 (mandating conduct "right and good" beyond strict legal entitlement); *Shulchan Aruch, Choshen Mishpat* 12:2 & *Rema* (encouraging compromise and lifnim mishurat hadin). The hadith of Nu'man Ibn Basheer in Islamic jurisprudence notes that "[t]he lawful is clear and the unlawful is clear, and between them are equivocal matters . . . whoever guards against them protects his faith and his dignity." *Sahīh al-Bukhārī* 52, *Sahīh Muslim* 1599; *see generally* WAHBAH AL-ZUHAYLI, USŪL AL-FIQH AL-ISLĀMĪ (1986) (distinguishing mubāh from mustahabb and wājib); MOHAMMAD HASHIM KAMALI, PRINCIPLES OF ISLAMIC JURISPRUDENCE (3rd ed. 2005).

insubordination and treat respect for ethical boundaries as unlawful defiance. The Constitution does not permit the Government to force institutions to abandon their moral commitments simply because the Government has not banned the conduct the institutions believe is immoral. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220–21 (2013).

## II. ANTHROPIC'S VIEWPOINT THAT THE VALUE OF HUMAN LIFE REQUIRES HUMAN ACCOUNTABILITY WHEN LETHAL FORCE IS USED IS A MATTER OF CONSCIENCE CONSISTENT WITH RELIGIOUS TEACHINGS AND PROTECTED BY THE FIRST AMENDMENT.

Anthropic's first proposed limit on the Government's use of its technology—a prohibition against using Claude for fully autonomous warfare that can take human life—falls well within the conscience protections of our constitutional tradition.

First, the faith traditions of FFTN's members teach that human life is sacred, and that the taking of any human life is a grievous act.[6] No human life should be taken absent the deliberate exercise of a fully formed moral conscience. Rather, the taking of life requires a conscience capable of mercy, compassion, and remorse—and it must be effectuated, if at all, by a person who can stand accountable before their deity and their community for their actions.

[6] *See Genesis* 1:27 ("So God created mankind in his own image[.]"); *Luke* 12:6-7 ("Are not five sparrows sold for two pennies? Yet not one of them is forgotten by God . . . Don't be afraid; you are worth more than many sparrows."); *The Qur'an*

AI cannot face criminal liability for any war crimes it commits. Traditional criminal law relies on the concept of *mens rea*—the mental state of the person who has committed a crime. Whether that concept could possibly apply to a generative AI model, which is not human, is at best dubious.[7]

This is not to say that all use of lethal military force is inherently immoral. FFTN's members' faith traditions all teach that the need to protect human life can sometimes justify lethal force.[8] But the decision to use lethal force must be made by a human being—one who can choose mercy, and one who can face consequences for their actions. Notably, Department of Defense Directive 3000.09 shows that the Department itself at one time respected these principles, explaining that "[a]utonomous and semi-autonomous weapon systems will be designed to allow commanders and operators to exercise appropriate levels of human judgment over

---

5:32 ("[W]hoever kills a soul . . . it is as if he had slain mankind entirely. And whoever saves one – it is as if he had saved mankind entirely.").

[7] *See* Daniel Gall, *AI Decision-Making: Legal and Ethical Boundaries and the Mens Rea Dilemma*, ABA: GPSOLO MAGAZINE, Dec. 3, 2024 [https://perma.cc/8YXT-U8GY]; *see also* Roee Sarel, *Restraining ChatGPT*, 75 U.C. L.J. 115, 135 (2023).

[8] Michael J. Davidson, *War and the Doubtful Soldier*, 19 NOTRE DAME L.J. ETHICS & PUB. POL'Y 91, 103–04 (2005); *The Qur'an* 22:39–40; *Leviticus* 19:16.

the use of force."[9] That commitment accords with a foundational precept: the lawful use of force requires a human mind capable of moral judgment, accountability, and restraint.

A company that takes a principled stance that it is unwise, premature, or immoral to use AI to deploy fully autonomous weapons is not a national security risk. Neither is it using "sanctimonious rhetoric" to tell the Government how to fight its wars.[10] Nor is it giving a "master class in arrogance."[11] Rather, it is adhering to principles of conscience shared by people of faith the world over, who believe that human life is uniquely valuable and should not be taken by an amoral, unfeeling, and unaccountable machine.

## III. ANTHROPIC'S VIEWPOINT THAT MASS DOMESTIC SURVEILLANCE VIOLATES BASIC HUMAN DIGNITY IS A MATTER OF CONSCIENCE CONSISTENT WITH RELIGIOUS TEACHINGS AND PROTECTED BY THE FIRST AMENDMENT.

Anthropic's second proposed limit to the Government's use of its products—as a tool for mass domestic surveillance—is equally grounded in moral and religious tradition. The prospect of a government surveilling its own citizens violates deeply

---

[9] Dep't of Defense Directive 3000.09, *Autonomy in Weapon Systems*, Sec. 1.2(a) (Effective Jan. 25, 2023).

[10] *Anthropic PBC*, 2026 WL 836842, at *5.

[11] *Id.*

rooted values in our faith traditions regardless of how it is conducted, but the massive scale enabled by AI technologies vastly exacerbates these dangers.

The Catholic Church's recent instruction on AI, *Antiqua et Nova*, explains that certain types of personal and relational data "touch upon the individual's interiority, perhaps even their conscience."[12] Privacy from surveillance of this data "plays an essential role in protecting the boundaries of a person's inner life, preserving their freedom to relate to others, express themselves, and make decisions without undue control."[13] This principle is inherent across religious traditions as the precondition for moral freedom and the space in which humans wrestle with their conscience and discern their moral values. The Catholic sacrament of confession depends on the absolute confidentiality of the penitent's disclosure; study of the Torah is premised on moral understanding through communal debate, and requires freedom from external coercion;[14] and Islam places a high premium on privacy and protection of

[12] *Antiqua et Nova* ¶ 90.

[13] *Id.*

[14] The Talmud also tells the story of Balaam, who praised the tents of Israel because their openings did not face one another (*Numbers* 24:5), as community architecture should shield its people from the unwanted gaze of their neighbor. (*Bava Batra* 60(a)).

the believer from unwarranted intrusion into personal affairs.[15] By contrast, misused surveillance can "exert control over the lives of believers and how they express their faith."[16]

History teaches that government surveillance programs, once established, often devolve into unwarranted intrusions of civil and religious life even without the aid of AI technologies. The FBI's Counterintelligence Program (commonly known as "COINTELPRO") surveilled and attempted to disrupt civil rights leaders, religious organizations, and political dissidents for fifteen years.[17] Its targets were Americans exercising their constitutional rights of speech, religion, assembly, and petitioning. Among them was Dr. Martin Luther King, Jr., whose home and office were subjected to break-ins, phone taps, and planted listening devices in an effort to neutralize his leadership of the civil rights movement.[18]

[15] The Qur'an expressly teaches: "O you who believe! Avoid much suspicions, indeed some suspicions are sins. And spy not, neither backbite one another." *The Qur'an* 49:12.

[16] *Antiqua et Nova* ¶ 90.

[17] S. Rep. No. 94-755, Book III (1976).

[18] *See* Danielle Cadet, *How the FBI Invaded Martin Luther King Jr.'s Privacy—and Tried to Blackmail Him into Suicide*, HUFFPOST, Jan. 20, 2014 [https://perma.cc/3A8Z-UMXE].

After the September 11, 2001 attacks, the New York City Police Department systematically surveilled and infiltrated Muslim communities—mapping entire neighborhoods, photographing mosques, and planting informants to report on sermons and attendees—based on the assumption that Muslim identity itself constituted a security threat.[19] Muslim communities across the United States experienced "a climate of insecurity, fear, and suspicion" that fundamentally altered how members practiced and expressed their faith.[20]

AI exponentially compounds these dangers.[21] AI systems can already deanonymize individuals from writing patterns,[22] capture and evaluate communications at scale, identify both the speaker and their religious community with startling precision, and recommend targets for further monitoring. The resulting chilling effect threatens religious communities' very existence. Refusing to be

---

[19] *The NYPD's Discriminatory Surveillance of Muslim Communities*, ACLU [https://perma.cc/3KVF-AGDQ].

[20] Tahseen Shams, *Visibility as Resistance by Muslim Americans in a Surveillance and Security Atmosphere*, 33 SOCIOLOGICAL FORUM 73, 74 (2018).

[21] *See, e.g.*, *Amici Curiae* Brief of Employees of OpenAI and Google in Their Personal Capacities at 10–11, *Anthropic v. U.S. Dep't of War et al.*, No. 26-1049 (D.C. Cir. Mar. 13, 2026).

[22] Simon Lermen et al., *Large-Scale Online Deanonymization with LLMs* at 13, CORNELL UNIVERSITY: ARXIV (Feb. 25, 2026) [https://perma.cc/Q49M-HC8E].

complicit in such abuse is a classic stand of conscience demanding protection from government retaliation.

As Judge Lita Rin explained when granting partial summary judgment in favor of Anthropic, "[t]he empty invocation of national security is not a blank check to punish and retaliate against government critics." *Anthropic*, 2026 WL 2534714, at *1 (N.D. Cal. Aug. 27, 2026). Thus, the government's actions "constitute[] unlawful retaliation in violation of the First Amendment." *Id*. That finding was correct—and the moral traditions and history described above illuminate precisely why it matters.

By sanctioning the Executive's use of public contracting to compel ideological conformity, the panel majority fractured settled First Amendment jurisprudence and created an unprecedented mechanism of state compulsion. En banc review is therefore warranted to correct a decision that departs from foundational limits on government coercion.

## CONCLUSION

The Court should grant Anthropic's petition for panel rehearing or rehearing en banc.

Dated: October 20, 2026

Respectfully submitted,

*/s/ Rakesh Kilaru*
Rakesh Kilaru
Caroline Li
Oluwatitomi Akinmola
Grace Driggers
WILKINSON STEKLOFF LLP
2001 M St NW, 10th Floor
Washington, DC 20036
Tel.: (202) 847-4000
Fax: (202) 847-4005
rkilaru@wilkinsonstekloff.com
cli@wilkinsonstekloff.com
takinmola@wilkinsonstekloff.com
gdriggers@wilkinsonstekloff.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), the brief contains 2,584 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word in 14-point size font Times New Roman.

Dated: October 20, 2026

*/s/ Rakesh Kilaru*
Rakesh Kilaru

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

Dated: October 20, 2026

*/s/ Rakesh Kilaru*
Rakesh Kilaru

*Counsel for Amicus Curiae*