No. 26-1049

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, *et al.*,

*Respondents*.

---

ON PETITION FOR REVIEW
OF A NOTICE OF THE DEPARTMENT OF WAR UNDER 41 U.S.C. § 4713

---

# UNOPPOSED MOTION FOR INVITATION TO PARTICIPATE AS *AMICI CURIAE* BY FREEDOM ECONOMY BUSINESS ASSOCIATION AND VALUES-LED INVESTORS IN SUPPORT OF PETITIONER ANTHROPIC PBC'S PETITION FOR REHEARING EN BANC

---


The Norton Law Firm PC
Josephine K. Petrick
jpetrick@nortonlaw.com
*Counsel of Record*
Fred Norton
Jo Levy
Celine G. Purcell
Heather Bates
Hayley Landman
Saja Spearman-Weaver
300 Frank H. Ogawa Plaza, Ste. 450
Oakland, CA 94612
510-906-4900

ATTORNEYS FOR *AMICI CURIAE* FREEDOM ECONOMY BUSINESS ASSOCIATION AND VALUES-LED INVESTORS

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and D.C. Circuit Rules 26.1 and 28(a)(1)(A), *Amici* provide the following disclosures.

The full list of *Amici* appears in the accompanying Appendix of *Amici*.

*Amici* Howard Fischer, Thomas Haslett, and John O'Farrell are individuals and have nothing to disclose.

Nine of the *Amici* listed in the Appendix are companies, associations, nonprofit organizations, or other similar entities that have no parent company and in which no publicly held company has a 10% or greater ownership interest. Those *Amici* are:

- Freedom Economy Business Association
- Candide Group
- Investor Advocates for Social Justice
- The Nathan Cummings Foundation, Inc.
- Pluralize Capital
- Interfaith Center on Corporate Responsibility
- Humanize Wealth

- Adasina Social Capital
- American Federation of Teachers

Two of the *Amici* listed in the Appendix are companies, associations, nonprofit organizations, or similar organizations that have a parent company and/or in which a publicly held company has a 10% or greater ownership interest. Those *Amici* are:

- Mission Driven Finance (MDF) – its Parent corporation, MDF AP Holdings, LLC, owns more than 10% of MDF's shares.
- Omidyar Network LLC – its Parent corporation, ON Affiliates LLC, owns more than 10% of Omidyar Network LLC's shares.

*See* D.C. Cir. R. 26.1(a).

With respect to the *Amici* that are entities, as detailed in the enclosed Interest of *Amici*, their general nature and purpose is to serve as trade organizations of institutional investors, asset managers, asset owners, allocators, and service providers committed to advancing just, equitable, and sustainable investment practices. *See id.* R. 26.1(b).

Dated: October 20, 2026

/s/ *Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

Pursuant to Federal Rule of Appellate Procedure 29(b)(2) and D.C. Circuit Rule 40(f), Freedom Economy Business Association and Values-Led Investors respectfully request an invitation to participate as *amici curiae* and an order accepting the accompanying *amicus* brief in support of Petitioner Anthropic PBC's Petition for Rehearing En Banc. *Amici* submit their brief to provide the Court with the perspective of values-led investors whose capital supports responsible AI development and who depend on a stable, predictable legal environment to make investment decisions. Counsel for *Amici* have conferred with counsel for the parties. Petitioner consents to this motion, and the Government does not oppose it.

This Court should exercise its broad discretion to permit *Amici* to participate as *amici curiae* in support of rehearing.

## INTEREST OF *AMICI*[1] AND REQUEST FOR INVITATION

*Amicus Curiae* the Freedom Economy Business Association is a national membership community of more than 150 institutional

[1] No party's counsel authored this brief in whole or in part, and other than *Amici* and their counsel, no person, party, or party's counsel contributed money to fund the preparation or submission of the brief. All parties consent to *Amici* filing this brief.

investors, asset managers, asset owners, allocators, and service providers committed to advancing just, equitable, and sustainable investment practices. Freedom Economy members collectively represent more than $25 billion in assets under management and influence. *Amici* also include ten other entities and three individuals who are values-led investors that rely on rules-based market conditions and a stable legal environment to make their investment decisions. The full list of *Amici* appears in the Appendix of *Amici*.

*Amici* have a direct and substantial interest in the outcome of this litigation. Responsible AI development is one of the most consequential areas of investment activity today, and *Amici* have invested significantly in companies across the AI ecosystem whose valuations and long-term viability depend on a predictable regulatory environment and protection from arbitrary government action. The Administration's retaliatory actions against Anthropic pose a profound threat not only to Anthropic but to the broader investment ecosystem that supports innovation in this sector.

As investors who have committed significant capital across the AI ecosystem, *Amici* are well positioned to explain how the Government's

actions here threaten the stable, rules-based legal environment on which investment in American innovation depends. *Amici* also participated as *amici curiae* at the merits stage of this case and are therefore familiar with the record and the issues presented. *Amici* respectfully submit that their proposed brief would materially assist the Court in evaluating considerations relevant to the petition for rehearing, and request an invitation to participate.

All of this Court's requirements for an *amicus* brief are satisfied. The proposed brief is timely because it is filed within the time limits set by Federal Rule of Appellate Procedure 29(b)(5), and it complies with the length limit of Rule 29(b)(4). No party will be prejudiced by this filing.

**CONCLUSION**

Freedom Economy Business Association and Values-Led Investors respectfully request that the Court invite them to participate as *amici curiae* and enter an order accepting the accompanying *amicus curiae* brief.

Dated: October 20, 2026

/s/ *Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

The brief is 509 words in length. *See* Fed. R. App. P. 27(d)(2).

Dated: October 20, 2026

*/s/ Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Pursuant to Fed. R. App. P. 25(c)(2)(A), I further certify that the foregoing was served on all registered users by filing it with the Court's electronic filing system.

*/s/ Trevor L. White*
Trevor L. White

## APPENDIX OF *AMICI*

Freedom Economy Business Association

Candide Group

Howard Fischer (an individual)

Thomas Haslett (an individual)

Investor Advocates for Social Justice

Mission Driven Finance

The Nathan Cummings Foundation, Inc.

Omidyar Network LLC

Pluralize Capital

Interfaith Center on Corporate Responsibility

Humanize Wealth

John O'Farrell (an individual)

American Federation of Teachers

Adasina Social Capital

No. 26-1049

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, *et al.*,

*Respondents*.

---

ON PETITION FOR REVIEW
OF A NOTICE OF THE DEPARTMENT OF WAR UNDER 41 U.S.C. § 4713

---

**PROPOSED BRIEF OF FREEDOM ECONOMY BUSINESS ASSOCIATION AND VALUES-LED INVESTORS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER'S PETITION FOR REHEARING EN BANC**

---


The Norton Law Firm PC
Josephine K. Petrick
jpetrick@nortonlaw.com
*Counsel of Record*
Fred Norton
Jo Levy
Celine G. Purcell
Heather Bates
Hayley Landman
Saja Spearman-Weaver
300 Frank H. Ogawa Plaza, Ste. 450
Oakland, CA 94612
510-906-4900

ATTORNEYS FOR *AMICI CURIAE* FREEDOM ECONOMY BUSINESS ASSOCIATION AND VALUES-LED INVESTORS

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and D.C. Circuit Rules 26.1 and 28(a)(1)(A), *Amici* provide the following disclosures.

The full list of *Amici* appears in the accompanying Appendix of *Amici*.

*Amici* Howard Fischer, Thomas Haslett, and John O'Farrell are individuals and have nothing to disclose.

Nine of the *Amici* listed in the Appendix are companies, associations, nonprofit organizations, or other similar entities that have no parent company and in which no publicly held company has a 10% or greater ownership interest. Those *Amici* are:

- Freedom Economy Business Association
- Candide Group
- Investor Advocates for Social Justice
- The Nathan Cummings Foundation, Inc.
- Pluralize Capital
- Interfaith Center on Corporate Responsibility
- Humanize Wealth

- Adasina Social Capital
- American Federation of Teachers

Two of the *Amici* listed in the Appendix are companies, associations, nonprofit organizations, or similar organizations that have a parent company and/or in which a publicly held company has a 10% or greater ownership interest. Those *Amici* are:

- Mission Driven Finance (MDF) – its parent corporation, MDF AP Holdings, LLC, owns more than 10% of MDF's shares.
- Omidyar Network LLC – its parent corporation, ON Affiliates LLC, owns more than 10% of Omidyar Network LLC's shares.

*See* D.C. Cir. R. 26.1(a).

With respect to the *Amici* that are entities, as detailed in the enclosed Interest of *Amici*, their general nature and purpose is to serve as trade organizations of institutional investors, asset managers, asset owners, allocators, and service providers committed to advancing just, equitable, and sustainable investment practices. *See id.* R. 26.1(b).

Dated: October 20, 2026

*/s/ Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

## TABLE OF CONTENTS

DISCLOSURE STATEMENT .......... 2

TABLE OF CONTENTS .......... 5

TABLE OF AUTHORITIES .......... 6

BRIEF OF *AMICI CURIAE* IN SUPPORT OF ANTHROPIC PBC'S PETITION FOR REHEARING EN BANC .......... 8

INTEREST OF *AMICI* .......... 8

INTRODUCTION .......... 10

ARGUMENT .......... 11

I. The panel majority's reading of "supply chain risk" warrants the full Court's review because it departs from the ordinary meaning of the defined term and is in tension with the Supreme Court's decisions in *Bond* and *Fischer* .......... 11

II. The panel majority's rule presents a question of exceptional importance because it exposes every federal supplier, and the investors who fund them, to a designation risk that cannot be predicted or priced .......... 18

CONCLUSION .......... 23

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS .......... 24

CIRCUIT RULE 29(d) CERTIFICATION .......... 25

CERTIFICATE OF SERVICE .......... 26

APPENDIX OF *AMICI* .......... 27

## TABLE OF AUTHORITIES


Page(s)

**Cases**

*Anthropic PBC v. U.S. Dep't of War*,
825 F. Supp. 3d 1101 (N.D. Cal. 2026) .............................. 11

*Bond v. United States*,
572 U.S. 844 (2014) .............................. 13, 23

*Fischer v. United States*,
603 U.S. 480 (2024) .............................. 14, 15

*Yates v. United States*,
574 U.S. 528 (2015) .............................. 14

**Statutes**

41 U.S.C. § 4713 .............................. 10, 11, 15, 18

41 U.S.C. § 4713(k)(6) .............................. 12, 16

**Rules**

D.C. Cir. R. 26.1 .............................. 2

D.C. Cir. R. 26.1(a) .............................. 3

D.C. Cir. R. 26.1(b) .............................. 3

D.C. Cir. R. 28(a)(1)(A) .............................. 2

D.C. Cir. R. 29(d) .............................. 25

Fed. R. App. P. 25(c)(2)(A) .............................. 26

Fed. R. App. P. 26.1(a) .............................. 2

Fed. R. App. P. 29(b)(4) .............................. 24

Fed. R. App. P. 40(b)(2)(D) .............................. 10

### Legislative Materials

H. Select Comm. on the Strategic Competition Between the U.S. & the Chinese Communist Party, 119th Cong., *DeepSeek Unmasked: Exposing the CCP's Latest Tool for Spying, Stealing, and Subverting U.S. Export Control Restrictions* (Apr. 16, 2025) ...................... 17

S. Rep. No. 115-408 (2018) ............................................ 10, 11

### Other Authorities

Jorge Farinha & Oscar López-de-Foronda, *The Impact of Corruption on Investment and Financing in the European Union: New Insights*, 30 Eur. J. Fin. 339 (2024)............... 21

Hayden Field, *U.S. Navy Bans Use of DeepSeek Due to "Security and Ethical Concerns,"* CNBC (Jan. 28, 2025, 5:16 PM EST) .................................................... 17

Dean Hand *et al.*, Glob. Impact Inv. Network, *Sizing the Impact Investing Market 2024* (2024)................................ 18

Emmet Lyons, *DeepSeek AI Raises National Security Concerns, U.S. Officials Say*, CBS News (Jan. 29, 2025, 9:03 AM EST).................................................... 17

Dominick Sorrentino, *These States Have Banned DeepSeek*, StateTech (Apr. 14, 2025) .................................................. 17

*Supply Chain Risk*, Nat'l Inst. of Stand. & Tech.: Comput. Sec. Res. Ctr. Glossary,..................................................... 14

U.S. Gov't Accountability Off., *A Snapshot: Government-Wide Contracting* ........................................................... 20

**BRIEF OF *AMICI CURIAE* IN SUPPORT OF ANTHROPIC PBC'S PETITION FOR REHEARING EN BANC**

## INTEREST OF *AMICI*[1]

*Amicus Curiae* the Freedom Economy Business Association is a national membership community of more than 150 institutional investors, asset managers, asset owners, allocators, and service providers committed to advancing just, equitable, and sustainable investment practices. Freedom Economy members collectively represent more than $25 billion in assets under management and influence. *Amici* also include ten other entities and three individuals who are values-led investors that rely on rules-based market conditions and a stable legal environment to make their investment decisions. The full list of *Amici* appears in the Appendix of *Amici*.

*Amici* have a direct and substantial interest in the outcome of this litigation. Responsible AI development is one of the most consequential areas of investment activity today, and *Amici* have invested

[1] No party's counsel authored this brief in whole or in part, and other than *Amici* and their counsel, no person, party, or party's counsel contributed money to fund the preparation or submission of the brief. All parties consent to *Amici* filing this proposed *amicus* brief.

significantly in companies across the AI ecosystem whose valuations and long-term viability depend on a predictable regulatory environment and protection from arbitrary government action. The designation of Anthropic as a "supply chain risk" poses a profound threat not only to Anthropic but to the broader investment ecosystem that supports innovation in this sector.

*Amici* thus have a strong interest in the subject matter of this litigation and submit this *amicus* brief in the hope of assisting the Court in its deliberation.

## INTRODUCTION

This case presents a question of exceptional importance: whether 41 U.S.C. § 4713 authorizes an agency head to designate an American company a "supply chain risk" because it declines to offer its products or services on terms the Department prefers. The panel majority answered yes. Judge Henderson dissented, observing that the panel majority's reading reaches even "a contractor's honest and upfront enforcement of restrictions on a covered article's use disfavored by the government"—conduct far removed from the "[h]ostile nation state and other bad actors" that prompted Congress to act. Dissent 7–8 (quoting S. Rep. No. 115-408, at 2 (2018)). The question warrants the full Court's review. Section 4713 reaches every executive agency and every company in the federal supply chain, and the panel majority's answer will shape what thousands of American businesses—and the investors who fund them—are willing to build, sell, and say. *See* Fed. R. App. P. 40(b)(2)(D).

The panel majority approached a difficult interpretive question with care, and *Amici* do not doubt the seriousness of the national-security concerns it identified. But the majority's broad reading of the

term "supply chain risk" is inconsistent with the statute's purpose to protect federal systems from sabotage and compromise by foreign threats and malicious actors, and will have grave consequences for the investment markets that sustain American innovation. The Court should grant rehearing en banc.

## ARGUMENT

### I. The panel majority's reading of "supply chain risk" warrants the full Court's review because it departs from the ordinary meaning of the defined term and is in tension with the Supreme Court's decisions in *Bond* and *Fischer*.

Everyone agrees that the Department may stop using Claude and choose another AI vendor. *See* slip op. 11, 28. As the district court in a companion case put it, "[t]hat is not what this case is about." *Anthropic PBC v. U.S. Dep't of War*, 825 F. Supp. 3d 1101, 1109–10 (N.D. Cal. 2026). Rather than simply decline to do business with Anthropic, the Secretary designated it a "supply chain risk" under Section 4713—an authority Congress enacted to guard federal information systems against "[h]ostile nation state and other bad actors," and one that, before this case, had never been applied to a domestic company. S. Rep. No. 115-408, at 2 (2018); Dissent 7–8; *see Anthropic*, 825 F. Supp. 3d at 1110.

Section 4713(k)(6) defines a "supply chain risk" as "the risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate the design, integrity, manufacturing, production, distribution, installation, operation, maintenance, disposition, or retirement of covered articles so as to surveil, deny, disrupt, or otherwise manipulate the function, use, or operation of the covered articles or information stored or transmitted on the covered articles." The panel majority read "manipulate" and "deny" broadly and concluded that because Anthropic designs Claude to decline certain uses, there was "not only a 'risk'… ***but a certainty***" of manipulation. Slip op. 24 (emphasis added). The panel majority acknowledged Anthropic's "noble intentions" but held that the definition "turns on *what* Anthropic does, not *why* Anthropic does it." *Id.* at 28.

Any company that contracts with the federal government controls the "design" and "operation" of its products and forecloses some function a buyer might want. The military might have all sorts of procurement preferences—firearms without safety switches, vehicles without airbags, or vehicles that use gasoline rather than electric batteries. Under the panel majority's reading, a firearms manufacturer that

includes safeties on all its weapons, a truck company that installs airbags in every model, or an electric-vehicle company that declines to offer internal combustion engines "manipulate[s] the design" of its product "so as to … deny" a function the Department wants. This is not a "supply chain risk." It simply is not an ideal fit for the procurement preferences the Department has expressed.

And Congress did not empower agencies to designate a product a supply chain risk whenever the product or its contract terms do not match the agencies' preferences. "In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond v. United States*, 572 U.S. 844, 861 (2014). Applying that principle, the Supreme Court declined to read a statute whose "core concerns are acts of war, assassination, and terrorism" to reach conduct of an entirely different order—there, "the simplest of assaults." *Id.* at 863. Here, too, a statute whose core concern is sabotage and compromise by hostile actors has been read to reach an American company's disclosed, contractually accepted limits on how its own product may be used.

“Supply chain risk” has an ordinary meaning: the risk that a product is compromised somewhere between design and disposal—or, in the words of the federal government’s own cybersecurity standards, “[t]he potential for harm or compromise that arises as a result of security risks from suppliers, their supply chains, and their products or services.” *Supply Chain Risk*, Nat’l Inst. of Stand. & Tech.: Comput. Sec. Res. Ctr. Glossary (citing NIST SP 800-53 Rev. 5), https://csrc.nist.gov/glossary/term/supply_chain_risk. The definition’s references to a product’s “integrity” and to “unwanted function” likewise assume that the product has departed from what the buyer agreed to buy.

The verbs surrounding “otherwise manipulate” reinforce that reading. Each listed example—to “sabotage,” to “maliciously introduce unwanted function,” to “extract data”—describes a hostile or covert act against the product, and a residual “otherwise” clause takes its meaning from the examples that precede it. *See Fischer v. United States*, 603 U.S. 480, 487 (2024); *Yates v. United States*, 574 U.S. 528, 543–45 (2015) (plurality opinion); Dissent 2–3, 6. Reading “manipulate” in its most neutral sense, as the panel majority did, leaves much of the

definition's "motive-infused language" as "'mere surplusage.'" Dissent 6–7 (quoting *Fischer*, 603 U.S. at 498).

The panel majority found it significant that Section 4713 reaches "any person" rather than an "adversary." Slip op. 30–31. But that language speaks to who may pose a supply chain risk, not to what conduct qualifies; Congress retained the same core terms—"sabotage" and "maliciously introduce unwanted function"—whose "sinister connotation" the panel majority recognized in Section 3252. *Id.* at 30.

Anthropic's restrictions were no departure from what the Department agreed to buy. They were disclosed, written into the parties' contracts, and accepted by the Department for more than a year. *See* slip op. 8–9, 40. Under the panel majority's reading, "[i]t matters not if the restrictions are ones the Department has already agreed to." Dissent 7. That cannot be right. A term the Department bargained for is not a risk that someone will "sabotage" or "manipulate" the product; it is part of the product the Department chose to buy. On the panel majority's reading, an agency may accept a vendor's terms, use the product under them for more than a year, and then designate the vendor a national-security threat for honoring the very terms it

accepted. *See* slip op. 40. The panel majority's reading thus converts a risk of compromise into the risk that a vendor will not agree to an agency's preferred contract terms—not, as Judge Henderson put it, "the scenario the Congress had in mind when it enacted FASCSA." Dissent 7.

FASCSA has proper targets—DeepSeek is an example. On October 19, 2026, the Department of Homeland Security ordered federal civilian agencies to strip Chinese AI company DeepSeek's products from their systems, warning that DeepSeek's models "may result in the transfer of sensitive data to the PRC" and "may contain malware or other security vulnerabilities." *See* Exclusion and Removal Order #2026-01. That application comports with the statute's purpose—addressing the risk that someone will "extract data" or "maliciously introduce unwanted function." 41 U.S.C. § 4713(k)(6). The order came after more than a year of warnings. In January 2025, the White House announced that the National Security Council was examining

DeepSeek's national security implications;[2] by spring, more than a dozen U.S. states had barred DeepSeek from government devices (as had the U.S. Navy),[3] and a House select committee found that DeepSeek "siphons data back to the People's Republic of China (PRC)" and "covertly manipulates the results it presents to align with CCP propaganda, as required by Chinese law."[4]

Anthropic is DeepSeek's opposite on every count. Its restrictions were not covert but written into the contracts the Department of War

---

[2] *See* Emmet Lyons, *DeepSeek AI Raises National Security Concerns, U.S. Officials Say*, CBS News (Jan. 29, 2025, 9:03 AM EST), https://www.cbsnews.com/news/deepseek-ai-raises-national-security-concerns-trump/.

[3] Hayden Field, *U.S. Navy Bans Use of DeepSeek Due to "Security and Ethical Concerns,"* CNBC (Jan. 28, 2025, 5:16 PM EST), https://www.cnbc.com/2025/01/28/us-navy-restricts-use-of-deepseek-ai-imperative-to-avoid-using.html; Dominick Sorrentino, *These States Have Banned DeepSeek*, StateTech (Apr. 14, 2025), https://statetechmagazine.com/article/2025/04/these-states-have-banned-deepseek.

[4] H. Select Comm. on the Strategic Competition Between the U.S. & the Chinese Communist Party, 119th Cong., *DeepSeek Unmasked: Exposing the CCP's Latest Tool for Spying, Stealing, and Subverting U.S. Export Control Restrictions* (Apr. 16, 2025), https://chinaselectcommittee.house.gov/media/investigations/deepseek-unmasked-exposing-ccps-latest-tool-spying-stealing-and-subverting-us.

signed.  No analogous warnings about Anthropic or Claude issued; the government warned about DeepSeek for more than a year, but approved and praised Claude until two weeks before declaring it a national security threat.  Anthropic answers to no foreign government.  And no one has shown, or even plausibly contends, that Anthropic extracts the Department's data or hides unwanted functions in Claude.  A reading of "supply chain risk" that captures both companies draws no line at all.

## II. The panel majority's rule presents a question of exceptional importance because it exposes every federal supplier, and the investors who fund them, to a designation risk that cannot be predicted or priced.

Values-led investing does not belong to a single party or political ideology, and it is substantial: in 2024, investors of all political stripes invested more than $1.5 trillion in capital in companies and funds whose social missions they support.[5]

The panel majority's reading of Section 4713 exposes every company that sells to the federal government, or to its contractors, to

---

[5] Dean Hand *et al.*, Glob. Impact Inv. Network, *Sizing the Impact Investing Market 2024* (2024), https://s3.amazonaws.com/giin-web-assets/giin/assets/publication/giin-sizingtheimpactinvestingmarket-2024.pdf.

the risk of designation, because every product reflects design choices that withhold some function an agency might later want, and the panel majority treats those choices as "manipulat[ion]" of a product's "design" that "den[ies]" its "function." Slip op. 24. Nor is the risk confined to Anthropic. As Judge Henderson observed, a replacement vendor that declines a future demand will face the same choice: "Agree to the Secretary's demands or risk being designated a national security threat." Dissent 7.

That risk is concrete. Here, the designation took effect immediately, and within days the Department ordered Claude removed from its systems and barred its contractors from using Anthropic products in their work for the Department. Slip op. 12, 14. For a company that sells to the Department's contractors as well as to the Department itself, that is exclusion from a substantial part of the American economy overnight. And considering the scale of the

Department's contracting base—over $792 billion in fiscal year 2025 alone[6]—the chilling effect on investment is all the greater.

Investors also have no way to measure that risk. Under the panel majority's reading, whether a vendor "manipulate[s]" its product does not turn on anything the vendor conceals; it turns on whether the vendor's disclosed design choices match what an agency wants at a given moment. And those preferences change. The Secretary's January 2026 strategy directed the Department to use AI models "free from usage policy constraints," and the panel majority emphasized that the technology itself changes with each new model. Slip op. 9–10, 22. Under the panel majority's holdings, moreover, a designation may take effect before the company is heard, and the lack of advance notice will be deemed harmless once post-designation process has run. *Id.* at 33–38. Diligence can assess a supplier's products, contracts, and customers; it cannot predict whether a future agency head will treat a disclosed, contractually accepted design choice as a national-security

[6] *See* U.S. Gov't Accountability Off., *A Snapshot: Government-Wide Contracting*, https://web.archive.org/web/20260926180508/https://www.gao.gov/blog/snapshot-government-wide-contracting-fy-2025-interactive-dashboard.

threat. And because agency preferences shift from one administration to the next, the panel majority's reading threatens to subject over three-quarters of a trillion dollars in federal contracting, and still billions more in contracts with federal contractors, to a regime in which access turns on agreement with the policy preferences of whoever holds office. Unlike countries where access to public contracts depends on political favor,[7] the United States has long attracted investment capital from all over the globe because its economy is based on merit and ingenuity—not on currying favor with the powers that be.

The panel majority questioned whether Anthropic has suffered reputational harm, noting reports that its valuation has risen since the designation. Slip op. 32. But one company's resilience is not the measure. A mid-size software vendor, a hardware startup, or a portfolio company whose largest customers are defense contractors would have no comparable cushion. For such companies, a designation that cuts

---

[7] *See* Jorge Farinha & Oscar López-de-Foronda, *The Impact of Corruption on Investment and Financing in the European Union: New Insights*, 30 Eur. J. of Fin. 339 (2024), https://www.tandfonline.com/doi/full/10.1080/1351847X.2023.2240846#d1e167.

them off from the federal supply chain and from the contractors who serve it could be fatal.

The panel majority's reading will also discourage some of the largest and most influential actors in the American economy from building safeguards into the products they sell. The panel majority recognized that Anthropic's advocacy about the safe use of AI is protected speech, but concluded that the Department acted because Anthropic refused a contract term. Slip op. 41–43. A company thus remains free to advocate for safeguards, but under the panel majority's reading, building them into its products and disclosing them in its contracts is what creates a "supply chain risk." Investors will take note. If built-in safeguards are what expose a company to designation, the companies least at risk are those whose products have the fewest safeguards, and capital will flow accordingly. A statute meant to reduce supply chain risk would thus steer investment away from the very features that reduce it.

Congress enacted a statute to protect federal supply chains from sabotage and compromise. It did not enact a tool for excluding companies that decline an agency's preferred terms. Such a result

would not be a "realistic assessment[] of congressional intent." *Bond*, 572 U.S. at 862.

## CONCLUSION

*Amici Curiae* respectfully ask the Court to grant Anthropic's petition for rehearing en banc.

Dated: October 20, 2026

Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ Josephine K. Petrick*

Josephine K. Petrick
Attorneys for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS**

The accompanying *amicus* brief is 2,419 words, i.e., under 2,600 words, in length. *See* Fed. R. App. P. 29(b)(4); *id.* R. 32(a)(2); Cir. R. 32 (a)(2).

Dated: October 20, 2026

*/s/ Josephine K. Petrick*
Josephine K. Petrick
Attorneys for *Amici Curiae*

## CIRCUIT RULE 29(d) CERTIFICATION

Pursuant to D.C. Circuit Rule 29(d), counsel for *Amici* certify that a separate brief is necessary. *Amici*'s perspective as values-led investors is distinct from that of other *amici* supporting Anthropic's petition for rehearing en banc, and a separate brief is necessary to present that perspective to the Court.

Dated: October 20, 2026

*/s/ Josephine K. Petrick*
Josephine K. Petrick
Attorneys for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Pursuant to Fed. R. App. P. 25(c)(2)(A), I further certify that the foregoing was served to all registered users by filing it with the Court's electronic filing system.

*/s/ Trevor L. White*
Trevor L. White

## APPENDIX OF *AMICI*

Freedom Economy Business Association

Candide Group

Howard Fischer (an individual)

Thomas Haslett (an individual)

Investor Advocates for Social Justice

Mission Driven Finance

The Nathan Cummings Foundation, Inc.

Omidyar Network LLC

Pluralize Capital

Interfaith Center on Corporate Responsibility

Humanize Wealth

John O'Farrell (an individual)

American Federation of Teachers

Adasina Social Capital