**No. 26-1049 (Consolidated with No. 26-1162)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ANTHROPIC PBC,
*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF WAR,
*Respondents*.

---

On Petition for Review of Department of War 41 U.S.C. § 4713 Notice

---

# CONSENT *AMICI CURIAE* BRIEF OF INDUSTRY TRADE ASSOCIATIONS IN SUPPORT OF PETITION FOR PANEL REHEARING OR REHEARING EN BANC

---

Daniel W. Wolff
Sharmistha Das
Matthew F. Ferraro
Alexandra L. Barbee-Garrett
Stephanie L. Crawford
CROWELL & MORING LLP
600 Fifth St., N.W.
Washington, D.C. 20001
Phone: (202) 624-2500
dwolff@crowell.com

*Counsel for Amici Curiae*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amici curiae* certify the following:

TechNet does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in TechNet.

The Software & Information Industry Association ("SIIA") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in SIIA.

The Computer & Communications Industry Association ("CCIA") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in CCIA.

The Information Technology Industry Council ("ITI") does not have any parent companies. No publicly traded company has a 10% or greater ownership interest in ITI.

## CERTIFICATION OF SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel certifies that a separate brief is necessary to provide the unique perspective of representatives of technology sector companies, including those that contract with the U.S. Government, on the risks that the government's supply-chain risk determination of Anthropic pose to the enterprise of federal procurement. No other *amici* are able to provide this perspective. This brief is meaningfully different from the briefing submitted by Petitioner and not likely to be submitted by any other *amici curiae*.

Dated: October 20, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ........ i

CERTIFICATION OF SEPARATE BRIEF ........ ii

GLOSSARY ........ v

IDENTITY AND INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........ 2

BACKGROUND ........ 5

ARGUMENT ........ 8

I. THE USE OF PRETEXTUAL NATIONAL SECURITY DETERMINATIONS IN DISAGREEMENTS OVER COMMERCIAL CONTRACT TERMS IS CONTRARY TO LAW. ........ 10

II. DOW'S NATIONAL SECURITY JUSTIFICATIONS ARE UNSUPPORTED, COMPOUNDING ITS ADVERSE EFFECT ON COMMERCIAL CONTRACTING. ........ 13

III. THE MAJORITY DECISION CONFLICTS WITH THE SECTION 3252 DETERMINATION, LEADING TO CONFUSION BY INDUSTRY. ........ 13

CONCLUSION ........ 15

CERTIFICATE OF COMPLIANCE ........ 16

CERTIFICATE OF SERVICE ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anthropic PBC v. U.S. Dep't of War*,
No. 26-CV-01996-RFL, 2026 WL 2534714
(N.D. Cal. Aug. 27, 2026) .................... 4, 6, 14, 15

## Statutes

10 U.S.C. § 3252 .................... 3, 4, 7, 14

10 U.S.C. § 3452 .................... 12

10 U.S.C. § 3453 .................... 9

41 U.S.C. § 1323 .................... 5

41 U.S.C. § 3307 .................... 9, 12

41 U.S.C. § 4713 .................... 3-7, 11-13

Pub. L. No. 103-355, 108 Stat. 3243 (1994) .................... 9

Pub. L. No. 119-60, 139 Stat. 718 (2025) .................... 9

## Regulations

48 C.F.R. § 52.204-29 .................... 6

48 C.F.R. § 52.204-30 .................... 6

Fed. R. App. P. 40(b)(2)(D) .................... 9

## Other Authorities

91 Fed. Reg. 66346 (Oct. 20, 2026),
https://www.federalregister.gov/d/2026-21447 .................... 10

S. Rep. No. 103-258 (1994), *reprinted in* 1994 U.S.C.C.A.N.
2561 .................... 9

## GLOSSARY

| | |
|---|---|
| AI | Artificial Intelligence |
| FASCSA | The Federal Acquisition Supply Chain Security Act |
| SIIA | The Software & Information Industry Association |
| CCIA | The Computer & Communications Industry Association |
| ITI | The Information Technology Industry Council |

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating for a targeted policy agenda at the federal and 50-state level.

The Software & Information Industry Association ("SIIA") is the principal trade association for those in the business of information, including developers of artificial intelligence ("AI") models and applications.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms.

The Information Technology Industry Council ("ITI") is the premier global advocate for technology, representing the world's most innovative companies, including those that are driving American leadership in AI.

*Amici* industry trade associations submit this brief because a divided panel upheld an unbounded assertion of executive power that, if

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *amici*, their members, or their counsel funded the preparation or submission of this brief. All parties have consented to the filing of this *amicus* brief.

left uncorrected, would carry immediate, far-reaching, and concrete consequences for *amici*'s members and for the legal framework on which the entire government contracting community depends. Many of *amici*'s members contract with the U.S. Government, including the Department of War ("DoW"),[2] to provide mission-critical products and services, including AI technology. They would be harmed if the panel majority's opinion stands, allowing the transformation of a law targeted narrowly at intentional supply-chain risk manipulation into a broad power the government can use to supplant traditional procurement law, engendering uncertainty throughout the broader industry. *Amici* respectfully request that this Court grant the petition for rehearing *en banc*.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

On February 27, 2026, the Secretary of War directed DoW to designate Anthropic PBC ("Anthropic") a "Supply-Chain Risk to National Security[,]" prohibited DoW contractors, suppliers and partners from "any commercial activity with Anthropic[,]" and directed Anthropic to

[2] The U.S. Department of War is the secondary name for the U.S. Department of Defense.

continue to provide its services to DoW "for a period of no more than six months to allow for a seamless transition[.]"[3] Six days later, DoW delivered two formal determinations to Anthropic, declaring the company a supply-chain risk under both 10 U.S.C. § 3252 ("Section 3252") and 41 U.S.C. § 4713 ("Section 4713"), enacted as part of the Federal Acquisition Supply Chain Security Act ("FASCSA") (collectively, the "Determinations").

The divided panel erred in finding that the Determination under Section 4713 (the "Section 4713 Determination") was justified. It was not.

*Amici* are industry trade associations with members that are government contractors and technology companies, many of which use Anthropic's signature offering, the AI model Claude, as part of, or to help create, products and services sold to the government. *Amici* write separately to highlight the destabilizing effect of this ruling on the procurement system and three particularly pernicious impacts on American industry of the panel majority's flawed decision.

---

[3] Secretary of War Pete Hegseth (@SecWar), X (Feb. 27, 2026, 5:14 PM) ("Secretarial Order"), https://x.com/SecWar/status/2027507717469049070.

***First***, the majority incorrectly concluded that the commercial terms by which a contractor's product is sold can constitute "manipulation" under Section 4713, resulting in a "covered procurement action" against the contractor. This interpretation is overbroad and allows the DoW to address run-of-the-mill contracting disputes through the extraordinary power of a supply-chain risk determination. If the interpretation stands, it would upset the established government contracting process upon which *amici*'s members rely.

***Second***, the panel majority relied on a remarkably thin record, which, among other flaws, includes inaccurate "facts."

***Third***, the divided panel's holding conflicts with the U.S. District Court for the Northern District of California's decision on Anthropic's challenge to the Section 3252 determination, which concluded the DoW's actions violated Anthropic's First Amendment rights and were arbitrary and capricious based on the same factual record at issue here. *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 2534714 (N.D. Cal. Aug. 27, 2026). *Amici*'s members find themselves in an unsustainable position, where functionally equivalent designations based on the same conduct and record resulted in conflicting rulings. *En*

*banc* review is necessary to eliminate this conflict and clarify the law for the entire technology industry.

## BACKGROUND

Section 4713 is part of FASCSA, a law that created the Federal Acquisition Security Council to investigate and respond to supply-chain risk. FASCSA authorizes two types of supply-chain security actions: (1) the heads of order-issuing agencies may issue broad "exclusion or removal orders" to prohibit certain agencies from sourcing (exclusion) or require removal of already-installed (removal) "covered articles," 41 U.S.C. § 1323, and (2) any federal agency may take a "covered procurement action," a process by which the issuing agency may exclude "covered articles" in a "covered procurement," *id.* § 4713(a), (k). FASCSA defines "covered article[s]" broadly to include substantially all information technology. *Id.* § 4713(k)(2).

Before invoking either type of FASCSA order, the issuing agency must comply with the relevant substantive and procedural requirements. 41 U.S.C. § 1323(c)(5)(A); 41 U.S.C. § 4713.

While "exclusion or removal orders" are broadly applicable to all procurements by impacted agencies, Section 4713 is limited to "covered

procurement actions"—*i.e.*, (A) excluding a source that fails qualification requirements to reduce supply-chain risk; (B) excluding a source with an unacceptable supply-chain risk evaluation rating; (C) finding a source non-responsible based on supply-chain risk; and (D) excluding or withholding approval of a source as a subcontractor, *id.* § 4713(k)(4).

DoW cited Section 4713, authorizing "covered procurement actions," to issue the Section 4713 Determination to Anthropic. Section 4713, like FASCSA, is implemented by mandatory clauses applicable to solicitations for government contracts, 48 C.F.R. § 52.204-29, and government contracts, 48 C.F.R. § 52.204-30. Under those regulations, a Section 4713 determination applies to any "covered article" "use[d] as part of the performance of the" contract to which the determination applies. 48 C.F.R. § 52.204-30.

DoW issued a nearly identical determination under Section 3252, which the U.S. District Court for the Northern District of California struck down because DoW had failed to justify it with underlying documents substantively identical to those supporting the Section 4713 Determination. *Anthropic PBC*, 2026 WL 2534714, at *1.

Despite the clear similarities between the Section 4713 Determination and the Section 3252 Determination and the factual record underlying both cases, the majority decision adopted a flawed analysis of the two statutory provisions at issue that sidesteps the district court's findings. The majority found that FASCSA's definition of "supply chain risk" at 41 U.S.C. § 4713(k)(6) covers the risk that any person may "sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate" covered technology. Dkt. #2194984 at 23-24. Purporting to interpret the "plain meaning" of "manipulate" (to skillfully arrange, operate, or control), the majority concluded that Anthropic's model training, which embeds restrictions preventing Claude from performing certain tasks, constituted manipulation of Claude's design and operation. The majority rejected Anthropic's argument that the statute requires hostile or malicious intent, holding instead that the statutory text does not uniformly connote bad motive.

The majority also downplayed Anthropic's arguments that the Section 4713 Determination violated FASCSA's procedural safeguards, including the requirement to consider less intrusive means. The majority agreed that DoW violated those safeguards but characterized the

violation as a "harmless error." Further, the majority found no causal link between Anthropic's protected speech and the Section 4713 Determination. The majority decision found that DoW issued the Section 4713 Determination because Anthropic "refused to agree to a contract term [DoW] deemed essential to national security." *Id.* at 41.

In dissent, Judge Henderson argued that the majority misinterpreted the definition of "supply chain risk" by reading the residual "or otherwise manipulate" clause in isolation from the surrounding words like "sabotage," "maliciously introduce," "extract," all of which connote intentionally hostile or deceptive conduct. *Id.* at 45-48. Further supporting the statute's focus on "harmful motive," Judge Henderson concluded that Congress enacted FASCSA to address threats from hostile foreign nations and malicious actors, not to punish good-faith commercial disagreements. Such a broad reading, Judge Henderson warned, could allow DoW to designate any contractor a "supply chain risk" for enforcing contractual restrictions that DoW dislikes.

## ARGUMENT

The divided panel's decision raises issues of exceptional importance because it will destabilize federal procurement. This case merits review

by the full court because that decision will undermine the established system of government contracting for commercial technology. *See* Fed. R. App. P. 40(b)(2)(D).

For over thirty years, Congress has required federal agencies, to the maximum extent practicable, to procure commercially available technology to meet their needs. *See* Pub. L. No. 103-355, § 8104, 108 Stat. 3243 (1994) (codified as amended at 10 U.S.C. § 3453 and 41 U.S.C. § 3307). Congress mandated this focus on commercial contracting to "eliminate the need for research and development, minimize acquisition leadtime, and reduce the need for . . . expensive product testing." S. Rep. No. 103-258, at *5 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2566. Just last year, Congress directed DoW to further leverage commercially available technology. *See* Pub. L. No. 119-60, §§ 1801, 1821-28, 139 Stat. 718, 1221-25, 1245-52 (2025). *Amici*'s member companies sell products and services to the government using commercial terms and conditions, much as Anthropic has.

The majority accepted DoW's substantively unsupported determination that Claude poses a supply-chain risk based on Anthropic's commercial terms, the terms under which it delivers its

products and services to both commercial and government customers. In so doing, the majority failed to substantively engage with the critical questions about what the designation of Anthropic as a supply-chain risk means for government contractors that provide commercial products and services. The majority's decision of first impression creates unbounded risk for commercial government contracting, upending the longstanding practices upon which the government and industry rely. This game-changing decision demands the full Court's review.[4]

## I. The use of pretextual national security determinations in disagreements over commercial contract terms is contrary to law.

The Section 4713 Determination is the result of a contract dispute between DoW and Anthropic over Anthropic's commercial terms and

[4] *En banc* review is even more exigent because all federal agency procurements are subject to new FASCSA orders requiring exclusion and removal of Chinese AI company DeepSeek due to structural conditions that make its customer data accessible to the Chinese government and concerns about data exfiltration due to system vulnerabilities. *Supply Chain Security Orders*, Sys. Award Mgmt., https://sam.gov/supplychainorders (click "Download FASCSA Orders") (accessed Oct. 20, 2026); 91 Fed. Reg. 66346 (Oct. 20, 2026), https://www.federalregister.gov/d/2026-21447. These orders underscore that supply-chain risk determinations should be based on substantiated, correct facts like "vulnerabilities" that reveal "actionable intelligence information" about the U.S. government, not routine system updates. *Id.*

conditions. Because DoW believed those terms were overly restrictive, it wrongly declared Anthropic a supply-chain risk. Under the majority decision, DoW's misuse of FASCSA would become business as usual. The majority explained that DoW "reasonably feared that Anthropic might manipulate Claude's design to prevent it from performing national-security functions that [DoW deems contractually authorized and necessary." Dkt. #2194984 at 20. But that DoW ***deems*** some action "contractually authorized" does not make it so. DoW's dispute was with Anthropic's terms, which never "contractually authorized" the uses to which Anthropic objected.

Moreover, Anthropic's commercial terms govern its relationship with DoW. Commercial contracting traditionally relies on commercial terms and conditions, supplemented only with "those contract clauses that are required to implement provisions of law or executive orders applicable to acquisitions of commercial products . . . or commercial services; or determined to be consistent with standard commercial practice." 41 U.S.C. § 3307(e)(2)(B); *see also* 10 U.S.C. § 3452. Nothing in FASCSA or other federal procurement laws permits DoW to designate a supply-chain risk based on a dispute over commercial contract terms. The

majority decision identified no contrary statute, nor any other reason to disrupt this longstanding rule. As Judge Henderson noted in dissent, the text of Section 4713 does not allow "a contractor's honest and upfront enforcement of restrictions on a covered article's use disfavored by the government" to be treated as manipulation. Dkt. #2194984 at 51. To allow otherwise—contrary to the majority's view—is no "harmless error." Under the majority's reading, contractors would have no opportunity to respond to DoW's findings, including to correct any misunderstandings about their products, before being deprived of their bargained-for contractual benefits.

Consistent with the commercial contracting preferences enshrined in law, many of *amici*'s members are DoW contractors that proudly sell their commercial offerings to DoW under commercial terms and conditions. Under the majority decision, DoW, or any agency, could use the specter of a supply-chain risk determination to dispute commercial terms and conditions without undertaking any legally required findings or processes if the agency asserts a "clean break" is needed. This interpretation will adversely affect *amici* member companies' ability and willingness to engage in commercial contracting with the government,

reducing the government's access to these companies' innovative commercial offerings.

## II. DoW's national security justifications are unsupported, compounding its adverse effect on commercial contracting.

The Section 4713 Determination stemmed from an ordinary contract dispute between DoW and Anthropic. The majority credited DoW with having "ample support" for the Determination. But the record makes clear that such support was merely DoW's assertions of ***potential*** risk, which were predicated on a misapprehension that Anthropic could reach back into DoW systems. Dkt. #2194984 at 17-18 (citing App. 8, 274-76). The majority ignored that DoW abandoned that argument during litigation. *Id.* at 18-19. Section 4713's requirements cannot be satisfied on such a thin reed of "support."

## III. The majority decision conflicts with the Section 3252 Determination, leading to confusion by industry.

The panel majority's holding conflicts with the materially equivalent case before the U.S. District Court for the Northern District of California. The district court, reviewing essentially the same record in Anthropic's parallel challenge to the Section 3252 Determination, concluded that DoW retaliated against Anthropic for its response to "DoW's views of the safety restrictions required for Claude and the role

of Anthropic in setting those safety restrictions" in violation of the First Amendment. *Anthropic PBC*, 2026 WL 2534714, at *13. Further, DoW's proffered rationales for the Section 3252 determination, the same model-training and update issues as here, are "not specific to Anthropic's technology and access[.]" *Id.* at *23. Instead, DoW's concern was that Anthropic "asked questions of DoW and publicly discussed the reasons for its refusal to accept DoW's contract terms." *Id.* The district court correctly identified that "[t]he contradictory positions, the procedural defects, and the rushed process following a public declaration of the foreordained conclusion" were arbitrary and capricious. *Id.* at *26.

Here, the majority held otherwise, deferring to DoW's bare assertion "that Claude might be 'subject to manipulation' by Anthropic[.]" Dkt. #2194984 at 17-18 (citing App. 178). But Claude's model training and product updates are not unique—as the district court noted, "many defense IT vendors" have those same capabilities. *Anthropic PBC*, 2026 WL 2534714, at *23.

*Amici*'s member companies also offer AI products and services, built on their own large language models or incorporating models from other entities. Member companies make these models available to the public

and the government through commercial terms. If Anthropic's AI model training and update functionalities "amply support[]" a supply-chain risk determination, so too would the model training and updates of any other company's AI offering. Without the *en banc* Court's clarification, the specter of catastrophic sanction justified only by pretext will deter and destabilize the innovation and investment activities of *amici*'s members.

## CONCLUSION

*Amici* respectfully request that the Court grant Anthropic's petition for rehearing *en banc*.

October 20, 2026

Respectfully submitted,

/s/ Daniel W. Wolff
Daniel W. Wolff
Sharmistha Das
Matthew F. Ferraro
Alexandra L. Barbee-Garrett
Stephanie L. Crawford
CROWELL & MORING LLP
600 Fifth St., N.W.
Washington, D.C. 20001
Phone: (202) 624-2500
dwolff@crowell.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(e)(3) because it contains 2,599 words, excluding the portions exempted by Rule 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook.

/s/ Daniel W. Wolff
Daniel W. Wolff

October 20, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on October 20, 2026, I have caused the foregoing to be filed electronically with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Daniel W. Wolff
Daniel W. Wolff