**No. 26-1049 (lead); 26-1162 (consolidated)**

# In The United States Court of Appeals for the District of Columbia Circuit

ANTHROPIC PBC,

PETITIONER,

v.

UNITED STATES DEPARTMENT OF WAR, PETER B. HEGSETH, in his official capacity as Secretary of War,

RESPONDENTS.

On Petitions for Review of Agency Action

**BRIEF OF *AMICUS CURIAE* PROFESSOR KEVIN FRAZIER IN SUPPORT OF PETITIONER**

Yar Chaikovsky
Andy LeGolvan
WHITE & CASE LLP
3000 El Camino Real 9th Floor
Palo Alto, CA 94304
Tel: (650) 213-0385

Mark S. Davies
Kufere Laing
Melissa A. Iannuzzi
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Tel: (202) 626-3600

*Attorneys for Amicus Curiae Kevin Frazier*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ iv

INTRODUCTION & INTEREST OF AMICUS CURIAE ........ 1

STATUTORY BACKGROUND ........ 2

PROCEDURAL BACKGROUND ........ 4

ARGUMENT ........ 5

A QUESTION OF EXCEPTIONAL IMPORTANCE IS WHETHER FASCA AUTHORIZES THE DEPARTMENT OF WAR TO DESIGNATE ANY CONTRACTOR THAT ARRANGES, OPERATES OR CONTROLS A COVERED ARTICLE A "SUPPLY CHAIN RISK" ........ 5

A. The Majority's Interpretation of "Otherwise Manipulate" is Incompatible with FASCA's Definition of "Supply Chain Risk" ........ 6

B. FASCA's Legislative History Confirms that Congress Intended "Otherwise Manipulate" to Apply Only to Hostile and Covert Conduct ........ 10

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anthropic PBC v. U.S. Dep't of War*,
2026 WL 2534714 (N.D. Cal. Aug. 27, 2026) ................................ 4, 13

*Anthropic PBC v. U.S. Dep't of War*,
2026 WL 2881404 (D.C. Cir. Sept. 25, 2026) ....... 3, 4, 5, 6, 8, 9, 10, 12

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ................................................................ 11

*Fischer v. United States*,
603 U.S. 480 (2024) ........................................................ 7, 8, 9

*McDonnell v. United States*,
579 U.S. 550 (2016) ................................................................ 8

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ................................................................ 7

*Van Buren v. United States*,
593 U.S. 374 (2021) ................................................................ 9

*Yates v. United States*,
574 U.S. 528 (2015) ................................................................ 7

### STATUTES AND RULES

48 C.F.R. §§ 52.233-1, 52.212-4(d), 52.249-2 ........................................... 9

10 U.S.C. § 3252 ................................................................ 13

40 U.S.C. § 11101 ................................................................ 9

41 U.S.C. § 1323 ................................................................ 3

41 U.S.C. § 4713 ................................................... 3, 4, 6, 9, 10

41 U.S.C. §§ 7101-7109 ................................................................ 9

## MISCELLANEOUS

*Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government: Hearing Before the Subcomm. on Oversight of the H. Comm. on Science, Space, and Technology*, 115th Cong. (2017) .......... 12

H.R. 6430, 115th Cong. (2018) .......... 14

H.R. Rep. No. 115-907 (2018) .......... 14

Kevin Frazier, *How Courts Can Adequately Adjudicate Issues from AI to Zoonotic Diseases*, 5 Notre Dame J. Emerging Tech. 46 (2023) .......... 1

Kevin Frazier, *Why Anthropic Is Asking for a Rehearing En Banc*, Lawfare (Oct. 15, 2026), https://tinyurl.com/why-en-banc .......... 1

*Manipulate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .. 7

*Manipulate*, Oxford English Dictionary (3d ed. 2026) .......... 7, 10

Nicolas McMullan & Kevin Frazier, *Who Writes the AI Constitution?*, Lawfare (Aug. 13, 2026), https://tinyurl.com/ai-constitution .......... 1

*Open Hearing on Worldwide Threats: Hearing Before the S. Select Comm. on Intel.*, 115th Cong. 64 (2018) .......... 11

S. Rep. No. 115-408 (2018) .......... 3, 11, 12

Statement of Gregory C. Wilshusen, Dir. Inf. Sec. Issues, I, Joint Hearing Before the Subcomm. on Counterterrorism and Counterintelligence, 115th Cong., 2d Sess., No. 115-71 (2018) .......... 14

Tara Beeny, U.S.-China Econ. & Sec. Rev. Comm'n, *Supply Chain Vulnerabilities from China in U.S. Federal Information and Communications Technology* 23 (Apr. 2018) .......... 13

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.** Except for the signatory to this brief, Professor Kevin Frazier, and any other amici who have not yet entered an appearance in this case, all parties, intervenors, and amici appearing before this Court are listed in Anthropic's Petition for Panel Rehearing or Rehearing En Banc.

**B. Ruling Under Review.** References to the rulings at issue appear in Anthropic's Petition for Rehearing or Rehearing En Banc.

**C. Related Cases.** References to any related cases appear in Anthropic's Petition for Panel Rehearing or Rehearing En Banc.

Dated: October 20, 2026

By: */s/ Mark S. Davies*
Mark S. Davies
Counsel for Amicus Curiae

## INTRODUCTION & INTEREST OF AMICUS CURIAE[1]

Professor Kevin Frazier is the AI Innovation and Law Fellow at The University of Texas at Austin School of Law, head of Texas Law's AI Innovation and Law Program, and a senior editor at Lawfare. His scholarship focuses on technology, regulatory design, and constitutional law. *See, e.g.*, Kevin Frazier, *How Courts Can Adequately Adjudicate Issues from AI to Zoonotic Diseases*, 5 Notre Dame J. Emerging Tech. 46 (2023); Kevin Frazier, *Why Anthropic Is Asking for a Rehearing En Banc*, Lawfare (Oct. 15, 2026), https://tinyurl.com/why-en-banc; Nicolas McMullan & Kevin Frazier, *Who Writes the AI Constitution?*, Lawfare (Aug. 13, 2026), https://tinyurl.com/ai-constitution.

Professor Frazier teaches courses on The Law of Artificial Intelligence and AI Constitutionalism. He regularly advises state and federal policymakers on emerging technologies and has testified before Congress about the intersection of artificial intelligence, law, and policy.

[1] The parties have consented to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amicus and their counsel made a monetary contribution intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29.

Professor Frazier has a particular interest in the correct interpretation of "supply chain risk" under the Federal Acquisition Supply Chain Security Act (FASCA), 41 U.S.C. § 4713(k)(6), because it raises important AI-era legal questions about issues that he interrogates in his scholarship.

As Anthropic's petition explains, the "majority decided four exceptionally important questions in conflict with decisions of this Court, the Supreme Court, and the Northern District of California" when it held that Section 4713 allows the Department to designate Anthropic a "supply chain risk" without a credible showing of ill intent. Anthropic Pet. at 1. This brief addresses the first—statutory scope. *Id.*

Under the majority's misinterpretation of the "otherwise manipulate" clause, the government may misuse a statute designed to target only hostile nation states and other bad actors. This Court should grant review to correct this error.

## STATUTORY BACKGROUND

Congress enacted FASCA in 2018 to supplement agency-specific authorities and coordinate cross-agency responses to supply chain

infiltration and security threats to information-technology products and systems. S. Rep. No. 115-408, at 1-9 (2018).

FASCA authorizes "covered procurement action[s]" to prevent agencies from using information technologies that threaten national security, 41 U.S.C. § 4713(a)-(b), including "the exclusion of a source" from the federal supply chain, "withhold[ing] consent for a contractor to subcontract with a particular source," or "direct[ing] a contractor exclude a particular source" for its subcontracts. *Id.* § 4713(k)(4)(A), (B), (D).

Relevant here, FASCA allows the Department of Defense to order "governmentwide exclusion" of a source from the supply chain, 41 U.S.C. § 1323, after determining the source poses a "supply chain risk," defined as:

> the risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate the design, integrity, manufacturing, production, distribution, installation, operation, maintenance, disposition, or retirement of covered articles so as to surveil, deny, disrupt, or otherwise manipulate the function, use, or operation of the covered articles or information stored or transmitted on the covered articles.

41 U.S.C. § 4713(k)(6).

## PROCEDURAL BACKGROUND

Early this year, after contract negotiations broke down between Anthropic and the Department of War, the Secretary removed Anthropic from the federal supply chain. Anthropic challenged this designation in two federal courts.[2]

A divided panel of this Court rejected Anthropic's challenge, finding that the designation was proper because Anthropic's conduct qualified as a "supply chain risk" under FASCA. The core dispute between the majority and dissent was the interpretation of the supply-chain risk definition's "otherwise manipulate" clause.

The majority adopted the Department's broad definition of "manipulate" as meaning "to skillfully arrange, operate, or control." *Anthropic PBC v. U.S. Dep't of War*, 2026 WL 2881404, at *10 (D.C. Cir. Sept. 25, 2026). It rejected Anthropic's argument that the term should be limited to acts done with hostility or bad motive, reasoning that the words before "otherwise manipulate" in the first clause (sabotage, maliciously introduce, and extract) and the second clause (surveil, deny,

[2] *See Anthropic PBC v. U.S. Dep't of War*, 2026 WL 2534714, at *21 (N.D. Cal. Aug. 27, 2026) (setting aside the Department's designation of Anthropic as a "supply chain risk" under 10 U.S.C. § 3252).

disrupt) did not "uniformly connote bad motive." *Id.* And it summarily rejected the "use of legislative history. . . to glean the ordinary public meaning of the seven verbs in the definition." *Id.* at *13. Ultimately, the majority concluded that the definition of supply chain risk "turns on what Anthropic does, not why Anthropic does it." *Id.* at *11.

Judge Henderson dissented because FASCA's surrounding text and context "decidedly favor[] [Anthropic's] narrower reading." *Id.* at *18. Instead, "manipulate" must be interpreted with the verbs it accompanies, which all "connote intentionally subversive and deceptive acts." *Id.* at *18-20. The majority's contradictory interpretation disregarded several canons of construction for purely "semantic reasons," rendered multiple portions of the statute surplusage, and contradicted the statute's history. *Id.*

## ARGUMENT

### A Question of Exceptional Importance Is Whether FASCA Authorizes the Department of War to Designate Any Contractor that Arranges, Operates or Controls a Covered Article as a "Supply Chain Risk"

Section 4713 does not authorize the Department to designate Anthropic—a multiyear federal contractor with no hostile or covert intent—a "supply chain risk" for refusing to modify contract terms. The

majority's reading of "otherwise manipulate" to allow such a result is incompatible with the text of the "supply-chain risk" definition, FASCA's structure, and its legislative history, all of which confirm that "manipulation" requires ill intent or hostile motive.

### A. The Majority's Interpretation of "Otherwise Manipulate" is Incompatible with FASCA's Definition of "Supply Chain Risk"

Congress defined "supply chain risk" to target covert, hostile conduct: the "risk that any person may sabotage, maliciously introduce unwanted function, extract data, or otherwise manipulate" a covered article "so as to surveil, deny, disrupt, or otherwise manipulate" that article. 41 U.S.C. § 4713(k)(6).

Faced with competing definitions of "manipulate," the majority rejected "more tailored" definitions implying nefarious intent, *e.g.*, *Manipulate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("To control or play upon by artful, unfair, or insidious means esp. to one's own advantage."); *Anthropic*, 2026 WL 2881404, at *18-19 (Henderson, J., dissenting) ("To manage, control, or influence in a subtle, devious, or underhand manner." (citing *Manipulate*, Oxford English Dictionary, https://perma.cc/9NF9-ME3B)).

But interpreting "otherwise manipulate" to require no "hostility or bad motive," only that a contractor "skillfully arrange, operate, or control a covered product," ignores "the specific context" in which the phrase appears "and the broader context of the statute as a whole." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

A residual "otherwise" clause (like "otherwise manipulate") must be interpreted by looking to its "surrounding words," especially the words it follows. *Id.* at 486 (quoting *Yates v. United States*, 574 U.S. 528, 536 (2015) (plurality opinion)). "The canon of noscitur a sociis teaches that 'a word is known by the company it keeps.'" *Id.* at 487. Applied to § 4713(k)(6), "the correct definition of 'manipulate' aligns best with the examples that precede it—all of which connote intentionally subversive and deceptive acts." *Anthropic*, 2026 WL 2881404, at *18 (Henderson, J., dissenting) (citing *McDonnell v. United States*, 579 U.S. 550, 569 (2016)). Section 4713's surrounding words describe a threat that operates in secret and against the interests of the United States—not a vendor negotiating in good faith over its own technology's use restrictions. *Id.* at *18-20.

A narrower interpretation of "manipulate" also tracks "the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer*, 603 U.S. at 487. A catchall "otherwise" clause must take meaning from the specific terms before it, which here "connote intentionally subversive and deceptive acts." *Anthropic*, 2026 WL 2881404, at *18 (Henderson, J., dissenting). Congress would not have spelled out all the specific types of "supply chain risks" it did if the word "manipulate" applied to every person who arranges, operates, or controls a covered article. *See Fischer*, 603 U.S. at 489-90. Indeed, the acts preceding both the first "otherwise manipulate" clause (sabotage, maliciously introduce unwanted function, extract data) and the second (surveil, deny, disrupt) all involve arranging, operating, or controlling an article.

Several "peculiar" results further "underscore the implausibility of the [majority's] interpretation," *Id.* at 496 (quoting *Van Buren v. United States*, 593 U.S. 374, 394 (2021)). *First,* the statute's definition of "covered article" already includes "any equipment" or system used in the "automatic acquisition, storage, analysis, evaluation, manipulation,

management, movement, control . . . of data or information by the executive agency" or its contractor. 41 USC § 4713(k)(2) (referencing 40 U.S.C. § 11101). If manipulation of a "covered article" in the broad "arrange, operate, or control" sense was also enough to create a supply chain risk, every product the government buys would pose one.

*Second*, before excluding a vendor from the supply chain, the Secretary must determine that "less intrusive measures are not reasonably available to reduce . . . supply chain risk." 41 U.S.C. § 4713(b)(3)(B). In disputes like this one—where the alleged "risk" arises from a contracting party's good-faith refusal to submit to the government's proposed contract terms—the government has an entire statutory scheme of less intrusive options available to resolve these conflicts.

The narrower definition of "manipulate"—"to manage, control, or influence in a subtle, devious, or underhand manner"—better fits FASCA's text and structure. *See Anthropic*, 2026 WL 2881404, at *18 (Henderson, J., dissenting) (citing *Manipulate*, Oxford English Dictionary (3d ed. 2026), https://perma.cc/9NF9-ME3B).

### B. FASCA's Legislative History Confirms that Congress Intended "Otherwise Manipulate" to Apply Only to Hostile and Covert Conduct

The majority's construction of "otherwise manipulate" broadens the definition of "supply chain risk" beyond the problem that Congress intended FASCA to address. Evidence of how a term was used before enactment "sheds light on what sense those words are meant to carry." *Id.* at *20 (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)). That history supports Anthropic's reading and refutes the view that a contractor's "honest and upfront enforcement of restrictions on a covered article's use disfavored by the government" qualifies as "manipulat[ion]." *Id.*

Congress enacted FASCA in response to calls from the U.S. intelligence community for legislation to meet the threat of "[h]ostile nation states and other bad actors" infiltrating the government's information and technology systems through its supply chains. S. Rep. No. 115-408, at 2 (2018). "For years, national security agencies had warned that companies 'beholden to foreign governments' and other malicious actors were introducing compromised products into 'many of the technologies the Federal Government relied on for vital, daily

functions," *Anthropic*, 2026 WL 2881404, at *20 (Henderson, J. dissenting) (first quoting *Open Hearing on Worldwide Threats: Hearing Before the S. Select Comm. on Intel.*, 115th Cong. 64 (2018), and then quoting S. Rep. No. 115-408, at 2).

Congress's focus on hostile and covert conduct forecloses "otherwise manipulate" to Anthropic—a multi-year government contractor attempting to negotiate use restrictions with the Department. The Senate Committee's report traces a "well-documented history" of warnings that "foreign governments may target the Federal [Information and Communications Technology] supply chain via certain products or services." S. Rep. No. 115-408, at 2.

Both the House and Senate identified recent supply chain risk incidents as catalysts for FASCA: one by the Chinese government and one by the Russian government, confirming the statute targeted covert infiltration by companies beholden to hostile actors. *Id.* at 4-6; *Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government: Hearing Before the Subcomm. on Oversight of the H. Comm. on Science, Space, and Technology*, 115th Cong. (2017).

The "supply chain risk" definition's origins further illustrate that "otherwise manipulate" was intended to target hostile actors. Pre-enactment reports by intelligence agencies described covert security breaches carried out by nefarious actors in terms that closely track Section 4713(k)(6)'s key terms. *See, e.g.*, Tara Beeny, U.S.-China Econ. & Sec. Rev. Comm'n, *Supply Chain Vulnerabilities from China in U.S. Federal Information and Communications Technology* 23, 27, 34 (Apr. 2018) (describing bad actors' attempts to "extract proprietary source code," "install unwanted software" onto compromised computers, and "surveil and manipulate users by hacking . . . embedded [computer] firmware").

Congress modeled Section 4713's definition of "supply chain risk" off a related statute, 10 U.S.C. § 3252, which defines the term as "the risk that *an adversary* may sabotage, maliciously introduce unwanted function, or *otherwise subvert* . . . a covered system so as to surveil, deny, disrupt, or *otherwise degrade* the function, use, or operation of such system." (emphasis added).[3] The House used almost identical language

[3] In Anthropic's parallel challenge, the Northern District of California read § 3252 to require bad motive. *See Anthropic*, 2026 WL 2534714, at *21-24. This Court distinguished that decision by pointing to textual

for the bill that became FASCA with three changes: it replaced "an adversary" with "a malicious actor," added "extract or modify data" to the first string of verbs, and substituted "manipulate" for "subvert" and "degrade." *See* H.R. 6430, 115th Cong. (2018). Bill sponsors confirmed Section 4713 was intended to be a continuation of Section 3252 across agencies, not a tool reaching a broader range of conduct. *E.g.*, H.R. Rep. No. 115-907 at 2-3 (2018).

At the pre-enactment House hearing, every use of "manipulate" was in the hostile sense and in the context of "malicious actor[s]" (even though "malicious actors" would later be changed to "any person"). For instance, the Government Accountability Office warned of "the risk that these systems are being *manipulated or damaged* by leading foreign cyber threat nations, such as Russia, China, Iran, and North Korea." Statement of Gregory C. Wilshusen, Dir. Inf. Sec. Issues, I, Joint Hearing Before the Subcomm. on Counterterrorism and Counterintelligence, 115th Cong., 2d Sess., No. 115-71 (2018) (emphasis added).

---

differences in § 3252—"the critical noun adversary, combined with the sinister connotation fairly pervading the string of sabotage, maliciously introduce, and otherwise subvert." *Anthropic*, 2026 WL 2881404 at *12.

In short, Section 4713's legislative history confirms what its text suggests: the statute was enacted to protect the government from hostile and covert conduct, not punish American companies for maintaining publicly disclosed use restrictions on the use of their own technologies.

## CONCLUSION

The Court should grant Anthropic's petition for rehearing.

Respectfully submitted,

Dated: October 20, 2026

By: *<u>/s/ Mark S. Davies</u>*
Mark S. Davies

Mark S. Davies
Kufere Laing
Melissa A. Iannuzzi
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Tel: (202) 626-3600

Yar Chaikovsky
Andy LeGolvan
WHITE & CASE LLP
3000 El Camino Real 9th Floor
Palo Alto, CA 94304
Tel: (650) 213-0385
*Attorneys for Amicus Curiae Kevin Frazier*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(b)(4), because it contains 2,405 words, calculated by the word processing system used in its preparation (Microsoft Word), and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). Further, this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: October 20, 2026

/s/ *Mark S. Davies*
Mark S. Davies

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October 2026, I caused a true copy of the foregoing to be filed through the Court's CM/ECF system, which will automatically serve all counsel of record.

Dated: October 20, 2026

/s/ *Mark S. Davies*
Mark S. Davies