**ORAL ARGUMENT HELD MAY 19, 2026**

Nos. 26-1049, 26-1162

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ANTHROPIC PBC,

*Petitioner*,

*v.*

U.S. DEPARTMENT OF WAR, ET AL.,

*Respondents*.

---

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

---

# BRIEF OF *AMICI CURIAE* FORMER SERVICE SECRETARIES AND RETIRED SENIOR MILITARY OFFICERS IN SUPPORT OF PETITION FOR REHEARING EN BANC

---

Clara J. Shin
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
cshin@cov.com

Sarah E. Harrington
*Counsel of Record*
David M. Zionts
Megan A. Crowley
Mishi Jain
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sharrington@cov.com

*Counsel for Amici Curiae Former Service Secretaries and Retired Senior Military Officers*

## RULE 28(a)(1)(A) STATEMENT

**Parties and *Amici*.** All parties, intervenors, and *amici* appearing in this Court are listed in the Rule 28(a)(1)(A) Statement filed by Petitioner Anthropic PBC ("Anthropic") on October 13, 2026. *See* Doc. No. 2197902; *see also* Circuit Rule 40(c). A list identifying the *amici* signatories of this brief is provided in the attached addendum.

Dated: October 20, 2026

*/s/ Sarah E. Harrington*
Sarah E. Harrington

*Counsel for Amici Curiae*
*Former Service Secretaries and*
*Retired Senior Military Officers*

## CERTIFICATE OF SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), a separate brief from *Amici* former Service Secretaries and retired senior military officers is necessary. *Amici* share a profound commitment to the rule of law as a cornerstone of national security. Having devoted their careers to ensuring the military's fidelity to the rule of law, they are uniquely positioned to speak about the dangers of the misuse of powerful national-security authorities by civilian political leadership when they wield those authorities not to address the serious concerns that led Congress to delegate the authority in question, but as retribution against a private company that has displeased the leadership.

To *Amici*'s knowledge, no other *amicus* has filed, or plans to file, a brief expressing similar views or based on similar experiences. Any overlap between this and other *amicus* briefs is thus unlikely. By filing a separate brief, *Amici* are also able to present their unique views in a clear, concise, and timely manner. *Amici* believe that a separate brief is justified and will serve the Court.

Dated: October 20, 2026

*/s/ Sarah E. Harrington*
Sarah E. Harrington

*Counsel for Amici Curiae*
*Former Service Secretaries and*
*Retired Senior Military Officers*

## TABLE OF CONTENTS

**Page**

RULE 28(a)(1)(A) STATEMENT ..... i

CERTIFICATE OF SEPARATE BRIEF ..... ii

TABLE OF AUTHORITIES ..... iv

IDENTITIES AND INTERESTS OF *AMICI CURIAE* ..... 1

SUMMARY OF ARGUMENT ..... 3

ARGUMENT ..... 5

I. The Secretary's Supply-Chain-Risk Designation Undermines the Military's Adherence to the Rule of Law and the Public's Confidence that the Military Is Governed Accordingly. ..... 5

II. Punishing Domestic Defense Contractors Over Policy Disagreements Threatens U.S. Military Primacy and Servicemember Safety. ..... 10

CONCLUSION ..... 13

ADDENDUM ..... 14

CERTIFICATES OF COMPLIANCE AND SERVICE ..... 22

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Little v. Barreme*,
6 U.S. (2 Cranch) 170 (1804) ....................7

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ....................6

*United States v. Lee*,
106 U.S. (16 Otto) 196 (1882) ....................6

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ....................8, 9

### Statutes

10 U.S.C. § 502 ....................6

10 U.S.C. § 3252 ....................3, 4, 8

41 U.S.C. § 4713 ....................3, 4, 8

Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489 (1862) ....................10

### Executive Order

Exec. Order No. 14,179, 90 Fed. Reg. 58499 (Dec. 11, 2025) ....................11

### Other Authorities

Lt. Col. Nathan J. Bankson, *Legitimacy and Rule of Law: A Military Practitioner's Point of View*, 67 DOJ J. Fed. L. & Prac. 245 (2019) ....................5

Benjamin R. Beede, *War Industries Board*, *in 1914–1918 Online: International Encyclopedia of the First World War* (Oct. 8, 2014), ....................10

Tess Bridgeman, *What Hegseth's "Supply Chain Risk" Designation of Anthropic Does and Doesn't Mean*, Just Security (Mar. 2, 2026) ....................12

Chief Digit. & A.I. Off., U.S. Dep't of Def., *CDAO Announces Partnerships with Frontier AI Companies to Address National Security Mission Areas* (July 14, 2025) ........ 11

DARPA, *About DARPA: Our Mission* (last visited Mar. 7, 2026) ........ 11

Def. Innovation Unit & Chief Digit. & A.I. Off., U.S. Dep't of Def., *DIU and CDAO: Deploying AI for Strategic Impact* (Jan. 21, 2025) ........ 11

Fed. R. App. P. 29 ........ 1

The Federalist No. 46 (James Madison) ........ 6

The Federalist No. 51 (James Madison) ........ 5

Marcy E. Gallo, Cong. Rsch. Serv., *IF12869*, *The Defense Innovation Ecosystem* (Jan. 8, 2025) ........ 10

Gallup, *Confidence in Institutions* (2024) ........ 9

Pete Hegseth (@SecWar), X, *Statement on Anthropic and Supply Chain Risk Designation* (Feb. 27, 2026, at 17:14 ET) ........ 4

Kathleen J. McInnis, Cong. Rsch. Serv., *IF11566*, *Congress, Civilian Control of the Military, and Nonpartisanship* (June 10, 2020) ........ 7

Open Letter from Former Secretaries of Defense and Former Chairmen of the Joint Chiefs of Staff, *To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks (Sep. 6, 2022), ........ 7

William M. Reid, Am. Soc'y of Arms Collectors, *1794/1798 U.S. Contract Muskets: The Political and Military Situation That Precipitated These Contracts and a Summary of the Contracts and Contractors* (2016) ........ 10

Alan Z. Rozenshtein, *Congress-Not the Pentagon or Anthropic-Should Set Military AI Rules*, Lawfare (Feb. 20, 2026) ........ 7

Kelley M. Sayler, Cong. Rsch. Serv., *R45178*, *Artificial Intelligence and National Security* (Nov. 10, 2020) ........ 11

Tom W. Smith & Jaesok Son, Nat'l Op. Rsch. Ctr., *General Social Survey 2012 Final Report: Trends in Public Attitudes about Confidence in Institutions* (2013) ....................9

Mike Walker et al., DARPA, *Innovation at DARPA* (July 1, 2016) ....................11

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*

*Amici* are former high-ranking military leaders whose professional responsibilities required them to pursue national-security imperatives while complying with the law. They have strong interests in this case because invoking national-security authorities outside their congressionally set limits threatens the rule of law and the military's relationships with domestic private-sector partners.[1]

*Amici* are identified below; biographies appear in the addendum.

- Admiral C. Steve Abbot, U.S. Navy (Ret.)
- Admiral Thad W. Allen, U.S. Coast Guard (Ret.)
- Vice Admiral Donald C. Arthur, U.S. Navy (Ret.)
- Rear Admiral (Upper Half) William D. Baumgartner, U.S. Coast Guard (Ret.)
- The Honorable Carlos Del Toro, Former Secretary of the Navy
- Brigadier General Robert J. Felderman, U.S. Army (Ret.)
- Rear Admiral (Upper Half) F. Stephen Glass, U.S. Navy (Ret.)
- Rear Admiral (Upper Half) Donald J. Guter, U.S. Navy (Ret.)
- Major General Richard S. Haddad, U.S. Air Force (Ret.)
- Major General Irving L. Halter, Jr., U.S. Air Force (Ret.)

[1] No counsel for any party authored this brief in whole or in part, and no person other than *Amici* or their counsel contributed money intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E). *Amici* received leave to participate at the panel stage. *See* Doc. No. 2167684.

- Rear Admiral (Upper Half) Janice Hamby, U.S. Navy (Ret.)
- Rear Admiral (Lower Half) Charles D. Harr, U.S. Navy (Ret.)
- General Michael V. Hayden, U.S. Air Force (Ret.)
- The Honorable Frank Kendall, Former Secretary of the Air Force
- Major General Steven J. Lepper, U.S. Air Force (Ret.)
- Major General Randy E. Manner, U.S. Army (Ret.)
- Rear Admiral (Upper Half) James E. McPherson, JAGC, U.S. Navy (Ret.)
- Brigadier General Mark A. Montjar, U.S. Army (Ret.)
- Admiral William A. Owens, U.S. Navy (Ret.)
- The Honorable F. Whitten Peters, Former Secretary of the Air Force
- Major General Gale S. Pollock, U.S. Army (Ret.)
- Rear Admiral Michael E. Smith, U.S. Navy (Ret.)
- Major General F. Andrew Turley, U.S. Air Force (Ret.)
- The Honorable Christine Wormuth, Former Secretary of the Army

## SUMMARY OF ARGUMENT

The United States military, which is grounded in the rule of law, has long thrived on public-private partnerships. The strength of the military, and of the critical partnerships it relies on, suffers when the government takes actions that lack legal foundation and that send the message that investing in national-security risks capricious retaliation or disproportionate punishment for voicing disagreement. Designating an American company a security risk without a legal basis, while warning others not to do business with that company, is an extraordinary and unprecedented step down a dangerous road.

The strength of our preeminent Armed Forces flows primarily from the brave men and women who serve. Their collective strength is reinforced by two enduring foundations: ingenuity borne of robust military and private-sector collaboration, and the rule of law. As former leaders in the Armed Forces, *Amici* share a profound commitment to the rule of law as a cornerstone of national security and are deeply troubled by government actions that stretch the law under the pretense of protecting national security.

The Secretary of Defense invoked 10 U.S.C. § 3252 ("Section 3252") and the Federal Acquisition Supply Chain Security Act ("FASCSA"), 41 U.S.C. § 4713, to

designate an American company, Anthropic, a "Supply-Chain Risk."[1] The Secretary described the designation's consequences in sweeping terms, including that it restricts every company that does business with the military from engaging in any commercial activity with Anthropic.[2] Yet Congress defined "supply chain risk" narrowly as "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a [national security] system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." 10 U.S.C. § 3252(d)(4); *see also* 41 U.S.C. § 4713(k)(6) (similar). Congress also required a determination that such a designation "is necessary to protect national security" and that "less intrusive measures are not reasonably available." 10 U.S.C. § 3252(b); 41 U.S.C. § 4713(b)(3).

*Amici* offer no view about the reported policy disagreement between Anthropic and the Administration about guardrails on the military's use of artificial intelligence. *Amici* instead address the misuse of national-security authority by civilian political leadership as retribution against a private company that displeased

[1] *See* Pete Hegseth (@SecWar), X, *Statement on Anthropic and Supply Chain Risk Designation* (Feb. 27, 2026, at 17:14 ET), https://perma.cc/5BNB-DCRX.

[2] *See* Pete Hegseth, *supra* ("Effective immediately, no contractor, supplier, or partner that does business with the United States military may conduct any commercial activity with Anthropic.").

the leadership rather than in service of the serious concerns that led Congress to delegate this authority. *Amici* are uniquely positioned to speak on that topic, having devoted their careers to ensuring the military's fidelity to the rule of law.

## ARGUMENT

### I. The Secretary's Supply-Chain-Risk Designation Undermines the Military's Adherence to the Rule of Law and the Public's Confidence that the Military Is Governed Accordingly.

Rule of law is the cornerstone of American constitutional democracy and central to the military's role within it. James Madison explained: "In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."[3] America's constitutional system of government requires those who exercise power—including the military—to adhere to the rule of law as a condition of legitimacy and public confidence.

Adherence to the rule of law by the Armed Forces is not an abstract principle subordinate to practical exigencies; it is a professional and legal obligation.[4] Servicemembers swear to support and defend the Constitution and to "bear true faith and allegiance to the same . . . according to regulations and the Uniform Code of

[3] The Federalist No. 51 (James Madison).

[4] Lt. Col. Nathan J. Bankson, *Legitimacy and Rule of Law: A Military Practitioner's Point of View*, 67 DOJ J. Fed. L. & Prac. 245, 247–48 (2019) (explaining that "[r]ule of law is the centerpiece to legitimacy" and that a military that "disregards the law . . . will not earn the trust and respect of the population and, therefore, will lose its legitimacy").

Military Justice." 10 U.S.C. § 502(a). Servicemembers thus agree that any exercise of authority must be subordinate to the Nation's laws.

The Secretary's designation undermines both the military's adherence to the rule of law and the public's confidence in the same, eroding the Armed Forces' ability to protect the Nation. When executive officials disregard—or appear to disregard—congressional limits, they violate the fundamental maxim that "[n]o man in this country is so high that he is above the law"—all officials are "creatures of law and . . . bound to obey it."[5] Such limits are particularly important for the military, which wields extraordinary power, especially when officials invoke national-security authorities that Congress deliberately confined to narrow and exceptional circumstances.

*First*, since the Founding, our Armed Forces have existed "entirely at the devotion of the federal government . . . render[ing] it sufficiently dependent upon the people," and thus subject to civilian control.[6] Congress plays a central role in that constitutional framework. Article I empowers Congress to oversee, authorize, and fund the military, ensuring that military power is exercised pursuant to

---

[5] *United States v. Lee*, 106 U.S. (16 Otto) 196, 220 (1882); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) (similar).

[6] The Federalist No. 46 (James Madison).

democratically enacted laws, not unilateral executive will.[7] Disregarding those limits erodes the Constitution's allocation of war powers between Congress and the Executive.

Under the proper allocation of power, the Armed Forces depend on Congress for resources and legal authority, while Congress entrusts military leaders with significant discretion to act within lawful bounds.[8] That arrangement is sustained by "reservoir[s]" of "[m]utual trust,"[9] and succeeds only if Congress can rely on the Secretary to "faithfully implement" legislative directives within statutory limits,[10] leaving ultimate control of the military in "the hands of democratically elected civilian leaders."[11]

*Amici* are gravely concerned that the Secretary exceeded those bounds by deploying Section 3252 and FASCSA in an unprecedented manner that appears disconnected from their purposes. Congress did not enact those statutes as general-

---

[7] *See* Kathleen J. McInnis, Cong. Rsch. Serv., *IF11566*, *Congress, Civilian Control of the Military, and Nonpartisanship* 1 (June 10, 2020), https://perma.cc/269Y-7S6N; *accord* Alan Z. Rozenshtein, *Congress—Not the Pentagon or Anthropic—Should Set Military AI Rules*, Lawfare (Feb. 20, 2026), https://perma.cc/VF68-2V6Y.

[8] *See Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177–79 (1804) (military action is unlawful when taken "without any special [congressionally delegated] authority for that purpose").

[9] Open Letter from Former Secretaries of Defense and Former Chairmen of the Joint Chiefs of Staff, *To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations* ¶ 13, War on the Rocks (Sep. 6, 2022), https://perma.cc/KP6S-CQDU.

[10] *Id.*

[11] McInnis, *supra*, at 2.

purpose tools for resolving policy disputes or punishing domestic actors who disagree with the Administration. Rather, those powerful tools address defined national-security threats, such as a foreign adversary attempting to "sabotage, maliciously introduce unwanted function, or otherwise subvert" a national-security system. 10 U.S.C. § 3252(d)(4); *accord* 41 U.S.C. § 4713(k)(6) (similar).

Congress carefully limited those grants of exceptional authority, permitting their use only when "less intrusive measures are not reasonably available to reduce . . . supply chain risk." 10 U.S.C. § 3252(b); 41 U.S.C. § 4713(b)(3). That deliberate choice cabins executive discretion and reserves those powers for the rare situations where they are necessary. *See id.* Ignoring those limits would transform tailored national-security tools into instruments of unbounded executive power.

When executive officials deploy delegated authority in ways "incompatible with the expressed or implied will of Congress,"[12] they erode trust between the branches, and legislators may hesitate to give the military the tools it may need to address emerging threats. That dynamic of distrust weakens the Nation's ability to respond to national-security challenges.

*Second*, the Secretary's actions threaten the military's legitimacy by creating the appearance that the military is not bound by law and can retaliate against

[12] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

domestic partners over policy disagreements. The Armed Forces have long been among the most trusted institutions in American life,[13] a trust that stems largely from the military's history of remaining above the fray of politics. That trust confers the legitimacy necessary for the military to exercise its powers.

Using extraordinary authorities in a manner that appears retaliatory and untethered from their purpose of defending the supply chain from foreign adversaries undermines public confidence in that rule-of-law foundation. In those circumstances, the public sees military leaders as having "los[t] sight of . . . the balanced power structure of our Republic," and who instead "emphasize transient results [based] upon policies."[14]

Such actions also set a dangerous precedent, emboldening future officials to reach for these authorities in similar ways and recasting the military in the public eye as an instrument of shifting political aims rather than a steady defender of the Nation.

---

[13] *See, e.g.*, Gallup, *Confidence in Institutions* (2024), https://perma.cc/P97V-6BGJ; Tom W. Smith & Jaesok Son, Nat'l Op. Rsch. Ctr., *General Social Survey 2012 Final Report: Trends in Public Attitudes about Confidence in Institutions* (2013), https://perma.cc/F2CK-HPU5.

[14] *Youngstown*, 343 U.S. at 634 (Jackson, J., concurring).

## II. Punishing Domestic Defense Contractors Over Policy Disagreements Threatens U.S. Military Primacy and Servicemember Safety.

Our military maintains its technological edge—and keeps servicemembers and all Americans safe—by working closely with the private sector to leverage American ingenuity.[15]

Military-private partnerships are part of the national fabric. The federal government contracted with private gunsmiths to manufacture muskets in the 1790s and authorized private railroad companies to build the transcontinental railroad in the 1860s—projects that proved critical to national defense and economic development alike.[16] During World War I, Congress established the War Industries Board to mobilize private industry to supply the military.[17] During the Cold War, President Eisenhower created the Defense Advanced Research Projects Agency, whose partnerships with private contractors and researchers produced the precursor to the modern internet, advancements in stealth aircraft, miniaturized GPS

---

[15] *See* Marcy E. Gallo, Cong. Rsch. Serv., *IF12869*, *The Defense Innovation Ecosystem* 1–2 (Jan. 8, 2025), https://perma.cc/N8LY-6A28.

[16] *See* William M. Reid, Am. Soc'y of Arms Collectors, *1794/1798 U.S. Contract Muskets: The Political and Military Situation That Precipitated These Contracts and a Summary of the Contracts and Contractors* 1 (2016), https://perma.cc/XSQ4-4CPM; *see also* Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489 (1862).

[17] Benjamin R. Beede, *War Industries Board*, *in 1914–1918 Online: International Encyclopedia of the First World War* (Oct. 8, 2014), https://perma.cc/C5EN-WXAL.

technologies, and more.[18] Such partnerships remain essential to meeting today's operational demands and tomorrow's emerging threats.

Those lessons apply equally to artificial intelligence. The United States' national-security advantage increasingly depends on frontier AI systems developed by private-sector companies,[19] and the Administration itself has emphasized that a robust domestic ecosystem of multiple frontier AI developers is essential to preserving that technological edge.[20]

These partnerships depend on trust, predictability, and adherence to established legal frameworks. When the military is a reliable and even-handed partner, it attracts companies for long-term, national-security investments. But businesses will be reluctant to form and maintain such partnerships—thus undermining the national-security objectives that the Administration's AI policies purport to advance—if businesses believe that the military does not operate within

[18] Mike Walker et al., DARPA, *Innovation at DARPA* 1 (July 1, 2016), https://perma.cc/T4HK-9C7C; *see also* DARPA, *About DARPA: Our Mission*, https://www.darpa.mil/about#mission (last visited Mar. 7, 2026).

[19] Kelley M. Sayler, Cong. Rsch. Serv., *R45178*, *Artificial Intelligence and National Security* (Nov. 10, 2020), https://perma.cc/7YSZ-B8ZA.

[20] *See, e.g.*, Exec. Order No. 14,179, 90 Fed. Reg. 58499, 58499–01 (Dec. 11, 2025); *see also* Chief Digit. & A.I. Off., U.S. Dep't of Def., *CDAO Announces Partnerships with Frontier AI Companies to Address National Security Mission Areas* (July 14, 2025), https://perma.cc/KE7B-ACRV; *see also* Def. Innovation Unit & Chief Digit. & A.I. Off., U.S. Dep't of Def., *DIU and CDAO: Deploying AI for Strategic Impact* (Jan. 21, 2025), https://perma.cc/6DVY-XWZ9 ("Adopting and responsibly accelerating AI use in the [Department of Defense] is an imperative to deter major conflict—or win if forced to fight—in the twenty-first century.").

the rule of law or that military leaders may wield national-security authority unpredictably or punitively.

The Secretary's actions here threaten precisely those harms. By using national-security authorities in an unprecedented and potentially unauthorized manner that appears to punish an American company for a policy disagreement, the Secretary signals that those authorities are available to be used against others. Companies may reassess whether to invest in defense-relevant research or long-term military partnerships, chilling investment in next-generation technologies, slowing the advancement of U.S. defense capabilities, and creating openings for foreign adversaries. That uncertainty will detract from military readiness and operational safety.

These risks are compounded when the targeted technologies are already integrated into ongoing U.S. military operations because sudden uncertainty could disrupt operational planning and put servicemembers at risk.[21] Any decision that affects U.S. military processes and systems during ongoing military operations should be undertaken with utmost deliberation and sensitivity to operational consequences.

---

[21] *See, e.g.*, Tess Bridgeman, *What Hegseth's "Supply Chain Risk" Designation of Anthropic Does and Doesn't Mean*, Just Security (Mar. 2, 2026), https://perma.cc/AU3A-RLTV ("Anthropic's Claude has been, and is, 'extensively deployed' across U.S. military and intelligence systems.").

## CONCLUSION

Far from protecting national security, the Secretary's conduct threatens rule-of-law principles that have long strengthened our military. *Amici* urge the Court to prevent the misuse of important national-security authorities, uphold the rule of law, and ensure the continued preeminence of our Armed Forces.

Respectfully submitted,

Dated: October 20, 2026

/s/ Sarah E. Harrington
Sarah E. Harrington
*Counsel of Record*
David M. Zionts
Megan A. Crowley
Mishi Jain
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sharrington@cov.com

Clara J. Shin
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
cshin@cov.com

*Counsel for Amici Curiae Former Service Secretaries and Retired Senior Military Officers*

## ADDENDUM

*Amici*'s short biographies listed below reflect a measure of their distinguished service to our country.

**Admiral C. Steve Abbot, U.S. Navy (Ret.)**, graduated from the U.S. Naval Academy in 1966, after which he was deployed to Vietnam and began a 34-year career with the U.S. Navy. His final active-duty tour was as Deputy Commander-in-Chief, U.S. European Command from 1998 to 2000. Following his retirement, Admiral Abbot served as Deputy Homeland Security Advisor to President George W. Bush from 2001 to 2003.

**Admiral Thad W. Allen, U.S. Coast Guard (Ret.)**, retired in 2010 as the 23rd Commandant of the U.S. Coast Guard. Admiral Allen led the federal responses to Hurricanes Katrina and Rita and the Deepwater Horizon oil spill. He led Atlantic Coast Guard forces in response to the 9/11 attacks and coordinated the Coast Guard response to the Haitian earthquake of 2010.

**Vice Admiral Donald C. Arthur, U.S. Navy (Ret.)**, served as 35th Surgeon General of the Navy. He was Commander of the National Naval Medical Center in Bethesda, Maryland, and the Naval Hospital in Camp Lejeune, North Carolina. He deployed and served with the hospital ship USNS Mercy.

**Rear Admiral (Upper Half) William D. Baumgartner, U.S. Coast Guard (Ret.)**, had a variety of operational and legal assignments during his 33-year career.

As a flag officer, he served as the Judge Advocate General (TJAG)/Chief Counsel of the Coast Guard and then as the Commander of the Seventh (Southeast) Coast Guard District.

**The Honorable Carlos Del Toro** immigrated to the U.S. with his family as refugees in 1962. Raised in the Hell's Kitchen neighborhood of New York City, he received an appointment to the United States Naval Academy and was commissioned as a Surface Warfare Officer upon his graduation in 1983. His 26-year naval career included a series of critical appointments at sea and ashore, including command as the Commissioning Commanding Officer of USS BULKELEY (DDG 84) and service in a combat zone during Operation Desert Storm. After retiring from active-duty service in 2004, Secretary Del Toro continued to support a range of government and private sector programs by founding SBG Technology Solutions, Inc., an engineering services company. Sworn in as the 78th Secretary of the Navy and Marine Corps on August 9, 2021, Secretary Del Toro led the nearly one-million-person Department through the largest modernization effort in half a century concurrent with the longest sustained surface-to-air naval combat operations since World War II in the Red Sea. Under his leadership, the Department of the Navy sought and commanded the largest budget in recent history, growing it over twenty-five percent over four years from $210B to $261B. Today, Secretary Del Toro is also President & CEO of Del Toro Global Associates, LLC.

**Brigadier General Robert J. Felderman, U.S. Army (Ret.)**, served as the United States Deputy Director and Principal Advisor to the North American Aerospace Defense Command (NORAD) and as the Deputy Director of Plans, Policy, and Strategy Directorate (DJ5) at the U.S. Northern Command (USNORTHCOM). He has commanded troops from squad to brigade. He is Army branch qualified infantry, armor, cavalry, medical service corps, and aviation.

**Rear Admiral (Upper Half) F. Stephen Glass, U.S. Navy (Ret.)**, served in the U.S. Navy for twenty-nine years, serving as Staff Judge Advocate and Force Judge Advocate billets advising Flag rank Commanders regarding military law and procedures, culminating his career as the reserve Judge Advocate General of the Navy. He was awarded the Navy Marine Corps Distinguished Service Medal.

**Rear Admiral (Upper Half) Donald J. Guter, U.S. Navy (Ret.)**, served on active duty in the Navy for 29 years, first as a surface warfare officer and then in the Judge Advocate General Corps, ultimately serving as the Judge Advocate General of the Navy from 2000–2002. After retiring from active duty, he served as Dean of Duquesne Law School and subsequently Dean of South Texas College of Law Houston.

**Major General Richard S. Haddad, U.S. Air Force (Ret.)**, was the Vice Commander of the Air Force Reserve Command, responsible for the daily operations

of approximately 70,000 citizen Airmen and 300 aircraft among 3 numbered air forces, 33 flying wings, 10 flying groups and one space wing.

**Major General Irving L. Halter, Jr., U.S. Air Force (Ret.)**, is an Air Force Academy graduate and former fighter pilot, serving in Iraq, Afghanistan, in the Pentagon with the Joint Chiefs of Staff, and as Vice Superintendent of the Air Force Academy. He is the recipient of two Bronze Stars.

**Rear Admiral (Upper Half) Janice Hamby, U.S. Navy (Ret.)**, served on active duty from 1980 until 2012. Dr. Hamby's service included assignments at sea and in war zones, in command, on the Joint Staff, and as a Deputy Department of Defense Chief Information Officer on the staff of the Office of the Secretary of Defense. After retirement she became the Chancellor of National Defense University's College of Information and Cyberspace. She completed her federal service in 2018.

**Rear Admiral (Lower Half) Charles D. Harr, U.S. Navy (Ret.)**, retired in 2013 as the 18th Medical Officer of the Marine Corps, former Commanding Officer of the 4th Medical Battalion. He is a Cardiovascular and Thoracic Surgeon currently practicing in Raleigh, North Carolina, and serving as the Chief Medical Officer of WakeMed Health and Hospitals.

**General Michael V. Hayden, U.S. Air Force (Ret.)**, entered active military service in 1969. During his career, he rose to the rank of four-star general and served

as Director of the Central Intelligence Agency and the National Security Agency. General Hayden also served as Commander of the Air Intelligence Agency and held senior staff positions at the Pentagon, Headquarters U.S. European Command, and the National Security Council.

**The Honorable Frank Kendall** served as the Secretary of the Air Force from 2021 to 2025 and as the Under Secretary of Defense for Acquisition, Technology and Logistics from 2012 to 2017. Earlier in his career he was Vice President of Engineering at Raytheon and a member of the board of directors of Leidos. He is a member of the Council on Foreign Relations and a Senior Fellow at the Center for American Progress. He holds degrees from West Point, Caltech, and Georgetown University Law Center. He is the author of "Lethal Autonomy; the Future of Warfare" and "Getting Defense Acquisition Right."

**Major General Steven J. Lepper, U.S. Air Force (Ret.)**, served for 35 years in the United States Air Force as a judge advocate in a variety of roles including Deputy Legal Counsel to the Chairman of the Joint Chiefs of Staff, commander, and military judge. He culminated his service as Deputy Judge Advocate General of the Air Force.

**Major General Randy E. Manner, U.S. Army (Ret.)**, served over 36 years in the U.S. Army in positions such as the Acting Vice Chief of the National Guard Bureau overseeing the readiness and deployment of over 450,000 Guardsmen, the

Deputy Commanding General of the U.S. Third Army, responsible for all Army forces in combat in the Middle East, and as the Acting and Deputy Director of the Defense Threat Reduction Agency, responsible for overseeing the safety of all U.S. nuclear and chemical weapons and developing Department of Defense procedures to respond to pandemics.

**Rear Admiral (Upper Half) James E. McPherson, JAGC, U.S. Navy (Ret.),** served on active duty for 26 years, retiring in 2006 as the Judge Advocate General of the Navy. He subsequently served as the General Counsel of the Army, the Undersecretary of the Army, and the Acting Secretary of the Navy.

**Brigadier General Mark A. Montjar, U.S. Army (Ret.)**, served in both the active Army and the Army Reserve from 1972 to 2007. He returned to active duty immediately after the events of September 11, 2001, and took an early retirement from General Motors Corporation in April of 2002 as a Global Purchasing Manager. His last two assignments as a brigadier general were at Ft. Monroe, Va. where he served as the Deputy Commanding General of the U.S. Army Cadet Command (Army ROTC) and at Ft. Belvoir, Va. where he served as the Assistant Deputy Chief of Staff for Operations at the U.S. Army Materiel Command. After his military retirement he served as a Director of Business Development for Booz Allen Hamilton, Agility Defense and Government Services, and VSE Corporation.

**Admiral William A. Owens, U.S. Navy (Ret.)**, retired in 1996 as the Vice Chairman of the Joint Chiefs of Staff. He began his career as a nuclear submariner, spending a total of 4,000 days aboard submarines, including duty in Vietnam. Admiral Owens was a senior military assistant to two Secretaries of Defense and served as commander of the U.S. 6th Fleet during Operation Desert Storm.

**The Honorable F. Whitten Peters** served as Secretary of the Air Force, Under Secretary of the Air Force, and Acting Secretary of the Air Force from 1997 to 2001. He also was the Principal Deputy General Counsel of the Department of Defense from 1995 to 1997. Since leaving DOD in 2001, Peters has served on or chaired a number of Presidential, DOD, Air Force, and Commonwealth of Virginia advisory committees and was a member of the Board and Chair of the Air and Space Forces Association. He served as a Navy Line Officer during Vietnam.

**Major General Gale S. Pollock, U.S. Army (Ret.)**, served as the Commander of the U.S. Army Medical Command and the Acting Surgeon General of the Army (the first woman, non-physician to have this role in any of the military services). General Pollock was the 22nd Chief of the Army Nurse Corps.

**Rear Admiral Michael E. Smith, U.S. Navy (Ret.)**, served on active duty from 1983 until 2015. During his service he commanded at all operational levels from the commanding officer of the Navy's newest destroyer to command of an aircraft carrier strike group. Mike founded and leads National Security Leaders for

America, a bipartisan and pro-democracy organization of over 1400 former senior national security leaders. Mike most recently served as a Presidential Appointee and Commissioner on the American Battle Monuments Commission and as a Senior Advisor to the Secretary of the Navy.

**Major General F. Andrew Turley, U.S. Air Force (Ret.)**, served in the U.S. Air Force for more than 27 years, in a wide variety of active duty, Air Force Reserve and Air National Guard judge advocate positions at the wing, major command and Air Staff levels, culminating in his appointment as the Ninth Air National Guard Assistant to The Judge Advocate General. As a federal civilian lawyer, he held senior level legal positions with several federal agencies, including the Department of Justice, the White House, and Department of the Air Force, and served as the general counsel of a small DOD agency. He is a retired member of the Senior Executive Service.

**The Honorable Christine Wormuth** served as the 25th Secretary of the Army from 2021 to January 2025. Prior to becoming Army Secretary, Wormuth was the Under Secretary of Defense for Policy from 2014 through 2016, and served in other senior positions on the National Security Council and in the Office of the Secretary of Defense from 2009 to 2014. Secretary Wormuth is currently the CEO and President of the Nuclear Threat Initiative, a nonprofit organization.

## CERTIFICATES OF COMPLIANCE AND SERVICE

1. I certify that this brief complies with the length limits, type-face, and type-style requirements of Federal Rules of Appellate Procedure 29(b) and 32(a), as it contains 2,600 words and was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

2. On October 20, 2026, I filed this brief with the Clerk of this Court via the CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished through that system.

Dated: October 20, 2026

*/s/ Sarah E. Harrington*
Sarah E. Harrington

*Counsel for Amici Curiae*
*Former Service Secretaries and*
*Retired Senior Military Officers*