ORAL ARGUMENT HELD ON MAY 19, 2026
No. 26-1049 (lead); No. 26-1162 (consolidated)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ANTHROPIC PBC,

*Petitioner*,

v.

U.S. DEPARTMENT OF WAR, PETER B. HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF WAR,

*Respondents.*

On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice

# BRIEF OF FORMER SECRETARY OF DEFENSE LEON PANETTA AND THE INSTITUTE FOR SECURITY AND TECHNOLOGY AS *AMICI CURIAE* IN SUPPORT OF PETITIONER'S PETITION FOR PANEL REHEARING OR REHEARING EN BANC

Matthew Klapper
Anjali Motgi
Elizabeth Deutsch
Andrew Cherry
Simon Chin
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
mklapper@jenner.com
amotgi@jenner.com
edeutsch@jenner.com
acherry@jenner.com
schin@jenner.com
*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici.*** All parties, intervenors, and *amici* appearing before this Court are listed in the Rule 28(a)(1)(A) Statement at Add.52 of the Addendum filed in conjunction with Petitioner's Petition for Panel Rehearing or Rehearing En Banc ("Petition"), or have been disclosed by other *amici* to date.

**Rulings Under Review.** The ruling under review is the panel's opinion and judgment denying Anthropic PBC's petitions for review, *Anthropic PBC v. U.S. Department of War*, Nos. 26-1049, 26-1162 (D.C. Cir. Sept. 25, 2026), reproduced at Add.1-51 of the Petition.

**Related Cases.** This case was previously before this Court on Anthropic's emergency motion for a stay, *Anthropic PBC v. U.S. Department of War*, No. 26-1049, 2026 WL 1042493 (D.C. Cir. Apr. 8, 2026) (per curiam), and on the merits, resulting in the panel decision under review. Anthropic has separately challenged its designation as a supply chain risk under 10 U.S.C. § 3252 in *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-01996 (N.D. Cal.), in which the district court granted summary judgment to Anthropic on August 27, 2026.

Dated: October 20, 2026

/s/ Matthew B. Klapper
Matthew B. Klapper
*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and Circuit Rules 26.1 and 28(a)(1)(A), *amici curiae* provide the following disclosures: Former Secretary of Defense Leon Panetta is an individual and has nothing to disclose. The Institute for Security and Technology is an association, nonprofit organization, or other similar entity that has no parent company and in which no publicly held company has a 10% or greater ownership interest.

## STATEMENT REGARDING AUTHORITY TO FILE

*Amici* submit this brief with a motion requesting an invitation to file under D.C. Circuit Rule 40(f). All parties have consented to the filing of this brief.

## CERTIFICATE OF SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), a separate brief from *amici* former Secretary of Defense Leon Panetta and the Institute for Security and Technology ("IST") is necessary. Secretary Panetta is deeply committed to the institutional integrity and long-term credibility of the Department of War ("Department"), which he previously directed (as the then-Department of Defense), and to the appropriate exercise of the Department's authorities, particularly in response to real or perceived threats to national security. IST shares a related and profound commitment to technological advancement that furthers national security and global stability, and is uniquely engaged with research and policy that facilitates the development of technologies that are neither exploitative nor untrustworthy. *Amici* are thus best situated to contextualize the adverse impact on the Department of pretextual and inappropriate use of authorities reserved for only the most extraordinary threats to national security, as well as the profoundly destabilizing impact on the American AI ecosystem and the global AI race that this particular pretextual use of such authorities is likely to have.

To *amici*'s knowledge, no other *amicus* has filed or plans to file a brief sharing similar perspectives or based on similar experience and expertise. Any overlap between this and other *amicus* briefs is thus unlikely. By filing a separate brief,

*amici* are able to present their views in a clear, concise, and timely manner. Accordingly, *amici* believe that a separate brief is justified and will serve the Court.

Dated: October 20, 2026

/s/ Matthew B. Klapper
Matthew B. Klapper
*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT ..................................................... ii

STATEMENT REGARDING AUTHORITY TO FILE ....................................... iii

CERTIFICATE OF SEPARATE BRIEF ...............................................................iv

TABLE OF AUTHORITIES ................................................................................ vii

GLOSSARY ............................................................................................................ix

IDENTITIES AND INTERESTS OF *AMICI CURIAE* ..........................................1

SUMMARY OF ARGUMENT ..................................................................................2

ARGUMENT .............................................................................................................4

I. The Decision Compounds the Damage the Designation Has Done to the Department's Credibility with Industry and the Public. ....................................................................................4

II. The Decision Exacerbates the Designation's Threat to the U.S.'s Military and Economic Advantage Over China. ...................................9

CONCLUSION .........................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*Anthropic PBC v. United States Department of War*, No. 26-cv-01996, __ F. Supp. 3d __, 2026 WL 2534714 (N.D. Cal. Aug. 27, 2026)....................... 5

*Greer v. Spock*, 424 U.S. 828 (1976) ................................................................ 4

## STATUTES

41 U.S.C. § 1327(b)(3)............................................................................... 12

41 U.S.C. § 4713 ........................................................................................ 2

41 U.S.C. § 4713(a) .................................................................................... 3

41 U.S.C. § 4713(b)(3)(B) ........................................................................... 8

41 U.S.C. § 4713(k)(2)................................................................................. 3

## OTHER AUTHORITIES

Emil Michael (@USWREMichael), X (Sept. 25, 2026), https://x.com/USWREMichael/status/2103523346092613665........................... 7

Fed. R. App. P. 29(a)(4)(E)........................................................................... 1

Fed. R. App. P. 40(b)(1)(A)........................................................................... 4

Fed. R. App. P. 40(b)(2)(D) ........................................................................ 3, 4

Kali Hays & Daniel Bush, *Pentagon Stops Using Anthropic AI Tools After Blacklisting Company, BBC Told*, BBC News (Oct. 5, 2026), https://www.bbc.com/news/articles/c5j9x9pr0240o ........................................... 5

Fatima Faisal Khan, *The Missing Middle: How to Close America's Deep-Tech Financing Gap in Strategic Competition with China*, Inst. for Sec. + Tech. (Oct. 2025), https://securityandtechnology.org/virtual-library/report/the-missing-middle/ ............................... 10

Scott Singer & Matt Sheehan, *China's AI Policy at the Crossroads: Balancing Development and Control in the DeepSeek Era*, Carnegie Endowment for Int'l Peace (July 17, 2025), https://carnegieendowment.org/research/2025/07/chinas-ai-policy-in-the-deepseek-era ........................................................................................10

*To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks (Sept. 6, 2022), https://warontherocks.com/to-support-and-defend-principles-of-civilian-control-and-best-practices-of-civil-military-relations/.................. 4-5

## GLOSSARY

| | |
|---|---|
| Add. | Addendum to Petition for Panel Rehearing or Rehearing En Banc |
| AI | artificial intelligence |
| App. | Merits Appendix |
| IST | The Institute for Security and Technology |

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*[1]

*Amici* have a strong interest in this case that lies at the intersection of significant civilian military authorities and technological advancements, national security, and global stability.

*Amicus* former Secretary of Defense Leon Panetta has directed the Nation's military through numerous armed conflicts and has managed countless relationships between the government and the private sector. He understands, through direct experience, the gravity and responsibility of deploying the Department of War's ("Department") most severe sanctions, including those designed to safeguard national security, and he is uniquely positioned to speak to the need to do so in a manner that protects the credibility of the Department in the eyes of industry and the public.

*Amicus* the Institute for Security and Technology ("IST") is a critical action think tank dedicated to the development of trustworthy technologies that advance national security and global stability. IST has been especially focused on the impact of the American developers of Artificial Intelligence ("AI") on global stability, and the interaction between those developers and government actors. IST has developed

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

a special expertise in AI security and the need to maintain American leadership in AI over China.

*Amici* filed a brief in support of petitioner at the panel stage, Brief of Former Secretary of Defense Leon Panetta and the Institute for Security and Technology as *Amici Curiae* in Support of Petitioner (Apr. 22, 2026), Doc. No. 2169951 ("Panetta & IST Br."), and submit a brief again because the panel decision compounds the harms *amici* identified there.

## SUMMARY OF ARGUMENT

The Department of War's decision to designate American AI company Anthropic PBC ("Anthropic") a supply chain risk under 41 U.S.C. § 4713 is a clear misuse of an authority designed to protect government systems from genuine threats to national security. It is a reactive gesture that threatens to upend the stability of the government's relationship with its private sector partners—a stability on which American military and economic power depend.

A divided panel upheld this designation. The majority found "no reason to doubt" Anthropic's "noble intentions," Add.28, and had "no quarrel" with the Northern District of California's finding that Anthropic acted with no bad motive, Add.30. Nonetheless, it sustained the designation, holding that a supply chain risk "turns on *what* Anthropic does, not *why* Anthropic does it." Add.28. And what Anthropic did, according to the majority, is "manipulate" the "function, use, or

operation" of its AI model by requiring privacy- and safety-based limitations on that use. *Id.*

Section 4713 has historically been deployed sparingly, but under the majority's interpretation it is transformed into an expansive procurement authority available to every Executive agency. *See* 41 U.S.C. § 4713(a). It reaches every provider of information technology, not only AI developers, and not only military contractors. *Id.* § 4713(k)(2). The panel's decision will govern *every* future exercise of that authority and resolves a dispute over "the appropriate military uses of an almost unimaginably powerful new technology." Add.43. It therefore presents a question of "exceptional importance" meriting rehearing. Fed. R. App. P. 40(b)(2)(D).

Moreover, the majority's reasoning is flawed for many reasons, including those Anthropic's petition and Judge Henderson's dissent highlight. *Amici* write to describe two significant consequences of the panel decision they are uniquely positioned to address. First, the decision compounds the damage the designation has done to the Department's standing as a trustworthy institution and contracting counterparty, by permitting the Department to brand a concededly well-intentioned American company a threat to national security. Second, the decision deepens the designation's threat to the U.S. AI ecosystem and to American leadership in AI, because it treats any guardrails on AI models as themselves a supply chain risk and

injects governmental volatility into the country's AI landscape. These consequences will make the United States—and the world—less safe.

## ARGUMENT

Rehearing en banc is warranted where a proceeding "involves one or more questions of exceptional importance," and panel rehearing where the panel "overlooked or misapprehended" a "point of law or fact." Fed. R. App. P. 40(b)(1)(A), (b)(2)(D). This case easily meets both standards.

When the Department designated Anthropic as a supply chain risk, its justification was pretextual. The panel did not credit Secretary Hegseth's accusation that Anthropic is a hostile party, but it sustained the designation on a reading of the statute under which no such accusation is needed. Far from protecting U.S. national security, the decision exacerbates the impact of the lawless designation on the Department's credibility and on American AI leadership.

### I. The Decision Compounds the Damage the Designation Has Done to the Department's Credibility with Industry and the Public.

The credibility of the Department and our Armed Forces depends on political neutrality and commitment to the rule of law. *See Greer v. Spock*, 424 U.S. 828, 839 (1976) (noting "American constitutional tradition of a politically neutral military establishment under civilian control"); *To Support and Defend: Principles of Civilian Control and Best Practices of Civil-Military Relations*, War on the Rocks, para. 15 (Sept. 6, 2022) (open letter signed by Secretary Panetta) ("Military and

civilian leaders must be diligent about keeping the military separate from partisan political activity.”).

If the Department takes significant action that falls outside the bounds of authority conferred by Congress—particularly decisions that appear motivated by political retribution or animus—it risks upending public trust in the military and the decisions of its civilian leaders. The designation here was driven by the Department’s animus toward Anthropic and desire to retaliate against the company for refusing to lift use restrictions on its AI models. *See* App.153 (President excoriating Anthropic as a “RADICAL LEFT, WOKE COMPANY” filled with “Leftwing nut jobs”); App.77 (Secretary Hegseth accusing Anthropic of “a cowardly act of corporate virtue-signaling that places Silicon Valley ideology above American lives”); *see also Anthropic PBC v. U.S. Dep’t of War*, No. 26-cv-01996, __ F. Supp. 3d __, 2026 WL 2534714, at *25-26 (N.D. Cal. Aug. 27, 2026) (concluding the Department’s “proffered reasons appear pretextual”); Kali Hays & Daniel Bush, *Pentagon Stops Using Anthropic AI Tools After Blacklisting Company, BBC Told*, BBC News (Oct. 5, 2026), https://www.bbc.com/news/articles/c5j9x9pr0240o (reporting that the Pentagon continued to use Anthropic models “throughout the whole period of the controversy” over the designation and as recently as late September 2026). The Department’s reaction was not only unjustified but also wildly disproportionate; the Department bypassed the many ordinary tools at the

government's disposal to terminate or scale back its relationships with contractors. *Amici* earlier explained how the designation undermines public trust in the military and its civilian leaders, confidence in future supply chain risk designations, and industry's willingness to partner with the military. Panetta & IST Br. 12-16.

The majority opinion exacerbates each of those harms. First, the majority refused to read Section 4713 to require any showing of "intentional hostility or bad motive" before a company may be designated a supply chain risk. Add.24. It thereby severed the designation from any finding that a company is hostile to the United States or intends its systems any harm. Any agency may now designate as a supply chain risk any company whose "noble intentions" are not in doubt. Add.28. A label that fits an honest American contractor as readily as a company beholden to a hostile foreign government tells industry and the public nothing about who actually endangers U.S. national security. And, as *amici* explained at the panel stage, if the public does not have confidence in the government's supply chain designations, private citizens and businesses may not follow the government's lead in severing ties to companies and technologies that pose legitimate risks. Panetta & IST Br. 13-14.

Second, the decision tells every contractor that Section 4713 is now a lever the government may pull in procurement negotiations rather than a considered judgment about national security. As Judge Henderson explained in her dissent,

under the majority's reading, "a contractor's honest and upfront enforcement of restrictions on a covered article's use disfavored by the government" now gives rise to a supply chain risk. Add.51. And it does not matter "if the restrictions are ones the Department has already agreed to." Add.50. Every contractor now faces "a choice: Agree to the Secretary's demands or risk being designated a national security threat." *Id.* The Department embraced this reading the day the decision issued: Under Secretary Michael announced that "no private company will insert their opinions in the chain of command."[2]

The designation has generated unpredictability in the procurement landscape—and, as *amici* explained in their earlier brief, unpredictability is bad for business. The majority opinion is far worse: Companies now know that the government may coerce compliance with its preferred uses of covered articles, generating even more unpredictability. A company that can be branded a national security threat for insisting on terms the Department itself once accepted has no way to know whether it can both supply the Department and maintain its ethical—or any other—commitments. Many will not even try to navigate this uncertainty, and the Department could find itself cut off from the most capable AI systems precisely as such systems become most consequential to military operations. *See* Panetta & IST

[2] Emil Michael (@USWREMichael), X (Sept. 25, 2026), https://x.com/USWREMichael/status/2103523346092613665.

Br. 14 (citing industry concerns that misuse of supply-chain designation authorities could "undermine the government's access to the best-in-class products and services from American companies" (citation omitted)).

Third, the majority erased the line between ordinary procurement tools and Section 4713's extraordinary designation authority. The decision reasoned that Anthropic would have suffered no "less of a stigma" from "conventional contract-termination authorities" than from a "clean break" under Section 4713. Add.32-33. But a conventional termination requires no finding about national security. A Section 4713 designation requires—indeed, turns on—the agency's view that the counterparty poses a risk to national security, and is designed to prompt other agencies and private companies to sever ties from the company, as well. Congress recognized that difference when it required the Secretary to determine that "less intrusive measures" are not "reasonably available." 41 U.S.C. § 4713(b)(3)(B). That requirement unmistakably directs the Department to designate supply chain risks under this authority sparingly, judiciously, and only when absolutely necessary for reasons of national security—not for punitive reasons or to achieve more dramatically what it could already have achieved through standard procurement authorities. The majority nonetheless accepted the government's argument that a designation limited to systems plausibly involving lethal autonomous warfare or mass surveillance would not be feasible because AI models are layered into other

applications. Add.32-33. But if the Department's aim is to stop using Anthropic's models altogether, the infeasibility of a narrower designation is a reason to use standard procurement authorities, not Section 4713. The Department can terminate contracts, decline to exercise options under them, or deem a contractor no longer responsible—for reasons as varied as cost overruns, shifting strategic priorities, or other performance failures—all without declaring a contractor a threat to the United States. Panetta & IST Br. 9-10. The panel decision never explains why the Department could not have done that here.

The Department cannot make a company change its product or its values, but it can decide, with few restrictions, that company or its product is not right for the military. By erasing the line between those ordinary tools and Section 4713's extraordinary authority, the panel has made it easier for the Department to deploy the designation punitively and in a manner that undermines its credibility as a national institution and a reliable counterparty. Whether an authority designed to protect national security may be turned against an American company whose intentions the panel concedes are noble, at that cost, is a question of exceptional importance.

## II. The Decision Exacerbates the Designation's Threat to the U.S.'s Military and Economic Advantage Over China.

The United States is engaged in a high-stakes AI competition with China, the outcome of which will have profound consequences for American military and

economic strength. China understands these stakes and has invested accordingly, and although the United States remains ahead in technical capabilities, Beijing is catching up. Panetta & IST Br. 16-18. Washington's advantage comes not from out-spending or out-planning Beijing, but from maintaining a flourishing private sector, governed by stable and predictable rules, that drives technological innovation at scale. *See* Fatima Faisal Khan, *The Missing Middle*, Inst. for Sec. + Tech. at 32-33 (Oct. 2025). What China cannot replicate is the stability of the relationship in the United States between the public and private sectors, which allows companies to innovate, commercialize, and grow without fear of interference or reprisal. *See* Scott Singer & Matt Sheehan, *China's AI Policy at the Crossroads: Balancing Development and Control in the DeepSeek Era*, Carnegie Endowment for Int'l Peace (July 17, 2025). This stability and predictability is why the world's leading frontier AI models—including Anthropic's Claude—are American.

The panel decision strikes directly at this source of strategic advantage. In the majority's view, Anthropic's model training is the supply chain risk. Because of that training, the majority reasoned, there is "not only a 'risk'—but a certainty" that Anthropic will "manipulate" Claude's design. Add.24. The statutory text, the majority said, "perfectly describes" Anthropic's training of Claude, Add.25; "Anthropic can and does program Claude's behavior with each new model it delivers to Department contractors" and necessarily "retains the ability to 'alter system

guardrails and model weights,'" Add.23 (citation omitted). And because the Department "cannot utilize AI systems that remain trapped in amber," Add.22, every new or updated model presents the risk anew.

On this logic, every frontier developer that builds specific features into its models—for safety *or any other* reason—is a potential supply chain risk whenever those features diverge from the Secretary's preferences. Because all AI models have training and guardrails of many kinds, *any* AI company that contracts with a federal agency faces this risk. This result is the very kind of state leverage that an AI company might expect in China but long had no reason to fear in the United States.

*Amici* warned at the panel stage that the designation of Anthropic signals that doing business in the United States is risky, and that frontier AI labs should take their business elsewhere. The designation is a live demonstration of what foreign AI purchasers fear: that reliance on American AI exposes them to the shifting and mercurial impulses of the U.S. Executive Branch. Panetta & IST Br. 19-20. The majority has now made that demonstration binding precedent. And if Silicon Valley is at the mercy of the U.S. government, foreign countries will be more likely to adopt Chinese AI or build their own sovereign capabilities—an outcome that would run directly counter to U.S. national security interests.

The designation has already done great damage to the American AI marketplace. Left standing, the panel decision ensures more will follow, including

because no other court may review a Section 4713 designation. 41 U.S.C. § 1327(b)(3). Responsible AI development will become a liability rather than a strategic asset. And the narrow advantage the United States now enjoys in the most important geopolitical competition of our age will be squandered—and may never be recovered. Few questions are of more exceptional importance than that.

## CONCLUSION

For the foregoing reasons, the Court should grant panel rehearing or rehearing en banc.

Respectfully submitted,

Dated: October 20, 2026

/s/ Matthew B. Klapper
Matthew B. Klapper
Anjali Motgi
Elizabeth Deutsch
Andrew Cherry
Simon Chin
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
mklapper@jenner.com
amotgi@jenner.com
edeutsch@jenner.com
acherry@jenner.com
schin@jenner.com

*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

## CERTIFICATE OF COMPLIANCE

1. I hereby certify that this brief complies with the length limits set forth in Federal Rule of Appellate Procedure 29(b)(4) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 2,582 words.

2. I further certify that this brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5)(A) and with the type-style requirements set forth in Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using 14-point Times New Roman font in Microsoft Office Word 365.

Dated: October 20, 2026

/s/ Matthew B. Klapper
Matthew B. Klapper
*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*

## CERTIFICATE OF SERVICE

On October 20, 2026, I caused this brief to be electronically filed with the Clerk of this Court via the CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished through that system.

Dated: October 20, 2026

/s/ Matthew B. Klapper
Matthew B. Klapper
*Counsel for Amici Curiae Leon Panetta and the Institute for Security and Technology*