Nos. 26-1049 and 26-1162

United States Court of Appeals
for the District of Columbia Circuit

ANTHROPIC PBC,
Petitioner,
v.
UNITED STATES DEPARTMENT OF WAR AND
PETER B. HEGSETH, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF WAR,
Respondents.

On Petitions for Review of Agency Action
of the Department of War

Proposed Brief of Amici Curiae

Center for AI and Digital Policy (CAIDP),
International Association for Safe and Ethical AI (IASEAI),
and
Interdisciplinary Scholars in AI, Law, Economics, and Governance
in Support of Petitioner's Petition for Rehearing En Banc

MARC ROTENBERG
IVAN K. FONG
CHRISTABEL RANDOLPH
CENTER FOR AI AND DIGITAL POLICY
(CAIDP)
1100 13th St. NW, Suite 800
Washington DC 20005
+1 202 415 6788
rotenberg@caidp.org
*Counsel for Amici Curiae*

## Certificate as to Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1), proposed amici curiae certify as follows:

### A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in Petitioner Anthropic PBC's Petition for Panel Rehearing or Rehearing En Banc, except for the proposed amici identified below:

Center for AI and Digital Policy (CAIDP);

International Association for Safe and Ethical AI (IASEAI);

Daron Acemoglu;

Gillian K. Hadfield;

Margaret Hu;

Stuart Russell; and

Joseph E. Stiglitz.

CAIDP is an independent nonprofit research and advocacy organization that promotes artificial intelligence policies protecting fundamental rights, democratic institutions, and the rule of law. IASEAI is an independent nonprofit association that brings together researchers and practitioners to advance safe and ethical artificial intelligence. Neither organization has a parent company, and no publicly held company has a 10% or greater ownership interest in either organization.

The individual amici appear in their individual capacities, with institutional affiliations stated for identification purposes only.

**B. Rulings Under Review**

The ruling at issue is the panel opinion issued September 25, 2026, in *Anthropic PBC v. United States Department of War*, Nos. 26-1049 and 26-1162. References to the ruling under review appear in Petitioner Anthropic PBC's Petition for Panel Rehearing or Rehearing En Banc.

**C. Related Cases**

These consolidated cases were previously before the panel of this Court in *Anthropic PBC v. United States Department of War*, Nos. 26-1049 and 26-1162, resulting in the panel opinion issued September 25, 2026.

Counsel for proposed amici are unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## Table of Contents

Certificate as to Parties, Rulings, and Related Cases............................................1

Table of Authorities....................................................................................3

Glossary......................................................................................................4

Interest of Amici Curiae..............................................................................5

Summary of Argument.................................................................................7

Argument.....................................................................................................8

I. Section 4713 requires a distinction between product design and supply-chain interference.............................................................................................8

II. AI engineering distinguishes safety specifications, capability limitations, and interference with system integrity......................................................9

III. The identified operational concerns do not establish the missing statutory predicate...............................................................................................12

IV. The statutory distinction has exceptional importance for AI governance.....14

Conclusion...................................................................................................15

Certificate of Compliance............................................................................17

Certificate of Service...................................................................................18

## Table of Authorities

*Cases*

*Fischer v. United States*, 603 U.S. 480 (2024).............................................7, 8

*Statutes*

41 U.S.C. § 1327(b)(2)(A)........................................................................15

41 U.S.C. § 4713(k)(6)............................................................7, 9, 12, 15

*Other Authorities*

David Dalrymple et al., *Towards Guaranteed Safe AI: A Framework for Ensuring Robust and Reliable AI Systems*, arXiv:2405.06624v3, §§ 3.1, 3.3 (July 8, 2024) ........................................................................................................ 9

Dylan Hadfield-Menell & Gillian Hadfield, *Incomplete Contracting and AI Alignment*, arXiv:1804.04268, abstract (Apr. 12, 2018)....................................11

Marc Rotenberg, *Regulatory Inversion: When Private AI Governance Exceeds State Constraints*, 3 Journal of AI Law and Regulation 1–4 (2026)...................15

Yoshua Bengio et al., *Managing Extreme AI Risks amid Rapid Progress*, arXiv:2310.17688v3, abstract (May 22, 2024), published in Science, doi:10.1126/science.adn0117..........................................................................13

## Glossary

| | |
|---|---|
| CAIDP | Center for AI and Digital Policy |
| IASEAI | International Association for Safe and Ethical AI |

## Interest of Amici Curiae

The Center for AI and Digital Policy (CAIDP) promotes artificial intelligence policies that protect human rights, democratic values, and the rule of law. CAIDP's comparative research, policy source materials, and legal advocacy connect technical design choices with public accountability. CAIDP has a direct interest in preserving the distinction between responsible safety engineering and interference with the integrity of government technology.

The International Association for Safe and Ethical AI (IASEAI) brings together researchers and practitioners to advance safe and ethical AI. IASEAI's interdisciplinary expertise includes AI alignment, safety specifications, verification, and governance. Stuart Russell, a CAIDP board member and IASEAI president, and researchers involved in IASEAI's founding, including Yoshua Bengio and Gillian Hadfield, have published scholarship directly relevant to that distinction.

**Interdisciplinary Scholars in AI, Law, Economics, and Governance**

**Daron Acemoglu,** Institute Professor of Economics at the Massachusetts Institute of Technology and recipient of the 2024 Nobel Memorial Prize in Economic Sciences. He is co-author, with Simon Johnson, of *Power and Progress: Our Thousand-Year Struggle Over Technology and Prosperity* (PublicAffairs, 2023).

**Gillian K. Hadfield,** Bloomberg Distinguished Professor of AI Alignment and Governance at Johns Hopkins University and an internationally recognized scholar of law, economics, and AI governance. She previously served as a Senior Policy Advisor to OpenAI and has written extensively on the institutional governance of advanced AI.

**Margaret Hu**, Davison M. Douglas Professor of Law and Director of the Digital Democracy Lab at William & Mary Law School, Chair of the Advisory Committee to the American Bar Association Standing Committee on Law and National Security, and author of *AI Law and Policy* (Aspen Publishing, 2026).

**Stuart Russell**, OBE, FRS, Distinguished Professor of Computer Science at the University of California, Berkeley and President of the International Association for Safe and Ethical AI. Professor Russell is the co-author, with Peter Norvig, of *Artificial Intelligence: A Modern Approach*, the standard textbook in the field of artificial intelligence, used at more than 1,500 universities in 135 countries.

**Joseph E. Stiglitz**, University Professor at Columbia University and recipient of the 2001 Nobel Memorial Prize in Economic Sciences. He is a former Chairman of the President's Council of Economic Advisers and former Chief Economist of the World Bank, and is one of the world's leading scholars of information economics and market regulation.

Proposed amici submit this brief pursuant to D.C. Circuit Rule 40(f), subject to the Court's invitation, as requested in their concurrently filed motion.

Amici offer a focused contribution: the technical and governance significance of distinguishing disclosed operating constraints from the supply-chain interference described by Congress. They rely on published research to illuminate the statute and on the existing record for case-specific facts.[1]

**Summary of Argument**

Anthropic's petition explains why the panel majority's interpretation of 41 U.S.C. § 4713(k)(6) conflicts with the statutory text and governing precedent, including *Fischer v. United States*, 603 U.S. 480 (2024). Judge Henderson's dissent reaches a similar conclusion. Amici address a related question requiring technical expertise: whether ordinary model training and disclosed safety specifications are properly understood as the kind of "manipulat[ion]" Congress placed alongside sabotage, malicious introduction of unwanted functions, and data extraction. They should not be treated as such, without more. AI engineering distinguishes among a system's operating specification, its performance or

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than amici, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

capability limitations, and interference with the integrity of the system. The panel's interpretation risks collapsing those distinct concepts.

The technical literature supplies a concrete reason for preserving that distinction. Safety constraints may define an AI system's intended operation; they are not necessarily alterations that compromise it. A refusal may reflect a specified safety boundary, an overbroad boundary, or a capability failure. Those possibilities raise different technical and procurement questions. Treating each as statutory manipulation eliminates distinctions essential to evaluating AI systems. The government may reject a model it considers unsuitable for its mission. But procurement suitability and the statutory predicate for supply-chain exclusion remain different questions. Rehearing is warranted to preserve that distinction.

## Argument

### I. Section 4713 requires a distinction between product design and supply-chain interference

Anthropic's petition explains why the residual phrase "otherwise manipulate" must be read in light of the conduct Congress placed beside it: sabotage, malicious introduction of unwanted functions, and extraction of data. Pet. 11–14; see *Fischer v. United States*, 603 U.S. 480, 487–90 (2024). Judge Henderson likewise concluded that the statutory terms describe intentionally subversive or deceptive interference. Dissent at 2–8.

Amici address the technical consequence of that construction. Every trained AI model reflects design choices about the responses it will and will not produce. Treating those choices themselves as statutory manipulation whenever an agency prefers different behavior would erase the distinction between a product with a specified operating scope and a product whose integrity has been compromised.

That distinction does not immunize AI developers or disclosed safety restrictions from § 4713. A supplier may engage in covered interference, including at the design stage, if the statutory predicate is established. But the existence or operation of a disclosed model constraint does not, by itself, establish the kind of interference Congress described. The technical inquiry therefore matters to application of the statutory text.

## II. AI engineering distinguishes safety specifications, capability limitations, and interference with system integrity

Research by Russell, Bengio, and their colleagues distinguishes between the specification of acceptable behavior and mechanisms for determining whether a system satisfies that specification. David Dalrymple et al., *Towards Guaranteed Safe AI: A Framework for Ensuring Robust and Reliable AI Systems*, arXiv:2405.06624v3, §§ 3.1, 3.3 (July 8, 2024). Their framework combines a world model, a safety specification, and a verifier. It illustrates a basic technical

point important here: reliable operation cannot be defined simply as producing whatever output a user requests.

The research does not establish that Claude implements that framework or possesses a formal safety guarantee. Its relevance is conceptual. *A safety specification describes intended behavior; capability concerns whether a system can reliably perform within that specification; interference concerns conduct that compromises the system or its operation.* Those concepts can overlap in particular circumstances, but they are not interchangeable. A system that declines an action outside its disclosed specification may be operating as designed even if the government considers that design unsuitable for its purposes. Procurement suitability therefore does not, without more, answer Congress's supply-chain question.

Consider an illustrative system that requires human authorization before an irreversible action. A request to act without authorization may be refused precisely because the system preserves its specified behavior. A covert modification that defeats authorized operation presents a different problem. Both involve engineering choices, but they present fundamentally different technical phenomena: the first is operation according to a specified constraint; the second is alteration that defeats authorized operation. The distinction illustrates why refusal behavior alone does not establish the statutory category of interference. These

illustrations do not establish facts about Claude. They expose the overbreadth of equating output denial with statutory manipulation.

The alignment literature also explains why a contractual instruction cannot supply a complete technical specification. Dylan Hadfield-Menell & Gillian Hadfield, *Incomplete Contracting and AI Alignment*, arXiv:1804.04268, abstract (Apr. 12, 2018), analyzes how incomplete contracts depend on external institutions and norms to supply omitted terms. Amici draw a limited inference: an all-lawful-uses contract does not itself establish that a model can reliably recognize lawful requests, resolve uncertain contexts, or execute them safely. Contractual permission and technical assurance are distinct. Legal authorization to perform a task, technical capability to perform it, and a safety specification governing whether the model will attempt it are three different propositions.

This distinction is relevant to the dissent's concern about a supplier enforcing restrictions previously agreed to by the government. Dissent at 7–8. A technical operating boundary does not cease to be a design specification because the reasons for adopting it include legal, ethical, or policy judgments. The government may negotiate another boundary or procure another product. The statutory question remains whether the supplier presents the specified risk of interference, rather than simply whether the government prefers different operating parameters.

## III. The identified operational concerns do not establish the missing statutory predicate

First, the record distinguishes the operation of a model already delivered to the Department from the development of a later model version. The opinion reports that Anthropic cannot access, alter, or shut down a model after deployment on the Department's classified systems. Maj. Op. 18, 20–23 (citing App. 274–78). A refusal produced by that deployed model therefore reflects the operation of the delivered system; it is not an exercise of continuing remote control by the supplier. That does not foreclose the possibility of design-stage interference. It identifies a technically different mechanism that must be analyzed on its own terms.

Second, after the Secretary clarified that his determination did not depend on real-time post-deployment access, the majority relied on restrictions incorporated into future model versions. Maj. Op. 22–23. But training, revising, and releasing successor models are ordinary features of AI development. A separately released future model version is ordinarily a distinct technical artifact, not a remote alteration of the already deployed model**.** Its design may of course create procurement concerns, and design-stage conduct could satisfy § 4713 if the statutory predicate is shown. But retaining a disclosed safety specification in a successor model does not itself transform ordinary model development into supply-chain manipulation.

Third, the opinion recounts refusals involving classified materials and infectious-disease research, together with Anthropic's account that engineers resolved those issues with government stakeholders. Maj. Op. 18–19. The majority treated the episodes as proof that training effectively enforces use restrictions. That shows the existence and consequential operation of constraints. It does not establish the kind of manipulation Congress specified. A defective safety boundary and covert interference can require different remedies even when both interrupt a task.

Finally, opacity cuts both ways. The majority acknowledged that models can respond differently to differently worded requests. Maj. Op. 21. That uncertainty warrants careful assurance; it does not demonstrate that removing constraints will produce reliably correct responses. Bengio, Russell, Hadfield, and coauthors describe the need for technical safety work alongside adaptive governance as increasingly capable systems present misuse and control risks. Yoshua Bengio et al., *Managing Extreme AI Risks amid Rapid Progress*, arXiv:2310.17688v3, abstract (May 22, 2024), published in *Science*, doi:10.1126/science.adn0117. Amici infer that unrestricted availability of outputs cannot substitute for assurance of their reliability.

Amici do not ask the Court to decide which model or safeguards the Department should purchase. Nor do they claim predeployment testing provides

complete assurance. The point is narrower: operational uncertainty cannot replace the statutory showing of a particular kind of supply-chain interference. Judge Henderson's contextual reading preserves that threshold while leaving the Department substantial authority to select products suited to its mission.

**IV. The statutory distinction has exceptional importance for AI governance**

The panel's interpretation has consequences beyond the treatment of a single vendor. Modern AI governance increasingly depends on developers identifying safety boundaries, documenting them, testing whether systems observe them, and disclosing relevant limitations to users and regulators. A legal rule under which a model's operation according to a disclosed safety boundary may itself constitute evidence of a national-security 'supply chain risk' changes those incentives.

The concern is not that private developers should determine military policy or that self-described safety measures must be accepted by government purchasers. They need not be. *The concern is that treating an openly specified safeguard as statutory manipulation merely because the government objects to the boundary may discourage developers from making safety constraints explicit, predictable, and auditable.* It may instead reward systems whose limitations are less clearly specified or whose developers make fewer commitments about how those systems will behave.

CAIDP scholarship describes the broader governance problem that arises when private safeguards exceed government requirements. Marc Rotenberg, *Regulatory Inversion: When Private AI Governance Exceeds State Constraints*, 3 Journal of AI Law and Regulation 1–4 (2026). The point is not to make private companies final arbiters of public policy. It is that *safety engineering and supply-chain compromise are different phenomena, and legal rules should preserve the ability to distinguish between them.*

Congress expressly provided judicial review for actions not in accordance with law. 41 U.S.C. § 1327(b)(2)(A). Respect for the Executive's national-security assessments does not dispense with identifying the category of conduct Congress authorized it to address. The panel recognized independent review of purely legal construction. Maj. Op. 16. Rehearing would permit the full Court to consider the statutory boundary with the benefit of the technical distinctions among safety specifications, performance limitations, and interference with system integrity**.**

## Conclusion

The Court should grant rehearing en banc. The technical distinctions described above reinforce Judge Henderson's conclusion that the panel's interpretation of § 4713(k)(6) sweeps beyond the category of supply-chain interference Congress defined.

Respectfully submitted,

/s/ Marc Rotenberg
Marc Rotenberg
Ivan K. Fong
Christabel Randolph
October 20, 2026

**Certificate of Compliance**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because it contains 2,187 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Marc Rotenberg
Marc Rotenberg
October 20, 2026

## Certificate of Service

I certify that on October 20, 2026, I electronically filed the foregoing proposed brief with the Clerk of the Court using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Marc Rotenberg
Marc Rotenberg
October 20, 2026