Case No. 26-1049

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**ANTHROPIC PBC**

*Petitioner,*

*v.*

**U.S. DEPARTMENT OF WAR, et al.**

*Respondents.*

---

On Petition for Review of a Notice of the Department of War
Under 41 U.S.C. § 4713

---

**CORRECTED *AMICI CURIAE* BRIEF IN SUPPORT OF
EN BANC PETITION**

---

**KLUBES LAW GROUP**
Benjamin B. Klubes
bklubes@klubeslaw.com
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054

**HANSON BRIDGETT LLP**
Matthew F. Miller
mmiller@hansonbridgett.com
Arezoo Jamshidi
ajamshidi@hansonbridgett.com
Patrick Burns
pburns@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
(415) 777-3200

*Attorneys for Amici Curiae*
Catholic Moral Theologians and Ethicists

# TABLE OF CONTENTS

**PAGE**

DISCLOSURE STATEMENT ........ 1
CORRECTED BRIEF OF AMICI CURIAE IN SUPPORT OF PETITIONER'S OPENING BRIEF ........ 2
INTRODUCTION AND INTEREST OF AMICI ........ 2
ARGUMENT ........ 6
CONCLUSION ........ 13
CERTIFICATE OF COMPLIANCE AND SERVICE ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

*Pope Francis Warns of "Technological Dictatorship" From Artificial Intelligence*, CNN, https://www.cnn.com/2023/12/14/tech/pope-francis-ai- warning-technological-dictatorship (Dec. 14, 2023)....................8

VATICAN, https://www.vatican.va/content/benedict-xvi/en/encyclicals/documents/hf_ben-xvi_enc_20071130_spe-salvi.html........................................................................................ 14

VATICAN, https://www.vatican.va/content/catechism/en/part_three/section_two/chapter_two/article_8/iv_respect_for_the_truth.html (last visited Mar. 13, 2026) ..........................................................................8

VATICAN, https://www.vatican.va/content/leo-xiv/en/encyclicals/documents/20260515-magnifica-humanitas.html ........................................................................ 10, 13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and Circuit Rules 26.1 and 28(a)(1)(A), the *Amici* declare they are individuals and have nothing to disclose.

Dated: October 21, 2026

*/s/ Benjamin B. Klubes*
Benjamin B. Klubes
bklubes@klubeslaw.com
KLUBES LAW GROUP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054

Matthew F. Miller
mmiller@hansonbridgett.com
Arezoo Jamshidi
ajamshidi@hansonbridgett.com
Patrick Burns
pburns@hansonbridgett.com
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, California 94105
(415) 777-3200

*Attorneys for Amici Curiae*
Catholic Moral Theologians and Ethicists

## CORRECTED BRIEF OF AMICI CURIAE IN SUPPORT OF PETITIONER'S OPENING BRIEF

## INTRODUCTION AND INTEREST OF AMICI

Amici curiae, Charles Camosy, Joseph Vukov, Brian Patrick Green, Michael Baggot, Jana Bennett, Christine Hinze, Jason Eberl, William Cavanaugh, Julie Hanlon Rubio, Maria Morrow and Patrick Clark (the "Catholic Moral Theologians and Ethicists"), are scholars of Catholic moral theology, philosophy, and social thought who have written extensively on questions of human dignity, moral responsibility, and the ethical limits of technology.[1] They submit this brief to offer the Court a perspective grounded in a longstanding moral tradition that bears directly on the issues raised by this action, while remaining attentive to the factual record and the technical realities of modern artificial intelligence.[2]

---

[1] The views expressed in this brief are solely those of the amici curiae. The Catholic Moral Theologians and Ethicists submit this brief in their individual capacities and do not purport to represent or speak for the broader Catholic Church.

[2] No person or entity other than the Catholic Moral Theologians and Ethicists and their counsel authored or made any monetary contribution to the preparation of this brief. Fed. R. App. P. 29(a)(4)(E).

This case arises from a narrow but consequential dispute about whether a developer of advanced AI systems may maintain principled limits on certain uses of its technology—specifically, lethal autonomous weapons and mass surveillance of Americans.

The government sought to deploy Petitioner Anthropic PBC's ("Anthropic") AI models for "all lawful purposes" without exception. Anthropic agreed to that request in substantial part, offering to permit all lawful uses subject to only two limited exclusions. As explained by Anthropic's co-founder and Chief Science Officer, Dr. Jared Kaplan, those exclusions reflect the company's technical judgment that current AI systems are not yet sufficiently reliable, interpretable, or controllable to be entrusted with decisions that directly take human life without human oversight, or to conduct population-scale surveillance in environments where errors, bias, or misuse could cause irreversible harm.

Central to Anthropic's approach is what it describes as "Constitutional AI," which reflects the company's effort to train and evaluate advanced AI systems against a set of clearly articulated principles. Under this approach, Anthropic's AI models are designed to

avoid harm, respect persons, privacy, and the limits of machine decision-making. As Anthropic explains, this emphasis achieves preeminence in settings where technical safeguards alone cannot fully address the risk and harms of misuse—such as classified environments, large-scale deployments, or systems that operate with a degree of autonomy beyond continuous human supervision. In those contexts, defined normative boundaries are intended to serve as an additional safeguard where direct human oversight is necessarily limited.

The two usage limitations at issue in this case—the exclusion of lethal autonomous weapons and mass surveillance of Americans—flow directly from that framework. They reflect Anthropic's assessment that, at the current stage of AI development, delegating decisions that directly implicate human life or pervasive monitoring to machine systems risks severing moral responsibility from human judgment in ways that existing legal and technical controls cannot adequately remedy.

Recently, a panel of this Court decided in favor of the government, acknowledging Anthropic's "noble intentions" but nonetheless endorsing the government's labeling of it as a supply chain risk.

Anthropic now seeks rehearing of this matter *en banc*. The Catholic Moral Theologians and Ethicists support Anthropic's *en banc* petition and submit this brief to assist the Court by emphasizing the social and moral importance of this issue and articulating the implications of AI assisted mass surveillance and autonomous warfare.

Long before the advent of artificial intelligence, the Catholic tradition has wrestled with similar underlying concerns related to morality and ethics. That tradition has consistently emphasized that decisions affecting human life, freedom, and dignity must remain the responsibility of human actors, and that not every technically feasible or legally permissible use of a tool is therefore appropriate.

The Catholic Moral Theologians and Ethicists have worked with people of different faiths—and of no faith—on a central matter of shared and longstanding concern: when technology is capable of violating life, dignity, and freedom, it is reasonable to draw clear boundaries around its use. Those boundaries reflect caution, not defiance, and responsibility rather than obstruction.

## ARGUMENT

The Catholic Moral Theologians and Ethicists submit the following views to explain why they believe the Church's moral traditions bear directly on the specific questions presented by Anthropic's refusal to permit certain uses of its AI technology:

**Catholic Moral Theologians and Ethicists' Position:**

1. Catholic Moral Theologians and Ethicists support this brief not because of any general partiality to Anthropic as a company nor because of the broader goals of AI development it shares with other companies. Indeed, many of them have different views about the goods that are achievable by AI, and the direction of AI development that Anthropic—together with many other companies—shares. Rather, the Catholic Moral Theologians and Ethicists affix their names as Catholic moral theologians and ethicists because they believe the Church's moral vision offers support for Anthropic's particular stand against the Department of War on the matters of (1) mass domestic surveillance and (2) the creation and use of AI-enabled autonomous weapons. In these matters, the Catholic Moral Theologians and Ethicists applaud

Anthropic for its principled ethical stance on AI use by the Department.

**On Mass Domestic Surveillance:**

2. The Catholic Moral Theologians and Ethicists are aligned with Anthropic's insistence that AI ought not be used for mass domestic surveillance. This stance is based on several Catholic teachings, including Catholic teachings about privacy. Catholic teaching on the appropriate level of privacy for personal communications is related to its understanding of communication more generally.[3] The Catechism of the Catholic Church asserts: "No one is bound to reveal the truth to someone who does not have the right to know it." In 2023, Pope Francis likewise insisted that the world needs an international treaty to regulate AI, especially with the rise of what he called "a surveillance society."[4]

3. This understanding of privacy grows from the Church's teaching about the dignity of the human person, a core teaching of the

---

[3] *Catechism of the Catholic Church* ¶¶ 2464–2513, VATICAN, https://www.vatican.va/content/catechism/en/part_three/section_two/chapter_two/article_8/iv_respect_for_the_truth.html (last visited Mar. 13, 2026).

[4] *Pope Francis Warns of "Technological Dictatorship" From Artificial Intelligence*, CNN, https://www.cnn.com/2023/12/14/tech/pope-francis-ai-warning-technological-dictatorship (Dec. 14, 2023).

Church's social doctrine, and one the Catholic Church shares with many other theological and philosophical traditions. Human dignity grounds individual human rights and is also inherently relational. It thus preserves human relationships as a sacred space, and guards communications within those relationships. Personal communication, in short, finds its ultimate end in the good of human relationships, which are in turn grounded in the dignity of the human person. For the government (and especially the military) to intrude in this space, and use private communications for some other end, undermines the good of human relationships and ultimately, the dignity of persons involved in those relationships. It is a totalitarian government which treats humans as mere objects, and human relationships as mere sources of data – moves that are characteristic of "the technocratic paradigm" warned against in Catholic thought.

4. Privacy is not an absolute right in Catholic teaching nor in the more general theological and philosophical frameworks the Catholic Moral Theologians and Ethicists endorse. Yet mass surveillance by the Department of War clearly oversteps privacy as described in Catholic

thought, and would, more generally, amount to a clear violation of human dignity.

5. In addition to concerns about privacy, the Catholic principle of subsidiarity (Pope Leo XIV, *Magnifica Humanitas*)[5] also opposes the idea of mass surveillance. Subsidiarity supports the idea that decisions and oversight should be handled by the smallest, most local competent body—families, communities, cities, regions, states—those closest to the people affected. In *Magnifica Humanitas*, Pope Leo XIV spells this out further: "the role of individuals, families, local communities and intermediary organizations should not be supplanted by higher-level authorities. Moreover, higher-level institutions must recognize, protect and promote the freedom and creativity of lower-level entities, coordinating their contributions so that they can cooperate effectively for the common good" (*Magnifica Humanitas*, §68). Mass surveillance works against subsidiarity by concentrating power to monitor and judge individuals in the hands of a remote central authority. This shift of power, from the local to the central, harms human agency—including

[5] *Pope Leo XIV, Magnifica Humanitas* (May 15, 2026), VATICAN, https://www.vatican.va/content/leo-xiv/en/encyclicals/documents/20260515-magnifica-humanitas.html

that of law enforcement and others closest to the communities where people live. This shift risks disempowering individuals, who are in danger of being caught up in AI-driven Kafkaesque bureaucracy which knows nothing of their concrete daily existence. It also undermines state and local governments, which are not only more likely to understand context better than a distant AI, but which must also live with the effects of these actions. Additionally, centralized surveillance can act as a steppingstone towards totalitarianism, which the Church absolutely opposes due to its threats to human dignity.

6. For the reasons articulated in paragraphs (2-5), the Catholic Moral Theologians and Ethicists therefore stand alongside Anthropic in its opposition to the use of AI to carry out such mass surveillance.

**On Lethal Autonomous Weapons Systems:**

7. The Catholic Moral Theologians and Ethicists also support Anthropic's stance against the use of AI by the federal government in lethal autonomous weapons systems that select and engage targets without meaningful human oversight. In a previous version of this brief, we articulated this stance in reference to the Church's longstanding teachings on just war theory. Since writing that brief, Pope Leo XIV

released the encyclical *Magnifica Humanitas*, which asserts that just war theory is "now outdated" (§192). However, the encyclical also speaks clearly and directly against the use of lethal autonomous weapons, asserting "it is not permissible to entrust lethal or otherwise irreversible decisions to artificial systems" (§198). And again: "the decision to use lethal force cannot be delegated to opaque or automated processes, but must remain under effective, self-aware and responsible human control" (§200). The encyclical provides several reasons for this stance, among them the idea that "moral judgment cannot be reduced to calculation, for it involves conscience, personal responsibility and the recognition of the other as a person" (§192). Put succinctly: the decision to deploy any lethal weapon is a moral decision; moral decisions require features including "conscience, personal responsibility and the recognition of the other as a person"; and AI cannot be characterized by these features. Hence, fully autonomous lethal weapons are in principle not morally licit.

8. In addition to this line of reasoning, other reasons buttress the Catholic Moral Theologians and Ethicists stand against lethal autonomous weapons, grounded in broader ethical considerations that

go beyond distinctively Catholic thought. Lethal autonomous weapons problematically obscure human agency, dangerously shifting responsibility away from human decision-makers to machines (see *Magnifica Humanitas* §200). They accelerate the already rapid military decision-making processes, perhaps to the point of eliminating even the possibility of human involvement. They circumvent the kind of practical judgment and careful decision-making that should inform all human decisions, and especially those that involve matters of life and death. The Catholic Moral Theologians and Ethicists could go on—there are myriad objections to lethal autonomous weapons. As Catholic moral theologians and ethicists, they take the reasons articulated by the Church--and most recently, in *Magnifica Humanitas*--to be authoritative. Yet they also find other objections, including those articulated in this paragraph, to be important considerations as well.

9. The Catholic Church thus stands against autonomous weapons on principle (see paragraphs 7 and 8). In this way, the Catholic Moral Theologians and Ethicists' stance on lethal autonomous weapons is more strident than Anthropic's, which is based on its understanding of the current limitations of the technology. They nevertheless agree

with Anthropic that (setting aside any disagreements about the permissibility of pursuing lethal autonomous weapons in principle) the present state of the technology makes it highly imprudent to use for autonomous targeting in current conflicts.

## CONCLUSION

In his encyclical Spe Salvi, Pope Benedict XVI warned that "progress, seen accurately, is progress from the sling to the atom bomb. [...] Without doubt, it offers new possibilities for good, but it also opens up appalling possibilities for evil—possibilities that formerly did not exist. We have all witnessed the way in which progress, in the wrong hands, can become and has indeed become a terrifying progress in evil. If technical progress is not matched by corresponding progress in man's ethical formation, in man's inner growth (cf. Eph 3:16; 2 Cor 4:16), then it is not progress at all, but a threat for man and for the world."[6]

Anthropic, in the lines it has drawn for the use of its products on domestic mass surveillance and autonomous weapons systems, sought

[6] *Pope Benedict XVI, Spe Salvi* (Nov. 30, 2007), VATICAN, https://www.vatican.va/content/benedict-xvi/en/encyclicals/documents/hf_ben-xvi_enc_20071130_spe-salvi.html.

to uphold minimal standards of ethical conduct for technical progress. In doing so, Anthropic was acting as a responsible and moral corporate citizen, not as a threat to the safety of the American supply chain. Accordingly, this Court should grant Anthropic's request for en banc review.

Dated: October 21, 2026

*/s/ Benjamin B. Klubes*
Benjamin B. Klubes
bklubes@klubeslaw.com
KLUBES LAW GROUP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054

Matthew F. Miller
mmiller@hansonbridgett.com
Arezoo Jamshidi
ajamshidi@hansonbridgett.com
Patrick Burns
pburns@hansonbridgett.com
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, California 94105
(415) 777-3200

*Attorneys for Amici Curiae*
Catholic Moral Theologians and Ethicists

## CERTIFICATE OF COMPLIANCE AND SERVICE

I certify that this brief complies with the length limits and typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d) and 32(a)(5)–(6) as it contains 2166 words and was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

On October 21, 2026, I filed this proposed brief with the Clerk of this Court via the CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished through that system.

Dated: October 21, 2026

*/s/ Benjamin B. Klubes*
Benjamin B. Klubes
bklubes@klubeslaw.com
KLUBES LAW GROUP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054

*Attorneys for Amici Curiae*
Catholic Moral Theologians and Ethicists