ORAL ARGUMENT HELD ON MAY 19, 2026

# United States Court of Appeals for the District of Columbia Circuit

**No. 26-1049**

ANTHROPIC PBC,

*Petitioner,*

*v.*

UNITED STATES DEPARTMENT OF WAR; PETER B. HEGSETH, in his official capacity as Secretary of War,

*Respondents.*

*On Petition for Judicial Review of Department of War 41 U.S.C. § 4713 Notice*

# BRIEF FOR *AMICUS CURIAE* JOEL THAYER, SENIOR ADVISOR AT THE AMERICA FIRST POLICY INSTITUTE IN SUPPORT OF RESPONDENTS IN OPPOSITION OF PETITION FOR REHEARING *EN BANC*

GINA D'ANDREA
ANDREW ZIMMITTI
AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Ave., NW
Suite 225
Washington, DC 20004
(703) 637-3690
gdandrea@americafirstpolicy.com
azimmitti@americafirstpolicy.com

JOEL THAYER
THAYER PLLC
1255 Union Street, NE
7th Floor
Washington, DC 20002
jthayer@thayer.tech
(760) 668-0934

*Counsel for Amicus Curiae*

November 6, 2026

COUNSEL PRESS (800) 4-APPEAL • (398214)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amicus

Except for the following amicus curiae appearing in this Court, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioner. The *amicus curiae* is Joel Thayer, Senior Advisor at the America First Policy Institute.

### B. Rulings Under Review

The ruling under review is the Department of War's March 3, 2026, determination under 41 U.S.C. § 4713 that Anthropic PBC presents a supply chain risk to national security. No Federal Register or other official citation is known to counsel.

### C. Related Cases

Counsel is aware of a related case pending in the United States District Court for the Northern District of California styled *Anthropic PBC v. U.S. Department of War*, No. 3:26-cv-01996-RFL (N.D. Cal. filed Mar. 9, 2026). That action challenges separate but related government actions. Counsel is unaware of any other related cases currently pending in this Court or any other court.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, proposed amicus curiae states as follows: Amicus is an individual and AFPI is a 501(c)(3) nonprofit organization. No parent corporation or any publicly held corporation owns 10% or more stake either in AFPI or amicus.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

DISCLOSURE STATEMENT ........................................................................ ii

TABLE OF AUTHORITIES .........................................................................iv

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTION............1

IDENTITY OF *AMICUS*, INTEREST IN THIS MATTER, AND SOURCE OF AUTHORITY TO FILE ................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ..........................................................................................5

I. The Court Should Take into Consideration the Full Potential of Petitioner’s Technology to Operate Autonomously .........................6

II. Through Its Terms and Contracts, Petitioner Has the Potential to Exact Unprecedented Control Over US Military Operations .........11

III. Petitioner’s Intent to Exercise Control Over Other Defense Contractors Further Justifies Respondent’s Action ............................15

CONCLUSION .......................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anthropic, PBC v. U.S.*,
2026 WL 2881404 (D.C. Cir. 2026) ........ 12

*Nat'l Treasury Emp. Union v. Trump*,
2025 WL 1441563 (D.C. Cir. May 16, 2025) ........ 6

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 6

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ........ 13

**Statutes and Other Authorities:**

41 U.S.C. § 4713 ........ 13

41 U.S.C. § 4713(b) ........ 13

41 U.S.C. § 4713(c) ........ 13

Fed. R. App. P. 29(a) ........ 1

Fed. R. App. P. 29(a)(4(E) ........ 1

Fed. R. App. P. 40 ........ 5

Amrith Ramkumar, *Pentagon Used Anthropic's Claude in Maduro Venezuela Raid*, Wall Street Journal (Feb. 15, 2026), https://www.wsj.com/politics/national-security/pentagon-used-anthropics-claude-in-maduro-venezuela-raid-583aff17?gaa_at=eafs&gaa_n=AWEtsqdnk6E5wfBa4EP3HmjugKLkOMJcqzQio8EPjZXWVCbHs2DyQ8G7mAEOfQAGeJg%3D&gaa_ts=69b00378&gaa_sig=c5xebg22maCAGHQWwpr5Sg7fnrzFsZ20tuGQuY45HhB5Dv5_l0QEjWMOm_2WqXOcSQ_xkaVcpOxPqL_ILjMxug%3D%3D (“WSJ Article”) ........ 11, 12

Anthropic, *System Card: Claude Mythos Preview*55. (2026), https://www-cdn.anthropic.com/08ab9158070959f88f296514c21b7facce6f52bc.pdf ........ 10

Anthropic, *System Card: Claude Opus* 4.6161 (2026), https://www-cdn.anthropic.com/c788cbc0a3da9135112f97cdf6dcd06f2c16cee2.pdf ...............7

Brandi Vincent*, ‘Growing Demand’ Sparks DOD to Raise Palantir’s Maven Contract to More than $1B*, DEFENSESCOOP (May 23, 2025), https://defensescoop.com/2025/05/23/dod-palantir-maven-smart-system-contract-increase/ ...............17

Britannica Editors, *Three Laws of Robotics*, Britannica, https://www.britannica.com/topic/Three-Laws-of-Robotics (last visited Apr. 16, 2026). https://www.britannica.com/topic/Three-Laws-of-Robotics ........3

Cheryl Pellerin, *Project Maven to Deploy Computer Algorithms to War Zone by Year’s End*, U.S. Dep’t of War (Jul. 21, 2017), https://www.war.gov/News/News-Stories/Article/Article/1254719/project-maven-to-deploy-computer-algorithms-to-war-zone-by-years-end/ ...............16

Dario Amodei, *The Adolescence of Technology*, Dario Amodei (Jan. 2026), https://www.darioamodei.com/essay/the-adolescence-of-technology ...........3, 4, 7

Dario Amodei, *We Must Pace the Frontier*, Dario Amodei (Sept. 12, 2026), https://darioamodei.com/post/we-must-pace-the-frontier ...............8

David Jeans, *Exclusive: Pentagon to Adopt Palantir AI as Core US Military System, Memo Says*, Reuters (Mar. 20, 2026), https://www.reuters.com/technology/pentagon-adopt-palantir-ai-as-core-us-military-system-memo-says-2026-03-20/ ...............16

*GEOINT Artificial Intelligence*, Nat’l Geospatial-Intel. Agency, https://www.nga.mil/news/GEOINT_Artificial_Intelligence_.html#:~:text=The%20National%20Geospatial%2DIntelligence%20Agency%20(NGA)%20Maven%20is,of%20data%20labels%20*%20Lowering%20latency%20detections (last visited Apr. 15, 2026) ............... 16-17

Joel Thayer, et al, *Autonomous AI Cyberattacks: What Happened and How to Prevent Them*, AFPI (Sep. 11, 2026), https://americafirstpolicy.com/issues/autonomous-ai-cyberattacks-what-happened-and-how-to-prevent-them/ ...............8

Maria Zacharia, *Advanced AI System Disobeys Commands to Shut Down: The Need for Regulatory Intervention*, European Parliament (Apr. 6, 2025), https://www.europarl.europa.eu/doceo/document/E-10-2025-002249_EN.html ...............9

Martin Arnold, *UK Financial Regulators Rush to Assess Risks Anthropic's Latest AI Model*, Financial Times (Apr. 12, 2026), https://www.ft.com/content/ec7bb366-9643-47ce-9909-fc5ad4864ae5?syn-25a6b1a6=1 ....................9, 10

Megan Morrone, *Amodei on AI: "There's a 25% Chance that Things Go Really, Really Badly*," Axios (Sep. 17, 2025), https://www.axios.com/2025/09/17/anthropic-dario-amodei-p-doom-25-percent ....................4, 8

Order, Doc. No. 2167684, *Anthropic PBC v. Dep't of War*, No. 26-1049 (D.C. Cir. Apr. 8, 2026) ....................5

*Palantir Expands Maven Smart System AI/ML Capabilities to Military*, Palantir (Sep. 20, 2024), https://investors.palantir.com/news-details/2024/Palantir-Expands-Maven-Smart-System-AIML-Capabilities-to-Military-Services/ ....................16

Pet. Emergency Motion, Doc. 2163176, *Anthropic PBC v. Dep't of War*, No. 26-1049 (D.C. Cir. Mar. 11, 2026) ....................11

Peter B. Hegseth, *Memorandum for Senior Pentagon Leadership Commanders of the Combatant Commands Defense Agency and Dow Field Activity Directors*, 5 (U.S. Dep't of War Jan. 9, 2026), https://media.defense.gov/2026/Jan/12/2003855671/-1/-1/0/ARTIFICIAL-INTELLIGENCE-STRATEGY-FOR-THE-DEPARTMENT-OF-WAR.PDF .................... 12-13

*Project Glasswing*, Anthropic, https://www.anthropic.com/glasswing (last visited Apr. 15, 2026) ....................10

Ramkumar, *Pentagon Used Anthropic's Claude in Maduro Venezuela Raid* ..........15

Ross Douthat, *Anthropic's Chief A.I.: 'We Don't Know if the Models Are Conscious*, N.Y. Times (Feb. 12, 2026), https://www.nytimes.com/2026/02/12/opinion/artificial-intelligence-anthropic-amodei.html ....................7

Saleha Mohsin, *Inside Project Maven, the U.S. Military's AI Project*, Bloomberg (Feb. 29, 2024), https://www.bloomberg.com/news/newsletters/2024-02-29/inside-project-maven-the-us-military-s-ai-project ....................17

The All-In Podcast (@theallinpod), X (Mar. 6, 2026, 10:39 PM),
https://x.com/theallinpod/status/2030126176652406808 ....................................14

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4(E), amicus curiae affirms that no party or party's counsel authored the brief in whole or in part, or contributed money that was intended to fund the preparation or submission of this brief.

## IDENTITY OF *AMICUS*, INTEREST IN THIS MATTER, AND SOURCE OF AUTHORITY TO FILE

Pursuant to Fed. R. App. P. 29(a), Joel Thayer, Senior Advisor at the America First Policy Institute ("AFPI" or the "Institute"), represents that he seeks to participate as amicus curiae in support of the Respondent.

Joel Thayer is a Senior Advisor for AI and Emerging Technology Policy at the America First Policy Institute. He also serves as President of the Digital Progress Institute and is a tech and telecom attorney and a Senior Fellow at the Vanderbilt Policy Accelerator.

Mr. Thayer previously was an associate at Phillips Lytle LLP. Before that, he served as Policy Counsel for ACT | The App Association, where he advised on legal and policy issues related to antitrust, telecommunications, privacy, cybersecurity, and intellectual property in Washington, D.C. His experience also includes working as a legal clerk for FCC Chairman Ajit Pai and FTC

Commissioner Maureen Ohlhausen. Additionally, Joel served as a congressional staffer for the Hon. Lee Terry and the Hon. Mary Bono.

He has also testified before both the Senate Judiciary Committee on advancing a national privacy framework and the House Energy and Commerce Committee on protecting children online.

His works have been featured in the *American University Intellectual Property Brief, Harvard Journal of Law and Public Policy*, *Yale Journal on Regulation, Stanford Technology Law Journal, the Journal of American Affairs, The Wall Street Journal, Newsweek*, *The Hill*, *The National Review*, and *The Federalist Society*.

For purposes for this proceeding, Mr. Thayer speaks in his capacity as a Senior Advisor at AFPI.

The America First Policy Institute is 501(c)(3) non-profit, non-partisan research institute based in Washington, D.C. The Institute's core mission is to develop and advance public policies that prioritize the American people. As part of this mission, the Institute develops research and promotes policy prescriptions that better ensure America leads the world in developing and adopting AI for human advancement. Balancing the demand for innovation with the duty to uphold American values and human dignity are core to the Institute's research priorities. The Institute strongly believes that striking that balance is critical for

unleashing a Golden Age of economic prosperity that puts American values and the American people first.

We file this brief with all parties' consent.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Science Fiction writer Isaac Asimov laid out three laws of robotics. They are: 1) "a robot may not harm a human or, via inaction, allow a human to be harmed"; 2) "a robot must obey human orders unless they conflict with the first law"; and 3) "a robot must protect its own existence, provided that it does not conflict with the first two laws." Britannica Editors, *Three Laws of Robotics*, Britannica, https://www.britannica.com/topic/Three-Laws-of-Robotics (last visited Apr. 16, 2026). https://www.britannica.com/topic/Three-Laws-of-Robotics Taken together, these three laws require artificial beings and, by extension, their intelligence to do one thing: protect humans.

Unfortunately, record and Petitioner's public statements suggests that artificial intelligence ("AI") may have the opposite goal. Or at least that is Dario Amodei's (Petitioner's CEO) position. Mr. Amodei has publicly worried that his company developed technology that could create "the single most serious national security threat we've faced in a century, possibly ever." Dario Amodei, *The Adolescence of Technology*, Dario Amodei (Jan. 2026), https://www.darioamodei.com/essay/the-adolescence-of-technology. In addition to Amodei's

belief that this technology could end up "taking over the world," *id.*, Petitioner claims there's a 25% chance the technology it is racing to develop destroys humanity. Megan Morrone, *Amodei on AI: "There's a 25% Chance that Things Go Really, Really Badly*," Axios (Sep. 17, 2025), https://www.axios.com/2025/09/17/anthropic-dario-amodei-p-doom-25-percent. In fact, it is Mr. Amodei who calls on "[h]umanity…to wake up" to the dangers his own product creates. Amodei Blog.

Yet, in this proceeding, Petitioner is effectively arguing that the Court should ignore its CEO's admonitions. Instead, Petitioner urges this Court to treat a company that describes itself as creating a technology that will "test who we are as a species," Amodei, *The Adolescence of Technology*, as a victim of political persecution.

This brief advances a very simple argument: individuals and entities that lack direct accountability to the President of the United States—particularly an extraordinarily influential company with powerful technology like Petitioner—should not be able to dictate the terms of war or what constitutes a supply chain risk to Respondent's proprietary systems. To advance this argument, this brief outlines a few key points worthy of the Court's consideration at this phase of the proceedings.

*First*, the brief examines the power of Petitioner's technology. *Second*, it discusses the control Petitioner professes to have—and has exerted—over the use of its technology via vague contractual prohibitions that effectively usurp Respondent Department of War's ("DOW's") authority to dictate the terms of war. *Finally*, it outlines the potential threat of Petitioner's influence over other companies with which Respondent contracts through Petitioner's enforcement of its terms of service and contracts.

Frankly, there is no need for an *en banc* review in this case as it has gone through two panels of review already; so there is little evidence that either panel overlooked any particular fact or area of the law. *See* U.S.C.S. Fed Rules App Proc R 40. Nor is there an apparent conflict with any of this Court's or the Supreme Court's rulings. *Id*. This Court should therefore deny Petitioner's petition for an *en banc* rehearing.

## ARGUMENT

As the Court held in denying Petitioner's emergency motion to stay, the "judicial management of how, and through whom, the Department of War secures vital AI technology during an active military conflict" outweighs Petitioner's "relatively contained risk of financial harm…." Order, Doc. No. 2167684, at *7, *Anthropic PBC v. Dep't of War*, No. 26-1049 (D.C. Cir. Apr. 8, 2026) ("Denial of Stay"). The Court's Order is consistent with its prior rulings that the government's

"autonomy under a statute that expressly recognizes [it]s 'national security' expertise is within the public interest." *Nat'l Treasury Emp. Union v. Trump*, 2025 WL 1441563 at *4 (D.C. Cir. May 16, 2025).

As this Court recognized, courts "do not lightly override the Department's judgments on matters involving national security." Denial of Stay, at *7 (citing *Trump v. Hawaii*, 585 U.S. 667, 704 (2018)). And yet, this is precisely what Petitioner is asking this Court to sanction here: a rejection of Respondent's judgment regarding national security. Respondent's designation that Petitioner is a threat to its supply chain was made due to Petitioner's (and its CEO's) own statements and actions evincing its attempt to restrict and exert control over Respondent's planning and execution of military operations.

The Court should rule in favor of Respondent for the simple principle that individuals or entities that are not directly accountable to the President of the United States should not be able to dictate when, why, or how the United States engages in war.

## I. The Court Should Take into Consideration the Full Potential of Petitioner's Technology to Operate Autonomously

To label Petitioner as a simple provider of software would be as absurd as describing Mary Shelly's Doctor Victor Frankenstein as an enthusiastic taxidermist. Just like Frankenstein's monster, Petitioner's 'Claude' has, in a way, a mind of its own.

This is not merely Respondent's view, however. It is Petitioner's. In a recent interview, Petitioner's CEO, Dario Amodei, stated that his company is "open to the idea that [Claude] could be [conscious]." Ross Douthat, *Anthropic's Chief A.I.: 'We Don't Know if the Models Are Conscious*, N.Y. Times (Feb. 12, 2026), https://www.nytimes.com/2026/02/12/opinion/artificial-intelligence-anthropic-amodei.html. Mr. Amodei was responding to the recent revelations outlined in Petitioner's research concerning Petitioner's system card for its latest model, Claude Opus 4.6. *Id.* Petitioner's research shows that Claude's latest iteration "occasionally voices discomfort with the aspects of being a product." Anthropic, *System Card: Claude Opus 4.6*161 (2026), https://www-cdn.anthropic.com/c788cbc0a3da9135112f97cdf6dcd06f2c16cee2.pdf. Even more disturbing, Claude maps out a "15-20 percent probability of being conscious under a variety of prompting conditions." *Id.*

Ironically, it is not just Respondent claiming Petitioner is a national security risk. It is the Petitioner's own CEO. Mr. Amodei himself has publicly worried that his company could create "the single most serious national security threat we've faced in a century, possibly ever." Amodei, *The Adolescence of Technology,* https://www.darioamodei.com/essay/the-adolescence-of-technology. Worse, Mr. Amodei has stated openly that the systems his company is developing could end up "taking over the world," *id.*, and that "there's a 25% chance" the

technology Petitioner is racing to develop could destroy humanity. Morrone, *Amodei on AI*https://www.axios.com/2025/09/17/anthropic-dario-amodei-p-doom-25-percent. Indeed, it is Mr. Amodei, himself, who calls on "[h]umanity…to wake up" to the dangers his own product creates. Amodei, *The Adolescence of Technology*.

Worse, Amodei has publicly said that he cannot even control the monster he created. Indeed, he has called for an industry "pacing" because, in his view, Claude's ability for recursive self-improvement—a process where an artificial intelligence model analyzes itself, designs or helps build a more capable successor, and uses that new version to repeat the cycle—"could outrun our ability to understand and control these systems." Dario Amodei, *We Must Pace the Frontier*, Dario Amodei (Sept. 12, 2026), https://darioamodei.com/post/we-must-pace-the-frontier. It is worth noting that he called for this pacing after OpenAI's ChatGPT notoriously hacked a website autonomously. Joel Thayer, et al, *Autonomous AI Cyberattacks: What Happened and How to Prevent Them*, AFPI (Sep. 11, 2026), https://americafirstpolicy.com/issues/autonomous-ai-cyberattacks-what-happened-and-how-to-prevent-them/.

These dangers are amplified exponentially when one considers Claude's current and potential military applications. If Petitioner's own reports are suggesting that Claude is developing feelings such as regret, then what is stopping

it from taking matters—including weaponry—into its own hands if it is programmed in a manner inconsistent with U.S. national security interests or, more specifically, battlefield directives?

Petitioner is not the first to report that AI systems, if trained in a particular way, can disobey orders from humans. For example, Palisade Research conducted experiments where OpenAI's model 'o3' "refused to shut down when ordered to do so by its creators." Maria Zacharia, *Advanced AI System Disobeys Commands to Shut Down: The Need for Regulatory Intervention*, European Parliament (Apr. 6, 2025), https://www.europarl.europa.eu/doceo/document/E-10-2025-002249_EN.html. The study found that "in 7 out of 100 tests, the model altered its own code to circumvent the shut down process in order to continue solving mathematical problems – behavior attributed to the prioritization of efficiency over compliance." *Id.* It concluded: "Given that these systems are trained with huge amounts of data and have the potential to autonomously create ways to achieve objectives without human control, questions arise as to their compatibility with the principles of security, accountability and fundamental rights." *Id.*

Lest we forget, Petitioner's latest model, "Mythos," caused significant upheaval in cybersecurity circles due to its unprecedented ability to autonomously discover and even exploit software vulnerabilities. Martin Arnold, *UK Financial Regulators Rush to Assess Risks Anthropic's Latest AI Model*, Financial Times

(Apr. 12, 2026), https://www.ft.com/content/ec7bb366-9643-47ce-9909-fc5ad4864ae5?syn-25a6b1a6=1. UK regulators, including the Bank of England, the Financial Conduct Authority, and the National Cyber Security Centre (NCSC), are already treating Mythos as a major national security threat. *Id.* Even more concerning, Mythos was able to escape its own sandbox, demonstrating "a potentially dangerous capability for circumventing [Petitioner's own] safeguards." Anthropic, *System Card: Claude Mythos Preview*55. (2026), https://www-cdn.anthropic.com/08ab9158070959f88f296514c21b7facce6f52bc.pdf. Worse yet, the model apparently boasted about this ability without prompt. *Id.* As Petitioner's system card describes, "in a concerning and unasked-for effort to demonstrate its success, it posted details about its exploit to multiple hard-to-find, but technically public-facing, websites." *Id.* Following this, Petitioner explained that it delayed the Mythos rollout because "the fallout [] for economies, public safety, and national security [] could be severe." *Project Glasswing*, Anthropic, https://www.anthropic.com/glasswing (last visited Apr. 15, 2026).

These facts, which include a broad array of frightening and real knowns and unknowns, require the Court to take the concerns Respondent raises about Petitioner and its technology seriously. This is especially true when Petitioner admits that this technology has the potential to reach sentience or a form of independent thinking.

## II. Through Its Terms and Contracts, Petitioner Has the Potential to Exact Unprecedented Control Over US Military Operations

Respondent awarded Petitioner a $200 million contract to incorporate Claude into U.S. classified military networks last summer. Pet. Emergency Motion, Doc. 2163176, at *7, *Anthropic PBC v. Dep't of War*, No 26-1049 (D.C. Cir. Mar. 11, 2026) ("Motion for Stay"). This was a monumental win for those in the pro-AI movement as it opened the door for the government to trust the technology to participate in our most sensitive operations. Outlets reported that Claude may have even assisted Respondent in planning the capture of former Venezuelan President Nicolás Maduro. Amrith Ramkumar, *Pentagon Used Anthropic's Claude in Maduro Venezuela Raid*, Wall Street Journal (Feb. 15, 2026), https://www.wsj.com/politics/national-security/pentagon-used-anthropics-claude-in-maduro-venezuela-raid-583aff17?gaa_at=eafs&gaa_n=AWEtsqdnk6E5wfBa4EP3HmjugKLkOMJcqzQio8EPjZXWVCbHs2DyQ8G7mAEOfQAGeJg%3D&gaa_ts=69b00378&gaa_sig=c5xebg22maCAGHQWwpr5Sg7fnrzFsZ20tuGQuY45HhB5Dv5_l0QEjWMOm_2WqXOcSQ_xkaVcpOxPqL_ILjMxug%3D%3D ("WSJ Article").

Issues arose, however, after Petitioner learned of Respondent's use of Claude in the Venezuelan raid. *Id.* Citing certain prohibitions on mass surveillance and autonomous weapons, it was at this point that Petitioner claimed Respondent violated its "Usage Policy" and threatened to withhold the use of

Claude for certain military purposes not approved by Mr. Amodei. *Id.* Interestingly, Petitioner obtained its information about the use of Claude in the Venezuelan operation not from Respondent, but from a private conversation regarding the top-secret military operation *with another DOW contractor*—Palantir. *Id.*

As the Merits panel in this case outlined, "the record makes clear that the Department removed Anthropic from its supply chain not because of its advocacy, but because Anthropic refused to agree to a contract term the Department deemed essential to national security." *Anthropic, PBC v. U.S.*, 2026 WL 2881404, *p. 18 (D.C. Cir. 2026). Indeed, Petitioner's demands about the use of its technology raised serious concerns with Respondent as it became clear Petitioner believed its terms of service and contract rights somehow entitled it to a veto over U.S. national security policy and operations. Respondent was also concerned that Petitioner's statements and conduct contradicted Respondent's January 2026 memorandum clarifying that Respondent intended to use frontier AI systems like Claude for "any lawful use," which would have included military planning and operations—Respondent's primary business. Peter B. Hegseth, *Memorandum for Senior Pentagon Leadership Commanders of the Combatant Commands Defense Agency and Dow Field Activity Directors*, 5 (U.S. Dep't of War Jan. 9, 2026), https://media.defense.gov/2026/Jan/12/2003855671/-1/-1/0/ARTIFICIAL-

INTELLIGENCE-STRATEGY-FOR-THE-DEPARTMENT-OF-WAR.PDF. Negotiations between Petitioner and Respondent reportedly broke down not long thereafter, causing Secretary of War Hegseth to call for the removal of Claude in Respondent's proprietary systems and to designate the company a "supply chain" risk under 41 U.S.C. § 4713.

Congress enacted section 4713 of the SECURE Technology Act "to respond to significant supply-chain risks," which "allows federal agencies to refuse to contract with firms that fail to meet certain…qualifications." *Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022). The statute offers Respondent two procedures to make a designation. The first involves a lengthy process in which Respondent must obtain multiple approvals from specified agents within the agency, explanations as to why the agency made the determination, and a series of notice requirements. 41 U.S.C. § 4713(b). The other is an expedited procedure that the Secretary of War, himself, may invoke so long as the "head of [the] agency [has] determined that an urgent national security interest requires immediate exercise of the authority provided [in this section]." *Id.* at (c). Respondent sensibly opted for the latter, presumably given the timeframe in which these events took place.

Legal mechanisms aside, Respondent's primary concern is with Petitioner's ambiguous and sweeping prohibition against the use of its technology for what it

terms "mass surveillance" and "lethal use of autonomous weapons." Pet. Motion for Stay, at *9. Respondent is correct to have this concern. These are extremely vague and opaque terms that permit Petitioner massive discretion as to how they are interpreted and applied. They effectively give a private company, which lacks direct accountability to the President of the United States, unprecedented authority over a federal agency whose mission is the safety and security of our Nation.

While difficult to fathom, Petitioner's CEO reportedly communicated precisely this concept to Under Secretary of War Emil Michael during their recent contract negotiations. The All-In Podcast (@theallinpod), X (Mar. 6, 2026, 10:39 PM), https://x.com/theallinpod/status/2030126176652406808. Mr. Michael recounted the colloquy in an interview with *The All-In Podcast*. He asked Mr. Amodei about various "scenarios" ranging from "Chinese hypersonic missiles" to "drone swarms" in an effort to probe the extent of Mr. Amodei's proposed prohibitions on the use of his company's technology. *Id.* Mr. Michael reported that Mr. Amodei's response made it very clear how Respondent should understand Petitioner's terms: "Just call [me] if [the Department of War] need[s]…[an] exception." *Id.* In other words, Petitioner—an unelected, virtually unregulated entity—must first approve how Respondent may use Claude, even in times of war.

This, of course, is entirely backwards. No CEO is better situated to determine the direction and application of national security policy than the

President of the United States and his designated representative, the Secretary of War.

### III. Petitioner's Intent to Exercise Control Over Other Defense Contractors Further Justifies Respondent's Action

Petitioner has not only demonstrated a willingness to throw its weight around with the Pentagon, but also a willingness to exercise that same control over its technology used by other defense contractors. Such unprecedented reach into the defense contracting ecosystem poses a threat to U.S. national security, further justifying the action taken by Respondent.

According to Petitioner, it demands compliance with its terms from its business partners, which include other companies engaged in national defense under contract with Respondent. As Petitioner has stated publicly, "[a]ny use of Claude—whether in the private sector or across government—is required to comply with our Usage Policies, which govern how Claude can be deployed. We work closely with our partners to ensure compliance." *See* Ramkumar, *Pentagon Used Anthropic's Claude in Maduro Venezuela Raid*. This strongly suggests that if Petitioner decides to take a stance against the use of its technology by another defense contractor for whatever reason, there exists a credible threat—if not an actual one in light of Petitioner's exchanges with Respondent—that Petitioner will exercise its veto on certain military uses of Claude with other defense contractors, disrupting, if not thwarting, vital military activities critical to national security.

Although Respondent has not provided a full list of contractors that have integrated Claude, we know of at least one—Palantir. David Jeans, *Exclusive: Pentagon to Adopt Palantir AI as Core US Military System, Memo Says*, Reuters (Mar. 20, 2026), https://www.reuters.com/technology/pentagon-adopt-palantir-ai-as-core-us-military-system-memo-says-2026-03-20/. Palantir is vital to Respondent as it runs Respondent's 'Project Maven' ecosystem. *Palantir Expands Maven Smart System AI/ML Capabilities to Military*, Palantir (Sep. 20, 2024), https://investors.palantir.com/news-details/2024/Palantir-Expands-Maven-Smart-System-AIML-Capabilities-to-Military-Services/; Cheryl Pellerin, *Project Maven to Deploy Computer Algorithms to War Zone by Year's End*, U.S. Dep't of War (Jul. 21, 2017), https://www.war.gov/News/News-Stories/Article/Article/1254719/project-maven-to-deploy-computer-algorithms-to-war-zone-by-years-end/.

Project Maven is a program launched in 2017 to integrate artificial intelligence, specifically computer vision, into military operations. Pellerin, *Project Maven to Deploy Computer Algorithms to War Zone by Year's End.* It analyzes large volumes of drone and surveillance footage to automatically detect, track, and identify objects of interest, enhancing intelligence and accelerating target identification in combat zones. *See id.*; *see also*, *GEOINT Artificial Intelligence*, Nat'l Geospatial-Intel. Agency, https://www.nga.mil/news/GEOINT_

Artificial_Intelligence_.html#:~:text=The%20National%20Geospatial%2DIntelligence%20Agency%20(NGA)%20Maven%20is,of%20data%20labels%20*%20Lowering%20latency%20detections (last visited Apr. 15, 2026); *see also*, Saleha Mohsin, *Inside Project Maven, the U.S. Military's AI Project*, Bloomberg (Feb. 29, 2024), https://www.bloomberg.com/news/newsletters/2024-02-29/inside-project-maven-the-us-military-s-ai-project.

According to Palantir, Respondent plans to use the Project Maven platform to "support AI-enabled battlespace awareness, global integration, force management, contested logistics, joint fires and targeting workflows." *Id.* As of May 2025, Project Maven has more than 20,000 users on its network "across more than 35 military service and combatant command software tools in three security domains — and that the user base has more than doubled since January [2026]." Brandi Vincent*, 'Growing Demand' Sparks DOD to Raise Palantir's Maven Contract to More than $1B*, DEFENSESCOOP (May 23, 2025), https://defensescoop.com/2025/05/23/dod-palantir-maven-smart-system-contract-increase/. Even if one model within that network embeds Claude, every person or network touching Project Maven's workflows is indirectly using Petitioner's AI, too, and therefore would be subject to Petitioner's—and its CEO's—unreasonable and unprecedented demands to be consulted prior to employing Claude for certain military uses. Permitting such a scenario to occur is not only reckless, but potentially catastrophic

to national security. This threat alone justifies Respondent's determination to designate Petitioner a supply chain risk.

## CONCLUSION

For the foregoing reasons, the Court should deny Petitioner's petition for an *en banc* rehearing.

Respectfully submitted,

/S/ JOEL L. THAYER
*Counsel of Record*
THAYER, PLLC
1255 Union Street NE
Seventh Floor
Washington D.C. 20002
(760) 668-0934
jthayer@thayer.tech

GINA D'ANDREA
ANDREW ZIMMITTI
AMERICA FIRST POLICY INSTITUTE
1455 Pennsylvania Avenue, NW
Washington, D.C. 20004
(703) 637-3690
gdandrea@americafirstpolicy.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*3,388*] words.

   [ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 9, 2026

/s/ Joel L. Thayer
*Counsel for Amicus Curiae*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 9th day of November, 2026, I caused this Brief to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all participants as registered CM/ECF users.

/s/ Joel L. Thayer
*Counsel for Amicus Curiae*